UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) Crim. No. 99-10371-RGS |
|  | ) |
| v. | ) Violations: |
|  | ) 18 U.S.C. § 1962(d) |
| KEVIN P. O'NEIL, | ) 18 U.S.C. § 1962(c) |
| JAMES J. BULGER, and | ) 18 U.S.C. § 1963 |
| STEPHEN J. FLEMMI, | ) 18 U.S.C. § 1956(a)(1) |
|  | ) 18 U.S.C. § 1956(h) |
| Defendants. | ) 18 U.S.C. § 1957 |
|  | ) 18 U.S.C. § 1951 |
|  | ) 18 U.S.C. § 1503 |
|  | ) 18 U.S.C. § 982 |
|  | ) 26 U.S.C. § 5841 |
|  | ) 26 U.S.C. § 5845(a) |
|  | ) 26 U.S.C. § 5861(d) |
|  | ) 26 U.S.C. § 5871 |
|  | ) 18 U.S.C. § 2 |

SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY in and for the District of

Massachusetts charges that:

COUNT ONE
(Racketeering Conspiracy)

THE ENTERPRISE

1.    From in or before 1972 and continuing until in or about

1999, within the District of Massachusetts and elsewhere, the

defendants **JAMES J. BULGER**, also known as "Whitey," "Jim," and

"Jimmy," **STEPHEN J. FLEMMI**, also known as "Stevie," and **KEVIN P.

O'NEIL**, and others known and unknown to the grand jury, were

members and associates of a criminal organization known by

various names such as "Winter Hill," "the Hill," "the Winter Hill

Gang," and "South Boston" (hereinafter the "Bulger Group") whose

members and associates associated together and with others for

the purpose of, among other things, earning money through extortion, loansharking, bookmaking, trafficking in narcotics and other controlled substances, and committing crimes of violence including murder, attempted murder, and assault.

2.   The Bulger Group, including its leadership, membership, and associates, constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, which engaged in, and the activities of which affected, interstate and foreign commerce. The Bulger Group affected interstate and foreign commerce by, among other things, the sale of narcotics and other controlled substances in Massachusetts and elsewhere that had been brought into Massachusetts from places outside thereof, the extortion of individuals and entities whose activities affected interstate commerce, the control and operation of businesses affecting interstate commerce, the use of financial institutions affecting interstate commerce, and travel in interstate commerce.

3.   At various times during the period covered by this Superseding Indictment, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI** were the leaders of the Bulger Group.  At various times during the period covered by this Superseding Indictment, the defendant **KEVIN P. O'NEIL** was a member of the Bulger Group who engaged in criminal activities, including

2

extortion and money laundering, with and at the behest of leaders of the Bulger Group.

4.   The Bulger Group formed in or about 1972 as a result of a merger of two South Boston criminal groups and one criminal group based in Somerville, Massachusetts.  The two South Boston criminal groups, one known as the Mullins Gang and another led by two brothers, Donald and Kenneth Killeen, had waged a shooting war for preeminence in South Boston in which the ranks of both groups had been decimated.  The defendant **JAMES J. BULGER**, who was aligned with the Killeen brothers, requested that Howard T. Winter, the leader of the Somerville criminal group, intercede to end the fighting in South Boston.  Winter agreed and the remnants of the two South Boston groups were merged into one group led by **BULGER**.  **BULGER** and his South Boston criminal associates subsequently associated themselves with Winter's Somerville group.  The resulting criminal organization became colloquially known as the Winter Hill Gang.  The Winter Hill Gang engaged in criminal activity throughout the Boston area and elsewhere.

5.   The principal members of the Winter Hill Gang included Howard T. Winter, James L. Sims, Joseph M. McDonald, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, and John V. Martorano.  In approximately 1976, Sims and McDonald became fugitives from federal charges relating to the theft and interstate transportation of stolen rare stamps.  In

3

approximately 1978, Winter was incarcerated as a result of a conviction on state extortion charges.  In late 1978, Martorano became a fugitive in anticipation of his indictment on federal racketeering charges.  Martorano remained a fugitive until 1995, when he was apprehended in Florida.  Consequently, by approximately 1979, **BULGER** and **FLEMMI** assumed control of the activities of this criminal organization, referred to herein as the Bulger Group, and maintained that control through 1999. During this period, South Boston was the primary base of operations for this organization, which continued to operate throughout the Boston area and elsewhere.

<u>GOALS AND PURPOSES OF THE ENTERPRISE</u>

6.    The primary goals and purposes of the Bulger Group included the following:

a.    Generating money for members and associates of the enterprise through extortion, loansharking, bookmaking, and the sale and distribution of narcotics and other controlled substances;

b.    Preserving and protecting the enterprise's territories, operations, and profits through the use of violence and threats of violence;

c.    Promoting and enhancing the prestige, reputation, and position of the enterprise with respect to rival criminal

4

organizations, victims, and members of the public through the use
of violence and threats of violence;

   d. Intimidating and punishing members, workers, and
associates of the enterprise who had fallen into disfavor or who
had failed to remain loyal to the leadership of the enterprise;
and

   e. Protecting the enterprise and its members from
criminal prosecution through efforts to obstruct justice,
including the use of violence and threats of violence against
potential witnesses.

MEANS AND METHODS OF THE ENTERPRISE

   7. To further their goal of generating money for the
enterprise, members and associates of the Bulger Group extorted
money from persons generating illegal income, including persons
engaged in the distribution of narcotics and other controlled
substances, in bookmaking, and in loansharking.  In order to
operate their illegal businesses without reprisals or
interference from the Bulger Group, drug dealers, bookmakers and
loansharks were required to make regular payments to the Bulger
Group.  These payments were commonly known as "rent."  Such
payments were made to representatives of the Bulger Group both
according to regular schedules and in the form of lump sums,
sometimes referred to as "fines," paid on one or several
occasions.

8.   To further their goal of generating money for the
enterprise, members and associates of the Bulger Group also
extorted money and other things of value from persons engaged in
commercial activities, such as the operation of taverns, liquor
stores, and real estate and lending transactions, and from
persons who otherwise had access to large amounts of funds.

9.   To further their goal of generating money for the
enterprise, members and associates of the Bulger Group also
engaged in income-generating criminal businesses, including
bookmaking and loansharking operations and wholesale and retail
trafficking in narcotics and other controlled substances.
Ordinarily, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**
delegated the operation of these criminal businesses to other
members and associates of the Bulger Group from whom they
collected a share of the proceeds of these illegal activities.

10.   The locations in which members and associates of the
Bulger Group frequently met for the purposes of planning and
conducting their criminal activities included among others, at
various times, Marshall Motors (also known as Motorama Sales,
Inc.), located at 12 Marshall Street, Somerville, Massachusetts,
the Lancaster Foreign Car Service Garage, located at 19 Lancaster
Street, Boston, Massachusetts, the South Boston Liquor Mart (also
known as Stippo's Liquor Mart and Columbia Wine and Spirits),
located at 295 Old Colony Avenue in South Boston, Massachusetts,

6

the Rotary Variety Store (also known as the Rotary Video Store

and South Boston Check Cashing), located at 309-325 Old Colony

Avenue in South Boston, Massachusetts, and Triple-O's Lounge,

located at 28 West Broadway in South Boston, Massachusetts.   The

defendants **JAMES J. BULGER**, **STEPHEN J. FLEMMI** and **KEVIN P.**

**O'NEIL**, were, at various times, among the owners, operators, and

employees of the South Boston Liquor Mart, the Rotary Variety

Store, and the parcels of real property on which they were

located.   The defendant **KEVIN P. O'NEIL** was, at various times,

among the owners and operators of Triple-O's Lounge.

11.  Members and associates of the Bulger Group engaged in

financial transactions with the proceeds of the Bulger Group's

criminal activities, many of which were designed, in whole or in

part, to disguise the nature and sources of those proceeds and

the relationships of members and associates of the Bulger Group

to those assets, and to shield those proceeds from seizure and

forfeiture by law enforcement authorities.   For example, between

approximately 1984 and 1999, members and associates of the Bulger

Group, including the defendants **JAMES J. BULGER**, **STEPHEN J.**

**FLEMMI**, and **KEVIN P. O'NEIL**, attempted to conduct and conducted a

series of financial transactions involving the South Boston

Liquor Mart, the real property at 295 Old Colony Avenue on which

the South Boston Liquor Mart was located, the real property

adjacent to the South Boston Liquor Mart at 309-325 Old Colony

7

Avenue, and the Rotary Variety Store located within 309-325 Old
Colony Avenue.  These transactions were designed to facilitate
the control of, and acquisition of income from, those assets by
members of the Bulger Group, while disguising their true
relationships to those assets and that the assets had been
obtained, maintained, and operated through extortion and with the
proceeds of extortion and other racketeering activities.

12.  To further their goals of earning money and gaining
prestige within the Bulger Group, as well as to protect members
of the Bulger Group, to preserve and enhance the reputation and
position of the Bulger Group with respect to others, and to
foster and maintain the Bulger Group's relationships with others,
members and associates of the Bulger Group engaged in the
threatened and actual use of violence, including assault,
attempted murder and murder.  These activities included, but were
not limited to, the following:

a.  In or about and between March 1973 and February
1974, at various locations in the District of Massachusetts and
elsewhere, members and associates of the Bulger Group including
**JAMES J. BULGER**, John V. Martorano, Joseph M. McDonald, James L.
Sims, and others known and unknown to the grand jury, assaulted
and murdered the following individuals in connection with a
dispute with members of a rival group led by Al Notorangeli:

(1)  Michael Milano - murdered on March 8, 1973;

8

(2)   Dianne Sussman - shot on March 8, 1973;

(3)   Louis Lapiana - shot on March 8, 1973;

(4)   Al Plummer - murdered on March 19, 1973;

(5)   Hugh Shields - shot on March 19, 1973;

(6)   Frank Capizzi - shot on March 19, 1973;

(7)   William O'Brien - murdered on March 24, 1973;

(8)   Ralph DiMasi - shot on March 24, 1973;

(9)   James Leary - murdered on April 3, 1973;

(10)  Joseph Notorangeli - murdered on April 18, 1973; and

(11)  Al Notorangeli - murdered on February 21, 1974.

b.   On or about December 1, 1973, in the vicinity of Dorchester, Massachusetts, the defendant **JAMES J. BULGER**, John V. Martorano, Joseph M. McDonald, and others known and unknown to the grand jury, murdered James O'Toole, a former associate of the Charlestown-based McLaughlin Gang and an enemy of members and associates of the Bulger Group.

c.   In or about October 1974, in the vicinity of Somerville, Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, John V. Martorano, Joseph M. McDonald, and others known and unknown to the grand jury, murdered James Sousa, a criminal associate who was involved in a botched robbery with other members and associates of the Bulger Group, after he was

9

arrested and charged in connection with that robbery because he was believed to be a potential witness against and liability to members of the Bulger Group.

d.   In or about November 1974, in the vicinity of South Boston, Massachusetts, the defendant **JAMES J. BULGER**, and others known and unknown to the grand jury, murdered Paul McGonagle, who had been a member of the Mullins Gang and an opponent of **BULGER** during the battle for control of South Boston among rival criminal groups, and thereafter buried his remains in the vicinity of Tenean Beach, Dorchester, Massachusetts.

e.   On or about June 12, 1975, in the vicinity of Dorchester, Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, John V. Martorano, and others known and unknown to the grand jury, murdered Edward Connors, a person who had knowledge of the participation of members of the Bulger Group in the murder of James O'Toole.

f.   On or about November 5, 1975, in the vicinity of South Boston, Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, John V. Martorano, and others known and unknown to the grand jury, murdered Thomas King, a member of the Bulger Group who was viewed as a threat to **BULGER** and other members of the organization, and thereafter buried his remains in the vicinity of the Neponset River, Quincy, Massachusetts.

g.   On or about November 6, 1975, in the vicinity of South Boston, Massachusetts, the defendant **JAMES J. BULGER**, and others known and unknown to the grand jury, murdered Francis "Buddy" Leonard, in an effort to divert attention from the disappearance of Thomas King.

h.   In or before May 1981, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, John V. Martorano, Joseph M. McDonald, John B. Callahan, and others known and unknown to the grand jury, conspired to murder Roger Wheeler, the owner of a business known as World Jai Alai.  On or about May 27, 1981, in the vicinity of the Southern Hills Country Club, Tulsa, Oklahoma, John V. Martorano and Joseph M. McDonald murdered Roger Wheeler.

i.   In or about late 1981, in the vicinity of South Boston, Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI** murdered Debra Davis, a girlfriend of **FLEMMI** whom **BULGER** and **FLEMMI** viewed as posing a threat to **FLEMMI**.

j.   In or about July 1983, in the vicinity of South Boston, Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, Kevin J. Weeks, and others known and unknown to the grand jury, kidnaped, extorted, and murdered Arthur "Bucky" Barrett.

k.   In or about early 1985, in the vicinity of South Boston, Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI** murdered Deborah Hussey, who was the step-daughter of

11

FLEMMI and whom **BULGER** and **FLEMMI** viewed as posing a threat to
**FLEMMI**.

13. In preparation for and in furtherance of their
commission of crimes of violence, members and associates of the
Bulger Group acquired and maintained firearms of various types
and calibers, including handguns, rifles, automatic weapons, and
shotguns, ammunition of various types and calibers, explosive
devices and materials, and other weapons. Such weapons and
ammunition were secreted at times in hidden locations and in
large stockpiles. Such locations included, but were not limited
to, a hidden location at the residence of George Kaufman in
Brookline, Massachusetts and a hidden compartment in the interior
wall of a detached structure in the rear yard of 832 East Third
Street, South Boston, Massachusetts, which was the residence at
times of the defendant **STEPHEN J. FLEMMI** and his parents.

14. As a means of preserving and protecting the enterprise
and its leadership from prosecution, members and associates of
the Bulger Group engaged in activities designed to hinder and
obstruct the administration of justice. These activities
included, but were not limited to, the following:

a. Members and associates of the Bulger Group used
and threatened to use violence, including murder, against actual
and potential witnesses with knowledge of the criminal activities

12

of the Bulger Group.  These activities included, but were not limited to, the following:

(1)   In or about December 1976, members and associates of the Bulger Group learned that Richard Castucci was providing information to agents of the Federal Bureau of Investigation regarding the whereabouts of fugitives Joseph M. McDonald and James L. Sims.  On or about December 30, 1976, in the vicinity of Somerville, Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, John V. Martorano, and others known and unknown to the grand jury, murdered Richard Castucci.

(2)   In or about May 1982, members and associates of the Bulger Group learned that Brian Halloran was providing information to agents of the Federal Bureau of Investigation regarding, among other things, the involvement of the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI** and John V. Martorano in the murder of Roger Wheeler, and the involvement of **BULGER** and others in the murder of Louis Litif.  On or about May 11, 1982, in the vicinity of Northern Avenue, South Boston, Massachusetts, **BULGER**, Kevin J. Weeks, and others known and unknown to the grand jury, murdered Brian Halloran and Michael Donahue, who was riding in an automobile with Halloran at the time Halloran was murdered.

(3)   In or about July 1982, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI** learned that investigative efforts relating to the murder of Roger Wheeler were being

13

directed towards John B. Callahan, former president of World Jai Alai. Concerned that Callahan might implicate **BULGER** and **FLEMMI** in the murder of Wheeler, **BULGER** and **FLEMMI** agreed with John V. Martorano to murder Callahan. On or about August 1, 1982, in the vicinity of Ft. Lauderdale, Florida, John V. Martorano and Joseph M. McDonald murdered John Callahan.

(4) In or about October and November 1984, members and associates of the Bulger Group learned that John McIntyre was cooperating with law enforcement officials including agents of the Federal Bureau of Investigation and the United States Customs Service concerning illegal activities of the Bulger Group. These illegal activities included the illegal shipment of arms and ammunition aboard the fishing trawler Valhalla to elements of the Irish Republican Army in Ireland in September of 1984 and the illegal distribution of drugs by members and associates of the Bulger Group, including the importation of approximately thirty-six tons of marihuana into Boston Harbor on board the vessel Ramsland, which had been seized by federal authorities on or about November 14, 1984. On or about November 30, 1984, in the vicinity of South Boston, Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, Kevin J. Weeks, and others known and unknown to the grand jury, kidnaped and murdered John McIntyre.

14

          (5)   In order to evade detection for the murders

of Arthur "Bucky" Barrett, John McIntyre, and Deborah Hussey, the

defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, Kevin J. Weeks,

and other members and associates of the Bulger Group, buried the

remains of these three persons in the basement of a private home

located in South Boston, Massachusetts.  In or about October

1985, **BULGER, FLEMMI**, Weeks, and others, having learned of the

impending sale of that residence, exhumed the remains of these

three persons and buried those remains in a common grave which

they prepared in the vicinity of 55 Hallett Street, Dorchester,

Massachusetts.

          b.   Members and associates of the Bulger Group

attempted to monitor the activities of grand juries investigating

the Bulger Group and to improperly influence the testimony of

witnesses called before those grand juries, as well as to

improperly influence courts conducting proceedings related to

members and associates of the Bulger Group.  For example, in or

about late 1993, the defendant **STEPHEN J. FLEMMI** attempted to

prevent the potential testimony of Richard O'Brien.  In or about

and between August and November 1995, **FLEMMI** improperly

influenced the grand jury testimony of Richard O'Brien.  In or

about 1997 and 1998, Kevin J. Weeks met with and passed

information between the defendant **STEPHEN J. FLEMMI** and John J.

Connolly as part of an effort by **FLEMMI**, Connolly, and others to

                              15

improperly influence federal court proceedings involving **FLEMMI**, including through perjury.

c.   The leadership of the Bulger Group at times arranged for or funded, in whole or in part, legal representation of persons facing criminal charges who were associated with the Bulger Group and who were believed to be potentially damaging witnesses against the leadership of the Bulger Group.  Such persons included, among others, Paul Moore and David Lindholm. In addition, leaders of the Bulger Group assisted each other, as well as leaders of allied criminal groups, in funding their defenses to criminal charges.  For example, in or about 1996, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, Kevin J. Weeks, and others, caused approximately $10,000 in cash, which was proceeds of racketeering activity, to be conveyed for use by John V. Martorano for legal and other expenses.

d.   Members and associates of the Bulger Group, including the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, fostered and maintained relationships with active and former law enforcement officers in order to obtain confidential investigative information to which they were not entitled.  Such information included, for example, the existence of electronic surveillance targeting members and associates of the Bulger Group and the activities of grand juries investigating the Bulger Group.  Other such information included the identities of

16

individuals actually and potentially cooperating with law enforcement authorities in various capacities, including as informants and witnesses.

e.   Members and associates of the Bulger Group at times fled the jurisdiction to avoid apprehension by federal and state law enforcement authorities and provided financial and other support to other members and associates of the Bulger Group who did the same.  For example, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, and other members and associates of the Bulger Group, provided financial support to federal fugitive John V. Martorano during the period from approximately 1978 through 1995.  **BULGER** and **FLEMMI**, and other members and associates of the Bulger Group, provided financial support to federal fugitives Joseph M. McDonald and James L. Sims during the period from approximately 1975 through 1982.  Kevin J. Weeks spoke with, met with, and provided information and false identification to **BULGER** while **BULGER** was a federal fugitive during 1995 and 1996.  In or about late 1999, at **FLEMMI**'s behest and through a source supplied by **FLEMMI**, Kevin J. Weeks obtained and provided to **FLEMMI** and others confidential information concerning electronic surveillance being conducted in connection with efforts to apprehend **BULGER**.

## THE RACKETEERING CONSPIRACY

15.  From in or before 1972 and continuing until in or about 1999, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER,
STEPHEN J. FLEMMI, and
KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, being persons employed by and associated with the Bulger Group, which enterprise engaged in, and whose activities affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined by Title 18, United States Code, Sections 1961(1) and 1961(5), and as set forth in paragraphs 17 through 77 of this Superseding Indictment.

16.  It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering.

### RACKETEERING ACT NUMBER ONE
(Conspiracy to Murder Members of Notorangeli Group)

17.  From in or about early 1973 and continuing until in or about early 1974, in the District of Massachusetts and elsewhere, the defendant **JAMES J. BULGER**, John V. Martorano, and others known and unknown to the grand jury, did commit an act involving

murder, that is, did conspire together to murder members of a criminal organization headed by Al Notorangeli that was viewed as a threat to the Bulger Group, in violation of Section 1 of Chapter 265 and Section 7 of Chapter 274 of the Massachusetts General Laws.

RACKETEERING ACT NUMBER TWO
(Murder of Michael Milano)

18.   On or about March 8, 1973, in the District of Massachusetts, the defendant **JAMES J. BULGER**, John V. Martorano, and others known and unknown to the grand jury, did commit an act involving murder, that is, aiding and abetting one another and being armed with dangerous weapons, did assault Michael Milano with the intent to murder him and did thereby kill and murder Michael Milano in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

RACKETEERING ACT NUMBER THREE
(Murder of Al Plummer)

19.   On or about March 19, 1973, in the District of Massachusetts, the defendant **JAMES J. BULGER**, John V. Martorano, and others known and unknown to the grand jury, did commit an act involving murder, that is, aiding and abetting one another and being armed with dangerous weapons did assault Al Plummer with the intent to murder him and did thereby kill and murder Al Plummer in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

19

## RACKETEERING ACT NUMBER FOUR
(Murder of William O'Brien)

20.   On or about March 24, 1973, in the District of
Massachusetts, the defendant **JAMES J. BULGER**, John V. Martorano,
and others known and unknown to the grand jury, did commit an act
involving murder, that is, aiding and abetting one another and
being armed with dangerous weapons, did assault William O'Brien
with the intent to murder him and did thereby kill and murder
William O'Brien in violation of Section 1 of Chapter 265 and
Section 2 of Chapter 274 of the Massachusetts General Laws.

## RACKETEERING ACT NUMBER FIVE
(Murder of James O'Toole)

21.   On or about December 1, 1973, in the District of
Massachusetts, the defendant **JAMES J. BULGER**, John V. Martorano,
and others known and unknown to the grand jury, did commit an act
involving murder, that is, aiding and abetting one another and
being armed with dangerous weapons, did assault James O'Toole
with the intent to murder him and did thereby kill and murder
James O'Toole in violation of Section 1 of Chapter 265 and
Section 2 of Chapter 274 of the Massachusetts General Laws.

## RACKETEERING ACT NUMBER SIX
### (Murder of James Sousa)

22.  The defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI** committed the following acts involving murder, the commission of any one of which constitutes the commission of Racketeering Act Number Six:

### A.   Murder Conspiracy

23.  In or about October 1974, in the District of Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, John V. Martorano, and others known and unknown to the grand jury, did commit an act involving murder, that is, did conspire together to murder James Sousa, in violation of Section 1 of Chapter 265 and Section 7 of Chapter 274 of the Massachusetts General Laws.

### B.   Murder

24.  In or about October 1974, in the District of Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, John V. Martorano, and others known and unknown to the grand jury, did commit an act involving murder, that is, aiding and abetting one another and being armed with a dangerous weapon, did assault James Sousa with the intent to murder him and did thereby kill and murder James Sousa in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

21

### RACKETEERING ACT NUMBER SEVEN
(Murder of Paul McGonagle)

25.   In or about November 1974, in the District of
Massachusetts, the defendant **JAMES J. BULGER**, and others known
and unknown to the grand jury, did commit an act involving
murder, that is, aiding and abetting one another and being armed
with dangerous weapons, did assault Paul McGonagle with the
intent to murder him and did thereby kill and murder Paul
McGonagle in violation of Section 1 of Chapter 265 and Section 2
of Chapter 274 of the Massachusetts General Laws.

### RACKETEERING ACT NUMBER EIGHT
(Murder of Edward Connors)

26.   On or about June 12, 1975, in the District of
Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J.
FLEMMI**, John V. Martorano, and others known and unknown to the
grand jury, did commit an act involving murder, that is, aiding
and abetting one another and being armed with dangerous weapons,
did assault Edward Connors with the intent to murder him and did
thereby kill and murder Edward Connors in violation of Section 1
of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts
General Laws.

### RACKETEERING ACT NUMBER NINE
(Murder of Thomas King)

27.   The defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**
committed the following acts involving murder, the commission of

22

any one of which constitutes the commission of Racketeering Act Number Nine:

A.    Murder Conspiracy

28.  In or about November 1975, in the District of Massachusetts and elsewhere, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, John V. Martorano, and others known and unknown to the grand jury, did commit an act involving murder, that is, did conspire together to murder Thomas King, in violation of Section 1 of Chapter 265 and Section 7 of Chapter 274 of the Massachusetts General Laws.

B.    Murder

29.  On or about November 5, 1975, in the District of Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, John V. Martorano, and others known and unknown to the grand jury, did commit an act involving murder, that is, aiding and abetting one another and being armed with dangerous weapons, did assault Thomas King with the intent to murder him and did thereby kill and murder Thomas King in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

RACKETEERING ACT NUMBER TEN
(Murder of Francis "Buddy" Leonard)

30.  On or about November 6, 1975, in the District of Massachusetts, the defendant **JAMES J. BULGER**, and others known and unknown to the grand jury, did commit an act involving

23

murder, that is, being armed with a dangerous weapon, did assault Francis "Buddy" Leonard with the intent to murder him and did thereby kill and murder Francis "Buddy" Leonard in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

RACKETEERING ACT NUMBER ELEVEN
(Murder of Richard Castucci)

31. On or about December 30, 1976, in the District of Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI,** John V. Martorano, and others known and unknown to the grand jury, did commit an act involving murder, that is, aiding and abetting one another and being armed with a dangerous weapon, did assault Richard Castucci with the intent to murder him and did thereby kill and murder Richard Castucci in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

RACKETEERING ACT NUMBER TWELVE
(Murder of Roger Wheeler)

32. The defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI** committed the following acts involving murder, the commission of any one of which constitutes the commission of Racketeering Act Number Twelve:

A.   Murder Conspiracy

33. In or about May 1981, in the District of Massachusetts and elsewhere, the defendants **JAMES J. BULGER** and **STEPHEN J.**

24

**FLEMMI**, John V. Martorano, Joseph McDonald, and others known and unknown to the grand jury, did commit an act involving murder, that is, did conspire together to murder Roger Wheeler, in violation of Section 1 of Chapter 265 and Section 7 of Chapter 274 of the Massachusetts General Laws.

      B.   <u>Murder</u>

    34.  On or about May 27, 1981, in the Northern District of Oklahoma, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, John V. Martorano, Joseph McDonald, and others known and unknown to the grand jury, did commit an act involving murder, that is, did unlawfully and with malice aforethought cause the death of Roger Wheeler, in violation of Section 701.7 of Title 21 and Section 432 of Title 22 of the Oklahoma Statutes.

<u>RACKETEERING ACT NUMBER THIRTEEN</u>
(Murder of Debra Davis)

    35.  In or about late 1981, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI** did commit an act involving murder, that is, aiding and abetting one another, did assault Debra Davis with the intent to murder her and did thereby kill and murder Debra Davis in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

25

### RACKETEERING ACT NUMBER FOURTEEN
(Murder of Brian Halloran)

36.   On or about May 11, 1982, in the District of Massachusetts, the defendant **JAMES J. BULGER,** and others known and unknown to the grand jury, did commit an act involving murder, that is, aiding and abetting one another and being armed with dangerous weapons, did assault Brian Halloran with the intent to murder him and did thereby kill and murder Brian Halloran in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

### RACKETEERING ACT NUMBER FIFTEEN
(Murder of Michael Donahue)

37.   On or about May 11, 1982, in the District of Massachusetts, the defendant **JAMES J. BULGER,** and others known and unknown to the grand jury, did commit an act involving murder, that is, aiding and abetting one another and being armed with dangerous weapons, did assault Michael Donahue with the intent to murder Brian Halloran and did thereby kill and murder Michael Donahue in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

### RACKETEERING ACT NUMBER SIXTEEN
(Murder of John Callahan)

38.   The defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI** committed the following acts involving murder, the commission of any one of which constitutes the commission of Racketeering Act Number Sixteen:

26

A.    Murder Conspiracy

39.    In or about and between June and August 1982, in the
District of Massachusetts and elsewhere, the defendants **JAMES J.
BULGER** and **STEPHEN J. FLEMMI**, John V. Martorano, Joseph McDonald,
and others known and unknown to the grand jury, did commit an act
involving murder, that is, did conspire together to murder John
Callahan, in violation of Section 1 of Chapter 265 and Section 7
of Chapter 274 of the Massachusetts General Laws.

B.    Murder

40.    On or about August 1, 1982, in the Southern District of
Florida and elsewhere, the defendants **JAMES J. BULGER** and **STEPHEN
J. FLEMMI**, John V. Martorano, Joseph McDonald, and others known
and unknown to the grand jury, did commit an act involving
murder, that is, did unlawfully kill a human being, to wit, John
Callahan, which killing was perpetrated from a premeditated
design to effect the death of a human being, in violation of
Sections 782.04(1)(a) and 777.011 of the Florida Statutes.

RACKETEERING ACT NUMBER SEVENTEEN
(Murder of Arthur "Bucky" Barrett)

41.    In or about August 1983, in the District of
Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J.
FLEMMI**, and others known and unknown to the grand jury, did
commit an act involving murder, that is, aiding and abetting one
another and being armed with a dangerous weapon, did assault
Arthur "Bucky" Barrett with the intent to murder him and did

27

thereby kill and murder Arthur "Bucky" Barrett in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

### RACKETEERING ACT NUMBER EIGHTEEN
(Murder of John McIntyre)

42.   On or about November 30, 1984, in the District of Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, and others known and unknown to the grand jury, did commit an act involving murder, that is, aiding and abetting one another and being armed with a dangerous weapon, did assault John McIntyre with the intent to murder him and did thereby kill and murder John McIntyre in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

### RACKETEERING ACT NUMBER NINETEEN
(Murder of Deborah Hussey)

43.   In or about early 1985, in the District of Massachusetts, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, and others known and unknown to the grand jury, did commit an act involving murder, that is, aiding and abetting one another, did assault Deborah Hussey with the intent to murder her and did thereby kill and murder Deborah Hussey in violation of Section 1 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

RACKETEERING ACT NUMBER TWENTY
(Extortion Conspiracy:   "Rent")

44.   From in or before 1979 and continuing until in or about
1996, both dates being approximate and inclusive, within the
District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER,**
**STEPHEN J. FLEMMI, and**
**KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, did knowingly and
intentionally conspire to obtain property from persons known and
unknown to the grand jury, including but not limited to the
following individuals,

Paul Moore,
William Shea,
John Cherry,
Thomas Cahill,
John "Red" Shea,
Joseph Tower,
Anthony Attardo,
David Lindholm,
Richard O'Brien,
Richard "Jay" Johnson, and
Kevin Hayes,

who were engaged in unlawful activities, including illegal
gambling, illegal money lending, and illegal trafficking in
narcotics and other controlled substances, with their consent,
which consent was induced by the wrongful use of actual and
threatened force, violence, and fear, and to thereby obstruct,
delay, and affect commerce and the movement of any article in
commerce, in violation of Section 1951 of Title 18 of the United
States Code.

45.   It was part of the conspiracy that members and associates of the Bulger Group identified individuals engaged in illegal business in South Boston and elsewhere who were considered to be favorable targets for extortionate demands, based upon such factors as those individuals' own involvement in illegal activities, their possession of and access to large amounts of cash and other things of value to the Bulger Group, and their lack of prior affiliation with organized crime groups.

46.   It was further part of the conspiracy that, while directly and indirectly communicating extortionate demands to targeted individuals, members and associates of the Bulger Group sometimes communicated to those targeted individuals, both directly and indirectly and at times by means of deception, threats of physical violence and other forms of reprisal against those individuals in the event they failed to meet the demands of members and associates of the Bulger Group.

47.   It was further part of the conspiracy that, at the same time that direct and indirect threats were communicated to targeted individuals, members and associates of the Bulger Group sometimes offered enticements to targeted individuals, including but not limited to the prospects of protection by the Bulger Group and future opportunities for generating income through association with the Bulger Group, as a means of further inducing compliance with their extortionate demands.

30

48.   It was further part of the conspiracy that, through words and actions, members and associates of the Bulger Group established, maintained, fostered, and sought advantage from a reputation for ruthlessness and violence in order to assist in inducing compliance with extortionate demands.   In addition and for the same purpose, members and associates of the Bulger Group, through words and actions, established, maintained, fostered, and sought advantage from the knowledge, understanding and acceptance among persons engaged in illegal activities, including narcotics trafficking, loansharking and bookmaking, that so-called "rent" payments to members and associates of the Bulger Group were required in order to conduct those activities in the South Boston area and elsewhere without suffering reprisal at the hands of members and associates of the Bulger Group.

49.   It was further part of the conspiracy that, at times, members and associates of the Bulger Group, in the presence of targeted individuals, committed actual acts of violence, engaged in acts and discussions in preparation for the commission of acts of violence, and used and brandished firearms and other weapons in order to induce compliance with extortionate demands.

RACKETEERING ACT NUMBER TWENTY-ONE
(Extortion of Richard O'Brien)

50.   From in or before 1980 and continuing until in or about 1993, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendants

31

**JAMES J. BULGER,**
**STEPHEN J. FLEMMI, and**
**KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, did knowingly and intentionally obtain property, to wit, United States currency from Richard O'Brien with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce, in violation of Sections 1951 and 2 of Title 18 of the United States Code.

## RACKETEERING ACT NUMBER TWENTY-TWO
(Extortion of Kevin Hayes)

51.    From in or before 1994 and continuing until in or about 1996, both dates being approximate and inclusive, within the District of Massachusetts, the defendant

**JAMES J. BULGER,**

and others known and unknown to the grand jury, did knowingly and intentionally obtain property, to wit, United States currency from Kevin Hayes with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce, in violation of Sections 1951 and 2 of Title 18 of the United States Code.

32

RACKETEERING ACT NUMBER TWENTY-THREE
(Extortion Conspiracy: "Fines")

52.   From in or before 1980 and continuing until in or about 1990, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER,**
**STEPHEN J. FLEMMI, and**
**KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, did knowingly and intentionally conspire to obtain property from persons known and unknown to the grand jury, including but not limited to the following individuals,

Michael Solimando,
Stephen Rakes,
Julie Rakes,
Richard Bucheri,
Raymond Slinger, and
Timothy Connolly,

who were engaged in a variety of commercial activities, including but not limited to real estate transactions and development, the operation of wholesale and retail liquor businesses, and the sale and brokering of insurance policies, with their consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, and to thereby obstruct, delay, and affect commerce and the movement of any article in commerce, in violation of Section 1951 of Title 18 of the United States Code.

53.   It was part of the conspiracy that members and associates of the Bulger Group sought opportunities to extort

33

money and other things of value from persons who were engaged in commercial activities in the South Boston area and elsewhere who were viewed as favorable targets for extortion based upon such factors as their access to large amounts of cash and other assets and the likelihood that they would be unable or unwilling to report being victims of extortion to law enforcement authorities.

54.   It was further part of the conspiracy that members and associates of the Bulger Group arranged meetings with such individuals targeted for extortion at discrete locations where threats were conveyed directly and indirectly to these individuals.   Locations where such meetings took place included, but were not limited to, Triple-O's Lounge, the South Boston Liquor Mart, and the Rotary Variety Store.   At times, firearms were displayed, brandished, and otherwise used in the course of such meetings for the purpose of inducing compliance with extortionate demands.

### RACKETEERING ACT NUMBER TWENTY-FOUR
(Extortion of Michael Solimando)

55.   From in or about September 1982 and continuing until in or about February 1983, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER and**
**STEPHEN J. FLEMMI,**

34

and others known and unknown to the grand jury, did knowingly and intentionally obtain property, to wit, United States currency from Michael Solimando with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce, in violation of Sections 1951 and 2 of Title 18 of the United States Code.

RACKETEERING ACT NUMBER TWENTY-FIVE
(Extortion of Stephen Rakes and Julie Rakes)

56.   From in or before December 1983 and continuing until in or about May 1984, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendant

**JAMES J. BULGER,**

and others known and unknown to the grand jury, did knowingly and intentionally obtain property, to wit, a business known as Stippo's Liquor Mart, a corporation known as Stippo's, Inc., and the right to purchase a parcel of real property located at 295 Old Colony Avenue, South Boston, Massachusetts, from Stephen Rakes and Julie Rakes with their consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce, in violation of Sections 1951 and 2 of Title 18 of the United States Code.

35

## RACKETEERING ACT NUMBER TWENTY-SIX
(Extortion of Richard Bucheri)

57.   In or about August and September 1986, within the District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER and
STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, did knowingly and intentionally obtain property, to wit, United States currency from Richard Bucheri with his consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby did obstruct, delay, and affect commerce and the movement of any article in commerce, in violation of Sections 1951 and 2 of Title 18 of the United States Code.

## RACKETEERING ACT NUMBER TWENTY-SEVEN
(Extortion of Raymond Slinger)

58.   In or about 1988, within the District of Massachusetts, the defendants

**JAMES J. BULGER and
KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, did, by a verbal communication, maliciously threaten an injury to the person of Raymond Slinger with intent thereby to extort a pecuniary advantage and with intent to compel Raymond Slinger to do an act against his will, in violation of Section 25 of Chapter 265 and Section 2 of Chapter 274 of the Massachusetts General Laws.

RACKETEERING ACT NUMBER TWENTY-EIGHT
(Narcotics Distribution Conspiracy)

59.   From in or before 1980 and continuing until in or about
1990, both dates being approximate and inclusive, within the
District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER and
STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, did knowingly and
intentionally conspire to distribute and to possess with intent
to distribute five kilograms or more of cocaine, a Schedule II
narcotic drug controlled substance, and 1,000 kilograms or more
of marihuana, a Schedule I drug controlled substance, in
violation of Section 846 of Title 21 of the United States Code.

60.   It was part of the conspiracy that members and
associates of the Bulger Group engaged directly in the
distribution of wholesale quantities of cocaine and marihuana in
the South Boston area and elsewhere, the profits of which
distribution were shared with other members and associates of the
Bulger Group.

61.   It was further part of the conspiracy that members and
associates of the Bulger Group demanded and collected regular
"rent" payments, and occasionally lump-sum "fines," from various
individuals engaged in the wholesale and retail distribution of
cocaine and marihuana in the South Boston area and elsewhere.

37

These individuals made such payments, which were then shared among members of the Bulger Group, from proceeds generated by the distribution of cocaine and marihuana by those individuals. Those individuals included, but were not limited to, Joseph Murray, Michael Murray, Michael Caruana, Frank Lepere, David Lindholm, William Shea, Paul Moore, John "Red" Shea, Joseph Tower, John Cherry, and Hobart Willis.

### RACKETEERING ACT NUMBER TWENTY-NINE
(Money Laundering Conspiracy)

62.   From in or before 1984 and continuing until in or about August 1999, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER,**
**STEPHEN J. FLEMMI, and**
**KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, knowing that the property involved represented the proceeds of some form of unlawful activity, did knowingly and intentionally conspire:

(1)   to conduct financial transactions, affecting interstate and foreign commerce, which in fact involved the proceeds of extortion, in violation of Title 18, United States Code, Section 1951, and Chapter 265, Section 25 of the Massachusetts General Laws, and distribution of narcotics and controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), knowing that the transactions were designed in whole and in part to conceal and disguise the nature,

38

the location, the source, the ownership, and the control of the

proceeds of said extortion and distribution of narcotics and

controlled substances; and

(2)   to engage in monetary transactions affecting

interstate and foreign commerce in criminally derived property

that was of a value greater than $10,000, said property having

been derived from specified unlawful activity, that is, extortion

in violation of Title 18, United States Code, Section 1951, and

Chapter 265, Section 25 of the Massachusetts General Laws, and

distribution of narcotics and controlled substances, in violation

of Title 21, United States Code, Section 841(a)(1),

in violation of Section 1956(h) of Title 18 of the United States

Code.

63.   It was part of the conspiracy that members and

associates of the Bulger Group acquired, maintained, operated,

purported to transfer, attempted to transfer, transferred, and

controlled the following assets, among others:   the real property

located at 295 Old Colony Avenue, South Boston, Massachusetts;

the corporations known as Stippo's, Inc. and the South Boston

Liquor Mart, Inc.; the business known, at various times, as

Stippo's Liquor Mart, the South Boston Liquor Mart, and Columbia

Wine and Spirits; the real property located at 309-325 Old Colony

Avenue, South Boston, Massachusetts; the business known as the

Rotary Variety Store; the corporation known as Rotary Variety

Store, Inc.; and the real property located at 337 West Fourth
Street, South Boston, Massachusetts.

64.  It was further part of the conspiracy that members and
associates of the Bulger Group used extortion and income
generated from the criminal activities of the Bulger Group,
including income from the collection of extortion or "rent"
payments and the distribution of narcotics and controlled
substances, to acquire, maintain, operate, and control all or
parts of the assets described in paragraph 63 above.

65.  It was further part of the conspiracy that members and
associates of the Bulger Group conducted financial transactions
involving the assets described in paragraph 63 above that were
designed, in part, to create the appearance of legitimacy in the
relationships between those assets and members and associates of
the Bulger Group, to facilitate the control of, and acquisition
of income from, those assets by members and associates of the
Bulger Group, and to disguise their true relationships to those
assets and that the assets had been obtained, maintained, and
operated through extortion and with the proceeds of extortion and
other racketeering activities.

66.  It was further part of the conspiracy that members and
associates of the Bulger Group used the assets described in
paragraph 63 above as bases for some of the criminal activities
of the Bulger Group and as sources of documentable and seemingly

40

non-criminal income, such as wages and salary, mortgage and rent payments, and income from sales of the assets.

OVERT ACTS

67.   In furtherance of the conspiracy and to effect the objectives thereof, the defendants **JAMES J. BULGER**, **STEPHEN J. FLEMMI**, and **KEVIN P. O'NEIL**, and others, did commit and cause to be committed the following overt acts:

a.   In or about January 1984, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, Kevin J. Weeks, and others, acquired a business known as Stippo's Liquor Mart, its inventory, and the option to purchase 295 Old Colony Avenue for cash which included proceeds of extortion and other racketeering activities of the Bulger Group.

b.   On or about January 26, 1984, the defendant **JAMES J. BULGER**, Kevin J. Weeks, and others, caused to be executed a stock purchase agreement whereby ownership of the corporation known as Stippo's, Inc., was transferred from Stephen Rakes and Julie Rakes to Kevin J. Weeks and which falsely represented the consideration paid for that transfer of ownership.

c.   From in or about 1984 and continuing until in or about 1986, the defendant **JAMES J. BULGER**, Kevin J. Weeks, and others, in various amounts and at various times, used cash proceeds of racketeering activities, including extortion and drug

41

distribution, for the purpose of maintaining and operating the liquor business located at 295 Old Colony Avenue.

d.   On or about September 4, 1985, the defendant **KEVIN P. O'NEIL**, Kevin J. Weeks, and others, created the "Three Hundred Nine Old Colony Avenue Trust," of which **O'NEIL** and Weeks were trustees, for the purpose of purchasing the real property located at 309-325 Old Colony Avenue, South Boston, Massachusetts.

e.   On or about September 4, 1985, the defendants **JAMES J. BULGER, STEPHEN J. FLEMMI** and **KEVIN P. O'NEIL**, Kevin J. Weeks, and others, purchased the real property located at 309-325 Old Colony Avenue, South Boston, Massachusetts for approximately $210,000 including a down payment of approximately $20,000, to which **BULGER, FLEMMI, O'NEIL** and Weeks each contributed approximately $5,000 and which included proceeds of extortion and other racketeering activities of the Bulger Group.

f.   On or about October 16, 1985, the defendants **JAMES J. BULGER** and **KEVIN P. O'NEIL**, and others, caused the sale of the real property located at 337 West Fourth Street, South Boston, Massachusetts, which **O'NEIL** had purchased in approximately 1979 for approximately $13,000, to **BULGER** for approximately $30,000, approximately $25,000 of which was financed by a mortgage granted by **BULGER** directly to **O'NEIL** and secured by the real property.

g.   On or about May 16, 1986, the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, Kevin J. Weeks, and others, caused

the sale of 295 Old Colony Avenue from Kevin J. Weeks to **BULGER**,
Mary Flemmi, mother of **FLEMMI** and nominal owner on behalf of
**FLEMMI**, and Weeks as joint one-third owners.

h.   On or about May 20, 1986, Kevin J. Weeks, and
others, caused to be executed a stock transfer agreement whereby
ownership of the business known as the South Boston Liquor Mart
was transferred from Weeks to the defendant **KEVIN P. O'NEIL** and
Gordon F. McIntyre for $300,000, which proceeds were shared among
the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, and Kevin
J. Weeks.

i.   On or about October 31, 1986, the defendant **JAMES
J. BULGER**, and others, caused the sale of the real property
located at 337 West Fourth Street, South Boston, Massachusetts,
which **BULGER** had purchased from the defendant **KEVIN P. O'NEIL** in
1985 for approximately $30,000, from **BULGER** to Barbara A. Buckley
for approximately $150,000.

j.   On or about January 12, 1987, the defendants **JAMES
J. BULGER** and **KEVIN P. O'NEIL**, and others, caused the discharge
of the mortgage granted to **O'NEIL** by **BULGER** on or about October
16, 1985 and secured by the real property located at 337 West
Fourth Street, South Boston, Massachusetts.

k.   In or about and between 1986 and 1989, the
defendant **KEVIN P. O'NEIL**, and others, made monthly rent payments
for occupancy of the real property located at 295 Old Colony

Avenue to the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**,

in the person of his mother Mary Flemmi, and Kevin J. Weeks.

l.   In or about 1989, the defendants **JAMES J. BULGER**

and **STEPHEN J. FLEMMI** and Kevin J. Weeks, and others, caused the

sale of 295 Old Colony Avenue from **BULGER**, Weeks, and Mary Flemmi

to **BULGER** as sole owner, in exchange for payments by **BULGER** of

approximately $100,000 each, which included proceeds of extortion

and other racketeering activities of the Bulger Group, to **FLEMMI**

and Weeks.

m.   On or about November 10, 1989, the defendants

**JAMES J. BULGER** and **STEPHEN J. FLEMMI**, Kevin J. Weeks, and

others, caused the sale of the Rotary Variety Store Company, Inc.

for approximately $75,000, which proceeds were shared among the

defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI** and Kevin J.

Weeks.

n.   On or about December 8, 1989, the defendants **JAMES**

**J. BULGER, STEPHEN J. FLEMMI, KEVIN P. O'NEIL**, Kevin J. Weeks,

and others, caused the sale of 295 Old Colony Avenue from **BULGER**

to the Shamrock Realty Trust, of which the defendant **KEVIN P.**

**O'NEIL** and Gordon F. McIntyre were trustees, in exchange for

$400,000.

o.   On or about December 8, 1989, the defendants **JAMES**

**J. BULGER** and **KEVIN P. O'NEIL**, and others, caused to be issued a

mortgage in the amount of $400,000 and secured by the real

44

property at 295 Old Colony Avenue, pursuant to which the Shamrock

Realty Trust agreed to make monthly payments to **BULGER**.

     p.   On or about and between January 1990 and March

1997, the defendant **KEVIN P. O'NEIL**, and others, through the

Shamrock Realty Trust, made monthly mortgage payments to **BULGER**

in the amount of approximately $4672.90 each.

     q.   From in or before 1984 and continuing until in or

about 1990, the defendant **KEVIN P. O'NEIL**, Gordon F. McIntyre,

Kevin J. Weeks, and others, caused wages and salary to be paid to

the defendants **JAMES J. BULGER** and **STEPHEN J. FLEMMI**, Kevin J.

Weeks, and others, by the entity doing business at 295 Old Colony

Avenue.

     r.   From in or before 1986 and continuing until or

about 1989, Kevin J. Weeks, and others, caused wages and salary

to be paid to the defendants **JAMES J. BULGER** and **STEPHEN J.

FLEMMI** by the entity doing business at 309-325 Old Colony Avenue.

     s.   On or about March 15, 1994, the defendants **JAMES

J. BULGER, STEPHEN J. FLEMMI** and **KEVIN P. O'NEIL**, and Kevin J.

Weeks, and others, caused the sale of the real property located

at 309-325 Old Colony Avenue in exchange for approximately

$375,000, the proceeds of which were shared among **BULGER, FLEMMI,

O'NEIL**, and Weeks.

<u>RACKETEERING ACT NUMBER THIRTY</u>
(Money Laundering)

68.   In or about 1989, within the District of Massachusetts, the defendants

**JAMES J. BULGER and
STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, knowing that the property involved in a financial transaction, to wit, 295 Old Colony Avenue, South Boston, Massachusetts, represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct a financial transaction, to wit, the sale of 295 Old Colony Avenue, South Boston, Massachusetts from the defendant **JAMES J. BULGER**, Mary Flemmi, and Kevin J. Weeks to **JAMES J. BULGER**, affecting interstate and foreign commerce, which in fact involved the proceeds of a specified unlawful activity, that is, extortion in violation of Title 18, United States Code, Section 1951, and Chapter 265, Section 25 of the Massachusetts General Laws, and distribution of narcotics and controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), knowing that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, in violation of Sections 1956(a)(1)(B)(i) and 2 of Title 18 of the United States Code.

46

RACKETEERING ACT NUMBER THIRTY-ONE
(Money Laundering)

69.   The defendants **JAMES J. BULGER**, **STEPHEN J. FLEMMI**, and

**KEVIN P. O'NEIL** committed the following money laundering

offenses, the commission of any one of which constitutes the

commission of Racketeering Act Number Thirty-One:

Racketeering Act 31(A)

70.   On or about December 8, 1989, within the District of

Massachusetts, the defendants

**JAMES J. BULGER,**
**STEPHEN J. FLEMMI, and**
**KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, knowing that the

property involved in a financial transaction, to wit, 295 Old

Colony Avenue, South Boston, Massachusetts, represented the

proceeds of some form of unlawful activity, did knowingly and

intentionally conduct a financial transaction, to wit, the sale

of 295 Old Colony Avenue, South Boston, Massachusetts for

$400,000, affecting interstate and foreign commerce, which in

fact involved the proceeds of a specified unlawful activity, that

is, extortion in violation of Title 18, United States Code,

Section 1951 and Chapter 265, Section 25 of the Massachusetts

General Laws, and distribution of narcotics and controlled

substances, in violation of Title 21, United States Code, Section

841(a)(1), knowing that the transaction was designed in whole or

in part to conceal and disguise the nature, the location, the

47

source, the ownership, and the control of the proceeds of said

specified unlawful activity, in violation of Sections

1956(a)(1)(B)(i) and 2 of Title 18 of the United States Code.

<u>Racketeering Acts 31(B) - 31(PPP)</u>

71.   On or about the dates indicated below, within the

District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER,**
**STEPHEN J. FLEMMI, and**
**KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, knowing that the

properties involved in the financial transactions set forth

below, to wit, certain real property and the proceeds of a liquor

business, represented the proceeds of some form of unlawful

activity, did knowingly and intentionally conduct financial

transactions, to wit, mortgage payments, affecting interstate and

foreign commerce, which in fact involved the proceeds of a

specified unlawful activity, that is, extortion in violation of

Title 18, United States Code, Section 1951, and Chapter 265,

Section 25 of the Massachusetts General Laws, and distribution of

narcotics and controlled substances, in violation of Title 21,

United States Code, Section 841(a)(1), knowing that the

transactions were designed in whole or in part to conceal and

disguise the nature, the location, the source, the ownership, and

the control of the proceeds of said specified unlawful activity,

48

in violation of Sections 1956(a)(1)(B)(i) and 2 of Title 18 of the United States Code.

| RACK'G ACT NO. | CHECK NO. | DEPOSIT DATE | PAYEE | AMOUNT OF TRANSACTION |
|---|---|---|---|---|
| 31(B) | Unnumbered | 01/12/90 | JAMES J. BULGER | $4,672.96 |
| 31(C) | 101 | 02/09/90 | JAMES J. BULGER | $4,672.96 |
| 31(D) | 102 | 03/12/90 | JAMES J. BULGER | $4,672.96 |
| 31(E) | 103 | 04/19/90 | JAMES J. BULGER | $4,672.96 |
| 31(F) | 104 | 05/11/90 | JAMES J. BULGER | $4,672.96 |
| 31(G) | 109 | 08/15/90 | JAMES J. BULGER | $4,672.90 |
| 31(H) | 115 | 10/15/90 | JAMES J. BULGER | $4,672.90 |
| 31(I) | 118 | 12/13/90 | JAMES J. BULGER | $4,672.90 |
| 31(J) | 123 | 02/14/91 | JAMES J. BULGER | $4,672.90 |
| 31(K) | 128 | 05/10/91 | JAMES J. BULGER | $4,672.90 |
| 31(L) | 131 | 08/08/91 | JAMES J. BULGER | $4,672.90 |
| 31(M) | 142 | 12/11/91 | JAMES J. BULGER | $4,672.90 |
| 31(N) | 144 | 01/10/92 | JAMES J. BULGER | $4,672.90 |
| 31(O) | 146 | 02/07/92 | JAMES J. BULGER | $4,672.90 |
| 31(P) | 148 | 03/10/92 | JAMES J. BULGER | $4,672.90 |
| 31(Q) | 151 | 04/09/92 | JAMES J. BULGER | $4,672.90 |
| 31(R) | 153 | 05/14/92 | JAMES J. BULGER | $4,672.90 |
| 31(S) | 156 | 06/11/92 | JAMES J. BULGER | $4,672.90 |
| 31(T) | 160 | 07/10/92 | JAMES J. BULGER | $4,672.90 |
| 31(U) | 161 | 08/12/92 | JAMES J. BULGER | $4,672.90 |
| 31(V) | 164 | 09/11/92 | JAMES J. BULGER | $4,672.90 |
| 31(W) | 168 | 10/13/92 | JAMES J. BULGER | $4,672.90 |
| 31(X) | 170 | 11/13/92 | JAMES J. BULGER | $4,672.90 |
| 31(Y) | 173 | 12/11/92 | JAMES J. BULGER | $4,672.90 |

| RACK'G ACT NO. | CHECK NO. | DEPOSIT DATE | PAYEE | AMOUNT OF TRANSACTION |
|---|---|---|---|---|
| 31(Z) | 176 | 01/12/93 | JAMES J. BULGER | $4,672.90 |
| 31(AA) | 178 | 02/12/93 | JAMES J. BULGER | $4,672.90 |
| 31(BB) | 181 | 03/11/93 | JAMES J. BULGER | $4,672.90 |
| 31(CC) | 182 | 04/14/93 | JAMES J. BULGER | $4,672.90 |
| 31(DD) | 185 | 05/17/93 | JAMES J. BULGER | $4,672.90 |
| 31(EE) | 187 | 06/09/93 | JAMES J. BULGER | $4,672.90 |
| 31(FF) | 189 | 07/09/93 | JAMES J. BULGER | $4,672.90 |
| 31(GG) | 190 | 08/16/93 | JAMES J. BULGER | $4,672.90 |
| 31(HH) | 194 | 09/22/93 | JAMES J. BULGER | $4,672.90 |
| 31(II) | 195 | 10/13/93 | JAMES J. BULGER | $4,672.90 |
| 31(JJ) | 198 | 11/17/93 | JAMES J. BULGER | $4,672.90 |
| 31(KK) | 200 | 12/13/93 | JAMES J. BULGER | $4,672.90 |
| 31(LL) | 203 | 01/12/94 | JAMES J. BULGER | $4,672.90 |
| 31(MM) | 204 | 02/14/94 | JAMES J. BULGER | $4,672.90 |
| 31(NN) | 207 | 03/14/94 | JAMES J. BULGER | $4,672.90 |
| 31(OO) | 210 | 04/14/94 | JAMES J. BULGER | $4,672.90 |
| 31(PP) | 213 | 05/12/94 | JAMES J. BULGER | $4,672.90 |
| 31(QQ) | 216 | 06/10/94 | JAMES J. BULGER | $4,672.90 |
| 31(RR) | 221 | 07/09/94 | JAMES J. BULGER | $4,672.90 |
| 31(SS) | 223 | 08/17/94 | JAMES J. BULGER | $4,672.90 |
| 31(TT) | 226 | 09/16/94 | JAMES J. BULGER | $4,672.90 |
| 31(UU) | 228 | 10/27/94 | JAMES J. BULGER | $4,672.90 |
| 31(VV) | 231 | 11/18/94 | JAMES J. BULGER | $4,672.90 |
| 31(WW) | 233 | 12/12/94 | JAMES J. BULGER | $4,672.90 |
| 31(XX) | 238 | 03/30/95 | JAMES J. BULGER | $4,672.90 |
| 31(YY) | 239 | 04/20/95 | JAMES J. BULGER | $4,672.90 |
| 31(ZZ) | 243 | 06/14/95 | JAMES J. BULGER | $4,672.90 |

| RACK'G ACT NO. | CHECK NO. | DEPOSIT DATE | PAYEE | AMOUNT OF TRANSACTION |
|---|---|---|---|---|
| 31(AAA) | 245 | 07/21/95 | JAMES J. BULGER | $4,672.90 |
| 31(BBB) | 250 | 11/30/95 | JAMES J. BULGER | $4,672.90 |
| 31(CCC) | 252 | 01/12/96 | JAMES J. BULGER | $4,672.90 |
| 31(DDD) | 253 | 01/12/96 | JAMES J. BULGER | $4,672.90 |
| 31(EEE) | 255 | 02/16/96 | JAMES J. BULGER | $4,672.90 |
| 31(FFF) | 256 | 02/17/96 | JAMES J. BULGER | $4,672.90 |
| 31(GGG) | 260 | 05/10/96 | JAMES J. BULGER | $4,672.90 |
| 31(HHH) | 261 | 05/13/96 | JAMES J. BULGER | $4,672.90 |
| 31(III) | 264 | 06/20/96 | JAMES J. BULGER | $4,672.90 |
| 31(JJJ) | 265 | 06/20/96 | JAMES J. BULGER | $4,672.90 |
| 31(KKK) | 266 | 06/20/96 | JAMES J. BULGER | $4,672.90 |
| 31(LLL) | 268 | 07/15/96 | JAMES J. BULGER | $4,672.90 |
| 31(MMM) | 269 | 07/20/96 | JAMES J. BULGER | $4,672.90 |
| 31(NNN) | 270 | 08/15/96 | JAMES J. BULGER | $4,672.90 |
| 31(OOO) | 278 | 01/06/97 | JAMES J. BULGER | $4,672.90 |
| 31(PPP) | 281 | 03/20/97 | JAMES J. BULGER | $4,672.90 |

RACKETEERING ACT NUMBER THIRTY-TWO
(Money Laundering)

72.   In or about July 1996, within the District of

Massachusetts and elsewhere, the defendants

**JAMES J. BULGER and
STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, knowing that the

property involved in a financial transaction, to wit,

approximately $10,000 cash, represented the proceeds of some form

51

of unlawful activity, did knowingly and intentionally conduct a
financial transaction, to wit, the transfer of approximately
$10,000 cash for use by John V. Martorano, affecting interstate
and foreign commerce, which in fact involved the proceeds of a
specified unlawful activity, that is, extortion in violation of
Title 18, United States Code, Section 1951, and Chapter 265,
Section 25 of the Massachusetts General Laws, and distribution of
narcotics and controlled substances, in violation of Title 21,
United States Code, Section 841(a)(1), knowing that the
transaction was designed in whole or in part to conceal and
disguise the nature, the location, the source, the ownership, and
the control of the proceeds of said specified unlawful activity,
and with intent to promote the carrying on of said specified
unlawful activity, in violation of Sections 1956(a)(1)(A)(i),
1956(a)(1)(B)(i) and 2 of Title 18 of the United States Code.

### RACKETEERING ACT NUMBER THIRTY-THREE
(Monetary Transaction in Criminally Derived Property)

73.   From in or before April 1999 and continuing until in or
about August 1999, both dates being approximate and inclusive, in
the District of Massachusetts, the defendant

**KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, did knowingly
attempt to engage in a monetary transaction affecting interstate
and foreign commerce, to wit:  the sale of the real property
located at 295 Old Colony Avenue, Boston, Massachusetts and the

business known, at various times, as Stippo's Liquor Mart, the South Boston Liquor Mart and Columbia Wine and Spirits, in criminally derived property that was of a value greater than $10,000, said property having been derived from specified unlawful activity, that is, extortion in violation Title 18, United States Code, Section 1951, and Chapter 265, Section 25 of the Massachusetts General Laws, and distribution of narcotics and other controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Sections 1957 and 2 of Title 18 of the United States Code.

### RACKETEERING ACT NUMBER THIRTY-FOUR
(Extortionate Collection of Credit)

74.   From in or about 1992 and continuing until in or about 1997, within the District of Massachusetts and elsewhere, the defendant

**STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, did knowingly and intentionally participate in the use of extortionate means to collect and attempt to collect extensions of credit made to Al Sapochetti in the amount of approximately $33,000, in violation of Sections 894(a) and 2 of Title 18 of the United States Code.

## RACKETEERING ACT NUMBER THIRTY-FIVE
### (Obstruction of Justice)

75.   From in or about 1993 and continuing until in or about November 1995, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendant

**STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, did corruptly endeavor to influence, obstruct, and impede the due administration of justice, to wit, did knowingly and intentionally attempt to influence and influence the potential and actual testimony of Richard O'Brien, with intent to obstruct and impede a United States grand jury investigating members and associates of the Bulger Group, in violation of Sections 1503 and 2 of Title 18 of the United States Code.

## RACKETEERING ACT NUMBER THIRTY-SIX
### (Obstruction of Justice)

76.   On or about August 20 and 28, 1998, in the District of Massachusetts, the defendant

**STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, did corruptly endeavor to influence, obstruct, and impede the due administration of justice in that the defendant **STEPHEN J. FLEMMI** did knowingly and willfully make false and misleading declarations before the United States District Court with intent to obstruct and impede the prosecution of the case of <u>United</u>

<u>States v. Stephen J. Flemmi</u>, Criminal Docket Number 94-10287-MLW,
in violation of Sections 1503 and 2 of Title 18 of the United
States Code.

77.   At the times and place stated above, the defendant
**STEPHEN J. FLEMMI**, and others, corruptly endeavored to influence,
obstruct, and impede the due administration of justice by the
means and in the manner stated below:

a.   In or about 1997 and 1998, the United States
District Court for the District of Massachusetts was conducting
pretrial hearings in the case of <u>United States v. Stephen J.</u>
<u>Flemmi</u>, Criminal Docket Number 94-10287-MLW.  These hearings
concerned, among other things, **FLEMMI's** claim that the case
should be dismissed because he was immune from prosecution.
**FLEMMI's** immunity claim was based, among other things, on his
claim that the conduct of certain agents of the Federal Bureau of
Investigation in protecting him from prosecution amounted to a
grant of immunity.

b.   **FLEMMI** testified in support of his motion to
dismiss in or about August and September 1998.  **FLEMMI** gave false
and misleading testimony that was designed, among other things,
to shield his corrupt relationship with former Federal Bureau of
Investigation Special Agent John J. Connolly and to falsely
attribute acts that were corrupt and intended to assist **FLEMMI** to
other agents of the Federal Bureau of Investigation.  For

55

example, **FLEMMI** falsely testified, in substance, that Federal

Bureau of Investigation Special Agent John Morris had warned

**FLEMMI** and **BULGER** in approximately December 1994 and January 1995

that **FLEMMI** and **BULGER** were about to be indicted and arrested.

In fact, former Federal Bureau of Investigation Special Agent

John J. Connolly had provided that warning to **FLEMMI**.  **FLEMMI**

coordinated with Connolly prior to **FLEMMI's** testimony regarding

the substance of **FLEMMI's** testimony and **FLEMMI's** subsequent false

and misleading testimony included, but was not limited to, the

following:

> (1)  On August 20, 1998:

Defense Attorney Fishman:    Did you receive some advance notice
                            of this indictment?

**STEPHEN FLEMMI:**             That's the big question, I guess.
                            Yes.

Defense Attorney Fishman:    And when did you receive advance
                            notice?

**STEPHEN FLEMMI:**             That information, when?

Defense Attorney Fishman:    When?

**STEPHEN FLEMMI:**             About a week prior to the
                            indictment coming down.

Defense Attorney Fishman:    And what was -- from whom did you
                            hear that the -- what did you hear?

**STEPHEN FLEMMI:**             What I heard, I got the information
                            from Jim Bulger, who got the
                            information from John Morris.

Defense Attorney Fishman:    What did he say to you?

| | |
|---|---|
| **STEPHEN FLEMMI:** | He said that the indictments were coming down within a short period of time, within I believe a week or so, and that information, what he told me, was a memo from Washington that the indictments were there, and they were going to be coming down in a week. |
| Defense Attorney Fishman: | Well, how do you know it was Morris? |
| **STEPHEN FLEMMI:** | Jim Bulger told me. |
| Defense Attorney Fishman: | What did he say? |
| **STEPHEN FLEMMI:** | He told me Morris contacted him and told him the indictments were coming down; they were coming down within a week.  And they came down within a week.  At least I got arrested within a week - a week later. |

(2)  On August 28, 1998:

**FLEMMI** testified: "I'm saying that the indictment come down or the information, whatever it was that come down, I had information from Jim Bulger that the indictment come down — was coming down.  I think it was a cross (sic) memo or a memo in Washington, and he had become aware of it.  John Morris made him aware of it.  He called me and made me aware of it."

All in violation of Title 18, United States Code, Section 1962(d).

<u>COUNT TWO</u>
(Racketeering)

78.   From in or before 1972 and continuing until in or about 1999, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER,**
**STEPHEN J. FLEMMI, and**
**KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, being persons employed by and associated with the Bulger Group described above, which was an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conduct and participate, directly and indirectly, in the conduct of the affairs of the Bulger Group through a pattern of racketeering activity, as that term is defined by Title 18, United States Code, Sections 1961(1) and 1961(5).

79.   The allegations of Paragraphs 1 through 14 of this Superseding Indictment and Racketeering Acts One through Thirty-Six, as set forth in Paragraphs 17 through 77 of this Superseding Indictment, are hereby realleged and incorporated as if fully set forth herein.   As set forth in paragraphs 17 through 77 of this Superseding Indictment, each defendant conducted and participated, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity as follows:

58

a.   The defendant **JAMES J. BULGER** conducted and participated in the conduct of the affairs of the enterprise by committing the following acts of racketeering:

(1)   Racketeering Acts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19 relating to murder;

(2)   Racketeering Acts 20, 21, 22, 23, 24, 25, 26, and 27 relating to extortion;

(3)   Racketeering Act 28 relating to drug distribution; and

(4)   Racketeering Acts 29, 30, 31, and 32 relating to money laundering.

b.   The defendant **STEPHEN J. FLEMMI** conducted and participated in the conduct of the affairs of the enterprise by committing the following acts of racketeering:

(1)   Racketeering Acts 6, 8, 9, 11, 12, 13, 16, 17, 18, and 19 relating to murder;

(2)   Racketeering Acts 20, 21, 23, 24, and 26 relating to extortion;

(3)   Racketeering Act 28 relating to drug distribution;

(4)   Racketeering Acts 29, 30, 31, and 32 relating to money laundering;

(5)   Racketeering Act 34 relating to extortionate collection of credit; and

(6)   Racketeering Acts 35 and 36 relating to
obstruction of justice.

c.   The defendant **KEVIN P. O'NEIL** conducted and
participated in the conduct of the affairs of the enterprise by
committing the following acts of racketeering:

(1)   Racketeering Acts 20, 21, 23, and 27 relating
to extortion; and

(2)   Racketeering Acts 29, 31, and 33 relating to
money laundering.

All in violation of Title 18, United States Code, Section
1962(c).

<u>COUNT THREE</u>
(Extortion Conspiracy:   "Rent")

80.   The allegations of paragraphs 1 through 14 of this Superseding Indictment are hereby realleged and incorporated as if fully set forth herein.

81.   From in or before 1979 and continuing until in or about 1996, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER,**
**STEPHEN J. FLEMMI, and**
**KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, did knowingly and intentionally conspire to obtain property from persons known and unknown to the grand jury, including but not limited to the following individuals,

Paul Moore,
William Shea,
John Cherry,
Thomas Cahill,
John "Red" Shea,
Joseph Tower,
Anthony Attardo,
David Lindholm,
Richard O'Brien,
Richard "Jay" Johnson, and
Kevin Hayes,

who were engaged in unlawful activities, including illegal gambling, illegal money lending, and illegal trafficking in narcotics and other controlled substances, with their consent, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, and to thereby obstruct,

61

delay, and affect commerce and the movement of any article in commerce.

82.  It was part of the conspiracy that the defendants **JAMES J. BULGER**, **STEPHEN J. FLEMMI**, and **KEVIN P. O'NEIL**, and others known and unknown to the grand jury, did commit and cause to be committed those acts and engaged in that conduct described in paragraphs 45 through 49 of this Superseding Indictment, which are hereby realleged and incorporated as if fully set forth herein.

All in violation of Title 18, United States Code, Section 1951.

COUNT FOUR
(Extortion of Kevin Hayes)

83.   From in or before 1994 and continuing until in or about
1996, both dates being approximate and inclusive, within the
District of Massachusetts, the defendant

**JAMES J. BULGER,**

and others known and unknown to the grand jury, did knowingly and
intentionally obtain property, to wit, United States currency
from Kevin Hayes with his consent, which consent was induced by
the wrongful use of actual and threatened force, violence, and
fear, and thereby did obstruct, delay, and affect commerce and
the movement of any article in commerce.

All in violation of Title 18, United States Code, Sections
1951 and 2.

COUNT FIVE
(Money Laundering Conspiracy)

84.   The allegations of paragraphs 1 through 14 of this Superseding Indictment are hereby realleged and incorporated as if fully set forth herein.

85.   From in or before 1984 and continuing until in or about August 1999, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER,
STEPHEN J. FLEMMI, and
KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, knowing that the property involved represented the proceeds of some form of unlawful activity, did knowingly and intentionally conspire:

(1)   to conduct financial transactions, affecting interstate and foreign commerce, which in fact involved the proceeds of extortion, in violation of Title 18, United States Code, Section 1951, and Chapter 265, Section 25 of the Massachusetts General Laws, and distribution of narcotics and controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said extortion and distribution of narcotics and controlled substances, and

64

(2)   to engage in monetary transactions affecting interstate and foreign commerce in criminally derived property that was of a value greater than $10,000, said property having been derived from specified unlawful activity, that is, extortion in violation of Title 18, United States Code, Section 1951, and Chapter 265, Section 25 of the Massachusetts General Laws, and distribution of narcotics and controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Section 1956(h) of Title 18 of the United States Code.

86.   It was part of the conspiracy that the defendants **JAMES J. BULGER**, **STEPHEN J. FLEMMI** and **KEVIN P. O'NEIL**, and others known and unknown to the grand jury, did commit and cause to be committed those acts and engaged in that conduct described in paragraphs 63 through 67 of this Superseding Indictment, which are hereby realleged and incorporated as if fully set forth herein.

All in violation of Title 18, United States Code, Section 1956(h).

<u>COUNTS SIX THROUGH TWENTY-SIX</u>
(Money Laundering)

87.   On or about the dates indicated below, within the District of Massachusetts and elsewhere, the defendants

**JAMES J. BULGER and
KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, knowing that the properties involved in the financial transactions set forth below, to wit, certain real property and the proceeds of a liquor business, represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct financial transactions, to wit, mortgage payments, affecting interstate and foreign commerce, which in fact involved the proceeds of a specified unlawful activity, that is, extortion in violation of Title 18, United States Code, Section 1951, and Chapter 265, Section 25 of the Massachusetts General Laws, and distribution of narcotics and controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, in violation of Sections 1956(a)(1)(B)(i) and 2 of Title 18 of the United States Code.

66

| COUNT NO. | CHECK NO. | DATE OF DEPOSIT | PAYEE | AMOUNT OF TRANSACTION |
|---|---|---|---|---|
| 6 | 231 | 11/18/94 | JAMES J. BULGER | $4,672.90 |
| 7 | 233 | 12/12/94 | JAMES J. BULGER | $4,672.90 |
| 8 | 238 | 03/30/95 | JAMES J. BULGER | $4,672.90 |
| 9 | 239 | 04/20/95 | JAMES J. BULGER | $4,672.90 |
| 10 | 243 | 06/14/95 | JAMES J. BULGER | $4,672.90 |
| 11 | 245 | 07/21/95 | JAMES J. BULGER | $4,672.90 |
| 12 | 250 | 11/30/95 | JAMES J. BULGER | $4,672.90 |
| 13 | 252 | 01/12/96 | JAMES J. BULGER | $4,672.90 |
| 14 | 253 | 01/12/96 | JAMES J. BULGER | $4,672.90 |
| 15 | 255 | 02/16/96 | JAMES J. BULGER | $4,672.90 |
| 16 | 256 | 02/17/96 | JAMES J. BULGER | $4,672.90 |
| 17 | 260 | 05/10/96 | JAMES J. BULGER | $4,672.90 |
| 18 | 261 | 05/13/96 | JAMES J. BULGER | $4,672.90 |
| 19 | 264 | 06/20/96 | JAMES J. BULGER | $4,672.90 |
| 20 | 265 | 06/20/96 | JAMES J. BULGER | $4,672.90 |
| 21 | 266 | 06/20/96 | JAMES J. BULGER | $4,672.90 |
| 22 | 268 | 07/15/96 | JAMES J. BULGER | $4,672.90 |
| 23 | 269 | 07/20/96 | JAMES J. BULGER | $4,672.90 |
| 24 | 270 | 08/15/96 | JAMES J. BULGER | $4,672.90 |
| 25 | 278 | 01/06/97 | JAMES J. BULGER | $4,672.90 |
| 26 | 281 | 03/20/97 | JAMES J. BULGER | $4,672.90 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

<u>COUNT TWENTY-SEVEN</u>
(Money Laundering)

88.   In or about July 1996, within the District of
Massachusetts and elsewhere, the defendants

**JAMES J. BULGER and
STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, knowing that the
property involved in a financial transaction, to wit,
approximately $10,000 cash, represented the proceeds of some form
of unlawful activity, did knowingly and intentionally conduct a
financial transaction, to wit, the transfer of approximately
$10,000 cash for use by John V. Martorano, affecting interstate
and foreign commerce, which in fact involved the proceeds of a
specified unlawful activity, that is, extortion in violation of
Title 18, United States Code, Section 1951, and Chapter 265,
Section 25 of the Massachusetts General Laws, and distribution of
narcotics and controlled substances, in violation of Title 21,
United States Code, Section 841(a)(1), knowing that the
transaction was designed in whole or in part to conceal and
disguise the nature, the location, the source, the ownership, and
the control of the proceeds of said specified unlawful activity,
and with intent to promote the carrying on of said specified
unlawful activity, in violation of Sections 1956(a)(1)(A)(i),
1956(a)(1)(B)(i) and 2 of Title 18 of the United States Code.

68

COUNT TWENTY-EIGHT
(Monetary Transaction in Criminally Derived Property)

89.   From in or before April 1999 and continuing until in or
about August 1999, both dates being approximate and inclusive, in
the District of Massachusetts, the defendant

**KEVIN P. O'NEIL,**

and others known and unknown to the grand jury, did knowingly
attempt to engage in a monetary transaction affecting interstate
and foreign commerce, to wit:   the sale of the real property
located at 295 Old Colony Avenue, South Boston, Massachusetts and
the business known, at various times, as Stippo's Liquor Mart,
the South Boston Liquor Mart and Columbia Wine and Spirits, in
criminally derived property that was of a value greater than
$10,000, said property having been derived from specified
unlawful activity, that is, extortion in violation of Title 18,
United States Code, Section 1951 and Chapter 265, Section 25 of
the Massachusetts General Laws, and distribution of narcotics and
other controlled substances in violation of Title 21, United
States Code, Section 841(a)(1).

All in violation of Title 18, United States Code, Sections
1957 and 2.

69

COUNT TWENTY-NINE
(Extortionate Collection of Credit)

90.   From in or about 1992 and continuing until in or about
1997, within the District of Massachusetts and elsewhere, the
defendant

**STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, did knowingly and
intentionally participate in the use of extortionate means to
collect and attempt to collect extensions of credit made to Al
Sapochetti in the amount of approximately $33,000.

All in violation of Title 18, United States Code, Sections
894(a) and 2.

70

<u>COUNT THIRTY</u>
(Obstruction of Justice)

91.   From in or about 1993 and continuing until in or about November 1995, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendant

**STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, did corruptly endeavor to influence, obstruct, and impede the due administration of justice, to wit, did knowingly and intentionally attempt to influence and influence the potential and actual testimony of Richard O'Brien, with intent to obstruct and impede a United States grand jury investigating members and associates of the Bulger Group.

All in violation of Title 18, United States Code, Sections 1503 and 2.

COUNT THIRTY-ONE
(Obstruction of Justice)

92.   On or about August 20 and 28, 1998, in the District of

Massachusetts, the defendant

**STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, did corruptly

endeavor to influence, obstruct, and impede the due

administration of justice in that the defendant **STEPHEN J. FLEMMI**

did knowingly and willfully make false and misleading

declarations before the United States District Court with intent

to obstruct and impede the prosecution of the case of United

States v. Stephen J. Flemmi, Criminal Docket Number 94-10287-MLW.

93.   At the times and place stated above, the defendant

**STEPHEN J. FLEMMI**, and others, corruptly endeavored to influence,

obstruct, and impede the due administration of justice by the

means and in the manner stated below:

a.   In or about 1997 and 1998, the United States

District Court for the District of Massachusetts was conducting

pretrial hearings in the case of United States v. Stephen J.

Flemmi, Criminal Docket Number 94-10287-MLW.   These hearings

concerned, among other things, **FLEMMI's** claim that the case

should be dismissed because he was immune from prosecution.

**FLEMMI's** immunity claim was based, among other things, on his

claim that the conduct of certain agents of the Federal Bureau of

72

Investigation in protecting him from prosecution amounted to a grant of immunity.

b.   **FLEMMI** testified in support of his motion to dismiss in or about August and September 1998.   **FLEMMI** gave false and misleading testimony that was designed, among other things, to shield his corrupt relationship with former Federal Bureau of Investigation Special Agent John J. Connolly and to falsely attribute acts that were corrupt and intended to assist **FLEMMI** to other agents of the Federal Bureau of Investigation.   For example, **FLEMMI** falsely testified, in substance, that Federal Bureau of Investigation Special Agent John Morris had warned **FLEMMI** and **BULGER** in approximately December 1994 and January 1995 that **FLEMMI** and **BULGER** were about to be indicted and arrested. In fact, former Federal Bureau of Investigation Special Agent John J. Connolly had provided that warning to **FLEMMI**.   **FLEMMI** coordinated with Connolly prior to **FLEMMI's** testimony regarding the substance of **FLEMMI's** testimony and **FLEMMI's** subsequent false and misleading testimony included, but was not limited to, the following:

(1)   On August 20, 1998:

Defense Attorney Fishman:   Did you receive some advance notice of this indictment?

**STEPHEN FLEMMI:**   That's the big question, I guess. Yes.

Defense Attorney Fishman:     And when did you receive advance
                              notice?

**STEPHEN FLEMMI:**           That information, when?

Defense Attorney Fishman:     When?

**STEPHEN FLEMMI:**           About a week prior to the
                              indictment coming down.

Defense Attorney Fishman:     And what was -- from whom did you
                              hear that the -- what did you hear?

**STEPHEN FLEMMI:**           What I heard, I got the information
                              from Jim Bulger, who got the
                              information from John Morris.

Defense Attorney Fishman:     What did he say to you?

**STEPHEN FLEMMI:**           He said that the indictments were
                              coming down within a short period
                              of time, within I believe a week or
                              so, and that information, what he
                              told me, was a memo from Washington
                              that the indictments were there,
                              and they were going to be coming
                              down in a week.

Defense Attorney Fishman:     Well, how do you know it was
                              Morris?

**STEPHEN FLEMMI:**           Jim Bulger told me.

Defense Attorney Fishman:     What did he say?

**STEPHEN FLEMMI:**           He told me Morris contacted him and
                              told him the indictments were
                              coming down; they were coming down
                              within a week.  And they came down
                              within a week.  At least I got
                              arrested within a week - a week
                              later.

              (2)  On August 28, 1998:

**FLEMMI** testified: "I'm saying that the indictment come down

or the information, whatever it was that come down, I had

information from Jim Bulger that the indictment come down - was

coming down.   I think it was a cross (sic) memo or a memo in

Washington, and he had become aware of it.   John Morris made him

aware of it.   He called me and made me aware of it."

All in violation of Title 18, United States Code, Sections

1503 and 2.

<u>COUNT THIRTY-TWO</u>
(Possession of Silencers)

94.   From in or about the late 1980s and continuing until on or about January 13, 2000, both dates being approximate and inclusive, within the District of Massachusetts, the defendant

**STEPHEN J. FLEMMI,**

and others known and unknown to the grand jury, did knowingly and intentionally possess firearms, to wit: five silencers, which were not registered to him in the National Firearms Registration and Transfer Record.

All in violation of Title 26, United States Code, Sections 5841, 5845(a), 5861(d), and 5871 and Title 18, United States Code, Section 2.

<u>MONEY LAUNDERING FORFEITURE ALLEGATIONS</u>

95.   The allegations of Counts Five through Twenty-Eight of this Superseding Indictment are hereby realleged and incorporated herein for the purpose of alleging forfeitures pursuant to the provisions of Title 18, United States Code, Section 982.

96.   As a result of the offenses in violation of Title 18, United States Code, Sections 1956 and 1957, set forth in Counts Five through Twenty-Eight of this Superseding Indictment, the defendants

> **JAMES J. BULGER,**
> **STEPHEN J. FLEMMI, and**
> **KEVIN P. O'NEIL,**

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal, involved in such offenses, and all property traceable to such property.   The property to be forfeited by the defendants pursuant to Section 982(a)(1) includes, but is not limited to, all of the defendants' joint and several interests in the following assets:

a.   Approximately $2,500,000 in United States currency;

b.   South Boston Liquor Mart, Inc., a Massachusetts corporation doing business as Columbia Wine and Spirits;

c.   Columbia Wine and Spirits, Inc., a Massachusetts corporation; and

d.    The real property, with all rights appertaining
thereto, located at 295 Old Colony Avenue, South Boston,
Massachusetts, title to which appears at Book 15995, Page 291, of
the Suffolk County Registry of Deeds.

97.  If any of the property described in paragraph 96 hereof
as being forfeitable pursuant to Title 18, United States Code,
Section 982(a)(1), as a result of any act or omission of the
defendants --

a.    cannot be located upon the exercise of due
diligence;

b.    has been transferred to, sold to, or deposited
with a third party;

c.    has been placed beyond the jurisdiction of this
Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which
cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18,
United States Code, Section 982(b)(1), incorporating Title 21,
United States Code, Section 853(p), to seek forfeiture of all
other property of the defendants up to the value of the property
described in subparagraphs a through e of this paragraph.

All pursuant to Title 18, United States Code, Section 982.

RACKETEERING FORFEITURE ALLEGATIONS

98.   The allegations of Counts One and Two of this
Superseding Indictment are hereby realleged and incorporated
herein for the purpose of alleging forfeitures pursuant to the
provisions of Title 18, United States Code, Section 1963.

99.   As a result of the offenses in violation of Title 18,
United States Code, Section 1962, set forth in Counts One and Two
of this Superseding Indictment, the defendants

**JAMES J. BULGER,**
**STEPHEN J. FLEMMI, and**
**KEVIN P. O'NEIL,**

shall forfeit to the United States of America pursuant to Title
18, United States Code, Section 1963(a):

(i)   all interests the defendants have acquired and
maintained in violation of Title 18, United States Code, Section
1962, wherever located, and in whatever names held;

(ii)  all interests in, securities of, claims against,
and properties and contractual rights of any kind affording a
source of influence over, any enterprise which the defendants
have established, operated, controlled, conducted, and
participated in the conduct of, in violation of Title 18, United
States Code, Section 1962; and

(iii) all property constituting, and derived from, any
proceeds which the defendants obtained, directly and indirectly,
from racketeering activity in violation of Title 18, United

79

States Code, Section 1962.  The property to be forfeited by the defendants pursuant to Title 18, United States Code, Section 1963 and subparagraphs (i) through (iii) of this paragraph, includes, but is not limited to, all of the defendants' joint and several interests in the following assets:

    a.    Approximately $10,000,000 in United States currency;

    b.    South Boston Liquor Mart, Inc., a Massachusetts corporation doing business as Columbia Wine and Spirits;

    c.    Columbia Wine and Spirits, Inc., a Massachusetts corporation;

    d.    The real property, with all rights appertaining thereto, located at 295 Old Colony Avenue, South Boston, Massachusetts, title to which appears at Book 15995, Page 291, of the Suffolk County Registry of Deeds;

    e.    Rotary Variety Store Company, Inc., a Massachusetts corporation and any and all proceeds derived therefrom;

    f.    The real property, with all rights appertaining thereto, located at 309-325 Old Colony Avenue, South Boston, Massachusetts, title to which appears at Book 18931, Page 294, of the Suffolk County Registry of Deeds and any and all proceeds derived therefrom;

    g.    Triple "O," Inc., a Massachusetts corporation;

    h.    Triple O's Nominee Trust; and

i.   The real property, with all rights appertaining thereto, located at 28-30 West Broadway, South Boston, Massachusetts, title to which appears at Book 16748, Page 251, of the Suffolk County Registry of Deeds.

100. If any of the property described in paragraph 99 hereof as being forfeitable pursuant to Title 18, United States Code, Section 1963, as a result of any act or omission of the defendants --

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred to, sold to, or deposited with a third party;

c.   has been placed beyond the jurisdiction of this Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of all other property of the defendants up to the value of the property described in subparagraphs a through e of this paragraph.

All pursuant to Title 18, United States Code, Section 1963.

81

A TRUE BILL

_____
Foreperson of the Grand Jury

_____
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS; Sept. 27, 2000 at 3:55 pm.

Returned into the District Court by the Grand Jurors and filed.

_____
Deputy Clerk