UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )    CRIM. NO. 99-10371-RGS |
| | ) |
| JAMES J. BULGER, | ) |
| | ) |
| Defendant. | ) |

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR RULE 16(a)(1)(E) DISCOVERY

The defendant has filed a motion seeking additional discovery primarily focused on

obtaining support for his frivolous and absurd claim that he was given a license to murder by

now deceased former federal prosecutor Jeremiah O'Sullivan (hereinafter "O'Sullivan").

Ironically, the defendant, who has incessantly complained about the volume of discovery in this

case, imagines that there are additional discoverable materials that he has yet to receive.  The

defendant claims that the basis for his request for this additional discovery is that the documents

are material to his immunity defense.

The government submits that, for the reasons set forth below: (1) the defendant has not

made any prima facie showing sufficient to justify his immunity claim and, therefore, cannot

establish materiality to support his new discovery requests; (2) the defendant did not, in fact,

have immunity; (3) the Court must decide prior to trial the question of immunity[1]; and (4) the

---

[1]    The Court has cited United States v. Doe, 63 F.3d 121, 126 (2d Cir. 1995), for the
proposition that the defendant's immunity claim is "a question of mixed law and fact that
requires certain factual findings by the jury as a predicate to the Court's ruling."  See
Memorandum And Order On Defendant's Motion To Continue Trial, p.12, n.13 issued
November 9, 2012.  However, Doe involves a claim of public authority which constitutes an
affirmative defense to be determined by a jury.  See Doe at 124-125. See also, F.R.Cr.P. 12.3.
Unlike Doe, the case at bar involves a claim of immunity which is a contractual claim and can be
determined by the Court "without the trial of the general issue." See F.R.Cr.P. 12(b). See also,

documents and information sought by defendant are privileged and specifically exempted from the requirement of Rule 16.  See F.R.Cr.P. 16(a)(2).

The defendant's contention that, "[u]ltimately, it will be a jury question to determine why Jeremiah O'Sullivan, nor any member of the Department of Justice, ever prosecuted James Bulger during his period of protection" militates in favor of determining the question of immunity prior to trial.  (See Defendant's Motion For Rule 16(a)(1)(E) Discovery, at p.10, ECF Docket #768.)  Otherwise, the trial of this matter will become unduly elongated and unmanageable.

_____

Doe at 125.

Furthermore, the defendant has failed to provide notice that he intends to rely on a defense of public authority as required by F.R.Cr.P. 12.3.  Nor could he.  His FBI file is bereft of any authorization by any federal official allowing the defendant to commit any crime.  See, e.g., United States v. Abcasis, 45 F.3d 39, 43-44 (2d Cir. 1995), where the court noted:

> Needless to say, the defendant's conduct must remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization.  Furthermore, for a defendant's reliance to be reasonable, the jury must conclude that "'a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries.'"

Id. (citations omitted).  See also United States v. Berg, 643 F. Supp. 1472, 1480 (E.D.N.Y. 1986), where the court stated:

> The proposition that a defendant may commit a criminal act without prior notice to any Government official on the basis of a supposed carte blanche authorization **or a license to do everything but kill** is without precedent and stretches any concept of good faith reliance beyond recognition.

Id. (emphasis added).

2

I.      INTRODUCTION

        A.      The Defendant Does Not Have Immunity From Prosecution

        The predicate for the defendant's claim that the government is in possession of

documents that are material to his defense and have yet to be produced is that the defendant has

immunity from prosecution.  The defendant has failed to provide any affidavit or evidence to

support the absurd notion that he entered into a legally binding agreement with O'Sullivan that

immunized the defendant in perpetuity for any crime the defendant chose to commit.  Even if

one were to indulge the defendant's fantastical claim, such an agreement would have been void

ab initio as against public policy. (See discussion infra. at pp. 17-21)

        Instead of providing the Court with an affidavit reciting the details of his alleged

conversation with the now deceased O'Sullivan, the defendant relies on vague representations

and renews old and debunked claims that somehow the failure to prosecute the defendant prior to

the instant case is proof that the defendant had immunity.

        The defendant, however, curiously ignores the testimony under oath by every

government official and federal agent that has testified about this matter over the past fifteen

years of seemingly endless civil and criminal litigation that there was no immunity agreement

between the defendant and the government.[2]  Moreover, the defendant ignores the fact that his

---

        [2]      For example, during the hearings conducted by Judge Wolf in the case of United
States v Frances Salemme, et al., Crim. No. 94-10287-MLW, every federal agent and prosecutor
called as a witness explicitly denied any knowledge of any immunity agreement involving either
Flemmi or Bulger.  (See testimony of Lawrence Sarhatt, Tr. 1/7/98 pp. 155-156; testimony of
Richard Carter, Tr. 8/18/98 p.84; testimony of James Greenleaf, Tr. 1/8/98 p.112; testimony of
H. Paul Rico, Tr. 1/13/98, pp.100,108,112,117,144, 145; Tr. 1/14/98, pp.16,52,71,77; testimony
of Roderick Kennedy, Tr. 4/14/98 p.159; testimony of Nicholas Gianturco, Tr. 4/20/98 pp.36-38;
testimony of John Morris, Tr. 4/22/98 pp.132-133; Tr. 4/29/98 p.49; testimony of Dennis
Condon, Tr. 5/5/98 p.136; testimony of James Ahearn, Tr. 5/7/98 p.106; Tr. 5/11/98 pp.55-56,

success in avoiding prosecution was due in large part to his corrupt relationship with his FBI

control agent, John Connolly.[3]  In addition to Connolly, a high ranking member of the

Massachusetts State Police has also been successfully prosecuted for his corrupt relationship

with the defendant and Stephen Flemmi.[4]

The defendant also ignores the fact that there had, in fact, been several significant efforts

involving Department of Justice (herinafter "DOJ") components to investigate and prosecute

Bulger and Flemmi during the 1980's, including the following:

1.  A joint DEA/FBI investigation ca. 1984-85 into Bulger and Flemmi's narcotics
    distribution activities known as "Operation Beans."  This investigation involved a
    wiretap on a telephone used by a Winter Hill Gang lieutenant, George Kaufman,
    as well as a "bug" in an automobile used by the defendant and a bug in the
    defendant's Louisburg Square apartment.

2.  A FBI undercover police corruption investigation ca. 1986-88 involving
    consensual recordings and wiretaps of several Winter Hill bookmakers who were
    making payments to members of the Boston Police Department.

---

61,64,123; testimony of Gary Crossen, Tr. 5/13/98 p. 33; testimony of Steven Boeri, Tr. 5/18/98
pp.114-115,129-130,144-146; Tr. 5/19/98, p.6; testimony of Albert Reilly, Tr. 5/20/98 pp.57,61-
62,91-92; testimony of Lawrence Potts, Tr. 5/21/98 pp. 99-100,154; testimony of William Weld,
Tr. 5/26/98 pp.49-50, 53; Tr. 5/27/98 pp.71-73,77,81-82,104-105; testimony of James
Blackburn, Tr. 5/6/98 pp. 46-47,49; testimony of John Newton, Tr. 5/28/98 pp.156-157; Tr.
6/2/98 pp.46-48,51,56,62,70; testimony of Richard Bergeron, Tr. 6/2/98 p.160; testimony of
James Ring, Tr. 6/11/98, pp.15-16,18,19; Tr. 6/19/98 pp.112-115,168; testimony of Walter
Steffens, Tr. 8/10/98 pp. 54-55; testimony of Diane Kottmyer, Tr. 8/14/98 pp.34,36.

[3]     See United States v. John J. Connolly, Jr., 341 F.3d 16 (1st Cir. 2003) where
Connolly was convicted of racketeering and obstruction of justice related to his relationship with
the defendant and Florida v. John J. Connolly, Jr., No. F01-8287D, 2011 WL 767985, where
Connolly was convicted of Murder in the Second Degree for his involvement with the defendant
for the 1982 murder of John Callahan.

[4]     See United States v. Richard Schneiderhan, 404 F.3d 73 (1st Cir. 2005).
Schneiderhan was convicted of obstruction of justice for "tipping off" Kevin Weeks that William
and John Bulger's home telephones were the subjects of court authorized electronic surveillance.
Historically, he had passed information to Flemmi and the defendant regarding state wiretaps of
bookmakers who worked for the defendant and Flemmi.

3.      A DEA narcotics distribution investigation ca. 1988-90 of the defendant's South
        Boston drug organization which involved at least fifteen wiretaps of Bulger-
        associated drug dealers as well as "bugs" placed in the defendant's vehicle and
        outdoor locations frequented by the defendant.

4.      A FBI investigation ca. 1990 which involved an extortion victim of the defendant
        who agreed to engage in consensual recordings and did, in fact, engage in
        consensual recordings with defendant's close associate, Kevin Weeks.

5.      An FBI wiretap investigation ca. 1993 at the Rotary Variety Store which targeted
        a telephone used by the defendant.

The defendant's claim of immunity is inconsistent with the objective evidence that the

DOJ and the FBI continued to investigate the defendant throughout the entire period of the

defendant's criminal career including the investigation that led to the defendant's indictment in

January 1995.  Many of these investigations occurred while O'Sullivan held management

positions in DOJ.

In fact, O'Sullivan testified before Congress in 2002 that he assisted the Massachusetts

State Police and the Suffolk County District Attorney's Office in 1980 to conduct electronic

surveillance at the Lancaster Street Garage in Boston's North End, a location the defendant used

to conduct criminal business.  See Investigation of Allegations of Law Enforcement Misconduct

in New England - Volume 3: Hearing Before the H. Comm. on Govt. Reform, 107th Cong.

(2003) (Statement of Jeremiah O'Sullivan, former Chief Attorney, New England Organized

Crime Strike Force at 291.)  O'Sullivan also testified that he targeted the defendant for

prosecution in the police corruption investigation mentioned above.  Id. at 309, 318.  Moreover,

O'Sullivan testified that he did not indict the defendant and Flemmi in the "race fix case"

because he had insufficient corroborative evidence, not because he agreed to the FBI's request to

decline prosecution.  Id. at 296, 312.   Interestingly, O'Sullivan also testified that the FBI (SAs

Connolly and Morris) asked O'Sullivan if they could take credit for saving Bulger and Flemmi from prosecution and O'Sullivan told them that they could say whatever they wanted.  Id. at 291.

Corroborative of O'Sullivan's testimony before Congress was the testimony of former U.S. Attorney William Weld who testified that he was "quite anxious to prosecute Mr. Flemmi and Mr. Bulger," and he was not aware of any immunity agreement with them.  United States v. Salemme, 94-10287-MLW, Tr. 5/27/98 p.82.  Mr. Weld testified that his "close" colleague, then Strike Force Chief Jeremiah O'Sullivan, never suggested to Weld that the defendant and Flemmi enjoyed any agreement with the government that would prevent their prosecution.  Further, O'Sullivan never discouraged Weld from investigating the defendant and Flemmi.  Tr. 5/27/98 p.73.

Also corroborative of O'Sullivan's testimony is a document authored by Connolly in the defendant's informant file.  The defendant was placed in a "closed" status by the FBI in January 1978 due to the fact that "subject could possibly become involved in legal difficulties in the near future."  (See FBI teletype dated 1/27/78 attached hereto as Exhibit A.)  On May 11, 1979, Connolly requested that the defendant be re-opened as an informant because, "... no prosecutable case developed against source in the opinion of Strike Force attorney handling matter."  (See FBI teletype dated 5/11/79 attached hereto as Exhibit B.)  These reports obviously reference the "race fix" case and the May 1979 teletype clearly makes no mention of any agreement between O'Sullivan and the defendant.  Rather, the document reflects exactly what O'Sullivan told Congress over twenty years later, i.e., the fact that the defendant was not prosecuted in the race fix case was due to a lack of evidence rather than any immunity deal between O'Sullivan and the defendant.

6

Furthermore, the defendant's informant file fails to record any meeting between the defendant and O'Sullivan.  FBI regulations required that any substantive contacts with an informant be memorialized.  If such a meeting occurred where O'Sullivan reached any agreement with the defendant, it would have been memorialized by the defendant's handler, John Connolly.  Even Connolly has denied that there was any agreement that the defendant could engage in acts of violence.  Connolly's supervisor, John Morris, has testified that, according to Connolly, the only thing the defendant wanted was "a head start."  It is now undisputed that Connolly did indeed give the defendant "a head start."

Finally, **in October 1984**, Connolly's then supervisor, James Ring, authored a report and placed it in the defendant's informant file that stated, in pertinent part,

> The contact agent's position is clear as is mine.  If these individuals [Bulger and Flemmi] are violating the law and subject to investigation, that is their problem.  There is not and will not be any authorization by the FBI for these individuals to commit any criminal acts unless such authorization conforms to present Bureau regulations.

(See FBI memorandum dated 10/17/84 attached hereto as Exhibit C.)

Regarding the defendant's argument that the failure to prosecute him corroborates his claim of immunity, the cooperation of the defendant's partners in crime, John Martorano, Stephen Flemmi, and Kevin Weeks has resulted in the successful prosecutions of two corrupt law enforcement agents, FBI SA John Connolly and MSP Lt. Richard Schneiderhan.  In fact, Connolly and Schneiderhan were on the defendant's payroll and received significant sums of money to "tip off" the defendant to pending law enforcement investigations. The testimony of Martorano, Flemmi, and Weeks has convincingly demonstrated that the defendant's success in avoiding prosecution was due to his corrupt relationship with Connolly and Schneiderhan rather

7

than any immunity deal with the government.

Since 1997 when the defendant's relationship with the FBI was first disclosed, relevant government documents have been reviewed by at least three different teams of government lawyers and investigators.  These teams include the current group of prosecutors and investigators assigned to the instant case, government lawyers and investigators from the DOJ's Torts Branch assigned to the nineteen civil cases related to the defendant, and the "Justice Task Force" composed of DOJ prosecutors and investigators from outside Massachusetts assigned to investigate and prosecute law enforcement corruption connected to the defendant.

It is pure fantasy for the defendant to contend that government documents exist that support his immunity claim which have yet to be discovered by the aforementioned teams of prosecutors and investigators.  Perhaps realizing that no such documents exist, the defendant argues that the absence of such documents allows him to rummage through numerous irrelevant and privileged government memoranda hoping to find something from which he can argue the negative, i.e., the failure to prosecute equals immunity.   The Court should not allow such a "fishing expedition."

The government has produced transcripts of the following trials and hearings to the defendant:

1.    Hearings held in U.S. v. Salemme, et al.

2.    Trial in U.S. v. John Connolly

3.    Trial in Florida v. John Connolly

4.    Trial in McIntyre v. United States

5.    Trial in Halloran, Castucci and Donahue v. United States

6.      Trial in <u>Litiff, Davis and Hussey v. United States</u>

In addition to the aforementioned, the defendant has received significant discovery in the form of depositions, plea colloquies and sentencing hearings in other related matters.  These materials also convincingly demonstrate that there was no immunity agreement between the government and the defendant.  Rather, they demonstrate that the defendant enjoyed a corrupt relationship with FBI SA John Connolly and that there was an institutional failure at the FBI to properly manage Connolly as well as its own informant program.

Needless to say, the extensive litigation which has surrounded this matter for almost two decades has left no stone unturned.  The defendant searches for evidence that does not exist.

II.     <u>The law</u>

Contracts generally require a meeting of the minds, mutuality of intent, offer and acceptance, and consideration. <u>Janowsky v. United States</u>, 36 Fed.Cl. 148, 151-152 (U.S. Court of Claims 1996).  Furthermore, in cases where the United States is a party, an additional element is required, <u>i.e.</u>, that the officer whose conduct is relied upon must have actual authority to bind the government in contract.  <u>Id.</u>  The reason for this proposition is pragmatic:

> The United States government employs over 3 million civilian employees.  Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obligating the United States.

<u>City of El Centro v. United States</u>, 922 F.2d 816, 820 (Fed.Cir. 1990), <u>cert. denied</u>, 501 U.S. 1230 (1991).  <u>See</u> <u>also</u>, <u>Federal Crop Insurance Corp. v. Merrill</u>, 332 U.S. 380, 384 (1947) ("[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.")

A.  <u>The defendant has failed to establish the basic elements of an enforceable contract.</u>

Basic tenets of contract law must be applied to the defendant's claim that he had

immunity from prosecution for all crimes (including murder) before it may be enforced against

the government.  <u>United States v. McLaughlin</u>, 957 F.2d 12, 16 (1st Cir. 1992); <u>United States v.</u>

<u>Baldacchino</u>, 762 F.2d 170, 179 (1st Cir. 1985) (holding that plea bargains are subject to contract

law); <u>United States v. Plummer</u>, 941 F.2d 799, 802 (9th Cir. 1991) (holding that "ordinary

contract principles apply when interpreting informal immunity agreements"); <u>United States v.</u>

<u>Santiago-Rodriguez</u>, 993 F.Supp. 31, 35 (D.P.R. 1998) (holding immunity agreements are

subject to the same standards as plea bargains).[5]

When evaluating the existence of such an immunity agreement, the defendant's rights

will be "determined by the terms and conditions of the bargain as found by the court."  <u>United</u>

<u>States v. Salemme</u>, 91 F. Supp. 2d 141, 316 (D. Mass. 1999), citing <u>McLaughlin</u>, 957 F.2d at 16.

While an agreement need not be in writing to be enforceable, an oral agreement must

contain the same essential requisites as a written agreement in order to be enforceable.  These

elements are offer, acceptance, and consideration.  <u>Zemke v. City of Chicago</u>, 100 F.3d 511, 513

(7th Cir. 1996).  To establish these elements and make out an enforceable contract, the proponent

must establish that the oral agreement had terms which were definite and certain.  <u>Zemke</u>, 100

F.3d at 513 (alleged oral employment contract that did not specify the date on which it was to

begin or the salary was unenforceable).  "Language within a contract 'is usually considered

---

[5]        <u>But</u> <u>see</u> <u>United States v. Carrillo</u>, 709 F.2d 35, 36 n.1 (9th Cir. 1983) (dictum in a
footnote suggesting that contract law might not always be applicable in a criminal cases
involving the interpretation of a criminal defendant's agreement with the government where "the
law of contracts does not provide a sufficient analogy and mode of analysis").

ambiguous where an agreement's terms are inconsistent on their face or where the phraseology

can support reasonable difference[s] of opinion as to the meaning of the words employed and

obligations undertaken.'" Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1122 (1st Cir.

1995) (citations omitted).

Under the doctrine of promissory estoppel, as well, there is the same requirement of

definite terms.  Ellenwood v. Exxon Shipping Co., 984 F.2d 1270, 1281 n.13 (1st Cir. 1993) (an

estoppel claim, like a contract claim, must be supported by a sufficiently definite promise).[6]  A

mere expression of a future intention does not constitute a sufficiently definite promise, for

purposes of promissory estoppel, to justify reasonable reliance thereon.  Santoni v. Federal

Deposit Insurance Corp., 677 F.2d 174, 179 (1st Cir. 1982).

In Held v. Zamparelli, 13 Mass.App.Ct. 957, 958, 431 N.E.2d 961, 962 (1982), involving

an alleged oral contract for a share of profits from a lease, the Court held that, even assuming the

truth of the allegations, they were too vague and indefinite to be enforceable.  The Court found

many of the essential terms to be missing, including the duration of the agreement.

"Construction and enforcement of the agreement without these essential terms would be futile,

and we cannot supply these provisions without writing a contract for the parties which they

themselves did not make."  Id.

Whether a contract exists is a question of law.  See Mass. Cash Register, Inc. v. Comtrex

Systems Corp., 901 F. Supp. 404, 415 (D. Mass. 1995) (citing Schwanbeck v. Federal-Mogul

---

[6]       " 'The theory of promissory estoppel, as embodied in the Restatement [(First)] of
Contracts § 90 (1932), permits recovery if (1) a promisor makes a promise which he should
reasonably expect to induce action or forbearance of a definite and substantial character on the
part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice
can be avoided only be enforcement of the promise.'" Coll, 50 F.3d at 1124.

Corp., 31 Mass.App.Ct. 390, 406, 578 N.E.2d 789 (1991), modified 412 Mass. 703, 709-710,

592 N.E.2d 1289 (1992)).  As discussed above, it is axiomatic that a contract's essential terms

must be "sufficiently definite so that the nature and extent of the obligations of the parties" are

ascertainable.  Mass. Cash, 901 F. Supp. at 417 (quoting Simons v. Am. Dry Ginger Ale Co.,

335 Mass. 521, 523, 140 N.E.2d 649 (1957)).[7]  For example, if an agreement does not allow

breach and remedy to be determined, it is unenforceable.  Jordan-Milton Machinery, Inc. v. F/V

Teresa Marie, 978 F.2d 32, 35 (1st Cir. 1992); see, Restatement (Second) of Contracts § 33

(1979).

Therefore, the defendant must prove that, as a matter of law, a contract for immunity

existed.  Under contract law, the party asserting breach of contract must prove as a threshold

issue that a binding agreement existed.  See Sargent v. Tenaska, Inc., 914 F. Supp. 722, 726

(D.Mass. 1996); see also United States v. Barahona, 990 F.2d 412, 419 (8th Cir. 1993).

In the case at bar, the defendant has failed to satisfy this burden and, therefore, has failed

to prove the existence of an enforceable agreement.  Other than the vague assertion that the

defendant was promised immunity by O'Sullivan, the defendant has failed to set forth any

definite terms and conditions of his alleged agreement.  Furthermore, there is no allegation that

the defendant ever met with O'Sullivan.  In the absence of such a meeting, there can be little

---

[7]      Among the missing terms in the alleged agreement is any mention of a duration.
While this alone does not make a contract too vague to enforce, the contract is then construed as
one terminable at will.  See Jackson v. Action for Boston Comm. Development, Inc., 403 Mass.
8, 9, 525 N.E. 2d 411, 412 (1988); Simons, 335 Mass. at 524, 140 N.E.2d at 653.  In the cases of
employment agreements, no notice of or reason for termination is required.  See Jackson, 403
Mass. at 9, 525 N.E. 2d at 412.  But see Simons, 335 Mass. at 524, 140 N.E.2d at 653 (stating
termination of repair contract required reasonable notice).

likelihood that there was any "meeting of the minds."  The credible evidence proves only that the

defendant had an informant relationship with the FBI.  This relationship did not confer upon the

defendant any legal entitlement nor create any contractual obligations.  Either party could have

terminated the relationship at any time without any legal consequence.[8]

      In <u>Salem Laundry Co. v. New England Teamsters and Trucking Industry Pension Fund</u>,

829 F.2d 278 (1st Cir. 1987), the First Circuit addressed this issue of mutual consent.

> Parties do not become contractually bound until they mutually
> assent to bind themselves to an agreement.  Courts determine that
> mutual assent, **not on the basis of what goes on inside the
> parties' heads**, but rather on the basis of what they say and do...

<u>Id.</u> at 280. (emphasis added)

      Most significantly, the defendant has failed to state with any degree of specificity what

his alleged immunity agreement covered.  For example, did he confess all his crimes to

O'Sullivan?  Did he continue to disclose the commission of new crimes to O'Sullivan?  As

previously mentioned, the defendant's FBI file is bereft of any indication that O'Sullivan ever

met with the defendant or communicated with the defendant in any fashion.  It is highly unlikely

that O'Sullivan met alone with the defendant without the knowledge of the defendant's handler,

John Connolly.

---

[8] Compare the lack of detail in the defendant's allegation to the detailed immunity agreements discussed in <u>United States v. Luloff</u>, 15 F.3d 763 (8th Cir. 1994); <u>United States v. Black</u>, 776 F.2d 1321, 1325 (6th Cir. 1985); and <u>United States v. Andrello</u>, 816 F. Supp. 806, 810 (N.D.N.Y. 1993).

B.      Promissory estoppel does not apply in the defendant's case.

Assuming arguendo that the Court finds that the evidence establishes that statements were made to the defendant that were sufficiently definite to amount to an unambiguous promise, the defendant did not reasonably rely upon the promise to his detriment.  In order for promissory estoppel to apply, three elements must be present: (1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; (3) detriment to such person as a consequence of the act or omission.  Mass. Cash, 901 F.Supp at 420, citing, Cellucci v. Sun Oil Co., 2 Mass.App.Ct. 722, 728 (1974), aff'd, 368 Mass. 811 (1975). See also United States v. Flemmi, 225 F.3d 78, 91 (1st Cir. 2000) (the party who seeks to enforce the promise must have detrimentally relied on it).

Additionally, the First Circuit has adopted the Massachusetts law that such reliance must be reasonable.  Kiely v. Raytheon Co., 105 F.3d 734, 735 (1st Cir. 1997), citing, Rhode Island Hospital Trust National Bank v. Varadian, 419 Mass. 841, 848 (1995).  In Rhode Island Hospital, the Supreme Judicial Court held

> An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made **reasonably relied on the representation**.

Id.

In essence, the defendant must prove that he committed the crimes charged in the indictment in reliance upon an alleged promise made to him by O'Sullivan.  The record in this case is clear that the defendant was a criminal first and an informant second.  In fact, "informer"

14

is a misnomer for the defendant who used his informant status to eliminate his competitors and insulate himself from prosecution by corrupting his handler, Connolly.  The defendant has utterly failed to identify which crimes he committed in reliance on O'Sullivan's alleged promise that the defendant would otherwise have failed to commit.

Furthermore, the reasonableness of this reliance must be apparent to both parties. Detrimental reliance requires "[a]n offer which the offeror should reasonably expect to induce action or forbearance of a substantial character on the part of the offeree ... and which does induce such action or forbearance ...." Loranger Construction Corp. v. E.F. Hauserman Co., 376 Mass. 757, 760, 384 N.E.2d 176, 179 (1978) (quoting Restatement, Contracts § 89B(2) and Illustration 6 (Tent. Drafts Nos. 1-7, 1973)).  Such reliance "is binding ... to the extent necessary to avoid injustice."  Id.  Detrimental reliance replaces the requirement of consideration and renders a promise enforceable only if all the other elements of a contract are met.  See Kiely v. Raytheon, 105 F.3d at 736; Rhode Island Hospital, 419 Mass. at 841; Santoni v. FDIC, 677 F.2d 174, 179 (1st Cir. 1982) (holding that disagreement about the conditions under which a real estate deal would occur made alleged contract too indefinite for application of detrimental reliance).  The defendant's claim that he believed that he had a lifetime license to commit crimes ranging from narcotics distribution to murder is objectively unreasonable.  His attempt to foist this absurd notion upon the Court demonstrates his disdain for the criminal justice system and society itself.

Finally, the resultant prejudice must be caused by an **objectively reasonable** interpretation of government actions.  When evaluating a promise for detrimental reliance, "attention is to be focused upon the reasonableness of reliance by the promisee." Rhode Island

Hospital, 419 Mass. at 848.  This objective test is meant to address whether the promisor could have reasonably predicted that the promisee would rely on his statement.  See Santoni, 677 F.2d at 179.  Defendant's "subjective understanding" is not binding in the First Circuit.  See McLaughlin, 957 F.2d at 16 (holding defendant could be prosecuted for separate crime discovered while he was informing on another crime, despite his belief that he would receive immunity in that case as well); United States v. Hogan, 862 F.2d 386, 388 (1st Cir. 1988) (holding defendant's expectations that his statements would not be used against him were not binding).[9]

In cases involving informal immunity agreements, the First Circuit follows the rule that in order to apply principles of equity to grant immunity there must be detrimental reliance.[10]  See Baldacchino, 577 F. Supp. at 13; United States v. Rodman, 519 F.2d 1058, 1059-60 (1st Cir.

---

[9]  Other circuits split on whether defendant's reasonable reliance should be examined objectively or subjectively.  Compare United States v. Irwin, 612 F.2d 1182, 1191 (9th Cir. 1980) (holding defendant possessed criminal intent despite his substantial compliance with immunity agreement in separate case and his belief immunity also applied to future crimes) with Rowe v. Griffin, 676 F.2d 524, 526 n.4 (11th Cir. 1982) (resolving ambiguity in alleged immunity agreement in defendant's favor).

[10]  Many circuits have never recognized equitable immunity.  The Eleventh Circuit's application of equitable immunity appears not to require detrimental reliance, but merely that: (1) an unauthorized government agent makes an agreement with the defendant; (2) the defendant performs his duties under the agreement; and (3) "the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government."  See Rowe, 676 F.2d 524, 527-28 (dismissing murder indictment because FBI and Alabama Attorney General had granted defendant, then a paid FBI informant, immunity in return for testimony about same murder). See also United States v. Fuzer, 18 F.3d 517, 521 (7th Cir. 1994) (stating Seventh Circuit has neither accepted nor rejected Rowe, but choosing not to grant immunity where state prosecutor and ATF agent who offered it were not authorized to do so).

1975).

Thus, the defendant must not only prove that his reliance on the alleged promise of O'Sullivan was reasonable, he must also prove that O'Sullivan reasonably believed that his statements to the defendant would induce the defendant to commit crimes that the defendant would not have otherwise committed.  The defendant has not and cannot meet these burdens.

Furthermore, engaging in criminal activity may not constitute a legal detriment.  In general, the promise to do an illegal act does not constitute consideration for a promise.  See J.Calamari & J.Perillo, Contracts § 22-1 at 889 (3rd ed. 1987) Comment a; Kiely v. Raytheon, 914 F.Supp 708, 712 (D.Mass. 1996) ("Generally, the Massachusetts courts will decline to enforce a contract the performance of which entails illegal conduct.").[11]   While this argument more properly belongs in the public policy discussion set forth below, it bears mention here for obvious reasons.

C.   It would be against public policy for the Court to enforce the agreement alleged by the defendant.

As briefly discussed above, contracts that require the commission of an illegal act are not enforceable.  In Kiely, the First Circuit refused to allow a claim by the plaintiff based upon his agreement with his employer to violate the law.  The plaintiff, Kiely, had illegally obtained Department of Defense documents on behalf of his defendant/employer, Raytheon.  Id. at 735. Both Raytheon and Kiely were convicted and Raytheon forced Kiely to retire.  Id.  Kiely sued, claiming promissory estoppel regarding his "forced retirement."  Id.   The First Circuit held,

> ... the alleged contract was an agreement to achieve mutual benefit

_____

[11]     As previously noted, the district Court's opinion in Kiely was affirmed at 105 F.3d 734.

17

> from the parties cooperative violation of the law.  Such a contract,
> even if explicitly agreed to by both parties, is void and
> unenforceable as against public policy.

Id. at 736.  This public policy also impacts the reasonableness of any reliance by a party to a

contract that calls for the commission of an illegal act.  The First Circuit stated,

> We reject Kiely's contention that it was reasonable to commit a
> crime in reliance on an implicit promise that he would not be fired
> for doing so.

Id.

Contracts that require conduct that is adverse to the public interest are as unenforceable

as those that contemplate an agreement to violate the law.  In Equal Employment Opportunity

Commission v. Astra USA, Inc., 94 F.3d 738 (1st Cir. 1996), Astra had engaged in settlement

negotiations with employees in sexual harassment claims, and required as a condition of

settlement that the employee not cooperate with the EEOC in any investigations.   Id. at 740-

741.  The First Circuit upheld the issuance of an injunction by the district court that prohibited

Astra from enforcing this "non-assistance" agreement.  Id. at 745.  In conducting its analysis, the

Court stated,

> We build on bedrock.  "[A] promise is unenforceable if the interest
> in its enforcement is outweighed by a public policy harmed by
> enforcement of the agreement."  Town of Newton v. Rumery, 480
> U.S. 386, 392 107 S.Ct. 1187, 1191, 94 L.Ed.2d 405 (1987).

Id. at 744.  This concept has become part of the federal common law and is known as the

"Rumery/Davies test."  United States v. Northrop Corp., 59 F.3d 953, 958 (9th Cir. 1995).

In the case at bar, the defendant's claim that he was promised immunity from prosecution

for all crimes (including murder) that he had committed in the past and would commit in the

future constituted the paradigmatic "agreement to achieve mutual benefit from the parties'

18

cooperative violation of the law." <u>Kiely</u> at 736.  If it is not an agreement to violate the law, it is most certainly an agreement that "sows the seeds of harm to the public interest." <u>Id.</u>

Beyond that basic principle, however, lies the fundamental issue raised by the defendant in this case, <u>i.e.</u>, the contention that any agreement to immunize future unknown criminal activity should be enforced by the courts.

In <u>United States v. Irwin</u>, 612 F.2d 1182 (9th Cir. 1980), the Ninth refused to honor an immunity agreement that would have granted the defendant immunity for all his crimes.  In <u>Irwin</u>, the defendant agreed to provide information to the police in exchange for the dismissal of a drug possession charge against him.  612 F.2d at 1183.  The police suspected that Irwin was trafficking drugs while working as an informant, and he was later arrested and charged with conspiracy to distribute cocaine.  <u>Id.</u>  Irwin's defense was that he was working as an informant during the whole transaction, and, therefore, had immunity from any related prosecution.  <u>Id.</u> at 1184.

The Ninth Circuit rejected Irwin's argument that by complying with his plea agreement, he absolved himself of criminal intent in any drug related venture.  <u>Id.</u> at 1191.  The court stated: "A major difficulty with defendant's proposed instruction is that it would grant the defendant blanket immunity on all future criminal acts so long as he substantially complied with the provisions of his plea agreement." <u>Id.</u> at 1192, n.21.

 The claim in <u>Irwin</u> sounds surprisingly similar to that in the case at bar.  As the defendant in <u>Irwin</u> attempted to extrapolate a blanket immunity agreement from a plea agreement related to a specific offense, the defendant also appears to extrapolate a blanket immunity from

O'Sullivan's decision not to prosecute him in 1979 for the so-called "race fix case."[12]

Moreover, many courts have specifically held that immunity does not protect against prosecution for future crimes. See Black, 776 F.2d at 1328 ("It is...firmly established that grants of immunity do not license future criminal conduct...."). The purpose and scope of immunity is to protect someone from prosecutions they might currently face in order to receive their testimony. Id. at 1326; United States v. Weiss, 599 F.2d 730, 737 (5th Cir. 1979); United States v. Caron, 551 F. Supp. 662, 671 (E.D.Va. 1982), affirmed 722 F.2d 739 (4th Cir. 1983), cert. denied 465 U.S. 1103 (1984). Immunity does not exist to benefit criminals. United States v. Harvey, 869 F.2d 1439, 1445-46 (11th Cir. 1989) (citing Heike v. United States, 227 U.S. 131, 141 (1913)). Therefore, crimes completely unrelated to immunity or arising wholly after the date of the grant of immunity are not protected. See Black, 776 F.2d at 1326 (holding defendant could be prosecuted for perjury and obstruction of justice as the crimes occurred after his grant of immunity and were unrelated to the crime for which he was granted immunity); Andrello, 816 F. Supp. at 813 (holding defendant may be prosecuted where no indication that defendant contemplated later crimes when he testified under immunity); United States v. Brown, 763 F. Supp. 1518, 1532-33 (D.Az. 1991), affirmed 979 F.2d 1380 (9th Cir. 1992) (holding laundering profits of immunized crime was crime begun at time of agreement and therefore protected, but if defendant had used that money to commit other crimes, e.g. bribery or tax evasion, he could have been prosecuted). The breadth given to each defendant's separate crimes must therefore be

---

[12] Although the vagueness of the defendant's allegation prevents the government from ascertaining the exact circumstances surrounding the alleged promise by O'Sullivan to the defendant, prior litigation regarding this matter has generally focused on the period surrounding the decision not to prosecute the defendant and Flemmi in the "race-fix case."

limited to that for which he was given immunity.  The defendant in <u>Andrello</u> assisted the Strike

Force in its investigation and then testified before grand and petit juries.  <u>See</u> <u>Andrello</u>, 816 F.

Supp. at 808.  Although all his crimes, earlier and later, involved racketeering, and he apparently

lived a life of crime, the crimes for which he was successfully prosecuted occurred four years

after the immunity agreement and contained different specific acts.  <u>Id.</u>

III.     <u>The Defendant's Discovery Requests Are Not Material To The Preparation Of His
         Defense And Seek Privileged Government Documents</u>

        As set forth above, the defendant's vague allegation that he received immunity from

O'Sullivan is insufficient to form the basis of any discovery request.  In fact, over a decade of

litigation regarding the defendant has conclusively established that no such agreement existed.

Even if the defendant were able to establish the existence of such an agreement, it is

unenforceable because its terms are indefinite, the defendant has not shown he relied upon it in

engaging in the crimes alleged in the indictment, any reliance would have been unreasonable,

and enforcement of any agreement that allowed for unrestrained and violent illegal activity

would be against public policy.

        Therefore, the defendant cannot establish the materiality of his numerous discovery

requests for privileged government documents.  <u>See</u> <u>United States v. Carrasquillo-Plaza</u>, 873

F.2d 10, 12 (1st Cir. 1989) (defendant must make a prima facie showing of materiality).

        As set forth above and reiterated here, the discovery produced to the defendant in the

case at bar is the result of reviews by several different teams of government lawyers and

investigators of relevant government documents.  Additionally, the production includes materials

produced pursuant to exhaustive discovery requests by plaintiffs' attorneys handling the nineteen

civil actions brought against the United States as a result of conduct by the defendant and others.

The government represents to the Court that it understands its discovery obligations, including the obligation to provide exculpatory evidence to the defendant.  The government represents to the Court that it has complied with those obligations.

     A.    <u>Defendant's Discovery Requests Nos. One Through Four, Six, Seven And Eleven</u>[13]

The defendant's requests Nos. 1 through 3 seek "correspondence" between the U.S. Attorney's Office (hereinafter "USAO") and the Strike Force, between the USAO and DOJ, and the USAO and the FBI relating to the defendant and numerous criminal associates.  The defendant's requests No. 4 and 11 seek similar "correspondence" involving Robert Mueller, as well as any "reports, memoranda, letters, and notes . . . directed to Mueller or Weld . . . regarding the compromise of Operation Beans."  The defendant's request No. 6 seeks "[a]ll prosecution memorandum of both the United States Attorney's Office and the Strike Force related to all investigations of Winter Hill members from 1967 - present." Defendant's request No. 7 specifically seeks production of the "race-fix" prosecution memorandum.  As set forth above, to the extent such materials exist which could contain exculpatory information, including any information regarding an agreement between the defendant and the government, those materials have been produced.

    The government disputes, however, that responsive documents that show knowledge by the government of the criminal activities of the defendant and his associates are exculpatory. The defendant's proposition that the failure to prosecute equals immunity is simply a foil to conduct a fishing expedition and rummage through sensitive and privileged government documents.

---

[13]    The defendant has withdrawn request 5, 8, 9, 12, and 18.

Moreover, the discovery produced to the defendant already contains hundreds of documents that demonstrate government knowledge of the criminal activities of the defendant and his criminal associates.

Moreover, the requested documents, to the extent that they exist and have not already been produced, are not discoverable as they are protected by the attorney work product privilege and the deliberative process privilege.

The attorney work-product privilege protects documents and other memoranda prepared by an attorney in contemplation of litigation.  See Hickman v. Taylor, 329 U.S. 495, 509-10 (1947).  Its purpose is to protect the adversarial trial process by insulating the attorney's preparation from scrutiny.  See Jordan v. United States Dep't of Justice, 591 F.2d 753, 775 (D.C. Cir. 1978) (en banc).  The privilege extends to criminal as well as civil proceedings.  See United States v. Nobles, 422 U.S. 225, 238 (1975).  The work-product doctrine protects not only material prepared by an attorney, but also that which is prepared by an attorney's agent, such as an investigator.  Id. at 238-39 and is not subject to disclosure.  See also, F.R.Cr.P. 16 (a)(2). Attorney work-product is divided into two categories: "opinion work product," which reflects an attorney's mental processes such as legal theories; and "ordinary work-product," which covers all other types of materials.  Hickman, 329 U.S. at 508.  Ordinary work-product may be disclosed if the party seeking it establishes sufficient need for the material, but opinion work-product is accorded far greater protection.  Upjohn Co. v. United States, 449 U.S. 383, 401 (1981) (opinion work product cannot be disclosed "simply upon a showing of substantial need and inability to obtain the equivalent without undue hardship"); In re Murphy, 560 F.2d 326, 336 (8th Cir. 1977) (opinion work product enjoys "nearly absolute immunity").

23

The work-product privilege has been held to attach to law enforcement investigations, when the investigation is "based upon a specific wrongdoing and represent[s] an attempt to garner evidence and build a case against the suspected wrongdoer." SafeCard Servs. v. SEC, 926 F.2d 1197, 1202 (D.C. Cir. 1991). And unlike the deliberative process privilege, discussed below, the work-product privilege does not distinguish between factual and deliberative material. See Martin v. Office of Special Counsel, 819 F.2d 1181, 1187 (D.C. Cir. 1987).

The deliberative process privilege is predicated on the recognition that disclosure of inter-agency and intra-agency deliberations and advice is injurious to the federal government's decision-making functions because it tends to inhibit the candid discussion necessary to effective government. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150-51 (1975). The privilege actually reflects two concerns: the encouragement of open, frank discussion between decision-makers and their subordinates concerning administrative action, Merrill v. Federal Open Marke Comm'n, 565 F.2d 778, 783 (D.C. Cir. 1977), and the protection of the executive branch from judicial interference. United States v. Nixon, 418 U.S. 683, 708 (1974); Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318, 325-26 (D.D.C. 1966), aff'd 384 F.2d 979 (D.C. Cir.), cert. denied, 389 U.S. 952 (1967). It has also been suggested that, of all the governmental privileges applicable to the Executive Branch, only the state secret privilege and the deliberative process privilege have constitutional underpinnings. Black v. Sheraton Corp. of America, 564 F.2d 531, 541 (D.C. Cir. 1977).

The deliberative process privilege applies to materials that are both "predecisional" and "deliberative." Texaco Puerto Rico v. Dep't of Consumer Affairs, 60 F.3d 867, 884 (1st Cir. 1995).

> [T]o qualify for the privilege, a document must be (1) predecisional, that is, "antecedent to the adoption of agency policy," and (2) deliberative, that is, actually "related to the process by which policies are formulated." ... Because the deliberative process privilege is restricted to the intra-government exchange of thoughts that actively contribute to the agency's decision-making process, factual statements or post-decisional documents explaining or justifying a decision already made are not shielded.

Id. Noting that the privilege is "qualified," the First Circuit has said that courts must balance the evidentiary need for the document against the harm that may result from disclosure. Id. at 885. See also United States v. Del Toro Soto, 676 F.2d 13, 16 (1st Cir. 1982), and on remand, 728 F.2d 44, 47 (1st Cir. 1984) (portions of Postal Inspector's investigation report not producible under the Jencks Act); United States v. White, 671 F.2d 1126, 1133 (8th Cir. 1982) (IRS legal opinion was an internal agency memorandum and not a statement within the Jencks Act); Canaday v. United States, 354 F.2d 849, 859 (8th Cir. 1966) (regional counsel's memorandum was not producible where underlying documents had been turned over); United States v. Duncan, 712 F. Supp. 124 (S.D.Ohio 1988) (use of F.R.Cr.P. 12(i) by defense to obtain discovery of a law enforcement agent's report after calling the agent itself at a pretrial hearing was against the spirit of the rule and therefore not permitted).

Clearly, the requested documents are covered by both privileges.

The defendant's Request 7 seeks production of the "race-fix" prosmemo. This privileged document has been reviewed for exculpatory materials by Chief Judge Wolf during the extended hearings in Salemme as well as by the trial court which presided over the murder prosecution of Connolly in Florida. Neither court determined that it contained exculpatory evidence and the government was not ordered to produce the document. Although President George W. Bush asserted executive privilege over the document when it was subpoenaed by Congress, it is the

undersigned's understanding that members of the congressional committee investigating allegations of corruption regarding the defendant's relationship with the FBI were eventually provided with access to the document.

      B.     <u>Defendant's Discovery Request No. Ten</u>

The defendant requests "all DEA tape recordings taken from defendant's automobile . . . related to Operation Beans."  All such tape recordings in the possession of the government have been produced to the defendant.  The government obtained its copy of these recording by obtaining an order to unseal the originals and making a copy of the original set of recordings.

      C.     <u>Defendant's Discovery Requests Nos. Thirteen through Seventeen</u>

These requests generally seek impeachment information of several key government witnesses as well as several non-witnesses.  These will be addressed seriatim.  The Court should, however, be mindful of the fact that the government has already provided to the defendant extensive <u>Giglio</u> and <u>Jencks</u> materials for all of its key witnesses.  Furthermore, the defendant has the benefit of several transcribed examinations of all these witnesses who have testified at several related trials.  The defendant currently seeks information that is generally not discoverable or information that does not exist.

      1.     <u>John Martorano</u>

Regarding monies paid to Martorano, the defendant already possesses that information; however, the government will provide a detailed schedule of payments made to Martorano's commissary account.  Martorano, like Weeks and Flemmi, was incarcerated in a Bureau of Prisons Witness Security Unit.  The defendant requests "prison records" without providing any legal basis for the discoverability of these records other than his general allegation that

everything he asks for is "material" to his defense.  The Bureau of Prison and the U.S. Marshals Service strongly resist the production of any records from a "WITSEC" facility for a number of reasons related to the security of inmates housed in those facilities.  Unless the defendant demonstrates a compelling need for certain records and provides some specificity, this request should be denied.

Likewise, the defendant requests Martorano's pre-sentence report.  These reports are generally not discoverable.  See, United States v. Pena, 227 F.3d 23, 27 (2d Cir. 2000), United States v. Moore, 949 F.2d 68, 70 (2d Cir. 1991).  The government understands its obligation to produce exculpatory or impeachment information that may be contained in such reports.

The defendant also requests materials regarding Martorano's former wife, Carolyn Wood.  The government has produced those materials.  Further, the government never targeted Wood for prosecution.  Similarly, the government never targeted Martorano's live-in girlfriend, Patricia Lytle, for prosecution.  Finally, the government never targeted one of Martorano's Florida associates, Jeffrey Jenkins, for prosecution.[14]

To the knowledge of the government attorneys, there are no documents that were authored, signed or approved by former Attorney General Reno relative to the "target list" in Martorano's plea agreement.  Even if such a document existed it would be privileged as discussed above.

---

[14]      In fact, Jenkins was a cooperating witness who would have testified against Martorano had Martorano not pled guilty.

27

2.     Stephen Flemmi

The defendant similarly requests prison records and pre-sentence reports for Flemmi.  For the reasons stated above, those requests should be denied.  To the extent that the government is in possession of transcripts related to plea and sentencing proceedings regarding Flemmi, they have been or will be produced.  These documents are publicly available to the defendant if they have not been produced by the government.

There are prison tapes obtained by the government of Flemmi during Flemmi's incarceration at the Plymouth House of Corrections.  While the government does not intend to use these recordings in its case and they are of marginal relevance as well as cumulative, the government will produce a set for the defendant.  Ordinarily, such material is not due until twenty-one days before trial at the earliest, however, the government will expedite the production of these materials.  (See L.R. 116.2(B)(2).)

3.     Patrick Nee

Nee is not a witness in this case and, therefore, the government has no discovery obligations regarding Nee except to the extent Nee has provided exculpatory information to the government.

4.     Kevin Weeks

The defendant similarly requests prison records and pre-sentence reports for Weeks.  For the reasons stated above, those requests should be denied.  All other impeachment materials of Weeks have already been produced.  Weeks was intercepted on some of the Flemmi prison tapes.  As set forth above, the government will produce those items to the defendant.

5.      James Martorano

James Martorano is not a witness in this case and, therefore, the government has no

discovery obligations regarding James Martorano except to the extent James Martorano has

provided exculpatory information to the government.

D.      Defendant's Discovery Requests Nos. Nineteen through Twenty-three

The defendant requests O'Sullivan's daily appointment book and telephone logs.

Relevant materials from these items have already been produced to the defendant.  The

remainder of the materials refer to unrelated matters occurring in the Strike Force and the

USAO, and are subject to the privileges discussed above.

Obviously, O'Sullivan will not be a witness at this trial.  To the extent that the

government possesses prior interviews and depositions of O'Sullivan, they have been produced.

The government is not in possession of any notes, documents, or other papers reflecting

statements made by O'Sullivan in preparation for his Salemme hearing testimony.

E.      Defendant's Discovery Request No. Twenty-four (sic)[15]

The defendant requests materials related to an FBI agent, Thomas Daly, who was

involved in misconduct with an informant.  Daly is not a witness in this case and, therefore, the

government has no discovery obligations regarding Daly except to the extent Daly has provided

exculpatory information to the government.

Misconduct by Daly regarding another informant unrelated to Bulger is not relevant to

the case at bar.  However, this request demonstrates that the defendant's intent is to relitigate

---

[15]      The original request no. 24 has been withdrawn by the defendant.  This request is
actually 25.

issues raised during the <u>Salemme</u> hearings in the case at bar.  As set forth above, any issue

relating to defendant's claim of immunity should be determined prior to trial.

   F.   Defendant's Discovery Request No. Twenty-six

   The defendant's twenty-sixth request seeks discovery of a polygraph test of Flemmi that

is routinely administered to all individuals entering the Witness Security Program.  It is not

discoverable because it is inadmissible at trial (<u>United States v. Varoudakis</u>, 1998 WL 151238,

48 Fed.R.Evid.Serv. 1187 (D. Mass. 1998))((polygraph evidence fails to satisfy standards of

either Fed. R. Evid. 702 and <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993),

or Fed. R. Evid. 403); <u>United States v. Black</u>, 78 F.3d 1, 7 (1st Cir. 1996)).  Further, the

polygraph  showed no evidence of deception by Flemmi and, therefore, does not constitute

impeachment information.

         Respectfully submitted,

         CARMEN M. ORTIZ
         United States Attorney

    By: */s/ Fred M. Wyshak, Jr.*
         FRED M. WYSHAK, JR.
         BRIAN T. KELLY
         ZACHARY R. HAFER
         Assistant U.S. Attorneys

<u>**CERTIFICATE OF SERVICE**</u>

   I, Fred M. Wyshak, Assistant United States Attorney, do hereby certify that this document, was filed
on the above date through the ECF system which sends copies electronically to the registered participants as
identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as
non registered participants on this date.

      */s/ Fred M. Wyshak, Jr.*
      FRED M. WYSHAK, JR.
      Assistant U.S. Attorney