UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 99-10371-RGS |
| | ) | |
| JAMES J. BULGER, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S MOTION PURSUANT TO FED. R. CRIM. P. 12(b)(2) AND 12(d) TO RESOLVE DEFENDANT'S IMMUNITY CLAIM PRIOR TO TRIAL

The United States of America, by and through the undersigned Assistant U.S. Attorneys, hereby moves, pursuant to Fed. R. Crim. P. 12(b)(2) and 12(d), for a pretrial ruling that defendant James J. Bulger (hereinafter, "defendant" or "Bulger") does not have an enforceable immunity agreement with the government.[1]

The United States, as a "party" to this proceeding, is entitled to move under Fed. R. Crim. P. 12(b)(2) for pretrial resolution of any issue that can be determined by the court "without a trial of the general issue." Bulger's claim that he was given immunity by a former prosecutor is such an issue. Once a party moves under 12(b)(2), this Court must decide the motion pretrial unless it finds "good cause" to defer ruling.

---

[1]   By this motion, the government also responds to defendant's January 14, 2013 Memorandum Regarding Immunity, ECF Dkt. No. 811, (hereinafter, "Def. Memo").

*See* Fed. R. Crim. P. 12(d).   No good cause exists here.   In fact, just the opposite is true - pretrial resolution of the immunity issue will conserve substantial resources and is in the public interest.   For example, if defendant does have immunity, he is entitled not be tried at all, and potential jurors should not be made to sit through a three-month trial only to learn there is a legal impediment to defendant's prosecution. Moreover, pretrial resolution of the immunity issue will, as discussed below, preserve the government's appellate rights and prevent confusion and distraction of the jury at trial. Accordingly, the government moves herein for an evidentiary hearing that will, for the reasons set forth below, establish that Bulger does not have an enforceable immunity agreement.

## I.   FACTUAL BACKGROUND

Defendant has the burden of proving both the existence and scope of any immunity agreement.   Bulger, however, has (strategically) provided almost no detail with respect to his purported immunity agreement.   The absence of any factual detail makes it surpassingly difficult to respond to Bulger's claim. Nevertheless, though of course under no obligation to prove that Bulger does not have immunity, the government includes herein the relevant factual background.

A. Bulger's Indictment and Capture

Bulger is charged with multiple crimes, including violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"). *See* ECF Dkt. No. 215. In particular, he is charged with being the leader of an organized criminal enterprise that, between approximately 1972 until 1999, generated money for its members through murder, extortion, loansharking, bookmaking, and the sale and distribution of controlled substances. *Id.* The indictment also specifically alleges that Bulger committed 19 murders as part of the racketeering conspiracy. *Id.*

Bulger and Stephen J. Flemmi were previously charged in January 1995 by a different grand jury (Criminal No. 94-10287-MLW) with, among other things, extortion and other RICO violations. *See, e.g., United States v. Flemmi*, 402 F.3d 79, 83 n.3 (1st Cir. 2005). Bulger, however, was forewarned of the indictments and fled in December 1994, *see, e.g, Donahue v. United States*, 634 F.3d 615, 619 (1st Cir. 2011), *cert. denied*, 132 S. Ct. 2375 (2012), and he remained a federal fugitive for approximately 16 years until his arrest on June 23, 2011, in Santa Monica, California. *See* ECF Dkt. Entry June 23, 2011.

B. <u>Bulger's Immunity Claim</u>

Bulger now claims he has an immunity agreement under which he supposedly was given immunity for any and all crimes, including the 19 murders charged in the indictment, by deceased former federal prosecutor Jeremiah O'Sullivan. *See* ECF Dkt. No. 750. Bulger, however, has never filed an affidavit or provided any factual basis for his claim.

Despite these factual deficiencies, based upon the unsworn comments of Bulger's counsel, the following "facts" can be ascertained with respect to Bulger's immunity claim: (a) O'Sullivan purportedly gave Bulger immunity at some point prior to December 1984; (b) the purported grant of immunity from O'Sullivan to Bulger included protection for all of Bulger's crimes, including the 19 murders, ECF Dkt. No. 685 at 1-2; (c) when O'Sullivan purportedly gave Bulger immunity, it was in perpetuity, that is, the purported grant of immunity "did not have an expiration date," Def. Memo at 11-12; and (d) Bulger's purported immunity agreement with O'Sullivan was an oral agreement and thus was not reduced to writing, *Id.* at 4-5 (distinguishing cases involving written contracts).

C. <u>Bulger Does Not Have And Does Not Believe That He Has Immunity</u>

Bulger's failure to offer any specific facts demonstrating the existence of an immunity agreement is particularly striking in light of the overwhelming evidence that Bulger does not have immunity, which is summarized below.

a. <u>Every Witness Who Has Testified Under Oath, and Each Court to Consider the Issue, Has Found No Evidence That Bulger Has Immunity</u>

During the hearings in *United States v. Salemme*, 91 F. Supp. 2d 141, 343-44 (D. Mass. 1999), the approximately 20 federal agents and prosecutors called as witnesses explicitly denied any knowledge of any immunity agreement involving either Flemmi or Bulger. *See* ECF Dkt. No. 785, at 3-4 n.2. In those same extensive hearings, Judge Wolf found that Flemmi, who was not claiming that his immunity agreement included murder, was never told that the protection that he was promised included immunity from prosecution; Judge Wolf also found that the word "immunity" was never mentioned. §§ II.2, II.5, II.16. *Salemme*, 91 F. Supp. 2d at 321.

In rejecting Flemmi's immunity-related arguments on appeal in *United States v. Flemmi*, 225 F.3d 78, 90 (1st Cir. 2000), the First Circuit found that while O'Sullivan agreed not to charge

Flemmi in the so-called race-fix case in 1979,[2] there was no evidence that O'Sullivan knew of any promise of use immunity to Flemmi, and the absence of such evidence was "fatal" to Flemmi's claim that O'Sullivan had ratified any FBI promise of use immunity.

      b. <u>O'Sullivan's Congressional Testimony Refutes Immunity Claim</u>

In sworn testimony before Congress before he died, O'Sullivan testified, "I state categorically and unequivocally that, although I was made aware of the status of Bulger and Flemmi as FBI informants in the late 1970's, I never authorized them to commit any crimes and have no knowledge of any such authorization.  Nor did I ever give them any type of immunity from prosecution.  Nor did I take any steps to protect them from investigation or prosecution ..." *Investigation of Allegations of Law Enforcement Misconduct in New England* – Volume 3: Hearings Before the House Comm. on Govt. Reform, 107th Cong., 2d Sess. 298-99 (2003) (statement of Jeremiah O'Sullivan).

---

[2]    After almost 20 years of Bulger-related litigation, the only indication of any decision not to prosecute Bulger stems from O'Sullivan's decision not to charge Bulger and Flemmi in a 1979 case related to race-fixing (which he testified before Congress was based on a lack of corroborative evidence). *See* ECF Dkt. No. 785 at 5.

c. <u>Corrupt Former FBI Agents (and Bulger Handlers)
Connolly And Morris Refute Bulger's Immunity Claim</u>

Bulger's corrupt former FBI handler of approximately 15 years, John Connolly, has repeatedly stated that Bulger was not authorized to commit violent crimes.   For example, Connolly told the *Boston Globe* in an article dated July 19, 1998, that Bulger and Flemmi never confessed to murder to him and were never given a license to kill.[3]   On October 21, 1998, Connolly told local radio station WGBH that, "I don't agree with Flemmi's ... assertion that he had the right to do anything but murder.   They had the right to conduct a gambling and loansharking business and collect rent from bookmakers with no violence."   Connolly's former supervisor, John Morris, has testified that, according to Connolly, the only thing that Bulger wanted was "a head start." *See* ECF Dkt. No. 785 at 3-4 n.2.

d. <u>Defendant's Own Informant File Refutes His Immunity
Claim</u>

Bulger's informant file is bereft of any indication that he had an immunity agreement with O'Sullivan; in fact, the file fails to record any meeting between Bulger and O'Sullivan.   A document authored by Connolly in Bulger's informant file establishes that Bulger was placed in a "closed" status by the

---

[3]     *http://www.bostonglobe.com/metro/1998/07/19/agent-mobster-forge-pact-old-southie-ties/0mh1bi12NTIr4FgaeWT78M/story.html*

FBI in January 1978 due to the fact that "subject could possibly become involved in legal difficulties in the near future." *See* ECF Dkt. No. 785, Exhibit A.   On May 11, 1979, Connolly requested that the defendant be re-opened as an informant because, "... no prosecutable case developed against source in the opinion of Strike Force attorney handling matter." *See* ECF Dkt. No. 785, Exhibit B.   These reports obviously reference the "race fix" case and the May 1979 teletype clearly makes no mention of any agreement between O'Sullivan and the defendant.

In October 1984, Connolly's then supervisor, FBI Special Agent James Ring, authored and placed a report in Bulger's informant file that stated, in pertinent part, "the contact agent's position is clear as is mine.   If … [Bulger and Flemmi] are violating the law and subject to investigation, that is their problem.   There is not and will not be any authorization by the FBI for these individuals to commit any criminal acts unless such authorization conforms to present Bureau regulations." *See* ECF Dkt. No. 785, Exhibit C.

     e. <u>Bulger's Own Actions and Words Refute His Immunity Claim</u>

Bulger's conduct entirely undermines his immunity claim. First, someone who thought he had immunity would not pay a corrupt FBI agent hundreds of thousands of dollars in cash, as

Flemmi testified that he and Bulger paid to John Connolly and Bulger himself confirmed in a September 11, 2012 recorded conversation with his brother Jack. *See infra*. Second, someone who thought he had immunity would not become a fugitive for sixteen years, alter his physical appearance, assume numerous alternate identities, and stash over twenty weapons and approximately $800,000 in cash in a secret hide in his apartment. Third, someone who thought he had immunity would have moved to dismiss the original indictment against him in 1995 (instead of fleeing); he would have also, after being captured in 2011, moved to dismiss the 2001 Indictment, and insisted on not being tried for charges he believed were legally precluded by his immunity agreement.

Finally, someone who thought he was given immunity in return for information he provided to the FBI would not have engaged in the following conversation with his brother on September 11, 2012, at Plymouth County Correctional Facility:

JAMES:     I'm up to my fuckin' ears in it. But again, I mean, I was accused -- I -- I never, I didn't know that fuckin' John Connolly wrote all those reports and the other guy -- what they did is they wrote reports making themself look like Whitey told us what -- **I never told them a fuckin' thing.**

JACK:     Mmm.

JAMES:     **I bought fuckin' information, I didn't sell it.**

JACK:       Mmm.

JAMES:      **I never gave them fuckin' information.  Nothin'.
            Nothin'.**[4]

## II.   <u>LEGAL AUTHORITY FOR MOTION – FED. R. CRIM. P. 12</u>

### a. <u>Fed. R. Crim. P. 12(b)(2) Allows the Government to Move Pretrial for Resolution of Any Issue that the Court Can Determine Without Trial of the General Issue</u>

Fed. R. Crim. P. 12(b)(2) provides, in pertinent part, "[a] party may raise by pretrial motion any … request that the court can determine without a trial of the general issue."  As the text of the rule makes clear, the United States, which is a "party" in any federal criminal proceeding, is entitled to seek relief under the rule.  *See United States v. Valencia*, 826 F.2d 169, 171-72 (2d Cir. 1987); *United States v. Layton*, 720 F.2d 548, 553 (9th Cir. 1983), *overruled on other grounds by United States v. W.R. Grace*, 526 F.3d 499, 506 (9th Cir. 2008); *United States v. Mitchell*, 2009 WL 103610 at *2 (N.D. Iowa Jan. 15, 2009)(district court has authority under 12(d) to issue a pretrial ruling on a Rule 12 motion by the government); *United States v. Andrews*, 764 F.Supp. 1252, 1254 (N.D. Ill. 1991) (government is entitled to raise 12(d) in bringing a pretrial motion).

---

[4]   This transcribed excerpt is a portion of a longer call. The entire transcript and the audio recording were provided to defense counsel on January 22, 2013.

The "general issue" in a criminal trial is, of course, whether the defendant is guilty of the offense charged. *See United States v. Barletta*, 644 F.2d 50 (1st Cir. 1981); *United States v. Yater*, 756 F.2d 1058, 1062 (5th Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985); *United States v. Doe*, 63 F.3d 121, 125 (2d Cir. 1995). Fed. R. Crim. P. 12 was written to encourage the making of motions prior to trial. *See* Notes of the Advisory Committee to the 1975 Amendments to Fed. R. Crim. P. 12.

> b. <u>Pursuant to Fed. R. Crim. P. 12(d), the Court Must Decide 12(b)(2) Motions Pretrial Unless There Is Good Cause to Defer Ruling</u>

Fed. R. Crim. P 12(d) provides in part, that "[t]he court must decide every pretrial motion before trial unless it finds good cause to defer a ruling. The court must not defer ruling on a pretrial motion if the deferral will adversely affect a party's right to appeal." A "district court *must* rule on any issue entirely segregable from the evidence to be presented at trial, but may in its discretion defer a ruling on any motion that requires trial of any nontrivial part of the 'general issue' that is, the presentation of any significant quantity of evidence relevant to the question of guilt or innocence ... " *Barletta*, 644 F.2d at 57-59 (emphasis added).

A motion requiring the presentation of a significant quantity of evidence relevant to the question of guilt or innocence constitutes good cause to defer. *See* Fed. R. Crim. P. 12(b)(2); *see also United States v. Wilson,* 26 F.3d 142, 159 (D.C. Cir. 1994) (encouraging deferral where the motion involves questions of fact "inevitably bound up with evidence about the alleged offense itself"); *Barletta*, 644 F.2d at 58 (trial court precluded from pretrial determination of motions when "a ruling on admissibility would require conducting virtually a complete mini-trial prior to the actual trial," as would be necessary in deciding the admissibility of, for example, co-conspirator statements).

With respect to immunity claims specifically, "a pretrial ruling may be required to preserve the government's right to appeal pursuant to 18 U.S.C. § 3731 because in some circumstances a motion to dismiss granted at trial may constitute an acquittal for double jeopardy purposes." *United States v. Salemme*, 1997 WL 810057 (D. Mass. Dec. 29, 1997).

> i. Whether Bulger Has Immunity Is "Entirely Segregable" From Trial of the Allegations in the Indictment and There Is No Good Cause to Defer Ruling on the Issue Pretrial

Resolution of Bulger's immunity claim would require only an inquiry into the alleged existence and scope of the defendant's

purported agreement with the late Jeremiah O'Sullivan - an issue entirely segregable from, for example, whether the government can prove that when Bulger was strangling Deborah Hussey, his intent was to kill her.[5] Specifically, the court could hold a hearing, take evidence, and find facts on, among other topics: (a) when Bulger purportedly met O'Sullivan; (b) where he met him; (c) who, if anyone else, was present during the meeting; (d) whether anything was written down at the meeting; (e) what O'Sullivan told Bulger regarding the terms of their purported agreement; (f) what crimes Bulger understood his purported agreement with O'Sullivan to encompass; (g) whether O'Sullivan ever told Bulger that he was authorized to kill; and (h) how often Bulger spoke with O'Sullivan to confirm that his understanding of their purported agreement was correct.[6] As such,

---

[5]    Even if resolution of the immunity issue involved some *de minimis* inquiry into the charged offenses, this Court should exercise its discretion and decide the issue prior to trial in order to preserve the government's appellate rights and prevent confusion at trial.

[6]    Fed. R. Crim. P. 12(d), formerly 12(e), clearly permits a district court to make preliminary findings of fact necessary to decide the questions of law raised in pretrial motions, so long as the court's findings on the motion do not invade the province of the jury. *See* Moore P 12.04 ***665*** at 12-24, 25. In making preliminary fact findings with respect to Bulger's immunity claim, this Court could take judicial notice, pursuant to Fed. R. Evid. 201, of, among other things, Judge Wolf's fact findings, sworn testimony of relevant witnesses before Judge Wolf, and Bulger's 16 years as a fugitive.

resolution of the immunity issue would not involve evidence relevant to the question of guilt or innocence. It would also preserve the government's appellate rights, prevent confusion and distraction of the jury at trial, and, in the event defendant is found to have immunity, will prevent an unnecessary trial and considerable waste of public resources.[7] Accordingly, there is no good cause to defer ruling on this motion.

In support of his claim that immunity is a jury issue, Bulger states — without citing a single case — that the defense, and not the government or the court, has the choice of pursuing immunity as a "defense" during trial. *See* Def. Memo at 2. He is wrong. First, as a threshold matter, immunity is not an affirmative defense like, for example, public authority or entrapment by estoppel.[8] Immunity is a legal impediment to a

---

[7]   In § 1983 qualified immunity cases, the Supreme Court has held that "[t]he entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). In other qualified immunity cases, the Court has said it was "wrong" to "place[]the question of immunity in the hands of the jury" because "[i]mmunity ordinarily should be decided by the court long before trial." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

[8]   Critically, the "objections and defenses" referred to in Fed. R. Crim. P. 12(b)(2) are all legal bars to prosecution: (a) former jeopardy, *see, e.g., Witte v. United States*, 515 U.S. 389, 396 (1995); former conviction and former acquittal, *see, e.g., Illinois v. Vitale*, 447 U.S. 410, 415 (1980); and statute

prosecution that, much like jeopardy, statute of limitations, and failure to state an offense, does not negate criminal intent and thus must be resolved by the court.   Authorization and entrapment by estoppel, on the other hand, are affirmative defenses that do negate the criminal intent of the defendant. The importance of this distinction is not semantic because, among other things, affirmative defenses require "trial of the general issue."[9]

---

of limitations, *see, e.g., Stogner v. California*, 539 U.S. 607, 616 (2003)(expired statute of limitations is a "conclusive presumption forbidding prosecution").   "Lack of jurisdiction" and "failure of indictment or information to state an offense" similarly preclude prosecution entirely when raised by substantiated motion.   Immunity is no different.   It is a legal bar to prosecution, not a defense at trial.

[9]   To allow the affirmative defense of entrapment by estoppel to be presented to the jury, the court must determine whether the defendant "was advised by a government official that the act was legal, whether [the defendant] relied on that advice, whether that reliance was reasonable, and whether, given that reliance, prosecution of the defendant would be unfair." *United States v. Smith*, 940 F.2d 710, 715 (1st Cir. 1991).   Relatedly, a public authority defense has four parts: "First, the defendant must have been asked to engage in covert activity by a governmental official. Second, *the* official must have actual authority to authorize such covert activity. Third, the defendant must have relied on the request. Fourth, the reliance must have been reasonable." *Id.*   For both defenses, courts may exclude their presentation at trial unless satisfied that a Fed. R. Evid. 401 relevance test has been met.   *Smith*, 940 F.2d 710 at 713.   Both affirmative defenses also require notice.   *See* Fed. R. Crim. P. 12.3.

Second, Bulger's reliance on the advisory committee notes to Fed. R. Crim. P. 12 (which of course are not given the force of law) referring to "… defenses … which the defendant … may raise by motion before trial," is also misplaced.  As the Fourth Circuit noted, that reference is clearly designed to preserve defendants' rights to raise 12(b)(2) issues by motion after trial begins, not to permit their presentation to a jury.  *See United States v. Jarvis*, 7 F.3d 404, 414 (4th Cir. 1993)("[f]ailure to raise a contemporaneous objection of immunity before trial does not constitute a forfeiture of the objection.").  Finally, as noted earlier, the plain text of Fed. R. Crim. P. 12(b)(2) clearly includes the government, one of only two parties in a typical federal criminal case.

## III.   IMMUNITY IS AN ISSUE FOR THE COURT, NOT THE JURY

The fundamental legal flaw with the Def. Memo is that it cites not a single case, in any circuit, in which a jury decided the issue of immunity.  The reason is obvious.  Immunity is not a jury issue.  Indeed, throughout the Def. Memo, Bulger repeatedly conflates immunity with the affirmative defenses of public authority and/or entrapment by estoppel, deliberately cherry-picking the most favorable aspects of these separate areas of law, while ignoring both the plain text of Fed. R. Crim. P. 12, and the actual holdings of *United States v.*

*McLaughlin*, 957 F.2d 12, 16 (1st Cir. 1992) and *United States v. Smith*, 940 F.2d 710 (1st Cir. 1991). [10]

    a. <u>The Validity of an Alleged Immunity Agreement, Even if Informal or Unwritten, is Strongly Influenced by Contract Law and Decided by the Court Prior to Trial.</u>

Immunity-in-exchange-for-cooperation agreements are in the nature of contracts, and thus their scope and effects are strongly influenced by contract law principles. *McLaughlin*, 957 F.2d at 16 (internal citations omitted). Federal immunity agreements are not, however, strictly governed by the underlying state's contracts jurisprudence, but rather "by traditional principles of contract law." *United States v. McHan*, 101 F.3d 1027, 1034 (4th Cir. 1996); *United States v. Liranzo*, 944 F.2d 73, 77 (2d Cir. 1991). As such, immunity agreements (like plea bargains and proffers) are only "subject to contract law principles insofar as their application will insure the defendant what is reasonably due him." *United States v. Baldacchino*, 762 F.2d 170, 179 (1st Cir. 1985); *see also United States v. Hogan*, 862 F.2d 386, 388 (1st Cir. 1988). Thus, the

---

[10]    Bulger's separation of powers argument is hard to comprehend. *See* Def. Memo at 5-9. He mysteriously claims that "the separation of powers prevents the judiciary from resolving [the immunity] conflict," and "the court has no role in determining if this grant of immunity was appropriate or not," *see* Def. Memo at 6-7, while simultaneously citing approvingly to numerous cases in which courts resolved immunity issues (and, tellingly, not citing a single case where the jury did).

contractual protections of immunity agreements do not encompass state procedural rules, but only "whether the government fairly lived up to its promises." *McLaughlin*, 957 F.2d at 16 n.4.

Applying such "traditional principles of contract law," the First Circuit has held that, "[a] defendant's rights are determined by the terms and conditions of the bargain *as found by the court*." *Id.* at 16 (internal citations omitted) (emphasis added). In *McLaughlin*, the defendant claimed to be immune from prosecution based on an informal, oral agreement with prosecutors. The government disputed the defendant's account, and the district court made a pretrial ruling in the government's favor. In affirming the district court's pretrial decision that defendant did not have immunity, the First Circuit held that the existence and scope of an alleged immunity agreement — even one that was unwritten — is an issue to be "found by the court," not a jury. *Id.*

Other courts agree with *McLaughlin.* The Seventh Circuit has held that "a motion to dismiss the indictment is the proper method of raising the issue [of immunity]" because it is "capable of determination without the trial on the merits." *United States v. Brimberry*, 744 F.2d 580, 586-587 (7th Cir. 1984) ("the [t]rial [j]udge should be alerted to the possible superfluity of the impending trial so that if the claim prove[s]

to have merit the time and effort of a trial might [be] saved."
(internal citation omitted).[11] Further, pretrial resolution of
immunity claims, to avoid unnecessary trials, is not just
permissible, but the "proper method." *See United States v.
McDaniel*, 449 F.2d 832, 835 (8th Cir. 1971) ("If, as he
contends, [the defendant] is entitled to transactional immunity,
a motion to suppress the indictment is clearly the only means of
accomplishing that end. The authorities recognize that a motion
to quash the indictment is the proper method of raising this
issue.")[12]

---

[11]   It should be noted that in *Brimberry* the Seventh Circuit
stated that "the proper time for making [the immunity] motion
[wa]s unclear," but that was in reference to whether grants of
immunity were waived if the defendant did not make a *motion* to
dismiss the indictment before trial. *Id.* at 586-87.   Nowhere in
the opinion did the court countenance the proposition that a
defendant could raise the issue before a jury.

[12]   Massachusetts civil contract law provides no help to
Bulger.   While in some civil contexts juries do determine
whether a contract exists under Massachusetts law, *see e.g.*,
*American Private Line Services v. Eastern Microwave*, 980 F.2d
33, 35 (1st Cir. 1992), *McLaughlin* makes it clear that the
existence and validity of immunity agreements — whether written
or oral — do not hinge on state law, and are properly decided by
the trial court, not the jury. *McLaughlin*, 957 F.2d at 16; *see
also Salemme*, 91 F. Supp. 2d at 343-44 (evaluating an "informal
promise[] of immunity") *rev'd in part sub nom., United States v.
Flemmi*, 225 F.3d 78 (1st Cir. 2000) (assuming no error with
district court's, not jury's, evaluation of an alleged oral
immunity agreement).

That immunity is not a jury issue is further confirmed by Bulger's failure to cite a single model jury instruction in any federal circuit for "immunity." *See generally* Def. Memo.  This failure is particularly noteworthy in light of Bulger's contention that, "it is the responsibility of the court to determine whether or not the defendant has met his burden of producing sufficient evidence on each component of immunity to warrant a jury instruction on the defense." Def. Memo at 5.  Of course, after making such a declaration regarding a jury instruction on immunity, Bulger cites two cases having nothing to do with immunity, but which actually involved the affirmative defenses of entrapment and duress. *See id.*  In stark contrast to the complete absence of jury instructions with respect to immunity, there are numerous examples of pattern instructions for public authority and entrapment by estoppel. *See, e.g.*, Fed. Crim. Jury Instr. 7th Cir. 6.07 (1999), Model Crim. Jury Instr. 9th Cir. 6.11 (2010); Pattern Crim. Jury Instr. 1st Cir. 5.07 cmt. 7 (2012); Pattern Crim. Jury Instr. 6th Cir. 6.09 (2011).

As noted above, Bulger fails to cite a single case in which the validity of an alleged immunity agreement was presented to the jury.  In fact, the one case on which his entire argument is premised, *United States v. Thompson*, 25 F. 3d 1558 (11th Cir.

1994), actually undermines his claim.  In *Thompson*, a felon-in-possession case, the defendant moved to dismiss the indictment, claiming that he had immunity based on oral statements by government officials that he could carry a firearm (despite being a felon) while serving as a drug informant.  *Id.* at 1560.  Because Thompson (like Bulger) provided no evidence in support of his motion, the district court summarily denied it.  *Id.* at 1561.  The government then moved in limine to prevent any reference by Thompson at trial to his alleged grant of immunity.  *Id.*  In response, Thompson asserted his intention to present the affirmative defense of entrapment by estoppel.  *Id.*  The district court permitted Thompson to make a factual proffer for that affirmative defense *in camera*, but ultimately precluded him from presenting the defense to the jury, finding that entrapment by estoppel was not a permissible defense to a felon-in-possession charge, a strict liability crime.  *Id.* at 1563.[13]

The Eleventh Circuit affirmed the district court's denial of defendant's motion to dismiss the indictment based on a purported immunity agreement, but found that the district court

---

[13]    It should be noted that Thompson's claim, which appears eminently reasonable when compared to Bulger's, was that he thought he was allowed to carry a firearm while conducting dangerous undercover operations.   Thompson, however (like Flemmi), conceded that his purported agreement did not include murder.  *Id.* at 1565.

made a legal error when it concluded that entrapment by estoppel was not a viable defense in § 922 cases. *Id.* at 1563-1564. Thus, contrary to Bulger's assertion, Thompson did not "bring an immunity defense at trial," *see* Def. Memo at 3.   Indeed, *Thompson* makes clear that there is no "immunity defense" at trial, but that defendants may — upon a pre-trial showing of relevance — raise the related affirmative defenses of "public authority" or "entrapment by estoppel."

### b. As Bulger Concedes, It is His Burden to Prove the Existence of an Enforceable Immunity Agreement; Immunity Agreements Do Not License Future Criminal Conduct

To prove the existence of an enforceable oral immunity agreement, defendants must offer more than "vague allegations" or "conclusory statements that such an agreement existed." *Thompson*, 25 F.3d at 1561-1563.   Rather, the court must "apply[] basic contract principles" and find that an agreement existed, the defendant performed his part, and the government was in breach.   *Id.* at 1562-63.   It is "firmly established," however, that such immunity agreements "do not license future criminal conduct."   *United States v. Black*, 776 F.2d 1321 (6th Cir. 1985); *see also United States v. Ramos*, 537 F.3d 439, 452 (5th Cir. 2008) (quoting *id.*); *United States v. Irwin*, 612 F.2d 1182, 1191-92 (9th Cir. 1980) ("substantial compliance" with a plea

agreement is not "a defense for committing additional criminal acts subsequent to the agreement"). Additionally, other circuits have cautioned that immunity agreements should "be read as a whole and given a reasonable interpretation, not an interpretation that would produce absurd results." *United States v. Irvine*, 756 F.2d 708, 710 (9th Cir. 1985) (internal citations omitted).

In that vein, Bulger's reliance on *Black and Irwin* for the proposition that immunity agreements can authorize future criminal conduct is well wide of the mark. *See* Def. Memo at 10-11. As a threshold matter, the facts in *Irwin* are instructive. In *Irwin*, the defendant was a drug informant who claimed that he needed to buy drugs to maintain the secrecy of his undercover status. While noting in dicta in a footnote the theoretical possibility that immunity agreements could cover situations where a cooperating defendant may have to "participate[] in criminal activity solely to protect or continue to maintain his undercover status," *Irwin*, 612 F.2d at 1192 n.22, the Ninth Circuit nevertheless found that because Irwin was conducting the drug transactions at issue with the intent to profit, they were outside the scope of his informant agreement, and thus he could still be prosecuted for them. *Id.* at 1191-92. As applied here, the notion that the murders with which Bulger is charged,

including gunning down Brian Halloran in broad daylight while Halloran was cooperating with the FBI, were committed "solely to protect … [Bulger's] undercover status" is not serious.   The notion is all the more absurd given Bulger's denial of his informant status to his brother Jack on September 11, 2012, and his alleged murder of additional federal cooperating witnesses Richard Castucci and John McIntyre.[14]

   c. Bulger Cannot Establish That He Has An Enforceable Immunity Agreement

   As set forth above, the public record is replete with evidence that Bulger did not have immunity.   Against this overwhelming evidence that there was no immunity agreement is, quite literally, no evidence that such an agreement existed. The only (apparent) living witness to this purported grant of

_____

[14]   Bulger's comments to his brother Jack that he "bought information," but "didn't sell it," and "never gave them information," raises the related issue of how Bulger could ever establish that he believed he was given immunity in return for information he was purportedly providing to law enforcement. When a defendant fails to perform his end of the bargain — *i.e.*, cooperating and providing information — the agreement is void for lack of consideration: "Contract principles, however, cannot help [the defendant] because he did not live up to his promise to fully and honestly cooperate with the government." *United States v. Baldacchino*, 762 F.2d 170, 179 (1st Cir. 1985) (finding agreement unenforceable) (internal citations omitted). *See also United States v. Gonzalez-Sanchez*, 825 F.2d 572, 578 (1st Cir. 1987) ("if the defendant fails to fulfill his promises, the government is released from its agreement and may indict and try the defendant regardless of whatever it may have promised earlier"); *United States v. Crawford*, 20 F.3d 933, 935 (8th Cir. 1994) (collecting cases).

immunity is Bulger, and he has steadfastly refused to file an affidavit, affirmation, or any type of sworn declaration.

> d. To the Extent Bulger Claims O'Sullivan Gave Him Prospective Authorization to Commit Murder, O'Sullivan Did Not Have Authority To Do So

As noted above, other than his counsel's unsworn representation that Bulger was given immunity sometime prior to December 1984, Bulger has provided no additional detail. On the assumption, however, that Bulger will claim that the purported grant of immunity came from O'Sullivan in 1978 or 1979 in connection with O'Sullivan's decision not to prosecute him in the so-called race-fix case, such a claim would have pre-dated eight of the murders with which Bulger is charged: (1) Roger Wheeler; (2) Debra Davis; (3) Brian Halloran; (4) Michael Donahue; (5) John Callahan; (6) Bucky Barrett; (7) John McIntyre; and (8) Deborah Hussey. *See* ECF Dkt. No. 215 at 26-30.

In light of the recent controversy regarding whether even the President of the United States, the Commander-in-Chief of the U.S. Armed Forces, faced with an imminent threat to national security, can authorize the targeted killings of American citizens affiliated with Al-Qaeda,[15] the notion that an AUSA in

---

[15] *See New York Times Co. v. United States*, 2013 WL 50209 (S.D.N.Y. Jan. 3, 2013); *see also*

Boston in 1979 had "actual authority to authorize" Bulger to murder eight American citizens with no involvement whatsoever in matters of national security, is, quite simply, ludicrous. *See Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384 (1947) ("[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority"); *see also United States v. Berg*, 643 F. Supp. 1472, 1480 (E.D.N.Y. 1986) ("[t]he proposition that a defendant may commit a criminal act without prior notice to any Government official on the basis of a supposed carte blanche authorization or a license to do everything but kill is without precedent and stretches any concept of good faith reliance beyond recognition.").[16]

---

http://openchannel.nbcnews.com/_news/2013/02/04/16843014-exclusive-justice-department-memo-reveals-legal-case-for-drone-strikes-on-americans?lite (February 5, 2013 article discussing Obama Administration's legal rationale for authorization of targeting killing of American citizens affiliated with Al Qaeda).

[16]   Of course, if Bulger intends to claim that a purported agreement in 1979 with O'Sullivan is the basis for his defense to the eight post-1979 murders, that would be a claim of public authority, not immunity.   Claims of public authority require defendants to provide extensive and detailed notice to the government.   *See* Fed. R. Crim. P. 12.3.   Bulger has not done so.

     e.  **Even Assuming *Arguendo* Both That the Unsworn Claims of Bulger's Counsel Are True, and that O'Sullivan Could Authorize Murder, An Agreement Conferring Open-ended Authority to Commit Murder Is Unenforceable and Against Public Policy.**

Bulger's claim that his "agreement with O'Sullivan specifically provided him with immunity for all crimes" and "did not have an expiration date," *see* Def. Memo at 10-12, is exactly the kind of "vague allegation" that fails under *Thompson*. Moreover, even assuming, for the sake of argument, that the unsworn allegations of Bulger's attorney set forth above are true, contracts that require the commission of an illegal act are not enforceable. *See Kiely v. Raytheon Co.*, 105 F.3d 734, 735 (1st Cir. 1997) (" … the alleged contract was an agreement to achieve mutual benefit from the parties cooperative violation of the law. Such a contract, even if explicitly agreed to by both parties, is void and unenforceable as against public policy.").

Similarly, contracts that require conduct that is adverse to the public interest are as unenforceable as those that contemplate an agreement to violate the law. In *Equal Employment Opportunity Commission v. Astra USA, Inc.*, 94 F.3d 738 (1st Cir. 1996), Astra had engaged in settlement negotiations with employees in sexual harassment claims, and required as a condition of settlement that the employee not

- 27 -

cooperate with the EEOC in any investigations. *Id.* at 740-741. The First Circuit upheld the issuance of an injunction by the district court that prohibited Astra from enforcing this "non-assistance" agreement. *Id.* at 745. In conducting its analysis, the Court stated,

> We build on bedrock. "[A] promise is unenforceable if the interest in its enforcement is outweighed by a public policy harmed by enforcement of the agreement. *Town of Newton v. Rumery*, 480 U.S. 386, 392 107 S.Ct. 1187, 1191, 94 L.Ed.2d 405 (1987).

*Id.* at 744. If a contract prohibiting cooperation with a civil agency is unenforceable as against public policy, then an open-ended agreement providing an unfettered license to kill certainly cannot withstand scrutiny.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, and because there are disputed issues of fact, the United States respectfully requests that the Court hold a hearing on this motion.

                              Respectfully submitted,

                              CARMEN M. ORTIZ
                              United States Attorney

Dated: February 6, 2013    By:    */s/ Zachary R. Hafer*____
                              ZACHARY R. HAFER
                              BRIAN T. KELLY
                              FRED M. WYSHAK, JR.
                              Assistant U.S. Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on February 6, 2013.

/s/ Zachary R. Hafer___
ZACHARY R. HAFER
Assistant U.S. Attorney

Dated: February 6, 2013