# United States Court of Appeals
## For the First Circuit

No. 12-2488

IN RE JAMES J. BULGER,

Petitioner.

PETITION FOR A WRIT OF MANDAMUS

TO THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

J. W. Carney, Jr. for petitioner.
Mark T. Quinlivan, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, and Zachary R. Hafer, Assistant United States Attorney, were on brief for respondent.

March 14, 2013

---

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER, Associate Justice**. James Bulger, the defendant in the federal criminal prosecution underlying this petition,[1] asks us to issue a writ of mandamus to require reversal of the district court's order denying a motion for recusal of the judge currently assigned to preside in the case. With great respect for the trial judge, we nonetheless grant the petition, because it is clear that a reasonable person would question the capacity for impartiality of any judicial officer with the judge's particular background in the federal prosecutorial apparatus in Boston during the period covered by the accusations.

I

The as-yet-untested indictment returned by a Massachusetts federal grand jury in 2001 describes the defendant as a leader of a criminal organization in Boston from 1972 to 1999. It charges him with a number of federal offenses, including violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, and it alleges that he committed 19 murders ancillary to the RICO conspiracy. The defendant's associate in the crimes charged, Stephen Flemmi, was likewise indicted and has since been convicted and sentenced on a guilty plea. See United States v. Flemmi, 225 F.3d 78, 81-83 (1st Cir. 2000); United States v. Flemmi, 245 F.3d 24, 25-27 (1st Cir. 2001); United States v. Connolly, 341 F.3d 16, 21 (1st Cir. 2003). The defendant remained

---

[1] See United States v. Bulger, No. 99-10371-RGS (D. Mass).

a fugitive until his arrest in 2011, with these proceedings ensuing.

During the 1970s and 1980s, organized crime in Boston was investigated by the Federal Bureau of Investigation and prosecuted federally either by the United States Attorney's Office or by a separate team of prosecutors, called the New England Organized Crime Strike Force, which operated independently of control by the United States Attorney, but not free from communication with his office. The defendant now alleges that over the course of that earlier period these law enforcement groups came to know of whatever evidence the Government relies upon to charge the crimes listed in the indictment. He argues that owing to his level of notoriety, the earlier prosecutors could not possibly have been ignorant of the involvement on his part that their successors now seek to show. He says that they refrained from taking action because they were aware of rumors he was working with the Government as an informant. Further, he contends that their failure to prosecute him is evidence that the Justice Department had granted him immunity for all crimes now alleged, which is at least one of his responses to the indictment.

The defendant's case was randomly assigned to the Honorable Richard G. Stearns of the United States District Court for the District of Massachusetts. Earlier in his career, Judge Stearns held a variety of managerial and supervisory appointments

within the U.S. Attorney's Office in the District, and during a significant period of the time covered by the indictment he was at various times Chief of the General Crimes Unit, Chief of the Criminal Division, First Assistant United States Attorney, and Senior Litigation Counsel.

In moving that Judge Stearns recuse himself, the defendant cited 28 U.S.C. § 455(a), (b)(1), (b)(3) and (b)(5)(iv). He asserted that a reasonable person would conclude that the judge could not be impartial, particularly in treating with the immunity defense, after the judge had held those positions of high responsibility in the U.S. Attorney's Office during part of the period in question, and that recusal was required under § 455(a). The defendant also contended that Judge Stearns likely would have had personal relationships at the time with numerous witnesses and would himself be a material witness, necessitating recusal under § 455(b).

Judge Stearns denied the motion. He found that his impartiality could not reasonably be called into question because at the time relevant here the U.S. Attorney's Office was separate from the Strike Force. He stated that he had no doubt that he could remain impartial and that no reasonable person could doubt it. Judge Stearns rejected the defendant's § 455(b)(5)(iv) claim because he had no personal knowledge of anything material to the charged conduct.

The defendant then renewed his motion in part, asserting again that recusal was warranted under § 455(a) and (b)(5)(iv). He alluded to Judge Stearns's order denying the first motion, in contending that "a failure to participate in any investigation targeting [Bulger] . . . is circumstantial evidence that corroborates [his] assertion of his immunity agreement." Pet. App. 137. The defendant also represented that he intended to call as a witness Robert S. Mueller, III, the current Director of the Federal Bureau of Investigation and formerly a Chief of the Criminal Division of the local U.S. Attorney's Office, who is said to be a close friend of Judge Stearns. The defendant reiterated his argument that a reasonable person would question Judge Stearns's impartiality.

Judge Stearns denied the renewed motion, concluding that it raised no new matters of law or fact (beyond the identification of the late Jeremiah O'Sullivan as the person defendant claims to have given him the promise of plenary immunity). Judge Stearns said that he remained unpersuaded that the defendant would call him as a witness, as he knew nothing of any relevance to the case.

The defendant now petitions this court for interlocutory relief by a writ of mandamus directing Judge Stearns to vacate his order denying the renewed motion for recusal and to remove himself from the case. He raises here the same two arguments for recusal presented in the renewed motion: that a reasonable person would

question Judge Stearns's impartiality, see 28 U.S.C. § 455(a); and that Mr. Mueller and Judge Stearns are likely to be material witnesses, see id. § 455(b)(5)(iv).[2] Because our resolution of the § 455(a) contention is dispositive, we do not address the § 455(b)(5)(iv) claim.

II

Resolving this case calls for synthesizing two legal standards. The governing statute, 28 U.S.C. § 455(a), provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." See Susan B. Hoekema, Questioning the Impartiality of Judges: Disqualifying Federal District Court Judges Under 28 U.S.C. § 455(a), 60 Temp. L.Q. 697, 708 (1987) ("[S]ection 455(a) suggests that it requires disqualification for the appearance of bias."); accord In Re Chantal, 902 F.2d 1018, 1023 (1st Cir. 1990). When after trial we review a judge's decision declining to recuse, we enquire only whether the district court abused its discretion. See United States v. Pulido, 566 F.3d 52, 62 (1st Cir. 2009). We ask "not whether [we] would have decided as did the trial court, but whether that decision cannot be defended as a rational conclusion supported by [a] reasonable reading of the record." United States v. Snyder, 235 F.3d 42, 46 (1st Cir. 2000) (second alteration in original)

---

[2] The defendant raises no grounds for recusal based on the Code of Conduct for United States Judges, and we consider no arguments other than those presented in the petition.

-6-

(quoting In re United States, 158 F.3d 26, 30 (1st Cir. 1998)). Thus, an abuse of discretion will be found only if a reasonable reading of the record fails to support the conclusion that the judge's impartiality was not subject to question.

The second standard is implicated because this issue arises not on direct appeal after trial but on petition for a writ of mandamus, which places an even more exacting burden on those who request it. Before the writ will issue, "the petitioner must satisfy 'the burden of showing that [his] right to issuance of the writ is clear and indisputable.'" Cheney v. U.S. Dist. Court for Dist. of Columbia, 542 U.S. 367, 381 (2004) (quoting Kerr v. United States Dist. Court for Northern Dist. of Cal., 426 U.S. 394, 403 (1976)). A petitioner for mandamus relief must also demonstrate that he has no other adequate source of relief; that is, he must show "irreparable harm." In re Vázquez-Botet, 464 F.3d 54, 57 (1st Cir. 2006); cf. In re Martinez-Catala, 129 F.3d 213, 217-18 (1st Cir. 1997) ("Some opinions suggest that a *clear* entitlement to recusal may itself warrant immediate [mandamus] relief, absent an equitable bar, because public confidence is enhanced where a clearly disqualified judge is removed swiftly."). And finally, a petitioner must demonstrate that, on balance, the equities favor issuance of the writ. See Cheney, 542 U.S. at 381; In re Vásquez-Botet, 129 F.3d at 57.

-7-

Applying the mandamus rule to the substantive recusal standard thus requires a doubly deferential review: relief for the defendant is only warranted if it is "clear and indisputable" that no reasonable reading of the record supports a refusal to recuse. In other words, the issue here is this: is it clear that a reasonable person might question Judge Stearns's ability to remain impartial in hearing the case?

This standard is difficult to meet, and rightly so. Absent such deferential review, any defendant with a spurious accusation might seek to trigger immediate mandamus review of recusal proceedings that would burden the Government and delay his trial. Since the law consequently entrusts these matters to the sound discretion of the district court, we review them only for the rare error that might arise from willful malfeasance or, as in this case, from a good-faith failure to recognize how a reasonable member of the public would perceive one's relation to the case.

III

In order to explain the conclusion we reach, we emphasize the limits on what we consider. The sole claim we pass upon here is the invocation of § 455(a) on the ground that Judge Stearns's impartiality might reasonably be questioned, it being understood that a reasonable person may question impartiality without the presence of any evidence that a judge is subjectively biased.

-8-

Indeed, defendant has made no claim that Judge Stearns has in fact demonstrated any bias in his handling of the case.

Accordingly, our analysis of the defensive claim and relevant facts does not question either Judge Stearns's ability to remain actually impartial or his sincerity in concluding that he is not biased against the defendant, nor do we draw any conclusion that he is biased. The point under § 455(a) is not his actual state of mind at a particular time, but the existence of facts that would prompt a reasonable question in the mind of a well-informed person about the judge's capacity for impartiality in the course of the trial and its preliminaries. This focus likewise excludes any consideration of the merits of defendant's assertion of immunity on the basis he claims, or of his entitlement to seek evidentiary support for that claim in testimony from Judge Stearns or Mr. Mueller. The issue under § 455(a) goes only to who should make the decisions.

Subject to these limits, what we do decide here comprises both facial and underlying, supportive elements. We understand the defendant's facial argument and its implications to run like this. The actions charged in the indictment are alleged to have occurred during a period when the defendant claims he was covered by a promise of immunity from any criminal prosecution, including for murder. He says the promise was made by the late Jeremiah O'Sullivan, then a member of the Strike Force but at other times an

Assistant United States Attorney and acting United States Attorney. This promise was supposedly given in return for the defendant's agreement to supply information about the criminal activities of others. The immunity agreement must have been known and honored by the Government's prosecutorial apparatus in Boston, the argument goes, throughout the better part of the period covered by the indictment. A reasonable member of the public could easily think that anyone who held a position of high responsibility in the Office of the United States Attorney during this period would only be human in reacting to such a claim in either a defensive or an adversarial way. Both responses would be natural, given the institutional relationship between the former official and his former office during his time there.

Still, the defendant's claim and its implications cannot themselves alone suffice to require the judge's recusal, lest the law confer a veto power on the assignment of his trial judge to any heckling defendant who merely levels a charge that implicates a judge's defensive or vicariously defensive reaction. The recusal standard must be more demanding because "the disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." In re

-10-

Allied-Signal Inc., 891 F.2d 967, 970 (1st Cir. 1989); see In re United States, 158 F.3d at 35 ("A party cannot cast sinister aspersions, fail to provide a factual basis for those aspersions, and then claim that the judge must disqualify [him]self because the aspersions, *ex proprio vigore*, create a cloud on [his] impartiality."). Hence, a district judge asked to recuse "is not to use the standard of 'Caesar's wife,' the standard of mere suspicion." In re Allied-Signal Inc., 891 F.2d at 970. The necessary independent support for a challenge to impartiality with the potential to produce bias, see Brooks v. N.H. Supreme Court, 80 F.3d 633, 640 (1st Cir. 1996), is supplied in this case by official reports and conclusions predating these proceedings, and already largely in the public domain, that disclosed disquieting links between the Government and the criminal element during the years in question, and that may fairly stimulate a critical attitude on the part of an independent observer.

For purposes of the reasonable question standard, some facts may be treated as undisputed owing to an extensive history of litigation and official enquiry into the relationship between the defendant and the FBI during a substantial portion of the span covered by the indictment. See United States v. Flemmi, 402 F.3d 79 (1st Cir. 2005); Donahue v. United States, 634 F.3d 615 (1st Cir. 2011); Flemmi, 225 F.3d 78; Connolly, 341 F.3d 16; McIntyre v. United States, 367 F.3d 38 (1st Cir. 2004); United States v.

-11-

Connolly, 504 F.3d 206 (1st Cir. 2007); United States v. Salemme, 164 F. Supp. 2d 49 (D. Mass. 1998). Prior judicial findings indicate that at relevant times the defendant and his associate Flemmi controlled the Boston crime organization known as the Winter Hill Gang, and they agreed with FBI agents to act as confidential informants about the city's chapter of La Cosa Nostra, which it was a Justice Department priority to destroy. Flemmi, 225 F.3d at 81-83; McIntyre, 367 F.3d at 45; Salemme, 164 F. Supp. 2d at 40, 60. The period covered by the special relationship between the defendant and the FBI overlapped both the dates of the activity alleged in the defendant's indictment and the years that Judge Stearns held supervisory positions in the federal prosecutor's office.

It is widely known that the FBI's principal contact person ("handler") with the defendant and Flemmi was later convicted of taking bribes from them, see Connolly, 341 F.3d at 20-21, and evidence in prior litigation showed that the FBI provided the Winter Hill Gang with names of rival snitches, who were subsequently murdered, see McIntyre, 367 F.3d at 41. Although the FBI agents were the defendant's immediate partners in the informant relationship, some knowledge of it and participation in it went deeper into the Justice Department, for it indisputably extended to O'Sullivan, from whom the defendant says he received the promise of immunity. See Flemmi, 225 F.3d at 90. At the time claimed,

O'Sullivan was a member of the New England Organized Crime Strike Force, for which he was at one period the chief prosecutor, though at other times (as mentioned before) he was an Assistant United States Attorney and even acting United States Attorney. He appeared as a witness in the congressional enquiry that followed the public disclosure of the informant agreement, cf. McIntyre, 367 F.3d at 45, where he was questioned about an investigation into a scheme implicating Winter Hill Gang members in fixing horse races at New England tracks, see 1 H.R. Rep. No. 108-414, *Everything Secret Degenerates: The FBI's Use of Murderers as Informants*, at 58 (2004). When he was asked why the Government had sought no indictments of the defendant and Flemmi along with others that were handed up, cf. Flemmi, 225 F.3d at 81-82, O'Sullivan spoke of their minimal participation, only to be confronted with a memo he had written on the matter at the time, which made it clear that the gang-leader informants were in no way minimal participants. See 1 H.R. Rep. 108-414, at 58. He acknowledged that what he wrote must have been what he understood at the time, but the committee's report branded his initial testimony as "false," not merely mistaken, id., and responsibility for favoritism to the defendant was thus extended to a Strike Force member who was subsequently placed in charge of the United States Attorney's Office. On these facts, concerns about impartiality arise from the very structure of

the prosecutorial forces, which included some communication between the Strike Force and the United States Attorney's Office.

The Strike Force, to be sure, was distinct from the Office of the United States Attorney where Judge Stearns was a supervisor, and was a competitor organization within the Justice Department, reporting directly to the Attorney General. But there is reason to believe that there was no impermeable barrier insulating information known to one office from being shared with the other. In 1970, the Attorney General instructed the two enforcement arms to keep each other informed of their activities, In re Persico, 522 F.2d 41, 68 (2d Cir. 1975), the two offices in Boston "interact[ed]" from time to time, and O'Sullivan was known to be in touch with the United States Attorney, Salemme, 164 F. Supp. 2d at 55. FBI reports, a source common to both offices, indicate that on at least some occasions the United States Attorney's Office as well as the Strike Force was apprised of investigations of the defendant's activities, and those investigations must have been aimed at the sort of activity charged here: the indictment itself lists a string of serious criminal acts, including 19 murders, on the part of the defendant or his organization, all of a sort subject to federal scrutiny during the periods of the judge's supervisory positions.

These disclosures of record do not, of course, add up to showing that any federal officers promised the immunity the

defendant claims (let alone that anyone had authority to do so). But they do tend to indicate that the Government and the defendant were not at arm's length during all of the period in question, and that any evidence about the terms on which they dealt with each other could reflect on the United States Attorney's Office as it was constituted in those days.

The record likewise includes enough to justify a reasonable belief that the defense's claim probably portends an enquiry into just those dealings. Given the institutional ties described here, the reasonable person might well question whether a judge who bore supervisory responsibility for prosecutorial activities during some of the time at issue could suppress his inevitable feelings and remain impartial when asked to determine how far to delve into the relationship between defendant and Government, and to preside over whatever enquiry may ultimately be conducted. On this record, that question could not reasonably be avoided.

We think it would be of no consequence to the reasonable person that the judge in the supervisory position had not been the United States Attorney, who carried ultimate responsibility for the office. See United States v. Arnpriester, 37 F.3d 466, 467 (9th Cir. 1994) (finding a U.S. Attorney responsible for the activities of his office). Indeed, a supervisor, such as Chief of Criminal Division, is more immediately accountable for the actions of his

-15-

own section than the United States Attorney is, with a corresponding immediate difficulty in remaining impartial toward a defendant who seeks to throw more fuel on the embers left from the prior disclosures related to this case. Cf. United States v. Scholl, 166 F.3d 964, 977 (9th Cir. 1999) (rejecting a recusal claim against a supervisor with no authority over the section of the office conducting the relevant investigation).

That of course is not quite the end of the matter, for as we mentioned earlier a mandamus petitioner must show irreparable harm if immediate relief is denied, and a balance of equities in his favor. As for the former, we can leave aside any question of harm personal to the defendant and concentrate on damage to the judicial system. It is enough to say that we need not consider a rule that a clear showing under the substantive recusal standard always suffices to demonstrate irreparable harm, see In Re Martinez-Catala, 129 F.3d at 217-218, for here the prior disclosures make it imperative to act promptly to preclude any reasonable question whether untoward Government action in the past may affect the fairness of the judicial branch in the present. Nor does balancing the equities present any close question. The prior disclosures take this case out of the category of the heckler's veto, and the defendant has represented that he will not seek any trial delay if a new judge is substituted.

In sum, despite our respect for Judge Stearns and our belief in his sincerity, we are nonetheless bound to conclude that it is clear that a reasonable person might question the judge's ability to preserve impartiality through the course of this prosecution and the likely rulings made necessary by the immunity claim.[3] The other mandamus conditions being satisfied, the petition is granted, and the case shall be reassigned to a judge whose curriculum vitae does not implicate the same level of institutional responsibility described here.

*It is so ordered.*

---

[3] On March 4, 2013, Judge Stearns responded to the Government's motion under Federal Rule of Criminal Procedure 12 by rejecting the defendant's immunity claim as a matter of law insofar as it included immunity for criminal acts that might have been committed after the date of any promise. This ruling neither moots the recusal issue nor affects our reasoning, for defendant's claim of possibly retrospective immunity remains subject to litigation. Nor does our own ruling require that Judge Stearns's March 4 order (or any other, save the one under review) be vacated. The defendant is free to respond to that order as he sees fit, but nothing we decide here necessarily requires reploughing the ground, given the absence of any allegation that Judge Stearns is actually biased.