1                      UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
2

3    _____

4    UNITED STATES OF AMERICA,

5                        Plaintiff,          Criminal Action
                                             No. 99-10371-DJC
6    V.
                                             June 3, 2013
7    JAMES J. BULGER,                        1:58 p.m.

8                        Defendant.
     _____
9

10

11              TRANSCRIPT OF FINAL PRETRIAL CONFERENCE

12            BEFORE THE HONORABLE DENISE J. CASPER

13               UNITED STATES DISTRICT COURT

14            JOHN J. MOAKLEY U.S. COURTHOUSE

15                    1 COURTHOUSE WAY

16                  BOSTON, MA  02210

17

18

19

20
                    DEBRA M. JOYCE, RMR, CRR
21                   Official Court Reporter
                 John J. Moakley U.S. Courthouse
22                1 Courthouse Way, Room 5204
                      Boston, MA  02210
23                      617-737-4410

24

25

```
 1    APPEARANCES:

 2    FOR THE GOVERNMENT:

 3    BRIAN T. KELLY, ESQ.
      FRED M. WYSHAK, JR., ESQ.
 4    ZACHARY R. HAFER, ESQ.
      United States Attorney's Office
 5    John Joseph Moakley Federal Courthouse
      1 Courthouse Way
 6    Suite 9200
      Boston, MA 02210
 7    617-748-3197

 8    FOR THE DEFENDANT:

 9    J.W. CARNEY, JR., ESQ.
      HENRY B. BRENNAN, ESQ.
10    Carney & Bassil
      20 Park Plaza
11    Suite 1405
      Boston, MA 02116
12    617-338-5566

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open
 3    court before the Honorable Denise J. Casper, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    1 Courthouse Way, Boston, Massachusetts, on June 3, 2013.)
 7              THE CLERK:  Criminal action 99-10371, United States v.
 8    James Bulger.
 9              Would counsel please state your name for the record.
10              MR. KELLY:  Good afternoon.  Brian Kelly, Fred Wyshak,
11    and Zach Hafer for the United States.
12              THE COURT:  Good afternoon, counsel.
13              MR. CARNEY:  Good afternoon, your Honor.
14              THE COURT:  Good afternoon.
15              MR. CARNEY:  This is Hank Henry Brennan, I'm J.W.
16    Carney, Jr., with me is James Bulger.
17              THE COURT:  Good afternoon.
18              Good afternoon, Mr. Bulger.
19              Counsel, I know we're here for a final pretrial
20    conference.  I know there are quite a number of pending motions
21    in limine, including a number I received this morning, but let
22    me address a few preliminary matters first.
23              I did receive the joint pretrial memo.  As I
24    understand it, the government estimates, I believe, 12 to 14
25    weeks, counsel; is that correct?
```

1          MR. KELLY:  That's correct, your Honor.

2          THE COURT:  Okay.

3          Mr. Carney, you estimate four weeks?

4          MR. CARNEY:  Yes, your Honor.

5          THE COURT:  As you may have seen in my proposed

6    remarks, I was going to tell the jury pool until the end of

7    September, given those estimates.  I think that's appropriate

8    and not too conservative.

9          In terms of the witness list, I think both sides have

02:00 10   now amended their witness lists so that the final witness lists

11   that I have, Docket 953 for the government, and I believe 960

12   and 61 for the defendant; is that correct?

13         MR. HAFER:  Yes, your Honor.

14         MR. CARNEY:  Yes, your Honor.

15         THE COURT:  And, Mr. Carney, I think the last

16   supplement added four names?

17         MR. CARNEY:  Yes.  I submitted it in two ways, your

18   Honor.  The first way was so that the four names would be

19   incorporated in the original list, so that way, if the Court

02:00 20   were using a version of a Word document to print one for the

21   jury, you'd have a complete list.  The second document was just

22   to identify the four new names separately.

23         THE COURT:  Okay.

24         And, counsel, no further additions?  Because we have

25   finalized the attachment A for the jury questionnaire; is that

1    correct?

2             MR. CARNEY:  Certainly not right now, your Honor.

3             THE COURT:  Okay.

4             MR. CARNEY:  It may be possible, based on testimony

5    that the government presents, that a witness with relevant

6    testimony may become known to us who is not known to us now.

7             THE COURT:  Okay.  But, counsel, obviously I'm asking

8    in terms of asking our jury pool.  No other names at this

9    point.

02:01 10          MR. CARNEY:  Yes, your Honor, that's completely

11   correct.

12            THE COURT:  And I'm assuming the same is true from the

13   government's perspective.

14            MR. KELLY:  Yes, your Honor.  But we would like to be

15   heard, perhaps not right now, about the defense witness list.

16            THE COURT:  And I saw and reviewed the government's

17   motion in that regard, and, counsel, we'll get to that later.

18   So we'll reserve on that issue for the moment.

19            Excuse me for a moment.

02:02 20          (Discussion off the record.)

21            THE COURT:  Counsel, in terms of exhibit lists, I'm in

22   receipt of the government's exhibit list, and I received copies

23   of the exhibits electronically on disk.

24            Mr. Carney, I don't believe an exhibit list has been

25   filed by the defendant.  Are there no exhibits other than, I

1    suppose, the exhibits that are being proffered by the

2    government?

3            MR. CARNEY:  We are not able today to tell your Honor

4    of an exhibit list, except to the extent that we've identified

5    no exhibits that we would offer in our case in chief.

6            THE COURT:  Which I'm assuming, counsel, since you

7    framed it that way, that's your reading of the local rule?

8            MR. CARNEY:  Yes, your Honor.

9            THE COURT:  Counsel, in terms of the motion in limine,

02:02 10   and I know there were initially ten filed and then there were a

11   number filed today that I'm going to deal with separately --

12           Mr. Carney, did you want to be heard on anything else?

13           MR. CARNEY:  Not related to the motions that are

14   before the Court.

15           THE COURT:  Okay.  Did you want to be heard -- I was

16   going to turn to the motions in limine.

17           MR. CARNEY:  Yes, I will want to be heard --

18           THE COURT:  Okay.

19           MR. CARNEY:  -- as directed by your Honor.

02:03 20   THE COURT:  Okay.

21           MR. CARNEY:  Thank you.

22           THE COURT:  In terms of the motions in limine, the

23   ones that I initially received, I received six from the

24   government, Dockets 924, 925, 927, 929, 933, and 935.

25           On Mr. Bulger's behalf I received 928, 942, 943, and

```
 1   946.
 2          I understand the government wants to be heard in
 3   regards to the last three of those in terms of timeliness, but
 4   also on the substance.
 5          Counsel, I'd like to address them in the following
 6   order:
 7          First, I'd like to address the three, Mr. Carney, to
 8   which I have not yet received any written objection, that's
 9   924, the government's motion in limine in regards to the
10   informant files, the admission of them as co-conspirator
11   statements; 925, the government's motion to admit certain DNA
12   evidence; and 929, the motion in limine in regards to proffered
13   opinion testimony as to the cause of death.
14          And why don't, before I give the government an
15   opportunity to be heard, ask you simply whether or not there is
16   opposition to any of those three?
17          MR. CARNEY:  We would like to be heard in regard to
18   all three, your Honor.
19          THE COURT:  Okay.
20          MR. CARNEY:  Attorney Brennan would handle 924; I
21   would handle the other two, with your Honor's permission.
22          THE COURT:  Okay.
23          Why don't I hear from the government.
24          MR. KELLY:  Your Honor, we, too, have broken up these
25   motions, so I apologize for the herky-jerky nature.
```

1          THE COURT:  That's fine.

2          MR. KELLY:  Hopefully the more difficult ones I've

3     assigned to -- are not assigned to me.

4          THE COURT:  The motion in limine on the informant

5     files, who's addressing that, Mr. Wyshak?

6          MR. WYSHAK:  Yes, your Honor.

7          Simply put, I don't want to belabor the point, but the

8     informant files are clearly the statements of the defendant or

9     alternatively statements of the defendant's co-conspirator,

02:05 10  John Connolly, as well as Mr. Flemmi's statements would be

11    statements of co-conspirator, John Connolly.

12         All the reports that we have isolated and marked as an

13    exhibit were generated by Mr. Connolly.  I think there is one

14    report that was generated by another FBI agent, Dennis Condon,

15    that we would offer solely on the basis of its being a

16    statement of the defendant that was the first informant report

17    made based upon information supplied by the defendant in the

18    case.

19         THE COURT:  And is that the earlier of the files?

02:06 20   MR. WYSHAK:  That's a 1971 report, yes.

21         There may also be some reports in there from

22    Mr. Morris, but Mr. Morris, again, was generally always present

23    with Mr. Connolly, and, of course, Mr. Bulger and Mr. Flemmi at

24    the time they were made.

25         Obviously, we -- it's the theory of the prosecution,

1   your Honor, that John Connolly was a corrupt FBI agent, that he

2   was on Mr. Bulger's payroll, he supplied information to

3   Mr. Bulger and Mr. Flemmi over a 15, 20-year period of time

4   that allowed them to avoid law enforcement detection.  He

5   provided information to them that identified people who were

6   cooperating against them, which is the source of some of the

7   murders in this case.

8         Alternatively, in addition to receiving money from

9   Mr. Bulger and Mr. Flemmi, John Connolly received information

02:07 10   from them which he used to enhance his own career as an FBI

11   agent, information that was used to bring cases against the

12   Mafia in this district, as well as other criminal cases which

13   Mr. Bulger and Mr. Flemmi provided information on.  So, again,

14   this is sort of a symbiotic relationship.

15         Mr. Connolly flourished, and Mr. Flemmi and Mr. Bulger

16   flourished; and by the end of their careers, Mr. Connolly was a

17   highly decorated FBI agent, and Mr. Bulger and Flemmi were, you

18   know, on top of the criminal food chain in Greater Boston.  We

19   think that obviously this is a significant part of the

02:08 20   conspiracy in which these men were involved, so that any

21   document generated by Mr. Connolly, based upon information from

22   Mr. Bulger and Mr. Flemmi, was all part of the gestalt, so to

23   speak, of keeping them in their informant roles, which sort of

24   allowed Mr. Connolly to run interference for them and, again,

25   allowed Mr. Bulger and Flemmi to receive information, sensitive

 1    law enforcement information, which enabled them to prevent

 2    apprehension.

 3              THE COURT:  Counsel, I have gone through these

 4    exhibits.  My memory is that the government had proffered

 5    Exhibits 353 and then 355 to 57, the latter being Mr. Bulger's

 6    files, and 353 being Mr. Flemmi's.

 7              In some of them, and they may have been in

 8    Mr. Bulger's files, there are certainly reports reflecting

 9    statements made, but my memory was there are also memos that I

02:09 10   wouldn't characterize as statements by the co-conspirators.  So

11    were you planning to offer the whole file or just the ones that

12    contain --

13              MR. WYSHAK:  Well, I think that the documents that are

14    part of the exhibit we intend to offer.

15              To the extent that there are memorandum in there, I do

16    think that to some extent they paraphrase information supplied

17    by Mr. Bulger and Mr. Flemmi, and to other extent constitute

18    statements by Mr. Connolly or Mr. Morris, which are essentially

19    being generated to justify the continued operation of

02:10 20   Mr. Bulger and Mr. Flemmi as informants.

21              I don't want to get too deep into the weeds on this,

22    but I think the testimony at trial will be that part of the

23    benefit that Mr. Bulger and Mr. Flemmi gained by being FBI

24    informants was that it made it that much more difficult for the

25    FBI to target them in criminal cases.

1          One example is if they were named as the targets of an

2     FBI investigation, they would have to be closed as informants,

3     Mr. Connolly's relationship with them would have to be over.

4     He would have a difficult time explaining why he continued to

5     associate with known criminals like Mr. Bulger and Mr. Flemmi

6     if they were, in fact, not open as FBI informants.

7          So many of those memorandum in the files are in there

8     for the purpose of perpetuating what we believe is the

9     racketeering conspiracy, which in large part was based upon

02:11 10    this relationship between Mr. Connolly and Mr. Bulger and

11     Mr. Flemmi.

12          THE COURT:  And, counsel, as I understand it, you're

13     proffering them now on the theory that I would admit them

14     conditionally under 104(a) and then make findings at the close

15     of evidence?

16          MR. WYSHAK:  Yes -- you mean, as a Petrozziello-type

17     finding?

18          THE COURT:  Yes.

19          MR. WYSHAK:  Yes.

02:12 20    THE COURT:  Thank you.

21          Counsel?

22          MR. BRENNAN:  May I, your Honor?

23          THE COURT:  You may, Mr. Brennan.

24          MR. BRENNAN:  While I disagree with the government

25     that these statements reflect statements made by Jim Bulger,

1   rather they are statements written by John Connolly, we're in

2   agreement that the entire file that's been labeled "James

3   Bulger's informant file" should be introduced.

4          THE COURT:  Do you take the same position as to

5   Mr. Flemmi's file, Exhibit 353?

6          MR. BRENNAN:  We have no objection to that file coming

7   in, in its entirety.

8          There are two notes that I'd like to make, first of

9   which is really perhaps an administrative issue regarding the

02:12 10  file.

11          The government provided us the file twice; the first

12   file was somewhat redacted during discovery and was Bates

13   numbered, the second file was unredacted and Bates numbered.

14   As an exhibit, the government sent us the complete file that

15   was unredacted.  It would be helpful if we could use the

16   previously provided Bates number copy as the exhibit at trial,

17   that way we can refer to specific pages when necessary.

18          The second issue is before the government gave notice

19   to the Court that they would like to introduce this

02:13 20  information, we had asked in discovery for not only the file

21   that is held in the local Boston FBI office, but also the FBI

22   headquarters in Washington is mandated to keep the exact same

23   file, a second separate copy.  We asked for that separate copy

24   from FBI headquarters during discovery, and that request was

25   either not heard or was denied, and we never received that

1    copy.  We would like to have the original copy from FBI

2    headquarters, which is supposed to mirror the local Boston

3    office copy.  Also, importantly, there is a pink sheet at the

4    beginning of the file, which is actually the color pink, and

5    has significance and import in this case.

6          So given the fact the government wishes to introduce

7    this file in its entirety, and we certainly welcome that, I

8    would ask your Honor to consider ordering that the FBI

9    headquarters file, which is supposedly the same, to be produced

02:14 10   in this as well.

11          THE COURT:  Okay.  And, counsel, just so I understand

12   the limits or the breadth of your not objecting to the

13   admission of these files, are you conceding that the statements

14   were made during the course of a conspiracy in furtherance of

15   the conspiracy and the declarant and the defendant were part of

16   the same conspiracy?

17          MR. BRENNAN:  I think the government's allegation is

18   that it was an ongoing conspiracy that included Mr. Connolly.

19   I think that the low threshold they'll have to show

02:15 20   co-conspirator statements will be met in this case, so I

21   wouldn't have an objection to the file coming in.

22          THE COURT:  Okay.

23          Mr. Wyshak, what do you say in regards to what I take

24   to be a further discovery request?

25          MR. WYSHAK:  Well, just so I understand what the

1    request is, there are two different files that are kept on each

2    informant, one is an administrative file or a main file, and

3    the second is the insert file, which contain the actual

4    reported information from the defendant in this case.  So we

5    have produced *in toto* the insert file.

6          Regarding the main file, we have redacted that file

7    because much of the information in that file is administrative.

8    It's documents which the FBI keeps which theoretically I

9    thought might raise issues as to whether or not they were

02:16 10   co-conspirator statements or whether they constituted

11   admissions of the defendant.  So I have redacted the main file

12   just to include what I thought would be admissible under those

13   two theories.

14         So, I don't know, is Mr. Brennan requesting that we

15   use the entire main file or the redacted file, which we've

16   produced as a government exhibit?

17         THE COURT:  Mr. Brennan?

18         MR. BRENNAN:  Your Honor, we want the entire file,

19   unredacted.  There's no need at this point for any redactions.

02:16 20   I don't see how there could be an extraordinary privacy

21   interest, and if we're looking to put all the information in,

22   it should be all the information.

23         I know there's a distinction between the

24   administrative and the insert file that the government talks

25   about, but there are two separate holders of that file.  The

1    local Boston FBI office keeps a copy of both of those files,

2    FBI Washington headquarters keeps a copy of those same files.

3    Procedurally how it happens is that if the FBI, a local office,

4    puts an insert or a report into the file, they are supposed to

5    immediately send it to headquarters in Washington and they're

6    supposed to keep the same file separately.

7           And so if we're going to introduce part of the file,

8    the local file, we should include also the Washington file as

9    well.  So it should be both unredacted in its totality, and we

02:17 10  should also have the Washington file as well.

11          MR. WYSHAK:  So we can provide a new exhibit of the

12   main file that is unredacted.

13          Regarding the headquarters file, your Honor, I need to

14   take a look at that.  I think it's not going to have any

15   documents in it that are not already included in the Boston

16   files.

17          As Mr. Brennan has said, headquarters maintains its

18   own file based upon what Boston sends them out of the local

19   file.  As a matter of fact, it's my experience that the

02:18 20  headquarters file will have less documents in it than the local

21   files, but that's something I'm going to have to take some time

22   and take a look at.

23          THE COURT:  Okay.

24          MR. BRENNAN:  Your Honor, I want to be clear that

25   we're not asking the government to look at the headquarter file

1    and see if there are any different documents.  We want a copy

2    of the file.  It is of significance.  The file is sent on a

3    page-by-page basis to headquarters.  If there are extra

4    documents in the headquarters file, it is important.  If there

5    are less documents in the headquarters file, that is important

6    as well.  If there are notations, as there oftentimes is, in

7    the headquarters file, those are important.  So rather than an

8    assessment of what the difference may be or whether there's no

9    difference, we'd like to have an actual copy of the headquarter

02:18 10    FBI file.  It's supposed to be kept contemporaneously, and any

11    deviation or differences or omissions are relevant.  If we're

12    going to introduce a document of the local FBI and say this is

13    the world and universe of these supposed statements, then we

14    should also have the ability to compare that to the FBI

15    headquarters file.

16        MR. WYSHAK:  I have no objection.  I'll access the

17    headquarters file and then, perhaps, we can discuss this once

18    we have the file and have taken a look at it.

19        THE COURT:  Okay.

02:19 20        Well, counsel, I'm going to see you at a few junctures

21    this week.  Given the representation that you're going to look

22    at this issue, and hopefully this can be resolved informally

23    between counsel, but I will intend to follow up with you; I

24    suppose Wednesday would be the best juncture for me to do that.

25        MR. BRENNAN:  Thank you.

         1            MR. WYSHAK:  I hope I can get it that quick, your

         2    Honor.

         3            THE COURT:  I'm confident, given the circumstances,

         4    Mr. Wyshak, that you can do that.

         5            Counsel, just in light of the fact that there's no

         6    objection, and I understand the defendant to be conceding that

         7    the basis for findings here would be made by the government

         8    based on their proffer of what the evidence will be, that the

         9    informant files that were proffered by the government in

02:20 10    support of Docket 924, specifically Exhibits 353 and 355

        11    through 57, include statements made during the course of the

        12    conspiracy that Mr. Bulger, as alleged, and the declarants of

        13    those statements were both members of the same conspiracy and

        14    that the statements reflected therein were made in furtherance

        15    of the conspiracy, I'm going to allow their admission.

        16            And, counsel, we'll leave open, as I said, for me to

        17    return on Wednesday to the issue of the main file versus the

        18    local file.

        19            MR. BRENNAN:  Thank you, your Honor.

02:21 20            If I could just note, in the preface to the admission

        21    you mentioned, that the defendant concedes the government's

        22    theory, we recognize what they're theory will be, but we

        23    certainly don't concede it.  I just want to make that note,

        24    it's important, I believe.

        25            THE COURT:  I guess what I was saying -- and I wasn't

1    trying to overstate your agreement, counsel -- that for the

2    purposes of the proffer being made now, I need to think through

3    whether or not I should still make formal findings at the close

4    of evidence anyway, counsel, for the purposes of the record,

5    but to the extent that counsel was asking me to conditionally

6    admit them based on the government's proffer, I will do so.

7           MR. BRENNAN:  Thank you.

8           THE COURT:  So motion allowed in that regard.

9           Counsel, the next motion I wanted to address was the

02:21 10   motion in limine as to DNA evidence.

11          Although, Mr. Carney, have you stood to raise

12   something before I turn to that?

13          MR. CARNEY:  Oh --

14          THE COURT:  Okay.

15          Motion in limine, it's a government's motion, and

16   perhaps you were standing to say there is no objection?

17          MR. CARNEY:  There's no objection, assuming that the

18   proper foundation is laid by the witness.

19          The witness does appear to be qualified to offer this

02:22 20   expert testimony, but it's necessary to present the procedures

21   by which this evidence was obtained.

22          So based on an assumption that the government will

23   meet that, we would not have an objection.

24          THE COURT:  Okay.

25          I don't know who was going to address it.  Mr. Wyshak?

 1          MR. WYSHAK:  The reason I made the motion in limine,

 2    your Honor, is so that we don't get diverted in some kind of

 3    Daubert hearing mid trial, because that can be a disaster.

 4          So I think there are two issues here.  The first issue

 5    is a fundamental issue:  Does the defendant contest the

 6    admissibility under Daubert of the science of mitochondrial

 7    DNA?  I think that's question one.  Because if he's going to

 8    contest the underlying science, we need to know that now before

 9    trial as opposed to during the course of the trial.

02:23 10          THE COURT:  Mr. Carney.

11          MR. CARNEY:  I think that's a fair question.

12          We do not intend to interpose a Daubert objection, and

13    we are not contesting the science underlying the evidence being

14    offered.

15          THE COURT:  Okay.

16          Mr. Wyshak, you're about to get to the second issue.

17          MR. WYSHAK:  The second issue is whether or not the

18    defendant is contesting the methodology used at the lab to

19    conduct the experiment.  Again, that could become a quagmire if

02:23 20    we have to have some kind of mid-trial hearing to explore how

21    this lab worked, what their methodology was.  Is he alleging

22    that the -- the DNA samples were contaminated in some fashion

23    or that the results are not as represented?

24          THE COURT:  Well, let me ask Mr. Carney his response

25    to that issue.

1    MR. CARNEY:  If the government is asking if we forego

2    all possible cross-examination, the answer to that is no.

3    THE COURT:  I don't think he's asking that.  He's

4    asking whether or not there's going to be a request for a voir

5    dire or a Daubert hearing mid trial on this issue, as opposed

6    to the scope of cross-examination.

7    MR. CARNEY:  No, I don't expect so, your Honor.

8    THE COURT:  Okay.

9    Okay.  Well, counsel, with that said, and I should say

02:24 10   that I've had a chance to review the government's motion and

11   their supporting materials, in light of both that review,

12   Mr. Carney's position that there's no objection to the

13   underlying science or the methodology used, understanding,

14   Mr. Carney, that there may still be vigorous cross-examination,

15   pursuant to Rule 702 and the standard under Daubert in

16   discharge of my gatekeeping duties, assuming that the

17   government makes the showing they need to under 702 and Daubert

18   at trial, I would allow the admission of this evidence.

19   I should note that the forensic biologist, Ms. Pineda,

02:25 20   I've reviewed her background.  It appears, based on her CV,

21   that she's qualified to give the opinion that's being proffered

22   based on her education, experience, knowledge, and training.

23   And I also find that the submission makes sufficient proffer

24   that the Daubert standard has been met in terms of the

25   underlying science in the analysis of mitochondrial DNA in this

1    case.

2            I think this analysis is both relevant to the case and

3    rests on a reliable foundation, given the proffer that's been

4    made, particularly where it's being offered to identify the

5    remains of a number of the alleged victims in this case and not

6    any broader basis or allegation against the defendant.

7            So, for all of these reasons and all of those

8    circumstances, I will allow Docket 925, the government's motion

9    in limine, again, assuming they make the foundation at trial

02:26 10    that they've proffered in this motion.

11            Counsel, moving to the last of what I think may be

12    unopposed motions, Docket 929, the government's motion in

13    limine to admit expert testimony, I believe it's Dr. Evans, as

14    to cause of death.  Mr. Carney has stood first, so perhaps

15    he'll -- no, you'll shortchange the discussion here.

16            MR. CARNEY:  Just stretching.

17            THE COURT:  Mr. Carney, are you standing to say that

18    there isn't an objection from Mr. Bulger?

19            MR. CARNEY:  I'm standing to alert the Court that I'm

02:27 20    familiar with the concept of having a substitute expert

21    witness, and I understand the limitations that have been put on

22    that concept by the U.S. Supreme Court, as well as addressed in

23    the 1st Circuit decisions.

24            So I concede that Dr. Evans is qualified as an expert,

25    and based on the foundation that will be presented, I expect he

1    can offer an opinion.

2            However, I will object on confrontation grounds if he

3    either offers the opinion of another witness or offers as facts

4    matters that were not actually determined by him.

5            THE COURT:  Okay.  Are you -- and -- well, those are

6    two separate things.  One is, I assume you're alluding to

7    whatever the opinion was of the original examining medical

8    examiner, which -- and I'll ask the government this to

9    clarify -- but I didn't understand was being offered, that he's

02:28 10   going to offer an independent opinion based upon review of

11   police reports, so on.

12           MR. CARNEY:  And I'll -- excuse me.

13           THE COURT:  Assuming that's the case, I take it you

14   don't object?

15           MR. CARNEY:  That's correct, your Honor.

16           THE COURT:  As to the second issue, I think -- and

17   I'll ask the government this in a moment -- but I understood

18   that there were certain parts of the autopsy report, perhaps

19   about observations about the state of the victim's body that he

02:29 20   would refer to in the basis of making his -- issuing an

21   opinion, testifying to an opinion.  Are you objecting to that

22   or something else?

23           MR. CARNEY:  I'm objecting to his presenting those

24   facts as facts.

25           I don't object to a medical examiner saying, I've

1    reviewed photos, I've reviewed this, I've reviewed that, but I

2    do object to his stating a fact as if it's a fact that he

3    himself observed.

4          If, on the other hand, on cross-examination the basis

5    for his opinion is challenged, then I believe on redirect

6    examination it's open to the government to bring in the

7    specifics of what he's basing his opinion on.  But if it's

8    unchallenged on cross, then it should not come in on direct.

9          THE COURT:  But, counsel, you would agree that under

02:30 10    702 and 703, actually, 703 more specifically, that an expert

11    can rely on things that are otherwise inadmissible, meaning --

12    I mean, they can rely on hypothetical situations and other

13    facts.

14          So I guess -- let me understand.  Are you talking

15    about the characterization of what's contained in the report?

16          MR. CARNEY:  I'm differentiating between what an

17    expert can rely upon in forming an opinion versus what the

18    expert can state as a fact regarding something that he's basing

19    his opinion on --

02:30 20          THE COURT:  Okay.

21          MR. CARNEY:  -- unless it's a matter challenged on

22    cross-examination.

23          I'll give an example.

24          An expert can be qualified and then offer an opinion.

25    An expert can base that opinion on evidence that would be

1  admissible independently at trial but also upon evidence that

2  would not be admissible at trial.

3       In that second category would be a statement of what

4  someone saw or what someone heard.  So that initially on his

5  direct examination he or she would say, I reviewed all of these

6  records, in my opinion the victim died as a result of multiple

7  gunshot wounds to the head, and that's his opinion.  And he can

8  talk about, I reviewed police reports, witness statements,

9  photographs, notes taken by the medical examiner, and that's

02:31 10  what I base my opinion on.  He stops then.

11       If on cross-examination I challenge his opinion as not

12  being based on proper evidence or having a solid foundation,

13  then on redirect examination, since I've now opened the door

14  for those facts to come in, now an expert can say, all right,

15  these are the photos that I actually looked at; the notes that

16  I saw said there were four entry-wound holes into the skull and

17  four exit-wound holes into the skull; I looked at the autopsy

18  photos, I read this statement by an eyewitness who said an

19  individual walked up to the victim, held the gun to his head,

02:32 20  and fired; all of this now comes in on redirect.  But unless I

21  open the door, the expert can talk generally --

22       THE COURT:  But, counsel, isn't -- I mean, an expert

23  witness is like any other witness in that the jury gets to

24  decide what weight, if any, they want to give to the testimony.

25  Doesn't drawing out the underlying basis for the opinion in

1    direct examination, isn't that part of whether or not the jury

2    should credit the opinion?  Why should that have to wait for

3    redirect?

4         MR. CARNEY:  Because the basis for the opinion is

5    often hearsay that would be inadmissible.

6         And so what the court has done is come up with a

7    procedure where the proponent of the expert gets to offer the

8    expert's credentials and in general what the expert reviewed

9    and what the expert's opinion is.

02:33 10        If the defense is content with that testimony and does

11   not challenge it on cross-examination, then the theory is the

12   government has its expert and the expert has offered his or her

13   opinion, but the jury has not been exposed to otherwise

14   inadmissible hearsay.

15        If, on the other hand, the defendant cross-examines

16   the doctor and challenges his or her opinion about having a

17   sufficient basis, then, in effect, the defendant is opening the

18   door to the admission of what would be normally hearsay

19   testimony in order to have the proponent or the expert be able

02:34 20   to show this is exactly what he looked at or she looked at.

21        THE COURT:  Counsel, you're raising this concern

22   essentially on 403 grounds, not on 703 grounds.

23        MR. CARNEY:  No, I'm offering it on 703 grounds,

24   because just because someone is an expert witness, it doesn't

25   mean that otherwise inadmissible hearsay statements of someone

1    who's not in court and not able to be cross-examined come

2    rolling right in.

3          And so the defense has to make a choice: either you

4    accept the expert and her credentials and her opinion and a

5    general statement of what was reviewed to reach that opinion,

6    or you're going to challenge that, knowing that by challenging

7    it on cross, otherwise inadmissible evidence will now be

8    admitted to the jury.

9          THE COURT:  And I understand the distinction you're

02:35 10   making.

11         Thank you, counsel.

12         MR. CARNEY:  And that is, in fact, exactly how it's

13   done in Massachusetts pursuant to the SJC's decision in Nardi,

14   N-a-r-d-i, which very carefully lays out the distinctions that

15   I made.

16         THE COURT:  Thank you.

17         MR. CARNEY:  Thank you.

18         MR. HAFER:  Yes, your Honor --

19         THE COURT:  Mr. Hafer.

02:35 20         MR. HAFER:  -- a couple of responses, just to frame

21   the entire issue.

22         The only reason we're here on this issue is because

23   Mr. Bulger was a fugitive for 16 years, and so the people who

24   performed the actual tests are quite literally all deceased or

25   no longer have their mental capacity.

1          There's two --

2          THE COURT:  And I think Mr. Carney isn't objecting on

3     that ground.

4          So can you address his last issue in regards to sort

5     of the scope of direct examination.

6          MR. HAFER:  Yes, your Honor.

7          There are two problems.  Mr. Bulger is raising a

8     Crawford issue with respect to certain underlying documents.

9     There are two responses.  The first thing is the underlying

02:36 10    documents that contain observations, such as the one we

11    excerpted in our pleading about a gaping wound on the skull,

12    those are not testimonial.  There is no Crawford objection to

13    non-testimonial statements.  What's testimonial is the

14    conclusion of a prior expert as to the cause of death, but an

15    observation is not testimonial.  That's the first response.

16          The second response is that Mr. Bulger has waived

17    under Crawford and its progeny any right to make a Crawford

18    objection here under the forfeiture by wrongdoing doctrine.

19          When you flee the jurisdiction for 16 years, thereby

02:37 20    causing witnesses with direct personal firsthand knowledge to

21    be unavailable, you waive your ability to raise a Crawford

22    issue.

23          So they're both non-testimonial, which takes it out of

24    Crawford, the types of things the government wants to elicit.

25    We will not be eliciting from Dr. Evans opinions of other

1    medical examiners.

2         But as your Honor's question to Mr. Carney indicated,

3    it is important to elicit not just what he relied on generally,

4    but to the extent it's non-testimonial, that is, it's a

5    photograph or an observation, what it is.

6         THE COURT:  Thank you.

7         Mr. Carney, I'll leave you the last word.

8         MR. CARNEY:  I believe the government is wrong in

9    extending forfeiture by wrongdoing to the extent that if a

02:37 10    person is on the lam for a period of time, he waives Crawford

11    in every respect.

12        If that theory were true, then this trial would be

13    very simple.  Every single witness the government would want to

14    call and who is unavailable because the person passed away of

15    old age or disease or something, we'd be able to have his or

16    her testimony admitted without objection to the fact that it's

17    denying the defendant the right of confrontation.  That dements

18    just the basic hearsay rule.

19        Forfeiture by wrongdoing is very specific.  If the

02:38 20    defendant has done something to make that specific witness

21    unavailable, then the U.S. Supreme Court has said he has

22    forfeited his right of confrontation.  But there's no

23    suggestion that Mr. Bulger did anything to have a witness who

24    may have died by natural causes no longer be a witness.  So I

25    disagree that the forfeiture by wrongdoing extends to someone

1    who's simply -- was on the lam.

2         THE COURT:  I gave Mr. Carney the last word on this.

3         Counsel, and I considered the government's motion, and

4    Mr. Carney, I appreciate your points on both issues.

5         As to the pending motion by the government to admit

6    the expert testimony from Dr. Evans as to cause of death, I'm

7    going to allow that motion.

8         I think as Mr. Carney concedes here, given the present

9    state of the law, which I think is reflected in U.S. v.

02:39 10   Ramos-Gonzalez, 664 F.3d 1 (1st Cir. 2011), and its

11   acknowledgment that U.S. v. De La Cruz, 514 F.3d 121 (1st Cir.

12   2008) is still good law, even after Melendez-Diaz, I think it's

13   appropriate here, where Dr. Evans, who, based on the proffer of

14   his credentials, seems well-qualified to make the proffered

15   opinion, which I don't think Mr. Carney is challenging, and

16   that he's not being offered merely as a conduit to offer the

17   conclusions of medical examiners who are no longer available,

18   but offering an independent opinion based upon his independent

19   review of records, autopsy reports, photographs, and reports,

02:40 20   which is appropriate under Rule 703, I'm going to allow that

21   testimony.

22        Mr. Carney, you've raised this issue about the scope

23   of direct.  I'll tell you that my initial reaction is, as my

24   questions suggested to you, that I think government's entitled

25   to get into the basis of Dr. Evans' opinion, even if it

1    includes, as is permissible under Rule 703, matters that

2    wouldn't otherwise be admissible.

3         I will take a look at the Nardi case, which is

4    familiar to me, but I want to review it again, and I'll take

5    that part of your objection under advisement, but I'll let you

6    know and let the government know that as I sit here now I'm

7    inclined to allow him to give the additional basis, because I

8    do think it's for the jury to decide whether or not the opinion

9    is credible, what weight they should give to it, and I don't

02:41 10  think just stating the bare-bones opinion without the

11   supporting information would do that.  But I'll take a look, as

12   I said, at the Nardi case.

13        MR. CARNEY:  Would your Honor be notifying us of your

14   final decision?

15        THE COURT:  Yes.

16        Yes.  And, counsel, although we're not on the normal

17   schedule that I usually have, what I usually do is on the first

18   day of trial, if there are things left over from the final

19   pretrial that I said I was going to look at again, I'll tell

02:42 20  you.  I suspect I'll be able to tell you this sooner than that,

21   because we're going to see each other a few times over the next

22   few days.  I think Wednesday when I see you for that first

23   review of the juror questionnaires might be a juncture where if

24   I've had any further thoughts on this, I'd let you know then.

25        MR. CARNEY:  Does the Court permit counsel to make a

1 continuing objection if it's an issue that's likely to recur?

2    THE COURT:  I will, counsel.

3    MR. CARNEY:  Thank you.

4    THE COURT:  We can take that up, as well, on our first

5 day of trial.

6    MR. CARNEY:  Yes, your Honor.

7    THE COURT:  Okay.

8    Counsel, moving forward to what I know are contested

9 motions by the government.  Docket 935, which is the

02:43 10 government's motion in regards to certain victim statements to

11 law enforcement, would the government like to be heard further?

12    MR. HAFER:  Your Honor, I have very, very little to

13 add beyond the papers other than 804(b)(6) is the authority for

14 the motion.

15    Very briefly, Mr.  Halloran, Castucci, and McIntyre

16 made statements to law enforcement prior to their death, either

17 reflecting the fact that they were cooperating with law

18 enforcement or implicating Mr. Bulger, Mr. Flemmi in various

19 criminal activities.  The government's evidence at trial by a

02:43 20 preponderance will show that Mr. Bulger was motivated, at least

21 in part, by the fact that they were cooperating when he caused

22 their death; and, therefore, under 804(b)(6) and the 1st

23 Circuit's decision in Houlihan, the government views the

24 statement as a hearsay exception and admissible.

25    THE COURT:  Counsel, just a few things.  First, what

1    do you say to the defense's objection that even if it's -- even

2    if they concede that the statements of these alleged victims

3    themselves might be admissible under this theory, that there

4    are several levels of hearsay reflected in the proffered

5    exhibits the Court shouldn't allow their admission.

6              MR. HAFER:  Frankly, your Honor, I don't quite

7    understand the argument.

8              If, hypothetically, Mr. Halloran made a statement to

9    former FBI Agent Montanari, and Montanari memorialized the

02:44 10    statement, I'm not quite sure, given that defendant caused

11    Halloran's death, how else the statement would come in under

12    804(b)(6), other than through either the document or person

13    memorializing the statement.

14              THE COURT:  Counsel, I've gone through the exhibits,

15    and they were reflected in the motion itself, so I'm not going

16    to recite all of them.  Some of them -- there is at least one

17    that was a transcript, a number of them were reports, a number

18    of them didn't list the author.  What do you say in regards to

19    those?  There were a few reports and there were a few

02:45 20    teletypes, unless it's in some coded way listed, where the

21    author wasn't clear.  What bearing, if any, should that have on

22    my ruling?

23              MR. HAFER:  When we made the motion, the goal was to

24    put the Court and the defendant on notice that we intended to

25    elicit certain statements, all of which have been produced by

1    these three individuals.  Quite frankly, we were very

2    overinclusive in listing the exhibits in which those statements

3    were contained or references to those statements were

4    contained, but I can tell your Honor that we intend to elicit

5    the statements either from an individual who heard the

6    statement or as its reflected in a report, which we would view

7    as a business record.

8              THE COURT:  And so -- and there are a few -- and --

9    Exhibits 278 to 283, which I believe were memos or reports by

02:46 10    John Connolly.  At least in my quick reading of them, they

11    appeared to follow Mr. Halloran's death, so I'm assuming those

12    are not being offered?

13             MR. WYSHAK:  The Halloran 209s, Judge, is what I think

14    you're referring to, will be admissible, your Honor, as, again,

15    co-conspirator statements of John Connolly or statements by the

16    defendant, Bulger.  So those are actually documents that are

17    contained within Mr. Bulger's informant file.

18             THE COURT:  Okay.  So those -- so they're not being

19    offered on these grounds, but on other grounds.

02:47 20             MR. WYSHAK:  Right.  I think they may be attached

21    to -- either attached to or made part of a teletype or some

22    kind of electronic document that was sent to other FBI

23    officers, and that's why it's part of that package.  But they

24    are independently admissible.

25             THE COURT:  Okay.

1            And, Mr. Hafer, in terms of how the government is

2    offering their admission at this point, do I understand -- and

3    there may have been some suggestion in the Houlihan case that

4    the Court should approach this in the way that it approaches

5    co-conspirator statements, meaning if I accept the proffer and

6    allow the motion, allow condition admission pending further

7    findings on whether the showing of forfeiture by wrongdoing has

8    been made here?

9            MR. HAFER:  That's correct, your Honor.  I think

02:48 10    that's exactly right.  I think it's a preponderance standard

11    like Petrozziello, as the court -- as the 1st Circuit indicated

12    in Houlihan.

13            THE COURT:  Counsel, anything else on this?

14            MR. HAFER:  Just the final thing, your Honor, with

15    respect to that showing, which again is a preponderance, the

16    1st Circuit has said it is sufficient in this regard to show

17    the evildoer was motivated in part by a desire to silence the

18    witness.  I just want to draw the Court's --

19            THE COURT:  Meaning that if there's more than one

02:48 20    motivation, but that's at least one.

21            MR. HAFER:  Yes, your Honor, in making the

22    preponderance showing.  And that's a quotation that we

23    excerpted from Houlihan at page 4 of our filing, ECF Docket

24    935.

25            THE COURT:  Counsel, just because I haven't gone back

```
 1   to compare this to the government's witness list, but Agent
 2   Daly, is he someone you're calling?
 3              MR. HAFER:  He is not on our witness list, no.
 4              THE COURT:  And is there another of these agents that
 5   is deceased?  Is it Agent Brunnick?
 6              MR. HAFER:  Yes.  I can confirm that Mr. Brunnick is
 7   deceased.
 8              THE COURT:  Okay.  Thank you.
 9              Counsel, Mr. Carney.
10              MR. CARNEY:  I'll concede only so far.
11              Let's say the witness named Jones speaks to FBI Agent
12   Adams, who speaks to FBI Agent Burke, who speaks to FBI Agent
13   Calendar.  Then the witness is killed by the defendant.  The
14   statement by the witness to the first FBI agent, Adams, is
15   admissible through the oral testimony of Adams, because that is
16   the level of hearsay that has been waived by this forfeiture by
17   wrongdoing concept.  But as soon as one gets beyond the oral
18   statement of Adams, it becomes another level of hearsay that is
19   not encompassed by this exception to the hearsay rule.
20              In other words, if the witness told Adams and Adams
21   told Burke and the witness is now unavailable, Burke does not
22   get to testify to what the witness said, nor does Calendar get
23   to testify about what the witness said.
24              The right of confrontation only extends to the first
25   agent, Agent Adams, and so he is permitted to orally describe
```

```
 1    what he heard from the witness.
 2              THE COURT:  But, counsel --
 3              MR. CARNEY:  If he writes a report --
 4              THE COURT:  But isn't the exception to the
 5    confrontation clause right under Crawford, isn't it that you're
 6    giving up your right to confront the victim's statement, the
 7    person who's now unavailable?
 8              MR. CARNEY:  You're giving up your right to confront
 9    the person who made the statement.
10              THE COURT:  Right.
11              MR. CARNEY:  But you continue to have your
12    confrontation right regarding anyone who is going to relate
13    what that witness ultimately said.
14              So if the defendant killed the witness, he gives up
15    his right to confront that witness, but he does not give up his
16    right to confront Agent Adams, who is the person who was told
17    the statement.
18              Similarly, if Agent Adams writes a report, that's now
19    an additional layer of hearsay, and so it's not possible to
20    simply introduce the report.
21              This hearsay exception to the confrontation right is
22    strictly limited to saying I can't object because the witness
23    is not here.
24              And if the government calls the agent or other person
25    to whom the witness made these statements, then the defendant
```

1    does have a right to confront that person because he's

2    testifying in the courtroom.  But if it goes beyond that, then

3    the right of confrontation is, in fact, being violated.

4         The government mentioned also that a report could come

5    in as a business record.  Well, I submit that that clearly is

6    not true.  The prerequisites for a business record include

7    documents that are simply made as a matter of course out of the

8    regular course of business without any anticipation that they

9    could be used in litigation.

02:53 10         I submit that every FBI report like this is a report

11    that anticipates litigation, specifically criminal prosecution,

12    and this would not constitute a business record on that basis.

13              THE COURT:  Thank you.

14              MR. CARNEY:  So if they present the person who spoke

15    to the witness, and I or Mr. Brennan can cross-examine him,

16    then the evidence comes in.  I concede it.  But if it's not

17    that person, then the right of confrontation blocks it.

18              Thank you.

19              THE COURT:  Anything to add, counsel?

02:53 20              MR. HAFER:  No, your Honor.

21              THE COURT:  Okay.

22              Counsel, on this issue, I want to consider what

23    Mr. Carney has said about the levels of hearsay.  I think

24    neither side is disputing the initial principle in regards to

25    forfeiture by wrongdoing.

1           There's some of these exhibits, frankly, in which,

2      Mr. Carney, I think, based on what you've just said about the

3      scope of your objection, you wouldn't object.  I know there's

4      at least one transcript in here of a debriefing of I think it's

5      Mr. McIntyre, if my memory serves me.

6           MR. HAFER:  Correct, your Honor.

7           THE COURT:  So I imagine, based on what you said, you

8      wouldn't object to that.

9           And as I understood your further objection, you

02:54 10     wouldn't object to, I suppose, the fresh complaint, for lack of

11     better analogy, witness.

12          MR. CARNEY:  If the person who took down the

13     transcript were a person who was present when the statements

14     were made that were later memorialized in the transcript is

15     able to testify and that person has an independent memory of

16     what was stated, that would come in.

17          THE COURT:  But, counsel -- and not to belabor this

18     point because I am going to give it further thought -- but why

19     would it matter if it's a transcript of what the victim said?

02:55 20     MR. CARNEY:  Because the fact that something is a

21     transcript does not mean that it is not hearsay.  It is a

22     statement by someone of what another witness said.

23          So if the stenographer came into court and said this

24     is what the person said, then I would concede that her

25     testimony would be admissible.  But there's no hearsay

1    exception just because something is a transcript; indeed, many

2    times the transcript would not even be admissible because it's

3    hearsay.

4              THE COURT:  Counsel, since I am going to give this

5    further thought, did I understand what the government was

6    saying is that there's some subset of the exhibits that have

7    been proffered to me that would be --

8              MR. HAFER:  We can be more precise, your Honor, if

9    that would help.

02:56 10           THE COURT:  That would help, counsel.

11             MR. HAFER:  We can put something together, both with

12   respect to actual --

13             THE COURT:  Even if it's just, counsel, notice to the

14   Court and Mr. Brennan and Mr. Carney about which of those

15   exhibits you were offering on this ground.

16             MR. HAFER:  No problem.

17             THE COURT:  Okay.  Thank you.

18             I'll take that under advisement.

19             MR. WYSHAK:  Your Honor, just one point on this.

02:56 20           THE COURT:  Yes.

21             MR. WYSHAK:  Because I don't want this to get lost

22   because this is an important point.  In two out of the three

23   cases, we are going to call the witness who directly spoke with

24   the deceased; however, I do think that the business record

25   issue is a live issue, because we do not intend to call that

1    witness, Special Agent Daly.  We intend to offer the statements

2    of Mr. Castucci to Special Agent Daly.  We intend to offer

3    those reports as business records of the FBI.  So that's an

4    issue that I think the Court has to determine, the

5    admissibility of those reports based on the business record

6    rule; otherwise we're going to have to add Special Agent Daly

7    to our witness list.

8         The argument I would make regarding why these are

9    business records is because it is in the ordinary course of

02:57 10   business for the FBI to take and receive information from

11   confidential informants.  It's the ordinary course of business

12   for them to record it in a certain fashion, to record it on

13   forms that they use to record this type of information.

14        Yes, the information contained in the report is

15   hearsay, and ordinarily it might be redacted from the usual

16   business record, but in this case, the exception to the rule is

17   the Houlihan case.

18        So you can't have an objection to the hearsay

19   contained in the business record because you've essentially

02:58 20   forfeited that objection.

21        So I do think that these documents come in as business

22   records under the Houlihan rule, because there can be no

23   objection to the hearsay contained within the document.

24        THE COURT:  On the basis of the forfeiture argument,

25   counsel.

1          MR. WYSHAK:  Exactly.

2          THE COURT:  I'll keep that in mind when I look through

3     it again.

4          Briefly Mr. Carney.

5          MR. CARNEY:  I know the government loves the

6     forfeiture by wrongdoing rule and would like to have it extend

7     virtually to every piece of evidence that it has a problem

8     getting in, but it's never been extended, to my knowledge, to a

9     business record, number one.

02:58 10          Number two, of course business records contain

11    hearsay, and if it weren't viewed that way, then state court

12    prosecutions would see a parade in every single case of police

13    reports.  But they don't because it doesn't meet the definition

14    of "business record," which is the same in the federal court as

15    it is in the state court.

16          Finally, the government states that if your Honor

17    rules that this would be inadmissible under the forfeiture by

18    wrongdoing, they will simply call the witness to whom the

19    statement was made.  Agent Daly is still with us.  If they call

02:59 20   Agent Daly to say, this is what Castucci said to me, then it's

21    almost certain that the evidence comes in in that fashion.

22          And so it's not even necessary to reach these other

23    issues.  The witness to whom Castucci allegedly spoke is still

24    available to relate that testimony, and by doing so, the

25    defendant's right of confrontation will be met.

1          Thank you.

2          THE COURT:  Okay.

3          Counsel, as I said, I'll take it under advisement, but

4     I would welcome from the government just a brief notice about

5     what subset of those exhibits you're offering on that basis.

6          Counsel, to move on to Docket 933, which is the

7     government's motion, which I know Mr. Carney and Mr. Brennan

8     oppose, in regards to the reference to the polygraph

9     examination.  I believe it was -- it's only one examination in

03:00 10     2000, if I recall?

11          MR. KELLY:  Yes, your Honor.

12          THE COURT:  And a few things.  One is, counsel, you're

13     seeking to preclude any reference, not just to the results, but

14     any reference to the polygraph --

15          MR. KELLY:  -- to the polygraph itself, but not to the

16     fact there was an inconsistency there.  That's more than fair

17     game.  We filed a motion citing all sorts of applicable 1st

18     Circuit law.  Their response didn't cite a single case.

19     Their response didn't try to distinguish --

03:01 20          THE COURT:  Counsel, let me just narrow, perhaps, the

21     focus here.

22          Counsel, I've read the cases that the government cited

23     to me.  I guess the case that gives me the most concern,

24     counsel, is the Lynn case, 856 F.2d 430, where there was a

25     finding by the 1st Circuit that it was an abuse of discretion

1      where the district court cut off examination by a cooperating

2      witness about taking a polygraph examination.

3              I think you said in your papers the distinction there

4      was that the polygraph was required under the plea agreement,

5      which it isn't as to Mr. Weeks.  But I guess my concern is in

6      subsequent cases, both inside and outside this circuit, there

7      seems to be a characterization of Lynn as making a distinction

8      between the disfavored practice of allowing in results of a

9      polygraph versus allowing cross-examination about whether or

03:02 10   not a witness is subjected to a polygraph as going to whether

11     or not they have a motive for currying favor with the

12     government based on what version they're giving.

13             And so I guess I was hoping you would address that

14     particular issue, because I accept the arguments about

15     polygraph results being disfavored, but I also see Mr. Carney

16     and Mr. Brennan's point here about giving a full flavor of the

17     sequence of -- evolution of Mr. Weeks' statements.

18             MR. KELLY:  Well, your Honor, we don't think Lynn is

19     on point for the reason you mentioned.

03:03 20        In Lynn, it was the government who mentioned it and

21     then tried to block the defense from referring to it, even

22     though the polygraph was actually in the witness' plea

23     agreement.

24             Here there was no such requirement in Weeks' plea

25     agreement; in fact, he hadn't yet pled guilty.  He was

1    polygraphed on two issues.  He passed on one issue, he failed

2    on the other.  The government is not going to bring out the

3    fact that he passed on one issue and failed on the other, and

4    that would be a Lynn-type situation.  That's not what we're

5    trying to do here.

6         We're trying to prevent the inappropriate use of the

7    term "polygraph" in front of the jury, which the 1st Circuit

8    has frowned upon, and we're trying to keep that reference out,

9    but we are not trying to preclude the defense in any way from

03:03 10    questioning Weeks about this change of stories.  That's what

11    the 1st Circuit has said is most important.  If they're

12    changing stories, it's fair game, but the use of the actual

13    polygraph, which is inadmissible in federal court, is not fair

14    game to mention in front of the jury.

15         THE COURT:  But, counsel, I guess what I'm struggling

16    with on this, isn't the fact that the government is saying to

17    Mr. Weeks, you know, we've given you this polygraph because we

18    have some question about your credibility to begin with, and

19    that as when the results come back there's some further

03:04 20    confrontation with him, and then -- I don't know the exact

21    sequence, but, as I understand the representation, it is at

22    some point after that his statement changes, right, as to the

23    South Boston Liquor Mart matter?

24         MR. KELLY:  Yes, correct.  The testimony will be to

25    the effect that he initially denied participating in any

1   extortion of Mr. Rakes.  He failed the polygraph on that issue

2   because he hadn't disclosed the fact that he brought a gun to

3   the table, and, in fact, that qualifies as an extortion.

4        So after he failed the test, he did, in fact, admit

5   that it was he who brought the gun to the table which closed

6   the deal.  And then subsequently he plead guilty to extortion.

7   So it's not as though he stuck to his original story.

8        And interestingly, this is the defendant's same

9   position.  They have made this point repeatedly in their

03:05 10   filings that that's what the defendant, Bulger, himself claims,

11   that Rakes was not extorted.

12        So we think in this instance we're the ones who cited

13   Lynn to the Court, and we think it's distinguishable.  And we

14   think the Court should follow the prevailing 1st Circuit law

15   cited in our motion, and we don't think they should be able to

16   mention the polygraph in front jury.  Because if they do, the

17   government should be permitted to mention the fact that he

18   passed on the rest of it.  I'm not sure that makes much sense

19   in the context of this case, but, at a minimum, the government

03:06 20   should not be precluded, then, from referring to the rest of

21   the story.

22        However, this is not what we're interested in.  We're

23   interested in making sure that the 1st Circuit rulings are

24   consistent in this case and that we do not have a mention of

25   the polygraph in front of the jury.

```
 1              THE COURT:  Thank you, Mr. Kelly.

 2              Counsel, Mr. Carney?

 3              MR. CARNEY:  Thank you, your Honor.

 4              THE COURT:  And I guess -- can I start on the flip

 5    side of the arguments I put to -- the questions I put to

 6    Mr. Kelly?  Why isn't this cumulative of everything else you'll

 7    be able to ask Mr. Weeks about the evolution of his statements?

 8              MR. CARNEY:  Because this is an extremely dramatic

 9    moment in terms of whether Mr. Weeks is telling the truth.

03:06 10              Let me acknowledge what we're not trying to offer here

11    in the way of evidence.

12              We're not trying to offer the results of a polygraph.

13    We're not trying to offer the questions asked during the

14    polygraph.

15              THE COURT:  And can you make me a proffer -- I won't

16    hold you to the exact language -- of what the question would

17    be?

18              MR. CARNEY:  Mr. Weeks stated "X," then you were asked

19    to take a polygraph.  After you took the polygraph you changed

03:07 20    your answer to "Y."

21              THE COURT:  So you wouldn't ask anything about the

22    results?

23              MR. CARNEY:  Not about the results, not about any

24    other questions, just the fact that there was this polygraph

25    test.
```

1          Otherwise the jury will be sitting there and going,

2     wait a minute, Weeks says one thing, then we hear he says

3     another thing.  What happened in the middle?  Was he beaten

4     with a club?  Because he offered money?  Was he given a glass

5     of whiskey?  What happened between when he said the first

6     version and the second version?

7          The jurors are entitled to know what happened there,

8     and the answer is very simple:  He was given a polygraph test.

9     And that's really all they need to know.

03:08 10          I have no personal knowledge on whether the polygraph

11    was correctly given or --

12          THE COURT:  What would you say to what Mr. Kelly may

13    stand up and say now, if I give him a chance, that even the

14    mention of a polygraph suggests some, you know, that there's

15    some real science behind the results, even if you don't refer

16    to them specifically?

17          MR. CARNEY:  I think that's not correct.  Many people

18    believe a polygraph is somewhat voodoo science.

19          Maybe it can be that, you know, if an agent said, I

03:09 20    looked on the Ouija board and it says you're not telling the

21    truth, and a witness says, oh, all right, you got me, and then

22    tells a different version.

23          The jury has the right to know that what Kevin Weeks

24    did was take a polygraph, and as a result of that -- and I'm

25    not going to go into any further statements made by the agents

1  or Weeks or anything.  I'm just trying to show that what

2  happened in the middle of statement A and statement B was a

3  polygraph.  And so the jury has a right to know that at least

4  as far as the witness is concerned that they can infer is what

5  led him to change his testimony.

6          He doesn't even have to have been told what the

7  results are.

8          THE COURT:  Okay.  Thank you.

9          MR. CARNEY:  It's just -- if it doesn't come in, it's

03:09 10  deceiving the jury about what happened, and the defendant's

11  right to due process in order to confront a witness on a

12  question of bias and interest would be violated.  And in no way

13  is this evidence cumulative of anything else that's been done

14  with Weeks.

15          MR. KELLY:  Your Honor, just briefly, this has not

16  been a problem in any of the multiple cases that Weeks has

17  already testified in.  So to suggest that this would be some

18  grave injustice has not been the case in other trials.

19          There is not a single case which supports the

03:10 20  defendant's arguments, and in fact, he has cited none in his

21  brief.

22          The Lynn case does not apply because in that case

23  there was a clause in the plea agreement that required the

24  defendant to successfully complete the polygraph exam.  So the

25  government shot itself in the foot in that case.

1          There's no such clause in Weeks' plea agreement in

2     this case.  He hadn't even pled guilty yet.  It was during the

3     back and forth when it was being determined whether he should

4     be a witness, whether he should plead guilty.

5          When confronted by skeptical members of law

6     enforcement, he failed that polygraph on that one issue.

7          THE COURT:  But, counsel, isn't it the issue that the

8     agents are so skeptical that they are asking him do this

9     polygraph, and then you've heard his proffer, he's not going to

03:11  10     ask about the results.  Doesn't that go to how much or how

11     little Mr. Weeks was trying to curry favor with the government?

12          Meaning, going to Mr. Carney's point, that it's

13     qualitatively different than any cross-examination just on the

14     fact that Mr. Weeks' statements have changed over time?

15          MR. KELLY:  Well, whether his statements have changed

16     over time, as we've said, is fair game.  The fact that when

17     confronted with the test and he fails it, he then pled guilty

18     to it.  So unless he's arguing that this plea to the extortion

19     was a total fiction and that what he's admitting, in that he

03:12  20     brought out the gun, is a total fiction, it's not -- nothing

21     extraordinary.  In fact, it's consistent, again, with the

22     defendant's own version of Rakes' extortion.  It remains at

23     odds with Rakes himself.  Rakes tells an entirely much more

24     elaborate story, but at the end of the day, either -- Weeks

25     admits he exhorted Rakes because he brought gun to the table.

1   He does not admit all of these other facts that Rakes has

2   claimed.

3           So he has plenty to work with in terms of

4   cross-examining Weeks in terms of his change of story on the

5   Rakes extortion.

6           THE COURT:  Counsel, so I take it that you still

7   object, even if defense counsel isn't going to refer to the

8   results, even if I instruct counsel not to make other reference

9   to polygraphs with any other witnesses, and simply to ask the

03:13 10  series of questions that he's proffered today?

11          MR. KELLY:  Yes.  Because then I'll bring out, okay,

12  he did fail the polygraph, and when confronted with the failed

13  polygraph, he admitted it.  Not only did he admit it, he pled

14  guilty to the extortion.

15          So, if he's going to be permitted to bring it out, the

16  government will bring it out first, and we'll bring out the

17  fact that he passed on the other issues.

18          To the extent there were questions during the

19  debriefing process on two issues, the government confronted him

03:13 20  with a polygraph, he failed one issue, passed on the other, and

21  he pled guilty to the one he failed on.

22          THE COURT:  Okay.

23          Last word, Mr. Carney.

24          MR. CARNEY:  Your Honor, the fact that I am not

25  introducing the results of the polygraph, just the fact that he

1    took a polygraph doesn't open the door that now the government

2    wants to introduce the results in part showing that he passed.

3    I'm just focused on the fact that a polygraph was taken, that's

4    all.

5            THE COURT:  I understand.

6            MR. KELLY:  It's a clear inference.  The clear

7    inference to the jury will be, well, he took a polygraph, and

8    then no one is going to say whether he passed or failed.  After

9    taking the polygraph he admitted it, and he admitted it because

03:14 10   he failed, it exposed the lie, he did extort Rakes.

11           THE COURT:  Counsel, I understand your point about,

12   the government's position you don't want to open this door at

13   all, and I'll consider this.

14           As the questions suggest to both sides, I am, perhaps

15   more so than some of the other motions, struggling a little bit

16   more with what the right line is on this issue.

17           So I will take it under advisement.

18           Mr. Carney were you planning to reference this at all

19   in your opening?

03:14 20           MR. CARNEY:  Not if your Honor hasn't made a decision.

21           THE COURT:  Counsel, I think as of this moment you

22   shouldn't plan to open on it.  If I make a decision before

23   then, I will let you know.

24           MR. CARNEY:  Fine, your Honor.  It's not necessary to

25   my opening, if your Honor needs additional time.

1            THE COURT:  Okay.

2            MR. KELLY:  And, your Honor, Weeks will not be the

3      first witness, so I would only request that he have some

4      decision before he testifies.

5            THE COURT:  What's your best guesstimate of when you'd

6      get to Mr. Weeks?

7            MR. KELLY:  Not for a while, hopefully soon, but not

8      for a while.

9            THE COURT:  I know that goes to one of your further

03:15 10      motions, so we'll get there, counsel.

11            MR. KELLY:  I would guess it's post-July 4th.

12            THE COURT:  Okay.

13            Mr. Carney, I know you have a motion on notice of

14      witnesses, so we'll get there.

15            Counsel, unless I've missed anything, I think the last

16      one from the government is the one that I know there are strong

17      feelings about on both sides, and that's the motion in limine

18      to bar defense counsel from holding press conferences after the

19      hearings.

03:16 20            I've reviewed both the motion, Docket 927, as well as

21      the opposition.

22            Who wants to be heard on this issue?  Mr. Kelly?

23            MR. KELLY:  Thank you, your Honor.

24            Your Honor, if there's no -- it's obvious this case is

25      generating a lot of media interest.  The government understands

1  that, and the government doesn't fault the media for doing its

2  job in reporting on this case.

3          However, there is a local rule in this district, and

4  if the local rule is going to apply in this case, then defense

5  counsel should be alerted to that fact.  Because it appears,

6  based upon the history of this case, they think it doesn't

7  apply to them.

8          The government has filed a motion citing relevant

9  authorities, and in return, once again, they have responded

03:16 10  with not a single case cite.  They've responded with an

11  irrelevant quote from Thomas Jefferson.

12          The game is -- the defense gives the game away with

13  its own website, talking about how they like to help their

14  clients in high profile cases through to the use of the media.

15  And that's what they've been doing throughout this litigation,

16  and that's what we are concerned they're going to continue to

17  do, because as surely as night follows day, after every hearing

18  they go in front of this courthouse and talk about the facts of

19  the case, the credibility of witnesses, and their different

03:17 20  theories that they want to disseminate widely.  They know it's

21  obviously being disseminated, and that's what the local rule is

22  designed to prevent, but they don't think it applies to them,

23  and we think it does.  That's why we made this motion, and we

24  would ask the Court to direct them to, in fact, comply with

25  this local rule.

```
 1              They haven't cited a single case as to why it doesn't
 2       apply to them, they haven't cited the First Amendment or
 3       question the constitutionality of the local rule, they simply
 4       ignore it.
 5              At this juncture, when we're about to pick a jury who
 6       is perhaps inundated with media, we don't want the defense
 7       going outside and giving their theories to the world because
 8       they can't get it done in this courtroom.
 9              We want to argue this case in the courtroom, and we
03:18 10      want the local rule to apply to them just as it applies to the
11       government.  We're not going outside after every hearing giving
12       press conferences, and we don't think they should either.
13              THE COURT:  And just so I understand, counsel, what
14       the scope of the remedy you're seeking, that they comply with
15       the local rule, or something broader than that, counsel?
16              MR. KELLY:  Something much more specific; that is, to
17       the effect that after they leave this courtroom, they are not
18       to go in front of the courthouse or anywhere else and talk
19       about this pending case with respect to what the local rule
03:18 20      prohibits, credibility of the witnesses, their theory of the
21       case, exactly -- I forgot the actual language of the rule, I
22       don't have it in front of me.
23              THE COURT:  Counsel, I have it in front of me,
24       credibility of prospective witnesses, extrajudicial statements,
25       or interviews relating to the trial, the parties, or interest
```

1    in the trial, which a reasonable person would expect to be

2    disseminated by means of public communications, except that the

3    lawyer or law firm may quote from or refer without comment to

4    public records of the court in the case.

5         MR. KELLY:  Right.  And they're not quoting from

6    public record.  Last time they were out in front they were

7    telling the world that at every step we've tried to find

8    information to be helpful to elicit the truth.  We've been

9    stopped, we've been prevented, we've been fought.  We're going

03:19 10   to continue throughout this trial to do everything we can to

11   bring the information to the jury so the public and the jury

12   can hear the truth.

13        They're not supposed to be saying this in front of the

14   courthouse.  And they go on and on about credibility of

15   witnesses when they appear in front of the courthouse, that's

16   prohibited by the local rule.

17        So what we're asking is that the defense be prohibited

18   from making these statements outside the courthouse after these

19   hearings, particularly as we are now about to choose a jury,

03:20 20   particularly as we are now about to have a trial.

21        Because what we don't want to have is every day having

22   to question the jurors about whether they heard the defense

23   counsel's latest press conference in front of the courthouse.

24   That's going to prolong an already lengthy trial, and that's --

25        THE COURT:  Counsel, let me just -- on this issue --

1    and I did attempt to see if there are any published cases, but

2    frankly, I also looked at the docket of some recent

3    high-profile cases in this district to see if there had been

4    any orders issued that were broader than the local rule, and

5    unless counsel wants to share with me their understanding of

6    any such cases, I was unable to find cases in which there was

7    an order imposed broader than the local rule here.

8            And in fact, in cases outside of this district, which

9    I would also characterize as ones that attracted a lot of media

03:21 10   attention, where apparently there wasn't a local rule, some

11   version of what we have as a local rule was adopted.

12           Are you aware of any cases that you can bring to my

13   attention that impose something closer to what you're seeking

14   and broader than what the local rule is?

15           MR. KELLY:  Cases I'm most familiar with are the ones

16   we cited in our brief, the Flemmi case, which in turn cites the

17   Supreme Court Sheppard case.

18           THE COURT:  And I did take a look at that.

19           MR. KELLY:  The ones about the carnival atmosphere

03:21 20   threat to a fair trial.

21           THE COURT:  Counsel, having read the facts of that

22   case, the circumstances there -- and I know you strongly object

23   to the press conferences outside -- the atmosphere in the

24   Sheppard case was much different than how this case is

25   proceeding.

1          MR. KELLY:  But the short answer is, we have cited the

2     cases, we're aware of no others, and --

3          THE COURT:  Okay.

4          MR. KELLY:  -- that's why we brought the motion we

5     did.

6          THE COURT:  Mr. Carney or Mr. Brennan -- Mr. Carney.

7          MR. CARNEY:  Your Honor, I am aware of the local

8     rules.  I try to follow them diligently.

9          I would prefer not to respond directly to the

03:22 10    government's arguments, because I don't think it would be

11    befitting of this Court to just go back and forth and say,

12    well, look what they did and look what they said and look at

13    these wrong things.

14          What I prefer to do is direct the Court -- and I'm

15    confident you saw this -- to the fact that in my response,

16    perturbative as it may have been, I noted in footnote 1,

17    "Defense counsel is aware of the limitations that Local Rule

18    83.2A imposes on counsel during the trial of a criminal matter,

19    including the period of jury selection."

03:23 20          THE COURT:  Counsel, I guess, you know, I have had an

21    opportunity to look in an unscientific way at statements that

22    have been made in the press by you or Mr. Brennan and also by

23    the government, and I'm defining "government" broadly here not

24    just to mean the attorneys who are before me now, but the U.S.

25    Attorney herself and so forth.

1          And I guess my question is, as to the statements

2    you've already made in press conferences, how are they not

3    extrajudicial statements relating to the trial or parties or

4    issues in this trial?  Meaning, I don't understand those

5    statements to be statements that are just quoting to or

6    referring to -- not all of them, counsel, but some of them --

7    that are only quoting from or referring without comment to

8    public records in this case.

9          And let me preface this all by saying that I would

03:24 10   agree with the characterization of this case being at a very

11   critical juncture right now, right?  I mean, counsel on both

12   sides know that there are 675 people who have been summonsed to

13   come to this court, none of whom yet know not to read the

14   newspaper, not to turn on, you know, the news, not to listen to

15   the radio.  So we're at a critical juncture here, and I need to

16   understand what the compliance with the rule is going to be

17   going forward.

18          MR. CARNEY:  I believe the rule is in two parts.  The

19   first part applies to proceedings prior to the start of the

03:25 20   trial.  The second half of the rule applies to the start of the

21   trial, which begins with the selection of the jury.

22          It's clear that those two sections are different and

23   that an attorney can do something while the case is in the

24   pretrial stage that he or she cannot do in the post-trial

25   stage.  I recognize that limitation -- I didn't mean

1    post-trial, post start of trial.  I recognize the limitation

2    put on counsel from this point going forward.

3              THE COURT:  Okay.

4              Counsel, I see that the rule certainly treats them

5    differently, although I will note that even before the start of

6    trial there's a prohibition on extrajudicial statements about

7    the identity, testimony, and credibility of prospective

8    witnesses, which I think applies.

9              So I get the distinction you're making between the

03:26 10   rule, but I think the prohibitions are still fairly broad in

11   both places.  Would you agree with that?

12             MR. CARNEY:  I would agree that the prohibition is

13   quite broad in the second one.

14             THE COURT:  Okay.

15             MR. CARNEY:  The first -- the prohibition in the first

16   one is more designed to make statements that will make it

17   difficult, if not impossible, to select a jury.

18             The reality is that for the last 20 years the

19   government has done everything it can to pollute this jury pool

03:26 20   by telling its side of the story.  It has demonized James

21   Bulger so that he is recognizable nationwide.  As his lawyer, I

22   can't just stand there and accept that.

23             THE COURT:  But, counsel, I mean, isn't some of

24   that -- again, I think you are right to suggest it won't be

25   productive to go back and forth about the he said/she said, but

```
 1    isn't some part of the publicity, if there was any, and
 2    certainly there was, in regard to Mr. Bulger when he was a
 3    fugitive?  I mean, how much of that is about demonizing him for
 4    the purposes of a fair trial and how much of that was about
 5    apprehending a fugitive?
 6              MR. CARNEY:  Well, I think that when it takes Osama
 7    Bin Laden to bump you off the FBI's Most Wanted list number one
 8    spot, that says all I need to say about what the government is
 9    doing to people who go to a post office or go to a courthouse.
10    They see that during that time period here is the number one
11    most wanted criminal in the country.  And that existed
12    throughout the entire time, not to mention the fact that these
13    prosecutors have given interviews.  I mean, he was a younger
14    man, certainly, but Mr. Wyshak was quite good on the Dateline
15    program where he was interviewed about this and very charming
16    in talking about this and -- they can't have it that way and
17    expect a lawyer for the defendant to just stand there mute.
18              THE COURT:  Well, counsel, why don't we productively
19    focus on moving forward.
20              Obviously, anything I impose is going to be in effect
21    as to both parties, as to counsel for both parties.
22              You seem to acknowledge that at least for the period
23    we're in now, I suppose starting today, that there are broader
24    prohibitions, and so I am asking or actually I'm ordering,
25    counsel, that you comply with the Local Rule 83.2A, that the
```

1      prohibitions that are discussed throughout the rule but

2      particularly in the section that focuses on during the trial of

3      any criminal matter, including the period of selection of the

4      jury --

5              MR. CARNEY:  I am aware of the rule, and I, as an

6      officer of this court, say that I will strictly follow the

7      local rule.

8              THE COURT:  Okay.

9              Counsel, just so I can finish my thought here, the

03:29 10   Court orders that the parties comply, as they're required to as

11     members of the bar, with Local Rule 83.2A.  That applies

12     equally to counsel for the defense and counsel for the

13     government.  It shall be complied with in all respects.

14             I had read at my initial questions to counsel the

15     provision of the local rule on which I'm most focused, but I

16     want to make clear that the parties, rather counsel for the

17     parties, shall comply with the local rule in its totality and

18     shall not violate this rule.

19             This is a long-standing rule of this court that was in

03:30 20   part imposed in response to the carnival-like atmosphere that

21     the Supreme Court discussed in the well-known Sheppard v.

22     Maxwell case, 384 U.S. 333 (1966).

23             Counsel on both sides will have ample time to try this

24     case in this courtroom, and I think public attention to it and

25     to your advocacy and to the trial of this case appropriately

     1    should be in this courtroom.

     2          So to the extent that the government was asking me for

     3    a broader rule, I will not allow Docket 927 in that regard, but

     4    I do allow it in the regard that I've just imposed in terms of

     5    compliance, and I think Mr. Carney himself said strict

     6    compliance with the Local Rule 83.2A.

     7          Unless I'm mistaken, other than the things that were

     8    filed today, that's the last of the government's motions.  So

     9    I'm going to turn now to the defense's motions in limine.

03:31 10          Counsel, I'll return at the end to the motions that

    11    were filed today.

    12          The first of the defense motions in limine was Docket

    13    928, which was to limit the victims' family members' testimony,

    14    and I don't know which of you is addressing this, Mr. Carney.

    15          And as I understand it, it was not to preclude that

    16    testimony, but to limit it to basic background information

    17    about the victim and any factual testimony relevant to the

    18    charges.

    19          I'll hear you.

03:32 20          MR. CARNEY:  Thank you.

    21          Your Honor is absolutely correct.  We are not trying

    22    to prevent witnesses from taking the stand and testifying to

    23    facts that would be relevant to the issues before the jury.

    24          My concern has been borne out when I have seen

    25    occasional media coverage of these witnesses when they have

```
 1   told the reporter what they want to say at this trial.  And I
 2   believe that people in good faith, with sincere motivations,
 3   are confusing the testimony that a witness may give at a trial
 4   with the impact statement that a witness, if appropriate, may
 5   give at a sentencing hearing.
 6           After the Greig case, it would be difficult to
 7   envision something that would be off limits for a victim to
 8   testify to at sentencing, perhaps.  But people should not
 9   confuse, I think, what they were permitted to say at the Greig
10   sentencing hearing from what they properly may say at a trial.
11           The way I'd like to handle it is I will assume that
12   the government will only ask questions that are appropriate,
13   and I assume that it will be unnecessary for me to object.
14           If I do object, I will politely bring it to the
15   attention of the Court if I feel the witness has gone beyond a
16   factual statement to something that, while absolutely true in
17   terms of their beliefs, is not properly to be given when it's
18   in front of the jury.  That's all.
19           Thank you.
20           THE COURT:  Counsel?
21           MR. KELLY:  We might actually have common ground on
22   this one, your Honor.
23           We are going to present family, ID witnesses, and we
24   don't intend to elicit improper testimony.
25           We do intend to have them identify anti-mortem or
```

1    pre-death photos of their loved ones.  We also intend to elicit

2    any information they may have about the disappearance of their

3    family members.  But beyond that we do not intend to turn it

4    into a sentencing hearing, but we do intend to offer probably

5    one family witness per victim.

6              THE COURT:  Okay.

7              Well, I guess -- and Mr. Kelly has summed up where I

8    was going on this, which is I think the line, Mr. Carney, you

9    were drawing in the motion is the appropriate one in terms of

03:35 10   any victim's family member's testimony at trial; that is, basic

11   background information and factual testimony, Mr. Kelly, as you

12   suggest, that would go to their disappearance or the charges in

13   this case.

14             And I think what you've mentioned, Mr. Kelly, in terms

15   of what you're planning to elicit seems appropriate in terms of

16   ID of the victim and relationship to the witness and factual

17   information.

18             Mr. Carney, did you rise to add something?  Stand

19   to --

03:35 20        MR. CARNEY:  Yes, I don't want to interrupt.

21             THE COURT:  You can go ahead.

22             MR. CARNEY:  I was just going to inform your Honor

23   that based on Mr. Kelly's statements, with your permission I

24   would formally withdraw the motion as unnecessary.

25             THE COURT:  Well, then I can stop talking entirely,

1   Mr. Carney.

2           So I will allow or -- allow you to withdraw it.

3           I will -- let me just finish the thought, which is,

4   Mr. Kelly, what you were suggesting sounds appropriate.

5   Clearly nothing about the impact of the loss of the victim on

6   the family, I think that's appropriately the subject of a

7   victim impact statement.  If the government proves its case

8   beyond a reasonable doubt and we get to sentencing, the

9   victim's family will have a full opportunity to make

03:36 10   appropriate statements --

11           MR. CARNEY:  Of course if we get to sentencing.

12           THE COURT:  I said "if."  I think I said "if" a few

13   times there.  If the government proves its case beyond a

14   reasonable doubt is what I specifically said, Mr. Carney.

15           MR. CARNEY:  Thank you.

16           THE COURT:  So, for all those reasons, I'll let

17   Mr. Carney withdraw the motion, but I've given the government

18   the guidance based on Mr. Kelly's proffer.

19           So Docket 928 is withdrawn.

03:37 20           Counsel, I believe the next motion -- well, the next

21   motion I'd like to address is Docket 942, which was the motion

22   in regards to Mr. Morris.  Is that -- Mr. Brennan?

23           MR. BRENNAN:  May I?

24           THE COURT:  You may.

25           MR. BRENNAN:  As a matter of background, the

1    government puts notice that they'll be calling former FBI Agent

2    John Morris as a witness in this case.

3         John Morris, as matter of background, was an FBI agent

4    with supervisory role over John Connolly for a number of years.

5    I think it is without debate that he was an FBI agent who was

6    corrupt, engaged in a number of different crimes, including

7    accepting bribes, obstruction of justice, among others.

8         At some point during the litigation in this case in

9    1997, the government sought to speak to John Connolly, and

03:38 10    although not a defendant or named target, he declined to speak

11    to his bosses and colleagues and superiors in the Department of

12    Justice.  Inevitably in 1998, the government chose to give him

13    immunity to testify on their behalf.

14         As part of that immunity, prior to that, he gave

15    what's a so-called proffer, where he gave information that he

16    alleged was true.  And the immunity agreement was to testify

17    not only consistently supposedly with the proffer agreement,

18    but to give complete and accurate information.

19         Mr. Morris was then called to what's called generally

03:38 20    as the Salemme hearings in the litigation in 1998 before Judge

21    Wolf.  He was then interviewed on a number of occasions in the

22    government and the Department of Justice's pursuit of John

23    Connolly.  He testified under oath, not only in the Salemme

24    hearings and in those litigation matters, but then he testified

25    in the United States v. Connolly, and subsequently he testified

1    in Florida v. Connolly, two criminal matters.

2         The entire time he was under the same immunity

3    agreement that had been offered to him by the government.

4    Notably, during testimony on many of those occasions, the

5    government would offer, as prosecutors often do, the immunity

6    agreement in a way that would attempt to bolster the

7    credibility of the witness, suggesting that the witness would

8    have to testify to the truth, otherwise they would lose the

9    benefit of that immunity agreement.

03:39 10        After Florida v. Connolly, there were a number of

11   civil litigations where the Department of Justice was exposed

12   to the concealment of wrongdoing over a period of decades, and

13   the Department of Justice fought zealously against the families

14   of those victims in that litigation.

15        Families who were wronged by the Department of Justice

16   sought to obtain information and witness statements to the best

17   of their ability, and in many cases they attempted to depose

18   John Morris, the same witness who was called to the criminal

19   trials who had full immunity for all of his crimes that he

03:40 20   offered to the government.

21        Unlike when he was being used by the Department of

22   Justice in the pursuit of John Connolly in their criminal

23   matters, when he reached the civil litigations, John Morris

24   asserted his Fifth Amendment privilege.  He asserted the Fifth

25   Amendment privilege at depositions, he asserted his Fifth

1       Amendment privilege in a number of different matters regarding

2       a number of different issues.

3               THE COURT:  Even though he was still immunized?

4               MR. BRENNAN:  Well, it is a very flexible term of

5       immunity that is interpreted through the litigation in this

6       case.

7               Of course, in the criminal matters when Mr. Morris was

8       given immunity, it is suggested that he's telling the truth and

9       the complete truth, and therefore, he is covered by that

03:41 10   immunity agreement and has no liability.

11              When he reaches civil litigation, there is

12      conversation and tortured interpretations of the immunity, and

13      at some point Mr. Morris says that his immunity only applies to

14      statements he gives to the federal government, which really has

15      no consistency in the concept of immunity to begin with.

16              And so, according to the testimony in civil cases, the

17      depositions, Mr. Morris took the position, or at least his

18      attorneys did on his behalf, that if he spoke to the federal

19      government, he's covered, but if he spoke to anybody else, he

03:41 20   wasn't.

21              At a basic level, the idea is that if he was giving

22      truthful testimony with no omissions and endorsed by the

23      Department of Justice, there would be no other concern or issue

24      that he would have, unless, of course, he was being untruthful.

25              Mr. Morris' credibility is the heart of this case, his

1   direct connection of being not only partners but the boss of

2   Mr. Connolly, his knowledge, his corruption, his conduct

3   permeates through the entire case, not only through his witness

4   testimony but through the conduct of his bosses.

5           THE COURT:  Just so I can understand what you're

6   seeking to admit or question him about, that is the fact that

7   he invoked in the civil cases?

8           MR. BRENNAN:  Not only that he invoked in the civil

9   cases, but certainly on specific cases he invoked the Fifth

03:42 10   Amendment privilege.

11           For example, in the Estate of McIntyre, he was asked

12   information about gifts that he received from Mr. Bulger.  Now,

13   this is after he's already testified completely and truthfully

14   and fully in litigation on behalf of the Department of Justice.

15   And when he's asked the question about gifts, which he

16   supposedly was truthful about, he says, I need to invoke my

17   Fifth Amendment, sir.

18           THE COURT:  But I guess my question to you, counsel,

19   and I have read over the cases that were cited in the papers,

03:42 20   Zaccaria, there's reliance on the earlier Hale case and the

21   earlier Grunewald case by the Supreme Court, how does his -- is

22   there a difference between silence or invocation of the Fifth

23   Amendment for fear of being indicted as opposed to a reflection

24   that contradicts later claims of innocence?  Is there a

25   difference between the two?

         1            MR. BRENNAN:  I think they're two entirely different

         2    concepts.

         3            Traditionally when we think about the fact that

         4    somebody should not have an adverse inference drawn against

         5    them for invocating their Fifth Amendment privilege, it is

         6    because it is such a vague concept.  A person may have the

         7    benefit of a law that they don't have to incriminate

         8    themselves.  They may have the free choice that they don't to

         9    speak to a government officer, whether or not they're innocent.

03:43 10    That is such a basic, bedrock constitutional principle, that

        11    somebody shouldn't be punished for that.

        12            It is different in a circumstance like this.

        13            The cases recognize in extraordinary circumstances it

        14    is permissible, and this is extraordinary circumstance.

        15            In this case, Mr. Morris is not the defendant.  He is

        16    a witness.  He is a witness not only in civil cases, but he is

        17    a witness in this case.

        18            Secondly, he doesn't bear the consequence or the

        19    jeopardy, supposedly, that any other witnesses would have,

03:44 20    witnesses that would be afraid to offer information because in

        21    consequence it could lead to their prosecution.  In this case,

        22    he's already been given immunity, which has been endorsed by

        23    the Department of Justice repeatedly over the course of years.

        24            THE COURT:  But you're asking to question him about

        25    his further invocation of the Fifth Amendment privilege, and I

1    guess what I'm struggling with is how does that suggest

2    something inconsistent, an inconsistent statement or action

3    that's inconsistent with his later claims of innocence?

4         Meaning, how does that -- how does that silence or

5    refusing or answer questions reflect on any inconsistency, as

6    opposed to, again -- as opposed to reflecting his receipt of

7    advice from counsel or, as I said, his fear of being indicted,

8    whether or not he was innocent or not?

9         MR. BRENNAN:  Well, his state of mind is absolutely

03:45 10   relevant in this case, especially when we're talking about his

11   credibility.

12        The difference is, here is a witness who has been

13   given immunity, and that immunity is based on his full and

14   complete offer of the truth.  So he is in a unique position

15   where he is fully protected for his testimony.  For example, he

16   says that he took $7,000 in bribes.  If he is fully protected

17   by the government from admitting or for admitting the fact he

18   took $7,000 in bribes, the fact that he would then later assert

19   his Fifth Amendment privilege on that specific question would

03:45 20   lead to a fair inference that he was not being candid that he

21   only received $7,000 in bribes.

22        If the government asked him about his role in

23   conspiracy for murder and he denies, despite the evidence, that

24   he has no role or liability in the conspiracy of a murder of at

25   least four individuals in this case, and the government

1    endorses his testimony as truthful and credible, he thus has

2    nothing to be concerned about because he is immunized from his

3    testimony unless it was not true.

4         So the only reason why he would assert the Fifth

5    Amendment privilege is if he perjured himself.

6         So in these unique and extraordinary circumstances,

7    the fact that he would subsequently assert his Fifth Amendment

8    privilege for the same information he's already protected from

9    through immunity is notable, and there must be an adverse

03:46 10   inference, there should be an adverse inference to the fact

11   that asserted that privilege.

12        THE COURT:  But, counsel -- and I need to give this

13   further thought -- but didn't you start your comments by saying

14   it might have reflected some advice, the basis of which may not

15   be clear, that he didn't have immunity in responding to the

16   questions by private counsel?

17        MR. BRENNAN:  He was represented by counsel in some

18   civil proceedings, some civil proceedings he was *pro se*, and he

19   asserted his Fifth Amendment privilege through lawyers but also

03:47 20   through himself independently.

21        It really doesn't -- is a distinction without a

22   deference, whether it was through his lawyer or through

23   himself.  By asserting the Fifth Amendment privilege, it

24   suggests there is that liability there beyond what he was given

25   immunity for.  There is nothing else that he would have

1     liability for unless he perjured himself in those proffers, if
2     he perjured himself in that prior testimony.

3          So we should not as a constitutional principle be
4     protecting the idea that somebody can perjure themselves after
5     they've been given immunity.

6          At some point he asserts his privilege privately, at
7     some point he asserts it with an attorney, but either way the
8     inference is that he was not being truthful when he testified
9     for the government on earlier occasions.

03:47  10          You can't limit immunity just to the deal he has with
11     the government.  He's either told the truth, which is
12     universal, or he didn't tell the truth.

13          So I know there's always, you know, lawyers are sacked
14     with this allergy to violating the constitutional principle of
15     assertion of the Fifth Amendment privilege or free speech.
16     These are such basic principles that I know it takes a great --
17     a very strong basis, overwhelming reason why we would do
18     something like that.  But the courts recognize that with the
19     proper basis, this is viable and it is appropriate.

03:48  20          In this case, there can be no more overwhelming
21     circumstance than when the government has wrapped their
22     immunity around him and then he asserts his privilege.

23          So I think under these circumstances, I ask your Honor
24     that you should allow that principle, you should allow that
25     inference to be drawn for Mr. Morris.

1          THE COURT:  Thank you.

2          Counsel.

3          MR. HAFER:  Your Honor, Mr. Brennan keeps saying the

4   courts recognize it, because he hasn't given you one case, not

5   one case, where this has ever been done.  In fact, he leads

6   with Zaccaria, a 1st Circuit case in which the 1st Circuit

7   affirmed the district court's refusal to allow impeachment by

8   evidence of prior invocation of the Fifth Amendment.  And

9   that's because there aren't any cases, and that's because, as

03:49 10   the Supreme Court stated in Hale, "as a threshold matter

11   silence per se generally has little or no probative value."

12          THE COURT:  What do you say to his argument that

13   Zaccaria suggests "a proffer of such evidence should being

14   rejected unless special circumstances exist in a given case

15   that materially shift the balance in favor of admissibility"?

16   What do you say to his argument that there are special

17   circumstances here?

18          MR. HAFER:  Candidly, your Honor, I'm having a hard

19   time following that.  Certainly we don't believe there are

03:49 20   special circumstances.

21          As your Honor's questioning of Mr. Brennan indicated,

22   there are any number of reasons that Mr. Morris -- consistent

23   with non-incriminatory reasons that Mr. Morris would have

24   invoked the Fifth Amendment.  And the reality is, he's going to

25   be on the witness stand in this case.  He can be asked about

1   prior testimony, he can be asked about bribes.  He's not going

2   to invoke his Fifth Amendment.  They can ask him anything they

3   want.

4          But we do think, consistent with, starting, actually,

5   long before Grunewald, the case we cited here, the Supreme

6   Court has been clear, that there is no inference to draw from

7   the invocation of the Fifth Amendment.

8          And, your Honor, he is asking specifically that an

9   inference not be drawn vis-a-vis a request in the jury

03:50 10   questionnaire.  Mr. Bulger requested a question that's seeking

11   to disqualify any juror that would hold it against him if he

12   exercised his Fifth Amendment right not to testify.

13          But he wants to cast an air or cloud of suspicion

14   around Mr. Morris, when there's any number of reasons he might

15   have invoked the Fifth Amendment, and he's provided no case in

16   which this has ever been allowed.  And he's, frankly, provided

17   no proffer for what's special about the circumstances.  He was

18   testifying in a civil proceeding, as your Honor indicated,

19   perhaps, on the advice of counsel, who wouldn't want to

03:51 20   litigate the validity and scope of an immunity agreement, he

21   invoked the Fifth Amendment.  That's perfectly consistent with

22   non-perjurious motive.  For those reasons, your Honor, we

23   believe this motion should be denied.

24          THE COURT:  I'll give you the last word, if you want

25   it.

1          MR. BRENNAN:  Well, there's a suggestion that there

2     are many reasons why he would have asserted it, but we don't

3     hear one reason, because there is only one reason: that he

4     perjured himself.

5          When he spoke in the depositions, the understanding of

6     Mr. Morris and his attorney was that the immunity only applied

7     when he was working with the federal government.  That suggests

8     that he knows he'll be protected when he offers help to the

9     federal government, but otherwise, he's on his own.

03:51 10          So there is no other reason why he would assert a

11     Fifth Amendment privilege other than the fact that he committed

12     perjury.

13          The Zaccaria case does say this is not a

14     constitutional issue, it's an evidentiary issue when it applies

15     to someone who is a non-witness.

16          To make the comparison to somebody who has been

17     criminally accused is a real grotesque analogy.

18          There is no semblance of analogy between Mr. Morris,

19     who has been given immunity by the government and upheld by the

03:52 20     government, and Mr. Bulger's position.  If they upheld their

21     immunity with Mr. Bulger and they enforced their agreement with

22     him, then we'd have a different circumstance, but they have

23     chosen not to do that, so that analogy is not befitting.

24          Thank you.

25          THE COURT:  Counsel, thank you for your arguments on

1    both sides of this issue, and I did have a chance to review the

2    motion papers in opposition.

3          As to this issue, and, Mr. Brennan, as my questions to

4    you suggested, I'm not clear that there's special circumstances

5    here.  I do agree with you under Zaccaria, 240 F.3d 75 (1st

6    Cir. 2001), that a witness' prior invocation of the Fifth

7    Amendment is not a matter of constitutional dimension.  So to

8    the extent there is an analogy to the jury questions that we're

9    putting as to Mr. Bulger, I don't think that analogy is apt.

03:53 10         The issue here is one of evidentiary dimension, and so

11   I need to think about the balancing required under Rule 403,

12   about whether any probative value of his prior invocation is

13   outweighed substantially by the risk of prejudicial effect.

14         And I'm going to -- I'm going to deny this motion in

15   limine, one, because I think Zaccaria, the case issued by the

16   1st Circuit, provides guidance here.  I don't think there are

17   any special circumstances here that imbue Mr. Morris'

18   invocation of silence about culpability with any special

19   probative value.  I don't think it clearly contradicts any

03:54 20   claims of innocence, but reflects, as my questions to you

21   suggested, perhaps a fear of being indicted, whether innocent

22   or not, and may be consistent, perhaps, with advice of counsel

23   or his own beliefs if he was representing himself in some of

24   these civil cases.

25         I also note that the Zaccaria case relies on the

1    Supreme Court's decision in United States v. Hale, 422 U.S.

2    171, and the 1st Circuit recognized that Hale teaches that a

3    trial court must start from the premise that silence per se

4    generally has little or no probative value for impeachment

5    purposes, and the evidence of the right to remain silent is

6    inherently prejudicial and should be rejected unless there's

7    special circumstances.

8            Weighing, in my discretion, the circumstances that

9    have been proffered here, I don't think those special

03:55 10   circumstances have been shown.  And based on the case law and

11   my view of the circumstances, I'm going to deny the motion.

12           Counsel, moving on to Docket 943, this is the motion

13   in limine to admit prior inconsistent statements by the

14   government.  I've now received the government's opposition

15   today, which I've had some time to digest.

16           Is it Mr. Brennan or Mr. Carney?

17           Mr. Carney?

18           MR. CARNEY:  Your Honor, I'm asking the Court to defer

19   action on this motion, please.  We've filed a supplemental

03:55 20   memorandum also, which I can't imagine your Honor has seen.

21           THE COURT:  Well, I have seen and I have read it.  It

22   seems to be broader than your initial motion in terms of what

23   it seeks to admit, so I'm fine with taking it under advisement

24   to have further time to digest it.  But I understood it to be

25   beyond what you were seeking to admit in the initial motion,

1   which were certain characterizations, if it's fair to say, of

2   the credibility of witnesses that I understand will be key

3   government witnesses at trial; whereas, I think the motion that

4   was -- the further memo that was filed today made reference to

5   statements by prosecutors, Docket 968, including both Attorneys

6   Wyshak and Kelly.

7          MR. CARNEY:  Yes.  I would be appreciative if the

8   Court were able to entertain oral argument on the motion later

9   this week, if possible.

03:57 10          THE COURT:  Okay.

11          And I imagine the government has no objection to that.

12          MR. WYSHAK:  Well, I don't know why we can't argue it

13   right now, your Honor.  The government's ready to go.  We've

14   filed our reply.

15          I think it's an outrageous motion, and we'd like to

16   address it now, unless there's some compelling reason to delay,

17   which Mr. Carney hasn't seemed to have provided to the Court.

18          THE COURT:  Well, counsel, I can certainly hear

19   argument.  I'm not inclined to decide this matter at the moment

03:57 20   because I'm still digesting the papers, so, counsel, either

21   way.  I imagine you're prepared to argue, counsel.

22          MR. CARNEY:  I'm not until I get a chance to read the

23   government's opposition, which I received this morning and have

24   not looked at.  And I would like to look at that opposition and

25   read the cases that they cite.  And I think an oral argument

1    will be more informed if the Court has the benefit of looking

2    at the pleadings before it's conducted.

3            THE COURT:  Counsel, I'm assuming from that

4    representation you're not planning to open on any of this?

5            MR. CARNEY:  Well, I am asking that the Court hear

6    oral argument this week, even tomorrow would be fine.  I just

7    don't like to go into an oral argument where I haven't read the

8    opposing party --

9            THE COURT:  Well, counsel, with that said, if you're

03:58 10   looking to open on this, and I do think we'll have some time

11   together, although not a lot of free time together, counsel,

12   during the remainder of this week, I'll hear you on what you

13   have to say.  I'm not going to decide this matter right at this

14   moment.  If there's something you want to add after you've had

15   an opportunity to absorb their opposition, I'll give you brief

16   time to do that, but why don't I hear you at least as an

17   initial matter.

18           MR. CARNEY:  Yes, your Honor.

19           The concept of an admission by a party opponent is

03:59 20   hallmark law, bedrock law in the rules of evidence.

21           The party can offer against the other party either

22   statements made by the party himself or through statements made

23   by an attorney representing the party.

24           As we've stated throughout the memoranda that we

25   filed, this party includes the United States of America when

1     it's an opposing party.

2           What I have cited in my memoranda, your Honor, are

3     instances where a government attorney representing the United

4     States has commented on, for example, the credibility of a

5     witness.

6           THE COURT:  And, counsel, are you referring to your

7     initial filing, the Exhibits 1 and 2?

8           MR. CARNEY:  Yes, your Honor.

9           THE COURT:  Okay.

04:00 10          MR. CARNEY:  Those are statements by the attorney

11    representing the United States of America; therefore, they are

12    admissible against the United States of America if offered by

13    an opposing party, in this case, James Bulger.

14          THE COURT:  And, counsel, I guess the question I have

15    for you is -- and I did look at the Kattar case and McKeon, and

16    there were a few other cases in that line of cases that was

17    brought to my attention by one side or the other that I've had

18    a chance to review, and wasn't -- wasn't the concern of the 1st

19    Circuit in Kattar that the government was trying to portray the

04:00 20    victim, the church, in a different light than it had been

21    portrayed in the past?

22          MR. CARNEY:  Yes.

23          THE COURT:  And I don't know what your brothers are

24    going to say when I turn to them, but I don't imagine they're

25    going to disown their previous statements about, for instance,

1    Mr. Flemmi.  I mean, isn't this a different situation?  There's

2    no suggestion that the government is going to try to hide the

3    ball about what they thought about his position as to immunity

4    or their position as to his prior statements?

5         MR. CARNEY:  The fact that they could stand up and be

6    defensive at this trial is different than in the past where

7    they have gone on the offense about these witnesses and whether

8    they have -- whether they are credible.

9         The statements made by Mr. Wyshak, Mr. Durham,

04:01 10   Mr. Kelly cited in this memorandum, your Honor, are admissions

11   by the United States about the quality of their case and the

12   credibility of their witnesses.

13        Let me use an example from -- if this had arisen in a

14   civil case.

15        Let's say that a plaintiff is suing an automobile

16   manufacturer and is saying, This car was not designed properly.

17   In related litigation where another plaintiff was injured by

18   the car and contended that the car was defective, the attorney

19   for the car company stated, I admit that this car was not

04:02 20   properly designed and the brakes should have been looked at

21   more carefully, but, ladies and gentlemen, that's not what

22   caused the accident.  What caused the accident in this case was

23   the plaintiff was driving drunk, erratic, and he caused the

24   accident and he is the sole cause of the accident, for that

25   reason you should find in favor of the defendant car

```
 1   manufacturer.

 2          Well, the fact that the attorney for the car

 3   manufacturer conceded in litigation than the car had been

 4   defectively designed and the brakes were not checked well

 5   enough is an admission as if it were issued by a press release

 6   for that auto company itself.

 7          THE COURT:  Counsel, isn't that different where it's

 8   an issue of fact that goes to the ultimate question that the

 9   jury has to decide, as opposed to here where these issues go to

10   credibility?

11          MR. CARNEY:  No, not at all.  In fact, it may be the

12   most important issue for this jury to determine, which is

13   credibility, as well as factual statements.

14          For example, your Honor, this is from Mr. Wyshak

15   talking about Connolly.

16          "Now, in order to support [Connolly's] decision to

17   recruit James Bulger as an FBI informant, the defendant" -- and

18   I'll refer to him --

19          THE COURT:  Counsel, what are you reading from, just

20   so I can follow you?

21          MR. CARNEY:  Page 2 of the memorandum filed today.

22          THE COURT:  Okay.

23          I'm there, counsel.

24          MR. CARNEY:  At the bottom, and I'm just substituting

25   the name "Connolly" for "the defendant" to make it clear.
```

1          "Now, in order to support [Connolly's] decision to

2     recruit James Bulger as an FBI informant, [Connolly]

3     represented to his supervisors in the FBI that James Bulger, or

4     Jim Bulger, could help them in this war on the Mafia, or you

5     may hear some witnesses call La Cosa Nostra.  The problem was

6     Jim Bulger really couldn't help that much.  He was an Irish guy

7     from Southie, really didn't hang around in the North End with

8     the Italian Mafia, principally hung around, but we'll get back

9     to that a little later..."

04:05 10          Continuing on page 3.

11          "It's Stephen Flemmi who really has got the

12     information that [Connolly] needs, but you will see that for

13     years, until about September of 1980, all the documentation at

14     the FBI and all the information regarding the Mafia or La Cosa

15     Nostra, is documented under Jim Bulger's name."

16          That is a factual admission by the government.  It is

17     a factual admission that Jim Bulger was not in a position to

18     become an informant against La Cosa Nostra, but really it was

19     Stevie Flemmi was.  That's a critical issue in this trial.  And

04:06 20     Fred Wyshak tells a jury that that is the truth.  And so he,

21     representing the government, has to own it.

22          In this case, we can introduce the fact that the

23     United States of America took the position that Stevie Flemmi

24     was an informant who had information about La Cosa Nostra, but

25     Jim Bulger had nothing to offer.

1          Nonetheless, the information from Flemmi was put in

2     James Bulger's file so that it would appear he was an

3     informant.

4          Assistant United States Attorney Wyshak dispels that

5     by what he says, and they can't run away from it.

6          There's another statement by --

7          THE COURT:  Counsel, I just want to stop you there,

8     because I have -- actually, I have had a chance to read this,

9     and I did focus on the pieces that you're reading aloud now.

04:07 10          But in terms of what standard you think applies here,

11     certainly there have been factors identified by the Supreme

12     Court in McKeon, and would you agree that those factors should

13     apply here?

14          MR. CARNEY:  Are you citing from the government's

15     brief?

16          THE COURT:  I'm citing -- well, I'm citing from my own

17     notes, counsel, but I think the government may have cited

18     McKeon, if I recall correctly.

19          MR. CARNEY:  That's why I wanted to read their

04:07 20     memorandum, so that I could answer your question, your Honor.

21          THE COURT:  Well, let me ask you this --

22          MR. CARNEY:  It would be fairer if I had a chance to

23     read their brief.

24          THE COURT:  I will give you an opportunity to respond

25     further.

```
 1            But I guess my question to you is, the statements that
 2   you're -- that are included in Docket 968, which in fairness,
 3   counsel, was also filed today --
 4            MR. CARNEY:  Another reason why I didn't want to go
 5   forward today.
 6            THE COURT:  Counsel, for what purpose would you be
 7   offering these statements?  Is it for the purpose of showing an
 8   inconsistent theory of the case?
 9            MR. CARNEY:  No.  An admission comes in as substantive
10   evidence against the other party.
11            THE COURT:  As non-hearsay, as a party opponent.
12            MR. CARNEY:  Correct.
13            THE COURT:  Okay.
14            MR. CARNEY:  Just like if a witness offers a statement
15   allegedly made by James Bulger, that comes in substantively.
16   And it's bedrock evidence law.
17            THE COURT:  Okay.
18            MR. CARNEY:  So that I can read this to the jury.
19            Let me, for example, read the next one.
20            "The government has alleged and will be alleging that
21   Mr. Connolly created false reports during his operation of
22   these informants to mislead other investigators away from their
23   criminal activity and to falsely justify their continuation as
24   FBI informants."
25            We are going to elicit evidence those reports are
```

```
 1   false and contain false information.

 2        I can read that as a statement by an attorney

 3   representing the United States of America as substantive

 4   evidence that what Attorney Wyshak said to that jury is, in

 5   fact, true.

 6        THE COURT:  And, so, I guess what I'll do, Mr. Carney,

 7   I know you want an opportunity to fully digest the opposition,

 8   but let me just leave you with this so when we speak again,

 9   you'll know what I'm focused on, which is, I'd like your

10   thoughts when we speak again -- and I'll return to this at the

11   end when we get to scheduling -- your thoughts on whether, in

12   your view, the McKeon factors apply, and it's slightly

13   different analysis than straight under admissions of a party

14   opponent, and I'd like to get your views on that when we speak

15   again.

16        MR. CARNEY:  Be happy to, your Honor.

17        THE COURT:  Mr. Wyshak.

18        MR. WYSHAK:  Yes, your Honor.

19        The first thing I'd like to say is the reason why our

20   filing came in this morning is, obviously, because Mr. Carney

21   missed his deadline for filing his motion in limine, and the

22   Court invited us to respond, even though he had missed his

23   deadline, and we did that this morning.

24        But just to put this --

25        THE COURT:  And understood, counsel.
```

1          MR. WYSHAK:  Just to put this in the proper context,

2    because Mr. Carney takes one legal proposition and runs with

3    it, but ignores all the other law which applies to this

4    situation.  Normally statements of employees of the United

5    States are not admissible to bind the United States as a party

6    opponent.

7          However, in Kattar, which Mr. Carney cites, the

8    courts -- and the cases that follow Kattar, the courts make an

9    exception where a prosecutor has made a factual assertion in

04:11 10   one proceeding and in the next proceeding makes another factual

11   assertion that's inconsistent with the prior factual assertion.

12         And the reason that the courts have carved out this

13   exception to the general rule that these types of admissions

14   are not -- do not bind the United States is because the courts

15   want to do justice.  They don't want the government in one case

16   to present evidence and in the next case to present evidence

17   that's inconsistent with that, because there's obviously the

18   concern about the truth, what the truth is, and whether or not

19   the attorney in the second case is suborning perjury.  So

04:12 20   that's the template that we have to operate under.

21         And in the McKeon case, which is followed in the 2nd

22   Circuit by the Salerno case, which applies it in the criminal

23   context to prosecutors, the courts have specifically stated

24   that this only applies when there's an inconsistent factual

25   assertion.  It doesn't apply regarding opinions or argument

1  regarding witness credibility or arguments which are made to a

2  jury.  It's about facts.

3          Now, getting back to this -- and just to address what

4  Mr. Carney has raised today, which is new information from what

5  was in his original motion in limine -- it's Mr. Carney's

6  burden to prove that my statements and the statements of my

7  colleagues in prior cases are inconsistent with the theory of

8  prosecution in this case.  And they are not.  I mean, there is

9  no contest in this case that Mr. Connolly falsified reports

04:13 10  that he placed in Mr. Bulger's file.  I think the evidence will

11  come out that Mr. Bulger and Mr. Connolly conspired together to

12  place false information in FBI files so that investigators, who

13  were investigating criminal activities that might lead them to

14  Mr. Bulger, were led away from Mr. Bulger in another direction.

15          It is not going to be inconsistent with the theory in

16  this case that the reason that Mr. Bulger recruits Stephen

17  Flemmi to become an FBI informant along with him -- and the

18  evidence will show that Mr. Bulger and Mr. Flemmi always met

19  together with Special Agent Connolly, was Frick and Frack, they

04:14 20  never -- Mr. Flemmi never met alone, except maybe on perhaps

21  one isolated occasion, never met alone with John Connolly.

22          Mr. Bulger recruits Mr. Flemmi so that he can get

23  Mr. Flemmi's information and pass it along to John Connolly.

24  That is not inconsistent with what the government will show in

25  this case.

1           THE COURT:  Mr. Wyshak, just to summarize, your

2      position is that these prior statements, and for the moment I'm

3      focused on 968, what Mr. Carney referenced on pages 2 and 3,

4      that those aren't inconsistent in the first instance.

5           MR. WYSHAK:  Correct.  In his most recent filing,

6      which came in this morning, I don't think he'll be able to

7      demonstrate that those are inconsistent.  If he can't do that,

8      they're not admissible.

9           Now, getting back to the prior filing, which is a

04:15 10   different animal, because in that situation Mr. Carney seeks to

11     admit statements made by civil litigators from the Department

12     of Justice Torts Branch, statements that they made during the

13     course of civil litigation and not statements made by the

14     prosecutors in this case.

15          I'd like to address those just briefly, and I think

16     that the rule, which Mr. Carney seeks to apply here today, was,

17     in fact, applied during the course of civil litigation.  Again,

18     the context here is very important.

19          The U.S. Attorney's Office, the criminal prosecutors

04:16 20   who initially brought these -- this series of cases took

21     certain positions, made certain statements that litigators from

22     the Torts Branch during the course of civil litigation

23     attempted to undermine and made inconsistent statements with

24     the statements made by the criminal prosecutors.

25          In that civil litigation, I suggest to the Court, that

1    rule was applied, that Judge Lindsay and Judge Alexander and I

2    even believe Judge Young constantly called the Torts Branch

3    lawyers and the fact that their positions were inconsistent

4    with the prior positions of the government and they were

5    rejecting and did reject, and as I put in my brief, in fact,

6    found at least one of the civil litigators to have proceeded in

7    bad faith in the McIntyre case.  There's a written opinion,

8    which I've attached to my brief.

9            So this rule was applied in the civil litigation to

04:17 10    those Torts Branch lawyers who were making statements

11    inconsistent with the prior statements of government attorneys.

12            THE COURT:  And so should it apply here --

13            MR. WYSHAK:  No.

14            So now Mr. Carney is trying to bang a square peg into

15    the round hole by saying, okay, well, now that the Torts Branch

16    lawyers have made those statements, which have been recognized

17    by the courts in the civil litigation as inconsistent and which

18    were essentially held against the government in that

19    litigation, now I'm entitled to use those statements in this

04:17 20    case to try to -- to do what?  What is he trying to accomplish?

21    He's not trying to accomplish the objectives of Kattar and

22    McKeon, which state that the objective of this rule is to make

23    sure that the truth comes out and make sure that government

24    attorneys are not suborning perjury.  That was applied in the

25    civil litigation.  To apply it in this case makes no sense.

1    It's just using the mistakes and errors of those Torts Branch

2    lawyers to now try to twist the evidence and twist the facts in

3    this case.  It's totally contradictory to the spirit of the

4    cases that Mr. Carney wants to rely upon.

5         THE COURT:  Well, counsel, and I appreciate the

6    argument.  I'm not going to decide this today.  I'll hear

7    further from Mr. Carney and from you if you want.

8         I guess I understand your argument to be, at least as

9    to the representations made by the Torts Branch attorneys,

04:18 10   not -- you're not disputing the idea that the Torts Branch

11   attorneys are part of the same party, but that under Kattar and

12   McKeon I shouldn't allow their admission here.  Do you

13   understand?

14        MR. WYSHAK:  Yes.  I think ultimately this does all

15   come down to a 403-type analysis.  And in this case, applying

16   403 to the facts as they occurred is only going to cause

17   confusion.  Essentially, it's going to require the government

18   to call those Torts Branch lawyers or Judge -- not that we

19   would want to do it -- or Judge Alexander to explain that she

04:19 20   actually found these statements made in bad faith and applied

21   the rule that Mr. Carney seeks to apply in this case to the

22   civil litigators in the civil litigation.

23        So I just don't see that it's helpful in this case or

24   it serves the purpose that Kattar and the other cases talk

25   about.

```
 1              THE COURT:  Okay.

 2              Well, counsel, I'll hear you again on this issue, and

 3       I'll reserve any judgment until that time.

 4              Counsel, I think we may be at the last of the defense

 5       motions before the matters that were filed today, Docket 946,

 6       the motion in limine to preclude reference to The Bulger Group.

 7              Mr. Carney, I understand your position, and perhaps I

 8       should, just to short-circuit things, maybe I should just put

 9       this to the government first.

04:20 10              Counsel, why not just redact the indictment here?

11              MR. KELLY:  Because it's not required to be redacted

12       under the law, the law that we cited.

13              THE COURT:  Vastola.

14              MR. KELLY:  Just because the defense wants it, we

15       don't think necessarily it should happen.  We think it's

16       perfectly appropriate in the indictment, it's a fairly plain

17       vanilla term.

18              As I indicated, this is a criminal group.  They didn't

19       go to the Secretary of State's office and incorporate as The

04:21 20       Bulger Group.  It's clear, the evidence will be clear, that

21       over the years the defendant was associated with a group of

22       criminals, and eventually he became the leader of this group of

23       criminals.

24              Now, in the old days, in the '70s, they were called

25       Winter Hill or The Hill.  Gradually, as he seized more and more
```

1    control, it was known by South Boston or sometimes still called

2    The Hill, but ultimately it was still a group of criminals

3    associated for the purpose of making money through criminal

4    activities.

5         And I don't want us to be cabined in where if we refer

6    to him belonging to a group of criminals that somehow we've

7    misused the word "group."  I think the law permits it to be

8    characterized as such in the indictment.  We don't think it's

9    of any grave prejudice to him to be -- to have this

04:22 10   reference --

11        THE COURT:  I guess, counsel, the reason I put it to

12   you first is I did read Vastola, 899 F.2d 211, (3d Cir. 1990),

13   which I know has been referred to -- you referred to in your

14   opposition.  I think even in that case where there was a

15   reference to The Vastola Organization, the court was cautioning

16   about it in a curative instruction.

17        And the reason I raise it in this way with you, my

18   memory is from your opposition, you don't think that your

19   witnesses are going to use the shorthand.  So I don't see what

04:22 20   the harm in redacting it is where the defendant is making this

21   argument that the term is assuming his role, which is part of

22   what you need to prove.

23        MR. KELLY:  Well, because in Vastola, the defendant --

24   the court said the defendant was only loosely affiliated with

25   the group.

1         This defendant, as the evidence will show, is not

2    loosely affiliated with these other criminals, he was, in fact,

3    by the end of it, their leader.  So we think it's an

4    appropriate term, and we don't -- I doubt there's going to be a

5    witness who will say, I belonged to "The Bulger Group," but I

6    don't want to preclude the government from using the term "a

7    group of criminals" or something like that, whether it's in

8    opening or closing --

9         THE COURT:  And I think there's a difference between

04:23 10   it being in the indictment and purposely elicited and it being

11   blurted out in a way that, perhaps in that instance, a curative

12   instruction would be appropriate.  But I guess what I'm saying

13   is, in the first instance, why not just not refer to it?

14   Particularly if it's not a term that your witnesses are -- that

15   you don't think your witnesses are going to use in the normal

16   course.

17        MR. KELLY:  Well, if the Court is considering reading

18   the indictment to the jury, I don't think it has to be read to

19   the jury as The Bulger Group, but I just don't want a situation

04:24 20   where either the government counsel or a witness stumbles into

21   it and thereby it's ruled improper because it's not under the

22   law.  The law allows us to call it that in the indictment, and

23   that's why we did it.

24        So I don't want to argue over nothing if it's not

25   going to come up, but at the same time, I don't want to set a

1    trap for myself if it does come up.

2            THE COURT:  And here, counsel, I mean, unless counsel

3    wants to be heard on this issue, I wasn't intending -- it's not

4    my practice to read the indictment.  It is my practice to send

5    it back with the jury with the jury charge.  In some instances

6    it's redacted for reasons, perhaps, similar to this or not, but

7    it wasn't my intention for a whole bunch of reasons, including

8    a very practical one, it being 111 pages, to read it to the

9    jury in the first instance.

04:25 10            MR. KELLY:  Well, clearly and perhaps unfortunately,

11    we're a long way from submitting it to the jury for

12    deliberation purposes, so maybe I should take some time to

13    reflect on this issue, and if redacting doesn't alter the

14    meaning of the charge or anything like that, perhaps we will

15    agree to it.  But in the first instance, I don't think it's

16    necessary to do so.

17            THE COURT:  Okay.

18            Mr. Carney, do you want to add anything to this?  I

19    think you've gotten a sense of where the Court is headed on

04:25 20    this.

21            MR. CARNEY:  I'd just like to read one sentence from

22    Vastola.

23            THE COURT:  Yes.

24            MR. CARNEY:  "We are aware of no RICO cases in which

25    the government, as part of its trial strategy, named the

1    enterprise after one of the defendants."

2          I think the Court was very insightful.  No one ever

3    called these individuals, this group, The Bulger Group until

4    the prosecutors decided, as part of its trial strategy, to name

5    them that.

6          I think your Honor understands the risk that is

7    involved here, and I'll leave it at that.

8          THE COURT:  Counsel, is it fair to say you're not

9    going to insist on my reading the indictment to the jury?

04:26 10          MR. CARNEY:  No, your Honor, I'm not going to insist

11   on it or -- I'm not asking your Honor to read the indictment.

12          THE COURT:  Okay.

13          MR. CARNEY:  And I'm not objecting if you don't read

14   the indictment.  I'm trying to get rid of the double negatives.

15          THE COURT:  Thank you, counsel, for both those

16   positions.

17          MR. KELLY:  Just for a brief response.

18          The Vastola case, which we cited, he didn't, I'm not

19   sure why he's reading that, but in this very own district we

04:26 20   used to put in the indictment, "The Patriarca Family."  It's

21   not as though all of the witnesses would say, yes, we are a

22   member of this organization.

23          I don't think we're precluded from calling it The

24   Bulger Group.

25          THE COURT:  Well, counsel, I think -- and I appreciate

1    you raising the other cases, and I don't know in which of those

2    cases an objection was raised or not in the way that Mr. Bulger

3    has here, but I think the better course is, particularly where

4    the parties are in agreement about there not being a necessity

5    for me to read the indictment in the first instance to the jury

6    anyway, that I'm going to grant this motion in limine, Docket

7    946.

8         I think given the defendant's objection and also

9    considering 403, I think -- I'm not sure what the probative

04:27 10   value of the shorthand of "The Bulger Group" is, and I

11   certainly think that there's some risk of any probative value

12   being outweighed by unfair prejudice if the jury can be left to

13   assume the defendant's role in the conspiracy that is charged

14   here.

15        I certainly understand under Vastola that a curative

16   instruction could blunt any such risk, but I don't see for the

17   limited probative value why we should take that chance.

18        So, as I said, we're a long way from this point, but

19   when the indictment goes back, for it to be redacted in that

04:28 20   regard, and the government shouldn't use the term in its

21   opening.  I don't think you were anticipating many of your

22   witnesses making reference to the organization in those terms,

23   but certainly you can instruct them not to.

24        MR. KELLY:  Yes, but just to clarify, I can still use

25   the word "group" in terms of group of criminals.

1          THE COURT:  Yes.

2          MR. KELLY:  Just not the Bulger Group.

3          THE COURT:  Yes.

4          MR. KELLY:  All right.

5          THE COURT:  So we're all clear, counsel.

6          Counsel, I think that comes to the end of the motions

7     that were previously filed.  I know there's some that I need to

8     get back to you on.

9          Just for a moment to address the issues, some of which

04:29 10    we may be able to dispatch in short order.  The motions that

11    were filed today, and I want to address them in the following

12    order:  The first is Docket 965, a motion by the Globe in

13    regards to exempting reporters Murphy and Cullen from any

14    sequestration order.  Obviously on my agenda for today was to

15    talk about sequestration.

16         I take it from, and I'm going to get in a moment to,

17    the government's objection to the defendant's witness list, but

18    I took from that filing and from the other papers filed as

19    well -- give me a moment, counsel.

04:30 20         Let me ask you, Mr. Carney first, do you have any

21    objection to this, or can I take it as agreed between the

22    parties that if there's a sequestration order, it wouldn't

23    apply to these two witnesses?

24         MR. CARNEY:  I don't agree with that, your Honor.

25         THE COURT:  Okay.  I'll hear you.

1          MR. CARNEY:  I haven't read the motion.  I just

2    received it as I was walking out of my office to come to court.

3          THE COURT:  Okay.

4          MR. CARNEY:  So I need at least until tomorrow so I

5    can read what they say and to prepare even an oral response.  I

6    haven't even read the first page.

7          THE COURT:  Let me hear from the government, if the

8    government wants to be heard.

9          MR. KELLY:  Briefly, your Honor.

04:30 10         That would be consistent with our objection to his

11   witness list; that is, it's not a real witness list.  He's

12   putting people on there, we think, just in an effort to keep

13   people out of the courtroom, such as a couple of the

14   government's agents, who worked a long time on this time, case

15   agents Doherty and Lieutenant Johnson.

16         So we object to having certain names on this list when

17   they have no relevant testimony in this case.  There's no

18   firsthand knowledge by Kevin Cullen or Howie Carr, Shelley

19   Murphy, Dick Lehr, they weren't eyewitnesses to any of the

04:31 20   crimes charged in this indictment.  So we would oppose having

21   them on this witness list, and we would further oppose them

22   being sequestered.

23         We'd also ask that the Court direct the defense to

24   give us a real witness list.  This is not a witness list.

25   There's people on here, as we indicate, who are on there solely

1    because of his now discredited and barred immunity theory.

2         He has David Margolis on this witness list, he has

3    William Weld, he has FBI Director Robert Mueller, he has Judge

4    Stearns.

5         So if the jury hears these people are going to be his

6    witnesses, are they going to be stricter because they were,

7    perhaps, in front of Judge Stearns, or they have heard of

8    William Weld.  These are not real witnesses, so we would object

9    to them being on his list.

04:32 10        THE COURT:  Mr. Carney, as to the motion for the

11   Globe, I understand you're still absorbing it, but it to some

12   extent affects proceedings starting as early as tomorrow at

13   9:00 a.m.

14        So as to reporters Murphy and Cullen, even assuming

15   they're on your witness list for reasons that perhaps you can

16   share with me now, what would be the basis for not exempting

17   them from the sequestration?

18        MR. CARNEY:  Because they've written books about this

19   case and are in position to be called to impeach witnesses who

04:33 20   testify in a contrary way to what they have told Murphy or

21   Cullen or other of these reporters that we've listed.

22        The people we've listed are not just because they are

23   reporters, the Boston Globe is a huge organization who has a

24   number of witnesses covering this case, but there are only two

25   that have purportedly written a definitive book on this period

1    of history in Boston.  And if witnesses testify in a manner

2    that's contrary to what they apparently told Murphy and Cullen,

3    then we have a right to call them, and they should not be

4    preview to that by sitting here and listening to testimony.

5         Howie Carr, same thing.  He's written two books about

6    witnesses here.  He's written a book about Flemmi and a book

7    about Martorano.

8         And so if those books contain statements allegedly

9    made by the subject of those biographies to Carr that are

04:34 10   inconsistent with what the witnesses -- witness says, we have a

11   right to call this person as a witness to impeach him.

12        THE COURT:  As opposed to cross-examination of the

13   witness about those statements?

14        MR. CARNEY:  If the witness holds true to what he has

15   stated on direct examination, the most compelling way that I

16   can impeach his testimony is to call the author of his

17   biography, who will have to say, he told me something different

18   because that's what's in the book I wrote.

19        THE COURT:  Well, counsel, would you at least agree,

04:34 20   even if you're not going to concede without having read their

21   filing, the issue of sequestration, would you agree at least

22   for the proceedings that are going to occur over the next few

23   days, which are in regards to jury impanelment, that you have

24   no objection to their presence, so I can have more time to both

25   hear you and decide this motion?

1          MR. CARNEY:  Certainly, your Honor.

2          THE COURT:  Okay.

3          Counsel, just moving on to the next matter, which was

4     964, and, Mr. Carney, did you want to be heard on this -- or I

5     understood it to be a motion for all further discovery -- one

6     moment here.

7          MR. KELLY:  Your Honor, I'm sorry.  Before we can move

8     on to that one, to stay on this one briefly, because with

9     respect to the government's objections, I don't know what

04:35 10    docket number it was --

11          THE COURT:  I was getting to that, counsel, I was

12     leaving that to the end, but I will not forget it.

13          MR. KELLY:  Okay.

14          THE COURT:  In regards to the motion for all remaining

15     discovery, counsel, I understood the representations before

16     about discovery being complete.  Did you want to be heard or do

17     you want to just stand on your motion as it's presented to me?

18          MR. CARNEY:  I'm really looking for the Court to pin

19     down the government.

04:36 20          At the last hearing the government represented to you

21     that 90 percent of the discovery has already been provided to

22     the defendant.  While we're talking about 380,000 pages of

23     documents, and by that calculation, are we expecting 38,000

24     more, which would be the remaining 10 percent?  Or my math is

25     wrong, but your Honor gets the idea, and recently we received

1    another 500 pages of discovery.

2         We recently received a document that's been in the

3    government's possession about an event that happened I think

4    ten years ago, and -- an event that took place in 2001, and on

5    May 30th we were provided with a version of that document.

6         I just would ask the Court to not accept that the

7    government has given us 90 percent of the discovery or 95

8    percent of the discovery or 99 percent of the discovery.  I'm

9    asking your Honor, because of the complexity of this case and

04:37 10   the beast it has been to try to get ready for trial, that the

11   government commit to you that they will give us 100 percent of

12   the discovery.

13         THE COURT:  And, counsel -- and I haven't gone back to

14   look at the transcript, but when I last saw you on May 22nd,

15   which is not the date that's cited in the footnote, my memory

16   is the government represented that discovery was complete with

17   the exception of anything they might supplement, but otherwise

18   I thought there was a representation that discovery was

19   complete.

04:38 20         MR. CARNEY:  Well, here's an example, your Honor.  The

21   most recent letter or a recent letter from the government we

22   received, it noted, We're providing you with additional early

23   Jencks material.

24         Now, why qualify it as early Jencks?  What I realized

25   is that in the last hearing we had, and your Honor's correct

 1   about the date -- in the last hearing we had, your Honor

 2   pressed the government to provide us with the Jencks material.

 3   And rather than commit to your Honor that they would,

 4   Mr. Wyshak said, Well, your Honor, you can't order us to do

 5   that.  Well, Mr. Wyshak, how about if I order it by May 30th?

 6   Well, you know, we're providing them the discovery as we're

 7   obligated to do, but you can't force us to give us Jencks

 8   material.  Well, what about this, what about by the start of

 9   the trial, will you give them the Jencks material?  Well,

04:39 10   respectfully, your Honor, you can't direct us to do that.

11          And now I realize that that wasn't just semantic

12   argument or making a point for the purposes of making it, it's

13   because they still have discovery that they haven't given to

14   us.

15          And one thing a defense lawyer finds out early when

16   you work in this business, is the last discovery you get from

17   the government is often the most important discovery to the

18   defense.  That's why they're holding it back.  That's why we

19   get all these names of new witnesses.  That's why we only

04:39 20   recently found out about the fact that John Martorano and Kevin

21   Weeks are being investigated this year for ongoing criminal

22   activity.  Did we find out about that earlier in this year when

23   people were talking to them and reports were created?  Did we

24   get it right away or did we get it much later when it's hard

25   for us to act on?

1            And so, at this point, I am asking your Honor to

2       consider, given the extraordinary nature of this case, the

3       almost unprecedented nature of this case, that your Honor enter

4       an order directing the government to provide the defense with

5       all of the discovery under Brady, Giglio, Jencks, and the

6       material your Honor has ordered be turned over by a day this

7       week before we start the trial.

8            And I'd like the Court to also order the government to

9       provide us with the addresses of their witnesses.  It can be

04:41 10  under a protective order, it doesn't have to be publicly filed,

11      but there are a couple of situations where having the addresses

12      is critical.  One is, when we are only given the town of an

13      individual.

14           The fact that someone may live in Wilmington,

15      Massachusetts, forces us to go on a hunt to try to find out,

16      well, where does this person live?  Look in a phone book, look

17      on the internet, look on other sites to find out, and we are

18      wasting time trying to find out where these people live, and

19      we're just asking from the government that they give us their

04:41 20  address so our investigator just drives to that house.

21           If we have the address, our investigator will drive to

22      that address and seek to interview the witness.

23           If we don't have that, then we're likely to be

24      spending money, which is in short supply, needless to say, with

25      our investigator trying to figure out where does this person

```
 1    live?  And even to the point of driving around to find out
 2    where he lives.  Just give us the street address.
 3            THE COURT:  Okay.
 4            MR. CARNEY:  The second one is, when it is a person
 5    who is retired from the government, let's say we want to speak
 6    to a particular witness who used to work for the FBI, and he
 7    retired ten years ago.  The only address we get is the FBI
 8    headquarters in Boston.  They're not going to tell us anything.
 9    And so we're back to try to figure out where is this person
10    living, where the government has the address.
11            So the bottom line is, we will spend much less money
12    on investigators.  We will not be going on wild goose chases
13    trying to find witnesses if we can just be told their address.
14            So what we'd like is a deadline for all of the
15    discovery and be provided forthwith with the addresses of the
16    witnesses so we can speak to them.
17            THE COURT:  And I'll hear from the government,
18    although, in fairness, I think I've already imposed a deadline
19    for discovery.  I think the only possible objection to that --
20    exception to that was Jencks.  I see May 20th was the 21-day
21    deadline, if I recall correctly, Mr. Carney?
22            MR. CARNEY:  Yes, your Honor.
23            THE COURT:  And correct me if I'm wrong, but I thought
24    there was a representation that discovery was complete.
25            MR. KELLY:  It is, except for a narrow group of
```

1    materials that, as we indicated at the last hearing, sometimes

2    in trial prep, you find additional materials and you quickly

3    produce them.

4        Now, the defense -- you know, he wants to quote Thomas

5    Jefferson.  I think we should quote Reagan here because here we

6    go again.

7        He asked for discovery last week, irrelevant

8    discovery, testimony of a woman named Julie Rakes.  Her

9    testimony is based upon hearsay that her husband, Stephen

04:44 10  Rakes, gave her.

11       We're not calling her as a witness, but they wanted

12   it.  So we copied it, we Bates stamped it, and we gave it.

13   That's the 500 pages of discovery.

14       He files a motion complaining about the fact that we

15   gave him a better version of a Kevin Weeks report.  Well, we

16   did because in reviewing his documents, his discovery, I found

17   that one document shouldn't have been redacted in a particular

18   area.  The information contained therein, if I remember

19   correctly, was fugitive-related, it was cumulative, it wasn't

04:44 20  exculpatory.  Since it was redacted and we found it and it

21   related to Kevin Weeks, we gave it to them.

22       THE COURT:  What about Jencks material, counsel?  Is

23   there some category --

24       MR. KELLY:  There's no category that we're trying to

25   hold back, but if we find a document that's Jencks material,

1    we're going to give it to them, and we're going to characterize

2    it as such.

3           And I think that was the subject of Mr. Wyshak's

4    soliloquy about the Jencks Act, only implying that we can't be

5    expected to produce all Jencks material on every witness weeks

6    in advance of trial because it inevitably, in any trial, if we

7    find additional material, we're going to give it, and that's

8    what we've done.

9           But the bulk of material he's referencing is

04:45 10   irrelevant --

11          THE COURT:  Not to put too fine a point on it, is

12   there any Jencks material in the government's possession right

13   now that you have not produced?

14          MR. KELLY:  I don't believe so -- what's that?

15          (Discussion off the record.)

16          MR. KELLY:  I don't believe so, but as we prep all

17   these witnesses -- he won't stipulate to anything, so now we

18   have all these additional witnesses -- and if we find

19   additional reports that we think we should produce, we're going

04:45 20   to produce them, and they may be technically Jencks material.

21          I think we're going through one witness now, a Robert

22   Long, he's going to testify in this case.  I think there were

23   some reports that were too heavily redacted.  We're going to

24   unredact them and give them to him.

25          We don't want additional time to produce Jencks, we

1    will produce it as quickly as we find it if it's additional.

2    We don't think there is 10,000 pages of additional Jencks, but

3    I think inevitably, you know, if the reports are of poor

4    quality or we find something that we think should be produced,

5    we'll produce it.

6         And I don't think his request for home addresses is

7    reasonable in a case in which the defendant is charged with

8    committing 19 different murders.  He is -- he's killed so many

9    people over the years, the witnesses are not going to be happy

04:46 10   to hear that their home addresses are being released to him.

11   It's never ordered in any other cases.  The local rules don't

12   require it; and, in fact, he's never even asked us for a

13   particular address of a particular witness.

14        So, having said that, we don't think it should be

15   ordered in this case.

16        THE COURT:  Well, counsel, as to the overall motion

17   itself, as my first question to Mr. Kelly suggested, the

18   Court's view is that I've previously ordered, both pursuant to

19   the local rule and pursuant to our prior conferences and status

04:47 20   conferences, the production of Brady and Giglio material and

21   the other materials required to be produced under Rule 16.

22        As in regards to Jencks, Mr. Carney, I remember

23   Mr. Wyshak's position.  I went back and looked at that, both as

24   a statutory requirement and a matter of case law, and unless

25   you point me to a basis for ordering it earlier than it

1  otherwise is required under statute -- I understood the

2  representation to be that Jencks material was being produced in

3  the same time frame as Giglio and Brady, as I previously

4  ordered.

5       I would also note for the record that regardless of

6  whether or not you filed the motion, the government continues

7  to be under continuing obligation to supplement their discovery

8  to you if in the course of their final trial prep they come up

9  with additional materials.

04:48 10      So, in those respects, I've said as much on the record

11  before, and I say it again.  I'm going to deny the motion as

12  moot because I think I've largely covered it, counsel.

13       I need to think about the question about the home

14  addresses of the witnesses, counsel.

15       MR. CARNEY:  I can be satisfied by a work address if

16  the person is employed.

17       THE COURT:  Do you have any objection to the work

18  address, Mr. Kelly?

19       (Discussion off the record.)

04:48 20      MR. KELLY:  Is he referring to agents?

21       MR. CARNEY:  No.  Well, if it's someone who is

22  currently employed by the FBI, a work address is fine.

23       THE COURT:  Let me make clear that's -- okay.

24       So I'll leave it to counsel to work that out, and I'll

25  understand that you've worked it out as to the work addresses.

1          The Court's interest obviously is in short-circuiting

2     the time and expense that is being spent on this matter.  So I

3     appreciate counsel conferring about that.

4          MR. CARNEY:  We just need to be able to be told where

5     to go to find someone, because there have been a couple of

6     witnesses that, frankly -- it took quite a bit of money for the

7     investigator to invest to finally track down where the person

8     actually is.

9          Your Honor knows that we're taking steps voluntarily

04:49 10    to reduce the investigator costs.

11          The single -- the single -- the single thing your

12    Honor could do to allow us to reduce that significantly even

13    further is just direct us to where we can find someone who is

14    on the government's witness list.

15          THE COURT:  As I said, I'll leave it to counsel in

16    regard to the work addresses.

17          Counsel, I do want to move, and I do want to move to

18    address a few other matters, given the lateness of the hour.

19          Counsel, the motion I saw that was filed by -- on

04:50 20   Mr. Bulger's behalf, Docket 962, which was an objection to the

21    conduct of jury selection.

22          Counsel, I was somewhat chagrinned at both the timing

23    of it and the substance of it, and I say that because, as I

24    think counsel on both sides will agree, the Court has been very

25    transparent, both in raising the jury process at the end of the

immunity hearing on April 26th, and also returning to this

issue on the record again on May 22nd.  And a lot of efforts

have been made, frankly, on the part of other staff members,

not necessarily myself, to ensure that this trial is a public

matter and that there's more than sufficient seating and

coverage and access to the proceedings.  And I think we're

planning to, as I described to you in court, and as counsel is

otherwise aware, that we're planning to use technology to

increase that access as opposed to inhibit it.

04:51           I have concerns about the candor and honesty of

jurors, which led us and led me to make a decision about the

follow-up -- the structure for the follow-up questions, but you

stood so do you want to add anything, counsel?

          MR. CARNEY:  No, your Honor.

          THE COURT:  Okay.

          Does the government have a position on this?

          MR. HAFER:  Your Honor, our position is that the

procedures that the Court has outlined certainly are

constitutional, certainly ensure the public's right of access.

04:52           Just, to -- certainly the government's view that the

close circuit feed, to the extent that's necessary, is

adequate.

          Now that there's an objection, even though there

hasn't been one up until this point, the Court wanted to

include a bench or two for the public, we certainly wouldn't

1    object to that, but we think that the procedures as outlined to

2    this point certainly assure the public's right of access.

3           Just on that point, your Honor, it wasn't clear to us

4    from Bulger's motion whether he was suggesting that there's a

5    public right to access to the process of the jurors actually

6    completing the questionnaire.  We don't think there is any

7    public right of access to that part of the process.  To the

8    extent there is and your Honor is on the record tomorrow

9    morning per the protocols you've already discussed with us,

04:53 10   it's our understanding that will be fed to the public in

11   another room once your Honor adjourned the proceeding and the

12   jurors are actually completing the questionnaire.  We don't

13   think that is a court proceeding; therefore, we don't think

14   there is any public right to access to that part of the

15   proceeding.

16          MR. CARNEY:  Your Honor, I agree in two ways with

17   Mr. Hafer.  First, I agree that the filling out of the

18   questionnaires is not part of the public process and need not

19   be done in the presence of public.

04:53 20          I also concur that if the Court were to allot two

21   benches for members of the public to be seated during the

22   proceedings, that would satisfy the defendant's interest in

23   having a public trial.

24          THE COURT:  And when you say "two benches," you're

25   talking about not in the jury assembly area, but when we

1    question jurors in the court?

2         MR. CARNEY:  Yes, your honor.  And I'm not referring

3    to an entire row, I'm just referring to the two benches

4    themselves placed anywhere in the courtroom.

5         THE COURT:  Counsel, I'll be honest about this, and

6    I'll hear your different views if you have it, do you have any

7    concerns about the candor of jurors?

8         MR. CARNEY:  No.  I think the solemnity with which the

9    Court handles proceedings is the best guarantee that we'll have

04:54 10   candid answers from jurors.  And we're -- if there's a risk to

11   be taken by the defendant, the defendant would choose to have

12   the public be represented in the courtroom even if it were to

13   make a potential juror slightly more circumspect.  We feel

14   the -- the benefit of having the public be present, because

15   it's so enshrined in the Constitution, is the more important

16   thing.

17        THE COURT:  And what's your position about the jury

18   assembly portion, which, again, all of this, as I've said on

19   the record before and as I know counsel is aware, all of this

04:55 20   is being broadcast live concurrently to public sessions in this

21   court as to the jury assembly portion.

22        MR. CARNEY:  I think if some seats can be designated

23   for the public at that aspect of the proceeding, that would be

24   appropriate as well.

25        I know there's been technological advances, but the

1     Constitution intended that people be able to see with their own

2     eyes, and I think that when it's the matter of the public

3     trial, it's not a matter of having everybody be able to be

4     present, but some component of the public be present so that

5     they can see with their own eyes.

6          There are some people who might even question whether

7     what they are seeing in an overflow courtroom on a TV monitor

8     is really what's actually happening.

9          If there are members of the public who will be able to

04:56 10   forever say, I was present in the courtroom and I saw it, that

11    will give the public the greatest confidence.

12         Thank you.

13         THE COURT:  Mr. Hafer, did you want to add something?

14         MR. HAFER:  I don't understand how someone would

15    question what they were seeing streamed live.

16         But with respect to the candor issue, your Honor, our

17    assumption is that to the extent you follow-up individual voir

18    dire, certainly at least with respect to some of the more

19    sensitive questions, that's usually conducted at sidebar, and I

04:57 20   assume that would be your Honor's practice.

21         THE COURT:  Well, I mean, what was contemplated, as I

22    described before, was if we were doing this setup as originally

23    contemplated, if there were questions that the jurors

24    themselves had identified as sensitive or I found compelling

25    reason not to project, the camera would go to the ceiling,

```
 1   sound would go off, and there would be no reason for Mr. Bulger
 2   or counsel to move.  It's somewhat more complicated if there
 3   are members of the public in the room, but I suppose we could
 4   think about that otherwise.
 5            MR. HAFER:  And again --
 6            MR. CARNEY:  I join Mr. Hafer's suggestion.
 7            THE COURT:  All right.
 8            Counsel, because we've been going for a while now, and
 9   Ms. Joyce, the hardest-working person in the courtroom right
10   now, our court reporter, has been going for three hours
11   straight, I think we're going to take a brief break.
12            There are a few other issues I do want to address with
13   you.  I'm aware that counsel for the government wants to be
14   heard on the witness list issue, and I do want to come back to
15   the issue we've just been talking about in a moment.
16            So why don't we take 15 minutes.
17            Thank you.
18            (Recess taken.)
19            THE COURT:  Counsel, to return to where we were, I
20   heard counsel on Docket 962, which was the defendant's motion
21   in regards to certain aspects of the jury selection.
22            I just wanted to make clear, Mr. Carney, when you were
23   proposing for the follow-up questions that just a few benches
24   in the back be filled, that was in full acknowledgment that at
25   that point all of the other potential jurors will be in
```

```
 1    courtroom 13.  So that otherwise it will be the few benches --
 2    if I adopt your position, a few benches open to the public, but
 3    otherwise it will just be counsel and Mr. Bulger, and the
 4    potential juror.
 5         MR. CARNEY:  That would satisfy our interest in a
 6    public courtroom, your Honor, yes.
 7         THE COURT:  And was that your understanding, too, on
 8    behalf of the government?
 9         MR. HAFER:  Yes, your Honor.
05:17 10         THE COURT:  Okay.  I just wanted to make sure that at
11    that point people understood that the other potential jurors
12    who we don't want to have hear the other potential juror's
13    answers would be in a different place, okay?
14         MR. CARNEY:  Yes, your Honor.
15         THE COURT:  Counsel, I think as to this, I went back
16    in response to your motion to look at Press-Enterprise and the
17    other cases, which I thought a great deal about before this
18    case and before proposing a certain jury process, and I should
19    also say that the jury process proposed has been conducted in
05:18 20    this courtroom in a number -- in this courthouse, rather, in a
21    number of other high profile cases.  I think it actually
22    comports in all respects with the defendant's public right to a
23    trial, and I do think that there were compelling and overriding
24    interests in limiting access for a portion of it for the
25    purposes of eliciting full and candid answers.
```

1           But given the parties' relative positions and in an
2    abundance of caution, I will acknowledge the defendant's
3    concerns, Mr. Carney.
4           And as to the jury assembly portion, there are some
5    seats outside of the glass, counsel, which will be made
6    available.
7           I understood that your position was that the
8    proceedings close or end after we leave, meaning after my
9    remarks, after we recess and adjourn the proceedings, so that
05:19 10  there is no interest or public right to watching the jurors
11   complete their questionnaires.  Is that a fair summary of your
12   position?
13          MR. CARNEY:  Yes, it is, your Honor.
14          THE COURT:  Okay.
15          And I also think that we will limit when the public
16   comes in and out of that portion, given the other concerns of
17   assembling there.  Does that make sense?
18          MR. CARNEY:  Yes, it does, your Honor.
19          May I ask a clarification?
05:20 20       THE COURT:  Yes.
21          MR. CARNEY:  Will the people, the public attendees, be
22   able to hear the instructions your Honor is giving?
23          THE COURT:  That is a fair question.  My memory is --
24   I don't know that it is always available, and I don't know who
25   from IT is off headphones to answer this, but my memory,

Mr. Doreau, not to put you on the spot, is that there is a

screen outside of the glassed-in area of the jury assembly

room?

MR. DOREAU:  There is a screen -- I know there's a

screen between the jury department and that room.  I don't know

if there's a screen -- there's the glass and there's the doors,

and the audio is only inside of the glassed-in area.  But as to

a physical screen that comes down the physical exterior, I'm

not sure.

05:21  MR. CARNEY:  I was anticipating the jurors would be

able to hear -- the public observers would be able to hear what

you say, your Honor, and just see the proceedings.  And then

when they start to fill out the questionnaire, I agree that

that's no longer a public trial aspect and they can literally

leave the room and the jurors are left to filling out the

questionnaire.

THE COURT:  Okay.

Mr. Hafer, did you have anything to add?

MR. HAFER:  No, not really, your Honor.

05:21  Just to reiterate that our position was that the

process outlined by your Honor up until this morning the

government felt perfectly acceptable, permissible,

constitutional --

THE COURT:  And I still do.  I'm proceeding in an

abundance of caution, given Mr. Bulger's position on this.

1          Counsel, I'm not quite sure on the sound issue in that

2    area, but I'll try to address it with staff after the

3    proceedings today.

4          In terms of the other portion of jury selection, which

5    were the follow-up questions, given the clarification that I

6    put to both the government and to Mr. Carney about just

7    reserving a few benches in the back, in light of the parties'

8    respective positions and the government's suggestion in this

9    regard, I'm prepared to do that.

05:22 10          Mr. Carney, my concern is, as I suggested before,

11   there was a procedure mapped out.  If there are instances in

12   which I think it's appropriate to hear potential jurors

13   privately, which is somewhat complicated by having even a few

14   members of the public present, but I think, counsel, having

15   mapped this out on Thursday with many members of the court

16   staff, our intention is to have the potential juror in one of

17   the front seats, moving the cables closer in sort of a T shape

18   so that counsel for both sides will have equal view, and I'll

19   be closer to the juror than you are, as will Ms. Joyce.  With

05:23 20   that configuration, I think if a private issue comes up, we can

21   step back here, and I'm pointing to the right of the bench, as

22   opposed to where we usually have sidebar, to address any

23   issues.

24          My concern is this adds a little bit more time to the

25   process, so to the extent that counsel would like to give me

1    the full benefit of their advocacy, I may require you to be a

2    little bit shorter in the questions that you propose to me for

3    the jurors.

4          Okay?

5          MR. CARNEY:  I'll try to be as short as Mr. Kelly.  I

6    mean just in terms of --

7          THE COURT:  Okay.  All right.

8          So, counsel, those will be my findings.

9          And I will say for the benefit of everyone, I think

05:24 10   the proposal, as Mr. Hafer mentioned, comported in all respects

11   with Press-Enterprise, but I will proceed in an abundance of

12   caution.

13         Counsel, I know there are two further motions.  One I

14   hope we can dispatch with very quickly, Docket 963.

15         Mr. Carney, I took this to be please give us advance

16   notice of your lineup.

17         MR. CARNEY:  That's it.

18         THE COURT:  Okay.

19         Any objection?

05:24 20   MR. CARNEY:  It's just too much to bring all --

21         THE COURT:  I'm assuming there's no objection to that.

22         MR. KELLY:  There's an objection to two full business

23   days, your Honor.  That's just not feasible in this type of

24   trial.

25         As a courtesy, we are more than happy to provide

1   notice, as we typically do, the day before.  There's no, for

2   us, two full business days before anticipating witnesses, given

3   how the case comes in.  We don't think there's authority to

4   order that.

5        Now, we're not trying to be prickly or ornery here,

6   we're just trying not to get ourselves trapped in, oh, there's

7   an order, you have to do it in two days and you didn't do it

8   and something changed.

9        THE COURT:  But, counsel, I understand and I

05:25 10   appreciate that your lineup may change in some respects or you

11   may have to push people around given their vacation schedules

12   or work obligations, but can't you give Mr. Carney some

13   tentative lineup a day or two ahead of time, and then if that

14   has to be altered, update him when you alter it?

15        MR. HAFER:  Yes, that's -- with the a day or two

16   caveat it's totally doable, your Honor.

17        Part of the problem, where practically the rubber

18   meets the road, is we can't anticipate the length of cross.

19        So, for example, Mr. Martorano is on the stand and

05:25 20   it's very difficult to know how long that cross -- we know it's

21   going to be long, we just don't know how long it's going to be.

22   But, yes, we can certainly --

23        THE COURT:  But you certainly expect to know who is

24   coming next.  So, counsel, I would ask you to give advance

25   notice to Mr. Carney.  I understand that there might be some

1    changes effected by the commitments of the witnesses and

2    whatever the length of examination is, but my interest here is

3    to move things along, and I think that notice will help do

4    that.

5         Also, I should say that it is my practice at the end

6    of the day to ask counsel where they are in examination and

7    who's coming up the next day, so that's my regular practice.

8         MR. HAFER:  Understood, your Honor.

9         THE COURT:  Okay.

05:26  10         Counsel, I think the motion that, Mr. Kelly, you

11    wanted to be heard on is the one I was going to address next,

12    which is 966, the government's objection to the defendant's

13    witness list.  I'm going to hold on the portion of that that

14    addressed Ms. Murphy and Mr. Cullen, but you wanted to be heard

15    otherwise.

16         MR. KELLY:  Yes, your Honor.

17         We're actually concerned with three things here.

18    First and foremost, we don't want the defense using their

19    purported witness list as a basis to exclude our agents from

05:27  20    assisting us on this case.  Specifically, probably the two

21    agents who have worked the longest and hardest on this case is

22    from state police and DEA, Dan Doherty and Steve Johnson.  We

23    are not calling them as witnesses.  So the defense turned

24    around and put them on their witness list, and we do not think

25    there's any chance that they will call them, but even if they

1   do call them, we don't think they should be sequestered.

2   They're going to be in the courtroom, assisting us,

3   coordinating witnesses, and they are essentially the case

4   agents -- the representative case agents from their agencies.

5          THE COURT:  Meaning, you otherwise were seeking to

6   exempt them from sequestration --

7          MR. KELLY:  Yes.

8          THE COURT:  -- as party representatives, counsel?

9          MR. KELLY:  Yes, as well as there will be -- there's

05:28 10   two other agencies working on the case, one is going to be at

11   the table working the computer at times, Sandy Lemanski, she's

12   on our list.  The fourth one would be James Marra, M-a-r-r-a,

13   from the AG's office.

14          So all four of them have different parts of the case

15   and have been assisting us for many years, so we don't think

16   it's fair or reasonable to sequester those four.

17          THE COURT:  Did I understand you're not intending to

18   call any of them or --

19          MR. KELLY:  We're calling Lemanski and Marra, but not

05:28 20   Johnson and Doherty.

21          THE COURT:  And was there other --

22          MR. KELLY:  I'm sorry?

23          THE COURT:  Did you want to be heard --

24          MR. KELLY:  Two other issues --

25          THE COURT:  Yes.

```
 1              MR. KELLY:  -- on this motion.

 2              The second issue, of course, is the family ID

 3      witnesses.

 4              I cited the victims, the Crime Victims Act, and we

 5      think it's pretty clear that if we're going to call a family ID

 6      witness, that doesn't mean he or she is excluded from observing

 7      the trial.  We don't think under the statute they should be

 8      excluded, and we urge the Court not to exclude them.

 9              THE COURT:  And I'll give you a chance in a second,

05:29 10     Mr. Carney.  Let me let Mr. Kelly finish.

11              MR. KELLY:  And the third and final point is, again,

12      because we don't think this witness list by the defense is a

13      real witness list, we want to make sure that the Court admonish

14      this defense that they can not raise this immunity theory or

15      immunity defense in their opening statement.

16              It's clear from their witness list that they think

17      they're going to present that defense, even though it's been

18      barred.  They have Margolis on it, they have Judge Stearns,

19      they have the FBI director.  They have people whose only

05:29 20     relevance is based upon this immunity theory.

21              So we think if you drill down on their witness list,

22      most of these people do not have relevant testimony, and it's

23      clear to us that they're trying to put that evidence before the

24      jury in some fashion, either in opening or at this trial, and

25      we would oppose that.
```

```
 1              THE COURT:  Okay.

 2              Mr. Carney.

 3              MR. CARNEY:  I understand that the government

 4    traditionally has some agent or agents who can assist them and

 5    I understand that they've identified two that they'd like to

 6    have in the courtroom and I also understand that the tradition

 7    in this court, among all the judges, is to allow that, so I

 8    don't press an objection on that.

 9              Regarding the other two persons on our witness list

05:30 10   that they mentioned --

11              THE COURT:  Mr. Doherty and Mr. Johnson?

12              MR. CARNEY:  Yes, your Honor.

13              THE COURT:  Okay.

14              MR. CARNEY:  We do, in fact, expect to call both of

15    those witnesses.  And it's particularly important to us that

16    they not sit here and listen to the testimony of witnesses,

17    particularly the witnesses that they would be connected to.

18              I know the Court's order of sequestration limits

19    people from not just being in the courtroom but being informed

05:31 20   of the testimony that is occurring in this courtroom, and with

21    those two witnesses, I would press the order of sequestration.

22              MR. KELLY:  And we would oppose that vehemently.

23              THE COURT:  Counsel, let me let Mr. Carney finish.

24              What do you say to the family members of the victims?

25              MR. CARNEY:  We would allow that to be an exception,
```

1     your Honor.  I believe the government's brief on the statute

2     passed by the Congress is a fair and correct reading of the

3     statute.

4          THE COURT:  And lastly, Mr. Carney, it did occur to

5     me, frankly, when I read over your witness list, there were a

6     number of witnesses where it was hard to see, and counsel has

7     already mentioned a few of them, including Judge Stearns,

8     Director Mueller, Mr. Margolis, where it was hard for me to see

9     how they would be witnesses for the defense other than on the

05:32 10   immunity issue, which I clearly -- although I know you strongly

11    disagree -- I clearly said you're precluded from raising at

12    this trial.

13         MR. CARNEY:  We fully except that your Honor has ruled

14    that we cannot present immunity as a defense to these criminal

15    charges.  We do not dispute that.

16         We are able to call witnesses for other reasons, and

17    that's why those witnesses are on the list.  To go further

18    would be to reveal trial strategy, but we do not intend to

19    argue that Mr. Bulger can be found not guilty because he

05:32 20   received -- or reached an immunity agreement with an authorized

21    representative.

22         THE COURT:  When you say you intend not to argue, you

23    also intend not to elicit testimony in that regard?

24         MR. CARNEY:  I can't make that representation with

25    certainty at this point.

1          THE COURT:  But, counsel, haven't I already ruled on

2     this issue?

3          MR. CARNEY:  You ruled that he cannot present an

4     immunity defense.  As I say, we are not going to interpose an

5     immunity defense.  But these witnesses, we believe, have other

6     relevant testimony.

7          THE COURT:  Well, counsel, I understand you may have

8     them on your witness list for other reasons, but to the extent

9     that you were putting them on the witness list to either argue

05:33 10   an immunity defense or put on evidence to put the immunity

11    defense before the jury, I do think in light of my ruling that

12    you're foreclosed from doing so.

13         MR. CARNEY:  I would agree in both respects.

14         MR. KELLY:  One final point on that --

15         THE COURT:  Were you done, Mr. Carney?

16         MR. CARNEY:  If you were done.

17         THE COURT:  I'm done.  I'm done.  Thank you.

18         MR. CARNEY:  Done, as well.

19         THE COURT:  Mr. Kelly.

05:34 20        MR. KELLY:  I assume, then, that that also goes with

21    respect to trying to refer to them in opening or elicit

22    testimony as to a public authority or entrapment by estoppel

23    defense, because that, too, was -- there was a deadline set and

24    the deadline wasn't met.  So if that's the other reason he's

25    trying to present these witnesses, that should also be barred.

1          MR. CARNEY:  I would agree with Mr. Kelly, and I'm not

2    presenting them on that basis.

3          THE COURT:  Okay.

4          Mr. Kelly, did you have anything else?

5          MR. KELLY:  Final point.  That is, I would urge the

6    Court to use its broad discretion in terms of terms of

7    permitting Agent Doherty and Lieutenant Johnson to stay in the

8    courtroom.  They've worked the longest and the hardest on this

9    case.  They are, in fact, probably the two true case agents on

05:34 10   this matter.  We are not calling them as witnesses.  I will be

11   very surprised if he calls them.  If he does, it's probably

12   going to be for improper purpose; that is, to present extrinsic

13   evidence to impeach a witness.

14         So we don't think they can even call those two.  Under

15   403 we would oppose them calling those two, and if they call

16   them, it's not going to help them.  But he shouldn't be allowed

17   to put those two witnesses on his list to bar them from the

18   courtroom during this trial that they've helped to get this

19   far.

05:35 20        THE COURT:  Counsel, I understand your arguments.

21   I'll take that matter under advisement.

22         And believe it or not, I think we're at least at the

23   end of discussion of the pending motions, counsel, unless I

24   have missed anything.

25         Okay.

1          Just a few other matters, and then we'll call it a

2    day.

3          In terms of jury selection, I'm not going to repeat

4    what I've said on the record before or to track back over what

5    we've discussed today about jury selection, other than to say

6    we'll start at 9:00 down in the jury assembly room.  I think as

7    either I or Ms. Hourihan had mentioned to counsel, counsel

8    should gather here at about ten to nine for the purposes of

9    gathering so that we can proceed into that proceeding.

05:36 10          It will be --

11          MR. CARNEY:  Forgive me, your Honor.  Do you want us

12    to meet here in this room?

13          THE COURT:  Yes.

14          MR. CARNEY:  I see.

15          THE COURT:  Yes.  And that's for counsel.  And we'll

16    meet up otherwise and join Mr. Bulger to go in together to that

17    proceeding.

18          Counsel, we'll otherwise proceed, as we've previously

19    discussed and as we've discussed further today, with jury

05:36 20    selection.

21          I won't make a decision about whether or not we should

22    bring in a fourth panel of jurors on Wednesday afternoon until

23    we've seen the first of the questionnaires to see how many

24    people we're losing for legitimate reasons.

25          The one thing I wanted to mention when we get to this

1    part, in terms of peremptory challenges, and counsel should

2    feel free to talk to Ms. Hourihan to explain this further after

3    we adjourn, but my practice is to have counsel exercise those

4    in alternating rounds, where the government goes first,

5    basically government one peremptory to the defense two, and

6    then the second round defense will go first, until we get

7    through the first -- the six and the ten for the government and

8    the defense.

9        When we get to the additional three peremptories that

05:37 10   you get for the number of alternates we're impaneling here,

11   we'll just go one to one, but we'll still rotate who goes first

12   in each round.

13       And I have peremptories exercised where all the jurors

14   who remain will be brought into the courtroom in number order,

15   and the numbers may be far apart, but they'll be in number

16   order.

17       And, counsel, as people are struck, I do not replace

18   them in their seat, so at the end of the process, the first 18

19   who remain in sequence will be our jury.  Okay?

05:38 20       So just a few notes about that.  I think we'll have an

21   opportunity for me to explain it further if you have any

22   questions.

23       In terms of examination at trial, two rounds of

24   examination, counsel, direct, cross, redirect, recross, and

25   then done.

1      In terms of objections, you know, object with a word

2   or two if you think it's necessary or citation to the rule, but

3   otherwise, no speaking objections.  If I need any more, I'll

4   ask for it.

5      Other than over the course of the next few days when

6   we're meeting at different times, counsel, once the trial

7   starts, we will meet, counsel and the defendant present, at

8   8:45 so I can take up any issues about sequence or anticipated

9   objections or anything that's come up overnight, although,

05:39 10  counsel, I don't expect things to come up overnight.  Just

11   allowing for that possibility.

12      Last few things, I've given counsel an opportunity to

13   look at my remarks to the jury pool.

14      Any comments?

15      MR. KELLY:  Yeah, I think minor -- I'm not going --

16   one typo on page 8, machine guns, rather than machines, but

17   that's it.

18      THE COURT:  Okay.

19      Was that for tomorrow?  Do you remember?  It's

05:40 20  probably for tomorrow.

21      MR. KELLY:  I believe it is.

22      THE COURT:  Okay.

23      Mr. Carney?

24      MR. CARNEY:  Yes, your Honor.

25      I wondered if your Honor could elaborate on the use of

1    an anonymous jury.  Is that what your Honor is anticipating?

2         THE COURT:  I think here, counsel, having looked at

3    the cases, and given all of the publicity and our interest in

4    having a jury that proceeds free from any outside influence,

5    that given the circumstances of this case, that the names of

6    the jurors would not be publicly distributed until after the

7    verdict.  I think there's precedent not only in this court, but

8    in the 1st Circuit generally to perhaps allow the jurors a few

9    days after the verdict and release the names, but otherwise not

05:41 10   do it beforehand.

11         I think, given the intense public attention to this

12   case, the length of the trial, the subject matter of the trial,

13   all of those things, I think they're compelling reasons to take

14   that approach here.

15         MR. CARNEY:  The parties will be aware of the names

16   during the selection process.

17         THE COURT:  Yes, yes, throughout the selection

18   process, and my intention would be that the juror's name, to

19   the extent we're doing follow-up questions, counsel, that that

05:41 20   would be reflected in the transcript, but that we'd otherwise

21   refer to them by number.

22         MR. CARNEY:  May I have one moment, please, your

23   Honor?

24         THE COURT:  Sure.

25         (Defendant conferred with counsel.)

1          MR. CARNEY:  Your Honor, thank you for giving me the

2     opportunity to discuss that with Mr. Bulger.

3          We concur completely with the process your Honor has

4     proposed.

5          THE COURT:  Mr. Hafer, did you want to be heard?

6          MR. HAFER:  I guess two just maybe things, your Honor.

7          I don't know if your Honor would maybe consider --

8     would be open to possibly seeing us after the introductory

9     remarks tomorrow.  I don't want to raise new issues this late

05:43 10    in the day, but we did note that there was a request for

11    internet access in the courtroom.  Among other things, we'd

12    like to seek your Honor's position with respect to Googling,

13    for example, potential jurors, whether there is going to be a

14    rule on that and how that rule is going to apply.

15         Similarly, we may seek some guidance from your Honor

16    with respect hardship challenges to facilitate our own review

17    of the questionnaires, and perhaps that's something your Honor

18    would consider seeing us on after the first group tomorrow.

19         THE COURT:  Mr. Carney, I imagine you don't have other

05:43 20    plans tomorrow.

21         MR. CARNEY:  I don't have other plans.

22         I certainly can meet with your Honor, but rather than

23    have it in the robing room or in the lobby, I think it would be

24    better, respectfully, do it in open court.

25         THE COURT:  I don't think he was suggesting otherwise.

         1           MR. HAFER:  In Mr. Carney's defense, I had mentioned
         2    the possibility -- there's one issue.
         3           I think as we discuss, your Honor, for example, what
         4    constitutes a hardship challenge, we may not want to put a hard
         5    and fast rule out on Tuesday morning at 10:00 a.m. for what
         6    constitutes a hardship challenge before 450 of the jurors come
         7    in and have a ready-made hardship challenge in hand.  That's
         8    the simple consideration that we're trying to address, but of
         9    course we think everything should be conducted publicly.
05:44   10           THE COURT:  Okay.
        11           Counsel, why don't I -- if counsel can bear with the
        12    Court and -- I don't want to set a specific time, counsel, but
        13    I think tomorrow morning we'll have time, if you can just
        14    generally plan to be available.  I don't expect that we're
        15    going to need much time for our appearance for the jury
        16    assembly.  My remarks I think are 10 or 12 minutes at most.
        17           Counsel, just opening statements, any sense of your --
        18    how much time?
        19           MR. KELLY:  I would think it's about an hour, give or
05:45   20    take a few minutes.
        21           MR. CARNEY:  I can live with that, your Honor.
        22           THE COURT:  Okay.  And I'm taking it you plan to open?
        23           MR. CARNEY:  Yes, your Honor.
        24           THE COURT:  Okay.
        25           And, counsel, anything else that I should take up at

1    this time that we haven't otherwise covered?

2              MR. KELLY:  No, your Honor.

3              MR. CARNEY:  No, your Honor.

4              THE COURT:  Okay.  Counsel, as I said, we'll --

5    counsel will gather here at 8:50 and then we'll proceed down.

6    And I'll also plan that you'll know what time we're going to

7    meet afterwards when we meet at 8:50.

8              (Court adjourned at 5:45 p.m.)

9                    - - - - - - - - - - - -

10                         CERTIFICATION

11             I certify that the foregoing is a correct transcript

12   of the record of proceedings in the above-entitled matter to

13   the best of my skill and ability.

14

15

16

17   /s/Debra M. Joyce              June 10, 2013
     Debra M. Joyce, RMR, CRR       Date
18   Official Court Reporter

19

20

21

22

23

24

25