1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3    _____

4    UNITED STATES OF AMERICA,

5                      Plaintiff,          Criminal Action
                                           No. 99-10371-DJC
6    V.
                                           June 19, 2013
7    JAMES J. BULGER,

8                      Defendant.
     _____

9

10

11            TRANSCRIPT OF TESTIMONY OF JOHN MARTORANO

12                     JURY TRIAL DAY 6

13           BEFORE THE HONORABLE DENISE J. CASPER

14              UNITED STATES DISTRICT COURT

15           JOHN J. MOAKLEY U.S. COURTHOUSE

16                    1 COURTHOUSE WAY

17                   BOSTON, MA  02210

18

19

20

21
                    DEBRA M. JOYCE, RMR, CRR
22                   JAMES P. GIBBONS, RMR
                     Official Court Reporters
23               John J. Moakley U.S. Courthouse
                 1 Courthouse Way, Room 5204
24                    Boston, MA  02210
                        617-737-4410
25

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:

 3   BRIAN T. KELLY, ESQ.
     FRED M. WYSHAK, JR., ESQ.
 4   ZACHARY R. HAFER, ESQ.
     United States Attorney's Office
 5   John Joseph Moakley Federal Courthouse
     1 Courthouse Way
 6   Suite 9200
     Boston, MA 02210
 7   617-748-3197

 8   FOR THE DEFENDANT:

 9   J.W. CARNEY, JR., ESQ.
     HENRY B. BRENNAN, ESQ.
10   Carney & Bassil
     20 Park Plaza
11   Suite 1405
     Boston, MA 02116
12   617-338-5566

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(The following proceedings were held in open

court before the Honorable Denise J. Casper, United States

District Judge, United States District Court, District of

Massachusetts, at the John J. Moakley United States Courthouse,

1 Courthouse Way, Boston, Massachusetts, on June 19, 2013.)

\*   \*   \*   \*   \*   \*   \*   \*

JOHN MARTORANO, having been previously duly sworn by

the Clerk, was further examined and testified as follows:

CONTINUED CROSS-EXAMINATION

BY MR. BRENNAN:

Q.   When we left off yesterday, Mr. Martorano, you were in the

Plymouth jail.  I want to ask you some question about the

Plymouth jail.

As you sat in the Plymouth jail, sir, you agree you

knew you were in trouble, right?

A.   I was arrested, sure, I was in jail.

Q.   Well, it was a little more than arrested.

We talked about the fact that you thought that Stevie

Flemmi might cooperate with the government?

A.   Good possibility.

Q.   And based on that good possibility, you knew that you were

going to be in bigger trouble than just sitting down in

Plymouth on the arrest charges for the RICO count?

A.   Also possible, yeah.

1    Q.    You knew that if Stephen Flemmi joined the government's

2    team and testified against you, he could talk about a lot of

3    the things that you did beyond RICO, correct?

4    A.    Yes, if he joined the team.

5    Q.    And we talked yesterday about a number of murders that you

6    committed, correct?

7    A.    Correct.

8    Q.    And many of those murders are what you were concerned

9    about?

09:06  10    A.    I would assume so, yeah.

11    Q.    Don't assume.  You were there.  Were you concerned about

12    them, sir?

13    A.    Yeah, sure.

14    Q.    One of the murders you were concerned about was when you

15    murdered Mr. Wheeler?

16    A.    Sure.

17    Q.    And that was in Oklahoma?

18    A.    Yeah, that was with their -- with Stevie and "Whitey's"

19    consent.

09:07  20    Q.    Now, when I just asked you if it was in Oklahoma and you

21    had to say Mr. Bulger, is there a reason why you were provoked

22    to put his name into it every time?

23    A.    No.  We were all involved in it.

24    Q.    Has anyone asked you to continually say his name when I

25    ask you a question?

1    A.    No.

2    Q.    So let me ask you the question again, Mr. Martorano.

3          One of the murders you committed was in Oklahoma,

4    correct?

5    A.    Correct.

6    Q.    And that murder in Oklahoma, as you sat there and thought

7    about Stevie maybe testifying against you, you knew what the

8    penalty was in Oklahoma was, didn't you?

9    A.    Yeah, eventually I did, yeah.

09:07 10    Q.    Tell the jury what the penalty in Oklahoma is for

11    murdering somebody.

12    A.    The death sentence.

13    Q.    As you sat down in Plymouth and you thought about the

14    exposure and the risk you had, you also thought about the man,

15    your friend, that you killed, Mr. Callahan in Florida, right?

16    A.    Correct.

17    Q.    Again, let the jury know what the penalty is in Florida.

18    A.    The death sentence.

19    Q.    So you sat there thinking about the two death sentences

20    that you would face if Stevie Flemmi joined the government's

21    team first, right?

22    A.    Correct.

23    Q.    So you also thought about at least some of the other 20

24    murders that you had committed that we talked about yesterday?

25    A.    Correct.

1    Q.    And you know in Massachusetts, although there is no death

2    penalty, the penalty is natural life on first-degree murder,

3    isn't it, sir?

4    A.    Correct.

5    Q.    So you're sitting there thinking about these many counts

6    over and over of natural life and two different counts of the

7    death penalty?

8    A.    I did think of it, not all day long.

9    Q.    How much of the day do you think you did?

09:08 10   A.    I don't know how much of the day.

11   Q.    Did you think about it in the morning or at night?

12   A.    I don't remember.

13   Q.    When you said, "not all day long," do you have an idea?

14   A.    Well, occasionally I would think of it.

15   Q.    And as you occasionally thought about natural life and you

16   occasionally thought about the death penalty, you also thought

17   about people other than yourself, didn't you?

18   A.    Sure.

19   Q.    You thought about the fact that if Stevie Flemmi joined

09:08 20   the government's team first, that your brother could be in big

21   trouble, right?

22   A.    Correct.

23   Q.    And you thought the woman that you lived with in Florida

24   who had been helping you be a fugitive could be in trouble,

25   right?

1  A.    Possibly, yeah.

2  Q.    Well, you know that if someone harbors a fugitive, the

3  federal government takes that very seriously, don't they?

4  A.    Correct.

5  Q.    Comes with sometimes a long sentence in jail?

6  A.    Correct.

7  Q.    You, also, while you were down there making money in

8  Florida, when you were living under your alias, you were

9  sending money routinely back to your family, right?

09:09 10  A.    Correct.

11  Q.    And you were sending it to your ex-wife and your children?

12  A.    Correct.

13  Q.    And that's a form of money laundering, isn't it, sir?

14  A.    Correct.

15  Q.    And so you knew, not only were you facing the death

16  penalty and you were facing natural life, but your brother was

17  in trouble and your family could be in trouble and that your

18  wife could be in trouble, right?

19  A.    Correct.

09:09 20  Q.    And not only did you think about your wife and your family

21  and you, you thought about your kids?

22  A.    Correct.

23  Q.    So there was a lot to think about.

24  A.    Sure.

25  Q.    You continued on through the case with your co-defendants

1    in front of a judge named Judge Wolf, correct?

2    A.    Correct.

3    Q.    And during Judge Wolf's courtroom, you would come into

4    court almost every day and have proceedings regarding the case.

5    A.    Correct.

6    Q.    And during those proceedings, Stephen Flemmi was trying to

7    argue, or at least his lawyers were, that his case should be

8    dismissed because the government let him commit crimes, right?

9    A.    I'm not sure what his defense was.

09:10 10   Q.    Well, you were signing paperwork and going to court every

11   day, weren't you?

12   A.    Yes.

13   Q.    And you were signing onto the motions that Stephen

14   Flemmi --

15   A.    I'm not a lawyer, so somewhat like that.

16   Q.    You had a great lawyer, didn't you?

17   A.    I had a great lawyer.

18   Q.    And he spent time explaining these different things to

19   you?

09:10 20   A.    Mostly, yeah.

21   Q.    And you sat in court every day and you watched what was

22   going on around you, didn't you Mr. Martorano?

23   A.    Correct.

24   Q.    And you knew that Steve Flemmi was saying that the

25   government allowed his conduct, including the murders, correct?

1    A.    This is after the disclosure, yes.

2    Q.    And after the disclosure, you went in and continued to

3    watch the proceedings?

4    A.    Correct.

5    Q.    And as you watched him talk about how the government -- or

6    the witnesses talk about the issues about Mr. Flemmi, the hope

7    was, on the part of you and your co-defendants, that the case

8    would somehow be dismissed, right?

9    A.    Sure.

09:11 10   Q.    And as you sat through court, you watched official after

11   official from the Department of Justice get on the stand and

12   testify, true?

13   A.    Correct.

14   Q.    And over and over again, questions were asked of these

15   officials about their roles in allowing Stephen Flemmi's

16   conduct in these murders to occur, correct?

17            MR. WYSHAK:  Objection.  Objection.  That's a

18   misrepresentation of what occurred.

19            MR. BRENNAN:  I disagree.

09:11 20          THE COURT:  Well, counsel, let me see you at sidebar.

21            (At sidebar on the record.)

22            THE COURT:  Mr. Wyshak, was your objection to the form

23   of the question?

24            MR. WYSHAK:  My objection is --

25            THE COURT:  And keep your voice down, please.

1          MR. WYSHAK:  -- Mr. Brennan's inserting murders into

2     his reference to what happened at the Wolf hearings.

3          Mr. Flemmi never, ever asserted that he was

4     authorized, allowed to commit any murders, nor that any

5     immunity claim he was making covered murders.

6          So I think it's misleading to suggest before this jury

7     that that was Mr. Flemmi's claim at the Wolf hearings.

8          As a matter of fact, he testified to the opposite,

9     that he was never told, allowed, or ever was claiming that he

09:15 10   had immunity from prosecution for murder.

11          THE COURT:  So, counsel, your objection is to the

12     characterization of authorization?

13          MR. WYSHAK:  Yes.

14          Mr. Brennan's including in his question to

15     Mr. Martorano that Mr. Flemmi was claiming that he had been

16     allowed to commit murder by the federal government.

17          MR. BRENNAN:  I think I understand Mr. Wyshak's

18     objection, that Mr. Flemmi did not claim that he was authorized

19     to commit murder.

09:15 20          Witnesses were called and the questions were asked

21     whether or not his conduct was authorized and whether or not

22     they knew that he was committing murders.  So it was an issue

23     for the witnesses, whether he had authorization and whether

24     they knew he was committing murders.

25          But I do agree that Mr. Flemmi did not assert that he

1   was allowed to commit murder.  So if I said the question in a

2   way that suggested Mr. Flemmi was saying that, then that's

3   inaccurate, and I misspoke.

4        But the issue was, did he have authorization, did the

5   federal agents know, and whether they aware he committed

6   murder?

7        In fact, there was vigorous cross-examination and

8   examination of many witnesses to their --

9        THE COURT:  Keep your voice down.

09:15 10        You can continue.

11        MR. BRENNAN:  -- as to their state of mind and their

12   knowledge of Mr. Flemmi's activities, including murder.

13        Many witnesses testified he was notoriously known as a

14   murderer.

15        Everybody disavowed specific instances or that they

16   were obligated to divulge it, but they discussed his history.

17        THE COURT:  And, counsel, you're proffering all this

18   because --

19        MR. BRENNAN:  -- it goes to Mr. Martorano's state of

09:15 20   mind.

21        THE COURT:  State of mind for cooperating and for

22   providing testimony?

23        MR. BRENNAN:  Yes.

24        THE COURT:  Okay.

25        MR. WYSHAK:  Just to close the loop on this, the

1     question about Mr. Flemmi's reputation for having been involved

2     in murders was of a historical nature, and not that he was

3     committing murders during the time that he was being operated

4     as an FBI informant by John Connolly from 1975 to 1990.

5              So to the extent that FBI agents knew of his

6     reputation, I think that's very different from them knowing he

7     was engaged in murder during the course of his activity as an

8     FBI informant.

9              MR. BRENNAN:  Well, that's funny, because they talked

09:15 10    quite a bit about the Halloran and Donahue murders, and they

11    asked different agents, like Montanari, about the knowledge of

12    Brunnick and that he wasn't an informant and that information

13    somehow was passed on which eventually led to Mr. Halloran's

14    death, according to the defendant.

15             So there was a number of events discussed in the '80s

16    regarding the Callahan investigation, Donahue investigation.

17    So to say that this was just historical is not the information

18    I've read.

19             THE COURT:  Counsel, just know I'm listening to the

09:15 20    questions with an eye toward it being proffered for the effect

21    on Mr. Martorano's state of mind.

22             MR. BRENNAN:  Of course.

23             THE COURT:  Thank you.

24             (End of discussion at sidebar.)

25             THE COURT:  Mr. Brennan.

1        MR. BRENNAN:   Thank you, your Honor.

2   BY MR. BRENNAN:

3   Q.   Sir, as you sat through these hearings with Judge Wolf,

4   there became a name to characterize the hearings known as the

5   "Salemme Hearings," correct?

6   A.   Yeah, I guess so, yeah.

7   Q.   And during these hearings, you heard from a number of

8   agents from the FBI, didn't you?

9   A.   Some, yeah.

09:16 10   Q.   And some from Washington?

11   A.   Yeah, I don't remember all of them.

12   Q.   You knew there were dozens and dozens of Department of

13   Justice officials and -- excuse me -- officials and employees

14   that testified, didn't you?

15   A.   Yeah, but a lot was after I left.

16   Q.   I see.

17        And as you watched and learned, you learned that the

18   court and that the lawyers were asking about what these

19   officials and what these employees knew about Stephen Flemmi's

09:16 20   conduct and the crimes that were allegedly being committed,

21   right?

22   A.   I don't follow you.

23   Q.   Well, as you listened to the witnesses' testimony, they

24   were being questioned about the corruptness within the FBI,

25   weren't they?

1  A.   Which witness?

2  Q.   Well, I'm asking you, any of them, sir.

3  A.   I didn't -- I don't remember it.

4  Q.   Do you remember Mr. Morris?

5  A.   I don't know if I was there when Mr. Morris was in.

6  Q.   Do you remember Mr. Greenleaf?

7  A.   I know the name, but I don't remember if I saw him there.

8       I remember Rico came in.

9  Q.   And the question was whether or not he was providing

09:17 10  special protections to people, wasn't it?

11  A.   Possibly.  I don't remember the questions.

12  Q.   You don't remember the specific questions --

13  A.   Not all of them, no.

14  Q.   I'm not asking for you to remember all the questions.

15       Don't you remember the subject matter of what they

16  were talking about, sir?

17  A.   Not really.

18  Q.   So you sat through this hearing for days and days and

19  months and months and you didn't pay attention?

09:17 20  A.   I paid a little attention, yeah.

21  Q.   What were you doing during the day when these witnesses

22  were testifying?

23  A.   I was there listening, trying to figure out what was going

24  on.  I'm not a lawyer.

25  Q.   Your life was at stake, wasn't it, sir?

1    A.    My life was at stake?

2    Q.    Right.

3    A.    Yeah, I was facing time.

4    Q.    And you were paying attention to your lawyer, weren't you?

5    A.    Correct.

6    Q.    And you were paying attention to what was going on in the

7    courtroom, weren't you?

8    A.    Correct.

9    Q.    And you're telling us you have no appreciation of what the

09:18 10    subject matter was?

11    A.    No, I tried to keep up with it.

12    Q.    What do you think it was about, sir?

13    A.    What do you mean, what do I think it was about?

14    Q.    What do you think it was about?

15    A.    It was about Stevie Flemmi corruption.

16    Q.    Corruption with who?

17    A.    The FBI, as far as I know.

18    Q.    And you realized, watching those hearings, that the

19    government was upset, or you believed the government was upset,

09:18 20    at John Connolly, didn't you?

21    A.    The government -- yeah.

22    Q.    John Connolly was trying to protect Stephen Flemmi, wasn't

23    he?

24    A.    Correct.

25    Q.    And John Connolly was blaming the Department of Justice,

```
 1   wasn't he?

 2             MR. WYSHAK:  Objection.

 3             There's no foundation for this, your Honor.

 4             THE COURT:  Sustained as to that question, counsel.

 5   BY MR. BRENNAN:

 6   Q.   You realized that, in your mind, John Connolly was a

 7   target of the government, didn't you?

 8   A.   I don't know if I realized that at the time.

 9   Q.   You realized that later?

10   A.   Maybe later.

11   Q.   When you say "maybe," you did realize that, didn't you?

12   A.   Later I did, but I don't know at what point.

13   Q.   Well, I don't want you to guess.

14             You're certain about that, aren't you?

15   A.   Yeah, I'm certain.

16   Q.   And so when you went back to your cell and you paid a

17   little bit of attention or thought through the situation you

18   were in, you thought that it might be a good chance for you to

19   join the government's team before Stephen Flemmi did.

20   A.   Well, at some point I decided to do that, yeah.

21   Q.   And, sir, you mentioned that before you got arrested, you

22   were friends with Joe Barboza.

23   A.   Correct.

24   Q.   And you were familiar with how Joe Barboza got his deal,

25   weren't you?
```

|    |    |                                                                    |
|----|----|--------------------------------------------------------------------|
| 1  | A. | He got killed for being an informant.                              |
| 2  | Q. | Before he got killed.                                              |
| 3  | A. | I'm not that familiar.  I know he went to the government           |
| 4  |    | and gave a false story about people.                              |
| 5  | Q. | And you knew that, despite the fact he gave a false story,         |
| 6  |    | the government protected him, right?                              |
| 7  | A. | Not too good.                                                     |
| 8  | Q. | Well, they got him out of jail, didn't they?                      |
| 9  | A. | Yeah, they got him out of jail.                                   |
| 10 | Q. | Then he went to California?                                        |
| 11 | A. | Correct.                                                          |
| 12 | Q. | Then he killed another person?                                    |
| 13 | A. | Correct.                                                          |
| 14 | Q. | And the government was so protective, you knew that they          |
| 15 |    | went out and sent a prosecutor out to testify on his behalf,      |
| 16 |    | right?                                                            |
| 17 | A. | I don't know that.                                               |
| 18 | Q. | You didn't know that?                                            |
| 19 | A. | No, I didn't know.                                               |
| 20 | Q. | And that agents went out to protect him and try to testify        |
| 21 |    | on his behalf.                                                    |
| 22 | A. | It's possible.  I don't know.                                    |
| 23 | Q. | Well, you knew that he got murdered at some point, right?         |
| 24 | A. | I knew he got murdered at some point, yeah.                       |
| 25 | Q. | Because you realize that he got out of jail for that             |

09:19 (line 10)
09:20 (line 20)

1   second murder in California?

2   A.   Yeah, must have got out of jail, he got murdered.

3   Q.   You knew a lot about Barboza because Barboza came to you

4   after he had killed Mr. Deegan, didn't he?

5   A.   He called me, yeah.

6   Q.   And he wanted to talk to you and tell you, Don't worry,

7   I'm not going to hurt you.

8   A.   That's when he started to cooperate, yes.

9   Q.   And he told you, Just stay out of it, but we won't get

09:20 10   you, you're going to be okay.

11   A.   And I told him he was doing the wrong thing.

12   Q.   And after you gave him this moral education about doing

13   the wrong thing, you went down and saw Mr. Patriarca, didn't

14   you?

15   A.   No.

16   Q.   Did you go down and see Mr. Patriarca?

17   A.   No, I saw Angiulo.

18   Q.   You didn't go down to Rhode Island, sir?

19   A.   Not at that point, no.

09:21 20   Q.   At some point did you go down to Rhode Island?

21   A.   I explained that yesterday.

22   Q.   Well, I'm asking you questions about it today, sir.

23   A.   But not for the same situation.

24   Q.   Didn't you go down there he and told you that he didn't

25   want retaliation?

A.    For Tommy DePrisco, right.

Q.    And DePrisco was part of Barboza's gang, wasn't he?

A.    Right.

Q.    And these were some of the guys you were hanging around with, including one of the murders you did, Mr. Jackson?

A.    Correct.

Q.    So you knew that Mr. Barboza, who cooperated with the government, who gave false testimony, was still protected by the government; you knew that, right?

A.    Seemed that way, yeah.

Q.    And, sir, as you sat there thinking about what you could do to get on the government's team, you realized you had to give them something of value, didn't you?

A.    I wanted to talk to them and let them hear my stories, because I figured if my story came out, it would be a true story, not somebody else's story.

Q.    Well, if you went down and just told them that you murdered a bunch of people and you're the one who pulled the trigger and you did it, you probably weren't going to get a good deal, were you?

          MR. WYSHAK:  Objection.

          THE COURT:  Sustained, sustained.

BY MR. BRENNAN:

Q.    Sir, if you just told them about your murders, you probably weren't going to get a deal, that wasn't going to

1    help, was it?

2            MR. WYSHAK:  Objection.

3    A.   I don't know.

4            THE COURT:  Sustained.

5    BY MR. BRENNAN:

6    Q.   Did you believe that if you went and talked about your

7    murders that you were going to get a good deal?

8    A.   I didn't know what would develop at the time.

9    Q.   So, what you did is, you wanted to strike a deal with the

09:22 10   government, right?

11   A.   I originally -- my attorney made a proffer letter.

12   Q.   And you wanted to get a deal with the government, didn't

13   you?

14   A.   And the proffer was to sit down with them and explain my

15   life story.

16   Q.   Well, you weren't writing a book at that time, were you?

17   A.   No, they just wanted to hear all the details in it.

18   Q.   You didn't go down there just because you wanted to emote

19   with the State Police, did you?

09:22 20   A.   No.

21   Q.   You went there because you wanted to get something.

22   A.   I was trying to work out a deal with the government, yes.

23   Q.   Thank you.

24            And so the deal you wanted to work out is that you

25   would give them something, information, right?

1    A.   Correct.

2    Q.   And in exchange for the information that you gave the

3    federal government, they'd give you something?

4    A.   Correct.

5    Q.   And, sir, you said in the past you've been a gambler,

6    right?

7    A.   Correct.

8    Q.   You know how to read the other side, don't you?

9    A.   Well, I don't know; I never did this before.

09:23 10   Q.   Don't be modest.  You're pretty good at reading people,

11   aren't you, Mr. Martorano?

12   A.   I don't know.  Maybe I am, maybe I'm not, I don't know.

13   Q.   When you sat down and told the government what you wanted,

14   you didn't want the death penalty?

15   A.   I didn't dictate to the government at all.

16   Q.   Oh, you didn't.

17   A.   No, I didn't.

18   Q.   Did you tell them what you'd be willing to do?

19   A.   I told them that I would tell them what I know about

09:23 20   myself and "Whitey" and Stevie.

21   Q.   And you said you wouldn't talk about anything that would

22   hurt your brother, correct?

23   A.   I said I wouldn't -- I'd talk about anything -- about

24   anybody else until we had an agreement.

25   Q.   And if you had an agreement, you weren't going to talk

1    about your brother?

2    A.    Then I mentioned everything about anybody.

3    Q.    Okay.

4          Let's take a step back.

5          Were you willing to talk to the federal government and

6    offer evidence to prosecute your brother?

7    A.    Yes, I told them he was with me on a certain murder.

8    Q.    And you were willing to assist them in prosecuting your

9    brother?

09:24 10   A.    If I was subpoenaed, I'd have to go.

11   Q.    Didn't you say in your sworn testimony in Florida in 2008

12   that if you were going to give the proffer to the government,

13   you would only do it, quote, Under the parameters that I would

14   only testify against the two informants.  If they want to hear

15   my proffer, those are my terms?

16   A.    Correct.

17   Q.    So you didn't say that you would testify against your

18   brother --

19   A.    I would tell the whole story and anything he was involved

09:24 20   with, I would leave his name out unless I made an agreement,

21   then I would fill in the name.

22   Q.    And if you made the agreement, the reason why you would

23   fill in the name is because you knew you wouldn't be called to

24   testify against that person.

25   A.    I didn't know that.

1          My agreement, which Marty Weinberg and Frank DiMento

2    made, it took over a year to make it, they made the agreement,

3    and in it were all the terms.

4    Q.   Well, let's talk about some of those terms.

5          MR. BRENNAN:   Could we put on the plea agreement,

6    please?   It's been previously introduced as an exhibit.

7    Q.   When they first came to you with the plea agreement, sir,

8    Mr. Martorano, you said, "no," didn't you?

9    A.   Correct.

09:25 10    Q.   And the reason why you said, "no," is because at that

11    point, the federal government wanted you to testify against

12    everybody about what you knew.

13    A.   Correct.

14    Q.   And you were not willing to testify against your brother,

15    right?

16    A.   I was not willing to testify against everybody and

17    anybody.   That's what they said.

18    Q.   Well, everybody and anybody, that includes your brother,

19    doesn't it?

09:26 20    A.   Included him.

21    Q.   And it included Howie Winter?

22    A.   Included anybody.

23    Q.   Well, did it include Howie Winter?

24    A.   Yes.

25    Q.   Did it include Pat Nee?

```
 1   A.   Correct.

 2   Q.   Did it include your family, who had been laundering money

 3   for years for you?

 4   A.   I don't know if they were laundering money for years, but

 5   it included a lot of people, I guess.

 6   Q.   Did it include your wife?

 7   A.   I don't know.  There was nothing specifically said it

 8   didn't include these people.

 9   Q.   So when the federal government came to you with the first

09:26 10   offer and said, you have got to come in and be honest and talk

11   about everybody and we're going to use you to prosecute

12   everybody you know about who was committing crimes, you said,

13   Send me back to jail --

14   A.   Correct.

15   Q.   -- I'm not going to do it.

16   A.   Correct.

17   Q.   But then the government came back to you, didn't they?

18   A.   They came back after deliberating with my attorneys.

19   Q.   And you got a feeling that when they came back, they were

09:26 20   a little more desperate?

21        MR. WYSHAK:  Objection.

22   BY MR. BRENNAN:

23   Q.   Wasn't that your feeling?

24   A.   I don't know.

25        THE COURT:  Sustained, sustained.
```

           1                MR. BRENNAN:  Let's put on Exhibit B, please.

           2     BY MR. BRENNAN:

           3     Q.   At some point they came to you with a new agreement that

           4     had a thing called a "target list," right, sir?

           5     A.   Correct.

           6     Q.   And the target list was a list of people that you were

           7     obligated to cooperate against.

           8     A.   Correct.

           9     Q.   And this is what the federal government was offering you.

09:27   10     A.   Correct.

          11     Q.   Right?

          12                Now, when you saw that list, you didn't even know most

          13     of the people on the list, did you?

          14     A.   I know most of them.

          15     Q.   Well, you said they came back to you with a different

          16     agreement that went to Washington and was approved by Janet

          17     Reno.  Is this the one you were talking about?

          18     A.   Correct.

          19     Q.   All right.

09:27   20                And then they asked, Would you accept this?

          21     A.   And I read that, and I accepted the terms of this list

          22     through my attorneys, again.

          23     Q.   And you said, you've testified before, that there were

          24     several people on that list you didn't even know.

          25     A.   Well, there's a few of them that I don't know.

1    Q.   Did you say "several" before?

2    A.   Well, there's not several there.

3    Q.   Okay.

4         Mr. Hogan, you said you never met him.

5    A.   I never did.

6    Q.   Mr. Linskey, you said you never met him?

7    A.   Never did.

8    Q.   You said Curran was a driver, but that's all you knew

9    about him.

09:28 10   A.   He used to drive to Somerville all the time, yeah.

11   Q.   Weeks, you saw him in the jail and talked to him about

12   some money, but other than that you knew nothing about him.

13   A.   No.

14   Q.   O'Neil, you couldn't offer any information?

15   A.   I think I met him once, he was a bookmaker.  I didn't know

16   anything about him.

17        MR. BRENNAN:  Your Honor, can I put a chalk up of

18   Exhibit B, please?

19        THE COURT:  You may.

09:28 20        You may approach.

21        (Pause.)

22        MR. BRENNAN:  May I approach, your Honor?

23        THE COURT:  You may.

24   BY MR. BRENNAN:

25   Q.   Mr. Martorano, can you see this?

1    A.    Yeah.

2            MR. BRENNAN:   Your Honor, can you see this?

3            THE COURT:   It's also on the screen.   I think it is

4    for the jury as well.

5    BY MR. BRENNAN:

6    Q.    So when the government came back and said you weren't

7    going to cooperate on your friends and family and people you

8    knew, they came back with this list that you had to testify

9    against?

09:29 10    A.    And if ever I'm called to any warrants they had, any

11    indictments they made on these people, they could call me into

12    court to tell them what I know even if I never met them.

13    Q.    So you didn't know anything about George Hogan, did you?

14    A.    Just hearsay.   They might want to hear my hearsay.

15    Q.    So did you have any testimony of anything you observed

16    about him that you could offer?

17    A.    I didn't know anything about him that much, no.

18    Q.    Nothing, right?

19    A.    Well, I knew he was a drug dealer.

09:29 20    Q.    Did you tell them he was a drug dealer?

21    A.    I said I heard he was a drug dealer.

22    Q.    Did you ever see him deal drugs?

23    A.    I never saw him deal drugs.

24    Q.    So were you an eyewitness to him being a drug dealer?

25    A.    No.

1    Q.    How about Mr. Linskey?

2    A.    I just knew he hit the lottery with them.

3    Q.    So you had no evidence you could say you saw him commit a

4    crime.

5    A.    No.

6    Q.    Curran, you knew he was in a car, you knew nothing else

7    about him, did you?

8    A.    Just that he was friends with "Whitey."

9    Q.    Kevin O'Neil you said you knew nothing about.

09:30 10    A.    I think he was a bookmaker for "Whitey."

11    Q.    You think?

12    A.    He was a bookmaker for "Whitey."

13    Q.    And, Mr. Weeks, other than giving you money --

14    A.    He was like his protege, he was his man, right-hand man.

15    All over the years I heard his name.

16    Q.    But you had never met him before you were in jail, did

17    you?

18    A.    No, I just know of him.

19    Q.    So the list was Mr. Bulger that they wanted --

09:30 20    A.    No, the list is seven names.  If they made an indictment

21    with them, they could call me at any time, and I have to go.

22    That's the agreement.

23    Q.    Knowing what you knew as far as -- excuse me.

24    A.    It doesn't matter.  They could call me, and I have to go.

25    Q.    I understand that, but the only people you could offer

```
 1   evidence that you knew anything about --
 2            MR. WYSHAK:  Objection.
 3   Q.   -- was Mr. Bulger and Mr. Flemmi?
 4            MR. WYSHAK:  I think this is --
 5            THE COURT:  Counsel, I understand the nature of the
 6   objection.
 7            Sustained as to that question.
 8   BY MR. BRENNAN:
 9   Q.   Did you ever go in and testify against George Hogan?
10   A.   They never subpoenaed me.
11   Q.   Did you ever go in and testify against him?
12   A.   They never subpoenaed me.  How would I testify if they
13   didn't subpoena me?
14   Q.   Is your answer no?
15   A.   No.
16   Q.   Did you ever go in and testify against Mr. Linskey?
17   A.   No.
18   Q.   Did you ever go in and testify against Mr. Curran?
19   A.   No.
20   Q.   Did you ever testify against Mr. O'Neil?
21   A.   No.
22   Q.   How about Mr. Weeks?
23   A.   No.
24   Q.   So when the federal government came to you and narrowed
25   their list to seven names, it was a pretty easy decision for
```

```
 1    you, wasn't it?

 2    A.   It was -- it was -- my lawyers' advice that I take the

 3    deal at that point there, before they started talking about

 4    years.

 5    Q.   When you were previously asked, Why did you agree to

 6    testify against somebody you didn't know?  Didn't you say,

 7    Well, that's the best way to agree, I didn't write the list?

 8    A.   I could have.

 9    Q.   Do you forget?

10    A.   No, I don't forget, I probably did say that.

11    Q.   So you knew when they showed you this list that when the

12    government wrote it, the best way to go after these people is

13    go after people you don't even know?

14    A.   There's another part of the agreement that says I have to

15    go answer any subpoena by any court that they give me.

16    Q.   We're going to get to that.  We're going to get to that.

17         So when you made this agreement with the government

18    that you were going to come in and testify whatever information

19    you had, the focus was on Mr. Bulger and Mr. Flemmi, wasn't it?

20    A.   Correct.

21    Q.   And Mr. Connolly?

22    A.   Correct.  And the amount of time involved.

23    Q.   So when you started to make this deal, you started to sit

24    down with some of the State Police, didn't you?

25    A.   What, during the proffer period, yes.
```

1    Q.    You sat down with Mr. Foley?

2    A.    Correct.

3    Q.    You sat down with Mr. Johnson?

4    A.    Correct.

5    Q.    And you sat down with Mr. Doherty, who was from the DEA?

6    A.    Correct.

7    Q.    And as you spoke to them and you gave them information and

8    you told them stories about your history, did they take notes?

9    A.    I believe so.

09:33 10   Q.    They didn't audio record any of your conversations with

11    them.

12    A.    Not that I know of.

13    Q.    And as this period continued where you were trying to work

14    out a deal, your cooperation with the federal government, the

15    State Police, they were very nice to you, weren't they?

16    A.    They were all right, yeah.

17    Q.    They did some small favors for you?

18    A.    I guess so.

19    Q.    Well, don't guess.  Why don't you tell the jury some of

09:33 20   those favors they did for you.

21    A.    One time they took me to the dentist, I had a toothache.

22    Q.    What other small favors did they do for you?

23    A.    I don't know.  The DEA gave me some money when I was in

24    jail, later.

25    Q.    Before you went to jail --

1    A.    You'd have to ask me, and I'll try to remember.

2    Q.    Do your best to remember, without asking.

3    A.    I can't remember.

4    Q.    And so you decided, after you saw that list, that you were

5    going to cooperate with the government and be on their team,

6    right?

7    A.    As far as the list went.  My attorneys kept working on

8    other things, too.

9    Q.    I understand.

09:34 10         They were trying to get other information to help the

11   government.

12   A.    Pardon me?

13   Q.    Well, they were -- your attorneys, on your behalf, were

14   trying to get other information to help the government, weren't

15   they?

16   A.    Other information to help the government.  I don't follow

17   you.

18   Q.    Well, didn't they go and procure Pat Nee to help out?

19   A.    I don't know.  You have to ask them.

09:34 20   Q.    I'm asking you.  Did you know that?

21   A.    No.

22   Q.    And so, when you spoke to the government, you told them

23   stories about a number of the murders you had committed, right?

24   A.    Correct.

25   Q.    And you knew they were particularly interested in

1    Mr. Wheeler, didn't you?

2    A.    They were interested in all of them.

3    Q.    When they asked you about Mr. Wheeler, sir, did you tell

4    them the truth?

5    A.    I told them the truth about everything.

6    Q.    And you told us yesterday, when you spoke about

7    Mr. Wheeler, you told us that the reason why you killed

8    Mr. Wheeler is because you were trying to protect a friend,

9    Mr. Callahan?

09:35 10    A.    Correct.

11    Q.    And when you were speaking to the government back in 2000

12    or before, did you tell the federal government that you had

13    stated that Mr. Flemmi had approved the murder of Mr. Wheeler

14    because it would help out our friend, former agent Mr. Rico?

15    A.    Could I read that?  I got to refresh my memory.

16         MR. BRENNAN:  May I approach, your Honor?

17         THE COURT:  You may.

18    BY MR. BRENNAN:

19    Q.    Please look at paragraph 1, Mr. Martorano.

09:36 20    A.    Paragraph what?

21    Q.    1.

22         It's the first paragraph we're interested in, sir.

23         (Pause.)

24    A.    Yeah, I think I remember that, yeah.

25    Q.    So do you remember a little over a decade ago saying that

1    the reason that you had killed Mr. Wheeler was to help out

2    Mr. Rico?

3            MR. WYSHAK:  Objection.  That's not a fair

4    characterization.

5            THE COURT:  Counsel, do you want to rephrase?

6            MR. BRENNAN:  Sure.

7    BY MR. BRENNAN:

8    Q.   Did you state in conversations that prior to the murder of

9    Roger Wheeler, Mr. Flemmi approved the murder of Wheeler

09:37 10   because it would help our friend, former FBI Special Agent Paul

11   Rico?

12   A.   Vaguely I remember that.  I mean, Stevie wanted to help --

13   probably help Rico, I wanted to help John, and Stevie and

14   "Whitey" agreed to the -- to have it done out there because

15   there was still a deal going for 10,000 a week.

16   Q.   Did you say that it was because of Mr. Rico, sir?

17   A.   I'm not -- I don't remember -- it says it there, but I

18   don't remember it.

19           MR. BRENNAN:  Your Honor, I'd like to introduce this

09:38 20   as an exhibit.

21           THE COURT:  Counsel, is there an objection?

22           MR. WYSHAK:  Could I see it?

23           MR. BRENNAN:  Of course.

24           (Pause.)

25           MR. WYSHAK:  May we approach, your Honor?

```
 1              THE COURT:  You may.

 2              (At sidebar on the record.)

 3              THE COURT:  Counsel, can you just make a proffer of

 4     what this is, for the record?

 5              MR. BRENNAN:  Sure.

 6              This is a statement by the government --

 7              THE COURT:  Keep your voice down, please.

 8              MR. BRENNAN:  This is a statement by the government to

 9     Mr. Flemmi's attorney at the time, Mr. Fishman, and it is a

09:43 10    statement attributed to Mr. Martorano saying that the reason

11    why Mr. Wheeler was killed, according to the conversation, was

12    to help Mr. Rico.

13              That is extraordinarily different than what

14    Mr. Martorano had said under oath yesterday, that the reason he

15    had killed him was because he was trying to help out a friend,

16    Mr. Callahan.

17              THE COURT:  And can I just see it for a second?

18              MR. WYSHAK:  Sure.

19              MR. BRENNAN:  Paragraph 1, your Honor -- I'm sorry,

09:43 20    paragraph 2.

21              (Pause.)

22              THE COURT:  Okay.  And this was discovery in the

23    course of the Flemmi proceedings, or supplemented discovery?

24              MR. BRENNAN:  Yes.

25              THE COURT:  Okay.
```

1           MR. WYSHAK:  So, our position is, your Honor -- I have

2      no objection to the substance of -- if I may have it back --

3           THE COURT:  Yes.

4           MR. WYSHAK:  -- substance of the letter being marked

5      as an exhibit, but this is a piece of information which

6      Mr. Brennan is taking out of context.  Because Mr. Martorano

7      engaged in an extensive proffer, he testified before a federal

8      grand jury, and there were numerous reports written after the

9      proffer period.

09:43 10          So, while Mr. Flemmi, yes, approved from his

11     perspective the reason they went along with murdering Wheeler

12     is because they thought it would help their friend Paul Rico,

13     it's not the only reason Wheeler was murdered.

14          As the witness has testified, his motivation for

15     murdering Wheeler was to help his friend John Callahan.

16          THE COURT:  Counsel, I think that has come out, and

17     certainly there's an opportunity for redirect, but do I hear

18     you saying you don't object to the admission --

19          MR. WYSHAK:  Okay.  So I do object.  I would ask that

09:43 20     the legal discussion here be redacted --

21          THE COURT:  And, counsel, can we just -- I don't know

22     how you -- what form you have this in, but can you do it so --

23     can we just read the paragraph, perhaps just saying who the

24     letter is to, read the paragraph, and then have it admitted

25     later just with that redacted section?

1          MR. BRENNAN:  Sure, I could just read that straight to

2     the jury.

3          THE COURT:  Yes.

4          MR. BRENNAN:  Okay.

5          THE COURT:  And if we're marking it as an exhibit,

6     somebody will have to tell me what the next number is.

7          MR. BRENNAN:  Very well.

8          THE COURT:  I'll look at Mr. Hafer.

9          MR. BRENNAN:  I'll just read paragraph 2.

09:43 10          MR. WYSHAK:  It's really paragraph 1.

11          MR. BRENNAN:  It is paragraph 1, second paragraph but

12     number 1.

13          MR. WYSHAK:  Well, if you're going to publish it, I

14     would publish all three.

15          MR. BRENNAN:  Okay.

16          THE COURT:  Well, if it's easy enough to publish just

17     the first page, counsel, and then it can be marked later.

18          MR. BRENNAN:  And then I wouldn't need to read it,

19     then.

09:43 20          THE COURT:  That's fine.

21          (Discussion off the record.)

22          MR. CARNEY:  I think --

23          (Discussion off the record.)

24          MR. BRENNAN:  Very well, then I'll read the first

25     three paragraphs, and then I'll submit it, but only the first

 1    page.

 2            MR. HAFER:  Do you guys want to start in a number in

 3    the 1200s?

 4            THE COURT:  1200.

 5            MR. BRENNAN:  Thank you, Zach.

 6            (End of discussion at sidebar.)

 7            THE COURT:  Counsel, pursuant to the discussion at

 8    sidebar, that can be marked and admitted as Exhibit 1200.

 9            It may be published as we discussed.

10            (Exhibit 1200 received into evidence.)

11            MR. BRENNAN:  Your Honor, with your permission, I'll

12    read this to the jury.

13            THE COURT:  It can be published in that way.

14            MR. BRENNAN:  Thank you.

15            This is a letter from the U.S. Department of Justice,

16    United States Attorney District of Massachusetts, dated

17    February 2, 2000.

18            It is addressed to Kenneth Fishman, Esq., Fishman,

19    Ankner & Horstmann, LLP regarding United States v. Stephen

09:44 20    Flemmi.

21            It reads as follows:

22            "Dear Mr. Fishman, I write this letter to memorialize

23    information I provided to you on January 21, 2000 in response

24    to your letter dated January 18, 2000.  As we discussed, John

25    Martorano has provided the following information to the

government that may arguably be consistent with certain claims

advanced by your client:

"1.  Martorano has stated that in conversations he had

with your client prior to the murder of Roger Wheeler, your

client approved the murder of Wheeler because it would help

"our friend [former FBI SA H. Paul] Rico.

"2.  Subsequent to these conversations, Martorano was

provided with a handwritten note containing personal

information about Wheeler, such as details about Wheeler's

appearance, vehicle, home address and work address.  Martorano

received this note from John Callahan who stated that Rico had

authored the note.

"3.  Your client introduced Martorano to Rico at the

offices of World Jai Alai in Florida for the purposes of asking

Rico about the planned acquisition of World Jai Alai by Rico

and others.  This meeting occurred after the murder of John

Callahan."

The letter is signed under the name of the United

States Attorney, Donald K. Stern, by Fred M. Wyshak, Jr.

If I may approach?

THE COURT:  You may approach.

MR. WYSHAK:  Your Honor, in the form we've previously

discussed.

THE COURT:  Yes, counsel.

BY MR. BRENNAN:

```
 1   Q.   You told us yesterday that the reason that you killed

 2   Mr. Wheeler is because you were helping out a friend,

 3   Mr. Callahan.

 4   A.   One of the reasons, yeah.

 5   Q.   You didn't say "one of the reasons" yesterday, you said it

 6   was the reason, didn't you, sir?

 7             MR. WYSHAK:   Objection, argumentative.

 8             THE COURT:   Sustained, sustained.

 9   BY MR. BRENNAN:

10   Q.   When you told us yesterday that it was the reason, did you

11   leave out something, sir?

12   A.   It was also a deal that we were going to get 10,000 a week

13   if he bought the place.

14   Q.   Now, let me go back to your plea deal and ask about that

15   deal.

16             In that deal that you had with the government, they

17   wanted you to testify, didn't they?

18   A.   Correct.

19   Q.   And in the deal, there was a suggestion that you had to be

20   truthful?

21   A.   Correct.

22   Q.   Who was supposed to be the person to decide whether you

23   were telling the truth or not?

24   A.   The government.  I don't know who.

25   Q.   Well, Mr. Wyshak?
```

1   A.    Probably.

2   Q.    When you say "probably," have you had discussions about

3   that?

4   A.    No.

5   Q.    Has anybody ever come back to you after you signed this

6   deal and talked about whether or not you told the truth?

7   A.    I was told if I ever told a lie, I'm going to go to jail

8   the rest of my life.

9   Q.    And in all these testimonies, including your testimony

09:47 10   yesterday, did you tell a lie?

11   A.    Not that I know of, no.

12        MR. BRENNAN:  Can we put on the plea deal, please, for

13   the jury to see?

14   Q.    Yesterday, Mr. Wyshak read you a portion of that plea

15   agreement that talked about your obligation to cooperate.

16        MR. BRENNAN:  Next page, please.

17        THE COURT:  Counsel, is this Exhibit 1159?

18        MR. BRENNAN:  I'd have to defer to a colleague on the

19   number, your Honor.

09:48 20        It's the plea deal that the government used as an

21   exhibit yesterday or the day before.

22        Thank you very much.

23        THE COURT:  1159.

24        MR. BRENNAN:  And could you turn the page, please?

25   I'm sorry, next page.

```
 1    BY MR. BRENNAN:

 2    Q.   On this plea deal, sir, when you were obligated to come

 3    in -- when you were obligated to come in and tell the truth in

 4    this plea deal, you knew, sir, that if you came into court --

 5    let me strike that.

 6          You knew that if you didn't cooperate with any other

 7    authorities, it wasn't going to change this plea deal at all,

 8    didn't you?

 9    A.   If I didn't?

09:48 10   Q.   Well, you've told the jury that you were supposed to have

11    the obligation to go into other courts and testify; is that

12    what you said?

13    A.   I have to answer any subpoenas.

14    Q.   And you knew that if you didn't answer any subpoenas,

15    nothing would happen to you with this deal, right?

16    A.   Correct.

17    Q.   So if you decided to neglect a subpoena or not show up for

18    court, it wouldn't change your deal with the federal

19    government, would it?

09:49 20   A.   Yes, I'd have to show up.

21    Q.   What if you didn't?

22    A.   They'd break the deal.

23          MR. BRENNAN:  Mr. Oh, can you take it back to -- next

24    page, please.

25    Q.   Look at the first full paragraph, Mr. Martorano.
```

1          Yesterday, Mr. Wyshak read to you, let me quote, The

2    parties agree that this agreement requires Defendant to appear

3    and testify in any federal or state court in cases that fall

4    within the above described categories.  Nothing in this

5    agreement precludes any prosecutor's office, including those

6    offices named in this agreement, from issuing a subpoena or any

7    other process to compel the Defendant's testimony before a

8    court or grand jury concerning any case or investigation other

9    than those described in the subparagraphs a through e.

09:50 10          Did I read that correctly?

11   A.   Correct.

12   Q.   That's what Mr. Wyshak read to you the other day?

13   A.   I don't recall him reading it, no.

14   Q.   The part that wasn't read to you, the next part, let's

15   read that.

16          "If Defendant refuses to testify in such other cases

17   or investigations, such refusal will have no impact on the

18   terms of the enforceability of this agreement notwithstanding

19   that such refusal may constitute criminal contempt or

09:51 20   obstruction of justice."

21          Do you see that part?

22   A.   Correct.

23   Q.   The part that I just read to you.

24   A.   Correct.

25   Q.   The end of the paragraph.

A.    Correct.

Q.    And so you understand from the end of the paragraph that
if somebody subpoenaed you in another court and you decided you
weren't going to cooperate with anybody, it would have no
effect on your agreement with Mr. Wyshak.

A.    Correct.

Q.    And in fact, sir, you were never called by another court,
were you?

A.    No.

09:51   Q.    Now, when you decided you were going to cooperate, you
knew it was important to say to the government that you were
partners with Mr. Bulger, didn't you?

A.    Well, we were.

Q.    You've said it many times over and over again, didn't you?

A.    We were partners.

Q.    When you moved down to Florida in 1978, how many times did
you speak to Mr. Bulger between then and the time you were
arrested?

A.    From 1978, I spoke to him in '80 and '82.

09:52   Q.    You say you spoke to him once on the phone?

A.    Spoke to him once on the phone.

Q.    And you say you met him once in person.

A.    And before I left, he said, Any time that you talk to
Stevie, it's like talking to me.

Q.    And he used that legal quote perfectly, didn't he?  You

1    talk to him, you talk me, as if he's responsible for

2    anything that happens --

3    A.    No, it's like talking to me, he tells me everything you

4    say.

5    Q.    So before you left, he said, By the way, have a good trip,

6    and anything you say to him, it's all me.

7    A.    It's like talking to him, because he doesn't want to get

8    on the phone.

9    Q.    He wasn't your boss, was he?

09:52 10    A.    No.  He was older than me, but he wasn't my boss.

11    Q.    He wasn't telling you what to do, was he?

12    A.    At that time, it probably took two of us to make a

13    decision.

14    Q.    Was he telling you what to do?

15    A.    Sometimes, yeah.

16    Q.    He would order you around, Mr. Martorano?

17    A.    Yeah, he would tell me sometimes what to do.

18    Q.    Really.

19    A.    If he wanted to get something done, I would usually listen

09:52 20    to him.  He usually knew the right buttons to press.

21    Q.    Was he your boss?

22    A.    No.

23    Q.    Were you kowtowing to him, Mr. Martorano?

24         MR. WYSHAK:  Objection.  Berating him.

25         THE COURT:  Well, sustained as to form.

1          Perhaps you want to rephrase, Mr. Brennan.

2    BY MR. BRENNAN:

3    Q.   When you went down to Florida, you didn't have any

4    conversation with him until your father died, right?

5    A.   Correct.

6    Q.   And when you decided to kill Mr. Wheeler, you didn't call

7    and speak to Mr. Bulger?

8    A.   I spoke to Mr. Flemmi.

9    Q.   Let me try the question again.

09:53 10          You didn't call and speak to Mr. Bulger?

11   A.   No.

12   Q.   Mr. Bulger didn't call you?

13   A.   No.

14   Q.   He didn't tell you it would be a good idea to go kill a

15   citizen, did he?

16   A.   No.

17   Q.   You didn't hear Mr. Bulger say, Oh, I'm okay with it, why

18   don't you go slaughter somebody that you don't know.

19   A.   I heard it through Stevie.

09:53 20   Q.   So the truth is, you never spoke to him about --

21   A.   No, I didn't speak to him.

22   Q.   Okay.

23          And so when you say that you guys were partners, you

24   were making money down in Florida, weren't you?

25   A.   We were partners in -- verbally.  I mean, it didn't end up

1    that way.

2    Q.    What do you mean, "verbally"?

3    A.    Well, financially, I don't know what they were doing, but

4    whatever they sent me, I was appreciative of it.

5    Q.    So you were partners when you needed him to get out of a

6    jam and say he was responsible for a murder, but you weren't

7    partners with him when you were keeping all your money down in

8    Florida?

9    A.    No --

09:54 10            MR. WYSHAK:  I object to the form of the question.

11            THE COURT:  Sustained as to form, counsel.

12   BY MR. BRENNAN:

13   Q.    Were you partners or were you not partners, Mr. Martorano?

14   A.    I thought we were.

15   Q.    Did you have an agreement?

16   A.    I thought I did.  I thought we were partners.

17   Q.    When you were down in Florida making money off your

18   bookmaking and loansharking, were you sending Mr. Bulger a

19   check?

09:54 20   A.    No, we both had separate things going, too.

21   Q.    So you could do things totally independent of

22   Mr. Bulger --

23   A.    Just as far as bookmaking, yes.

24   Q.    Excuse me.

25            You could do things totally independent of Mr. Bulger

```
 1   and that would be okay.
 2   A.    Probably, yeah.
 3   Q.    And he could do things totally independent of you, and
 4   that would be okay.
 5   A.    Probably.
 6   Q.    And you could do things with Mr. Winter that didn't
 7   include Mr. Bulger, and that would be okay.
 8   A.    He wasn't around.
 9   Q.    But before he was, and you did things with him separately,
10   didn't you?
11   A.    I'm not sure what you mean.
12   Q.    Well, the thing is, when you were down in Florida, you
13   were running your own business, weren't you?
14   A.    Late on, very late.
15   Q.    And you were running your own bookmaking through Boston,
16   Mr. Raso?
17   A.    Yeah.
18   Q.    And you were getting accounts down in Florida that were
19   paying you.
20   A.    Correct.
21   Q.    And you weren't talking to Mr. Bulger about that, were
22   you?
23   A.    No.
24   Q.    You didn't share any information with him, did you?
25   A.    No.
```

```
 1   Q.   You didn't ask his permission, did you?

 2   A.   Not for little stuff like that, no.

 3   Q.   You didn't give him anything, did you?

 4   A.   No.

 5   Q.   Now, you knew this deal with those two names up top

 6   wouldn't go through unless you could offer information against

 7   Mr. Bulger and Mr. Connolly, didn't you?

 8   A.   I assume so.

 9   Q.   So, in order for you to get out of the death penalty and

10   the natural life and your family's trouble, you knew you had to

11   give something to the government about Mr. Connolly.

12   A.   I was never indicted.

13   Q.   You never met Mr. Connolly, had you?

14   A.   No.

15   Q.   In your entire life, you never spoke to the man?

16   A.   No.

17   Q.   So you couldn't say to the government that Mr. Connolly

18   told you something, right?

19   A.   No.

20   Q.   But you knew that if you said Mr. Bulger said Mr. Connolly

21   said it, that would be enough.

22   A.   I didn't see it that way, but it was the truth.

23   Q.   Yeah.

24        So what you needed to do was get a conversation to

25   Mr. Connolly through Mr. Bulger.
```

 1   A.   I didn't need to do anything except tell the truth.

 2   Q.   I got you.

 3        And that's what you do, you tell the truth all the

 4   time, don't you, sir?

 5   A.   Yes, I do.

 6   Q.   And you've historically done that?

 7   A.   Pardon me?

 8        (Interruption by computer.)

 9        MR. BRENNAN:  Not an exhibit, your Honor.

09:56 10      THE COURT:  Thanks.

11   BY MR. BRENNAN:

12   Q.   Didn't you tell this jury yesterday that you didn't always

13   tell the truth?

14   A.   Yes.

15   Q.   And that you lied?

16        MR. WYSHAK:  Objection.

17        Can we have a time frame and a reference, your Honor?

18        THE COURT:  Well, sustained as to form, counsel, but

19   you can pose another question.

09:57 20   BY MR. BRENNAN:

21   Q.   You even lied to your best friend, John Callahan, before

22   you murdered him.

23   A.   Correct.

24   Q.   So you don't historically always tell the truth, do you?

25   A.   Well, that to me was necessity.

1    Q.   Well, isn't avoiding the death penalty kind of a

2    necessity?

3    A.   No, not the same as it was with -- as telling John I

4    wanted to see him.  I couldn't tell him I wanted to shoot him.

5    Q.   Isn't protecting your brother, Jimmy, a necessity?

6    A.   No.

7    Q.   When you talk about telling the truth, I want to talk to

8    you a little bit about your conversations with Trooper Foley

9    when you were trying to make a deal and give him information.

09:57 10   Okay?

11        Now, we talked yesterday about some of these murders,

12   about the brutality of them, that's not what I'm going to ask

13   you about today.

14        The questions I'm going to ask you about these murders

15   are whether or not you lied.  Okay?

16   A.   Correct.

17   Q.   Okay, correct.

18        Let's start with Mr. O'Toole.

19        When you spoke to Mr. Foley in 1998, you talked to him

09:58 20   about the murder of Mr. O'Toole, didn't you?

21   A.   Correct.

22   Q.   And you knew at that point, when you spoke to Mr. Foley

23   and the State Police, you wanted to give them something they

24   wanted as far as information, you wanted to give them something

25   on Stevie Flemmi, didn't you?

```
 1              MR. WYSHAK:  Objection.

 2              THE COURT:  Sustained, sustained.

 3    BY MR. BRENNAN:

 4    Q.   When you talked to them about Mr. O'Toole, you thought

 5    that that murder happened in 1975, didn't you?

 6    A.   Maybe at the first outing when I talked about O'Toole's

 7    murder, it was -- I didn't have any of the dates in front of

 8    me.  I didn't know the dates, but I knew that Stevie was

 9    involved after May of '74.  So it had to be after May of '74

09:58 10   for him to be involved.

11    Q.   And so what you told Trooper Foley is that you got

12    together to kill Mr. O'Toole, and you were in the backseat of

13    the car.

14    A.   Correct.

15    Q.   And you told him that when you were in the backseat of the

16    car, Stephen Flemmi was next to you and he had a carbine?

17    A.   Somebody was with me, I thought, and I thought it was

18    possibly Stevie Flemmi because I had been talking to him in

19    Montreal about it.

09:59 20   Q.   You expressed uncertainty when you testified in

21    Massachusetts and Florida who was in the car, but I'm going

22    back to '98 when you first spoke to Trooper Foley.

23    A.   Yeah, but I corrected that statement, it was wrong.

24    Q.   We'll get to that.

25              When you first told Trooper Foley about the fact of
```

1   killing O'Toole, you said Stephen Flemmi was sitting next to

2   you in the backseat.  That's what you said, right?

3   A.   It's possible I said that, but I recanted it.  It didn't

4   happen like that.

5   Q.   I want to get before the recantation and ask about the

6   first version you gave.

7            MR. WYSHAK:  Object to the editorializing.

8            THE COURT:  Counsel, no commentary on either side, as

9   I mentioned yesterday.

09:59 10            Counsel, sustained as to form.

11   BY MR. BRENNAN:

12   Q.   When you first spoke to Trooper Foley in 1998,

13   Mr. Martorano, you told him that on the O'Toole killing, Flemmi

14   was in the rear passenger's seat behind McDonald?

15   A.   I thought it was possible that he was, but it wasn't.

16   Q.   Did you tell Mr. Foley that it was possible or did you say

17   that he was?

18   A.   I think I told him it was possible, but maybe he wrote it

19   was, I'm not sure.

10:00 20   Q.   Did you tell him that Flemmi began shooting out the right

21   rear window at O'Toole?

22   A.   I'm not sure what I said.

23   Q.   Did you tell him that he had a carbine?

24   A.   I was telling him that the guy with me had these things,

25   and I don't think it was Flemmi.

```
 1              MR. BRENNAN:  May I approach?

 2              THE COURT:  You may.

 3              MR. BRENNAN:  Foley report, 00326835.

 4    BY MR. BRENNAN:

 5    Q.   Showing you a report.  I don't want you to read it out

 6    loud, I want you to look at it and see if it refreshes your

 7    memory.  I've highlighted the relevant portion.  Look up when

 8    you're done, please.

 9              THE COURT:  Counsel, are the screens on?

10    Ms. Hourihan, shut the screens down.

11              MR. BRENNAN:  This is not on the screen.

12              MR. WYSHAK:  It was on my screen.

13              MR. BRENNAN:  My apology.

14              (Pause.)

15    A.   It wasn't Flemmi.

16    Q.   Let me ask you the question, Mr. Martorano.

17              Did you in 1998, regarding the O'Toole murder, tell

18    Trooper Foley that Flemmi was in the rear passenger's seat

19    behind McDonald?

20    A.   Yeah, I told him that, but I was wrong.

21    Q.   And did you tell him Flemmi began shooting out the rear

22    window at O'Toole with a carbine, as they passed by O'Toole?

23    A.   Yeah, but it was somebody else in the backseat, not

24    Flemmi.

25    Q.   Did you tell Mr. Foley that Martorano, you, leaned over
```

10:01 (line 10)
10:02 (line 20)

1  Flemmi and fired out the same window with a machine gun?

2  A.   I leaned over whoever was there.

3  Q.   When you spoke to Trooper Foley, did you say that

4  Martorano leaned over Flemmi --

5  A.   Yes, I did, but I was in error.

6  Q.   -- fired out the same window?

7  A.   I was in error, I corrected it.

8  Q.   So when you are cooperating with the State Police and you

9  know that Flemmi is number two on that list and you're offering

10:03 10  information, you told them, Mr. Foley, that Mr. Flemmi was

11  involved in that murder and you described in detail how he shot

12  out the window with a carbine, right?

13  A.   Yes, but I was in error.

14  Q.   You were in error because in 1973 this murder happened,

15  not 1975.

16  A.   Stevie wasn't involved in anything until he got back in

17  May of '74.

18  Q.   When you initially spoke to Trooper Foley about this

19  murder, you thought this was 1975 and you got your date wrong,

10:04 20  didn't you, Mr. Martorano?

21  A.   Because I was talking to Stevie about it continuously

22  during the period, and he was very interested because O'Toole

23  had shot his brother.

24  Q.   And when you learned that the date was wrong, you realized

25  that Mr. Flemmi was not even in the United States but he was up

```
        1    in Canada on the run?
        2    A.   Yes.  But when I wrote that report, it was 30 years later.
        3    Q.   And when you learned that you were wrong, because
        4    Flemmi --
        5    A.   I corrected it.  I corrected it.
        6    Q.   When you learned that you were wrong, because Flemmi was
        7    in Canada and couldn't have been there as you detailed to
        8    Trooper Foley, you then changed your story, didn't you?
        9    A.   Yeah, I told -- but at the same time I told him that
10:04  10    story, I told him it is impossible if it was before May of '74.
       11    Q.   Let's try another one, Mr. Martorano.
       12         We talked in detail yesterday about Mr. Banno.  He's
       13    the gentleman that you were trying to bring to the hospital.
       14    A.   Correct.
       15    Q.   When you spoke to Trooper Foley in 1998, you were telling
       16    him the whole truth, weren't you?
       17    A.   I hope so.
       18    Q.   And when you spoke to Mr. Foley about that, you told
       19    Mr. Foley that during the confrontation outside the Sugar Shack
10:05  20    with Mr. Banno, you stabbed him to death with his own knife.
       21    Right?
       22    A.   I don't know.  You want to let me read that?
       23    Q.   I'd be happy to.
       24         MR. BRENNAN:  May I approach, your Honor?
       25         THE COURT:  You may.
```

1              (Discussion off the record.)

2    BY MR. BRENNAN:

3    Q.   Showing you a page from the report of May of 1988, could

4    you please read that paragraph, and please look up when you're

5    done.  No comment, please.

6              (Pause.)

7    Q.   When you spoke to Mr. Foley back in 1998, Mr. Martorano,

8    did you tell Mr. Foley that "Touch" -- that's Banno's nickname,

9    right?

10:07 10   A.   Correct.

11   Q.   "'Touch' then pulled a knife on him, Martorano took the

12   knife from 'Touch' and stabbed him to death.  Martorano took

13   the body, put it in his car, and later dumped it behind the

14   Diplomat."

15             Is that what you told --

16             MR. WYSHAK:  Objection, objection.

17             There's no foundation laid for him to be reading from

18   a document not in evidence.  The witness has not adopted it as

19   his prior statement.

10:07 20             THE COURT:  Well, he was in the process asking the

21   question.

22             Do you object to the characterization of it, counsel?

23             MR. WYSHAK:  I object to him reading from a document

24   not in evidence, which is -- he has not yet established is a

25   prior statement of the witness.

1          MR. BRENNAN:  And I object to coaching of the witness.

2          MR. WYSHAK:  I'm not coaching the witness.

3          THE COURT:  Counsel, counsel, let me see you at

4     sidebar.  I'll hear Mr. Brennan's response.

5          (At sidebar on the record.)

6          THE COURT:  Can I just see what you're --

7          (Pause.)

8          THE COURT:  Counsel, I think -- I believe,

9     Mr. Brennan, you were in the process of asking this?

10:15 10          MR. BRENNAN:  That's what I was asking, the

11    highlighted portion.

12          THE COURT:  What's wrong with him asking, Did you say

13    this?

14          MR. WYSHAK:  The proper procedure, your Honor -- and

15    I'm actually -- I have a legal memo sitting on my desk, it's

16    not in final form yet -- if he's going to show a report to the

17    witness, the first question to the witness is:  Have you read

18    that report?  Is that your statement?

19          If the witness says, I didn't say that, counsel cannot

10:15 20    then stand up in front of the jury, read from a document that's

21    not in evidence to try to get this statement in in front of the

22    jury.

23          THE COURT:  Keep your voice down.

24          Counsel, I don't recall if you asked after reading it

25    whether or not he remembered this statement.

1          MR. BRENNAN:  I'm asking if he made the statement as

2     an inconsistent statement.  If he doesn't, I'll recall Trooper

3     Foley in my case in chief.

4          I don't have to, as a matter of evidence, ask him if

5     he agrees with the statement, and if he denies it then I

6     can't --

7          THE COURT:  I'm asking, counsel, given that you had

8     shown it to him first -- I just don't remember -- did you ask

9     him if he recalled making the statement?

10:15 10          MR. BRENNAN:  I didn't ask if he recalled.

11          THE COURT:  Okay.

12          MR. BRENNAN:  I didn't ask if it refreshed his memory.

13          He asked to see the document.  I accommodated him by

14     showing the document.

15          THE COURT:  But you were offering it as a prior

16     inconsistent statement.

17          MR. WYSHAK:  And he can't establish the foundation for

18     it being a prior inconsistent statement if the witness did not

19     adopt the statement.

10:15 20          THE COURT:  No, but, counsel, he gets to ask the

21     question, right?

22          He's acknowledged that he met with Mr. Foley.  Can't

23     he ask him?  I mean, he has to take the answer, but why can't

24     he ask him, you know, Did you attend a proffer session with

25     Mr. Foley?

1        Yes, I do recall sitting down with him.

2        Did you tell him, so forth, so on?

3        He says either yes or no.

4        MR. WYSHAK:  Because the cases say exactly the

5   opposite, that you cannot do that, that you cannot stand up

6   with what purports to be a 302 or a report of an interview and

7   try to get that information into evidence if the witness has

8   not adopted it as his statement.

9        THE COURT:  No, but, counsel -- but, counsel, how

10:15 10   could -- just playing this out, forward, let's say he says, No,

11   I never said that.

12        MR. WYSHAK:  Right.

13        THE COURT:  Mr. Brennan couldn't lay the foundation

14   for later calling Trooper Foley unless he had first confronted

15   the witness with the statement.

16        MR. WYSHAK:  Yes, because --

17        THE COURT:  Under 13(b).

18        MR. WYSHAK:  He's showing the witness the statement,

19   the witness says he never made it --

10:15 20        THE COURT:  I don't think he did.  I don't think he

21   did --

22        MR. WYSHAK:  Well, he hasn't asked him, that's my

23   whole objection.

24        THE COURT:  He was about to.

25        MR. WYSHAK:  No, no.  He's supposed to show him --

1          THE COURT:  We should all keep our voices down --

2          MR. WYSHAK:  -- the witness reads, then the next

3  question is:  Did you make that statement to Trooper Foley?  If

4  the answer is, Yes, then he can use it to impeach as a prior

5  inconsistent statement.  If the answer is, No, that's the end

6  of the inquiry.

7          If he can --

8          THE COURT:  Yeah, but he hasn't asked the question

9  yet, counsel.

10:15 10          MR. WYSHAK:  No, but what he's doing -- he's not

11  asking, Did you make that statement?  He's putting the

12  statement into evidence in front of the jury before he's

13  established the foundational matter of whether or not the

14  witness made the statement to begin with.

15          He is showing the document to the witness, that's the

16  proper method.  The next question is, simply, Did you say

17  that --

18          THE COURT:  Keep your voice down, counsel.

19          MR. WYSHAK:  The next question is, simply, Did you

10:15 20  make that statement to Trooper Foley?

21          MR. CARNEY:  Your Honor, I want to interject here.

22          The proper way to impeach with a prior inconsistent

23  statement, I submit, is to ask the witness:  Did you make a

24  statement on a prior occasion?

25          Yes.

1           Was it to Trooper Foley?

2           Yes.

3           Isn't it true that you said to him X?

4           And if that's inconsistent with what the witness has

5   said on the stand, he can say, Yes, I did say that, or, No, I

6   didn't say that.

7           THE COURT:  Right.

8           MR. CARNEY:  He doesn't have to go through the process

9   of showing the statement every time.  You just can ask him

10:15 10  if --

11          MR. WYSHAK:  You know, the case -- I mean, the

12  background to this line of cases, quite frankly, is that this

13  document is not a Jencks Act statement of this witness.

14          MR. CARNEY:  It's not being introduced.  The document

15  isn't being introduced.

16          The question is:  Did you make that statement?

17          And the only reason the document is here is to show

18  that the questioner has a good-faith basis for asking it.

19          MR. WYSHAK:  The document is not a Jencks Act

10:15 20  statement of the witness, and until it is adopted by the

21  witness, there is no good-faith basis to question --

22          THE COURT:  But he has to be able -- counsel --

23  counsel --

24          MR. WYSHAK:  He's also reading from a document not in

25  evidence.

1          When he stands up with a piece of paper in his hand,

2   which he is representing to be a report, a statement of another

3   witness, quite frankly, the person who wrote it, and he reads

4   from it, that's also not proper, reading from a document not in

5   evidence.

6          I couldn't do that.  I couldn't stand up with a police

7   report and start reading from it, and that's what he's doing

8   when he follows this procedure.

9          MR. CARNEY:  You could stand up and say, Didn't you

10:15 10   tell Officer Brown that you, in fact, were at the scene and

11   knew the people who --

12          THE COURT:  Counsel, I'm going to cut off this

13   discussion.

14          MR. CARNEY:  I think your Honor has it exactly right.

15          THE COURT:  Mr. Wyshak, if there's a memo you want to

16   share with me, I'll be happy to review it.

17          It seems to me, and I have thought through this

18   because counsel has brought this up before, having looked

19   through 16(b), I think Mr. Brennan is allowed to confront the

10:15 20   witness and he's stuck with the answer.

21          Thanks.

22          (End of discussion at sidebar.)

23          MR. BRENNAN:  May I proceed, your Honor?

24          THE COURT:  You may.

25   BY MR. BRENNAN:

Q.   Mr. Martorano, did you engage in a conversation with
Trooper Foley offering him facts about your murders?

A.   Correct.

Q.   And, sir, Mr. Martorano, did you tell Mr. Foley that Banno
pulled a knife on you and then you took the knife from him and
then stabbed him to death, then you took the body and put it in
a car and dumped it at the Diplomat?

          MR. WYSHAK:  Object.

          THE COURT:  Sustained as to compound.

          Counsel, if you want to break it down.

          MR. BRENNAN:  Sure.

Q.   When you spoke to Mr. Foley, did you tell him that Banno
pulled a knife on you?

A.   Correct.

Q.   And did you tell Mr. Foley that you took the knife from
Banno and stabbed him to death?

A.   I took a knife from him and stabbed him.  At that time, I
didn't kill him; later, I did.

Q.   So are you saying that you didn't tell Mr. Foley that
after you stabbed and killed him, you then took the body and
put it in your car?

A.   Maybe he confused it, but I didn't say it that way.

Q.   When you were speaking to Mr. Foley, did you learn through
the reports that you were being shared with, did you learn that
there was a witness who saw Banno get into your car?

 1   A.   I don't recall.

 2   Q.   Did that have any effect on your story?

 3   A.   Didn't recall.

 4   Q.   And so your position today is that you did not tell

 5   Mr. Foley that?

 6        MR. WYSHAK:  Objection.  That's been asked and

 7   answered.

 8        THE COURT:  Sustained.

 9        Counsel, I understand the basis for the objection.

10:16 10   I'll ask you if I need further explanation, counsel.

11   BY MR. BRENNAN:

12   Q.   Regarding Mr. Smith, Ms. Dickson, and Mr. Barrett, do you

13   remember we talked about them yesterday?

14   A.   Correct.

15   Q.   You remember Ms. Dickson, don't you?

16   A.   Correct.

17   Q.   I had asked you about whether or not you knew you had

18   killed a 19-year-old girl.  Do you remember that?

19   A.   Correct.

10:17 20   Q.   And, sir, when you answered the question yesterday on --

21   the first time, you said that they had hoods on, right?

22   A.   It was -- the night was about 3:00 in the morning, it was

23   a blizzard.  There was about a foot of snow on the ground, and

24   I could see in the car as I walking to get in the car that

25   there was the figure of three bodies.  I couldn't tell anything

1   but three bodies, whether they had hoods or scarves or hats or

2   winter coats.  It was in the middle of the winter, and I

3   couldn't make it out.

4   Q.   Haven't you testified under oath regarding these matters

5   before?

6   A.   Probably.

7   Q.   You've testified in the grand jury?

8   A.   Probably.

9   Q.   Massachusetts?

10:17 10   A.   Yeah.

11   Q.   And Florida?

12   A.   Yeah.

13   Q.   And in the earlier versions, didn't you say in your

14   testimony that they had hoods on?

15   A.   Could have said hoods or scarves or winter clothes.

16   It's -- I just couldn't tell who they were.

17   Q.   When you spoke to Trooper Foley --

18        MR. WYSHAK:  I object to this, your Honor.

19        This entire line of inquiry was gone through

10:18 20   yesterday.

21        THE COURT:  Asked and answered, counsel?  Is that your

22   objection?

23        MR. WYSHAK:  Yes.

24        THE COURT:  Counsel, haven't we covered this ground?

25        MR. BRENNAN:  If I can speak to his conversation

```
 1   solely with Mr. Foley, your Honor.
 2           THE COURT:  Solely, but I think the area has been
 3   covered.
 4           MR. BRENNAN:  Understood.
 5   BY MR. BRENNAN:
 6   Q.   When you spoke to Mr. Foley, Mr. Martorano, did you tell
 7   him that they had hoods on?
 8   A.   I don't remember.  You want to give me something that's
 9   written to refresh me?
10           MR. BRENNAN:  Okay.
11           (Discussion off the record.)
12           (Pause.)
13   Q.   Take a look at that document and look up when you're done,
14   sir.
15           (Pause.)
16   Q.   Mr. Martorano, does that refresh your memory whether or
17   not you told Mr. Foley that Ms. Dickson had a hood on?
18   A.   I said they had winter clothes on, also.  I didn't know if
19   they were hooded at this point here -- whatever they had.  I
20   couldn't recognize who was in the car.
21   Q.   Let me ask the question again.  Do you remember --
22   A.   No, I don't remember telling Foley that or -- who was it
23   Duffy, Foley?  I don't know.
24   Q.   After you made your deal with the government,
25   Mr. Martorano, at no point after that time did the Mass. State
```

10:18 (line 10)
10:21 (line 20)

Police or any law enforcement officer call you in to court to
testify in the grand jury about Mr. Nee, did they?

        MR. WYSHAK:  Objection.  Relevance.

        THE COURT:  Counsel, in a few words, the basis?

        MR. BRENNAN:  The government offered a proffer
yesterday suggesting an obligation, and this goes to his state
of mind and understanding of that agreement.

        MR. WYSHAK:  Objection.

        THE COURT:  Well, counsel, I think to the extent
you're asking about his state of mind about who he -- who he
was going to testify against --

        MR. BRENNAN:  It would be difficult to give the
proffer unless I go to sidebar, your Honor, because I don't
want to say anything inappropriate.

        THE COURT:  Okay.  Let me hear you.

        (At sidebar on the record.)

        THE COURT:  Ms. Hourihan advises me that we should all
keep our voices down.

        MR. BRENNAN:  There is the proffer that they offered,
and they emphasized the fact that he was obligated to continue
his cooperation with the federal government.

        Trooper Foley testified last week that they took what
they could get from Mr. Martorano, and that realistically
Mr. Martorano wasn't going to be involved in any state court
cases.

1           I asked Mr. Foley:  Did you do any investigation with

2     the information you had, and --

3           MR. KELLY:  They can hear you.

4           MR. BRENNAN:  Still?

5           MR. KELLY:  Yeah.

6           MR. BRENNAN:  -- and he said, No.

7           So when the government makes the proffer in his plea

8     agreement and tries to bolster by suggesting he is telling the

9     truth and he has this ongoing obligation, Mr. Martorano, based

10:27 10     on Mr. Foley's testimony, realistically understood he was never

11    going to be called to the state court to testify against any of

12    his friends.

13           THE COURT:  But I think Mr. Wyshak's objection was the

14    direction of the question was that law enforcement expected, as

15    opposed to whether Mr. Martorano had any expectation that he

16    would ever be called to testify against Mr. Nee.

17           MR. BRENNAN:  Well, the fact that he wasn't called

18    implies by inference.

19           He can say all day long he expected he was going to be

10:27 20     called for people he didn't know, that's corroborated by

21    Mr. Foley.

22           I asked Mr. Foley specifically from his past

23    transcripts when I had to impeach him, and we read them,

24    realistically making this deal with John Martorano, they knew

25    he wasn't going to testify.

1          And then I followed it up by saying, Did you do any

2     independent investigation with the state?  And he said that he

3     didn't.

4          And then I said, So, that was part of the deal?  He

5     said, We had to take it.  And then he started to say something

6     about John Connolly, and it was cut off in the transcript.

7          So the State Police and John Martorano, by inference,

8     certainly had an understanding he was never going to go to

9     state court.  It's not just a coincidence, it's an inference

10:27 10     supporting that.

11          THE COURT:  Why isn't that proper as to

12     Mr. Martorano's state of mind in terms of the scope of his

13     cooperation to ask if he was ever called to testify against

14     Mr. Nee and whether he expected ever to have to testify --

15          MR. WYSHAK:  Well, I think he can ask him, Did you

16     ever expect to be called as a witness in a case against

17     Mr. Nee?  I think that's perfectly appropriate.

18          But this is another straw man that the defense has set

19     up in this case.

10:27 20          Neither Mr. Nee nor Mr. Winter were federally

21     prosecutable at the time of this investigation for any of the

22     criminal activity that was under investigation because they had

23     been incarcerated for long periods of time.  The statute of

24     limitations had expired.  They could not be prosecuted as RICO

25     defendants in this case.  As a result, the federal government

1    didn't care --

2            THE COURT:  Counsel, my memory is some of that came

3    out in the testimony of law enforcement.

4            MR. WYSHAK:  Yes, yes.  And that's exactly why this

5    entire line of questioning is inappropriate and not true.

6            Now, what the state decided to do, did or did not do,

7    is another issue.

8            I think it's appropriate to ask him what his

9    expectation or understanding was, but he shouldn't be -- carry

10:27 10   the burden of what a state prosecutor decided to do regarding

11   the information that he provided.

12           You know, whether or not they decided to bring a case,

13   whether or not they decided to call him as a witness, that's

14   not his problem.

15           THE COURT:  Well, I think he can ask both questions,

16   but I expect you're leaving this soon, anyway.

17           MR. BRENNAN:  Yes.

18           THE COURT:  Okay.

19           (End of discussion at sidebar.)

10:27 20   THE COURT:  Counsel, you may proceed.

21           MR. BRENNAN:  Thank you.

22   BY MR. BRENNAN:

23   Q.   Mr. Martorano, were you ever called to testify in any

24   proceeding against your brother, James Martorano?

25   A.   No.

```
 1   Q.   Were you ever called in any proceeding --
 2              MR. WYSHAK:  Objection.  Object on the same basis.
 3              THE COURT:  I understand the objection.  Overruled as
 4   to that question.
 5   BY MR. BRENNAN:
 6   Q.   Were you ever called in any proceeding, any criminal
 7   proceeding, to testify against Patrick Nee?
 8   A.   I don't think so, no.
 9   Q.   You don't think so.  Would you remember --
10   A.   I don't know whether -- during the proceeding of the
11   proffer and everything, if that was part of that, but you're
12   talking about after that?
13   Q.   What criminal proceeding were you called to testify in
14   against Patrick Nee?
15   A.   None.
16   Q.   Were you ever called in to any criminal proceeding to
17   testify against Howie Winter?
18   A.   No.
19   Q.   Mr. Martorano, I want to talk to you about some of the
20   benefits the government gave you in your deal.
21              Rather than get the death penalty or a life sentence,
22   you received a sentence of 14 years in jail?
23   A.   Correct.
24   Q.   And you spent 12 years in jail?
25   A.   Twelve-and-a-half.
```

1    Q.   And when you came into court today, you weren't coming

2    from jail, were you?

3    A.   No.

4    Q.   You came in through that door?

5    A.   Correct.

6    Q.   And when you finish your testimony today, you get to leave

7    through that door, don't you?

8    A.   Correct.

9    Q.   While you were in jail, after you got this benefit, the

10:29 10   government gave you more benefits, didn't they?

11        MR. WYSHAK:  Object to the characterization, your

12   Honor.

13        THE COURT:  He can ask the question.

14        Overruled.

15   BY MR. BRENNAN:

16   Q.   Did the government put money in your account in jail so

17   you could have some extras?

18   A.   Correct.

19   Q.   In fact, any time you wanted money, you could call

10:29 20   Mr. Doherty from the DEA, and he would come down and put money

21   in your account for you?

22   A.   I don't know if it was like that.  He'd send money every

23   once in a while.

24   Q.   And when you wanted money, you'd call him, didn't you?

25   A.   Correct.

1    Q.    In fact, he would put in $400 at a time into your account

2    when you would call him?

3    A.    Every two or three months, yeah.

4    Q.    And every two or three months you had an extra $400 from

5    the federal government, didn't you?

6    A.    Yeah, yeah.

7    Q.    And that was important money while you were doing your

8    time in jail, wasn't it?

9    A.    Correct.

10:30 10   Q.    In fact, they gave you $6,000?

11   A.    Probably a total of that for the eight or ten years,

12   whatever it was.

13   Q.    After you finished your time and you got your money, you

14   were let out of the jail, weren't you?

15   A.    Correct.

16   Q.    You asked for some more money.

17   A.    I asked for some start-up money, yeah.  After I got out, I

18   had nothing.

19   Q.    When you asked for start-up money, they didn't tell you,

10:30 20   No?

21   A.    No.

22   Q.    The government gave you what you asked for?

23   A.    They determined what they gave me, and they gave me some

24   start-up money.

25   Q.    They gave you $20,000?

A.   Correct.

Q.   You didn't just get canteen money and start-up money in this deal on the sentence, they gave you other benefits, too, didn't they?

A.   Such as?

Q.   Well, you had a house down in Florida?

A.   Correct.

Q.   And you agree that that house in Florida, when they first asked about who owned the property, you lied about that, right?

A.   Correct.

Q.   The reason why you lied to the government when they asked about your property is because you wanted to keep it?

A.   Probably.

Q.   Because it was a benefit for you if you could keep the property for yourself?

A.   For my family to live in, yeah.

Q.   When there is an important reason for you to lie, you're willing to do that.

A.   I was fighting the government at that point.

Q.   So depending on what side you're on, depends on what kind of lie you tell?

A.   No, when I cooperated with the government, I stopped lying.  I just got to tell the truth or I'll go to jail.

Q.   So after you told the truth, or they found out about the property, you admitted that the property in Florida was yours.

```
 1   A.    Correct.

 2   Q.    And that was a property you bought from illegal proceeds

 3   of your crimes?

 4   A.    Probably, yeah.

 5   Q.    Well, you didn't have a legitimate job the 17 years you

 6   were in Florida, did you?

 7   A.    I said, Yes.

 8   Q.    Pardon me?

 9   A.    I said, Yes.

10:32 10   Q.    And so the money from that house was illegal money that

11   the government actually sought to seize and take from you.

12   A.    Correct.

13   Q.    After you decided to work with them, they gave you that

14   money back, didn't they?

15            MR. WYSHAK:  Objection.

16            THE COURT:  Well, sustained as to form, counsel.

17            MR. BRENNAN:  Sure.

18   BY MR. BRENNAN:

19   Q.    After you decided to be on the government's team, you had

10:32 20   a conversation about that property that was obtained with

21   illegal proceeds, didn't you?

22            MR. WYSHAK:  Object to the characterization, "the

23   government's team," your Honor.  He's a witness in a criminal

24   case.

25            THE COURT:  Counsel, sustained as to form, counsel.
```

1          You can put the question about the property to him.

2   BY MR. BRENNAN:

3   Q.   After you made a plea offer and agreement with the

4   government, you had some conversations about the property,

5   didn't you?

6   A.   My lawyers did.

7   Q.   And the government, rather than seizing that property,

8   gave you the benefit of the value of that property, didn't

9   they?

10:33 10  A.   They allowed me to settle a suit with it.

11  Q.   You had a suit from your ex-wife for money that she said

12  you owed her?

13  A.   Correct.

14  Q.   Money that she said you owed her from back child support

15  that you didn't pay?

16  A.   But I won that argument.  It was money from a house that I

17  sold.

18  Q.   And the amount of money that the government gave back to

19  you from those illegal proceeds was $200,000?

10:33 20  A.   That was the judgment.

21  Q.   That way, when you finished serving the sentence, you

22  could get out with your start-up money unencumbered, right?

23  A.   Pardon me?

24  Q.   When you got out of jail, you wanted to be in a position

25  that you didn't have that debt over you, correct?

```
 1   A.   Correct.

 2   Q.   And so that the start-up money they were going to give

 3   you, you could just take and spend on what you wanted to.

 4   A.   Correct.

 5   Q.   When you made your arrangement with the government, there

 6   was no provision that precluded you from profiting off your

 7   murders and crimes, was there?

 8   A.   No.

 9   Q.   And profit you did, true?

10   A.   Yeah, I had a book and a movie.

11   Q.   So when you got out of jail, you said that you were quite

12   remorseful, right?

13   A.   Correct.

14   Q.   You felt bad for the victims' families about what you had

15   done?

16   A.   Of course.

17   Q.   And in that remorse, you decided to sit down with Howie

18   Carr and strike a deal to write a book?

19   A.   Correct.  I made a deal with him, yeah.

20   Q.   And when you wrote the book, the title of it is "Hitman"?

21   A.   I didn't write it.

22   Q.   Is that the title of your book, Mr. Martorano?

23   A.   Title of Howie Carr's book.

24   Q.   So this is not your book?

25   A.   No.
```

        1    Q.   So you don't have a book?

        2    A.   He wrote it about me, yeah.

        3    Q.   So this --

        4    A.   I gave him the rights to use my name.

        5    Q.   All you gave Mr. Carr was your name, and then he could

        6    write anything he wanted?

        7    A.   Correct.

        8    Q.   So you didn't care whether it accurately portrayed --

        9    A.   No, I tried to oversee some things he wrote.

10:35  10    Q.   Which parts didn't you oversee?

       11    A.   I don't remember.  You'll have to specify.

       12    Q.   What parts did you oversee?

       13    A.   I don't remember.  You'd have to specify what you're

       14    talking about.

       15    Q.   So are you saying this is Howie Carr's book or your book,

       16    sir?

       17    A.   It's Howie's.

       18    Q.   So all you sold, really, was your name?

       19    A.   Correct.

10:35  20    Q.   And that name you got $20,000 for?

       21    A.   I don't follow you.

       22    Q.   Forty?

       23    A.   I don't follow you.

       24    Q.   How much money did Howie Carr give you to use your name?

       25    A.   How much did I make on that book so far?

| | |
|---|---|
| 1 | Q.   Yes. |
| 2 | A.   Seventy, something like that. |
| 3 | Q.   Seventy thousand dollars? |
| 4 | A.   Correct. |
| 5 | Q.   And you're still getting royalties? |
| 6 | A.   Correct. |
| 7 | Q.   And you get royalties every month? |
| 8 | A.   Not -- every six months. |
| 9 | Q.   Every six months you get a check in the mail? |
| 10:35 10 | A.   Something. |
| 11 | Q.   And you didn't care whether or not it was an accurate book |
| 12 | or inaccurate book? |
| 13 | A.   I cared if it was accurate or fairly accurate, but writers |
| 14 | have their prerogatives, they put what they want in. |
| 15 | Q.   So for you, it was really just about the money? |
| 16 | A.   Correct. |
| 17 | Q.   And when you say you felt remorse, did you know this book |
| 18 | was going to go in bookstores around the country? |
| 19 | A.   Correct. |
| 10:36 20 | Q.   Did you think about maybe when the victims' families walk |
| 21 | by and they see your face on the book and it says "Hitman," how |
| 22 | that makes them feel? |
| 23 | MR. WYSHAK:  Objection, relevance. |
| 24 | MR. BRENNAN:  Remorse. |
| 25 | THE COURT:  Counsel, overruled as to this question. |

1          You may have the question.

2    BY MR. BRENNAN:

3    Q.   Did you think, Mr. Martorano, when you were taking the

4    money for this book, did it cross your mind in all the remorse

5    you had for the victims' families that they'd be walking around

6    in their neighborhoods and their stores seeing your face with

7    "Hitman" on it, how that would make them feel when you were

8    getting your check?

9    A.   I guess.

10:36 10   Q.   You thought about it -- what did you think about it?

11   A.   I didn't want to hurt anybody with it.

12   Q.   But you wanted the money, it didn't matter?

13   A.   I wanted to make a living.

14   Q.   So you knew that it was going to hurt people when you put

15   that book on the shelf, right?

16   A.   I didn't think of it that way.

17   Q.   How did you think of it?

18   A.   As a book to try to make a living with.

19   Q.   So that wasn't part of the remorse equation that you were

10:37 20   thinking about, huh?

21   A.   I didn't try to hurt anybody with the book.

22   Q.   Do you realize now that it hurts a lot of people when they

23   see your picture?

24   A.   It's possible, yeah.

25          MR. WYSHAK:  Objection --

```
 1              THE COURT:  Sustained, counsel.

 2              No speaking objections, Mr. Wyshak.

 3    BY MR. BRENNAN:

 4    Q.   When you say you have remorse, do you have any intention

 5    of taking the book or writing a letter to take it off the

 6    shelf?

 7    A.   I can't do that, it's his book to take off.

 8    Q.   The money that you get from it, in your remorse --

 9    A.   There probably won't be anymore money with it.

 10:37 10   Q.   How much money that you got from this book did you give to

 11   the victims' families?

 12   A.   I supported my family with it.

 13   Q.   How much have you given to the victims' families?

 14              MR. WYSHAK:  Objection, relevance.

 15   A.   None.

 16              MR. BRENNAN:  Sustained.  Counsel, I think you've

 17   exhausted this area.

 18              Mr. Brennan.

 19   BY MR. BRENNAN:

 10:37 20   Q.   So it's not just a book, you also sold your rights to a

 21   movie, Mr. Martorano, didn't you?

 22   A.   Correct.

 23   Q.   And what do you think the movie is going to be about?

 24   A.   I don't know, I didn't read the screenplay.

 25   Q.   Well, other than the 20 people that you killed, has there
```

1    been anything notable in your life someone would make a movie

2    about?

3    A.    I don't know.  Somebody else is doing the writing, not me.

4    Q.    So as you sit in front of this jury and you sold the

5    rights to your movie for $250,000, you're telling us you have

6    no idea what that movie may be about?

7    A.    No, not yet.

8    Q.    And if that movie actually comes to fruition, you get

9    another $250,000, don't you?

10:38 10    A.    Correct.

11    Q.    And if the movie is so successful because the public likes

12    what you're all about, you get more money on bonuses, don't

13    you?

14    A.    Correct.

15    Q.    That's not affected by your remorse for what you've done?

16    A.    Can't change the past.  I still have to make a living for

17    my family.

18    Q.    So you're liable to profit from it?

19         MR. WYSHAK:  Objection and move to strike that last

10:38 20    comment by counsel.

21         THE COURT:  Well, motion to strike as to that part of

22    the question, but the question and answer, the other part of

23    the question and answer, can stand.

24         Jurors, I'm just going to instruct you, part of my

25    instruction to the attorneys about no commentary is because the

1    testimony and the evidence is what the witnesses say.  Okay?

2         Thank you.

3    BY MR. BRENNAN:

4    Q.   When you stood in front of the judge trying to get your

5    deal, what you told Judge Wolf is that you just wanted to go

6    home to your family, right?

7    A.   Correct.

8    Q.   Since you've gotten out of jail, you've done a little more

9    than just go back to your family, haven't you?

10:39 10   A.   I don't understand what you mean.

11   Q.   Well, you went and saw a person by the name of Mr.

12   Cherkas after you got out of jail, didn't you?

13   A.   Yes.

14   Q.   And Mr.  Cherkas is somebody that you thought owed you a

15   hundred thousand dollars from a past debt.

16   A.   He did.

17   Q.   And that hundred thousand dollars was the result of

18   illegal conduct, right?

19   A.   Correct.

10:39 20   Q.   You had loaned money, loansharking, and you felt like he

21   owed you that money that was on the street?

22   A.   No, he did owe it ten years before, yeah.

23   Q.   And so after you made this agreement with the government

24   and you got your deal and you told Judge Wolf, I just want to

25   go see my family, you were back on the street doing the same

1  thing, weren't you?

2  A.   I didn't do anything.

3  Q.   Well, you went and saw him and you wanted to get your

4  money?

5  A.   I wanted to see how it ended.

6  Q.   And if he gave you the $100,000, were you going to pay

7  taxes?

8  A.   If he gave it to me, I would have paid taxes, but I don't

9  think I would have accepted it.  I wanted to see how it ended.

10:40 10  He said he won it back, he didn't owe anything.  I just wanted

11  to make sure that I didn't owe the agency in New York where I

12  sent him to play.  I didn't want them tapping me on the

13  shoulder to say I owed money because of this guy.

14  Q.   So it wasn't that you were trying to go collect money --

15  A.   I wanted to see what happened.

16  Q.   You weren't looking for money for your family.  What

17  you're telling us, instead, is you, being a noble man, didn't

18  want to have a debt over your head?

19  A.   I didn't want anybody chasing me for money that he might

10:40 20  have owed.

21  Q.   In fact, you didn't know where Cherkas was, so you had one

22  of your friends go find him for you?

23  A.   Somebody mentioned his name, it hit a bell.  I never met

24  him.

25  Q.   You summoned him to a meeting, didn't you?

1    A.    I summoned him to a meeting?  I just went to see him.

2    Q.    Where did you go see him?

3    A.    In the North End somewhere.

4    Q.    You went down to the North End, you sat him down, and you

5    wanted to know where the money was?

6    A.    He got in the car, I talked to him for a minute.

7    Q.    You wanted to know where the money was, Mr. Martorano,

8    didn't you?

9    A.    I wanted to know what happened.

10:41 10    Q.    You didn't just see him just once?

11    A.    That's all I saw him.

12    Q.    Didn't you see him twice?

13    A.    Nope.

14    Q.    You're certain?

15    A.    I'm positive.

16    Q.    So, after that, you continued other things, didn't you?

17    A.    I don't know what you're talking about.

18    Q.    Well, you're friends with Mr. Masella, aren't you?

19    A.    Correct.

10:41 20    Q.    And you and Mr. Masella have an arrangement together,

21    don't you, Mr. Martorano?

22    A.    Yeah, we go to dinner together.

23    Q.    Continue on.  Tell us what else that arrangement --

24    A.    And we go to the casino together.

25    Q.    And what happens at the casino, Mr. Martorano?

A.   He's a gambler, and I take a piece of what he does.   I
gamble with him.

Q.   When you take a piece of what he does, are you charging
him rent?

A.   No.

Q.   Are you extorting him?

A.   No.   I'm betting with him.

Q.   Is it your money you're betting?

A.   When I lose, I pay him, yeah.

Q.   I see.

So when you go to the casino, is it a rule that you
can't gamble?

A.   No.

Q.   Is there a reason why you take a piece of Mr. Masella's
money?

A.   Because I consider him a better gambler than me.

Q.   Well, you said he plays dice?

A.   Yeah.

Q.   Are you good at the dice, Mr. Martorano?

A.   Is he good at dice?

Q.   Yeah?

A.   Yes.

Q.   He's better than you at dice?

A.   Yes.

Q.   I see.

```
 1              MR. WYSHAK:  Objection.

 2              THE COURT:  Wait, wait.

 3              Counsel, was there an objection?

 4              MR. WYSHAK:  Yes.

 5              THE COURT:  As to?

 6              MR. WYSHAK:  Relevance, betting in a casino?

 7              THE COURT:  Well, I think, counsel, you're at the end

 8    of this line?

 9              MR. BRENNAN:  Yes, your Honor.

10:42 10        THE COURT:  Okay.

11              Proceed.

12    BY MR. BRENNAN:

13    Q.   And you say it's 10 percent, sir?

14    A.   Yeah, he's a bigger bettor than me.  I can't afford to

15    play as much as he plays, so I take ten percent of the win or

16    loss, and I pay him if we lose, and he pays me if we win.

17    Q.   Sir, when you were telling us about your history, you were

18    telling us that it's important to have a partner who can help

19    you out; isn't that true?

10:43 20   A.   I would assume so, sure.

21    Q.   A partner that can give you money?

22    A.   I don't follow you.

23    Q.   Well, is it important that a good partner will be able to

24    give you money when you need it?

25    A.   Sure.
```

1    Q.   Your partner now, Mr. Martorano, is the federal

2    government, isn't it?

3           MR. WYSHAK:  Objection.

4           THE COURT:  Sustained.

5    A.   No.

6           MR. BRENNAN:  I have no further questions for this

7    witness.

8           THE COURT:  Redirect?

9                       REDIRECT EXAMINATION

10   BY MR. WYSHAK:

11   Q.   On that last line of questioning, Mr. Martorano, is there

12   anything wrong with going to a casino and betting at a casino

13   that you know of?

14   A.   Not that I know of.

15   Q.   All right.

16          Now, when you were testifying yesterday and today,

17   every time Mr. Brennan asked you a question and you brought up

18   Mr. Bulger's name, he would say, I'm asking about you.  So now

19   I'm going to ask you about you and Mr. Bulger.

10:44 20         Were you and Mr. Bulger involved in the murder of

21   Michael Milano?

22   A.   Correct.

23   Q.   Were you and Mr. Bulger involved in the murder of Al

24   Plummer?

25   A.   Correct.

```
 1    Q.   Were you and Mr. Bulger involved in the murder of William
 2    O'Brien?
 3    A.   Correct.
 4    Q.   Were you and Mr. Bulger involved in the murder of Al
 5    Notarangeli?
 6    A.   Correct.
 7    Q.   Were you and Mr. Bulger involved in the murder of Eddie
 8    Connors?
 9    A.   Correct.
10:45 10    Q.   Were you and Mr. Bulger involved in the murder of Thomas
11    King?
12    A.   Correct.
13    Q.   Were you and Mr. Bulger involved in the murder of James
14    O'Toole?
15    A.   Correct.
16    Q.   Were you and Mr. Bulger involved in the murder of James
17    Sousa?
18    A.   Correct.
19    Q.   Were you and Mr. Bulger involved in the murder of Richard
10:45 20    Castucci?
21    A.   Correct.
22    Q.   Were you and Mr. Bulger involved in the murder of Roger
23    Wheeler?
24    A.   Correct.
25    Q.   Were you and Mr. Bulger involved in the murder of John
```

```
 1  Callahan?

 2  A.    Correct.

 3  Q.    Did Mr. Bulger admit to you that he murdered Brian

 4  Halloran?

 5  A.    Correct.

 6  Q.    Did Mr. Bulger admit to you that he murdered "Buddy"

 7  Leonard?

 8  A.    Correct.

 9  Q.    You were asked about appearing on "60 Minutes"?

10  A.    Yeah.

11  Q.    Did you have a friend who worked for "60 Minutes"?

12  A.    Yes.

13  Q.    Who was that?

14  A.    Ed Bradley.

15  Q.    What was your relationship with Ed Bradley?

16  A.    We were football players together in Rhode Island.

17  Q.    Did he make a request to you?

18  A.    Yes.

19           MR. BRENNAN:  Objection, leading.

20           THE COURT:  Well, sustained as to form, but you can

21  reframe it.

22  BY MR. WYSHAK:

23  Q.    Well, tell us why you went on "60 Minutes."

24  A.    Well, he wanted to do an interview with me and find out

25  what happened and how things ended up the way they did, and I
```

1   agreed to have it with him.  But he died just before I got out.

2   Q.   All right.

3        You also, yesterday, used the word "Judas" --

4   A.   Correct.

5   Q.   -- when you were describing some of your feelings about

6   committing some of these murders.  Do you recall that?

7   A.   Correct.

8   Q.   Can you explain what you meant by that to the jury?

9   A.   Well, Judas is a person that -- it's like an informant.

10:47 10  It's a rat, it's a no-good guy, and I was always brought up

11   to -- that's the worst person in the world.  I mean, as far as

12   being a rat, I mean, it's just the opposite of the way I want

13   to live.

14   Q.   You were asked questions about lying.  Mr. Brennan asked

15   you this morning, you would lie for your brother.  Do you

16   remember that line of questions?

17   A.   Yeah.

18   Q.   Since you agreed to cooperate and testify with the federal

19   government, have you lied about your brother's involvement in

10:48 20  any criminal activity?

21   A.   After I made an agreement with the government, I lied

22   about nothing about my brother.

23   Q.   Have you lied about your involvement in criminal activity

24   with any other individual?

25   A.   None.

```
 1   Q.   You were asked about whether or not you ever testified
 2   about criminal activity involving your brother.  Do you recall
 3   that?
 4   A.   Correct.
 5   Q.   Or Pat Nee or Howard Winter?
 6   A.   Correct.
 7   Q.   Did you testify before a federal grand jury?
 8   A.   Yes.
 9   Q.   Were you asked questions at that federal grand jury about
10   criminal activity involving Howard Winter?
11   A.   Correct.
12   Q.   Pat Nee?
13   A.   Correct.
14   Q.   Your brother?
15   A.   Correct.
16   Q.   You answered those questions?
17   A.   Correct.
18   Q.   Did you answer them truthfully?
19   A.   Yes.
20   Q.   You were also asked this morning by Mr. Brennan about this
21   individual, Paul Rico, in connection with the Wheeler and
22   Callahan murder.
23   A.   Correct, correct.
24   Q.   And did Rico have something to gain by the murder of Roger
25   Wheeler?
```

| | |
|---|---|
| 1 | A.   I think he did, yeah. |
| 2 | Q.   He wasn't your friend, was he? |
| 3 | A.   No. |
| 4 | Q.   Whose friend was he? |
| 5 | A.   He was Callahan's, Callahan had hired Rico for head of |
| 6 | security. |
| 7 | Q.   What was Stephen Flemmi's relationship with Paul Rico? |
| 8 | A.   I guess he used -- I found out later he was an informant |
| 9 | for him. |
| 10:49 10 | Q.   Your motivation to kill Roger Wheeler was what? |
| 11 | A.   To try to help my friend, John. |
| 12 | Q.   Did Mr. Flemmi have a different motivation? |
| 13 | MR. BRENNAN:  Objection. |
| 14 | A.   Yes. |
| 15 | THE COURT:  Was there an objection, counsel? |
| 16 | MR. BRENNAN:  I withdraw it. |
| 17 | BY MR. WYSHAK: |
| 18 | Q.   And what was it? |
| 19 | A.   To help Rico, evidently, and to make money, if it was |
| 10:49 20 | possible. |
| 21 | Q.   You were also asked about your lifestyle in Florida.  Do |
| 22 | you recall those questions, yesterday? |
| 23 | A.   Correct. |
| 24 | Q.   Where was the money coming from that supported your |
| 25 | lifestyle in Florida? |

```
 1   A.   I got a lot of it from Stevie and "Whitey."

 2   Q.   Money that they were earning, correct?

 3   A.   Correct.

 4   Q.   And sending you a piece?

 5   A.   Correct.

 6        MR. BRENNAN:  Objection.  I object on the basis of who

 7   was sending it.

 8        THE COURT:  Well, I think he's answered that, counsel.

 9   Overruled.

10:50 10        Mr. Wyshak.

11        MR. WYSHAK:  Your Honor, I'd like to put up this

12   target list again.

13        THE COURT:  You may.

14        (Pause.)

15   BY MR. WYSHAK:

16   Q.   Are you familiar with that list, Mr. Martorano?

17   A.   Yes.

18   Q.   Now, the first two people on that list, Mr. Bulger and

19   Mr. Flemmi, at the time you entered your plea agreement, were

10:51 20   they under indictment?

21   A.   Yes.

22   Q.   You were required to testify in that case --

23   A.   Correct.

24   Q.   -- is that fair to say?

25        And you're not a lawyer, correct?
```

           1    A.   Correct.

           2    Q.   Are you familiar with how evidence can be used in a

           3    courtroom?

           4    A.   Not really.

           5    Q.   Did you know what the government's strategy was regarding

           6    the prosecution of other members of the South Boston crew?

           7    A.   No.

           8    Q.   Did you learn that subsequent to your plea agreement that

           9    Mr. Weeks and Mr. O'Neil were indicted?

10:52    10    A.   Correct.

          11    Q.   If called to testify in that case --

          12    A.   -- I had to go.

          13    Q.   You knew Kevin Weeks, right?

          14    A.   I knew of him, yeah, I met him once.

          15    Q.   Other than meeting him once, what else did you know about

          16    him?

          17    A.   I know he was "Whitey's" right-hand guy.

          18    Q.   How did you know that?

          19    A.   From "Whitey."

10:52    20    Q.   He told you, right?

          21    A.   Over the years, yeah.

          22    Q.   More than once?

          23    A.   Many times.

          24    Q.   Did you know whether or not that testimony would be

          25    admissible in a prosecution against Kevin Weeks?

```
 1   A.   Did I -- pardon me?

 2   Q.   You didn't know, as a matter of law, whether or not that

 3   testimony would be admissible in a case against Kevin Weeks,

 4   did you?

 5   A.   No.

 6   Q.   If called to testify in a trial against Kevin Weeks and

 7   Kevin O'Neil, would you have testified?

 8   A.   Yes.

 9   Q.   That was required by your plea agreement, correct?

10:52 10   A.   It's the agreement, yeah.

11   Q.   Now, this next person, Jack Curran, didn't you testify

12   about him before the federal grand jury?

13   A.   Yeah.

14   Q.   You testified at this trial about Jack Curran, correct?

15   A.   Correct.

16   Q.   Was Jack Curran one of the individuals who was in these

17   backup cars, these crash cars?

18   A.   He was possible to be around in many -- a lot of places,

19   yeah.

10:53 20   Q.   Now, you were also asked some questions about Joe Barboza.

21   Remember those questions?

22   A.   Yes.

23   Q.   And when did Joe Barboza get arrested and cooperate with

24   the FBI?

25   A.   I'm not sure, in the late '60s.
```

```
 1   Q.    It wasn't at any time -- well, withdrawn.

 2         Thirty years prior to the time that you entered a plea

 3   agreement with the government --

 4   A.    Correct.

 5   Q.    -- fair to say?

 6         MR. WYSHAK:  Could we put the plea agreement up on the

 7   screen?

 8         MR. CARNEY:  Your Honor, could I approach, please,

 9   with Mr. Wyshak?

10:54 10    THE COURT:  Sure, counsel.

11         Would this be a good time to take a break?

12         Why don't we do that first.

13         Jurors, we'll take a 20-minute break.

14         THE CLERK:  All rise.

15         (Jury left the courtroom.)

16         THE COURT:  Counsel, would you still like to approach?

17         MR. CARNEY:  No, your Honor.

18         THE COURT:  Everyone can be seated.

19         MR. CARNEY:  Would it be possible to that take the

10:55 20  recess at this time?

21         THE COURT:  Yes.

22         MR. CARNEY:  Thank you.

23         THE COURT:  Understand, understand.

24         Counsel, I think this was a matter that you wanted to

25   bring up beforehand?  Should we -- it was a matter you wanted
```

1  to bring up before the next witness.

2  MR. CARNEY:  Yes, I waive the defendant's presence for

3  that.

4  THE COURT:  Okay.

5  Do you understand, Mr. Bulger?

6  THE DEFENDANT:  Yes.

7  (Defendant left the courtroom).

8  THE COURT:  Counsel, can you be heard briefly about

9  this so I can give you all the benefit of a break?

10:56 10  MR. CARNEY:  Yes.

11  THE COURT:  Everyone else be seated.

12  We're still in session, to the gallery, please.

13  MR. CARNEY:  Your Honor, I would request that the

14  government make an offer of proof regarding the testimony of

15  the next witness, in particular focusing on his ability to

16  authenticate the photos.

17  MR. HAFER:  Happy to do so, your Honor.

18  THE COURT:  And can you just remind me the name of the

19  next witness?

10:57 20  MR. HAFER:  William Doogan, he's a supervisor in BPD's

21  cold case squad.

22  THE COURT:  Is it fair to say he was not involved in

23  the investigation of the homicides that we're talking about?

24  MR. HAFER:  That is fair to say.  He's had, in fact,

25  no involvement whatsoever other than the following:  As the

1   supervisor of that squad, he's familiar with BPD's system of

2   maintaining, storing files related to murders.

3        He will testify as to his familiarity with the system

4   with respect to murder files, including files that BPD

5   maintains at its photo lab.

6        Just as a threshold matter, BPD has eight of the crime

7   scenes with respect to the 19 murders here, so Sergeant

8   Doogan's testimony is limited to those eight crime scenes.

9   Separately, we're calling someone from the State Police with

10:57 10   respect to those crime scenes.

11        Just backing up even further, this is something, of

12   course, we tried unsuccessfully to get a stipulation on with

13   respect to the photos.

14        But Sergeant Doogan will testify that based on the 27

15   or so years he's been with BPD, including the last

16   three-and-a-half as a supervisor of the cold case squad, as

17   part of his day-to-day responsibility he accesses the files, he

18   interacts with the photo lab.  The photo lab has a system of

19   maintaining and storing in the ordinary course of business

10:58 20   negatives from photographs of every homicide committed within

21   the City of Boston.

22        As part of this case, after being provided eight names

23   by our office, he went, he looked up the eight names in

24   something called BPD's card filing system.

25        I intend to establish the card filing system at BPD is

1    a business record of the Boston Police Department.

2         He then compares what he learns from the card file

3    system with another thing that -- business record that BPD

4    keeps called a long sheet, which is effectively an Excel spread

5    sheet which lists every murder by year committed within the

6    City of Boston, to obtain essentially what is a CC number,

7    which is a complaint number that Boston Police assigns to each

8    case.

9         He then goes to the photo lab with the name of the

10:59 10   murder victim and the number and asks the photo lab to print up

11   from the original negatives in the file photographs associated

12   with that particular victim.

13        And I intend to lay a foundation that this is a filing

14   system that he's familiar with, that the card file, the long

15   sheet, and the photo lab murder files are kept in the ordinary

16   course of business, it's BPD's usual practice and custom to

17   maintain these files.  They are made at or near the time --

18             THE COURT:  And are you introducing photos, counsel?

19             MR. HAFER:  And then I will offer the photos through

10:59 20   him.

21             THE COURT:  No other documents, just photos.

22             MR. HAFER:  Simply photographs.  There's no commentary

23   that the government will elicit from the witness beyond the

24   photographs.

25             THE COURT:  And are these photographs of murders that

 1   the jury has already heard about?

 2          MR. HAFER:  Your Honor, the -- there's eight, like I

 3   mentioned.

 4          The government's plan is to publish -- the eight are

 5   Milano, Plummer, O'Toole, Al Notarangeli, Eddie Connors,

 6   Francis "Buddy" Leonard, and then Brian Halloran and Michael

 7   Donahue.

 8          The government's plan is to offer the photographs for

 9   all eight through this witness, but at this time, because

11:00 10   there's been only very limited testimony with respect to

11   Messrs. Halloran and Donahue, not to publish the Halloran and

12   Donahue photographs at this time, but only to publish -- offer

13   all, but only to publish for those first six.

14          THE COURT:  Mr. Carney.

15          MR. CARNEY:  I accept Mr. Hafer's representations.  If

16   they are just coming in through this witness as a keeper of the

17   records, essentially saying, I looked up the Boston Police

18   records of this homicide, these photos were contained in that

19   record, then I will not object to their admission.

11:01 20          MR. HAFER:  And let me just add one last thing.

21          The reason I'm laying the foundation on the card file

22   specifically, your Honor, is because there is a date associated

23   with the card file.  That's the only substantive testimony I

24   intend to ask Sergeant Doogan, is in the course of looking at

25   the card file, looking at the long sheet, and going and

1    obtaining the photos from the lab, did he become aware of the

2    date, essentially, upon which BPD learned of the incident.  And

3    I intend to elicit that date from him.

4            MR. CARNEY:  I don't object to that either.

5            My concern, frankly, was if the witness were going to

6    go beyond that, and either compare the photos to testimony at

7    the crime scene or add any commentary.

8            If it's going to be as limited as Mr. Hafer

9    represents, all of the exhibits can come in without objection.

11:02 10   Indeed, if he doesn't want to be as fulsome about telling

11   everybody about the whole process, that won't change my view of

12   the --

13           THE COURT:  I'll leave that to Mr. Hafer, but I

14   understand the proffer and I understand Mr. Carney's position

15   in light of that proffer.

16           MR. HAFER:  And can I just -- on a scheduling matter

17   just while we're here, your Honor, I think your Honor is

18   probably aware of this already, but on the assumption that

19   we're going to get through the current witness sometime in the

11:02 20   next 30 or 40 minutes, Sergeant Doogan, as you know, is the

21   only other witness the government has here today.  So I just

22   wanted to remind you of that.

23           THE COURT:  I understand that.  I don't think the jury

24   will be disappointed.

25           MR. CARNEY:  Your Honor, if I also may add, as you

```
 1    certainly recall from your own trial lawyer experience,

 2    sometimes it's difficult to predict how long a

 3    cross-examination will go.

 4            The prosecutor was, in part, acting on a

 5    representation of our best estimate.

 6            THE COURT:  No, I understand.

 7            MR. CARNEY:  So I just want to let you know how they

 8    find themselves --

 9            THE COURT:  I understand.

10            Like I said, we'll just -- we'll see if there are

11    other matters counsel and the Court can take up in the interim.

12            MR. KELLY:  Just a motion for clarification, when are

13    we supposed to be back from break?

14            THE COURT:  I will give you the benefit of the full 20

15    minutes.  Actually, it's really for Ms. Joyce's benefit.

16            MR. CARNEY:  Could one representative of the

17    government accompany me to speak to you just for one moment?

18            THE COURT:  Okay.

19            MR. CARNEY:  It need not be on the record, your Honor.

20            THE COURT:  Okay.

21            (Discussion off the record.)

22            (Recess taken.)

23          (Whereupon the Honorable Court entered.)

24            THE COURT:  Can I see counsel at sidebar for a quick

25    moment?
```

1        (SIDEBAR CONFERENCE AS FOLLOWS:

2        THE COURT:  Counsel, just two quick things.  One is

3    right as we recessed, we went off the record briefly on a

4    personal-comfort issue related to the defendant, which I

5    addressed with Mr. Carney and Mr. Kelly.

6        The other thing is I just -- this is actually for

7    Mr. Carney and Mr. Brennan.

8        I think all of the folks operating the Sanction

9    software have been trying to do a great job.

10       I did notice, Mr. Brennan, that there were a few times

11   where there were documents up on the screen that I think were

12   related to refreshing recollection that were a little ahead of

13   when they were being offered.  And I know people are being

14   conscientious and trying to be prepared in anticipation of

15   where you're going, but I would just ask you to remind folks

16   that things are not admitted until the Court admits them, and

17   that anything used for refreshing or impeachment should not be

18   before the jury unless I have allowed it specifically.

19       MR. BRENNAN:  My apologies.  It's my fault.  I will

20   make sure it doesn't happen again.

21       THE COURT:  Thank you.

22   END OF SIDEBAR CONFERENCE.)

23       THE CLERK:  All rise for the jury.

24       (Whereupon, the jury entered the courtroom.)

25       THE CLERK:  Court is in session.

1       You may be seated.

2           THE COURT:  Mr. Wyshak.

3           MR. WYSHAK:  Yes, your Honor.

4   BY MR. WYSHAK

5   Q.   Mr. Martorano, do you remember the target list that was up

6   there, and Mr. Weeks' name was on that?

7   A.   Correct.

8   Q.   When you were incarcerated at Plymouth, did you have any

9   interaction with Mr. Weeks?

10  A.   Yes.

11  Q.   What was that?

12  A.   He was in the visiting room, and I came in and introduced

13  myself to him.

14  Q.   For what purpose?

15  A.   I wanted him to ask "Whitey" for some money.

16  Q.   Did you get that money?

17  A.   Yes, I did.

18  Q.   Where did that money go?

19  A.   To my girl's mother's house in Somerville.

20  Q.   Her name was?

21  A.   Loretta Lytle.

22  Q.   Did you understand that that was a potential money

23  laundering violation?

24  A.   By me?

25  Q.   You and other people involved in that transaction.

1   A.    Yeah, could have been.

2   Q.    Did you think -- who did you ask Mr. Weeks to get the

3   money from?

4   A.    "Whitey."

5   Q.    Did you think that was legitimate money?

6   A.    No, no.

7   Q.    So you were asking Mr. Bulger to engage in a financial

8   transaction; is that fair to say?

9         MR. BRENNAN:  Your Honor, redirect, leading.

10   Objection.

11         THE COURT:  Well, sustained as to the form.

12   Q.    You understand that by what you were doing you were

13   asking Mr. Bulger to engage in a crime?

14         MR. BRENNAN:  Objection.  Leading.

15         THE COURT:  No.  I'll allow that.

16   A.    Correct.

17   Q.    And that was something Mr. Weeks was also involved in at

18   the time, correct?

19   A.    Correct.

20   Q.    So you could have been a witness against him for that

21   offense, correct?

22   A.    Correct.

23   Q.    And you testified about that offense; is that fair to say?

24   A.    Correct.

25   Q.    Now, other than Mr. Bulger, did you learn about

1    Mr. Weeks' involvement in Winter Hill from anybody else?

2    A.    Sure.  All over the years from Stevie and George Kaufman.

3    Q.    Now, I think --

4         MR. WYSHAK:  Can we put the plea agreement up?

5    It's Exhibit 1159, page 4, Bates No. 00051354.

6    Q.    All right, Mr. Martorano, do you recall --

7         Mr. Martorano?

8         Do you recall you were asked questions by Mr. Brennan

9    about the issues at this Wolf hearing?

10   A.    Correct.

11   Q.    Or the "Salemme hearing" I think he described it as.

12   A.    Correct.

13   Q.    You were before Judge Wolf?

14   A.    Correct.

15   Q.    You testified that that was about the FBI and corruption?

16   A.    Correct.

17   Q.    What did you understand the government's focus to be at

18   the time they made this agreement with you regarding future

19   prosecutions?

20   A.    I don't follow you.

21   Q.    Did you have an understanding regarding, as a result of

22   information that came out during the Salemme hearings, what the

23   government's focus was in terms of who they wanted to

24   prosecute, who they were seeking your assistance with?

25   A.    Yes.

1   Q.   Who?

2   A.   Whitey and Stevie and corrupt officials.

3   Q.   And if you look at the bottom of page 4, there are

4   actually cases that you were required to testify on, correct?

5   A.   Correct.

6   Q.   And that first case, United States against Stephen Flemmi,

7   that's the case that you were involved in, the one before Judge

8   Wolf?

9   A.   Correct.

10  Q.   Was Mr. Bulger a defendant in that case?

11  A.   Yes.

12  Q.   At the time he was a fugitive, correct?

13  A.   Correct.

14  Q.   But he was named as a defendant?

15  A.   Yes.

16  Q.   Okay.

17       And if you'd go to the top of the next page.

18       You were required to testify regarding any prosecution

19  arising from the murders of Roger Wheeler, John Callahan, or

20  Brian Halloran, correct?

21  A.   Correct.

22  Q.   The prosecution of the individuals on the so-called target

23  list correct?

24  A.   Correct.

25  Q.   And then "Any prosecution brought against any current or

1    former member of local, state, or federal law enforcement,

2    including, without limitation, any prosecution based upon any

3    illegal or corrupt relationship between that individual and

4    James Bulger or Stephen Flemmi."

5    A.   Correct.

6    Q.   Did that language include John Connolly?

7    A.   Correct.

8    Q.   Richard Schneiderhan?

9    A.   Correct.

10   Q.   Now, you engaged in a proffer, right?

11        Could you explain to the jury what a "proffer" is?

12   A.   It's a letter that my lawyers drew up with the

13   government that allowed me to speak to them with immunity, and

14   so -- I had derivative use immunity, so that nothing could be

15   used against me if we didn't strike a deal.  And then we tried

16   to work out a deal.

17   Q.   And when you made your statement to Colonel Foley, or at

18   that time Lieutenant Foley, was that during the proffer period?

19   A.   Yes.

20   Q.   Can you describe the difference between the information

21   you were providing during the proffer and the information you

22   were providing after you reached an agreement with the

23   government?

24   A.   Well, the information after I made an agreement was the

25   final product.  The rest was just discussing things and putting

1   them in place.

2   Q.   Okay.

3      During the proffer, did you provide all the information

4   that you were aware of?

5   A.   Yes.

6   Q.   Did you provide the names of every individual who was

7   involved in criminal activity with you?

8   A.   No.

9   Q.   After you entered into an agreement with the government,

10   did you provide all the names of every individual who was

11   involved in criminal activity with you?

12   A.   Yes, after I had the agreement.

13   Q.   You were asked about a statement made during the proffer

14   regarding this O'Toole murder.  Do you recall those questions

15   about Mr. Flemmi be being in the car --

16   A.   Oh, yeah, yeah.

17   Q.   -- during the O'Toole murder?

18      I want to show you the report that Mr. Brennan showed you.

19   A.   Correct.

20      MR. WYSHAK:  I'm going to show the witness what's been

21   designated 00257757 and 00257758.

22   Q.   Would you read the last line of that very same paragraph

23   that Mr. Brennan was asking you to read.  Do you see that at

24   the top of the second page there?

25   A.   (Witness complies.)

1       Correct.

2    Q.   What does it say?

3    A.   It says that --

4            MR. BRENNAN:  Objection.

5            THE COURT:  Basis, counsel?

6            MR. BRENNAN:  Number one, starting with the

7    evidentiary admissibility.  Secondly, doctrine of completeness.

8    I think we're should read the whole thing.

9            THE COURT:  Are you offering it for completeness,

10   counsel?

11           MR. WYSHAK:  Completeness and to show a prior

12   consistent statement, your Honor.

13           MR. BRENNAN:  It's -- pardon me.

14       I object on the basis of a prior consistent statement.

15   The timing of it does not make it a prior consistent statement.

16           THE COURT:  Let me hear the question, counsel.

17           MR. WYSHAK:  I am asking the witness to state what the

18   report concludes regarding his statement on the O'Toole murder.

19           THE COURT:  Meaning you're going to ask him if he said

20   what you're referring to?

21           MR. WYSHAK:  Yes.

22           MR. BRENNAN:  The statement that he was impeached on

23   was a prior consistent statement.  The time and motive to

24   fabricate was prior to that subsequent recantation.  So it's

25   not a prior consistent statement.

1          THE COURT:  Mr. Wyshak?

2          MR. WYSHAK:  May I proceed?

3          THE COURT:  Was there a response to that, about it

4   being prior?

5          MR. WYSHAK:  It's a prior consistent statement to his

6   testimony in this proceeding, your Honor.  He makes a statement

7   at the time of the interview which corrects an error in the

8   report.  He was impeached with the error in the report, but it

9   wasn't reflected that that very same report in that very same

10  paragraph contains the correction made by the witness.  So it's

11  a prior consistent statement of his testimony at this

12  proceeding.

13         MR. BRENNAN:  Your Honor --

14         THE COURT:  Counsel, do you still have the same

15  objection.

16         MR. BRENNAN:  I do.

17      He lied.  He caught the lie --

18         MR. WYSHAK:  I object to that, that he lied.

19         THE COURT:  Counsel, that's for the jury to decide.

20      I understood your objection to be that it's not a prior

21  consistent statement.

22         MR. BRENNAN:  It's not a prior consistent statement

23  because he was impeached with the statement that he originally

24  made.

25         THE COURT:  No, but I understand -- well, overruled on

1     that ground.

2          You may ask the question, Mr. Wyshak.

3     Q.   What did you tell Colonel Foley?  What does the report

4     reflect you told Colonel Foley regarding the O'Toole murder?

5     A.   That I told Foley that Steven Flemmi was not present at

6     the homicide.  However, I did speak with Flemmi on the

7     telephone about the O'Toole situation.

8     Q.   And that statement was made at the same time --

9     A.   Same time.

10    Q.   -- you were making this proffer; is that fair to say?

11    A.   Same time, yeah.

12    Q.   It's reflected in the proffer report?

13    A.   Yes.

14    Q.   Now, you were also asked about the property that you owned

15    in Florida, correct?

16    A.   Correct.

17    Q.   And that property was seized by the United States?

18    A.   Forfeiture, yeah.

19    Q.   Did you get the money that resulted from the seizure of

20    that property?

21    A.   No.

22    Q.   Who got the money that resulted from the seizure of that

23    property?

24    A.   Ex-wife.

25    Q.   Did you ever see a nickel of it?

1  A.   No.

2  Q.   At the time that she got that money, did she have a

3  relationship with you?

4  A.   No.

5       MR. WYSHAK:   I have nothing further, your Honor.

6       THE COURT:   Any recross, Mr. Brennan?

7       MR. BRENNAN:   Yes, your Honor.

8  May I have one moment, your Honor?

9       THE COURT:   You may.

10      (Pause in proceedings.)

11                     RECROSS-EXAMINATION

12 BY MR. BRENNAN

13 Q.   You were just asked about Mr. O'Toole, and Mr. Wyshak

14 asked you some questions, and you purportedly read along with

15 the report, sir --

16 A.   Yes.

17 Q.   -- is that true?

18      And when I had asked you earlier about Mr. O'Toole, and I

19 had asked you whether or not you originally put Stevie Flemmi

20 in the car and provided details about him being in the car, you

21 said that you recanted that, right?

22 A.   Yes.

23 Q.   And when Mr. Wyshak just asked you the question, he asked

24 you if on the same day you made up for that mistake.

25           MR. WYSHAK:   Objection.  I did not say --

1          THE COURT:  Mr. Wyshak.

2      Sustained.

3  Q.   Looking at that report, sir, you mentioned that Stephen

4  Flemmi was the person that was in the car with you.

5  A.   Correct.

6  Q.   I am going to ask you to look at the next page, 00326836,

7  and that's the end of the paragraph of Mr. Foley's report.

8  A.   I don't think I have it.

9          MR. BRENNAN:  May I approach the witness?

10          THE COURT:  You may.

11          MR. BRENNAN:  Actually, can we show this on the

12  screen, your Honor?

13          MR. WYSHAK:  It's a document that's not in

14  evidence, unless we want to put the whole proffer in.

15          THE COURT:  Counsel, not on the screen, but you can

16  ask him about it if you want him to read it.

17  Q.   This is the page of the O'Toole report that Mr. Wyshak

18  gave you, and this is the second page right here, sir

19  (indicating).

20  A.   Yeah.

21  Q.   Correct?

22  A.   This page and this page.

23  Q.   Okay.

24      Starting with the word "further" from Mr. Foley's

25  report, let me know if I am reading this correctly.

1        "Further investigation --

2              MR. WYSHAK:  Objection to his reading --

3              THE COURT:  Sustained as to -- I thought you were

4    going to have him read it to himself, counsel, and then ask

5    your question.

6              MR. BRENNAN:  Your Honor, the government was allowed

7    to read part of this.  The doctrine of completeness doesn't put

8    it in context unless we read the next sentence.  And since the

9    government already introduced part of it, under completeness,

10   out of fairness, we need the rest of the sentence.

11             THE COURT:  Counsel, let me see the rest of it.

12         Can I see you at sidebar.

13             MR. BRENNAN:  May I have that, Mr. Martorano?

14             (SIDEBAR CONFERENCE AS FOLLOWS:

15             THE COURT:  Okay.

16             MR. BRENNAN:  He was reading the report that he

17   recanted on that day from Mr. Foley.

18             THE COURT:  Where are you?

19             MR. BRENNAN:  Up here (indicating).

20             MR. WYSHAK:  I don't have any objection if he asks the

21   witness to read it.

22             THE COURT:  So what was your objection?

23             MR. WYSHAK:  I don't think Mr. Brennan should stand up

24   and start reading in front of the jury from a document that's

25   not in evidence.

1           If he wants to show the witness --

2                THE COURT:  Well, he can read it.

3                MR. BRENNAN:  Thank you.

4      END OF SIDEBAR CONFERENCE.)

5                MR. BRENNAN:  Can I approach the witness, because I

6      only have one copy?

7                THE COURT:  I think Mr. Wyshak is offering it to you.

8                MR. BRENNAN:  May I approach the witness and give him

9      a copy?

10               THE COURT:  You may.

11          (Pause in proceedings.)

12               THE COURT:  Mr. Brennan, you can have your

13     question.

14               MR. BRENNAN:  Certainly.

15     BY MR. BRENNAN

16     Q.   Finishing the paragraph, Mr. Martorano, when you spoke to

17     Mr. Foley, didn't it say, "Further investigation regarding the

18     homicide revealed that James O'Toole was murdered on December

19     1, 1973"?

20     A.   Correct.

21     Q.   "At a later date, Martorano recalled that Flemmi was not

22     present during the homicide.  However, he did speak with Flemmi

23     over the telephone regarding the plan to hit O'Toole."

24     A.   Correct.

25     Q.   So when Mr. Wyshak asked you if at that same meeting you

 1   clarified with Mr. Foley --

 2          MR. WYSHAK:  Objection.

 3   Q.   -- you were mistaken, weren't you, sir?

 4          THE COURT:  Sustained, sustained.

 5       I think for the purposes of completeness it's before the

 6   jury, Mr. Brennan.

 7   Q.   Did the government ever ask you to come in and testify

 8   regarding any other corrupt federal officials other than

 9   Mr. Connolly?

10   A.   I don't remember that.

11       No.

12   Q.   When Mr. Wyshak asked you about your target list, sir, did

13   the deal you had with the federal government include protection

14   of your brother, James Martorano?

15   A.   I don't recall.

16   Q.   Did you testify to Mr. Wyshak that it did not include

17   protection of your brother?

18   A.   I don't remember.  No.

19   Q.   Well, you know what the list was, okay, that you had

20   testified to, right?

21   A.   Yes.

22   Q.   And did you think that you could protect Pat Nee?

23   A.   No.

24   Q.   Did you think you could protect Howie Winter?

25   A.   No.

1   Q.   Did you think that you could protect your brother, James

2   Martorano?

3   A.   No.

4            MR. BRENNAN:  May I approach with a transcript and

5   read, your Honor?

6        I'm referring to Florida v. Connolly, Bates 00265694,

7   testimony of John Martorano.

8            THE COURT:  You may approach.

9            MR. BRENNAN:  Thank you.

10       (Counsel conferred.)

11   Q.   You testified in Florida v. Connolly, sir?

12   A.   Yes.

13   Q.   And when you testified in Florida v. Connolly, you were

14   under oath, just like the oath you took today?

15   A.   Correct.

16   Q.   You swore to tell the truth and be accurate?

17   A.   Correct.

18   Q.   Did you do that in Florida, sir?

19   A.   Yes.

20   Q.   I want to show you a document.  I'm going to read, and let

21   me know if I am reading it accurately.

22   A.   Right.

23   Q.   In your testimony were you asked:  "How about James

24   Martorano, your brother, did you talk about" --

25   A.   What is this piece of paper?

1    Q.    A transcript from Florida.

2    A.    From the trial?

3    Q.    Yes.

4    A.    Okay.

5          MR. BRENNAN:  Let me confirm.

6          (Pause in proceedings.)

7    Q.    9/17/06 trial.

8          "How about James Martorano, your brother, did you talk

9    about him with the murder?"

10         And your answer was:  "I believe I did."

11   A.    Yes.

12   Q.    "How many murders did you tell the government that your

13   brother, James Martorano, did?"

14   A.    He was with me one time, it says.

15   Q.    "I believe he was with me one time."

16   A.    Right.

17   Q.    "And part of the plea agreement was that couldn't be used

18   against you?"

19         Your answer --

20         MR. CARNEY:  May I have a moment, please, your Honor?

21         THE COURT:  Sure.

22         (Microphone adjusted.)

23         THE COURT:  Thank you.

24   Q.    "And part of your plea agreement was that couldn't be used

25   against you?"

1      Your answer:  "Positively."

2      QUESTION:  "So that's something else you got from the

3  government?"

4      ANSWER:  "Positively."

5      QUESTION:  "But you got protection from not only yourself,

6  but from -- but your brother, James Martorano?"

7      Your answer:  "Like I said, I had good lawyers."

8  A.   Yes.

9  Q.   QUESTION:  "Yes, sir.  I am sure you did.

10      "The point I'm asking, what you received and how your

11  lawyers are, but -- because if we want to know, we can tell

12  them to come and talk about it."

13      ANSWER:  "What I received?  14 years.

14       The question, Mr. Martorano:  "So part of the deal

15  included protection for your brother, James Martorano, right?"

16      And your answer, sir?

17  A.   It says, "Sure."

18        MR. BRENNAN:  I have no further questions.

19       THE COURT:  Mr. Martorano, you're excused.  Thank you.

20       THE WITNESS:  Thank you.

21    (Witness excused.)

22              *   *   *   *   *   *   *   *

23

24

25

```
1                        CERTIFICATION

2            We certify that the foregoing is a correct transcript

3    of the record of proceedings in the above-entitled matter to

4    the best of our skill and ability.

5

6

7    /s/Debra M. Joyce               June 19, 2013
     Debra M. Joyce, RMR, CRR        Date
8    Official Court Reporter

9

10

11

12   /s/James P. Gibbons             June 19, 2013
     James P. Gibbons, RMR           Date
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                        INDEX

2

3    WITNESS                                                    PAGE

4

5    JOHN MARTORANO

6       Continued Cross-Examination                              3
        By Mr. Brennan
7                                                               89
        Redirect Examination
8       By Mr. Wyshak

9       Recross-Examination                                    115
        By Mr. Brennan
10

11

12                               E X H I B I T S

13

     Exhibit No.          Description                    Received
14

15     1200          2/2/2000 Letter from DOJ to Kenneth    38
                     Fishman Esq.
16

17

18

19

20

21

22

23

24

25