1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3       _____

4       UNITED STATES OF AMERICA,

5                         Plaintiff,          Criminal Action
                                              No. 99-10371-DJC
6       V.
                                              July 22, 2013
7       JAMES J. BULGER,                      8:44 a.m.

8                         Defendant.
        _____
9


10


11              TRANSCRIPT OF JURY TRIAL DAY 26

12            BEFORE THE HONORABLE DENISE J. CASPER

13               UNITED STATES DISTRICT COURT

14            JOHN J. MOAKLEY U.S. COURTHOUSE

15                    1 COURTHOUSE WAY

16                   BOSTON, MA  02210

17


18


19


20                DEBRA M. JOYCE, RMR, CRR
21               VALERIE H. O'HARA, RMR, CRR
                   Official Court Reporters
22            John J. Moakley U.S. Courthouse
               1 Courthouse Way, Room 5204
23                  Boston, MA  02210
                      617-737-4410
24


25

1   APPEARANCES:

2   FOR THE GOVERNMENT:

3   BRIAN T. KELLY, ESQ.
    FRED M. WYSHAK, JR., ESQ.
4   ZACHARY R. HAFER, ESQ.
    United States Attorney's Office
5   John Joseph Moakley Federal Courthouse
    1 Courthouse Way
6   Suite 9200
    Boston, MA 02210
7   617-748-3197

8   FOR THE DEFENDANT:

9   J.W. CARNEY, JR., ESQ.
    HENRY B. BRENNAN, ESQ.
10  Carney & Bassil
    20 Park Plaza
11  Suite 1405
    Boston, MA 02116
12  617-338-5566

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

                    (The following proceedings were held in open

court before the Honorable Denise J. Casper, United States

District Judge, United States District Court, District of

Massachusetts, at the John J. Moakley United States Courthouse,

1 Courthouse Way, Boston, Massachusetts, on July 22, 2013.)

                    THE COURT:  Good morning, counsel.

                    ALL:  Good morning, your Honor.

                    THE COURT:  Good morning, Mr. Bulger.

08:44    THE DEFENDANT:  Good morning, your Honor.

                    THE COURT:  Anything we need to take up before we

begin today?

                    MR. WYSHAK:  Yes, your Honor, I have several issues.

                    When we put Exhibit 1171 in on Friday, which was

Mr. Flemmi's plea agreement in the Judge Wolf case --

                    THE COURT:  Yes.

                    MR. WYSHAK:  -- it went in without attachments, so:

We've marked a copy Exhibit 1171 A with attachments that I'd

like to have marked as an exhibit, if there's no objection.

08:45    THE COURT:  Counsel, I've just been handed a copy

which appears to have the attachments.

                    Counsel, any objection?  Mr. Brennan?

                    MR. BRENNAN:  None, your Honor.

                    THE COURT:  Okay.

                    We can substitute that, counsel.

1          MR. WYSHAK:  And the reason I want to put that in is

2    because the plea agreement in that case makes it clear that

3    there was a certain amount of real estate and bank account

4    assets that were forfeited pursuant to that plea agreement in

5    2001.

6          I think I raised this on Friday, and I'm raising it

7    again, your Honor.  We received a large package of documents

8    from the defense regarding the real estate properties that were

9    released pursuant to the plea agreement in 2001.

08:46 10          I think that the defense intends to question the

11    witness about those assets under the theory that they are some

12    kind of promise, reward, and inducement to Mr. Flemmi's

13    cooperation in this case.

14          He did not agree to cooperate in this case until he

15    pled guilty in 2003, pursuant to the plea agreement before

16    Judge Stearns.  The forfeiture settlement in 2001 was a

17    straight-up, you know, he was pleading guilty to the case

18    before Judge Wolf, there was a case before Judge Keeton at the

19    time, there was also a case before Judge Tauro.  He pled to all

08:47 20    three of those cases, received a ten-year sentence on those

21    cases, resolved the forfeiture through a settlement that was

22    handled by our Asset Forfeiture Unit, and then prepared to go

23    to trial on the murder case, which obviously at that time was

24    going to control his fate.

25          So I believe that trying to impeach the witness

1    because there was some settlement on real estate assets in a

2    case where he did not agree to cooperate, it was not part of

3    the agreement, it was not an inducement, promise, reward is

4    going to be unfair and misleading.

5         THE COURT:  But, counsel, doesn't it -- I understand

6    your point that it wasn't part of the agreement in 2003 that

7    resulted, I suppose, in his testimony today, but it's part of a

8    previous agreement with the government.  Doesn't it at least go

9    to his interest in currying favor in some way with the

08:48 10   government?  I mean, it's part of an agreement with the

11   government who's putting him on now as a witness.

12        MR. WYSHAK:  Well, I mean, I don't think that that can

13   be developed through this witness, that either he was trying to

14   curry favor with the government or the government was trying to

15   curry favor with him.  I think that this is -- you know, what

16   happens in many cases where there are a number of assets

17   seized, there's a plea, and part of the plea bargain is a

18   settlement on the forfeiture.  It's part of the plea bargain

19   which resulted in him getting a ten-year sentence, and like in

08:48 20   any plea bargain, there's always a give and take between the

21   parties.  It had nothing to do with his cooperation two years

22   later.  As a matter of fact, for the next two years, he

23   vigorously fought the allegations --

24        THE COURT:  But can't you bring that all out, counsel?

25   Meaning -- I'll hear from Mr. Brennan in a moment -- but

```
 1    isn't -- can't you draw different conclusions from this
 2    information?
 3           MR. WYSHAK:  I don't think so.  And I think it's going
 4    to be hard for me to develop through the witness what the --
 5    the way cases are settled in the forfeiture realm between the
 6    government and counsel.  I mean, I don't think this witness is
 7    sophisticated enough to really understand that.
 8           I don't think that -- I guess my argument here is
 9    there is no good-faith basis to cross-examine this witness
08:50 10   regarding this settlement on the forfeiture.  I think it's
11    going to chew up a lot of time, and there's no good reason for
12    it, because it wasn't given to him to try to get him to
13    cooperate in any manner.  It was given to him, essentially, so
14    we didn't have to litigate the forfeiture, just like we didn't
15    want to litigate the three cases that he pled guilty to, which
16    were the Keeton case, the Wolf case, and the Tauro case.  So
17    that's my argument on that.
18           The only other issue I wanted to raise before the
19    Court is I received a document, which appears to be a dismissal
08:50 20   of a UFAP complaint, which was dismissed after Mr. Flemmi was
21    arrested in 1974 when he returned from being a fugitive to face
22    state murder charges.  Again, I think that the defense intends
23    to impeach Flemmi where this was some kind of, again, reward
24    given to Flemmi, some kind of misconduct by the government
25    dismissing this case.  Again, this is standard procedure, it's
```

1       the Department of Justice's policy that we help local

2       authorities to apprehend fugitives by issuing a UFAP complaint,

3       it goes into the federal NCIC system, it allows federal agents

4       to make the arrest.  Once the arrest is made on local charges,

5       every UFAP complaint is dismissed in the ordinary course of

6       business.  To, again, impeach the witness and imply this was

7       some kind of benefit given to him, I think is unfair and

8       there's no good-faith basis to do that.

9                   THE COURT:  Mr. Brennan?

08:52 10                 MR. BRENNAN:  To address the impeachment of Mr. Flemmi

11      with the properties first, there is a plea agreement that was

12      offered by the government in this case as an exhibit, 1171 A,

13      that was the plea agreement that occurred in front of Judge

14      Wolf.  Part of that plea agreement was an Attachment C, which

15      listed different properties that the government agreed that

16      Mr. Flemmi could keep, knowing that other than his brief stint

17      in Canada that all his properties and assets were garnered

18      through illegal activity, the government chose to allow him to

19      keep a number of properties that totalled hundreds of thousands

08:52 20      of dollars.

21                  After that plea was resolved, there was further

22      litigation in front of Judge Stearns, inevitably Mr. Flemmi

23      pled guilty on October 2, 2003.  There is an agreement in the

24      Judge Stearns case.

25                  Although the property was already released from the

1    lis pendens by the government in 2001, this is property that

2    the government still had an opportunity to attach if they chose

3    to do so.

4          Under section 10 of the agreement in front of Judge

5    Stearns, there is a specific paragraph that considers the same

6    property that was previously attached and released noted in

7    Attachment C.  And in fact, in the agreement in front of Judge

8    Stearns, Attachment C, is again included.  And the reason why

9    is they want to make clear to Mr. Flemmi, according to this

08:53 10   agreement, the assets to be forfeited pursuant to this

11   agreement do not include certain particular assets listed on

12   Attachment C --

13         THE COURT:  Meaning that the later agreement says that

14   the real estate previously released will remain released --

15         MR. BRENNAN:  Yes.

16         THE COURT:  -- and is not affected by the later plea

17   agreement.

18         MR. BRENNAN:  Yes.  So, clearly, it is contemplated --

19         THE COURT:  I understand the argument.

08:54 20         What about the UFAP complaint?

21         MR. BRENNAN:  As a matter of background --

22         THE COURT:  For what it's worth, how Mr. Wyshak has

23   explained it comports with my memory of procedure in regard to

24   it.  So is it fair to suggest it's a promise, reward, or

25   inducement here, counsel?

1        MR. BRENNAN:  Yes.  Are we talking about the second

2   issue or the first issue?

3        THE COURT:  The second issue.

4        MR. BRENNAN:  It is.

5        As a matter of background, Mr. Flemmi was being aided

6   tremendously by a Department of Justice employee, Paul Rico.

7   He had a relationship of exchange not only information but

8   favors --

9        THE COURT:  Is he the one that says the coast is clear

08:54 10  to someone?  Do I remember this testimony correctly?

11        MR. BRENNAN:  Something to that effect, your Honor.

12   He warned Mr. Flemmi of indictments for murder and attempted

13   murder, had him and Mr. Salemme leave town, stayed in contact

14   with Mr. Flemmi while he was gone, and then called Mr. Flemmi

15   to return after he believed he could take care of the

16   indictments for him.

17        There is previous testimony in other court cases where

18   it is clear that Mr. Rico, the Department of Justice employee,

19   is the one controlling and directing Mr. Flemmi's return.  In

08:55 20  fact, in one such prior testimony, Mr. Flemmi talks about the

21   fact he felt he was forced to return, that there was an implied

22   or veiled threat by Mr. Rico that he needed to return.

23        The testimony, however, during this trial, was

24   elicited very differently.  The suggestion that I infer from

25   the testimony was simply that the witness had disappeared so it

1   was time to come home and although there was a call with

2   Mr. Rico, really it was the fact that there was a weak or

3   nonexistent case.  That is not consistent with the prior

4   testimony, and it's not consistent with the documents showing

5   that there was coordination between both the FBI and the U.S.

6   Attorney's Office to resolve his case.

7            THE COURT:  And who was the -- was the UFAP made out

8   by Rico, or applied for?

9            MR. BRENNAN:  I'm not certain what is being referred

08:56 10  to as UFAP.  I'm not familiar with that term.

11           THE COURT:  Unlawful Flight to Avoid Prosecution.

12  Meaning -- are you referring that there was some document that

13  was planning to be introduced?

14           MR. WYSHAK:  Yes.  It's the letter from an Assistant

15  U.S. Attorney, Henry Hammond, notifying the FBI that the UFAP

16  complaint has been dismissed.

17           THE COURT:  And, counsel, are you planning to

18  introduce that?

19           MR. BRENNAN:  I am.

08:56 20           THE COURT:  Okay.

21           And, counsel, can somebody hand a copy of that up,

22  just so I can see what it is?

23           (Pause.)

24           THE COURT:  Okay.

25           Counsel, I've just taken a look at it.  I guess my

1   question on this is -- what you talk about as the subject

2   matter of what you intend to, I suppose, cross Mr. Flemmi about

3   in terms of conversations with Paul Rico, obviously seems like

4   fair game.  I guess my question is, it's not clear to me

5   looking at this what, if any, connection this document, which

6   may be a matter of just normal proceedings, would have with

7   what has already been put before the jury about Paul Rico or

8   what you might draw out on cross-examination.

9        MR. BRENNAN:  Well, that's the issue.  This

08:58 10   information was not put before the jury, and it should.

11        When Mr. Flemmi fled on April 23, 1970, which is the

12   other document that precedes that document, there's a memo from

13   the Special Agent in Charge of Boston to the Director of the

14   FBI, and this is for a noted Top 10 Most Wanted Fugitive,

15   Mr. Flemmi.  And it is a warrant for him based on the

16   indictments against him.

17        In consequence, he has an association with Mr. Rico

18   and Mr. Condon, and Mr. Rico directs him to return home.

19        Mr. Condon, according to Mr. Flemmi in prior

08:59 20   testimony, then said he would take care of the warrant for him.

21   This is an inducement to Mr. Flemmi to work with the government

22   and to establish the relationship between the DOJ employees and

23   Mr. Flemmi.  So it is an inducement.

24        When he comes back to Boston and the warrants are

25   dismissed and the cases are dismissed, there's still an

1   outstanding warrant charge against him.  That is also dismissed

2   for him.  He's never charged with that flight warrant.  So this

3   is another inducement to show the totality of the relationship

4   between Rico, Condon, and Flemmi.

5        So where Flemmi has testified under oath in the past

6   that Mr. Condon told him that he was the one that got rid of

7   the warrant for him, and Mr. Rico is the one --

8        THE COURT:  Hold on one second.

9        (Discussion off the record.)

09:00  10        THE COURT:  I'm sorry, Mr. Brennan.

11        MR. BRENNAN:  And that Mr. Rico is the one who told

12   him he would take care of the indictments, not only is that

13   going to contradict the testimony that he gave on direct

14   examination, it also shows the relationship and the inducements

15   by Mr. Rico and the Department of Justice.

16        These same documents were taken from the civil

17   litigation.  It was the same point in principle -- I know this

18   is a criminal case, but it is the same idea that this

19   inducement or protection of Mr. Flemmi actually existed.

09:00  20        So although he didn't author these documents, they are

21   relevant to show that relationship, otherwise he can stand by

22   an inconsistent answer here at trial that he just thought the

23   witness was gone and that's why he came home, when the reality,

24   this was orchestrated by his friend who he then, in turn,

25   continued to work for as an informant.  It explains the

1  relationship in a way that the jury needs to know about,

2  because the relationship with Condon and Rico and the

3  Department of Justice that predates his meeting with Mr. Bulger

4  explains the relationship post Mr. Bulger.

5          Mr. Flemmi has made a lot of assertions about what he

6  says the relationships were with Mr. Connolly and Mr. Bulger

7  and the Department of Justice, this contradicts that, and

8  that's why these documents are necessary.

9          THE COURT:  Counsel, I understand the line of

09:01 10  questioning you want to get to.  I think given what's been

11  brought out before, I don't think it's improper at all.

12          I guess, counsel, I'll be listening for whether or not

13  the foundation is laid with this witness for introducing what's

14  been handed to me as the UFAP document and the previous

15  document that you've alluded to.

16          In regards to the asset forfeiture, Mr. Wyshak, as my

17  question to you suggested, I think it's fair game for

18  Mr. Brennan to ask about, especially given the cross-reference

19  in the later plea agreement.  I think you've brought out some

09:01 20  from this witness about what the scope of his agreement was in

21  2001 and 2003, but I'll hear you as things come out.

22          MR. WYSHAK:  Well, just to --

23          THE COURT:  Counsel, do you need to be heard further

24  on this before we start?

25          MR. WYSHAK:  I guess not, your Honor.

```
 1              (Pause.)

 2              (Witness entered courtroom.)

 3              (Jury entered the courtroom.)

 4         THE COURT:  Good morning.

 5         THE JURY:  Jury good morning.

 6         THE COURT:  We'll get started.

 7         Mr. Flemmi, good morning.

 8         THE WITNESS:  Good morning, Judge Casper.

 9         THE COURT:  I remind you, you remain under oath.

09:03 10   THE WITNESS:  Yes, thank you.

11         THE COURT:  Mr. Wyshak.

12         MR. WYSHAK:  Thank you, your Honor.

13         STEPHEN FLEMMI, having been previously duly sworn by

14    the Clerk, was further examined and testified as follows:

15                   CONTINUED DIRECT EXAMINATION

16    BY MR. WYSHAK:

17    Q.   Good morning, Mr. Flemmi.

18    A.   Good morning, Mr. Wyshak.

19    Q.   When we broke on Friday, we were talking about the murder

09:03 20   of Debra Davis?

21    A.   Yes, sir.

22    Q.   And during the course of your testimony, you had mentioned

23    that one of the Davis brothers was, in your view, using drugs

24    and might be an informant.  Do you recall that testimony?

25    A.   Yes, sir.
```

```
 1    Q.    Which Davis brother were you referring to?

 2    A.    Steven Davis.

 3    Q.    Steven Davis?

 4    A.    Yes, I was referring to him.  But he wasn't the one I was

 5    actually referring to.

 6              MR. BRENNAN:  I object.  I move to strike as

 7    irrelevant.

 8              THE COURT:  Counsel?  Mr. Wyshak, what's --

 9              MR. WYSHAK:  There were several Davis brothers, I was

10    just trying to clarify which Davis brother he was referring to.

11              THE COURT:  I'll allow the clarification.

12              Overruled.

13              MR. STEVEN DAVIS:  That's a lie.  That's a fucking

14    lie.

15              THE COURT:  Mr. Davis --

16              THE WITNESS:  I said no --

17              MR. STEVEN DAVIS:  There's no testimony on me being a

18    rat, you piece of shit.

19              THE COURT:  Mr. Davis --

20              THE WITNESS:  I just declined it.  I just told you I

21    inadvertently made a mistake.  I said it wasn't you that I was

22    referring to.

23              THE COURT:  Mr. Davis, I need you to be respectful of

24    these proceedings, okay?

25              Mr. Davis, okay?  You can remain here if you can do
```

```
 1   that.  Okay?

 2              MR. STEVEN DAVIS:  Yes.

 3              THE COURT:  I need your promise that you can do that.

 4              MR. STEVEN DAVIS:  Yes.

 5              THE COURT:  Okay?

 6              Thank you.

 7              Jurors, you'll disregard anything that was said from

 8   the gallery.

 9              Mr. Wyshak.

09:05 10        MR. WYSHAK:  Yes.

11   BY MR. WYSHAK:

12   Q.   You just said that you were mistaken, is that what you

13   were saying?

14   A.   I wasn't referring to Steven Davis.

15   Q.   Who were you referring to?

16   A.   His brother, Mickey Davis.

17   Q.   Mickey Davis.  Not Steven Davis.

18   A.   Yes.

19              THE WITNESS:  I apologize for that remark.

09:05 20        MR. STEVEN DAVIS:  Thank you.

21   BY MR. WYSHAK:

22   Q.   You were shown a plea agreement that you entered into with

23   Judge Wolf on Friday, Exhibit 1171.  Do you recall that?

24   A.   Yes, sir.

25              MR. WYSHAK:  Your Honor, can we get the ELMO?
```

1          (Pause.)

2          MR. WYSHAK:  Let the record reflect I'm showing the

3     witness Exhibit C from Exhibit 1171 A.

4     Q.   Do you see that document on the screen in front of you?

5     A.   Yes, sir.

6     Q.   All right.

7          At the time you pled guilty before Judge Wolf, many

8     assets that you owned had been seized; is that fair to say?

9     A.   Yes, sir.

09:06 10   Q.   And you forfeited many of those assets to the United

11    States pursuant to the plea agreement?

12    A.   Yes, sir.

13    Q.   And some were returned to your family; is that fair to

14    say?

15    A.   Yes, sir.

16    Q.   And again, going to page 4 of Exhibit C, those are the

17    assets that were returned?

18    A.   There was one piece of property on Comm. Ave., on Tremont

19    Street, Beacon Street, Tinson Road, and Norwood, and some bank

09:07 20   accounts.

21    Q.   Now, this agreement that was reached in April 2001, did

22    you agree to cooperate with the United States at that time?

23    A.   Not at that time.  Not at that time, no.

24    Q.   Were these assets returned pursuant to an agreement for

25    you to cooperate with the government?

```
 1   A.   These assets were in Judge Wolf's trial, and I forfeited

 2   those assets in Judge Wolf's trial.

 3   Q.   Were they returned to you because you had agreed to

 4   cooperate?

 5   A.   No, that was the first -- my first indictment.

 6   Q.   Okay.

 7        And some of these locations -- again, showing you the

 8   real estate that was returned, who lived on Tinson Road in

 9   Quincy?

09:09 10  A.   O'Brien.

11   Q.   Who was she?

12   A.   Jane O'Brien was a friend of mine.

13   Q.   All right.

14        That was her private home?

15   A.   Hers.

16        MR. BRENNAN:  Objection, leading.

17        THE COURT:  Well, sustained as to form.

18   BY MR. WYSHAK:

19   Q.   Is that where she lived?

09:09 20  A.   Yes.

21   Q.   And who lived at 260 Summer Street in Norwood?

22   A.   My wife, Jeanette.

23   Q.   Was that her private home?

24   A.   Yes.

25        MR. BRENNAN:  Your Honor, I object as to leading.
```

1          THE COURT:  Sustained as to form, counsel.

2          MR. WYSHAK:  I don't think that's a leading question,

3     your Honor.

4     BY MR. WYSHAK:

5     Q.   Was that where she lived, her home?

6     A.   Yes, yes.

7          MR. BRENNAN:  Your Honor, second question, again, I

8     object to leading.

9          THE COURT:  I'll allow that one, counsel.

09:10 10    BY MR. WYSHAK:

11    Q.   You also told us on Friday that you had sent money to John

12    Martorano in Florida?

13    A.   Yes.

14    Q.   Do you recall that?

15    A.   Yes.

16    Q.   Did you ever give any money to Patty Lytle?

17    A.   His wife, yes, I have.

18    Q.   And how many occasions do you recall giving money to Patty

19    Lytle?

09:10 20    A.   On one occasion I personally met her at the airport, I

21    gave her $10,000, another time we sent down $10,000 to her

22    mother.

23    Q.   Is that after Mr. Martorano was arrested?

24    A.   Yes.

25    Q.   All right.

1        Now, after you buried Debbie Davis on the banks of the

2  Neponset River, did you attempt to obtain her dental records?

3  A.   Yes, I did.

4  Q.   And how did you do that?

5  A.   Had a friend of mine, George Kaufman, knew the dentist and

6  we knew the dentist that she went to and he obtained the

7  records from the dentist.

8  Q.   How?

9  A.   I think his wife had some way of having the records

09:11 10  obtained.

11  Q.   Did you get the records at some point?

12  A.   Yes.

13  Q.   What did you do with them?

14  A.   Destroyed them.

15  Q.   Why?

16  A.   A deterrent to identification, so there's no trace of her

17  dental records.

18  Q.   You told us about a man named Brian Halloran.

19  A.   Yes.

09:11 20  Q.   Directing your attention to 1982, what was his

21  relationship with you and Mr. Bulger?

22  A.   He didn't have any relationship with us.

23  Q.   Why was that?

24  A.   We didn't like him, we had nothing to do with him.

25  Q.   He had been associated with the Winter Hill Gang?

1    A.    Previously, yes.

2    Q.    Did something happen that caused you to end your

3    relationship with him?

4    A.    Well, we just -- we just had nothing to do with him.  His

5    lifestyle, he was different from ours, the way he was acting;

6    he was on drugs.

7    Q.    Did you become aware at some point that he was cooperating

8    with law enforcement?

9    A.    Yes.

09:12 10    Q.    How did you first hear that?

11    A.    Street rumor.

12    Q.    As a result of hearing those street rumors, did you have a

13    conversation with John Connolly?

14    A.    Yes.

15    Q.    And what did Mr. Connolly tell you?

16    A.    He said that he was giving -- he gave information on Jim

17    Bulger and myself, John Martorano in connection with the

18    Wheeler murder.

19    Q.    As a result of receiving information, that information,

09:13 20    what, if anything, did you and Mr. Bulger decide to do?

21    A.    Put everything in motion to kill him.

22    Q.    And what does that mean, "put everything in motion"?

23    A.    Well, we made a decision that we wanted to kill him, and

24    we put people around us that were looking for him.

25    Q.    Did you have a conversation with John Callahan about Brian

1    Halloran?

2    A.    Yes.

3    Q.    And what was that?

4    A.    We warned him we got information from John Connolly that

5    he was wired, officially he was -- FBI investigation on him,

6    and they directed him to John Callahan so they could compromise

7    him on tape.

8    Q.    And John Connolly told you that?

9    A.    Yes.

09:13 10    Q.    And so what did you say to John Callahan?

11    A.    We warned him not to have any contact with him.

12    Q.    Was John Callahan the only person you told about Brian

13    Halloran?

14    A.    We told John Martorano.

15    Q.    Who were the people who were looking for Brian Halloran?

16    A.    We had people around us, South Boston people, a friend of

17    ours from Charlestown, John Hurley, and other people, friends

18    of theirs.

19    Q.    Was it difficult to locate Mr. Halloran?

09:14 20    A.    He wasn't around for a while.

21    Q.    How do you know?

22    A.    No one could find him, he was in hiding.

23    Q.    Were you looking for him?

24    A.    Yes.  At the time we were looking, yes.

25    Q.    How were you looking for him?

1   A.   We had people that knew him, people were out looking, if

2   they seen him, they would notify us.

3   Q.   Were you personally looking for him?

4   A.   Well, I was inquiring.

5   Q.   Did there come a time when somebody located Mr. Halloran?

6   A.   Yes.

7   Q.   And he was murdered; is that fair to say?

8   A.   Yes.

9   Q.   Were you there when he was murdered?

09:15 10   A.   No, I wasn't.

11   Q.   How did you find out about the murder?

12   A.   Jim Bulger contacted me.

13   Q.   And where were you when he contacted you?

14   A.   I was in Milton.  I was at the Blue Hills in Milton.  I

15   was meeting a friend of mine.

16   Q.   And what did Mr. Bulger say to you?

17   A.   He said, "the balloon burst."

18   Q.   And what does that mean, "the balloon burst"?

19   A.   That was a nickname we had for Brian.

09:15 20   Q.   Did you understand what he meant when he said, "the

21   balloon burst"?

22   A.   Yes.

23   Q.   What did he mean?

24   A.   It means he got killed.

25   Q.   After he told you that, what did you do?

```
 1    A.    I met him later that evening.

 2    Q.    Where?

 3    A.    My mother's house.

 4    Q.    Was he alone?

 5    A.    No.

 6    Q.    Who was with him?

 7    A.    Kevin Weeks.

 8    Q.    And what happened at your mother's house that night?

 9    A.    He explained to me what happened.

09:16 10    Q.    And what did he say to you happened?

11    A.    He said that they -- John Hurley had come to the hill,

12    Broadway, and told him that Brian was seen at the Pier 4 Grill,

13    and that's where they -- that's where the murder was.

14    Q.    And what did he tell you he did?

15    A.    They went and they got the boiler --

16    Q.    What does that mean, "the boiler"?

17    A.    Boiler was the car that we had all souped up and all the

18    different features on it.

19    Q.    Like what?

09:16 20    A.    Well, we had switches if the car was being chased, say at

21    nighttime you could switch the lights off; there was a feature

22    on there that you could hit a switch and it would release oil

23    on the manifold and would create a smokescreen in case you were

24    chased; and had special tires on it and it was souped up.

25    Q.    And was that car used for any particular purpose?
```

| | | |
|---|---|---|
| 1 | A. | It was a hit car in case we needed it. |
| 2 | Q. | And where was that car kept? |
| 3 | A. | At a garage over in Southie. |
| 4 | Q. | Who souped it up for you? |
| 5 | A. | We had a mechanic, a friend of Jim Bulger's. |
| 6 | Q. | Did it cost a lot to soup it up, so to speak? |
| 7 | A. | I think it cost $30,000. |
| 8 | Q. | So Mr. Bulger told you he got the boiler, and then what |
| 9 | | did he tell you? |
| 09:17 10 | A. | They used the boiler. |
| 11 | Q. | Who's "they"? |
| 12 | A. | Pat Nee, himself, Kevin Weeks. |
| 13 | Q. | Okay. |
| 14 | | And what did he tell you they did? |
| 15 | A. | Well, they went down -- they went to Pier Grill, and Brian |
| 16 | | Halloran was there, he was coming out, he got in his car, and |
| 17 | | they positioned themselves so they'd have a good firepower on |
| 18 | | the car and he killed him, both -- two people. |
| 19 | Q. | He told you that there were two people there? |
| 09:18 20 | A. | Yes. |
| 21 | Q. | Did you learn the name of the other individual who was |
| 22 | | there? |
| 23 | A. | Yes. |
| 24 | Q. | What was his name? |
| 25 | A. | His name was Donahue. |

```
 1   Q.   And what did Mr. Bulger tell you about how he killed
 2   Mr. Halloran and Mr. Donahue?
 3   A.   He said he positioned themselves behind them so they got
 4   good firepower on the car.  He was driving, he leaned over and
 5   he fired from the passenger's side, and he hit Donahue, killed
 6   Donahue, and then he shot Brian.  The car hit the curb, he got
 7   out of the car, Brian did, and they continued firing at him.
 8   Q.   Did he demonstrate how he did this?
 9   A.   He did.
10   Q.   How did he demonstrate it?
11   A.   Just reached over and fired.
12   Q.   Where was this conversation occurring at your mother's
13   house?
14   A.   My mother's kitchen.
15   Q.   Was Mr. Weeks present at the time?
16   A.   No.
17   Q.   Where was he?
18   A.   He went into the living room to watch television.
19   Q.   Can you describe Mr. Weeks' demeanor that evening?
20   A.   I mean, he was shaken up.
21   Q.   He didn't want to participate in the conversation?
22   A.   No.
23            MR. BRENNAN:  Objection.
24            THE COURT:  Sustained.
25   BY MR. WYSHAK:
```

1    Q.   Did he participate in the conversation?

2    A.   No.

3    Q.   Did you learn that Mr. Halloran had made a dying

4    declaration?

5    A.   Yes.

6    Q.   And do you recall what that was?

7    A.   He said that -- he identified Jimmy Flynn.

8    Q.   Did you have a conversation with Mr. Bulger about that?

9    A.   Yes.

09:19 10    Q.   And what was that conversation?

11    A.   He said that he had a floppy wig on and a mustache and it

12    resembled Jimmy Flynn.

13    Q.   The day after the murder of Brian Halloran and Michael

14    Donahue, did you have a meeting in South Boston at the beach?

15    A.   Yes.

16    Q.   Who was at this meeting?

17    A.   Jim Bulger, myself, Kevin Weeks, and Pat Nee.

18    Q.   And what, if anything -- well, withdrawn.

19         What were you discussing at the meeting?

09:20 20    A.   Discussing the shooting.

21    Q.   And what, if anything, did Pat Nee say about the shooting?

22    A.   He said the gun jammed.

23    Q.   His gun jammed?

24    A.   Yes.

25    Q.   All right.

1              Now, I'd like to put Exhibit 276 up on the screen.

2              (Pause.)

3    Q.   Do you know what this document is, Mr. Flemmi?

4    A.   It's 209 -- an FBI 209.

5    Q.   Okay.

6              And do you know who this individual is, BS 1544-OC?

7    A.   1544-OC is Jim Bulger.

8    Q.   How do you know that?

9    A.   The documents, we got a lot of documents.

09:21 10   Q.   When you say "we got a lot of documents" --

11   A.   In discovery.

12   Q.   When you were charged with certain crimes --

13   A.   Yes.

14   Q.   -- these documents were produced to you?

15   A.   Yes.

16             MR. WYSHAK:   Could we go to page 2?

17   Q.   Can you see that?

18   A.   Yes.

19   Q.   Directing your attention to that first paragraph.

09:22 20   A.   Yes.

21   Q.   BS 1544 advised that "the outfit" continued to be

22   interested in having Brian Halloran killed in order to prevent

23   him from testifying against Jackie Salemme.

24   A.   Yes.

25   Q.   Is that true?

1   A.   No.

2   Q.   Did you and Mr. Bulger say that to Mr. Connolly?

3   A.   I was present during that conversation.

4   Q.   And did you say it to Mr. Connolly?

5   A.   Jim Bulger did.

6   Q.   Were you trying to trick or fool Mr. Connolly?

7   A.   Yes.

8   Q.   Why?

9   A.   We didn't -- we wanted to take the heat away from Jim

09:23 10  Bulger.

11  Q.   At this point in time, in April of 1982, had he told you

12  that Brian Halloran was cooperating with the FBI?

13  A.   At that time I believe he was.

14  Q.   So, again, were you trying to trick Mr. Connolly?

15  A.   We told Mr. Connolly, yes, wanted to divert the attention

16  away from Bulger.

17  Q.   What does that mean, "divert the attention" --

18  A.   Wanted to put the heat somewhere else.

19  Q.   Mr. Bulger did?

09:23 20  A.   Yes.

21       MR. WYSHAK:  Can we go to the next one, 278?

22  Q.   Again, this is from Mr. Bulger; is that fair to say?

23  A.   Yes.

24       MR. WYSHAK:  The next page.

25  Q.   Again, if you look at the last paragraph there, this is

1    after Mr. Halloran is killed; is that fair to say, May 13,

2    1982?

3    A.   Yes.

4    Q.   It says, "Source added that source is not convinced that

5    Flynn actually killed Halloran and that source has not heard

6    that this is true.  Source stated that the Mafia should not be

7    ruled out in that they stood to gain the most from Halloran's

8    death."

9         Were you there when Mr. Bulger told this to

09:24 10   Mr. Connolly?

11   A.   Yes.

12   Q.   And, again, is that true, that the Mafia killed Brian

13   Halloran?

14   A.   No.

15   Q.   And that word in the last 209, "outfit," what does "the

16   outfit" mean?

17   A.   The outfit is the LCN, Mafia.

18   Q.   Same thing?

19   A.   Yes.

09:25 20        MR. WYSHAK:  Again, could we go to 279?

21   Q.   And again this is -- who is BS 955?

22   A.   That's me.

23        MR. WYSHAK:  Second page.

24   Q.   All right.

25        And this one says that you told Mr. Connolly that the

```
 1   wiseguys in Charlestown supposedly heard that Brian Halloran

 2   and his brother, who is a Mass. State Trooper, had met with

 3   Colonel O'Donovan of the Mass. State Police and that Halloran

 4   was going to cooperate with the law.

 5          Did you tell John Connolly that?

 6   A.   No, no.

 7   Q.   Did Mr. Bulger tell John Connolly that?

 8   A.   Yes.

 9   Q.   Was that true?

10   A.   No.

11          MR. WYSHAK:  Can we have the next one, 280?

12   Q.   And this is Mr. Bulger, is that fair to say, 1544?

13   A.   Yes.

14          MR. WYSHAK:  Second page, please?

15   Q.   Again, directing your attention to the first paragraph,

16   "Mr. Bulger advised that Jimmy Flynn did the hit on Brian

17   Halloran with Jimmy McCormick from Charlestown as wheelman.

18   Pat Flannery, Billy Coyman and Red Noonan were in a backup van

19   near the scene."  Is that true, Mr. Flemmi?

20   A.   No.

21   Q.   Were you there when Mr. Bulger told Mr. Connolly that?

22   A.   Yes.

23          MR. WYSHAK:  If we can have Exhibit 281.

24   Q.   And again, this is Mr. Bulger; is that fair to say?

25   A.   Yes, sir.
```

1          MR. WYSHAK:  Can we go to the second page?

2    Q.   Again, directing your attention to that second paragraph,

3    Source advised that Jimmy McCormack is openly taking credit for

4    participating in the hit and is the driving force behind the

5    party mentioned above.  Is that true, that Jimmy McCormick was

6    taking credit for killing Brian Halloran?

7    A.   That's what I heard.

8    Q.   From who?

9    A.   Jim Bulger.

09:28 10   Q.   Were you present when Mr. Connolly -- when Mr. Bulger told

11   Mr. Connolly that?

12   A.   Yes.

13   Q.   All right.

14        You knew who was responsible for the murder of Brian

15   Halloran, correct?

16   A.   Yes.

17   Q.   Who?

18   A.   Jim Bulger.

19        MR. WYSHAK:  If we could go to the last one, that's

09:29 20   282.

21   Q.   This is Mr. Bulger again, correct?

22   A.   Yes.

23        MR. WYSHAK:  Second page.

24        If we could blow up the second paragraph.

25   Q.   See where I put that dot, where it says, "Source," who in

1  this report is Mr. Bulger, "Source pointed out that no one had

2  any information that Halloran was cooperating with the FBI

3  until it appeared in the paper after his death."  Was that

4  true?

5  A.    I don't believe that.

6  Q.    You don't agree with that?

7  A.    No.

8  Q.    Did you know that Mr. Halloran was cooperating with the

9  FBI before he was murdered?

09:30 10  A.    Yes.

11  Q.    How did you know that?

12  A.    It was told to me.

13  Q.    By who?

14  A.    John Connolly.

15  Q.    And did Mr. Bulger know that Mr. Halloran was cooperating

16  with the FBI before he was murdered?

17  A.    Yes.

18  Q.    And how did he know that?

19  A.    He got that from John Connolly.

09:30 20  Q.    And when John Connolly wrote, His source pointed out that

21  no one had any information that Halloran was cooperating with

22  the FBI until it appeared in the paper after his death, that

23  was not true, was it?

24  A.    He was with FBI.

25  Q.    Could you move a little bit way from the mic?  Sorry.

1            Was that true or not true?

2    A.   He was cooperating with the FBI was true.

3    Q.   That Mr. Halloran was cooperating?

4    A.   With the FBI, yes.

5    Q.   Now, why is Mr. Bulger giving all this misleading

6    information to Mr. Connolly?

7    A.   Because he was involved with the murder.

8    Q.   And why tell Mr. Connolly it was the people in

9    Charlestown, it was the Mafia, it was Jimmy McCormick?

09:31 10   A.   He's taking the heat away from himself.

11   Q.   Did John Connolly understand that that's what Mr. Bulger

12   was doing?

13            MR. BRENNAN:  Objection.

14            THE COURT:  Sustained.

15   BY MR. WYSHAK:

16   Q.   What was your understanding about Mr. Connolly's role in

17   writing these reports with this misinformation in it?

18            MR. BRENNAN:  Objection, no foundation.

19            THE COURT:  As to writing the reports, counsel?

09:32 20           MR. BRENNAN:  Right, because he received this in

21   discovery many years later.

22            THE COURT:  Sustained as to that question, counsel.

23   BY MR. WYSHAK:

24   Q.   Did you have an understanding whether Mr. Connolly knew

25   that this was misinformation?

```
 1   A.   Well, he gave the information originally about Brian

 2   Halloran, so the information that Bulger gave him was

 3   misleading.

 4   Q.   And did you have an understanding of what Mr. Connolly

 5   understood regarding that?

 6            MR. BRENNAN:   Objection.

 7            THE COURT:   Counsel, sustained as to the form.

 8   BY MR. WYSHAK:

 9   Q.   Again, did you think that you were tricking Mr. Connolly?

09:32 10   A.   Mr. Connolly was aware.  He gave information to us that

11   Brian Halloran was cooperating with the FBI, gave information

12   to the FBI about Wheeler, the Wheeler murder.

13   Q.   All right.

14            Now, after Mr. Halloran and Mr. Connolly were

15   murdered, did you have a conversation with Mr. Bulger about

16   John Callahan?

17   A.   Can you repeat that again, please?

18   Q.   After Mr. Halloran and Mr. Donahue were murdered, did you

19   have a conversation with Mr. Bulger about John Callahan?

09:33 20   A.   I did.

21   Q.   And what was that conversation?

22   A.   Well, Callahan was the one, originally the one that gave

23   up the information.

24   Q.   Gave up the information about what?

25   A.   Well, he was the one that originally -- with the Wheeler
```

1    murder.

2    Q.   Okay.

3         And did you have a conversation with Mr. Bulger about

4    John Callahan after the murder of Brian Halloran?

5    A.   I'm trying to focus on that, you know.

6    Q.   Did Mr. Bulger tell you he received a telephone call from

7    John Connolly about Mr. Callahan?

8    A.   I'm trying to focus in on that.

9    Q.   Did you go to New York City after the murder of Brian

09:34 10   Halloran?

11   A.   Yes.

12   Q.   Why?

13   A.   We went to see John Martorano.

14   Q.   Why?

15   A.   We wanted to make him aware of what happened.

16   Q.   What happened to who?

17   A.   When we went to New York, we wanted to make John Martorano

18   aware of the -- of the murder.

19   Q.   Which murder?

09:35 20   A.   The Callahan murder.

21   Q.   The Callahan murder --

22   A.   Excuse me, Halloran murder.

23   Q.   Okay.

24        Was there any other reason why you went to New York?

25   A.   We wanted to make him aware of it.

1    Q.    Where did you meet with Mr. Martorano?

2    A.    We met him at the parking lot in the airport and went to

3    the Marriott Hotel.

4    Q.    And tell us what the conversation was -- when you say

5    "we," who do you mean?

6    A.    Jim Bulger and myself.

7    Q.    And tell us what the conversation was between yourself,

8    Mr. Bulger, and Mr. Martorano.

9    A.    He said that he had -- he told him about the Halloran

09:35 10   murder.

11   Q.    Anything else?

12   A.    And he said that Callahan was a threat.

13   Q.    Okay.

14         Tell us to the best of your recollection the entire

15   conversation that you can recall.

16   A.    Well, when we got called, John Connolly had contacted Jim

17   Bulger and said that we had to meet with -- to get in touch

18   with John Martorano to tell him that the FBI is looking for

19   John Callahan and that the -- they felt that if they could

09:36 20   contact -- he was a suspect in the Wheeler murder, if they can

21   speak to him, that he would probably explain the -- he would be

22   a threat to the murder, the Wheeler murder.

23   Q.    Okay.

24         How did you know that John Connolly had contacted

25   Mr. Bulger?

1    A.    He told me.

2    Q.    What did he tell you?

3    A.    He told me to get in touch with John Martorano and set up

4    a meet.

5    Q.    What did he tell you the purpose for the meet was?

6    A.    To make him aware that John Callahan was a threat to him

7    and that he would be -- if the FBI contacted him, they were

8    looking for him, that he would disclose what happened to the

9    Wheeler murder.

09:37 10   Q.    If the FBI contacted who?

11   A.    John Callahan.

12   Q.    And as a result of that, did you contact John Martorano?

13   A.    Yes.

14   Q.    Had you previously met John Martorano in New York on prior

15   occasions?

16   A.    I met him at the -- I met him in -- when we went up there.

17   Q.    Okay.

18         What did John Martorano say after Mr. Bulger told him

19   about John Callahan?

09:37 20   A.    Well, he was a little reluctant to -- after we told him

21   he'd be a threat to him, that he -- Callahan wouldn't face the

22   prospect of doing 20 years to life and that the FBI would be

23   able to probably have him disclose what happened in the Wheeler

24   murder, that he should kill John Callahan.

25   Q.    Who said that?

```
  1    A.    Jim Bulger.

  2    Q.    Who was doing the talking at this meeting?

  3    A.    Jim Bulger.  He does most of the talking.

  4    Q.    Did he use any particular -- did John Connolly have a

  5    nickname?

  6    A.    "Zip."

  7    Q.    And did Mr. Bulger use that nickname when he was talking

  8    to Mr. Martorano?

  9    A.    He knew the nickname, yes.

09:38 10    Q.    Did Mr. Martorano initially agree to murder Mr. Callahan?

 11    A.    Yes.

 12    Q.    Was he reluctant?

 13    A.    He was at first because John Callahan was a friend of his.

 14    John Callahan helped him in a lot of ways.  He let him use his

 15    apartment in Miami, he was a courier for him, he let him use

 16    his Cadillac.

 17    Q.    So what did Mr. Martorano say to Mr. Bulger when

 18    Mr. Bulger told him he had to kill John Callahan?

 19    A.    Well, he finally agreed to it.

09:39 20    Q.    Did you discuss the circumstances of where Mr. Callahan

 21    should be murdered?

 22    A.    In Miami.

 23    Q.    Why?

 24    A.    Because he was -- that's where he was staying.  We figured

 25    if he got murdered in Miami, we wouldn't have all the attention
```

1    here in Boston.

2    Q.   Was there a lot of attention on you after the murder of

3    Brian Halloran?

4    A.   Yes, there was.

5    Q.   Did you also discuss where to leave Mr. Callahan's

6    possessions?

7    A.   Leave them in Miami, let them be found in Miami.

8    Q.   Where in Miami?

9    A.   Well, he was found in the airport.

09:40 10   Q.   What about his personal possessions, his wallet?

11   A.   They were left -- Joe McDonald left those, I think, in

12   some bar in -- some Cuban bar.

13   Q.   Did you discuss that with John Martorano at this meeting

14   in New York City?

15   A.   We discussed he was to be murdered, but leaving his

16   possessions, that was their -- that was their decision.

17   Q.   I'm going to show you Exhibit 317.

18        Can you see who's -- who's that?

19   A.   That's me.

09:40 20   Q.   Can you see the date of this report?

21   A.   '82.

22   Q.   July 9th?

23   A.   July 9, '82.

24   Q.   This is before John Callahan is murdered?

25   A.   Yes.

1         MR. WYSHAK:  Can we go to the second page?

2  Q.   See where my finger is?

3  A.   Yes.

4  Q.   Right there.

5         Can you read that for us?

6  A.   "Callahan was close to a Cuban group who he was impressed

7  with as being very bad.  Source added that lately Callahan's

8  relationship with this group has cooled and Callahan is

9  supposed to be avoiding them.  Source is unaware of any reason

09:41 10  Callahan may have for avoiding them or any specifics of his

11  business dealings with them, if any.  On the night of his

12  return from Ireland within the last week Callahan was drunk at

13  the Quincy Market."

14  Q.   Did you give that information to John Connolly?

15  A.   No, that was -- I was there when Bulger gave him that

16  information.

17  Q.   Okay.

18         Had you discussed this story about the Cubans with

19  Mr. Bulger prior to meeting with John Connolly?

09:42 20  A.   That was one of the stories he concocted.

21  Q.   Who concocted?

22  A.   Jim Bulger.

23  Q.   For what reason?

24  A.   To put the heat -- to take the attention away from us.

25  Q.   And put the attention on who?

```
     1   A.    On John Callahan.

     2   Q.    If Mr. Callahan was the one who was going to be murdered,

     3   who would the attention be on?

     4   A.    The attention would be on us.

     5   Q.    What about the Cubans?

     6   A.    The Cubans were the ones -- right, the Cubans would be the

     7   ones.

     8   Q.    Did you discuss this with John Martorano at the meeting

     9   New York City?

09:43 10   A.    Yes.

    11   Q.    Who -- can you tell us, to the best of your recollection,

    12   what was said and by whom?

    13   A.    Well, we wanted to put the heat on Callahan.

    14   Q.    How do you put the heat on Callahan if you're going to

    15   kill him?

    16   A.    I'm getting a little confused here, you know?

    17         We want to take the heat and put it on somewhere else.

    18   Q.    And where is the somewhere else?

    19   A.    On --

09:43 20         (Pause.)

    21   A.    We wanted to take the heat off and put it on the Cuban

    22   group.

    23   Q.    Okay.

    24         And my question was:  Did you talk to John Martorano

    25   about that at the meeting in New York City with yourself and
```

1   Mr. Bulger?

2   A.   We told him we wanted him to put the heat on somewhere

3   else, put the heat on the Cuban group.

4   Q.   Okay.

5        Did you tell him you wanted Mr. Callahan murdered in

6   Miami?

7   A.   Yes.

8   Q.   Why?

9   A.   We didn't want attention up here, we wanted to keep the

09:44 10   attention on Miami.

11   Q.   Did John Martorano have a problem locating John Callahan

12   after this meeting --

13   A.   Yes.

14   Q.   -- in New York City?

15   A.   Yes.

16   Q.   Did you talk to John Martorano about that?

17   A.   Yes.

18   Q.   And what were your conversations with him?

19   A.   It was over a month and he couldn't locate Callahan, so we

09:45 20   says -- so I call him -- Jim Bulger said, Give him a call, find

21   out what's going on.  I call Johnny down in Miami, I asked him,

22   What's going on?  He said that Callahan was out of the country,

23   and as soon as he got back, he'd be in contact with him, and

24   when he showed up, that's when he met him.  He come back

25   from -- I think he was in Europe.

1   Q.   Did there come a time when you learned that John Callahan

2   had been murdered?

3   A.   Yes.

4   Q.   Did you speak with John Martorano about that?

5   A.   Yes.

6   Q.   What did he tell you?

7   A.   He explained to me what happened.

8   Q.   What did he say?

9   A.   He said he met him at the airport -- as soon as he got

09:45 10   back, he met him at the airport, him and Joe McDonald killed

11   him at the airport, they took him and put him in a location

12   over in Miami in a garage.

13   Q.   After the murder, did you go to Miami?

14   A.   Yes.

15   Q.   Why?

16   A.   Went to see Johnny.

17   Q.   Did you have a meeting with Paul Rico?

18   A.   Yes.

19   Q.   And what was that meeting about?

09:46 20   A.   Johnny said to me, he said -- Johnny Martorano said to me

21   that he wanted me to set up a meeting with Paul Rico and

22   himself, John Martorano.

23        Joe McDonald, who was one of the participants in the

24   murder, said that he wanted to find out if the jai alai deal

25   was still viable, and he wanted to hear it from Paul Rico.  So

1    he asked Johnny to meet him down there and to call Rico myself,

2    asked me to set the meeting up, which I did.

3    Q.   How did you set the meeting up?

4    A.   I called Paul Rico and we met him at the jai alai in

5    Miami.

6    Q.   So you called him on the telephone?

7    A.   Yes.

8    Q.   Did he agree to meet with you?

9    A.   He did.

09:46 10    Q.   And did you have that meeting?

11   A.   Yes, several months after Callahan, we had the meeting.

12   Q.   Who was present at that meeting?

13   A.   Paul Rico, myself, and when I set the meeting up, we met

14   down there -- I met John Martorano, I went in, he was with me,

15   went into the jai alai.  I went in and I spoke to Paul Rico.  I

16   told him that John Martorano, who was a fugitive at the time,

17   wanted to speak to him on Joe McDonald's behalf.

18        So I called Johnny over, introduced him to him, and

19   Johnny asked him, Joe McDonald wanted to know if the jai alai

09:47 20   deal was still viable, but he wanted to hear it from Paul Rico

21   himself.  Paul Rico said, There's no deal here.  He says, Okay.

22   He said, I'll just go back and tell Joe that.

23   Q.   All right.

24        And at the time John Martorano was a fugitive?

25   A.   Yes.

```
 1   Q.   And he met with Paul Rico?

 2   A.   Yes.

 3   Q.   What did Paul Rico do about that?

 4   A.   That was the end of the deal.  That was it.

 5   Q.   Subsequent to that meeting in Miami, did the FBI want to

 6   interview you and Mr. Bulger about the Wheeler and Callahan

 7   murders?

 8   A.   Yes.

 9   Q.   Did you agree to be interviewed?

10   A.   Yes.

11   Q.   Where did that interview occur?

12   A.   It occurred in South Boston in Jim Bulger's club, the L

13   Street Club.

14   Q.   Were you interviewed alone?

15   A.   Both of us were interviewed together with agent -- FBI

16   Agent Gerry Montanari, and I think it was Agent Brunnick.

17   Q.   So the two of you were interviewed at the same time?

18   A.   Yes.

19   Q.   Why?  Do you know?

20   A.   Well, he -- Jim Bulger insisted on it.

21   Q.   Did you discuss, prior to the interview, the parameters of

22   the interview with John Connolly?

23   A.   Yes.

24   Q.   And what did he tell you?

25   A.   He said that we should meet them and dress -- when we went
```

1    to take photographs up at the FBI office, to dress

2    conservatively in business suits.

3    Q.    Why?

4    A.    They were going to send those photos down to Oklahoma.

5    Q.    Why dress in business suits?

6    A.    Well, want to show that we were probably legitimate

7    business people.

8    Q.    Is that usually the way you and Mr. Bulger dressed when

9    you were engaged in criminal activity?

09:49 10   A.    No, no.

11         MR. WYSHAK:  Can we put up Exhibit 329?

12   Q.    Do you recognize those photographs?

13   A.    Yes.

14   Q.    Are those the pictures taken of you after the interview

15   with the L Street Club?

16   A.    Yes.

17   Q.    That's not the way you usually looked, right?

18   A.    No.

19   Q.    Who told you to dress that way?

09:50 20   A.    John Connolly.

21   Q.    After the murder of Mr. Callahan, did you call Mike

22   Solimando?

23   A.    Yes.

24   Q.    And who was Mike Solimando?

25   A.    He was a businessman from a friend of John Callahan's.

1    They were business partners in some real estate deals.

2    Q.    Did you know Mike Solimando?

3    A.    Yes.

4    Q.    How did you know him?

5    A.    He's a neighbor of mine.

6    Q.    Okay.

7          Had you, at some point in time, worked out with him or

8    jogged with him --

9    A.    Jogged with him, Curry College, across from my home.

09:50 10  Q.    So why did you call Mike Solimando after the murder of

11   John Callahan?

12   A.    Well, because Jim Bulger and us, collectively, wanted to

13   collect some -- get some money that Callahan supposedly --

14   well, that we claimed he owed to us.

15   Q.    Did John Callahan owe you money?

16   A.    No.

17   Q.    So why were you --

18   A.    It was extortion.

19   Q.    It was fabricated?

09:51 20  A.    Yes.

21   Q.    And why pick on Mike Solimando?

22   A.    He had business dealings with John Callahan, he was a

23   friend of his.

24   Q.    Who's idea it was it to try to get money from Mike

25   Solimando?

```
 1   A.   Jim Bulger.

 2   Q.   And can you tell us what the plan was regarding Mike

 3   Solimando?

 4   A.   Well, we called him in to the Triple O's --

 5   Q.   Who's "we"?

 6   A.   Jim Bulger, myself, we called him into Triple O's.  He

 7   asked me to contact him.  I called James Martorano, who was

 8   friendlier with him, and asked him to bring him down.

 9   Q.   Okay.

10        And did Mike Solimando come to Triple O's?

11   A.   Yes.

12   Q.   And what happened when he got there?

13   A.   We took him upstairs, up in the -- Triple O's has a room

14   upstairs, and he told him, he says that Callahan owed us some

15   money.

16   Q.   So who's present in this room upstairs above Triple O's?

17   A.   Kevin Weeks was there, myself, Jim Bulger, and Michael

18   Solimando.

19   Q.   What's that room like?

20   A.   It's a function room, large function room, probably the

21   size of this -- probably almost the size of this courtroom.

22   Q.   Okay.

23        Were other people up there at the time?

24   A.   No.

25   Q.   What happened in that room above Triple O's?
```

1  A.   We sat him down, he was questioning him, told him that

2  Callahan owed us some money and we knew he was a partner, that

3  he had access to -- be able to get his money.

4  Q.   Okay.

5       And what did Mr. Solimando say?

6  A.   He agreed after he was threatened.

7  Q.   How was he threatened?

8  A.   Well, Jim Bulger had a pistol on the table and he had a

9  machine gun on his lap.

09:53 10  Q.   What did he do?

11  A.   He pointed the machine gun at his crotch and pointed the

12  gun at him.

13  Q.   Okay.

14       How long did this conversation with Mr. Solimando

15  last?

16  A.   Not long.

17  Q.   Did Mr. Solimando agree to pay money?

18  A.   He agreed to get the money, yes.

19  Q.   Mr. Solimando was a friend of yours?

09:53 20  A.   Yes.

21  Q.   Why did you go along with this?

22  A.   Bulger insisted, he had done it to other friends of mine,

23  also.

24  Q.   So this was a totally made-up claim?

25  A.   Yes.

```
 1   Q.    Was Mr. Solimando afraid?

 2   A.    Yes, he was.

 3   Q.    Did you get money from Mr. Solimando?

 4   A.    Yes.

 5   Q.    Did you warn Mr. Solimando about going to the police or

 6   the FBI?

 7   A.    Yes.

 8   Q.    What did you say to him?

 9   A.    Jim Bulger did the talking.  He said to him, Don't bother

09:54 10   to go to the FBI, because we'll hear about it.

11   Q.    Was that true?

12   A.    It would be true.

13   Q.    And who did most of the talking during this extortion?

14   A.    Jim Bulger.

15   Q.    How much money approximately, to the best of your

16   recollection, did you receive from Mike Solimando?

17   A.    Probably in excess of $400,000.

18   Q.    And who got this money?

19   A.    It was divided amongst the group of us.

09:54 20   Q.    And who's the group?

21   A.    Well, there was Jim Bulger, myself, Jimmy Martorano,

22   George Kaufman, and Johnny Martorano.

23   Q.    Why was George Kaufman getting part of this money?

24   A.    Well, he was the one who was collecting the money, he was

25   the intermediary.
```

```
 1   Q.   Mike Solimando was making payments to him?

 2   A.   He was giving him the money, yes.

 3   Q.   Do you recall if sometime later Michael Solimando was

 4   called to a grand jury in Florida?

 5   A.   Yes.

 6   Q.   And did you discuss that fact with Mr. Bulger?

 7   A.   Yes.

 8   Q.   And did you create a plan for Mike Solimando?

 9   A.   We gave him a script.

09:55 10   Q.   What does that mean, "we gave him a script"?

11   A.   We told him what to say if he went to the grand jury.

12   Q.   And what did you tell him to say?

13   A.   Said that if he was -- if anyone -- if anyone asked, the

14   grand jurors or whoever was -- that he was to say that "Bucky"

15   Barrett was the one that he had met and gave the money to.

16   Q.   And who came up with that idea, to blame it on "Bucky"

17   Barrett?

18   A.   Jim Bulger.

19   Q.   Where was "Bucky" Barrett at the time you told Mike

09:55 20   Solimando to blame it all on "Bucky" Barrett?

21   A.   "Bucky" was dead.

22   Q.   Who killed "Bucky" Barrett?

23   A.   Jim Bulger.

24   Q.   Did you give Mike Solimando a photograph of Mr. Barrett?

25   A.   Yes.
```

```
 1    Q.    Where did you get that photograph from?

 2    A.    From Jim Bulger; he got it from John Connolly.

 3    Q.    All right.

 4          Now, how did it come about that Mr. Barrett was

 5    murdered by Mr. Bulger?

 6    A.    Well, originally what happened was that when the Medford

 7    Deposit Trust Company was burglarized, "Bucky" Barrett was the

 8    one that put the whole thing in -- he was involved in it, put

 9    this thing in motion.  So when they burglarized the bank, they

09:56 10   got in excess of -- numbers I've heard -- about $10 million,

11    and he was one of the people that bypassed the alarm, and there

12    were other people involved with him.

13    Q.    How did you know that Mr. Barrett was part of the

14    Depositors Trust burglary?

15    A.    Well, what happened was that Gusmini was a friend of

16    Clemente and people that were involved in it, Captain Clemente,

17    another guy, I think his name was Doherty, they were the

18    officers on the scene and Gusmini had information -- how he got

19    it, I don't recall how he got the information.

09:57 20   Q.    And who was Mr. Gusmini?

21    A.    Gusmini, he was a local wiseguy, always out looking to

22    make some money, looking for scores, but he had a wealth of

23    information about things that were happening around the city.

24    So --

25    Q.    Did Mr. Gusmini tell you and Mr. Bulger about
```

```
 1    Mr. Barrett's involvement?
 2    A.   Well, he -- yes.  What happened was we went -- we found
 3    out from Gusmini -- after we went and located Gusmini, he was
 4    at a bar over in Charlestown, the Cobblestone.  We went in
 5    there, Bulger and myself, Bulger had a machine gun on him and
 6    got Gusmini, to come out, and we brought him over to his home
 7    over in O'Callahan Way and told Gusmini that we wanted
 8    information from him.  We heard he had some information
 9    regarding the Safe Deposit Trust.  And he disclosed all
10    information to us.
11    Q.   And why were you interested in that burglary?  You had
12    nothing to do with it, right?
13    A.   It was a score, you know, there was -- it was a ruse
14    because the Mafia was saying that they did -- Gerry Angiulo had
15    a safe deposit box there, that's how this all come about.  So
16    we told him, I said, Howie had a safety deposit box there,
17    Howie Winter, and we were entitled to -- we wanted some of
18    their money.  And so he said that he would -- he was with
19    Frankie Salemme.  So I heard that --
20    Q.   Let's back up.
21         When you say "it was a score," can you explain to the
22    jury what you mean by "it was a score"?
23    A.   Well, we figured it was a way would could make some money,
24    get some money out of him.
25    Q.   So what did Mr. Gusmini tell you about the bank burglary?
```

1   A.   He said that "Bucky" Barrett was the one that was

2   involved, he was the one that bypassed the alarm.

3   Q.   And as a result of receiving that information, did you

4   have a conversation with Mr. Barrett?

5   A.   We located him, yes, and we met at the garage.

6   Q.   What garage?

7   A.   The garage on Lancaster Street.

8   Q.   And what happened at the garage on Lancaster Street?

9   A.   We told him that we knew he was involved and that Howie

09:59 10   had some money in that safe deposit box and we wanted a portion

11   of the money.

12   Q.   Was it true that Howie Winter had money in the bank?

13   A.   No, it wasn't.

14   Q.   So that was sort of like saying John Callahan owes us

15   money?

16   A.   Right.

17   Q.   After you told Mr. Barrett that, what did he say?

18   A.   He said he was with Frank Salemme.  Frank was in prison at

19   the time.  So I said, Well, fine.  I says, you know, we might

10:00 20   want to back off.  So he went up and spoke to Frank.  So Frank

21   sent word back down that "Bucky's" with him.

22   Q.   What does that mean, "'Bucky's' with him"?

23   A.   That "Bucky's" associated with him, so, in other words,

24   he's under -- "Bucky" is under his umbrella, so to speak.  He

25   was his protector.

1   Q.   And what did that mean so far as you and Mr. Bulger were

2   concerned?

3   A.   We backed off.

4   Q.   All right.

5        At some point --

6   A.   At that time.

7   Q.   At that time?

8   A.   Right.

9   Q.   At some point later does Mr. Barrett come to your

10:00 10 attention again?

11  A.   Well, he did.

12       What happened was that Jim Bulger and Kevin Weeks were

13  over at the Prudential and they seen him at the Prudential, and

14  that kind of, like, resurrected the thing.

15  Q.   And what happened after that?

16  A.   We called -- it was a ruse to get him.  We had Jimmy

17  Martorano contact "Bucky" Barrett and told him we had somebody

18  who wanted to sell some diamonds.  It was a ruse to have Jimmy

19  Martorano bring him in to 799 East Third Street.

10:01 20 Q.   Okay.

21       Now, why would Mr. Barrett be interested in buying

22  diamonds?

23  A.   Well, he had a lot of money and he's always buying -- from

24  what I understand, he was always interested in buying jewelry

25  or whatever was available.

```
 1   Q.   Is this allegedly stolen property?

 2   A.   Yes.

 3   Q.   He wasn't going to a jewelry store and buying jewelry, was

 4   he?

 5   A.   No.

 6   Q.   And what was 799 East Third Street?

 7   A.   That's where the bodies were buried, in the cellar.

 8   Q.   Okay.

 9        Whose house was that?

10   A.   Pat Nee's brother's house.

11   Q.   Whose brother's house?

12   A.   Pat Nee's.

13   Q.   Pat Nee's brother's house?

14        So when -- did Mr. Barrett come to Pat Nee's brother's

15   house?

16   A.   He did.

17   Q.   How did he get there?

18   A.   Jim Martorano brought him down.

19   Q.   When he got there, what happened?

20   A.   He put a gun to him.

21   Q.   Who put a gun --

22   A.   Jim Bulger.  Sat him down in the chair, Jim Martorano

23   left.

24   Q.   Okay.

25        When you say he "sat him down in the chair," in the
```

1    chair where?

2    A.    In the kitchen.

3    Q.    And what did you do?

4    A.    We tied him up, chained him up.

5    Q.    What kind of chains?  You had chains there?

6    A.    Some chains in the -- little, small, thin chains.

7    Q.    Was he able to move?

8    A.    Yes.

9    Q.    Was he able to get up off the chair?

10:03 10   A.    I think he was chained to the chair, if I remember

11   correctly.

12   Q.    And why did you do that?  Why are you chaining Mr. Barrett

13   up?

14   A.    For effect.

15   Q.    What kind of effect?

16   A.    To kind of, you know, terrorize him.

17   Q.    Okay.

18         So after you chained Mr. Barrett up, what happened?

19   A.    He asked him some questions.  He asked him about Joe

10:03 20   Murray.  He wanted -- because he was involved with Joe Murray

21   in marijuana.  He asked him questions about Joe Murray's

22   marijuana business, which "Bucky" answered because he was

23   involved with Joe Murray.

24   Q.    And why are you questioning Mr. Barrett about Joe Murray's

25   marijuana business?

1    A.   Jim Bulger wanted to find out anything he could find out.

2    Q.   Why?

3    A.   Maybe for a potential score down the road.

4    Q.   Okay.

5         And did Mr. Barrett provide the information that

6    Mr. Bulger was questioning him about?

7    A.   He said he was with Joe Murray.  In fact, he had him call

8    Joe Murray; he called Michael Murray.

9    Q.   For what purpose?

10:04 10   A.   Wanted to see if he could get some money out of him.

11   Q.   Were you there when Mr. Barrett called Joe Murray?

12   A.   Yes.

13   Q.   Tell us about that conversation.

14   A.   Well, he called Michael Murray, Michael Murray wouldn't

15   talk to him; so he called Joe Murray, he asked Joe Murray for

16   some money, and Joe Murray hung up.

17   Q.   Then what happened?

18   A.   Then he told us that he had some money at his house.

19   Q.   In whose house?

10:04 20   A.   His, "Bucky" Barrett's house.

21   Q.   And what did you do as a result of learning that?

22   A.   We went to the house and retrieved the money.

23   Q.   Prior to going to his house, did you have him do

24   something?

25   A.   We had came call -- he called his house, he called his

1      wife.

2      Q.   Why?

3      A.   To have her leave the house.

4      Q.   Okay.

5           When you went to his house, did you find any money?

6      A.   Yes.

7      Q.   Where was it?

8      A.   It was where he said it was, downstairs under one of the

9      laundry machines.

10:05 10   Q.   How much was it?

11     A.   I think it was about $60,000, $70,000, around there.

12     Q.   Did he tell you that he had any other money any place

13     else?

14     A.   Yes.

15     Q.   Where?

16     A.   He said his partner, Jackie Rooney, was holding some money

17     in the loan shark business, and he said that he had his money.

18     So Kevin Weeks sent his brother-in-law over there to pick up

19     the money.

10:05 20   Q.   Okay.

21          So who was it that went to Mr. Barrett's house and got

22     the money under the washer machine?

23     A.   Jim Bulger and myself.

24     Q.   So where was Mr. Barrett at this time?

25     A.   In the kitchen.  Pat Nee and Kevin Weeks were there with

 1   him.

 2   Q.   All right.

 3        So he's still in the kitchen, chained to the chair --

 4   A.   Yes.

 5   Q.   -- while you guys go to his house and take his money.

 6   A.   That's correct.

 7   Q.   Pat Nee and Kevin Weeks are watching him?

 8   A.   Yes.

 9   Q.   Now, who gets the money from Jake Rooney?

10:06 10   A.   Kevin's brother-in-law.

11   Q.   And who's that?

12   A.   Jimmy -- I forget his name, I think --

13   Q.   Okay.

14        Did you know him?

15   A.   No.

16   Q.   That individual?

17   A.   No.  I've seen him probably one time over Southie, but I

18   didn't really know much about him.

19   Q.   Can you describe him?

10:06 20   A.   He was an oriental gentleman, married to Kevin's sister.

21   Q.   Okay.

22        How much money did this individual get from Jake

23   Rooney?

24   A.   $10,000.

25   Q.   Did there come a time when you returned after you had

1    obtained the money from Mr. Barrett's house?

2    A.    Yes.

3    Q.    And when you got back to 799 East Third Street, what

4    happened?

5    A.    Well, he's taking him downstairs --

6    Q.    Who's taking him downstairs?

7    A.    Jim Bulger.

8    Q.    Why?

9    A.    Well, at the time I -- he was just taking him downstairs

10:07 10   because the cellar, where the cellar is situated, there's an --

11   there's a door in the cellar that led to the parking area.  So

12   on the way down the stairs, I was in front of him a couple of

13   steps down, he shoots him in the back of the head.

14   Q.    Who shoots who in the back of the head?

15   A.    Jim Bulger shoots "Bucky" Barrett in the back of the head.

16   Q.    After that, what happened?

17   A.    Well, took him in the cellar, he was down in the

18   basement -- while he was coming down the stairs, unbeknownst to

19   me, I didn't know he was going to shoot him, because I was

10:08 20   right in front of him, I was in the line of fire, and when he

21   shot him, the bullet could have went through him and hit me,

22   but the gun happened to be on single shot.  It was a fully

23   automatic weapon.  If it was on fully automatic weapon, it

24   would have hit me also.  But the body hit me, we both went down

25   the stairs.

```
 1    Q.    Were you angry about that?

 2    A.    I was.  I asked him, I said, You know, you could have shot

 3    me.

 4    Q.    What did he say?

 5    A.    He made some asinine statement.  I don't remember what it

 6    was.

 7    Q.    Did you know that Mr. Bulger intended to kill Mr. Barrett

 8    that day?

 9    A.    No.  He didn't have to kill him.

10:08 10    Q.    Why?

11    A.    Because "Bucky" Barrett was never going to say anything.

12    He would have taken his loss.  He was a wiseguy.  He could have

13    went out and made money on the next score.  There was no reason

14    for him to kill him.  "Bucky" Barrett never would have said

15    anything.

16    Q.    Did you say to Mr. Bulger, Why did you kill him?

17    A.    I did.  There was no reason why he had to shoot him.

18    Q.    After Mr. Bulger shot Mr. Barrett, what did Mr. Bulger do?

19    A.    He went upstairs, lied down.

10:09 20    Q.    Why did he lie down?

21    A.    I don't know.  Maybe he was mentally, physically

22    exhausted.  I don't know.  Maybe he got a high on it or

23    something and he was exhausted.  That's my interpretation.  It

24    would happen at other times.

25    Q.    Who else was there when Mr. Bulger shot Mr. Barrett in the
```

```
 1   back of the head?

 2   A.   Kevin was there.

 3   Q.   And what did you and Kevin do at that point?

 4   A.   We went downstairs and we took all his clothes off for

 5   identification purposes and we buried him.  I think I extracted

 6   some teeth, at his insistence.

 7   Q.   At whose insistence?

 8   A.   Jim Bulger.

 9   Q.   How did you extract Mr. Barrett's teeth?

10:09 10   A.   With some -- a pair of tools, pair of -- a pair of pliers.

11   Q.   Where did you get the pliers?

12   A.   Bulger.

13   Q.   What kind of pliers were they?

14   A.   They were pliers that you would find in a dentist's

15   office.

16   Q.   And where did Mr. Bulger get those pliers?

17   A.   He got them from his girlfriend, Cathy, she was a dental

18   hygienist.

19   Q.   And why did you extract Mr. Barrett's teeth?

10:10 20   A.   Well, there was no DNA back at that time, to deter

21   identification.

22   Q.   So to make sure there was no dental ID?

23   A.   Yes.

24        I only took a few out, there was -- I just couldn't do

25   it fully.
```

1    Q.   Gruesome, was it a gruesome task?

2    A.   Yes.

3             MR. BRENNAN:  Objection.

4             THE COURT:  Well, sustained as to form.

5    BY MR. WYSHAK:

6    Q.   You said you buried him in the basement?

7    A.   Yes.

8    Q.   Why?

9    A.   Well, it was a convenient location for one thing, and I

10:10 10   don't think it was going to be permanent.  Pat Nee's brother

11   was living there.

12   Q.   How did you bury him?  Was the floor dirt?

13   A.   It was a dirt floor.  It was an enclave, small area,

14   probably 15-by-15 square, 10-by-10 square, and it was a dirt

15   floor.  It was like an enclosed, probably like -- the old time

16   they would probably use it as a coal bin.

17   Q.   So the whole floor in the basement, it wasn't --

18   A.   Just on one section.

19   Q.   Kind of risky business, to bury a body in somebody else's

10:11 20   house, isn't it?

21   A.   I would say so.

22            MR. BRENNAN:  Objection.

23            THE COURT:  Sustained as to form, counsel.

24   BY MR. WYSHAK:

25   Q.   Did you discuss with Mr. Bulger burying the body at that

 1    location?

 2    A.    I thought it wasn't a good idea at all.

 3    Q.    What did he --

 4    A.    We had access to the body, entrance to the side door.  You

 5    could have driven the car two feet from the door; the house, it

 6    was between two buildings; there was no way anyone could have

 7    seen what was going on, you could have done it at night; you

 8    could have taken the body and buried it anywhere.

 9    Q.    Did you discuss that with Mr. Bulger?

10:12 10    A.    Yes.

11    Q.    What did he say?

12    A.    That's where we put him, right in the cellar.

13    Q.    You told us before about a man named Phil Costa?

14    A.    Yes.

15    Q.    Did you ask him for any assistance at that time?

16    A.    I asked him to get some lime.

17    Q.    Why?

18    A.    To dissolve the body.

19    Q.    And did he?

10:12 20    A.    He did.

21    Q.    And what happened?

22    A.    He brought the lime over, delivered to the side entrance,

23    and we used --

24    Q.    What did you do?

25    A.    We used the lime to cover the body.

```
 1   Q.   So who dug the hole?

 2   A.   Kevin and I.

 3   Q.   And who buried the body?

 4   A.   Both of us.

 5   Q.   And what was Mr. Bulger doing while you were doing that?

 6   A.   He was upstairs, taking a nap.  He was lying down.

 7   Q.   And when you finished, what did you do?

 8   A.   We left.

 9   Q.   I'd like to direct your attention now to a man named

10   Stephen Rakes.

11   A.   Yes.

12   Q.   Did you know Stephen Rakes?

13   A.   I know who he is.

14   Q.   Did there come a time when you engaged in a purchase of a

15   liquor store that he owned?

16   A.   Yes.

17   Q.   And can you tell us what your recollection is of how that

18   came about?

19   A.   Well, Stephen Rakes acquired a liquor license for a

20   location over in South Boston and was going to put a liquor

21   store there.  So when he started getting involved, it become a

22   pretty expensive operation, so at the time that he wanted to

23   sell the liquor store.  So his sister, Mary O'Malley, brought

24   that to Jim Bulger's attention.

25   Q.   And was Mary O'Malley associated with your group?
```

1    A.    She was.

2    Q.    In what capacity?

3    A.    She was dealing in drugs over in South Boston.

4    Q.    She was working in the narcotics business?

5    A.    She was working for -- yes.

6    Q.    And did there come a time when you met with Mr. Rakes

7    about this transaction?

8    A.    Yes.

9    Q.    And when did that occur?

10:14 10    A.    That occurred -- well, both Jim Bulger and I were in front

11    of the liquor store, and he says to me, Take a walk with me

12    around the corner, because his mother had a home right behind

13    the liquor store.  So I went with him --

14    Q.    Whose mother?

15    A.    Rakes' mother had -- his parents had a house right behind

16    the liquor store.

17          So I went with him.  We were sitting in the kitchen

18    and Rakes was there and he's discussing the purchase of the

19    liquor store, he wanted to sell the liquor store.

10:15 20    Q.    And what did he say to you?

21    A.    He said that he wanted to sell the liquor store, and if we

22    were interested -- because Mary O'Malley came to Jim Bulger and

23    told him that her brother was interested in selling the liquor

24    store.

25    Q.    And did you negotiate a purchase at that time?

A.    No, but it was an agreement at the time about some of the

money, how much money was going to be involved.

Q.    And what do you recall about the amount of money to be

involved?

A.    I think he said he wanted -- the figures that I remember

at the time was $67,000 cash, and then there was an inventory

of about $25,000.

Q.    So about --

A.    Give or take a few thousand, the inventory maybe was a

little bit more.

Q.    And did you reach an agreement with Rakes that day?

A.    No.

Q.    Did there come a time when you learned that there was a

subsequent meeting between Mr. Bulger and Mr. Rakes?

A.    Yes.

Q.    And how did you learn about that?

A.    Jim Bulger told me.

Q.    What did he tell you?

A.    He said that Rakes said that -- actually, it was Mary

O'Malley who came to him and said her brother was being --

there was a bomb threat against his store.

Q.    Okay.

      But I'm asking you about a meeting between Mr. Bulger

and Mr. Rakes about the purchase of the liquor store.

A.    Well, I was only present for the first time, then there

1  was a meeting subsequent to that.

2  Q.   And did you learn about that meeting?

3  A.   He told me about it, Bulger told me about it.

4  Q.   What did he tell you about that meeting?

5  A.   He said he was going to purchase the liquor store.

6  Q.   Okay.

7       And what happened at that meeting?

8  A.   They made an agreement.

9  Q.   Okay.

10:16 10      Did Mr. Rakes voluntarily agree?

11      MR. BRENNAN:  Objection.

12      THE COURT:  Are you objecting to form, counsel?

13      MR. BRENNAN:  I am.

14      THE COURT:  Sustained as to form, counsel.

15  BY MR. WYSHAK:

16  Q.   What did he tell you happened at that meeting with

17  Mr. Rakes?

18  A.   Rakes wanted to sell the liquor store, and he agreed to

19  purchase it.

10:17 20  Q.   For how much?

21  A.   Well, the figures I mentioned were the figures that I

22  heard, then it was -- what the figures after that was I think

23  maybe a hundred thousand dollars, if I'm not mistaken.

24  Q.   Where did this money come from?

25  A.   It come out of the Ex Fund.

```
 1   Q.   Okay.

 2        And the Ex Fund was criminal proceeds?

 3   A.   Yes.

 4   Q.   Did there come a time when you and Mr. Bulger took

 5   possession of the liquor store?

 6   A.   Yes.

 7   Q.   Now, shortly after that occurred, where did Mr. Rakes go?

 8   A.   He went to Florida.

 9   Q.   Did you request that he return?

10   A.   Yes.  The rumor was around town that something happened to

11   him.

12   Q.   Okay.

13        And what did you do next after you heard that rumor?

14   A.   Jim Bulger contacted him in Florida to come back to South

15   Boston to be seen.

16   Q.   Why?

17   A.   He wanted it to be known that nothing happened to him.

18   Q.   I'd like to show you a photo, Exhibit 77.

19        Do you recognize that location?

20        Look on the monitor.

21   A.   Yes, I see it.

22   Q.   What is it?

23   A.   It's the South Boston Liquor Mart on Old Colony Ave.,

24   South Boston.

25   Q.   Now, who were the true owners of that business after the
```

1    transaction with Mr. Rakes?

2    A.    Kevin Weeks.

3    Q.    Were you an owner?

4    A.    On the business, no.

5    Q.    Did you -- well, you told us that the money to purchase it

6    came out of the Ex Fund.

7    A.    But not on paper, that's what I'm referring to.

8    Q.    Okay.

9          On paper is one thing.  Who really owned it?

10:19 10   A.    We owned it.

11   Q.    Who's "we"?

12   A.    Me, Kevin Weeks, and Jim Bulger.

13   Q.    Who was on paper?

14   A.    Kevin Weeks.

15   Q.    Why?

16   A.    Because he could get the liquor license in his name.

17   Q.    Did there come a time when you purchased the real estate?

18   A.    Yes.

19   Q.    And again, who were the true owners of the real estate?

10:20 20   A.    All of us.

21   Q.    Who was on paper?

22   A.    Kevin Weeks.

23   Q.    Where was the money -- where did the money come from to

24   purchase the real estate?

25   A.    We got a bank loan.

1    Q.    Any cash involved?

2    A.    Some cash involved, I'm not sure how much.

3    Q.    Where did the cash come from?

4    A.    It come out of the Ex Fund.

5    Q.    Didn't you guys had a lot of money?

6    A.    We had a lot of money, yes.

7    Q.    Why didn't you just pay cash for the real estate?

8    A.    Well, we wanted -- you just can't start paying cash, large

9    amounts of cash for businesses.  It raised a red flag.

10:20 10    Q.    What kind of red flag?

11    A.    The IRS would start looking at it, other people might

12    start looking at it.

13    Q.    After you gained possession of the liquor store, did you

14    go on the payroll?

15    A.    Yes.

16    Q.    For how much?

17    A.    At the time I think it was $500 a week.

18    Q.    Who else went on the payroll?

19    A.    Kevin Weeks, Jim Bulger, and myself.

10:21 20    Q.    Did you need $500 a week from the liquor store?

21    A.    That's what we got, 500 a week.

22    Q.    Did you need it?

23    A.    No, we didn't really need it, but we just used it for tax

24    purposes.

25    Q.    What does that mean, "used it for tax purposes"?

1   A.   Show legitimate income.

2   Q.   Why did you want to show legitimate income?

3   A.   Well, for lifestyle you got to show -- you got to pay

4   taxes if you're going to, you know -- if you're going to

5   purchase things or you're going to buy real estate or whatever,

6   you got to show how you're living.

7   Q.   Mm-hmm.

8        Did you receive a W-2 at the end of the year?

9   A.   Yes.

10:21 10   Q.   Did you use that to file your tax returns?

11   A.   Yes, filed it, yes.

12   Q.   Did you keep the $500 a week that you were getting?

13   A.   At first we did, yes.

14   Q.   And at some point, what happened?

15   A.   Well, the property in the business was sold at some later

16   point in time.

17   Q.   Okay.

18        Did you stay on the payroll?

19   A.   Yes.

10:22 20   Q.   And what did you do with the money from the pay?

21   A.   We got the paycheck and we gave the money back because it

22   was a different owner, Kevin O'Neil was the owner and a fellow

23   named McIntyre.

24   Q.   Okay.

25        So directing your attention to about May 1986, did you

         1    sell the business to O'Neil and McIntyre?

         2    A.   Yes.

         3    Q.   How much did you receive from that transaction?

         4    A.   On the business?

         5    Q.   Yeah.

         6    A.   I think we received in excess of $100,000, I believe, at

         7    one point.

         8    Q.   All right.

         9         And who gave you the $100,000?

10:22   10    A.   Jim Bulger.

        11    Q.   So when you say we received $100,000 --

        12    A.   Kevin and I received $100,000 in cash.  That's involved in

        13    the real estate.

        14    Q.   Each?

        15    A.   Yes.

        16    Q.   And now you told us you continued to be on the payroll --

        17    A.   Yes.

        18    Q.   -- after Mr. O'Neil bought the business?

        19    A.   Right.

10:23   20    Q.   But you gave the money back?

        21    A.   Yes.

        22    Q.   Why?

        23    A.   Well, because it was an excessive amount of money that was

        24    being paid out of the business and the business couldn't, you

        25    know, handle the payroll.

1    Q.   So why didn't you just go off the payroll?

2    A.   We still wanted to be on the payroll for tax purposes.

3    Q.   So what happened?  Mr. O'Neil would give you a paycheck?

4    A.   Right.

5    Q.   What would you do with the paycheck?

6    A.   Sign it and give him back the money.

7    Q.   At the end of the year did he issue you a W-2?

8    A.   Yes.

9    Q.   Did you report that as income on your tax return?

10:23 10  A.   Yes.

11   Q.   Even though at that time you really didn't receive the

12   money?

13   A.   Right.

14        MR. BRENNAN:  Objection, leading.

15        THE COURT:  I'll allow that.

16        Overruled.

17        MR. WYSHAK:  Could we put up Exhibit 886 on the

18   screen?

19        THE COURT:  886?

10:24 20       MR. WYSHAK:  Yes.

21   BY MR. WYSHAK:

22   Q.   Do you see those checks on the screen?

23   A.   Yes.

24   Q.   Is that you on the bottom, check 2585?

25   A.   That's me, yes.

1    Q.   Is that an example of the check that -- that paycheck that
2    you would receive?
3    A.   Yes.  I cleared $343.
4    Q.   That was every week?
5    A.   Yes.
6    Q.   Who is this individual, Gordon McIntyre, who signed the
7    check?
8    A.   He's one of the owners with Kevin O'Neil.
9    Q.   Okay.
10   Did there come a time when there was a transaction
11   regarding the real estate that the liquor store was on?
12   A.   Yes.
13   Q.   And did you sell it?
14   A.   Sell it -- yes.
15   Q.   Who did you sell it to?
16   A.   Kevin O'Neil.
17   Q.   All right.
18   And on paper, who did it appear conducted the sale?
19   A.   It was Kevin Weeks.
20   Q.   In reality, who received the money from the sale?
21   A.   Kevin Weeks, myself, and Jim Bulger.
22   Q.   Was there a mortgage taken back?
23   A.   I think there was a mortgage on it.
24   Q.   Prior to selling the real estate to Kevin O'Neil, did you
25   collect rent on that property?

```
 1   A.   Yes.

 2   Q.   Were you issued a document for tax purposes regarding the

 3   rent money?

 4   A.   Yes.

 5   Q.   And did you use that document to file your tax returns?

 6   A.   Yes.

 7   Q.   All right.

 8        Now, when the real estate was sold to Mr. O'Neil, how

 9   much money did you get from that sale?

10   A.   One hundred thousand.

11   Q.   Who did you get it from?

12   A.   Jim Bulger.

13   Q.   Did Kevin Weeks get any money?

14   A.   Same amount.

15   Q.   Do you know how much Mr. Bulger sold the liquor store to

16   Mr. O'Neil for?

17   A.   I don't have all those figures, but I know that he was

18   getting a rent check every month.

19   Q.   How do you know that?

20   A.   Because he told me.

21   Q.   Okay.

22        Was it a mortgage payment?

23   A.   Yes.

24   Q.   Are you familiar with the boat named the VALHALLA?

25   A.   Yes.
```

```
 1   Q.   What was the VALHALLA?

 2   A.   VALHALLA was the ship that was taking weapons to Ireland.

 3   Q.   And what kind of weapons?

 4   A.   A large amount of weapons, military weapons, all different

 5   assortment of weapons.

 6   Q.   Did you supply weapons for that shipment?

 7   A.   Yes.

 8   Q.   How did you do that?

 9   A.   We sent -- we had a stash with a large amount of weapons,

10   and we didn't need all those weapons, so -- enough weapons to

11   supply a company of -- an Army company.

12   Q.   Where did you get all those weapons to begin with?

13   A.   Collected them over the years.

14   Q.   How?

15   A.   Different sources, robberies, weapons that came off the

16   boat that was going to send the weapons over during the war,

17   the Vietnam war from the docks.

18   Q.   Somebody stole them?

19   A.   We stole them.

20   Q.   You bought them?

21   A.   Different people bought them.

22   Q.   Why do you need more than one gun?

23   A.   We didn't refuse anything that came along, we just bought

24   all the guns that would become available.

25   Q.   So at some point, you sent some of these weapons to
```

1    Ireland?

2    A.    On a couple of different occasions.

3    Q.    Why?

4    A.    Well, Pat Nee and Joe Murray were IRA sympathizers, we

5    were partners, and so we went along with them.

6    Q.    Were you an IRA sympathizer?

7    A.    I was with the group.

8    Q.    Okay.

9          And when you say "with the group," who's the group?

10:29 10   A.    Jim Bulger, Joe Murray at the time, Pat Nee, Kevin Weeks.

11   Q.    Other than providing weapons, did you provide anything

12   else?

13   A.    Yes.

14   Q.    What?

15   A.    We sent them over, I think it was 20 pounds of C-4 high

16   explosive.

17   Q.    How many times did you send weapons to Ireland?

18   A.    I think there were two occasions.  I recall the VALHALLA,

19   but there was one occasion prior to that, but I wasn't privy to

10:29 20   much information about that, but I know that some of our

21   weapons got through in the first load.

22   Q.    Were you there when the VALHALLA was loaded?

23   A.    Yes.

24   Q.    Why were you there at that time?

25   A.    I was overseeing -- I was on the higher elevation looking

1  down, just surveying the area to make sure everything was all

2  right.

3  Q.   Who were you with?

4  A.   Kevin Weeks.

5  Q.   Did you contribute any money for the purchase of arms?

6  A.   It come out of our Ex Fund.

7  Q.   Who did you give the money to?

8  A.   Gave it to -- there was a Northern Aid Society that was

9  ongoing at the time, we were supplying money to that

10:30 10  organization, and we gave money to people who were buying

11  weapons for us, and John Hurley and Joe Murray.  Joe Murray was

12  using most of his own money.

13  Q.   Did the VALHALLA deliver the weapons to Ireland?

14  A.   Yes.

15  Q.   And what happened to those weapons?

16  A.   Well, the boat, the VALHALLA, made the trip across and

17  they offloaded to another ship in the Irish sea, I think the

18  name of it was the MARITA ANN, and it was compromised in that

19  end, and the Irish Navy intercepted -- there was seven tons of

10:31 20  weapons and explosives.

21  Q.   Did you have a conversation with Mr. Bulger about that?

22  A.   Yes.

23  Q.   And what did you discuss?

24  A.   Well, he was in his kitchen -- excuse me, his living room,

25  the day I remember, when they intercepted the boat, and he

1    said, That that's our stuff on TV.

2    Q.   Did you have any discussion, any further discussion about

3    whether the load was compromised?

4    A.   Well, at the time we did, we thought it was, but when the

5    boat come back, it was docked on the waterfront and two people

6    were getting off the boat, there was a photograph in the Globe.

7    Q.   Are you familiar with the boat called the RAMSLAND?

8    A.   Yes.

9    Q.   And what was the RAMSLAND?

10:32 10   A.   The RAMSLAND was a ship that Joe Murray owned.  It was a

11   marijuana ship.  It was importing marijuana from overseas, and

12   it was in the bottom of the hull of the boat, and there was

13   coal on top of the -- on top of that as a disguise.  The ship

14   was being taken into Boston with 48 tons of marijuana and it

15   was going to be dismantled for scrap.

16   Q.   What was your involvement in that marijuana shipment?

17   A.   We were with Joe Murray, and so we were involved that in

18   that shipment.  We didn't have no money invested, we was just

19   going to get a portion of the proceeds.

10:32 20   Q.   And why would you get a portion of it if you didn't invest

21   any money?

22   A.   Because Joe Murray, we had Joe Murray with us.

23   Q.   What does that mean?

24   A.   He was part of our group, we were getting -- we were

25   getting marijuana off him and cocaine at another point in time.

```
 1   Q.   Did that mean he had to pay you every time he brought a
 2   load?
 3   A.   That's right.
 4   Q.   How much money did you expect to make from this particular
 5   load?
 6   A.   In excess of a million dollars.
 7   Q.   And what happened to the RAMSLAND?
 8   A.   It was intercepted by the Coast Guard and the DEA.
 9   Q.   Did you suspect that that was compromised?
10   A.   Yes.
11   Q.   Did you receive any information from Mr. Connolly at that
12   time about the compromise of the RAMSLAND?
13   A.   He said that there was -- actually, the VALHALLA you're
14   talking about.
15   Q.   Okay.
16   A.   He said that the two people -- there was a photograph in
17   the Globe from the VALHALLA, and two people were getting off
18   the boat, and he said that one of them, one of those people
19   were cooperating.
20   Q.   He told you one of the people who got off the boat was
21   cooperating?
22   A.   Right.
23   Q.   Did you at some point identify that individual?
24   A.   Through Bulger's -- his investigation, he found out.
25   Q.   And who was it that he found out was cooperating?
```

10:33 (line 10)
10:34 (line 20)

```
 1   A.    McIntyre.  That's after the RAMSLAND.

 2   Q.    Okay.

 3         What happened to John McIntyre?

 4   A.    He was murdered.

 5   Q.    And how did that come about?

 6   A.    Well, he concocted a ruse --

 7   Q.    Who's "he"?

 8   A.    Jim Bulger.

 9   Q.    What was the ruse?

10   A.    To have -- after the RAMSLAND got intercepted, we

11   concocted a ruse to find out who the source was.  So we told

12   Pat Nee to tell him that we were investing in another load to

13   come in and we all had to invest X amount dollars, I think it

14   was $20,000, for another load that was coming in.  And so he

15   went and he got the money from the Customs --

16   Q.    Who went and got the money from Customs?

17   A.    John McIntyre.

18   Q.    You didn't know that at the time, did you?

19   A.    No, we didn't know, but I'm just giving you the whole

20   scenario, you know?

21   Q.    And what happened with the $20,000?

22   A.    It was given to Pat Nee, and then it was divided up four

23   ways.

24   Q.    And who got the money from that --

25   A.    Jim Bulger, Kevin Weeks, Pat Nee, and myself.
```

```
 1    Q.    After you received that $20,000, what happened?

 2    A.    We had Pat bring him to the house over at 799 East Third

 3    Street, and Pat told him we were having a party there and they

 4    brought some beer over and he was carrying a case of beer in

 5    when Bulger grabbed him, Jim Bulger grabbed him.

 6    Q.    So Mr. McIntyre comes to 799 East Third Street --

 7    A.    That's correct.

 8    Q.    -- with Pat Nee?

 9    A.    Yes.

10:36 10    Q.    And then what happens?

11    A.    Put a gun to him, sat him in the chair, and questioned

12    him.

13    Q.    Was he secured to the chair?

14    A.    Yes.

15    Q.    How?

16    A.    Chains.

17    Q.    Like Mr. Barrett?

18    A.    Yes.

19    Q.    Did you do that?

10:36 20    A.    Yes.

21    Q.    And questioned Mr. McIntyre about what?

22    A.    About if he was the informant on the RAMSLAND.

23    Q.    And what did Mr. McIntyre say?

24    A.    He admitted it.  He apologized to Pat Nee.

25    Q.    Okay.
```

1    A.    He said he was weak, and he told him the whole -- whatever

2    questions Jim Bulger asked him, he answered.

3    Q.    How long did you have this conversation with John

4    McIntyre?

5    A.    Before he admitted everything?  A matter of a few -- about

6    a minute or so.

7    Q.    Okay.

8          What did you say to him after he admitted it?

9    A.    Well, he was going to give him a script he wanted to give

10:37 10   him --

11   Q.    Who's "he"?

12   A.    Jim Bulger.  And he said that we're going to send him to

13   South America, or if he was to go to the grand jury, tell him

14   what to say in front of the grand jury.

15   Q.    And what did Mr. McIntyre say?

16   A.    Well, he was -- he agreed.

17   Q.    Okay.

18          And then what happened?

19   A.    Took him downstairs --

10:38 20   Q.    Who took him downstairs?

21   A.    Jim Bulger, myself took him downstairs.

22   Q.    Why?

23   A.    To murder him.

24   Q.    Did you know that you were going to murder John McIntyre

25   that day?

```
 1    A.    I suspected so.

 2    Q.    Who else was present at that time?

 3    A.    Kevin Weeks.

 4    Q.    Where did Mr. Nee go?

 5    A.    I think he left.  I'm not certain, though.  He might have

 6    been upstairs or he left.

 7    Q.    What happened when Mr. McIntyre, yourself and Mr. Bulger

 8    and Mr. Weeks went downstairs?

 9    A.    He tried to strangle him.

10    Q.    Who tried to strangle who?

11    A.    Jim Bulger.

12    Q.    Tried to strangle who?

13    A.    Davis, both of them, Hussey.

14    Q.    We're talking about Mr. McIntyre.

15    A.    You say who else?

16    Q.    No, I said, Who tried to strangle who?

17    A.    Jim Bulger tried to strangle McIntyre.

18    Q.    Okay.

19          How?

20    A.    We had some nautical rope, but the rope was too thick, and

21    it wasn't doing -- it wasn't -- couldn't do the job with the

22    rope, he couldn't strangle him.  So he released the rope, and

23    he said, Do you want one in the head?  And he said, Yes,

24    please.

25    Q.    And what was Mr. McIntyre doing when Mr. Bulger was trying
```

1  to strangle him with rope?

2  A.   He was choking, he was gagging and choking.

3  Q.   Was somebody holding Mr. McIntyre?

4  A.   I believe -- both of us.  He was choking him, but I was

5  holding him.

6  Q.   So you were holding Mr. McIntyre and Mr. Bulger was trying

7  to choke him with the rope?

8  A.   Yes.

9  Q.   Mr. McIntyre is choking?

10:39 10  A.   Yes.

11  Q.   How long did that last?

12  A.   Not long, because it wasn't -- he was having difficulties

13  with the rope, strangling him.

14  Q.   And then what happened?

15  A.   Then he released the rope, and he says, You want one in

16  the head?  And McIntyre said, Yes, please.

17  Q.   And then what happened?

18  A.   He shot him in the head.

19  Q.   Who shot who?

10:40 20  A.   Jim Bulger shot McIntyre in the head.

21  Q.   Then what happened?

22  A.   He was on the ground and I picked him up a little bit to

23  see if he was still alive and he was still pulsating and he

24  shot him again.

25  Q.   So who decided he was still alive?

```
      1   A.   I was checking, I could feel his neck pulse was pulsating.

      2   Q.   What did you say?

      3   A.   I said, He's still alive.

      4   Q.   To who?

      5   A.   To Jim Bulger.

      6   Q.   And then what happened?

      7   A.   He shot him again.

      8   Q.   Was he dead at that point, Mr. McIntyre?

      9   A.   Yes.

10:41 10  Q.   And what did you do at that point?

     11   A.   Well, we took all his clothes off for identification

     12   purposes.

     13   Q.   Who's "we"?

     14   A.   I think it was Kevin and I.

     15   Q.   Where did Mr. Bulger go?

     16   A.   He went upstairs and took a -- lied down.

     17   Q.   Why?

     18   A.   I don't know, maybe -- I don't know, I'm just -- my

     19   assumption, he's physically exhausted from it.  I don't know.

10:41 20  Q.   All right.

     21        He went upstairs and lied down again?

     22   A.   Yes.

     23   Q.   Same thing he did after Ms. Davis?

     24   A.   Yes.

     25             MR. BRENNAN:  Objection.
```

```
 1            THE COURT:  Well, sustained.
 2   BY MR. WYSHAK:
 3   Q.   Is that the same thing he did after he killed Ms. Davis?
 4            MR. BRENNAN:  Objection.
 5            THE COURT:  Counsel, I'll see you at sidebar for a
 6   second.
 7            (At sidebar on the record.)
 8            MR. WYSHAK:  Your Honor, I apologize, I caught a
 9   little head cold over the weekend, so --
10            THE COURT:  Okay.
11            The question pending, counsel, was -- I think it
12   was --
13            MR. WYSHAK:  Is that the same thing you did after --
14            MR. BRENNAN:  It's not only leading, it's trying to
15   make an analogy between two different incidents in conclusion.
16            So what he's doing is saying Mr. Bulger is -- rather
17   than asking the witness about it.  So Mr. Wyshak's questions
18   are not only leading, but they also draw Mr. Wyshak's
19   conclusion to have Mr. Flemmi endorse it.  It's not a proper
20   question.
21            MR. WYSHAK:  I think it's perfectly appropriate to ask
22   him whether the conduct after this murder was similar to the
23   conduct after a previous murder.
24            MR. BRENNAN:  I see no relevance in it, and it's also
25   Mr. Wyshak's question and analogy and conclusion and not the
```

```
 1   witness'.

 2         MR. WYSHAK:  I asked the witness what happened, he

 3   said he went upstairs and lied down.  And I'm asking him, is

 4   that the same thing he did after the murder of Ms. Davis?  And

 5   I intend to ask him is that the same thing he did after the

 6   murder of Mr. Barrett?

 7         THE COURT:  Well, I'm not sure that it's leading,

 8   counsel.

 9         Is it the same thing?

10   MR. BRENNAN:  Well, the way he first asked is leading.

11         THE COURT:  I sustained that.

12         MR. BRENNAN:  Then he changed it.

13         Secondly, he was drawing a conclusion for the witness,

14   drawing to make an analogy for the witness, instead of asking

15   what happened.  Trying to tell the story with the witness and

16   have the witness simply sit up there like a parrot and say, Yes

17   or No.

18         THE COURT:  No, I don't think this question is

19   leading.  I've sustained your other objections to the questions

20   I thought were leading.

21         I'll let you ask this question, if you choose to.

22         MR. WYSHAK:  Thank you.

23         (End of discussion at sidebar.)

24         MR. WYSHAK:  May I proceed, your Honor?

25         THE COURT:  You may.
```

```
        1   BY MR. WYSHAK:

        2   Q.   Mr. Flemmi, Mr. Bulger's conduct in going upstairs and

        3   lying down after the murder of Mr. McIntyre, was that the same

        4   conduct he engaged in after he strangled Debbie Davis?

        5   A.   Yes.

        6   Q.   Is that the same conduct he engaged in after he shot

        7   "Bucky" Barrett?

        8   A.   Yes.  And he also laid down when she was being buried.

        9   Q.   Now, after Mr. Bulger shot Mr. McIntyre, what did you do?

10:44  10   A.   Took his clothes off to deter identification.

       11   Q.   Did you do anything else?

       12   A.   Took some of his teeth out, but he had a bridge on.

       13   Q.   Mm-hmm.

       14            And did you bury him?

       15   A.   Yes.

       16   Q.   Where?

       17   A.   In the cellar, in the basement.

       18   Q.   In the same area where Mr. Barrett was buried?

       19   A.   Yes.

10:45  20   Q.   Who was present when he was buried?

       21   A.   Kevin Weeks and myself.

       22   Q.   Did you dig the hole?

       23   A.   Both of us did.

       24   Q.   You buried him?

       25   A.   Yes.
```

```
  1   Q.   What did you do with his clothes?
  2   A.   We took the clothes and they took them off, got rid of
  3   them over the pier in Castle Island.
  4   Q.   What about the teeth?
  5   A.   The teeth went along that I recall.  I'm not -- I think
  6   they went along.
  7   Q.   Is that the same with Mr. Barrett, you disposed of his
  8   clothes and his teeth?
  9   A.   Yes.
10:46 10   Q.   About this time in late 1984, did you become aware that
 11   you were the targets of an investigation by DEA, the Drug
 12   Enforcement Administration?
 13   A.   Yes.
 14   Q.   How did you become aware that you were the subjects of
 15   that investigation?
 16   A.   Well, it was brought -- Connolly actually mentioned the
 17   fact that the investigation was going on with us, plus
 18   observation, our own observation.
 19   Q.   Did you take some action in order to deter the
10:46 20   investigation?
 21   A.   Yes.
 22   Q.   What did you do?
 23   A.   Well, we compiled a number of plates, DEA plates,
 24   surveillance vehicles, I think it was about maybe a dozen of
 25   them, not certain, plates, different vehicles.
```

```
 1    Q.    You're talking about license plates?

 2    A.    License plates.

 3    Q.    License plate numbers?

 4    A.    Yes.

 5    Q.    What did you do?  You compiled a list, what did you do

 6    with that?

 7    A.    Gave it to John Connolly.

 8    Q.    For what purpose?

 9    A.    Well, he gave them to the FBI, his superior, the superior

10:47 10   gave it to the DEA.

11          I think Greenleaf was the Agent in Charge, the FBI

12    Agent in Charge.

13    Q.    And who did Mr. Greenleaf give it to?

14    A.    The SAC, Special Agent in Charge, the DEA.

15    Q.    And how did you learn that?

16    A.    John Connolly.

17    Q.    What was the purpose in doing that?

18    A.    Probably to discourage the investigation or probably to

19    embarrass them.

10:47 20   Q.    Did you get arrested or prosecuted as a result of that

21    investigation --

22    A.    No.

23    Q.    -- in 1984?

24    A.    No.

25    Q.    Who was Deborah Hussey?
```

```
 1   A.   My girlfriend.

 2   Q.   Deborah Hussey?

 3   A.   Excuse me.  Deborah Hussey was Marion's daughter.

 4   Q.   What was your relationship with her like?

 5   A.   At the time, after I come back off the lam?

 6   Q.   From the beginning.  How did you -- she's not your

 7   daughter; is that fair to say?

 8   A.   No, she's Marion Hussey's daughter by her first marriage,

 9   Tom Hussey.
```
10:48 10   Q.   So how did you first meet Deborah Hussey?
```
11   A.   She was Marion's daughter.

12   Q.   And Marion was your --

13   A.   -- girlfriend at the time.

14   Q.   You were living with her?

15   A.   Yes, I was.

16   Q.   Where?

17   A.   Well, a couple of different locations, but eventually she

18   ended up living in Milton.

19   Q.   Okay.
```
10:48 20        Did you have children by Marion Hussey?
```
21   A.   Yes.

22   Q.   How many?

23   A.   Three.

24   Q.   Okay.

25        And describe your relationship with Deborah Hussey
```

 1    after you returned from Canada in or about 1974.

 2    A.   Well, when I come back, lifestyle was a little different,

 3    and her lifestyle was totally different because she was doing

 4    drugs, she was living with her boyfriend, she was having

 5    trouble at home with her mother.

 6    Q.   Okay.

 7         And what did you do about that?

 8    A.   I wasn't -- didn't know much about the drug problem with

 9    kids because when I come back, it seemed to -- that's when I

10    started experiencing people on drugs and what they were doing,

11    and I thought I could help her.

12    Q.   And how did you try to help her?

13    A.   Well, I was -- I asked her to go to a drug rehab, which I

14    gave her money to do.

15    Q.   Okay.

16         Did she start having problems with the law?

17    A.   She did, yes.

18    Q.   Like what?

19    A.   Well, she was in the combat zone.

20    Q.   What do you mean when you say "the combat zone"?

21    A.   The red light, that's a red light district in Boston, one

22    of the areas where prostitution, drugs -- excuse me -- and it

23    was going on at the time.

24    Q.   Did she get arrested?

25    A.   Several times.

Q.   Did you have a sexual relationship with her?

A.   Not intercourse, no.

Q.   Did you get her an apartment to live in?

A.   No.

Q.   Did there come a time when she left Boston?

A.   Yes.

Q.   And where did she go?

A.   She went to several places.  She went to Chicago, she come back; she went to California, come back; she went to Florida, stayed with her father down there for some period of time, she come back to Boston.

Q.   Okay.

     And did she return to Boston sometime in the mid '80s?

A.   Well, she was back and forth, but she was -- I mean, she was only gone short -- not long periods of time, but she was back in Boston in the mid '80s, yes.

Q.   When she came back, did she start frequenting Triple O's?

A.   She had been in Triple O's a number of times.

Q.   And did that cause a problem?

A.   It caused quite a bit of a problem.

Q.   Can you describe that?

A.   Well, she would come in and she'd be on drugs, Kevin O'Neil was very upset about it and he was nervous about it, and he brought it to Jim Bulger's attention, brought it to my attention, and I tried to keep her out of there, I did keep her

1      out of there for a while.  She went back in again, and she

2      become a problem.

3      Q.   Okay.

4           And did you discuss that with Mr. Bulger?

5      A.   I did.

6      Q.   And what did he say?

7      A.   He said to keep her out of there, you know, she's causing

8      problems, it's embarrassment.

9      Q.   What kind of problems?

10:52 10    A.   Well, she's doing drugs, she's in there doing drugs, and

11     it was embarrassing for Kevin O'Neil, he didn't know -- she's

12     using my name, she's using his name.

13     Q.   Whose name?

14     A.   Jim Bulger's name, and she's around the town doing drugs,

15     acquiring drugs from different people.  She went to a bookmaker

16     that was working for me one time, she was going out with him,

17     and she said to him who she was.  She stole $800 from him.

18     Q.   What does that mean, "she said to him who she was"?

19     A.   She told him she was my daughter, and she stole $800 for

10:53 20    from him, and he came to me and asked me about it.  He said

21     that she took 800, and the money, actually, was money that

22     belonged to his bookmaking money.

23          So I checked it out, and it -- actually, he was right.

24     He worked for a friend of mine.  So I told him I wrote off the

25     $800.

```
 1    Q.    Okay.
 2          Did there come a time when you had a further
 3    discussion with Mr. Bulger about Ms. Hussey?
 4    A.    Yes.
 5    Q.    And what was that conversation?
 6    A.    He wanted me to -- he wanted to kill her, and I told him,
 7    I said, Well, why don't we just send her off, I'll send her off
 8    somewhere.  I kept sending her off and she kept coming back.
 9    So it come to the point where he wanted to kill her.
10:53 10    Q.    And did you agree?
11    A.    Reluctantly, yes.
12    Q.    Did you create a plan to murder Deborah Hussey?
13    A.    He said bring her to the apartment, at the house over at
14    799, which I did.
15    Q.    And you knew that when she got there, she was going to be
16    murdered, correct?
17    A.    Yes.
18    Q.    And you brought her to that house?
19    A.    Right.
10:54 20    Q.    When you got there, who was there?
21    A.    Pat Nee, Kevin Weeks, and Jim Bulger.
22    Q.    And when Deborah Hussey walked in the door, what happened
23    to her?
24    A.    Well, she was in front of me.  She walked in, she walked
25    into the kitchen area, Jim Bulger stepped out from behind the
```

1    top of the basement stairs and grabbed her by the throat and

2    started strangling her.

3    Q.    What happened then?

4    A.    Well, he lost his balance and they both fell on the floor,

5    he continued strangling her.

6    Q.    Okay.

7          And how long did it take to strangle Deborah Hussey?

8    A.    Didn't take long.  She was a very fragile woman.

9    Q.    What were you doing?

10:55 10   A.    I was there; I wasn't doing anything.

11   Q.    Was Mr. Weeks there?

12   A.    He was there when we walked in.  I think at some point he

13   walked upstairs a few minutes later or something.

14   Q.    Did Mr. Bulger kill her?

15   A.    Yes.

16   Q.    What happened next?

17   A.    We took her downstairs.

18   Q.    Who's "we"?

19   A.    Bulger and I.

10:55 20   Q.    And then what happened?

21   A.    While we were downstairs, then Kevin come down, I think,

22   at some point.  Bulger went back upstairs, and I was taking the

23   clothes off for identification purposes.

24   Q.    Did you strangle Ms. Hussey in the basement?

25   A.    No, I didn't.  She was dead.

```
 1   Q.   What did you do?

 2   A.   I was taking her clothes off.  She had a very tight beige

 3   sweater on, and I'm trying to get it off over her head.

 4            I definitely did not strangle her.

 5   Q.   Did you remove her teeth?

 6   A.   I tried to.

 7   Q.   Did you remove some of her teeth?

 8   A.   Some of them.

 9   Q.   Then what did you do?

10   A.   Then we buried her in the cellar.

11   Q.   Did you remove her clothes?

12   A.   Took all her clothes, took the clothes, got rid of the

13   clothes, same way.

14   Q.   And who buried her?

15   A.   Kevin Weeks and myself.

16   Q.   Where was Mr. Bulger when this occurred?

17   A.   He went upstairs and lied down.

18   Q.   Did you bury her in the same area as Mr. Barrett and

19   Mr. McIntyre in that basement?

20   A.   Yes.

21   Q.   Now, at some point in time do you have to move these three

22   bodies?

23   A.   Yes.

24   Q.   Why?

25   A.   The house was being sold.  Pat Nee's brother was actually
```

1    renting the house, but we had to take the bodies out, exhume

2    the bodies, and take them to another location.

3    Q.    Why?

4    A.    Because the house was being sold.

5    Q.    What does that mean?

6    A.    Well, the new owner comes in and he wanted to do a little

7    renovation and they find the bodies in the house, there would

8    be a lot of explanations that would have to come forward.

9    Q.    So did you devise a plan?

10:57 10    A.    Yes.

11    Q.    What was the plan?

12    A.    The plan was to exhume the bodies, take them and bring

13    them to the site where they were buried at -- in Dorchester.

14    Q.    And who chose that site?

15    A.    Jim Bulger chose that site, the Florian Hall area.

16    Q.    Did you go to Florian Hall and prepare a grave?

17    A.    Yes.   Prior to taking the bodies there, yes.

18    Q.    Who did that?

19    A.    The three of us, Kevin, myself, and Jim Bulger.   Kevin and

10:58 20    I dug the hole.

21    Q.    And what did Mr. Bulger do?

22    A.    Nothing.

23    Q.    How deep did you dig a hole?

24    A.    Probably -- it was over my head, so probably a foot over

25    my head, maybe over six feet.

```
 1    Q.   And what did you do after you dug the hole?

 2    A.   We brought some duffel bags, a number of duffel bags along

 3    with us, we dug the hole, took the dirt, put the dirt in the

 4    duffel bags, filled the hole up with the duffel bags and

 5    covered it over with some -- camouflage the hole, and he put a

 6    $20 bill on top of the hole.

 7    Q.   Who did that?

 8    A.   Jim Bulger, in case anyone found it, then we'd know

 9    someone was at that site.

10:58 10    Q.   Did you do this at night or in the daytime?

11    A.   Nighttime.

12    Q.   After you prepared the hole, what did you do?

13    A.   We went back and we got the bodies and we drove them over

14    there.

15    Q.   In what kind of vehicle?

16    A.   Station wagon.

17    Q.   Where did you get the station wagon?

18    A.   We bought the station wagon for that purpose.

19    Q.   All right.

10:59 20         How did you exhume the bodies?

21    A.   We dug them up.

22    Q.   Who's "we"?

23    A.   Kevin and I and Pat Nee.

24    Q.   And in what state of decomposition were they when you dug

25    them up?
```

```
     1   A.   Very badly.

     2   Q.   Did you use tools to dig them up?

     3   A.   Shovel and a pick.

     4   Q.   Do you know if the tools hit the bodies at all?

     5   A.   I think one of the picks hit the body.

     6   Q.   Who's body?  Do you remember?

     7   A.   I don't know whose body it was.

     8   Q.   How did you -- what did you do after you removed the

     9   bodies from the hole in the basement of 799 East Third?

10:59 10  A.   Well, a friend of mine was an undertaker and I asked him

    11   for some body bags, which he supplied, and we took the body

    12   bags, put the bodies in the bag and used the body bag to

    13   transport them.

    14   Q.   Okay.

    15        Who drove the car transporting the bodies?

    16   A.   Jim Bulger.

    17   Q.   And where were you and Mr. Weeks?

    18   A.   I think I was in the front seat, and Kevin Weeks might

    19   have been in the back.

11:00 20  Q.   And where was Mr. Nee?

    21   A.   He might have been there, I'm not certain on that, though.

    22        Oh, no, Mr. Nee wasn't there.

    23   Q.   And why is that?

    24   A.   Well, because Bulger didn't want him to be aware where the

    25   location was.
```

1   Q.   Why?

2   A.   For his own reasons, whatever they were.

3   Q.   So you brought the bodies to the area of Florian Hall

4   where you had previously dug the grave?

5   A.   Yes.

6   Q.   And what happened when you arrived there?

7   A.   Well, we backed the station wagon up to where we were.  It

8   was only, like, 10 feet away from where the parking lot ended,

9   and we just took the bags out.  They were easy to transport

11:01 10   because they had handles on the side.  There were two of them,

11   I believe, and just took the bodies and took them to the site

12   and buried them.

13   Q.   Was this at night?

14   A.   Yes.

15   Q.   And when you say you buried them, who buried them?

16   A.   Kevin and myself.

17   Q.   And what did Mr. Bulger do?

18   A.   Nothing.

19   Q.   Did you have any weapons with you at the time?

11:01 20   A.   Yeah, we had that grease gun over there.

21   Q.   Who's that?

22   A.   Huh?

23   Q.   Who had it?

24   A.   Kevin had it, Bulger had it, I'm not sure which one.

25   Q.   What did you need a weapon for at that time?

```
 1   A.   Well, if anybody was to come on the scene, he was going to

 2   shoot them.  There was a silencer on it, so it wouldn't be

 3   heard.

 4   Q.   Did you do anything else to disguise what you were doing

 5   that night?

 6   A.   Yes.

 7   Q.   What was that?

 8   A.   I asked him to get a four-by-eight piece of quarter inch

 9   plywood and to paint it black so it would be in front of the

10   location where we were digging the hole because it wasn't too

11   far from the parking lot, and when the cars pull in from the

12   Florian Hall area, the light would flash and could see whoever

13   was there.  But the black plywood prevented the light from --

14   in other words, it was a camouflage.

15   Q.   When you got to the location of the grave across from

16   Florian Hall, was the $20 bill still there?

17   A.   I don't remember if it was.  It probably was, I didn't pay

18   much attention to that.

19   Q.   Mm-hmm.

20        And you buried the bodies?

21   A.   I think it was there, if I'm not mistaken, because I think

22   Jim Bulger made a comment on it, Nobody's been here.

23   Q.   And did you bury the bodies there?

24   A.   Yes.

25   Q.   What did you do with the duffel bags?
```

        1   A.   We took one of them with us, but the other one -- threw it

        2   in the hole because there was so much decomposition there, we

        3   just threw it in the hole.

        4   Q.   Okay.

        5        Now, are you talking about the body bags?

        6   A.   Yes.

        7   Q.   What about the duffel bags with the dirt?

        8   A.   I think we took those with us.

        9        THE COURT:  Counsel, given the time, should we take

11:03  10   our break here?

       11        MR. WYSHAK:  Yes, your Honor, that's fine.

       12        THE COURT:  Jurors, we'll take 20 minutes, our

       13   mid-morning break.  Thank you.

       14        THE CLERK:  All rise.

       15        (Jury left the courtroom.)

       16        THE COURT:  Sir, you can step down.  Step down, 20

       17   minutes.

       18        (Witness left the stand.)

       19        THE COURT:  Counsel, anything before we break?

11:04  20        MR. WYSHAK:  No, your Honor.

       21        MR. CARNEY:  No, your Honor.

       22        THE COURT:  Okay.

       23        (Recess taken.)

       24        THE CLERK:  All rise for the jury.

       25        (JURORS ENTERED THE COURTROOM.)

1          THE CLERK:  Court is in session.  Please be seated.

2     Mr. Wyshak.

3          MR. WYSHAK:  Thank you.

4     Q.   Mr. Flemmi, I'd like to direct your attention to

5     September, 1985.  Did you purchase, you and Mr. Weeks and

6     Mr. Bulger purchase, the Rotary Variety, the property that

7     became the Rotary Variety?

8     A.   Yes, sir.

9          MR. WYSHAK:  Could we put Exhibit 76 up on the screen.

11:30 10   Q.   Showing you Exhibit 76, is that the Rotary Variety?

11    A.   Yes, sir, it is.

12    Q.   And that property is next to the Liquor Mart; is that

13    correct?

14    A.   That's correct.

15    Q.   Is this the Liquor Mart over here?

16    A.   To the right, yes.

17    Q.   And did you and Mr. Bulger and Mr. Weeks purchase that?

18    A.   Yes, sir.

19    Q.   Was Kevin O'Neill involved in that?

11:30 20   A.   He was.

21    Q.   Do you recall how much you invested in that?

22    A.   In the property, 5,000.

23    Q.   Where did that money come from?

24    A.   Part of a trust fund I had.

25    Q.   Did each one of you invest 5,000?

```
 1    A.    Yes.

 2    Q.    Were you on paper on that transaction?

 3    A.    No.

 4    Q.    Who was on the paper?

 5    A.    Kevin O'Neill and Kevin Weeks, I believe.

 6    Q.    And who were the true owners?

 7    A.    We all were, Kevin O'Neill, myself, Jim Bulger and Kevin

 8    Weeks.

 9    Q.    Did you have to repair the building?

10    A.    We did.

11    Q.    Where did that money come from?

12    A.    It come out of our ex fund.

13    Q.    Did Mr. Weeks open a store at that location?

14    A.    Yes.

15    Q.    And who was on paper regarding the ownership of the store?

16    A.    Kevin Weeks.

17    Q.    Who really owned the store?

18    A.    Jim Bulger, myself, Kevin Weeks.

19    Q.    Did you go on the payroll for that store?

20    A.    No.

21    Q.    Did Mr. Bulger go on the payroll for the store?

22    A.    No.

23    Q.    Did you sell that business?

24    A.    Yes.

25    Q.    And do you recall who you sold it to?
```

1   A.   Jamie Kuchidaro (ph), I believe.

2   Q.   How much money did you earn as a result of the sale of

3   that business?

4   A.   I think it was something in the neighborhood, my end I

5   think was 11,000, I'm not sure, the store itself.

6   Q.   The business?

7   A.   The business, probably we were getting 1100 a month, it

8   was 30,000, if I'm not mistaken.

9   Q.   Did you ultimately sell the real estate?

11:32 10   A.   Yes.

11   Q.   And do you recall how much you sold the real estate for?

12   A.   Probably around 300,000, around those numbers.

13   Q.   How much did you get?

14   A.   I got 100,000.

15   Q.   All right.  Now, directing your attention to approximately

16   1988, did you become aware that there was a second

17   investigation by the Drug Enforcement Administration regarding

18   yourself and Mr. Bulger and your narcotics business?

19   A.   Yes, in South Boston.

11:33 20   Q.   Did you discuss that investigation with Mr. Connolly?

21   A.   He was aware of it.

22   Q.   Did you get charged in that case?

23   A.   No, sir.

24   Q.   Did anybody involved in your drug organization get charged

25   in that case?

1    A.    There was 51 people.

2    Q.    All right.  And was that essentially the end of your

3    narcotics business when those people got arrested --

4    A.    Yes, sir.

5    Q.    -- and indicted?  Now, I'd like to show you some

6    documents, your Honor.  These documents are from Exhibit 359G.

7    The first is one Bates stamped 35703, if we could put that up

8    on the screen.  Make it bigger.  All right.  Now at the time of

9    this when the DEA had indicted these 51 individuals, you were

11:35 10   still an informant for the FBI?

11   A.    Yes.

12   Q.    Mr. Bulger was still an informant for the FBI?

13   A.    Yes, sir.

14   Q.    And looking at this document, this report, Mr. Bulger, is

15   that 1544-TE?

16   A.    Yes, sir.

17   Q.    And Frankie Salemme has been down to see John Gotti

18   several times in New York.  Do you recall this information?

19   A.    Yes, I do.

11:35 20   Q.    Do you recall providing that information to Mr. Connolly?

21   A.    I did.

22   Q.    Was Mr. Bulger present at the time you did that?

23   A.    He was.

24   Q.    Did you discuss it with Mr. Bulger prior to meeting with

25   John Connolly?

1    A.   Yes, I did.

2    Q.   Remind us, how would these meetings with Mr. Connolly go?

3    Who did most of the talking?

4    A.   He did all of the talking, 99 percent of it or 95 percent

5    of it.

6    Q.   So you provided the information to Mr. Bulger?

7    A.   That's correct.

8    Q.   And what did he do with the information?

9    A.   He gave it to John Connolly.

11:36  10   Q.   If you could show the next document, 357005.

11        THE COURT:  Still 359G?

12        MR. WYSHAK:  Yes, your Honor.

13   Q.   And, again, this is more information about Mr. Gotti?

14   A.   Yes, sir.

15   Q.   Raymond Patriarca, Jr., Frank Salemme?

16   A.   Yes, sir.

17   Q.   Do you recognize that information?

18   A.   Yes, I do.

19   Q.   Did you provide it to Mr. Connolly?

11:36  20   A.   I spoke to Jim Bulger about it, and I was there when that

21   information was given to him.

22   Q.   Okay.  And that's Mr. Bulger again, 1544?

23   A.   Yes.

24   Q.   And you were present when that occurred?

25   A.   I was.  I was the only one that had access to that

1    information.

2    Q.    Say that again.

3    A.    I was the one that had access to that information.

4    Q.    And you told Mr. Bulger about it?

5    A.    Yes.

6    Q.    I've asked you to look at some of these documents before,

7    have I not?

8    A.    Yes.

9    Q.    Are you familiar with them?  We could go to 13, 357013

11:37 10   from 359G.  Again, showing you the information in this report,

11   are you familiar with it, Frank Salemme making trips to

12   Rhode Island to meet with Raymond Patriarca?

13   A.    Yes.

14   Q.    Did you provide this information to Mr. Bulger?

15   A.    Yes, I did.

16   Q.    What did he do with it?

17   A.    He gave it to John Connolly.

18   Q.    Were you present when that happened?

19   A.    Yes, I was.  Like I said, I was the only one that could

11:38 20   provide this information.

21   Q.    And why is that?

22   A.    Because I was with Frank Salemme, I was around them, I was

23   with these people.

24   Q.    At this point, Mr. Salemme was out of jail; is that fair

25   to say?

```
 1   A.   Yes, he was.

 2   Q.   And shortly thereafter he became the boss of the mafia?

 3   A.   Yes.

 4        MR. BRENNAN:  Leading, your Honor.

 5        THE COURT:  Sustained as to form.

 6   Q.   Did he eventually become boss of the mafia?

 7   A.   He did.

 8   Q.   If we could to 357084 out of Exhibit 359G.  Again, are you

 9   familiar with this information regarding Sonny Mercurio and

10   Vanessa's Restaurant?

11   A.   Yes, I was.

12   Q.   Did you provide it to Mr. Bulger?

13   A.   Yes, I did.

14   Q.   What did he do with it?

15   A.   He gave it to John Connolly in my presence.

16   Q.   Okay.  This is 1986, correct?

17   A.   Yes, sir.

18   Q.   If we could to go 357165 out of 359G.  And, again, are you

19   familiar with this information?

20   A.   Yes.

21   Q.   Did you give it to Mr. Bulger?

22   A.   I did.

23   Q.   What did he do with it?

24   A.   Gave it to John Connolly.

25   Q.   Were you there when he did?
```

```
  1   A.   I was.

  2   Q.   If we could go to 357175 out of Exhibit 359G.  And, again,

  3   this is 1984, correct?

  4   A.   Yes, sir.

  5   Q.   And this information about Phil Wagenheim and

  6   Larry Zannino, did you give this information to Mr. Bulger?

  7   A.   I did.

  8   Q.   And what did he do with it?

  9   A.   He gave it to John Connolly.

11:40 10   Q.   And you recall being there when he did it?

 11   A.   I did, I was.

 12   Q.   If we could go to 356050, again, out of 359G.  Okay.

 13   Regarding this information here, "Source heard that Stevie

 14   Flemmi and Whitey Bulger went to see Danny Anguilo -- "

 15   A.   Yes, sir.

 16   Q.   "-- regarding a card game involving Johnny Cincotti," do

 17   you see that?

 18   A.   Yes.

 19   Q.   Do you recall this information?

11:41 20   A.   I do.

 21   Q.   Did you give it to Mr. Bulger?

 22   A.   I did.  In fact, we met with Danny Anguilo over this.

 23   Q.   What did Mr. Bulger do with this information?

 24   A.   Gave it to John Connolly.

 25   Q.   Were you there?
```

1  A.   Yes.

2  Q.   Were there times when you spoke with John Connolly

3  directly?

4  A.   When I was present there.

5  Q.   Okay.  And on what occasions would you speak up?

6  A.   If he asked me to verify something and he asked me, isn't

7  that right, you were there, or some words to that effect, I

8  agreed, but I didn't have much input though.

9  Q.   Regarding Vanessa's Restaurant, what was that?

11:42  10  A.   It was a restaurant that was owned by Sonny Mercurio.  It

11  was in the Prudential Center.

12  Q.   And were you asked at some point to provide information

13  about the layout of Vanessa's?

14  A.   Yes, I was.

15  Q.   Could we put up 353075.  This is from Mr. Flemmi's

16  informant file, your Honor.  The date of this report is what?

17  A.   8-21-86.

18  Q.   And who is providing this information?

19  A.   I was.

11:43  20  Q.   Would you go to the next page.  That will be 353077.  Did

21  you provide a diagram to the FBI regarding Vanessa's

22  Restaurant?

23  A.   Yes.

24  Q.   And if we could put 353078 up.  Is that a copy of the

25  diagram?

1   A.   That's the diagram I drew up, yes, and I gave it to

2   John Connolly and Jim Ring.

3   Q.   Okay.  So at the time that you drew this diagram, who was

4   present?

5   A.   John Connolly, Jim Bulger and Supervisor Jim Ring, it was

6   in John Connolly's condominium.

7   Q.   Okay.  Do you know what the purpose of providing this

8   diagram to Special Agents Connolly and Special Agent Ring were?

9   A.   They wanted to put a bug in the place.

11:44 10   Q.   Did they discuss that with you and Mr. Bulger?

11   A.   Yes.

12   Q.   Mr. Bulger was there?

13   A.   He was.

14   Q.   You drew this diagram in his presence?

15   A.   I did.

16        MR. BRENNAN:  Objection, your Honor.

17        THE COURT:  Counsel.  Well, sustained as to form.

18   Q.   Did you draw this diagram in his presence?

19   A.   Yes, sir.

11:44 20   Q.   And what did you do with the diagram after you drew it?

21   A.   Gave it to Jim Ring, Supervisor Jim Ring.

22   Q.   And I'd like to show you another diagram.  If we could put

23   up 353222, again, a document from Mr. Flemmi's informant file.

24   Okay.  That's you, is that correct, 955?

25   A.   Yes, sir.

1    Q.   The date of this document is what?

2    A.   February 15th, 1983.

3    Q.   Okay.  And if we can go to 353225, do you recognize that?

4    A.   Yes, sir.

5    Q.   Okay.  What is it?

6    A.   Francesca's Restaurant.

7    Q.   Who asked you for that?

8    A.   John Connolly.

9    Q.   And do you remember the circumstances surrounding your

11:45 10   creation of this diagram?

11   A.   Yes.

12   Q.   What was it?

13   A.   They wanted to know the seating arrangements for Larry

14   Zannino, alias Baione, and he used to frequent the restaurant

15   there with Jerry Anguilo and other higher-up members of the

16   LCN.

17   Q.   Was Mr. Bulger present when you drew this diagram?

18   A.   Yes.

19   Q.   And what did you do with it after you drew it?

11:46 20   A.   I gave it to John Connolly.

21   Q.   Okay.  If we could put up 353226, again a document from

22   Mr. Flemmi's informant file.  Again, that's you, correct?

23   A.   Yes.

24   Q.   And the date is February, 1983, February 15th?

25   A.   February 15th, yes.

1    Q.   And if we could put up 353229.  Do you recognize that

2    drawing?

3    A.   Yes.

4    Q.   Did you draw it?

5    A.   Yes.

6    Q.   What is it a drawing of?

7    A.   It's the Bella Napoli Restaurant on Hanover Street in the

8    North End.

9    Q.   Why did you make this drawing?

11:47 10   A.   Well, they wanted to know what the seating arrangements

11   were regarding some of the LCN members and specifically Larry

12   Baione's table.

13   Q.   Was Mr. Bulger present when you drew this diagram?

14   A.   Yes.

15   Q.   What did you do with it after you drew it?

16   A.   Gave it to John Connolly.

17   Q.   Was Mr. Bulger present when you gave it to John Connolly?

18   A.   He was there.

19   Q.   You told us about a -- earlier you mentioned a man named

11:47 20   Tommy Nee.  Do you remember him?

21   A.   I know who he is.

22   Q.   Okay.  Who was he?

23   A.   He was a South Boston character.

24   Q.   Did you ever discuss Tommy Nee with James Bulger?

25   A.   Several times.

```
 1   Q.   All right.  In what regard?
 2   A.   Well, Tommy Nee was a very dangerous person in South
 3   Boston, and he had killed quite a few people in Southie.
 4   Q.   Okay.  And what was your conversation with Mr. Bulger
 5   about Tommy Nee?
 6   A.   He said Tommy Nee had killed several people in South
 7   Boston.
 8   Q.   Were you ever present when Mr. Bulger discussed Tommy Nee
 9   with John Connolly?
11:48 10   A.   Yes.
11   Q.   And he was not a mafia member; is that fair to say?
12   A.   No, he was a South Boston character.
13   Q.   All right.  Now, you've told us about all the guns that
14   you possessed; is that correct?
15   A.   Sorry, I didn't hear it.
16   Q.   You told us about all the guns that Winter Hill gang
17   possessed?
18   A.   Yes.
19   Q.   Directing your attention to the early to mid-'80s, where
11:49 20   were those guns stored?
21   A.   They were stored in early to mid-'80s, they were stored in
22   my cabana in the back.
23   Q.   Okay.  Where did they come from?
24   A.   Well, they came from originally we had them in
25   George Kaufman's home in Brookline.
```

1    Q.   Okay.  And were they moved at some point from

2    George Kaufman's home?

3    A.   Yes, they were.

4    Q.   And how many guns are we talking about?

5    A.   Well, a large number of guns, probably in excess of maybe

6    70 weapons.

7    Q.   Why were they moved from George Kaufman's home?

8    A.   George was selling his home, and we had to remove all the

9    guns from the home.

11:50 10  Q.   Where did you bring them after George Kaufman sold his

11   home?

12   A.   Well, Kevin Weeks picked them up from George Kaufman's

13   home and brought them over to Pat Nee's house in South Boston.

14   Q.   And why did you decide to bring them to Pat Nee's house?

15   A.   Well, the location was Pat Nee lived right in Southie.

16   The location was accessible for us if we needed to retrieve the

17   weapons for any reason.

18   Q.   Where were they stored in Pat Nee's house?

19   A.   I built a hide for them.

11:51 20  Q.   What does that mean?

21   A.   A hide is a section where you can take a section of the

22   wall apart, and you can put something in the back, it's a false

23   space behind the wall, but the wall would be part of the room,

24   so if you were looking at the wall, you couldn't tell that

25   there was anything behind it.  You would have a secret

1   attachment or secret device so you can release the mechanism in

2   the back so the hide would open, and then you take the hide,

3   the face of the hide off, and you'd use the storage space in

4   the back, and you'd put the cover back on.

5   Q.   And at this time Mr. Nee lived in South Boston?

6   A.   Yes.

7   Q.   How did you learn how to build one of these hides?

8   A.   Well, going back to the bookmaking days, there was an

9   old-timer there, carpenter and he was making all the hides for

11:51 10   the bookmakers so they could hide their money or slips or

11   whatever paraphernalia they had, and you'd never be able to

12   detect them.  They had certain pieces of furniture he made,

13   hides under the stairway.  I made one for Jim Bulger in his

14   house, and I made that for Pat Nee for us.  It was at Pat Nee's

15   house.

16   Q.   And you learned from him?

17   A.   Yes.

18   Q.   Did there come a time when Pat Nee went to jail?

19   A.   Yes.

11:52 20   Q.   And what happened to the guns at that point?

21   A.   We took -- at some point we took the guns out of there,

22   and I brought them over to my cabana in the back on East Third

23   Street, and I built a hide in the cabana.

24   Q.   Okay.  When you say East Third Street, you mean 832 East

25   Third Street?

1    A.    That's correct.

2    Q.    Could we put that photo up?  Do you have that photo handy?

3    Now, when -- you said you built a hide in the cabana.  Is that

4    the building behind the house?

5    A.    Yes.

6    Q.    And can you describe the hide that you built at that time.

7    A.    When you walk in the cabana, it enters like a hallway

8    entrance, in that area there, the far part of the cabana in the

9    wall, that's a section probably as wide as this here, section

11:53 10   here.

11   Q.    Indicating about five or six feet?

12   A.    Probably five or six feet, and as you walk in facing the

13   wall, I took some boards down.  It was sections of boards,

14   small sections of boards, I took them down, and I built a hide

15   so when you put the section back in, there would be a clamp

16   there, and it was clamped into the rest of the wall, and then

17   it opened.  I had two pins in the bottom that would release the

18   mechanism at the bottom, and I'd pull the bottom out, and it

19   would slide out to take the whole section out, and then I just

11:54 20   put it back in and slammed it in, and it was a shelf that would

21   hide the area of the top of the wood so you wouldn't -- you'd

22   have to take the shelf down in order to be able to see where

23   the top of the piece that went back into the wall.

24   Q.    Okay.  Showing you the picture in front of you, which is

25   the aerial photograph of 832 East Third Street, can you point

```
 1   to the building in which you built this hide?

 2   A.   It was the center, the center building with the circle

 3   around it.

 4   Q.   Which is the cabana?

 5   A.   You can't see the cabana from here, but you can see the

 6   house.

 7   Q.   What is this building here?

 8   A.   Oh, I'm looking at the house, I'm sorry.  That's the

 9   cabana in the back.  I was looking at the house itself.

11:55 10   Q.   What is this building here?

11   A.   That's just the section that we built in the back, it's

12   like a recreation area, recreation room.  It had a bar in it.

13   Q.   You're talking about the cabana?

14   A.   The cabana in the back, right.

15   Q.   Okay.  This house across the way?

16   A.   That's Senator Bulger's house.

17   Q.   This house here?

18   A.   That's my mother's home.

19   Q.   Is this house your mother's house?

11:55 20   A.   Right.

21   Q.   Where Debbie Davis was murdered?

22   A.   Yes.

23   Q.   Yes?

24   A.   Yes.

25   Q.   All right.  Now, at some point after you built the hide at
```

1    832 East Third Street and the cabana, did you move the guns

2    there?

3    A.    Yes.

4    Q.    Who carried the guns from Pat Nee's house to 832 East

5    Third?

6    A.    I think Kevin and myself.

7    Q.    Did there come a time when Mr. Bulger requested a certain

8    number of guns?

9    A.    Yes.

11:56 10    Q.    And why was that?

11    A.    Well, he wanted to put, have another location for the guns

12    that would be accessible if he needed them.

13    Q.    Okay.  Did he tell you that?

14    A.    Yes.

15    Q.    How did you know -- well, withdrawn.  Did you give him

16    some guns?

17    A.    The guns he requested, yes.

18    Q.    And how did you know what the guns he requested were?

19    A.    How did I know what they were?

11:56 20    Q.    Yes.

21    A.    Because I know them, I'm familiar with them.

22    Q.    Did he tell you what he wanted?

23    A.    Yes.

24    Q.    And what did he tell you?  Did he give you a list?

25    A.    He gave me a list.

```
 1   Q.  All right.  I'm going to ask you if you could step down
 2   and take a look at the guns on the table.
 3        MR. WYSHAK:  Is that okay, your Honor, if the witness
 4   steps down?
 5            THE COURT:  Counsel, let me just see you at sidebar
 6   for a moment.
 7                (THE FOLLOWING OCCURRED AT SIDEBAR:)
 8            THE COURT:  Counsel, I expect you're just going to
 9   have him point to the guns.  You're not going to have him
10   handle them at all?
11            MR. WYSHAK:  No.
12            THE COURT:  That's fine.  Any objection from the other
13   side about that, Mr. Brennan?
14            MR. BRENNAN:  No.
15            THE COURT:  All right.  And, counsel, I couldn't
16   remember what exhibit number that photo was.
17            MR. WYSHAK:  I'll get that for you.
18            THE COURT:  Even if we do it later.
19                (SIDEBAR CONFERENCE WAS CONCLUDED)
20            MR. WYSHAK:  Your Honor, for the record, the
21   photograph of 832 East Third is Exhibit Number 994.
22            THE COURT:  Thank you.
23   Q.  Mr. Flemmi, could you step down.  Could you look at the
24   guns on the table.
25            MR. WYSHAK:  For the record, your Honor, without touching
```

1   them, please, these are Exhibits 924, 932, 914, 922, 928, 930

2   and 926 in this first row.

3   Q.   Do you recognize those guns?

4   A.   Yes.

5   Q.   What do you recognize them to be?

6   A.   Guns that come out of my hide.

7   Q.   Are those the guns you gave to Mr. Bulger?

8   A.   That's correct.

9   Q.   How do you know that?

11:59 10   A.   I'm familiar with them.  Some of these guns belonged to

11   me.

12   Q.   Okay.  Can you describe the ones that you particularly

13   recognized without touching them, please.

14   A.   MP 40 German machine gun.

15   Q.   Indicating Exhibit 932.

16   A.   The retractable stop carbine, .30 calibre.

17   Q.   Indicating Exhibit 914.

18   A.   Submachine gun, .45 calibre grease gun with a silencer.

19   Q.   Indicating Number 922.

12:00 20   A.   German MP 40 machine gun.

21   Q.   Exhibit 928.

22   A.   MP 40 German machine gun.

23   Q.   Exhibit 930.

24   A.   The R-16.

25   Q.   Exhibit 926.  You specifically recognize those weapons?

1    A.   Yes, I do.

2    Q.   Do you recognize those as weapons you gave to Mr. Bulger?

3    A.   That's correct.

4    Q.   They came out of the hide at 832 East Third Street?

5    A.   That's correct.

6    Q.   What about the handguns in front of you?

7    A.   Those are the handguns he requested.

8    Q.   Just 934, Exhibit 912, Exhibit 910, Exhibit 916,

9    Exhibit 920, Exhibit 936, Exhibit 918, any handguns that you

12:01  10   specifically recognize?

11   A.   I recognize all of them.

12   Q.   Okay.  And what did you do with those guns?

13   A.   I sent them over with the package that he requested.

14   Q.   When you say he, you mean Mr. Bulger?

15   A.   Jim Bulger.

16   Q.   Thank you.  Could you please resume the stand.  Now, when

17   you prepared this package, what did you do with it?

18   A.   Gave it to Kevin.

19   Q.   When you say Kevin?

12:01  20   A.   Kevin Weeks.

21   Q.   Kevin Weeks.  Could we put up Exhibit 942.  Do you

22   recognize any of the items in that photograph, Mr. Flemmi?

23   A.   I do vaguely because it's ammunition boxes.  I can't give

24   you the calibre because I can't see it.

25   Q.   Did you provide additional materials in addition to the

1    weapons?

2    A.    Yes.

3    Q.    Could we put up Exhibit 943.  Do you recognize any of the

4    items depicted in that picture?

5    A.    Yes.

6    Q.    What do you recognize?

7    A.    I recognize my Sykes Fairbairn commando knife.

8    Q.    What is that?

9    A.    That's a fighting knife.

12:02 10    Q.    Can you point it out for us, please.

11    A.    It's like a stiletto-shape knife.

12    Q.    Okay.  What do you recognize that to be?  What is it?

13    A.    Sykes Fairbairn.  That's the name of the weapon.

14    Q.    What kind of weapon is it?

15    A.    It's a dagger.  It's sharp on both sides.

16    Q.    And did you give that to Mr. Bulger?

17    A.    Yes.

18    Q.    Why?

19    A.    He requested it.  I just put the package together what he

12:03 20    requested, and I sent it along.

21    Q.    Do you recognize any of the other items from this

22    photograph as items that you put in that package for

23    Mr. Bulger?

24    A.    There was the ammunition, the carbon clip and the rest of

25    the knives.

1    Q.   Can you point out the carbon clip?

2    A.   Right there.

3    Q.   And the other knives you also recognize?

4    A.   Yes.

5    Q.   As being included in the package for Mr. Bulger?

6    A.   Yes.

7    Q.   Now, I'd like to show you what's been marked Exhibit 945.

8         MR. WYSHAK:  If we could put a copy of it up on the

9    screen, your Honor.  May I approach?

12:04 10         THE COURT:  You may.

11   Q.   Showing you what's been marked Exhibit 945 in evidence, do

12   you recognize that handwriting?

13   A.   It's Jim Bulger's handwriting.

14   Q.   And do you understand the subject matter of those notes?

15   A.   Yes, I do.

16   Q.   And what are they notes about?

17   A.   About George McLaughlin.

18   Q.   Who was George McLaughlin?

19   A.   He was one of the McLaughlin brothers from Charlestown

12:05 20   that we had the war with in the '60s.

21   Q.   Did you have conversations with Mr. Bulger about

22   George McLaughlin?

23   A.   Yes.

24   Q.   And particularly tell us to the extent that you can recall

25   whether or not the information in these notes was information

1   that you discussed with Mr. Bulger about George McLaughlin?

2   A.   Yes.

3   Q.   And what was your interest in George McLaughlin at that

4   time?

5   A.   Well, he was part of the, like I said, Charlestown gang,

6   brothers, and, well, he was one of the ones that went to

7   prison, and we never got a chance to catch up to him.  We

8   wanted to kill him.

9   Q.   Okay.  Was he in prison at the time that these notes were

12:05 10   written?

11   A.   Yes.

12   Q.   And how were you going to kill him if he was in prison?

13   A.   Well, he was taking, getting a furlough from what I

14   understand at the time, and he was married to his wife was an

15   attorney, and he was getting furloughed.

16   Q.   All right.  And you were planning to kill him while he was

17   out on furlough?

18   A.   Yes.

19   Q.   All right.  Now did there come a time -- well, withdrawn.

12:06 20   Who was Billy St. Croix?

21   A.   I'm sorry.

22   Q.   Billy St. Croix?

23   A.   My son.

24   Q.   Also known as Billy Hussey?

25   A.   Yes.

1    Q.   And where, St. Croix, where does that name come from?

2    A.   That is his grandmother.

3    Q.   Did there come a time when you asked him to move guns out

4    of the hide as 832 East Third Street?

5    A.   Yes.

6    Q.   Why?

7    A.   Well, because Kevin Weeks was cooperating, and he knew

8    where the hide was, and I wanted to remove all the guns, and I

9    asked him to go down there and to take the guns out and to

12:06 10   throw them in the ocean.

11   Q.   Okay.  This time I'd like to put Exhibit 995 up, I think.

12   Do you recognize that picture?

13   A.   Yes.

14   Q.   What is it?

15   A.   It's the hide in the cabana that I built.

16   Q.   So, this is the hide that you asked Mr. St. Croix to empty

17   out?

18   A.   Yes.

19   Q.   And, again, why did you ask him to empty it out?

12:07 20   A.   Well, he was visiting me, and there was a period of time

21   there that I wanted to get them out as quickly as possible.

22   Q.   Why?

23   A.   Because Kevin Weeks was cooperating.

24   Q.   All right.  The next photo, 996.  I'm sorry, withdrawn.

25   1003.  Again, that's a picture of 832 East Third?

```
 1    A.    Yes.

 2    Q.    Can we put 996 up.  What is that a photo of?

 3    A.    Inside the hide.

 4    Q.    Okay.  There's nothing in there, right?

 5    A.    No, just the racks.

 6    Q.    Is that the way it looked the last time you saw it?

 7    A.    Yes.

 8    Q.    Empty?

 9    A.    Oh, no, no, I thought you meant -- no, it was full of

10    weapons.

11    Q.    And the last time you saw it was when?

12    A.    During discovery.

13    Q.    Well, did you see it before you were arrested?

14    A.    The hide, I didn't see it after I got arrested, everything

15    was taken out, and I was incarcerated.

16    Q.    And when were you arrested?

17    A.    January of 1995.

18    Q.    And at the time in January, 1995, did that hide contain

19    weapons?

20    A.    Yes, it did.

21    Q.    All right.  Can we put up 960.  I'm just going to flash

22    through some photographs, and I'll ask you if you recognize

23    these weapons.  You can tell me yes or no.

24    A.    Yes.

25    Q.    Do you recognize that?
```

```
 1   A.   Yes, I do.  It's a little beat up, but I do.

 2   Q.   Was that one of the weapons that was in the hide?

 3   A.   Yes.

 4   Q.   961, do you recognize that weapon?

 5   A.   Yes, that's the shotgun.

 6   Q.   962?

 7   A.   Yes, another shotgun.

 8   Q.   963?

 9   A.   The pump gun shotgun.

12:10  10   Q.   964?

11   A.   Yes.

12   Q.   965?

13   A.   Yes.

14   Q.   966?

15   A.   Yes.

16   Q.   967?

17   A.   Yes.

18   Q.   What kind of gun is that?

19   A.   It looks like a carbon, I believe.

12:10  20   Q.   968?

21   A.   Yes.

22   Q.   969?

23   A.   Yes.

24   Q.   970?

25   A.   Yes.
```

1   Q.   971?

2   A.   Yes.

3   Q.   972?

4   A.   Yes.

5   Q.   973?

6   A.   Yes.

7   Q.   Do you recognize what that is?

8   A.   That's a Schmeisser, I think it's a German Schmeisser.

9   Q.   These are the guns out of the hide at 832 East Third

12:11 10   Street?

11   A.   Yes.

12   Q.   I'm sorry, I lost count, 974?

13   A.   Yes.

14   Q.   975?

15   A.   Yes, I think it's a Thomson submachine gun.

16   Q.   This up here?

17   A.   It's two pieces, yes.

18   Q.   976?

19   A.   Yes.

12:12 20   Q.   977?  You don't recognize that?

21   A.   No.

22   Q.   How about can we put up Exhibit 1004?  What is that?

23   A.   That's a pistol, a Derranger.

24   Q.   Do you recognize that as one of the guns that was in your

25   hide?

```
 1   A.   Yes.

 2   Q.   Again, if we could flip through these quickly.  1005?

 3   A.   Yes.

 4   Q.   1006?

 5   A.   Yes.

 6   Q.   1007?

 7   A.   Yes.

 8   Q.   1008?

 9   A.   Yes.

12:13 10   Q.   1009?

11   A.   Yes.

12   Q.   1010?

13   A.   Yes.

14   Q.   11?

15   A.   Yes.

16   Q.   12, I'm sorry, it's 1011, 1012.

17   A.   Yes.

18   Q.   1013?

19   A.   Yes.

12:13 20   Q.   1014?

21   A.   Yes.

22   Q.   What kind of gun is that?

23   A.   That's a Derringer, two-shot.

24   Q.   1015?

25   A.   Yes.
```

| | | |
|---|---|---|
| 1 | Q. | 1016? |
| 2 | A. | Yes. |
| 3 | Q. | 1017? |
| 4 | A. | Yes. |
| 5 | Q. | 1018? |
| 6 | A. | Yes. |
| 7 | Q. | 1019? |
| 8 | A. | Yes. |
| 9 | Q. | 1020? |
| 12:14 10 | A. | Yes. |
| 11 | Q. | 1021? |
| 12 | A. | Yes. |
| 13 | Q. | 1022? |
| 14 | A. | Yes. |
| 15 | Q. | 1023?  What is that, Mr. Flemmi? |
| 16 | A. | Those are some of the parts and some of the clips. |
| 17 | Q. | Were those materials in the hide at 832 East Third Street? |
| 18 | A. | Yes. |
| 19 | Q. | 1024?  Again, what are those materials? |
| 12:15 20 | A. | Those are the magazines for the grease gun. |
| 21 | Q. | 1025?  What are those? |
| 22 | A. | Those are magazines. |
| 23 | Q. | 1026?  What is that? |
| 24 | A. | Camouflage equipment. |
| 25 | Q. | 1027, what is that? |

1  A.   Those are little pouches that I believe some of the

2  ammunition was in.

3  Q.   What is this hide in here?

4  A.   It's like a pouch bag.

5  Q.   1028?

6  A.   Those are just gas masks.

7  Q.   Were these items in the hide at 832 East Third Street?

8  A.   Yes.

9  Q.   1029, what is that?

12:16 10  A.   That's a machine pistol, a machine gun.

11  Q.   And that was in the hide at 832 East Third?

12  A.   Yes.

13  Q.   1030?  That's it.  1031, what is that?

14  A.   It's a Nexon machine gun.

15  Q.   That was in the hide at 832 East Third Street?

16  A.   Yes.

17  Q.   1032, what is that?

18  A.   That's another same type weapon.

19  Q.   1033, do you recognize that handgun?

12:17 20  A.   Yes.

21  Q.   1034, what is that?

22  A.   That's a grease gun, .45 calibre without the barrel.

23  Q.   Is that similar to one of the guns on the table?

24  A.   Yes, but it doesn't have the barrel on it.  It's an

25  interchangeable barrel.

```
 1  Q.   So it doesn't have the end up here?

 2  A.   I'm sorry.

 3  Q.   It doesn't have the end on it; is that what you're saying?

 4  A.   That's where the barrel screws on, if you take that, you

 5  can screw that barrel off, and you can put a regular barrel on.

 6  Q.   Indicating one of the weapons on the table, your Honor.

 7  A.   Yes.

 8  Q.   And the last one, 1035, what are those?

 9  A.   Those are homemade silencers.  One or two of them was

10  original, and the rest were homemade.

11  Q.   Who made them?

12  A.   A machinist made them.

13  Q.   For you?

14  A.   Somewhere along the line we picked them up.  They didn't

15  make them specifically for me, but they were picked up, and

16  they were part of the inventory.

17  Q.   All of these items that we've just gone through were items

18  that were in your hide at one point in time; is that fair to

19  say?

20  A.   Yes.

21  Q.   Do you know a man named John Bahorian?

22  A.   Yes.

23  Q.   And who was John Bahorian?

24  A.   He's one of the largest bookmakers in Roxbury.

25  Q.   If we could put up Exhibit 94, and, again, if we could
```

1    enlarge this photo on the bottom here.

2    A.    That's him.

3    Q.    Who was he?

4    A.    He worked for us, with Steven Puleo, he was in charge of

5    all the Roxbury area bookmakers, and John Bahorian's a large

6    bookmaker, took numbers.

7    Q.    What was your relationship with him?

8    A.    He was part of our organization, the Roxbury group.

9    Q.    Did there come a time when you received information about

12:19 10    Mr. Bahorian?

11    A.    Yes.

12    Q.    And who did you get that information from?

13    A.    John Connolly and John Morris.

14    Q.    What did they tell you?

15    A.    They told us that they were -- we met him, they told us --

16    both of them told us, Bulger and myself, not to talk to his

17    telephone because they had a wiretap on it.

18    Q.    All right.  Who was present at this, during this

19    conversation?

12:20 20    A.    Jim Bulger, myself, John Morris and John Connolly.

21    Q.    Do you recall where it was, where you had this meeting?

22    A.    John Morris' home.

23    Q.    Did Mr. Morris mention Brian Halloran at this meeting?

24    A.    Yes, I think he did.

25    Q.    What did he say?

```
 1   A.   "I don't want another Brian Halloran."

 2   Q.   What did you understand that to mean?

 3   A.   Don't kill John Bahorian.

 4   Q.   As a result of receiving this information from

 5   Mr. Connolly and Mr. Morris, did you avoid speaking with

 6   Mr. Bahorian?

 7   A.   Yes, and I also told Steve not to talk on his telephone,

 8   but he didn't listen too carefully.

 9   Q.   Did you get charged in that case?

10   A.   No.

11   Q.   Did Mr. Bahorian get charged?

12   A.   Yes.

13   Q.   Did Mr. Puleo get charged?

14   A.   Yes.

15   Q.   I'd like to direct your attention to the fall of 1988.

16   Did there come a time when there was a story in the

17   Boston Globe about yourself and Mr. Bulger's relationship with

18   the FBI?

19   A.   Yes.

20   Q.   Do you recall that story?

21   A.   Yes.

22   Q.   What was Mr. Bulger's reaction to that story?

23   A.   He went off the wall.  He was very, very upset.

24   Q.   Did you and Mr. Bulger blame any particular individual for

25   that story?
```

12:21 (lines 10, 20)

1    A.    He knew right away where it came from.

2    Q.    Where was that?

3    A.    It came from John Morris.

4    Q.    How did you know that?

5    A.    Because the information in that, we were speaking to

6    John Morris, we knew John Morris.

7    Q.    How did you know it didn't come from John Connolly?

8    A.    Well, because John, we knew, we just knew it came from

9    John Morris.

12:22 10   Q.    After that story came out, did you ever speak with

11   Mr. Morris again?

12   A.    No.   Particularly it was a reporter I think on the story

13   from The Globe.

14   Q.    Do you know if Mr. Bulger -- well, withdrawn.   Did you

15   know a man named Richard Buchieri?

16   A.    He's a friend of mine.

17   Q.    And what was your relationship with him?

18   A.    Well, he was a contractor, and I bought some real estate

19   off him.

12:22 20   Q.    Did there come a time when he got involved in a dispute

21   involving Kevin Weeks?

22   A.    Yes.

23   Q.    And tell us to the best of your recollection what

24   happened.

25   A.    It was a dispute over a boundary line, a fence that was

1    between Kevin Weeks' property, he just purchased a home and

2    Jack DePalma who owned the home next door.

3    Q.    And how did Mr. Buchieri get involved in that?

4    A.    He was a friend of Jack DePalma, and Jack DePalma went to

5    Richard Buchieri and told him about it, the dispute, and

6    Richard Buchieri got involved in some capacity over the

7    boundary.

8    Q.    And as a result of that, what happened?

9    A.    They wanted to shake down Mr. Buchieri.

12:23 10   Q.    Who's they?

11   A.    Jim Bulger.

12   Q.    Why?

13   A.    Well, because it would look like a score there.

14   Q.    Okay.  Why did it look like a score?

15   A.    Well, because Richie Buchieri was -- he was a businessman,

16   he was a contractor, and he was a very wealthy guy, and we knew

17   him.

18   Q.    And what was the pretense for this score?

19   A.    Well, he told him, he asked me to bring him down, I met

12:23 20   him at the screenhouse, and they said to him that Kevin Weeks

21   would like his son, and he should have minded him own business

22   and not interfere with Kevin's business and his neighbor's

23   business over the fence line.

24   Q.    So this occurred at the cabana, the same place where the

25   hide was?

1    A.    Yes.

2    Q.    And when you say -- who brought Mr. Buchieri to that

3    location?

4    A.    I believe Kevin did, Kevin Weeks.

5    Q.    And when Mr. Buchieri arrived there, who was present?

6    A.    Jim Bulger and myself.

7    Q.    Did Mr. Weeks come into the cabana?

8    A.    No, he was parked outside.

9    Q.    So what happened between Mr. Buchieri, yourself and

12:24 10   Mr. Bulger inside the cabana?

11   A.    He complained to him he should not get involved, and Kevin

12   was like a son to him so he fined him 200,000.

13   Q.    Were any weapons displayed at the time?

14   A.    Yes.

15   Q.    What kind of weapons?

16   A.    Well, I think it was one of those sawed-off shotguns with

17   the handle on the table.

18   Q.    How was it displayed to Mr. Buchieri?

19   A.    Facing right after him.

12:25 20   Q.    And what did Mr. Bulger say to Mr. Buchieri?

21   A.    He told him he'd kill him.

22   Q.    Unless?

23   A.    Unless he come up with the money.

24   Q.    Did Mr. Buchieri come up with the money?

25   A.    Yes, he did.

1          MR. WYSHAK:  Your Honor, may I approach the witness?

2          THE COURT:  You may.

3     Q.   I'm going to show you what's been marked for

4     identification 901 and 907.  Take a look at those two

5     documents.

6     A.   Yes.

7     Q.   First 901, what do you recognize that document to be?

8     A.   It was a check from Richie Buchieri made out to me for the

9     sum of 200,000.

12:26 10   Q.   And is that for payment for the extortion?

11    A.   That was the extortion payment, yes.

12    Q.   Why did he write a check to you?

13    A.   We had some transactions that would cover it, I had bought

14    two penthouses off of him, and it was just worked into the

15    figures, and he made it out, the check that would cover those

16    figures.

17         MR. WYSHAK:  I offer the check 901, your Honor.

18              THE COURT:  Any objection?

19              MR. BRENNAN:  No objection, your Honor, thank you.

12:26 20         THE COURT:  It may be admitted and published.

21              (Exhibit No. 901 was admitted into evidence.)

22    Q.   Is this the check that was made out to you in payment for

23    the $2000,000 extortion at the cabana?

24    A.   Yes.

25    Q.   What did you do with the check?

1    A.    I cashed it at the Braintree Savings Bank, and I requested

2    cash.

3    Q.    That other document which is before you, 907?

4    A.    Yes.

5    Q.    What is that?

6    A.    It's a document I had to sign in front of three bank

7    tellers that acknowledged the fact that they gave me $200,000

8    in large bills in cash.

9              MR. WYSHAK:  I offer that document, 907.

12:27 10         MR. BRENNAN:  No objection, thank you.

11             THE COURT:  It may be admitted and published.

12             (Exhibit No. 907 was admitted into evidence.)

13   Q.    Okay.  I'll read it to you, Mr. Flemmi.  "I, Steve Flemmi,

14   acknowledge that on September 12th, 1986, I received $200,000

15   in large bills from Braintree Savings.  The cash was verified

16   by myself and three bank employees."  Is that your signature on

17   the bottom?

18   A.    Yes, sir.

19   Q.    What did you do with that $200,000?

12:28 20   A.    Brought it down to Jim Bulger, and we chopped it up.

21   Q.    And who's we?

22   A.    Jim Bulger, myself and Kevin Weeks.

23             MR. WYSHAK:  Your Honor, may I approach the witness

24   again?

25             THE COURT:  You may.

1    Q.   Showing you what's been marked Government Exhibit 66 for

2    identification, do you recognize that photograph?

3    A.   Yes.

4    Q.   Who's in that photograph?

5    A.   Jim Bulger in front, I'm behind him, and the other figure,

6    there's a Sonny Mercurio and Vinny Ferrara is behind him.

7    Q.   Okay.  Is that as a result of a meeting that you had with

8    those individuals?

9    A.   Yes.

12:29 10          MR. WYSHAK:  I offer the photograph, your Honor.

11          THE COURT:  Any objection?

12          MR. BRENNAN:  None, thank you.

13          THE COURT:  It may be admitted and published.

14          (Exhibit No. 66 was admitted into evidence.)

15    Q.   Again, could you just put a dot on Mr. Bulger there.

16    A.   Jim Bulger is in front, I'm behind him with my hands in my

17    pocket.

18    Q.   Who's that next individual?

19    A.   It's Sonny Mercurio, he's not visible, but I know he was

12:29 20    there, and Danny Ferrara was behind him.  They show them

21    meeting inside.

22    Q.   Is that the approximate date of the meeting, April of

23    1989?

24    A.   Yes.

25    Q.   What happened?  Why were you meeting with -- withdrawn.

1    Who was Sonny Mercurio?

2    A.    Sonny Mercurio was a liaison, he was a friend of both

3    sides basically.  He was more partial to the Winter Hill people

4    because they had helped him when he was in prison, they gave

5    him some money, and the mafia people didn't help him so he was

6    more partial to Johnny Martorano and Howie Winter.

7    Q.    And who was Vinny Ferrara?

8    A.    He was one of the mafia figures, an LCN.

9    Q.    And why were you meeting with these individuals?

12:30 10   A.    Well, there was a dispute over Tommy Ryan, who was a

11   bookmaker with us from Cambridge, and Vinny Ferrara said that

12   he was having a problem, he had a problem with Vinny Ferrara,

13   Vinny Ferrara had a problem with Tommy Ryan.  He disrespected

14   him on some money that he said he'd tried to get off Tommy

15   Ryan, and Tommy told him, he said a derogatory remark toward

16   Vinny, so Vinny was very upset about it, and he wanted to do

17   something about it, so that's why that meeting was arranged.

18   This is the second meeting.

19        The first meeting I was meeting with Sonny Mercurio and

12:31 20   Vinny Ferrara, the three of us, and he says to me, the incident

21   about Tommy Ryan, and he said that he wanted to do something to

22   him, and I said to him, Vinny, if you hurt this guy, you're

23   going to have a very serious problem on your hands, so we had

24   kind of a bit of an argument, and I got a little forceful with

25   him, and so Sonny Mercurio, he was kind of a peacemaker, and he

1    resolved it.  Later on when they found the real impact what

2    could happen, this is when they called the meeting.

3    Q.   What happened at this meeting?

4    A.   This is one of the meetings I did most of the talking.

5    Q.   What did you say?

6    A.   I told him that, you know, he apologized anyway, that was

7    why the meeting was set up, and I told him the guy was with us,

8    and it was uncalled for for him to threaten the guy, and if he

9    did anything about it, I said there would be retaliations and

12:32 10  he would be the target.  Of course, it had an effect, but that

11   was basically the message that he got.  Jim Bulger was present.

12   Q.   These two individuals, they were Sonny Mercurio and

13   Mr. Ferrara or members of the mafia?

14   A.   Yes.

15   Q.   Weren't you afraid to threaten members of the mafia?

16   A.   Well, if they're going to hurt anybody that's involved

17   with us, we're going to retaliate, and they know that, and it

18   would happen.

19   Q.   Okay.  I'd like to direct your attention to approximately

12:33 20  December of 1990.  Did John Connolly retire from the FBI at or

21   about that time?

22   A.   Yes.

23   Q.   Did you give him anything at the time he retired?

24   A.   I gave him a retirement gift.

25   Q.   What was the retirement gift?

1    A.    10,000.

2    Q.    Were you present when that was given to Mr. Connolly?

3    A.    Yes.

4    Q.    Was Mr. Connolly after that able to provide information to

5    you?

6    A.    To some extent, yes.

7    Q.    Did you become the subject of a federal grand jury?

8    A.    Yes.

9    Q.    During the early 1990s?

12:33 10    A.    Yes.

11   Q.    And did Mr. Connolly, was he able to provide information

12   to you about the progress of that grand jury?

13   A.    Yes, he said the grand jury was sitting and that they were

14   still interested in, you know, in Bulger, Jim Bulger and

15   myself.

16   Q.    As a matter of fact, in late December of 1994, did you

17   receive information from John Connolly about indictments?

18   A.    Yes.

19   Q.    What was that information?

12:34 20    A.    Kevin Weeks came to me and says to me that the indictments

21   were coming down on us, Jim Bulger and myself, and for us to

22   leave the scene.

23   Q.    Did Kevin Weeks tell you where he got that information?

24   A.    He got that from John Connolly.

25   Q.    Did you leave?

```
 1   A.   No.

 2   Q.   Did Mr. Bulger leave?

 3   A.   He was already gone.  I think he was on vacation

 4   somewhere.

 5   Q.   Did you warn anybody?

 6   A.   I did.

 7   Q.   Who?

 8   A.   I met Frank Salemme at his home, I went to his home at the

 9   request of his son who was dying, and he wanted to see me and

12:35 10   say goodbye to me.  While I was there, Frank come in, his wife

11   was in the kitchen, and he come in with some other guy named

12   Ruggerio I believe his name was, some mafia guy from

13   Rhode Island, and so I was talking to him.  That was a chance

14   meeting, and I just told him the indictments were coming down,

15   but he was aware of it but to take that with a grain of salt

16   because that wasn't -- because he was throwing it out, you

17   know, let me know he knew what was going on.

18   Q.   Did he flee?

19   A.   I'm sorry.

12:35 20   Q.   Did Frank Salemme flee the jurisdiction?

21   A.   He did leave.

22   Q.   And why didn't you flee?

23   A.   Well, I didn't think the indictments were coming down at

24   that particular time.  I for some reason or another, I thought

25   they were going to be coming down later on, but I was
```

1   procrastinating, which I did I think for a matter of a few

2   days, and the day I was leaving was the day I got arrested.  In

3   fact, Kevin said to me the second time he seen me, he said,

4   "Why are you still here?"  I said, "I'm on top of it," and I

5   kind of fluffed him off.

6   Q.   All right.  Now, after you were arrested, did you try to

7   defend your case based upon your status as an FBI informant?

8   A.   Yes, I did.

9   Q.   And what was your position at that time?

12:36 10   A.   I think originally it was an authorization defense, and

11   during the course of the hearing Judge Wolf had said they may

12   have an immunity issue here, and I just picked up off on that,

13   and I said, yo, went along with that theory and said that that

14   was an immunity defense.

15   Q.   And the first offense you mentioned, authorization?

16   A.   Authorization defense.

17   Q.   Can you tell us what you meant by that?

18   A.   Well, because we were -- we had a business going, we had

19   bookmakers, and we were in the gambling business and

12:37 20   everything, and the FBI kind of like didn't give it any serious

21   consideration, and so that was they kind of in a sense

22   authorized us to do it.  That was my defense.

23   Q.   Did they authorize you to kill people?

24   A.   No, we're talking about gambling and loan sharking, not

25   murder.

1   Q.   Not extortion?

2   A.   Extortion, that usually kind of went with -- well,

3   extortion is extortion, but there's also extortion with

4   bookmakers when you're dealing with them and you're giving them

5   money, loan shark money to finance their business, so I looked

6   at it in the sense that that was extortion also.

7   Q.   How about narcotics distribution?  Were you claiming that

8   you were authorized to distribute narcotics?

9   A.   No.

12:37 10   Q.   You didn't have immunity, did you?

11   A.   No, no.

12   Q.   You weren't authorized to engage in criminal activity,

13   were you?

14   A.   No, they just kind of winked away just in bookmaking and

15   loan sharking, I mean, that was about it, but anything beyond

16   that, no.

17   Q.   Was Mr. Connolly assisting you in this period of time when

18   you were making these claims before Judge Wolf?

19   A.   Yes.

12:38 20   Q.   How?

21   A.   He was in touch with my attorney at the time, Superior

22   Court Judge Fishman, but at the time before he became appointed

23   Judge, he was my attorney, and he was dealing with --

24   John Connolly was dealing with him.

25   Q.   Giving you information?

1    A.    Yes, and Kevin Weeks was in touch with me, and he was the

2    liaison between John Connolly and myself.

3    Q.    Now, you testified at a hearing in that case; is that fair

4    to say?

5    A.    Yes.

6    Q.    And you were on the stand for a number of days --

7    A.    Nine days.

8    Q.    -- in that hearing?  That would have been in approximately

9    1998?

12:39 10    A.    Yes.

11    Q.    Did you tell the truth about your relationship with

12    John Connolly --

13    A.    Not at all.

14    Q.    -- at that hearing?

15    A.    Not at all.

16    Q.    Why not?

17    A.    Because I was hoping -- he kept sending word on several

18    occasions that he was going to come forth and testify on our

19    behalf, on my behalf, that we had authorization to engage in

12:39 20    certain activities, bookmaking and loan sharking.

21    Q.    Did you tell Judge Wolf that you had paid John Connolly

22    off?

23    A.    No, not at all.

24    Q.    Did you tell Judge Wolf that John Connolly had tipped you

25    off to investigations being conducted by the FBI?

```
 1   A.   No.

 2   Q.   Or DEA?

 3   A.   No.

 4   Q.   Or any other law enforcement agency?

 5   A.   No.

 6   Q.   Why were you protecting John Connolly?

 7   A.   Well, because, like I said, he had assured me on several

 8   occasions he was going to come forth in my defense.

 9   Q.   Did you in fact implicate John Morris --

12:40 10  A.   Yes.

11   Q.   -- in tipping you off to the indictment?

12   A.   Yes.

13   Q.   Was that true?

14   A.   No, that was the insistence, John Connolly sent that up to

15   blame John Morris where the tip came from.

16   Q.   And why blame John Morris?

17   A.   Because they had a little feud between them, and he didn't

18   like John Morris anymore.

19   Q.   Is it fair to say that your claims at the hearing before

12:40 20  Judge Wolf were false?

21   A.   Yes, and I'd like to publicly apologize to Judge Wolf for

22   purging myself in his courtroom.

23   Q.   And it was about five years after that when you pled

24   guilty in this case; is that fair to say?

25   A.   That's correct.
```

```
 1   Q.   And agreed to cooperate with the government?

 2   A.   Yes, signed a plea agreement in 2003.

 3        MR. WYSHAK:  One moment, your Honor.

 4   Q.   Did you know a man named Ray Slinger?

 5   A.   I knew who he was.  I know he's deceased now.

 6   Q.   Okay.  Did you and Mr. Bulger have any involvement with

 7   Ray Slinger?

 8   A.   Yes.

 9   Q.   What was the nature of that involvement?

12:41 10  A.   Well, I don't know much about actually how it originated,

11   but from what I understand, there was a question over a real

12   estate transaction involving Kevin O'Neill.

13   Q.   Okay.  Were you present at some point with Mr. Bulger and

14   Mr. Slinger?

15   A.   I was.

16   Q.   What happened?

17   A.   Well, I went with Jim Bulger and Kevin O'Neill up to his

18   office on Broadway.

19   Q.   To whose office?

12:42 20  A.   Mr. Slinger's office, and Bulger did all the talking and

21   told him that he had no business interfering with the

22   particular transaction.  I don't recall the transaction, it was

23   some kind of real estate transaction, and he fined him $50,000.

24   Q.   Okay.  Were you ever present at Triple O's with

25   Mr. Slinger and Mr. Bulger and Mr. Weeks?
```

1    A.    Subsequent to that, yes.

2    Q.    What happened after that?

3    A.    Well, he come down and we went -- he went upstairs, he

4    went in the area upstairs, there's a lounge area like, and he

5    sat down, and Bulger asked him if -- I think he mentioned he

6    had a pistol on him, and so anyway --

7    Q.    So when you say he had a pistol?

8    A.    Mr. Slinger said he had a pistol on him.

9    Q.    And who was upstairs in Triple O's?

12:43 10    A.    It was Kevin O'Neill, myself and Kevin Weeks, I believe.

11    Q.    And Mr. Bulger?

12    A.    And Mr. Bulger, yes.

13    Q.    And what happened at that point?

14    A.    He threatened him, and he told him he was going to kill

15    him, and he asked him to come up with $50,000, I believe it

16    was.

17    Q.    What happened to Mr. Slinger's gun?

18    A.    I'm not sure what happened to the gun, but I think he took

19    it from him and I think he might have gave it back to him.

12:43 20    Q.    When?

21    A.    When he was leaving.

22    Q.    Did Mr. Slinger pay any money?

23    A.    He paid the initial the first payment was 25,000, and at

24    some point after that, I think he went to -- the FBI become

25    aware of it.

1    Q.    How did you find out the FBI became aware of it?

2    A.    John Connolly told us that two agents went to him,

3    John Newton and another agent, I can't recall his name at the

4    moment, but they both went to Mr. Slinger.  His first name was

5    Rod something.

6    Q.    Rod Kennedy?

7    A.    Rod Kennedy.

8    Q.    As a result of learning that information from

9    Mr. Connolly, what did you do regarding Mr. Slinger?

12:44 10    A.    Backed off.  I convinced him.  Anyway, he backed off.

11    Q.    Do you recall in about 1993 visiting Dick O'Brien in

12    Florida?

13    A.    Yes.

14    Q.    Why did you go to Florida to meet with Dick O'Brien in

15    1993?

16    A.    I think John Martorano was present and Dick O'Brien and

17    myself and talking about the grand jury questions at that

18    point.

19    Q.    Okay.

12:45 20    A.    And that he was in, you know, he was going to continue

21    paying us rent.

22    Q.    Were you concerned he might cooperate?

23    A.    Well, yes, I believe so.

24    Q.    Is that one of the reasons that you met with him?

25    A.    Yes.

```
 1    Q.    You met with some of the other bookmakers; is that fair to
 2    say?
 3    A.    Yes.
 4    Q.    At or around that time?
 5    A.    Yes.
 6    Q.    Mr. Levenson?
 7    A.    Howie Levenson was one of them.  I met him with
 8    George Kaufman.  We met at McDonald's hamburger place over in
 9    Brookline.
10    Q.    Mr. Katz?
11    A.    I think they were both together.
12    Q.    What was the purpose of meeting with them?
13    A.    Grand jury is going on, and we gave him -- I gave him kind
14    of a script and go in and said that they weren't extorted.
15    Q.    Is that the same reason that you met with Mr. O'Brien in
16    Florida?
17    A.    Yes.
18              MR. WYSHAK:  I have nothing further, your Honor.
19              THE COURT:  Mr. Brennan.
20                         CROSS-EXAMINATION
21    BY MR. BRENNAN:
22    Q.    You married your wife Jeanette in the '50s?
23    A.    That's correct.
24    Q.    You had a child, didn't you?
25    A.    Yes.
```

```
 1  Q.   Your first child was born in 1956?

 2  A.   That's correct.

 3  Q.   Your second child was born in 1958?

 4  A.   Correct.

 5  Q.   Around the time your first child was two years old and

 6  your second child was an infant, you began a relationship with

 7  Marion Hussey?

 8  A.   I wasn't getting along with my wife at the time, yes.

 9  Q.   And when you began the relationship with Mrs. Hussey, you
12:47 10  had a child with her shortly after in 1960, didn't you?

11  A.   Correct.

12  Q.   In fact, you would have three children with her, another

13  the following year in 1961?

14  A.   Correct.

15  Q.   And you had another child, Stephen, in 1967?

16  A.   '66, '67.

17  Q.   '67?

18  A.   Yes.

19  Q.   So at the time you had two children with Jeanette, you had
12:48 20  children of the same age with Marion?

21  A.   Right.

22  Q.   When you met Marion before you had your first child, she

23  had a little baby, didn't she?

24  A.   Yes, four years old, I believe.

25  Q.   Well, you know that Deborah Hussey was born in 1968 --
```

```
 1   1958, don't you?

 2   A.   '58, you say?

 3   Q.   Yes.

 4   A.   I'm not sure the actual dates.

 5   Q.   When you had your first son with Marion in 1960,

 6   Debbie Hussey was just two years old?

 7   A.   Who?  Say that again.

 8   Q.   When you had your first child with Marion Hussey --

 9   A.   Yes.

12:48 10   Q.   -- Debbie Hussey was just two years old?

11   A.   How old, two?

12   Q.   Two.

13   A.   I'm not sure, but if you say so, if you've got the dates.

14   Q.   Do you remember when you moved in with Marion Hussey and

15   you had children and little Debbie was there?

16   A.   Probably, yeah, more likely, yes.

17   Q.   Do you remember as she was an infant holding her,

18   Mr. Flemmi?

19   A.   Probably.

12:49 20   Q.   Do you remember some of the things you would do to help

21   Marion with Debbie when she was just a baby, like feed her,

22   change her diaper?

23   A.   No.  I wasn't a very domestic person as far as that was

24   concerned, even with my own children.

25   Q.   When you spent time at home living with your babies,
```

1  Debbie was just a little girl growing up, wasn't she?

2  A.   She was a young girl.

3  Q.   And some of the things that you would do with her is you

4  would let her sit on your lap?

5  A.   No, that's not true.  That's the way Marion's attorney

6  portrayed it.

7  Q.   You would never let her sit on your knee?

8  A.   No.  I didn't even do that with my own children, very --

9  Q.   You wouldn't have her sit on your knee and you'd read

12:49 10  stories to her, Mr. Flemmi?

11  A.   No, of course not, no, I never did that to my own

12  children.

13          MR. BRENNAN:  May I approach, your Honor?

14          THE COURT:  You may.

15          MR. BRENNAN:  McIntyre transcript, 265.

16  Q.   McIntyre transcript.  Mr. Flemmi, did you testify in a

17  case?

18  A.   Yes, I know exactly what you're saying, where you're

19  coming from.  Go ahead.

12:50 20  Q.   And you were a named defendant in that case?

21  A.   Yes.

22  Q.   It was a civil case, wasn't it?

23  A.   That's right.

24  Q.   For wrongful death?

25  A.   That's right.

1    Q.    And in that case, you were asked a number of questions,

2    weren't you?

3    A.    By Attorney Donovan.

4    Q.    And you testified?

5    A.    That's right.

6    Q.    Under oath?

7    A.    That's right.

8    Q.    Did you tell the truth at that proceeding?

9    A.    Well, like she asked me questions, and I just went yes,

12:50 10   yes, yes on some of the questions that you were just asking me

11   now.

12   Q.    So when someone asks you questions in a court proceeding,

13   you sometimes just say yes, yes, yes if it's not true?

14   A.    Well, but there was boring questions, and I just answered

15   in that respect.

16   Q.    So if we had boring questions in this case, you would just

17   answer yes, yes, yes?

18   A.    Depending on how you ask the questions.

19   Q.    How many of Mr. Wyshak's questions over the last few days

12:51 20   do you think were boring, Mr. Flemmi?

21   A.    Not many.

22   Q.    The ones that you did think were boring that you just said

23   yes, yes, yes to and weren't accurate, which ones were those?

24   A.    There weren't any questions that he asked me that weren't

25   boring.  They were all on point, they were all regarding

1  criminal activity.

2  Q.   Well, you just said not many.  Which ones were you

3  referring to?

4  A.   I'd have to go back over that testimony because I don't

5  recall exactly which one he was referring to.

6  Q.   When you go back tonight, can you think about the

7  questions, the not many questions that you just said yes, yes,

8  yes to and let us know tomorrow which ones you just agreed to

9  that weren't accurate today?

12:51 10  A.   There might be some slight variations on some of it.

11  Q.   Well, the jury wants to know the accuracy of those

12  statements.  Can you tell us which ones weren't accurate, sir?

13  A.   Well, the questions I answered were questions pertaining

14  to mostly criminal activities, murders and everything else that

15  was involved.

16  Q.   Can you tell this jury which ones?

17  A.   Which questions are you asking about, which particular

18  question are you referring to?

19  Q.   Can you tell this jury, sir, which questions?

12:52 20          MR. WYSHAK:  Objection.  Asked and answered.

21          THE COURT:  I'm not sure the question has been

22  answered, but I'll let you proceed, Mr. Brennan, briefly.

23  Q.   Mr. Flemmi, please tell this jury which questions that you

24  answered weren't accurate.

25  A.   They're all accurate, most all the questions that

1    Mr. Wyshak asked me were accurate to the best of my memory,

2    yes, but go ahead.  Go ahead, Mr. Brennan, go ahead.

3    Q.    Thank you, sir.  Now, when you testified in McIntyre, you

4    were asked questions about Deborah Hussey, weren't you?

5    A.    Yes.

6    Q.    I'm showing page 265.  You were asked by the attorney, if

7    I may, "This was a girl you had known since she was three or

8    four years old, correct?"

9    A.    Yes.

12:53 10   Q.    What did you say, Mr. Flemmi?

11   A.    I said, "Yes, that's correct."

12   Q.    A girl you used to --

13          THE COURT:  I'm just going to ask, can we move the

14   microphone so you're speaking into it?

15          THE WITNESS:  Sure.

16          THE COURT:  Thank you.

17   Q.    "A girl you used to put on your knee and read stories to?"

18   What was your statement under oath, Mr. Flemmi?

19   A.    I said, "Correct."

12:53 20   Q.    When you testified in the case of Hussey, you were sworn

21   to take an oath, weren't you, Mr. Flemmi?

22   A.    Yes, sir.

23   Q.    You raised your right hand and you said you would tell the

24   truth?

25   A.    That's correct.

1    Q.   And you know there's a moral obligation to tell the truth

2    when you swear under oath, don't you?

3    A.   I swore under oath.

4    Q.   When you testified under oath in Hussey and you said that

5    little Debbie Hussey would sit on your knee and you'd read her

6    stories, were you telling the truth?

7    A.   Well, at the time, it was just a question that was a

8    general question, and I just said yes when she asked me that.

9    Q.   You were asked if little Debbie Hussey sat on your knee

12:54 10   and you read stories to her and you swore under oath and said

11   correct, were you telling the truth?

12   A.   I was telling the truth.

13   Q.   So when I asked you today, Mr. Flemmi, if little

14   Debbie Hussey sat on your knee while you read her stories, and

15   you said that didn't happen, were you telling the truth today?

16   A.   I didn't recall exactly that, but at the time when I

17   answered that way, it was a general question, and I says

18   correct.

19   Q.   Is there a difference in a general question and a specific

12:54 20   question as far as your obligation?

21   A.   As far as that particular issue was, but my conduct at the

22   time with her sitting on my knee and me reading her stories, it

23   was -- I just said yes.

24   Q.   So do you sometimes just say yes even if it's not true,

25   Mr. Flemmi?

1    A.   Not that, it was just generalizing that particular point.

2    Q.   When you swear under oath to tell the truth, don't you

3    have to --

4    A.   I was telling the truth, but at that particular, it didn't

5    to me mean all that much that I was so specific about it, I

6    just said yes, correct.

7    Q.   The truth didn't mean much to you or you --

8    A.   No, the truth, but I mean that question didn't mean all

9    that much to me, and I just says yes.

12:55 10   Q.   So answers that really aren't important to you, you can

11   lie about?

12   A.   No, I'm not lying about it, I just didn't take it as a

13   very important issue.

14   Q.   Regardless of how important the issue was, were you

15   telling the truth when you testified in the Hussey matter, or

16   are you testifying to the truth today?

17   A.   I'm telling the truth today, and at the time it didn't

18   seem to me to be of any significance, that's why I just says

19   correct, correct, and I just said correct to all those mundane

12:55 20   questions, that's how I looked at it.

21   Q.   Are you willing to lie if a question is mundane?

22   A.   Look, you ask me questions, when we get into the case, you

23   start asking me questions about the murders, there's no lies on

24   any of this other stuff, but if something is innocent to me as

25   that was, that's the reason why I said, oh, yes, correct,

1    correct, and that was how I portrayed it, that was how I

2    answered.

3    Q.   So if it's an innocent question, you're willing to lie

4    about that?

5    A.   Look, not willing to lie, but I just at the time, it

6    didn't seem significant to me, I just says correct because if

7    she's sitting on your lap, you're reading her stories, and I

8    just says yes, correct.

9    Q.   Was it true?

12:56 10    A.   Could be, it could have been truth at the time or it could

11    not, I just didn't put any significance to it.

12    Q.   Was it true, Mr. Flemmi?

13    A.   According to you, according to the transcript, no, it

14    wasn't the truth, if that's what you want to hear because I

15    didn't put any significance to it.

16    Q.   So what you're saying is your testimony in that litigation

17    was untrue?

18    A.   No, that testimony is all true except for that couple of

19    issues there that I just, like I said, they weren't significant

12:57 20    to me, and I just answered correct.

21    Q.   So it's okay to be truthful on most of the things, but

22    some of the things, if you're not truthful, that's okay?

23    A.   No, it's just in that particular couple of issues about

24    sitting on my lap and reading, they were insignificant to me, I

25    didn't put any significance on it, and I just says correct.

1   Q.   Is there any reason, Mr. Flemmi, why you want to distance

2   yourself from holding a little girl on your knee?

3   A.   It's just the way I responded.

4   Q.   Is it because of what you did to her a couple decades

5   later, is that why you're trying to distance yourself from what

6   you did to her, how you held her when she was a baby?

7   A.   No, that's the way I answered the question.  I answered

8   the question when Ms. Donovan said, asked me those questions, I

9   responded, and I didn't think of anything beyond that, just the

12:57 10   fact that I just says correct.

11   Q.   Is it hard for you to accept the fact that you strangled

12   somebody who sat on your knee as a little girl?  Is that hard

13   for you to accept, Mr. Flemmi?

14   A.   I didn't strangle her.

15   Q.   She would call you "daddy," Mr. Flemmi, wouldn't she?

16   A.   Mr. Brennan, I didn't strangle her.

17   Q.   Mr. Flemmi, did she call you "daddy"?

18   A.   That's beside the point.  The fact of the matter is I

19   didn't strangle her.

12:58 20        THE COURT:  Mr. Flemmi, what you need to do is answer

21   the questions.  There is a question pending.

22   A.   Go ahead.

23   Q.   Did little Debbie Hussey call you "daddy"?

24   A.   As a young girl, I was there, she thought I was her daddy.

25   Q.   Did she call you "daddy"?

```
 1   A.   Probably did.

 2   Q.   Do you have any failure of memory about that, Mr. Flemmi?

 3   A.   No, I'm saying she did, she probably did.  She did.

 4   Q.   I don't want probably, did she or she didn't?

 5   A.   She did, yes.

 6   Q.   She did?

 7   A.   I just said yes.

 8   Q.   What's your reluctance in answering the question about

 9   whether she called you "daddy"?

12:58 10  A.   I'm saying she did.

11   Q.   So this little girl that you watched grow up who called

12   you daddy you're saying is not your daughter?

13   A.   She's not.  Debbie Hussey was not my daughter.

14   Biologically she was not my daughter.

15   Q.   Did you ever tell her not to call you "daddy"?

16   A.   No.

17   Q.   And you watched her when she was a little girl go off to

18   school in the morning, didn't you?

19   A.   I wasn't spending that kind of time there that I would

12:59 20  watch her go to school in the morning.

21   Q.   Did you watch her as she went through school, grammar

22   school, sir?

23   A.   Well, she left the house, and I was there, yes, of course.

24   Q.   And you watched her as she went through middle school,

25   didn't you?
```

1    A.   Well, when she was going to school, I knew she was going

2    to school.

3    Q.   And the whole time this little girl was calling you

4    "daddy" and referring to you as her father, you never corrected

5    her, did you, Mr. Flemmi?

6    A.   No, why should I correct a little girl not to call me

7    "daddy"?

8    Q.   You treated her like --

9    A.   She's there.

12:59 10   Q.   You treated her like she was your daughter?

11   A.   I took care of her and her mother.

12   Q.   Were you a good father, Mr. Flemmi?

13   A.   I provided very well, I was a provider.

14   Q.   As a good father, were you charged with the responsibility

15   of protecting the children in your home?

16   A.   Well, I think I did on one occasion when she was being

17   held hostage somewhere, and I got a phone call, and I went and

18   left the house with a pistol on me and went down and got her

19   released, so I protected her, yes.

01:00 20   Q.   As a good father, were you charged with the responsibility

21   of making sure nobody hurt her, Mr. Flemmi?

22   A.   I just answered that, nobody would hurt her.

23   Q.   Except you?

24   A.   There was a whole different situation here.  Do you want

25   to go back to early years, I never hurt her in the early years,

1    if that's what you're referring to.  This is later on in a

2    different lifestyle and at the insistence of Jim Bulger, that's

3    the reason why she was killed.

4    Q.   This little girl who would call you daddy is the same

5    little girl just a decade later that you'd start abusing

6    sexually, wasn't it, Mr. Flemmi?

7    A.   When you say abusing her sexually, would you clarify that

8    a little, please?  You're talking about intercourse?

9    Q.   Any kind of sex with your daughter?

01:01 10   A.   Well, intercourse or what or oral sex?  What are you

11   referring to?

12   Q.   What kind of abuse did you inflict upon her, Mr. Flemmi?

13   A.   Nothing, I didn't inflict any abuse on her, that was

14   consensual.

15   Q.   So, your daughter, Debbie, the girl who called you "daddy"

16   consented to having sex with you?

17   A.   Mr. Brennan, it's a whole different ball game, different

18   person, different time, so if you want to bring it back to

19   early years, you're way off the wall there.

01:01 20   Q.   Did she change her name?

21   A.   Did I change her name?

22   Q.   Did she change her name?  You said it was a different

23   person, it's still the little girl.

24   A.   I'm talking about her demeanor, her lifestyle, she was

25   different.

```
 1   Q.   So because her demeanor and lifestyle changed, it gave you

 2   an invitation to have sexual relations with her?

 3   A.   No.

 4   Q.   When you decided that you were going to have or inflict

 5   sex upon her, Mr. Flemmi, did it cross your mind that this

 6   is --

 7   A.   Did you say inflict?

 8   Q.   Yes, inflict.

 9   A.   Consensual.

01:02 10   Q.   When you decided to have consensual relations with this --

11   A.   On two occasions, two occasions, let's clarify that, two

12   occasions, and I regret it, a moment of weakness, it happened,

13   but it happened later on in life.

14   Q.   You had a number of moments of weaknesses with her, didn't

15   you?

16   A.   We all did, so did Bulger and myself, we all had moments

17   of weaknesses.

18            THE COURT:  Mr. Brennan, just given the time, I want

19   to pause here.  Mr. Flemmi, you need to wait until Mr. Brennan

01:02 20   finishes his questions, okay, when we resume tomorrow.

21            THE WITNESS:  I apologize, your Honor.

22            THE COURT:  Jurors, we're going to break for the day

23   here.  As always, keep all of my cautionary instructions in

24   mind, keep an open mind about the evidence, don't talk to

25   anyone about the case, and we'll see you tomorrow morning.
```

1    Thank you.

2              THE CLERK:  All rise for the jury.

3              (JURORS ENTERED THE COURTROOM.)

4              THE COURT:  Counsel, anything before we break?

5              MR. WYSHAK:  No, your Honor.

6              MR. CARNEY:  No, thank you, your Honor.

7              THE COURT:  See you in the morning.

8              (Whereupon, the trial was adjourned at 1:03 p.m.)

9                          CERTIFICATION

10             We certify that the foregoing is a correct transcript

11   of the record of proceedings in the above-entitled matter to

12   the best of our skill and ability.

13

14

15   /s/Debra M. Joyce           July 26, 2013
     Debra M. Joyce, RMR, CRR    Date
16   Official Court Reporter

17   /s/Valerie A. O'Hara        July 26, 2013
     Valerie A. O'Hara, RMR, CRR Date
18   Official Court Reporter

19

20

21

22

23

24

25

INDEX

WITNESS                                                              PAGE

STEPHEN FLEMMI

    Continued Direct Examination                                      14
    By Mr. Wyshak

    Cross-Examination                                                159
    By Mr Brennan


                            E X H I B I T S


Exhibit No.            Description                         Received

    901               Check                                   145

    907               Bank documents                          146

    66                Photograph                              147