1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3    _____

4    UNITED STATES OF AMERICA,

5                    Plaintiff,        Criminal Action
                                       No. 99-10371-DJC
6    V.
                                       July 26, 2013
7    JAMES J. BULGER,                  8:45 a.m.

8                    Defendant.
     _____
9

10

11              TRANSCRIPT OF JURY TRIAL DAY 30

12         BEFORE THE HONORABLE DENISE J. CASPER

13              UNITED STATES DISTRICT COURT

14          JOHN J. MOAKLEY U.S. COURTHOUSE

15                  1 COURTHOUSE WAY

16                  BOSTON, MA  02210

17

18

19

20              DEBRA M. JOYCE, RMR, CRR
                 Official Court Reporter
21          John J. Moakley U.S. Courthouse
             1 Courthouse Way, Room 5204
22              Boston, MA  02210
                   617-737-4410
23

24

25

 1   APPEARANCES:

 2   FOR THE GOVERNMENT:

 3   BRIAN T. KELLY, ESQ.
     FRED M. WYSHAK, JR., ESQ.
 4   ZACHARY R. HAFER, ESQ.
     United States Attorney's Office
 5   John Joseph Moakley Federal Courthouse
     1 Courthouse Way
 6   Suite 9200
     Boston, MA 02210
 7   617-748-3197

 8   FOR THE DEFENDANT:

 9   J.W. CARNEY, JR., ESQ.
     HENRY B. BRENNAN, ESQ.
10   Carney & Bassil
     20 Park Plaza
11   Suite 1405
     Boston, MA 02116
12   617-338-5566

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(The following proceedings were held in open

court before the Honorable Denise J. Casper, United States

District Judge, United States District Court, District of

Massachusetts, at the John J. Moakley United States Courthouse,

1 Courthouse Way, Boston, Massachusetts, on July 26, 2013.)

THE COURT:  Good morning, counsel.

ALL:  Good morning, your Honor.

THE COURT:  Good morning, Mr. Bulger.

THE DEFENDANT:  Good morning, your Honor.

THE COURT:  Did we lose Mr. Carney and Mr. Brennan?

Counsel, can one of you go out and see if they're in

the back?

Here they come.

Thank you.

MR. BRENNAN:  Good morning, your Honor.

THE COURT:  Good morning.

Good morning, counsel.

Counsel, there were a few defense witnesses that we

were in the midst of discussing, and Mr. Carney or Mr. Brennan,

I think you wanted to be heard further on a proffer as to

Mr. Hussey, Stephen Hussey?

MR. CARNEY:  Yes, your Honor.

THE COURT:  Okay.

Did you want to make a further proffer?  I think

1    that's where we left it, that you wanted some time overnight to

2    think about the proffer for Mr. Hussey.

3            MR. CARNEY:  We expect Stephen Hussey to testify that

4    he was asked to sign an affidavit that was submitted before his

5    father's bail hearing that contained false information, and he

6    was subsequently charged with perjury and obstruction of

7    justice for doing so, was found guilty, and sentenced.

8            There's evidence that his father said to him at or

9    about this time, Look, he's only facing 18 months, I'm facing

08:47 10   life, suggesting that the father thought it was an appropriate

11   risk for his son to take.  And I believe that suggests the

12   father's consciousness of guilt and willingness to even put his

13   own family in harm's way if he will get a benefit for it.

14           That supports our theme that Mr. Flemmi will do

15   anything, certainly not the least lie in court or even put up

16   his son to lie in court.

17           THE COURT:  And while you're still standing,

18   Mr. Carney, can I ask you just a little bit further about your

19   proffer on Mrs. Hussey?

08:48 20           MR. CARNEY:  Yes, your Honor.

21           THE COURT:  And for what purpose are you offering her

22   testimony?  I know the subject matter, but for what purpose are

23   you offering it?

24           MR. CARNEY:  To show the motive that Stephen Flemmi

25   had to kill his daughter.

1          THE COURT:  A motive that was personal to Stephen

2     Flemmi.

3          MR. CARNEY:  Yes, your Honor.

4          Mrs. Hussey -- I can elucidate on the facts if you

5     would like, your Honor.

6          THE COURT:  Yes.

7          MR. CARNEY:  There was a dispute going on with

8     Mr. Flemmi, Marion Hussey, and Deborah Hussey during which she

9     accused him of -- I'll use more formal language -- providing

08:49 10     sexual services to him for years.  As a result, Mr. Flemmi was

11     told by Mrs. Hussey to leave the house immediately and move out

12     permanently.

13          THE COURT:  And what was the time frame of that in

14     relationship to Ms. Hussey's murder?

15          MR. CARNEY:  I'd have to check on the date.  I don't

16     have the exact date.  Mr. Brennan can --

17          (Discussion off the record.)

18          MR. CARNEY:  As early as six months before the murder.

19          In addition, we expect Mrs. Hussey will testify that

08:49 20     she asked another of her daughters at a later time, Has Stephen

21     ever put his hands on you?  And that daughter burst into tears,

22     sobbing uncontrollably.  We intend to offer that as a

23     spontaneous explanation.

24          The reason this becomes relevant is it appears that

25     Mr. Flemmi had been sexually abusing both daughters, and that

1    Deborah Hussey was now being open about it, and we would

2    suggest that as her lifestyle was spiraling down, it became

3    necessary for Mr. Flemmi in his eyes to take steps to prevent

4    this information from being revealed.

5        We would call the second daughter, but we can't.  She

6    died of a drug overdose, which is similar to the extreme drug

7    use that Deborah Hussey was suffering from before her death.

8        THE COURT:  Thank you.

9        MR. CARNEY:  There is --

08:51 10       THE COURT:  Oh, you weren't finished.

11       MR. CARNEY:  There is one other related piece of

12   evidence -- well, I'll leave the Hussey matter for now.

13       THE COURT:  Okay.

14       Mr. Kelly, as to Stephen Hussey, first?

15       MR. KELLY:  Yes, first of all, I don't believe, if I

16   recall correctly, that Mr. Flemmi was ever even asked about any

17   such false -- alleged -- it wasn't alleged -- it was a false

18   affidavit filled out by his son, his son was convicted, but

19   that is just classic bad conduct being offered to impugn

08:51 20   someone's credibility.  Under the 1st Circuit case law,

21   specifically Winchenbach at page 558, the 1st Circuit has

22   already held that Rule 608(b) applies to and bars the

23   introduction of specific instances of a witness' misconduct if

24   offered to impugn his credibility.  I think that's exactly what

25   Hussey's testimony on his conviction would amount to, a

1    collateral attack on an extrinsic issue which should not be

2    permitted under the Federal Rules of Evidence.

3         Secondly, with respect to his daughter, as grotesque

4    and despicable as that conduct may be, it is still collateral

5    to this case.  It is also double hearsay.

6         So there's been nothing set forth by the defense which

7    permits that sort of statement from his live-in companion who

8    received it from another person who's now deceased to make such

9    statements admissible under the rules of evidence, and

08:52 10   therefore, that, too, should be barred as -- under 608(b) and

11   as set forth under 403 as well.

12        THE COURT:  Well, counsel, as to Mr. Hussey, the

13   proffer that's been made, I think I do agree with you that that

14   would be barred under 608(b) as extrinsic evidence going to

15   credibility on the basis that I mentioned in regards to a

16   number of other witnesses yesterday.

17        But as to Marion Hussey, even in the cases Beauchamp

18   and the other 1st Circuit cases that talk about collateral

19   matters, they do carve out an exception where the evidence is

08:53 20   not being offered in regards to truthfulness, but in regards to

21   motive to give false testimony or bias.

22        And here, where it's being proffered by the defense as

23   a reason that Mr. Flemmi had for murdering Ms. Hussey, which

24   the defendant wouldn't have shared, why is that -- why would

25   that be a collateral matter, and why would that be barred by

608(b)?  And I'm putting aside, perhaps, some of the hearsay

issues that I'd have to give further consideration to, but it

seems to me that that stands in a different place than the

proffer being made about Steven Hussey.

MR. KELLY:  Here's why, well, two reasons:  Because,

first of all, the witness did admit, albeit not to the extent

suggested by the defense, but he did admit the underlying

sexual misconduct.  So it's not as though he denied that.  So

basically we're talking about numbers of occasions when this

activity occurred.  Thus, it's a waste of time, and it's really

being offered to impugn him for misconduct, which is what

animates 608(b), that's why they're offering it, to further

show what sort of character he has, and it's not as though he's

denied that in the first place.

Secondly, there is a very serious hearsay objection to

it, because they are clearly offering it for the truth of the

matter asserted, i.e., that he did do this and he did do it

more than, I think he indicated, twice he indicated on the

witness stand.  So there is a clear hearsay prohibition against

it as well.  Ultimately, why it's being offered is just to show

more misconduct by him, and that's what is barred by 608(b).

MR. CARNEY:  May I respond briefly, your Honor?

THE COURT:  Yes, briefly.

MR. CARNEY:  Mr. Flemmi tried to minimize the number

of occasions that this occurred.  He was very specific in

1    saying it only happened on two occasions.

2         The testimony that would be offered that was made in

3    front of him was that Debbie Davis --

4         THE COURT:  Debbie Hussey.  Debbie Hussey.

5         MR. CARNEY:  Debbie Hussey -- I apologize, your Honor.

6         That Debbie Hussey stated --

7         MR. KELLY:  I think we get the point.  The suggestion

8    is it was more than twice.

9         THE COURT:  Well, let me --

08:56 10        MR. CARNEY:  "I've been sucking your" -- insert the

11   word -- "for years."

12        This goes to the mental state of Mr. Flemmi.  It's not

13   a hearsay objection, because whether that statement is truthful

14   or untruthful, the impact of this statement on Mr. Flemmi's

15   state of mind would be undeniable.  And that would be what

16   would give him the clearest motive on why he has to silence

17   this woman.

18        THE COURT:  I understand the argument.

19        As to the sister, though, what's the basis for

08:57 20   admitting that?

21        MR. CARNEY:  Because it -- first of all, that evidence

22   was --

23        THE COURT:  Well, it is hearsay, so what would be the

24   basis, what would be the exception there?

25        MR. CARNEY:  Spontaneous exclamation.  As your Honor

knows, a spontaneous exclamation is frequently used in
prosecutions involving sex abuse, where a parent talks to a
child about whether something has happened, and the child
blurts something out. And that can be long after the actual
abuse has occurred, but the exciting event is that the parent
is now confronting the child, suggesting that the parent now
knows the abuse that the child suffered at the hands of someone
else, and the child's uncontrollable reaction is to burst out
crying and sobbing uncontrollably when asked by the parent, in
essence, Have you been abused by this person? That reaction
need not be oral statement of words, that reaction would
undoubtedly be admissible if this were a trial alleging sexual
abuse.

        Now, this is a different situation, but the underlying
evidence is the same, and the evidence analysis is the same.
If it meets the criteria for the witness having an unexpected
and exciting event and certainly being asked directly by your
mother if you were abused by your stepfather, and then the
child reacts and says, -- either by words or actions, says,
Yes, I have been, courts, in my experience, certainly in
Massachusetts, would find that classic as admissible as a
spontaneous explanation, and for that reason, it's admissible.

        Mr. Flemmi doesn't have a right to confrontation.

        THE COURT: I guess my point is -- counsel, given the
time, I'm not going to decide the Marion Hussey issue at this

1  point.  I will -- what I said as to Stephen Hussey does stand,

2  Mr. Carney, for the reasons I articulated.  I think

3  Mr. Hussey's -- the proffer made is barred by 608(b).  I'm not

4  going to rule on Ms. Hussey, but I think I communicated to

5  Mr. Kelly that I think you may have a better argument in that

6  regard.

7       I think in regards to the sister, where we're talking

8  about an offer being made about what his motive to lie is about

9  Deborah Hussey's murder, the statements of the sister seem to

09:00 10  me more attenuated.  I need to think through that, and I need

11  to think through the issues that Mr. Kelly has raised.

12       MR. CARNEY:  We're also going to be offering evidence

13  next week, your Honor, we're preparing a submission for the

14  Court about the fact that Debra Davis' sister, during a

15  deposition under oath, said that Stephen Flemmi had sexually

16  abused her, as well.

17       THE COURT:  And what would that be -- meaning her, the

18  sister, or her --

19       MR. CARNEY:  Yes, the sister.

09:01 20       THE COURT:  But, counsel, how does that go to -- just

21  briefly, how does that go to the motive for Mr. Flemmi to give

22  false testimony about Ms. Hussey's murder?

23       MR. CARNEY:  He has to start making steps to make sure

24  that this avalanche of sexually predatory behavior does not

25  start getting revealed.  He would know that if Deborah Hussey

1    reveals it, it makes it much more likely that her sister,

2    Stephanie, will reveal it, which would make it even more likely

3    that Debra Davis' sister would reveal it.  Because once this

4    starts to get into the open, young victims feel much more

5    confident in coming forward if they know there's someone else

6    who's gone through the same experience.  And that's what's in

7    Mr. Flemmi's state of mind, and he has to stop this with the

8    one who looks like she is most ready to go public with it, and

9    that's Deborah Hussey.

09:02 10           THE COURT:  Well, counsel, that seems a little more

11   attenuated to me, but I'm not going to decide this now,

12   Mr. Kelly.

13           MR. CARNEY:  May we approach a moment on Stephen

14   Hussey for a second?

15           THE COURT:  Yes.

16           MR. CARNEY:  Just Mr. Kelly and I.

17           THE COURT:  That's fine.

18           Counsel, I'm assuming you don't need to be heard on

19   the Nee matter at this point?

09:02 20           MR. KELLY:  No.

21           MR. CARNEY:  No, your Honor.

22           (At sidebar on the record.)

23           MR. CARNEY:  We had talked yesterday regarding Stephen

24   Hussey, who I would remind your Honor was the person who was

25   not going to come in.

1          I don't know what steps my staff took in notifying the

2    marshal to pick him up and bring him to court, but with your

3    ruling I would just ask if I could have a moment to call my

4    office and just make sure that Hussey is not on the way here

5    with a marshal.

6          THE COURT:  That would seem prudent.  Okay.

7          MR. CARNEY:  So if I could just have two minutes.

8          THE COURT:  I think she's just going to line them up.

9          I'll make sure they're not brought in.

09:05 10          MR. KELLY:  Your Honor, while we're here, I received a

11    message yesterday from the clerk to bring redacted versions of

12    the indictment today rather than Monday.  So I brought them

13    here, and I've done my best, but I'd like to give copies to the

14    defense and the Court to double-check.

15          I took out -- in the caption I took out the citations

16    that he's not charged with.

17          THE COURT:  Okay.

18          MR. KELLY:  Even I would concede he shouldn't be

19    convicted for things he's not charged with, and I've taken out

09:05 20    the word "Bulger" where it says "group," so it just says

21    "group," "group," "group."

22          THE COURT:  Okay.

23          MR. KELLY:  So there's no name attached to the group.

24          THE COURT:  Okay.

25          MR. CARNEY:  Great.  Appreciate that.

 1              THE COURT:  I appreciate that, counsel, and -- well, I

 2       think we'll probably have time to talk about scheduling at the

 3       end -- at the end, before 1:00.

 4              Who's up?

 5              MR. KELLY:  Ms. Lemanski and Mr. Garriola.

 6              MR. CARNEY:  We're also going to notify the Court that

 7       we're not going to call Mr. James Lesar, the attorney who was

 8       the expert on the FOIA for the FBI.

 9              The incredibly shrinking defense witness list.

09:05 10              THE COURT:  I appreciate your updates to the Court,

11       and I would like to talk about expected time frame after --

12              MR. CARNEY:  Previously I would have been looking at a

13       calendar, now I'll be looking at a watch.

14              THE COURT:  I suspected as much, Mr. Carney,

15       yesterday, which is why I just wanted to make sure we were all

16       on the same page, and when we have a moment, I'll talk to both

17       sides about how much time you want for closing, all those

18       things.

19              MR. CARNEY:  Thank you.

09:05 20              MR. KELLY:  Thank you.

21              (End of discussion at sidebar.)

22              (Discussion off the record.)

23              (Jury entered the courtroom.)

24              THE COURT:  Good morning, jurors.

25              We'll get started right away.

1        Counsel?

2            MR. HAFER:  Thank you, your Honor.  The United States

3    calls Sandra Lemanski.

4            SANDRA LEMANSKI, having been duly sworn by the Clerk,

5    was examined and testified as follows:

6            THE CLERK:  Thank you.  Please be seated.

7            THE COURT:  Good morning.

8            THE WITNESS:  Good morning, your Honor.

9            THE COURT:  Mr. Hafer.

09:08 10            MR. HAFER:  Thank you, your Honor.

11                    DIRECT EXAMINATION

12    BY MR. HAFER:

13    Q.   Could you state your name please, and spell your last name

14    for the record?

15    A.   Sandra Lemanski, L-e-m-a-n-s-k-i.

16    Q.   How are you currently employed?

17    A.   I'm a special agent with IRS Criminal Investigation.

18    Q.   How long have you been a special agent with IRS Criminal

19    Investigation?

09:08 20    A.   Eighteen years.

21    Q.   And prior to your 18 years as a special agent with IRS

22    Criminal Investigation, how were you employed?

23    A.   As a revenue agent for IRS Civil Division.

24    Q.   Where did you graduate from college, Special Agent

25    Lemanski?

1    A.    Fitchburg State.

2    Q.    What year?

3    A.    1989.

4    Q.    Could you explain the difference, briefly, between a

5    revenue agent for the IRS and a Criminal Investigative Division

6    agent for the IRS?

7    A.    Sure.  The revenue agent is under the Civil Division and

8    the duties include conducting audits of individual, corporate,

9    and partnership tax returns that are filed with the IRS to

09:09 10    check for accuracy.

11         A special agent works under the criminal division and

12    is a law enforcement officer and is tasked with conducting

13    criminal investigations relative to violations of the tax code,

14    money laundering and Bank Secrecy Act violations.

15    Q.    You were a revenue agent for six years?

16    A.    Yes.

17    Q.    And then you've been a criminal agent for 18; is that

18    correct?

19    A.    Yes, sir.

09:09 20    Q.    Prior to becoming a criminal investigatory agent, did you

21    attend a different academy or additional training?

22    A.    Yes.  Upon transferring over to the Criminal Division, I

23    attended the Federal Law Enforcement Training Academy in

24    Glencoe, Georgia.

25    Q.    Did you graduate from that academy?

1    A.    Yes, in April of 1995.

2    Q.    And briefly, what was taught at that academy?

3    A.    The first section is the actual law enforcement section,

4    where you're trained in firearms, defensive tactics, and

5    basically law enforcement duties.

6              Upon completing that training, you transfer over where

7    it's just IRS agents, special agents, and you specialize in

8    conducting -- learning how to conduct criminal investigations

9    into tax violations, money laundering, Bank Secrecy Act

09:10 10   violations.

11   Q.    Very general terms, what is money laundering?

12   A.    Money laundering in the simplest terms is when someone has

13   proceeds from an illegal activity, such as drug trafficking,

14   extortion, bookmaking, and which is generally in the form of

15   cash, and when they try to take those proceeds and conduct or

16   even attempt to conduct a transaction with those proceeds using

17   a financial transaction to make it look like that money came

18   from a legitimate source, or a legal source.

19   Q.    After you graduated from Glencoe in 1995, where were you

09:11 20   assigned?

21   A.    To the Boston office of IRS Criminal Investigation.

22   Q.    And what types of cases did you begin working on?

23   A.    Criminal tax investigations, money laundering

24   investigations.

25   Q.    And over the course of your 18 years as a criminal IRS

1    agent, Special Agent Lemanski, how many separate criminal

2    investigations have you participated in?

3    A.    Participated in, approximately a hundred.

4    Q.    At some point after being assigned to Boston in 1995, did

5    you become involved in an investigation of James Bulger,

6    Stephen Flemmi, and Kevin Weeks?

7    A.    Yes.

8    Q.    When was that?

9    A.    Initially in the summer of 1995 I was assisting a senior

09:12 10   special agent who was already assigned to that investigation

11   and acting as a witness on interviews he was conducting.

12   Q.    What type of investigation was it, generally?

13   A.    A money laundering investigation.

14   Q.    And when your money laundering investigation began, what

15   was your focus?

16   A.    When I got assigned full time in October of 1995, we were

17   investigating allegations that Mr. Stephen Flemmi had purchased

18   numerous pieces of property using nominee trusts in the Boston

19   area.

09:12 20   Q.    And what was the result of that investigation into

21   Flemmi's property?

22   A.    At that time, in March of 1997, he was indicted on money

23   laundering charges relative to his purchase of those properties

24   with proceeds of his criminal activities.

25   Q.    What types of properties?

         1    A.    He was purchasing, like, brownstones and condominium units

         2    in the Boston area and surrounding areas, using --

         3    Q.    I'm sorry --

         4    A.    -- using nominee trusts.

         5    Q.    And a specific nominee trust that you recall?

         6    A.    One of the specific trusts was the Mary Irene Trust, named

         7    after his mother, Mary Irene Flemmi.  It was using those

         8    nominee trusts to make it appear that it was his parents' funds

         9    that were used to purchase this real estate.

09:13   10    Q.    And as part of that investigation did the IRS eventually

        11    seize certain assets of Stephen Flemmi's?

        12    A.    Yes, we did.

        13    Q.    What were those, generally?

        14    A.    Generally, real estate and bank accounts.

        15    Q.    Totaling how much money?

        16    A.    At the end we forfeited about $2.3 million in assets.

        17    Q.    And after that initial portion of your investigation,

        18    Special Agent Lemanski, into Stephen Flemmi, did your

        19    investigation continue?

09:13   20    A.    Yes, it did.

        21    Q.    And what, if anything -- what properties, if any, became

        22    the focus of your further investigation?

        23    A.    Two pieces of property in South Boston, 295 Old Colony

        24    Ave. and 309 Old Colony Ave., both in South Boston.

        25    Q.    Why were you focused on those?

1    A.    Those two properties were very well-known to law

2    enforcement as being associated with James Bulger, Stephen,

3    Flemmi, and Kevin Weeks, and they had similar -- when you

4    checked the real estate information, they had similar ownership

5    transactions as well.

6    Q.    Is it fair to say over the course of the past 18 years on

7    and off you've remained involved in an investigation into those

8    properties in South Boston?

9    A.    Yes.

09:14 10    Q.    And could you describe generally over those years the

11    types of work that you personally have done in that

12    investigation?

13    A.    Mainly the financial piece, which would be the subpoenaing

14    of bank and financial records, analyzing those records, doing

15    searches at the Registry of Deeds and Secretary of State's

16    office, and conducting interviews of witnesses relative to

17    those transactions.

18    Q.    In total, Special Agent Lemanski, if you had to

19    approximate, how many hours have you spent in your financial

09:14 20    investigation of those properties in South Boston?

21    A.    Thousands of hours.

22    Q.    And you mentioned you interviewed witnesses in addition to

23    reviewing documents and bank records and other financial

24    documents?

25    A.    Yes.

1    Q.   And if you had to approximate, how many hours have you

2    spent interviewing witnesses in the course of that

3    investigation?

4    A.   Hundreds of hours.

5    Q.   In advance of your testimony today, in addition to those

6    thousands of hours, Special Agent Lemanski, have you reviewed

7    and analyzed the financial records, documents, deeds, and other

8    evidence admitted in this case related to those two pieces of

9    property?

09:15 10   A.   Yes, I have.

11   Q.   And in addition to reviewing those exhibits that are in

12   evidence, have you personally listened to the testimony of some

13   of the witnesses involved in this case involving those two

14   pieces of property?

15   A.   Yes, I have.

16   Q.   And after reviewing the exhibits admitted into evidence

17   and listening to the testimony of witnesses, what, if anything,

18   did you do?

19   A.   I assisted in the preparation of three summary charts

09:15 20   summarizing the real estate and financial transactions relative

21   to the two businesses and two properties at 295 Old Colony Ave.

22   in South Boston and 309 Old Colony Ave. in South Boston.

23            MR. HAFER:  May I approach, your Honor?

24            THE COURT:  You may.

25            (Pause.)

BY MR. HAFER:

Q.    I placed three documents in front of you marked for identification as Exhibits 91, 97 A, and 97 B, Special Agent Lemanski.  Do you recognize those?

A.    Yes, I do.

Q.    What are they?

A.    These are the summary charts that I prepared.

Q.    And in general terms, with respect to each one, beginning with 91, what do they depict?

09:17 A.    Exhibit 91 is a broad summary of the financial transactions relative to the South Boston Liquor Mart and the property at 295 Old Colony Ave. as well as the business known as Rotary Variety Store and the real property at 309 Old Colony Ave.

Q.    And Exhibit 97 A?

A.    97 A is a more detailed timeline relative to the financial transactions relating to the South Boston Liquor Mart and 295 Old Colony Ave.

Q.    And 97 B.

09:17 A.    And 97 B is also a timeline summarizing the numerous transactions relative to the Rotary Variety Store and 309 Old Colony Ave.

Q.    To the best of your knowledge, do exhibits 91, 97 A, and 97 B fairly and accurately summarize voluminous records related to complex financial transactions?

```
 1   A.   Yes, they do.
 2            MR. HAFER:  At this time, your Honor, the government
 3   offers Exhibits 91, 97 A and 97 B.
 4            MR. BRENNAN:  No objection, thank you.
 5            THE COURT:  They may be admitted and published.
 6            (Exhibits 91, 97 A, 97 B received into evidence.)
 7            MR. HAFER:  With your permission, I have a blowup.
 8            THE COURT:  Yes, you may approach.
 9   BY MR. HAFER:
10   Q.   Both next to you and on the screen in front of you,
11   Special Agent Lemanski, is what's now in evidence as Exhibit
12   91.
13            Could you explain, starting at the top -- maybe we
14   could just enlarge the top portion -- what this chart reflects?
15   A.   This chart, the top of the chart relates to the business,
16   as you can see is South Boston Liquor Mart at 295 Old Colony
17   Ave.
18            As you've heard from the testimony of Kevin Weeks and
19   Stephen Flemmi, this property was both a business and the
20   property that was obtained with cash coming from the
21   organization's Ex Fund, which contained their illegal proceeds
22   from their illegal activity.
23   Q.   And that's essentially the bag here on the left is what
24   that's depicting?
25   A.   Yes.
```

1   Q.   On the four -- on the right-hand side of the chart,

2   starting at the top, there are four separate entries.  Could

3   you explain each one of those?

4   A.   Yes.  Those depict the financial transactions, the

5   proceeds coming out of those -- that entity.  There were

6   paychecks made payable to Bulger, Mr. James Bulger, Stephen

7   Flemmi, and Kevin Weeks.  You've heard testimony of Mr. O'Neil

8   and Mr. Weeks relative to once they started receiving rent

9   checks in the name of James Bulger, Mary Flemmi, and Kevin

09:20 10  Weeks, and when the business was sold, as you heard from

11  Mr. Weeks and Mr. O'Neil, Mr. James Bulger, Stephen Flemmi, and

12  Kevin Weeks split the $300,000 in proceeds.

13  Q.   Just to stop you for a second there.  So it's clear,

14  there's a business that's associated with the liquor mart, a

15  corporation --

16  A.   Yes.

17  Q.   -- right?  And then there's the real estate?

18  A.   Correct.  There's a liquor store business and the real

19  estate that it operates in.

09:20 20  Q.   And then the final entry there, "Sale of Property"?

21  A.   Yes.  As you've heard Mr. Weeks and O'Neil testify, in

22  December of 1989, Mr. Bulger gave Mr. O'Neil and Mr. McIntyre a

23  mortgage of $400,000 upon the sale of that real estate to them.

24  Q.   And then after the sale of property, $400,000, there's an

25  entry, "67 checks."  What is that?

A.    Mr. O'Neil testified upon obtaining the mortgage from
Mr. Bulger, he then, he and his partner, Gordon McIntyre, made
monthly mortgage payments in the amounts of $4,672.96 from
January of 1990 to March of 1997.

Q.    And what was the total amount of the payments that were
made with respect to that mortgage, Special Agent Lemanski?

A.    $313,088.32.

        MR. HAFER:  Could I have the bottom of the chart,
please?

Q.    Could you explain the portion of Exhibit 91 pertaining to
Rotary Variety Store, Special Agent Lemanski, starting with the
left and working your way over, what this reflects?

A.    Yes.  As with the previous business and property, there
was a business operating out of 309 Old Colony Ave. called the
Rotary Variety Store.  As you heard testimony from Mr. Weeks
and Mr. O'Neil and Mr. Flemmi, they used cash proceeds from
their illegal business to make a down payment on this property
and -- to obtain the property.

        After that property was obtained, that business was
created and Rotary Variety Store began issuing paychecks to
Mr. James Bulger and Kevin Weeks, weekly paychecks.  And at
some point that business was sold to the Cuccinatas, and the
sale of the business was $75,000, the proceeds of which were
split between Mr. James Bulger, Kevin Weeks, and Stephen
Flemmi.  And that at a point subsequent to that, a few years

1    later, the real property was sold for $375,000, and those

2    proceeds were mainly split between James Bulger, Stephen

3    Flemmi, and Kevin Weeks, with Mr. O'Neil receiving a smaller

4    portion.

5             MR. HAFER:  Your Honor, we have another chart.  May I

6    approach?

7             THE COURT:  You may.

8    BY MR. HAFER:

9    Q.   On the screen in front of you, Special Agent Lemanski, is

09:23 10   another chart, now in evidence as Exhibit 97 A.  Before we get

11   into the specifics, what generally does this depict?

12   A.   This is a more specific timeline detailing the individual

13   financial transactions relating to the business, South Boston

14   Liquor Mart, and the real property it was located in at 295 Old

15   Colony Ave.

16             MR. HAFER:  Mr. Barnico, could you enlarge the column,

17   January 1984, please?

18   Q.   Could you explain what this depicts, Special Agent

19   Lemanski?

09:24 20   A.   Yes.  This depicts the purchase of the liquor business in

21   January of 1984 from a Stephen Rakes, which is -- it was an

22   existing business that was purchased.

23   Q.   By Kevin Weeks?

24   A.   Right.

25   Q.   And there's a notation there that has some details, it

1    says, "Exhibit 687."  What does that mean?

2    A.    That there was an existing corporation and they bought the

3    stock in that corporation.

4    Q.    And that particular exhibit, 687, is in evidence in this

5    trial?

6    A.    Yes.  That's what the public record shows, yes.

7    Q.    And then lower down in the column under the heading,

8    "concealment," there are some bullet points there, could you

9    explain what those are, please?

09:25 10    A.    Yes.  Obviously, when you look at the document, Exhibit

11    687, it doesn't disclose, as you heard Mr. Weeks testify and

12    what he pled guilty to, is that this business was actually

13    extorted from Mr. Rakes.

14          MR. BRENNAN:  I object to that conclusion, your Honor.

15          THE COURT:  Sustained as to that.

16          MR. BRENNAN:  Your Honor, I move to strike the answer.

17          THE COURT:  It's struck.

18          Jurors, as you recall, whenever I strike something,

19    you're not to consider it.

09:25 20    BY MR. HAFER:

21    Q.    Under the "Concealment" heading, the second bullet point

22    says, "Bulger/Flemmi Ownership in Business."  What does that

23    reflect?

24    A.    The transfer of a bag of $100,000 in cash to Mr. Rakes by

25    Mr. Weeks and Mr. Bulger.

1  Q.   What about the other two?  The other two bullet points,

2  I'm sorry.

3  A.    To show that once the business was acquired, that James

4  Bulger, Stephen Flemmi, and Kevin Weeks were put on the books

5  as employees.

6  Q.   That's not disclosed in the documents that are publicly

7  recorded.

8  A.    That's correct.

9         MR. HAFER:  Could I have the next column, please,

09:26 10  Mr. ^ Barnico?

11  Q.   Highlighting now the May of 1984 column, Special Agent

12  Lemanski, could you explain this column, please?

13  A.    Yes.  This details the real estate transaction for when

14  the property at 295 Old Colony Ave. was purchased on paper by

15  Kevin Weeks for -- the deed at the Registry of Deeds showed it

16  was purchased for $40,000.  However, the real purchase price

17  was $55,000, and Mrs. Burns took back a $27,000 mortgage.

18  Q.   And the three exhibits, 687, 693, and 699, those are

19  exhibits that, essentially, reflect that information that are

09:27 20  in evidence in this trial?

21  A.    That's correct.

22  Q.   Under the "Concealment" portion of the chart, could you

23  explain that, please?

24  A.    As you remember the testimony of Mr. Weeks and Mr. Flemmi,

25  the -- the public record shows that the business was purchased

1    by Kevin Weeks, when, in fact, the -- the real property was

2    purchased by Kevin Weeks, but, in fact, the ownership was by

3    all three, James Bulger, Stephen Flemmi, and Kevin Weeks.  So

4    that -- Mr. Bulger's and Mr. Flemmi's ownership was not on the

5    public document.

6            MR. HAFER:  Could I have the next column, please,

7    Mr. Barnico, May of 1986?

8    Q.   Showing you the May 1986 column, Special Agent Lemanski,

9    starting at the top, could you explain those entries, please?

09:28 10   A.   The top entry is from a deed filed publicly with the

11   Registry of Deeds showing that Kevin Weeks sold a portion of

12   his interest in the property at 295 Old Colony Ave. to James

13   Bulger and Mary Flemmi for $40,000.

14   Q.   And that's reflected in Exhibit 704?

15   A.   Yes.

16   Q.   And then the entry for "Sale of Liquor Business"?

17   A.   That's, as Mr. Weeks and both Mr. O'Neil testified, in May

18   of 1986 the liquor store business was sold to Kevin O'Neil and

19   Gordon McIntyre for $300,000.

09:28 20   Q.   And under "Concealment," could you explain those bullet

21   points?

22   A.   Yes.  As you see the transaction above with the transfer

23   of the real property, that was simply a paper transaction.

24   Based on the testimony, Mr. Bulger and Mr. Flemmi already had

25   an ownership interest in that property.  So that paper

1  transaction was to now just put their interest public.

2          And the -- when the sale to the -- Mr. O'Neil and

3  Mr. McIntyre, it showed that it was just sold by Kevin Weeks to

4  them, which concealed the sale of all three owners at that

5  time, Mr. Weeks, Mr. Flemmi, and Mr. James Bulger.

6          MR. HAFER:  Mr. Barnico, could I have the next column,

7  please, December of '89?

8  Q.   Showing you now, Special Agent Lemanski, the column,

9  "December of 1989," starting with the top entry, could you

09:29 10  explain this column, please?

11  A.   Yes.  The top entry is the deed filed at the Registry of

12  Deeds showing that the property -- the real property at 295 Old

13  Colony Ave. that was transferred to -- from James Bulger, Mary

14  Flemmi, and Kevin Weeks to now just Mr. Bulger individually for

15  $40,000.

16  Q.   And that's reflected in Exhibit 702?

17  A.   That's correct.

18  Q.   And then under "Sale of Property," what's that?

19  A.   On that same day, December 8th, the next deed shows that

09:30 20  James Bulger sold that same piece of real estate to Kevin

21  O'Neil and Gordon McIntyre as trustees of the Shamrock Realty

22  Trust for $400,000.

23  Q.   And the four exhibits listed under the "Sale of Property,"

24  692, 705, 701, and 700, what do those reflect?

25  A.   Those reflect the deed for the initial $40,000 transfer,

1   then the $400,000 transfer, and the two -- the mortgage and the

2   promissory note relating to the $400,000 mortgage that

3   Mr. Bulger granted to Mr. O'Neil and Mr. McIntyre.

4   Q.   And finally, the "Concealment," could you explain that?

5   A.   Yeah, the concealment is relating to the transfer, the

6   first transfer, when Mr. Flemmi and Mr. Weeks give up their

7   ownership interest in the 295 Old Colony Ave. it says on paper

8   and the public record shows that it was for $400,000, but as

9   both Mr. Flemmi and Mr. Weeks has testified, upon giving up

09:31 10  that ownership, they each received $100,000 in cash from

11   Mr. James Bulger.

12        MR. HAFER:  Mr. Barnico, could you highlight the

13   bottom portion of the chart all the way across, please?

14   Q.   Special Agent Lemanski, there are four separate entries on

15   the bottom portion of this chart.  Starting at the top

16   left-hand side there's an entry with respect to '84 to '86.

17   Could you explain that, please?

18   A.   Yes.  The first line, the green line indicates illegal

19   cash proceeds invested in both the business, South Boston

09:32 20  Liquor Mart, and 295 Old Colony Ave.  This cash was invested in

21   the business and the real estate to maintain that business and

22   real property.

23   Q.   What is the significance of the fact that illegal cash

24   proceeds were invested in the business?

25   A.   Once illegal proceeds are put into a piece of real estate,

1    that real estate is now tainted.  So from here on in, although

2    the cash prior to that was the proceeds, now that actual real

3    estate is the proceed.  So every time you move that real

4    estate, conduct a transaction with that real estate, that's

5    considered a money laundering transaction.

6    Q.    Next line from 1984 to 1990 titled "Weekly Wages."  Could

7    you explain that, please?

8    A.    Yes.  If you recall the testimony of Mr. Weeks and

9    Mr. Flemmi, they were put on the books of this liquor business

09:32 10    to make it look like they had a legitimate source of income,

11    and the way you do that is they would receive weekly wages of

12    $500 a week, and then -- so anyone -- you know, IRS was looking

13    and saw them spending money, they would determine that a

14    portion of their wages came from -- because they made it look

15    like they were actually getting wages to conceal their illegal

16    activity.

17    Q.    There's a note there for Exhibit 670 through 686, what do

18    those reflect?

19    A.    Those were the payroll records that were introduced by

09:33 20    Mr. Weeks and Mr. O'Neil showing the forms, W-2 and the actual

21    payroll records, for those $500 weekly wages.

22    Q.    And those are weekly wages that the chart and exhibits

23    indicate were paid for six years between 1984 and 1990?

24    A.    That's correct.

25    Q.    The next entry, Special Agent Lemanski, from 1986 to 1990

1    in the center of the diagram, what is that?

2    A.    Yes.  Based on the testimony of Mr. Weeks and Mr. Flemmi,

3    if you recall when they -- they had decided that they were

4    going to sell the business, they wanted to also show additional

5    legitimate sources of income, and so they decided to, upon

6    selling the business, to rent -- they still owned the real

7    estate at that point at 295 Old Colony Ave., so they decided to

8    now charge Mr. O'Neil and Mr. McIntyre a monthly rent, and all

9    three individuals received monthly rent checks from 1986 to

09:34 10    1999, which would be an additional source to say was from a

11    legitimate source of income.

12    Q.    Again, those monthly --

13          THE COURT:  Counsel, I think the witness said 1999?

14    BY MR. HAFER:

15    Q.    1986 to 1990, Special Agent Lemanski?

16    A.    That's correct, sorry.

17    Q.    Those monthly rent records are reflected by Exhibits 695

18    and 887, is that what that indicates?

19    A.    That's correct.

09:35 20    Q.    And finally, on the far bottom right, Special Agent

21    Lemanski, what does that entry depict?

22    A.    That depicts the mortgage that was entered into between

23    Mr. O'Neil and Mr. McIntyre with Mr. Bulger, which called for

24    monthly mortgage payments starting in January of 1999 in the

25    amount of $4,672.96 each month.

1    Q.    And there's a total of how many checks reflecting those

2    payments?

3    A.    There's 67 checks made payable to James Bulger from the

4    Shamrock Realty Trust.

5    Q.    And those are reflected in Exhibits 720 through 885?

6    A.    That's correct.

7    Q.    With respect to those checks specifically, Special Agent

8    Lemanski, did you obtain any records?

9    A.    Yes.

09:35 10    Q.    What records?

11    A.    Obtained the bank records of a joint -- a bank account

12    held by Mr. James Bulger and his brother John Bulger, where

13    those monthly rent checks were deposited every month.

14    Q.    And you reviewed those records?

15    A.    I did.

16    Q.    And in very general terms, what did they reflect?

17    A.    They reflected that each of the 67 checks were deposited

18    into that bank account.

19    Q.    And you said that was a bank account, a joint bank account

09:36 20    between James Bulger and who?

21    A.    John, his brother John Bulger.

22         MR. HAFER:  Your Honor, may I approach again?

23         THE COURT:  You may.

24         (Discussion off the record.)

25    BY MR. HAFER:

1    Q.   I've placed in front of you a binder, Special Agent

2    Lemanski, and two exhibits marked 730 and 735 for

3    identification.

4         First, with respect to the binder, which contains a

5    series of exhibits between 720 and 884 already in evidence, do

6    you recognize the exhibits in the binder?

7    A.   Yes.  These are the monthly mortgage checks from Shamrock

8    Realty Trust payable to James Bulger that I received through

9    subpoenaing the bank or Shamrock Realty Trust.

09:37 10   Q.   And is that all 67 checks in the binder that are reflected

11   on the chart that's in evidence as Exhibit 97 A?

12   A.   The binder only contains 65 of the 67 checks.

13   Q.   And what are the two exhibits not in evidence yet in front

14   of you as 730 and 735?

15   A.   Exhibits 730 and 735 are two additional checks that I

16   obtained through subpoena documenting the -- 730, Exhibit 730

17   documents the October of 1990 mortgage payment from Shamrock

18   Realty Trust to Mr. James Bulger, and Exhibit 735 documents the

19   February of 1991 mortgage payment to James Bulger from Shamrock

09:38 20   Realty Trust.

21   Q.   And to the best of your knowledge, are those checks fair

22   and accurate?  Do those checks reflect records that you

23   obtained pursuant to a subpoena and you reviewed relative to

24   the mortgage that you've testified about?

25   A.   Yes, they do.

 1                THE COURT:  Your Honor, at this time the government

 2        offers Exhibit 730 and 735.

 3                MR. BRENNAN:  No objection.

 4                THE COURT:  They may be admitted, 730 and 735.

 5                (Exhibits 730, 735 received into evidence.)

 6                MR. HAFER:  Can I have Exhibit 883 on the screen,

 7        please, already in evidence?

 8                Actually, Mr. Barnico, 884 first, please.

 9        BY MR. HAFER:

09:39 10        Q.   On the screen in front you, Special Agent Lemanski, in

11        evidence already is Exhibit 884.  What is this?  Do you

12        recognize this?

13        A.   Yes, I do.

14        Q.   What is it?

15        A.   This was the first check Shamrock Realty Trust issued to

16        James Bulger in payment of the $400,000 mortgage.

17        Q.   That's a property that you testified was purchased in

18        December of 1989; is that correct?

19        A.   That is correct.

09:39 20        Q.   But the check actually reflects a date at the top of

21        January of 1989.  Can you explain that?

22        A.   Yes.  I believe Mr. McIntyre, who drafted the check,

23        because it was in early January of 1990, he accidentally put

24        '89, even though it was the beginning of 1990.

25                And you can tell from this check and the other bank

1    records I have the check was actually negotiated at the bank

2    and deposited into the bank in December -- I mean in January of

3    1990.

4    Q.   By the way, do these bank transactions you mentioned that

5    you reviewed records showing negotiated and deposited checks,

6    are those in the federal banking system, those records?

7    A.   Yes.

8    Q.   And based on your review of the records related to South

9    Boston Liquor Mart in this case, did the Liquor Mart purchase

09:40 10   goods and services in interstate commerce?

11   A.   Yes.

12   Q.   Is the deposit of a check into a bank considered a

13   financial transaction, Special Agent Lemanski?

14   A.   Yes.

15        MR. HAFER:  Now could I have 883, please?

16   Q.   Do you recognize this document in evidence as Exhibit 883?

17   A.   Yes, I do.

18   Q.   Could you explain it, please?

19   A.   This is the final check issued by Shamrock Realty Trust to

09:41 20   James Bulger in payment of the $400,000 mortgage in March -- on

21   March 13, 1997.

22   Q.   So these mortgage checks and records you reviewed went

23   from 1990 to 1997?

24   A.   That's correct.

25   Q.   And they were deposited into an account, a joint account

```
 1   that the defendant had with his brother?
 2   A.    That's correct.
 3            MR. HAFER:  Your Honor, may I approach again, please?
 4            THE COURT:  You may.
 5            Permission to publish 97 B, a chart?
 6            THE COURT:  You may.
 7            MR. HAFER:  Could I have Exhibit 97 B, Mr. Barnico?
 8   BY MR. HAFER:
 9   Q.    On the screen in front of you in evidence is Exhibit 97 B.
10            Could you explain first in very general terms what
11   this is, Special Agent Lemanski?
12   A.    Yes.  This is the timeline I assisted in preparing
13   relative to the business known as Rotary Variety Store and the
14   real estate it was located in at 309 Old Colony Ave.
15            It depicts the financial transactions relative to
16   those -- that business and that property.
17   Q.    And based on your review of records related to the Rotary
18   Variety Store, did the Rotary Variety Store purchase goods and
19   services in interstate commerce?
20   A.    Yes, it did.
21            MR. HAFER:  Mr. Barnico, could you highlight the
22   "September of 1985" column?
23   Q.    Showing you the first column of Exhibit 97 B, what is
24   this, Special Agent Lemanski?
25   A.    This documents the deed showing that the real property at
```

1    309 Old Colony Ave. was purchased by a trust of which Kevin

2    Weeks and Kevin O'Neil were the trustees of, and they purchased

3    that property from Mid-Town Construction for $210,000 in

4    September of 1985.

5    Q.    And that transaction is reflected or depicted within

6    Exhibits 691, 706 and 697; is that correct?

7    A.    Yes, in addition to the mortgage that they -- the $190,000

8    mortgage as well.

9    Q.    Under the "Concealment" entry, it says "Bulger, Flemmi

09:44 10   ownership in property."  That does that mean?

11   A.    This piece of property was purchased by using a nominee

12   realty trust.  As Mr. Bulger and Mr. Flemmi and Mr. O'Neil --

13   I'm sorry, Mr. Weeks, Mr. Flemmi, and Mr. O'Neil testified,

14   that in addition to them, that was also owned by Stephen Flemmi

15   and James Bulger, and the public record does not disclose their

16   ownership interest in that property.

17        MR. HAFER:  Could I have the next column, please,

18   Mr. Barnico?

19   Q.    What does this "September 1986" column reflect?

09:44 20   A.    This shows that the business, Rotary Variety Store Company

21   Incorporated, was incorporated with the Massachusetts Secretary

22   of State's office, and the sole officers were listed as Kevin

23   Weeks.

24   Q.    And not James Bulger or Stephen Flemmi?

25   A.    That's correct.

1          MR. HAFER:  Could I have the next column, please,

2   Mr. Barnico, "November of 1989"?

3   A.   This shows the sale of the Rotary Variety Store business,

4   just the business, not the real property.  It was sold in

5   November of 1989 for $75,000, and the proceeds were split

6   between Mr. James Bulger, Stephen Flemmi, and Kevin Weeks.

7          MR. HAFER:  Could I have the final column, please,

8   "March of 1994."

9   Q.   What does this depict?

09:45 10   A.   The actual sale of the real property located at 309 Old

11   Colony Ave.  It shows that the trust, the nominee trust of

12   which Kevin Weeks and Kevin O'Neil were the trustees of, sold

13   the real property for $375,000.

14          MR. HAFER:  Would you go back, Mr. Barnico, to the

15   first column, "September of 1985"?

16   Q.   At the bottom of this column, there's an entry, "Proceeds

17   in," Special Agent Lemanski.  Could you please explain what

18   that reflects?

19   A.   Yes.  That's based on the testimony of Mr. Weeks and

09:46 20   Mr. Flemmi, funds from their illegal activities were used as

21   the down payment on this piece of real estate.

22          MR. HAFER:  Could you highlight, please, the very

23   bottom entry there, Mr. Barnico?

24   Q.   What is that, Special Agent Lemanski?

25   A.   This depicts the weekly wages paid to James Bulger and

1      Kevin weeks after the Rotary Variety Store business was

2      incorporated.

3            Mr. Bulger, Mr. Weeks, starting in 1986 through 1989

4      received weekly wages from this business.

5      Q.    You mentioned earlier that $20,000 in proceeds was used to

6      acquire this business.  What is the significance of that?

7      A.    Once again, once criminal proceeds are used to purchase an

8      asset, it taints the asset and it now -- the asset itself is

9      proceeds.

09:47 10   Q.    During the 18 years that you've been involved in this

11     money laundering investigation, Special Agent Lemanski, have

12     you ever obtained any records reflecting legitimate employment

13     by the defendant, James Bulger?

14     A.    No, I have not.

15            MR. HAFER:  Your Honor, could I have just a moment?

16            THE COURT:  You may.

17            (Discussion off the record.)

18     BY MR. HAFER:

19     Q.    Special Agent Lemanski, you testified that based upon your

09:48 20   investigation, your personal participation in this

21     investigation, that South Boston Liquor Mart purchased goods

22     and services in interstate commerce; is that correct?

23     A.    That's correct.

24     Q.    And what was the basis of that conclusion?  Did you review

25     records that reflected that?

1    A.    Yes.

2    Q.    What were those records?

3    A.    For the South Boston Liquor Mart, that business purchased

4    liquor from suppliers outside of Massachusetts and other goods,

5    as well.

6    Q.    And what about with respect to the Rotary Variety?

7    A.    Same thing, goods purchased outside of Massachusetts.

8          MR. HAFER:  Thank you very much.

9          THE COURT:  Any cross-examination, Mr. Brennan?

10                     CROSS-EXAMINATION

11   BY MR. BRENNAN:

12   Q.    Good morning, Special Agent Lemanski.

13   A.    Good morning, Mr. Brennan.

14   Q.    I had not met you before this case?

15   A.    No, we had not.

16   Q.    And you have sat in the seat next to the podium for the

17   entire case?

18   A.    Yes, I have.

19   Q.    With the government?

09:49 20  A.    Yes.

21   Q.    On a couple of occasions during in this case, I think you

22   noticed that I misplaced documents and you were kind enough to

23   reach over and hand me some documents?

24   A.    Yes.

25   Q.    I want to thank you for that.

```
 1   A.   You're welcome.
 2   Q.   So I'll try to be as nice as I know how to be.
 3         You mentioned that during your investigation you
 4   became involved in looking at a number of incidents of
 5   potential money laundering.
 6   A.   That's correct.
 7   Q.   You looked through hundreds, if not dozens, of records.
 8   A.   Probably like thousands, yes.
 9   Q.   And you looked at much of the evidence that the government
10   had produced as far as discovery.
11   A.   Yes.
12   Q.   You mentioned that you listened to a number of witnesses
13   testify in this case.
14   A.   Yes.
15   Q.   And when listening to that, you had the benefit of having
16   quite a bit of training and experience in money laundering,
17   didn't you?
18   A.   Yes.
19   Q.   When you hear that someone has taken $5,000 of money
20   that's money not accounted for, not legal money, and put it
21   into a bank account, is that one form of money laundering?
22   A.   Yes.
23   Q.   And so if they ask somebody to open a bank account just
24   for the purpose of concealing that $5,000, as an investigator,
25   would that be an indicator to you that the person who had the
```

09:50 (line 10)
09:50 (line 20)

1  $5,000 and the other person who opened the account may be

2  involved in money laundering to hide that money?

3  A.   I think I lost you.  I'm sorry.

4  Q.   If a person, for example, said they were trying to hide

5  $5,000 so they asked perhaps their girlfriend or wife to open

6  up a bank account just to move that money into that account,

7  would those two people, both the person who had the money and

8  the person who opened the account for them, people you'd to be

9  interested in investigating to see if they were both laundering

09:51 10  the money?

11  A.   Yes.

12  Q.   When you consider money laundering, you look at certain

13  real estate and properties to see if there's a title or a

14  history or a record of legal proceeds that help fund or buy

15  those properties, don't you?

16  A.   Legal or --

17  Q.   Yes, legal.

18  A.   Or illegal, yes.

19  Q.   When you saw the exhibits being shown yesterday, for

09:51 20  example, Attachment C of Mr. Flemmi's plea agreement, you

21  noticed, didn't you, there were a number of properties that at

22  some point were given back to Mr. Flemmi?

23  A.   Yes.

24  Q.   Were you ever asked to look into whether or not the money

25  that was used to purchase those properties was money that was

1  illegal money?

2  A.   Those were a part of my 1997 money laundering

3  investigation, those properties.

4  Q.   The properties in Attachment C that were given back to

5  Mr. Flemmi, did you determine that those properties were

6  properties that were gained as a result of illegal proceeds

7  and, thus, money laundering?

8  A.   Some of them, yes.

9  Q.   When a property is obtained as a result of money

09:52 10  laundering, the government has an opportunity to try to seize

11  those properties; is that fair to say?

12  A.   Yes.

13  Q.   And by seizing them, they put a lis pendens or a technical

14  writ or something on the property so they can attach the

15  property?

16  A.   Yes.

17  Q.   If it's determined that those properties are, in fact, the

18  result of money laundering, does the government get to keep

19  those properties, if they choose?

09:52 20  A.   They have to -- the court has to -- we have to produce the

21  evidence to the court, and the court decides if we can keep

22  those assets.

23  Q.   And you go through that process before, or you've gone

24  through that process before, haven't you?

25  A.   Yes.

1    Q.    And if you're successful showing the court that the money

2    to purchase those properties was illegal money and, thus, money

3    laundering, is it fair to say that the properties are then

4    returned to the government?

5    A.    The ownership transfers to the government.

6    Q.    And inevitably, the value of the properties goes to the

7    people of the United States, doesn't it?

8    A.    Yes.

9    Q.    When you look at different real estate transactions to see

09:53 10    whether or not they were purchased with illegal money and,

11    thus, money laundering, you make a determination whether the

12    person who owns them had legitimate resources to purchase the

13    property, don't you?

14    A.    Yes.

15    Q.    And in the case of those different properties on

16    Attachment C that were given back to Mr. Flemmi, did you

17    determine whether or not Mr. Flemmi had any legal income to

18    support the purchase of any of those properties?

19    A.    I think only -- there's one property that I wasn't able to

09:53 20    trace the proceeds to, so I'm not -- I can't tell if that was

21    purchased with illegal proceeds.

22    Q.    So one of those properties out of the seven you were

23    inconclusive about, correct?

24    A.    Correct.

25    Q.    And the other six came from money laundering?

A.    Yes.

Q.    If somebody were to put a house or a home or a mortgage in their name but it was actually a house intended for a different person, is that one way in which somebody might commit money laundering?

A.    Conceal -- yeah, concealing the ownership if it was purchased with illegal proceeds.

Q.    For example, you heard Mr. Raso testify that he had purchased a house in his name for the benefit of John Martorano.  Do you remember that testimony?

A.    Yes.

Q.    Would that be an indicator, as an investigator, that this may be a process in which money laundering was involved in?

A.    It's one step in the chain.

Q.    Did you look into that home of John Martorano based on your knowledge and experience and see whether or not that was an example of money laundering?

A.    I did not.

Q.    Did anybody ask you to look into Mr. Martorano's Massachusetts home to see whether or not it should be seized and given back to the people of the United States?

A.    No one asked me, no.

Q.    There's a term called "offshore banking."  I'm sure you've heard of that term in your experience?

A.    Yes.

1    Q.    And offshore banking is when people who have illegal money

2    will place it somewhere outside the country?

3    A.    Not necessarily illegal money.

4    Q.    Can they do that with illegal money?

5    A.    Yes.

6    Q.    Is it common that people who are trying to hide illegal

7    money will use offshore banking?

8    A.    Illegal and legal money.

9    Q.    Is it often that people who would try to move illegal

09:55 10    money, would they use offshore banking?

11    A.    People use offshore banking to move illegal and legal

12    money.

13    Q.    Is Switzerland a place where people oftentimes hide

14    illegal money?

15    A.    It was.  It was, not anymore.

16    Q.    It became too popular or too well-known?

17    A.    I think there's been some IRS litigation that has

18    prevented that advantage.

19    Q.    When did that litigation come into effect popularly?

09:56 20    A.    Probably in the last five years.

21    Q.    So back in the 1980s, early 1990s, it was a lot more

22    common to hide illegal money in a place like Switzerland than

23    it is now.

24    A.    Yes.

25    Q.    When you considered looking at this discovery, did you pay

1    any attention to the home that Mr. Martorano had in Florida

2    before his arrest that he co- and jointly owned with

3    Mr. Jenkins?

4    A.    I wasn't asked to look at that, no.

5    Q.    Did you know that half the value of that property,

6    $200,000, was given back to Mr. Martorano?

7    A.    I don't know that.

8    Q.    Did you remember hearing that in testimony by any chance?

9    A.    No.  Sorry.

09:56 10   Q.    Did you -- were you asked to look and see whether or not

11   Mr. Martorano had any legitimate source of income for any

12   property that was given back to him in Florida?

13   A.    I'm sorry, can you repeat the beginning of the question?

14   Q.    Were you asked to look into whether or not Mr. Martorano

15   had any legitimate source of income to support property he

16   owned prior to his arrest?

17   A.    I was not.

18   Q.    Let me ask you one more series of questions, Special Agent

19   Lemanski.

09:57 20        In your experience, have you learned that casinos are

21   one of the most popular locations for criminals to launder

22   money?

23   A.    Most popular?  I'm not --

24   Q.    One of the most popular?

25   A.    Recently, yes.

1    Q.    Because casinos are a way that somebody can go in and buy

2    chips and where the wins and losses are not accounted for on a

3    bet-by-bet basis, the return of chips provides the opportunity

4    for somebody who is trying to wash money, to move money without

5    having a true accounting; isn't that fair to say?

6            MR. HAFER:  Objecting, your Honor.

7            THE COURT:  Sustained as to compound.  Counsel, if you

8    want to try another question.

9            MR. BRENNAN:  Sure.

09:58 10   BY MR. BRENNAN:

11    Q.    Are casinos particularly attractive from your training and

12    experience for criminals to wash money, so to speak; isn't that

13    true?

14    A.    It's one of the ways.

15    Q.    And the reason why it's one of the ways is because there

16    is a difficult ability for the government or for the casinos to

17    account for wins and losses on a bet-by-bet basis; isn't that

18    fair to say?

19    A.    There is some accounting.  I mean, we obtain records from

09:58 20   the casinos that do show cash purchased and wins out.

21    Q.    So what a person can do is they can buy chips and then go

22    to different games or tables within a casino, correct?

23    A.    That's my understanding.

24    Q.    And when they return their chips, they only report what

25    they won and lost; isn't that fair to say?

1              MR. HAFER:  Objection, your Honor, form.

2              THE COURT:  No, overruled.

3    BY MR. BRENNAN:

4    Q.   When they go to return their chips, they simply have to

5    report what they won and lost; isn't that fair to say?

6    A.   That's not my understanding.

7    Q.   Well, if somebody was to say they shared in 10 percent

8    winnings and 10 percent losses with a dice player, do you know

9    of any accurate way to account for that person's movement of

09:59 10   money within the casino, Special Agent Lemanski?

11   A.   Can you repeat that question?  I'm sorry.

12   Q.   Sure.  If somebody was to say that they frequented casinos

13   and they shared in 10 percent wins and losses with a partner of

14   theirs at the casino in gambling, such as dice playing, would

15   there be any way for you to account for those wins and losses

16   if you were to investigate them?

17   A.   The casino would keep account of when the cash was paid

18   out.

19   Q.   Would it account for the 10 percent winning and loss of

09:59 20   somebody's partner unless that person reported it themselves?

21   A.   It's the person that goes to the window at the end when

22   they're cashing in the chips.

23   Q.   So if there were a group of people, two or more, the

24   person who would have the accounting is the person that went to

25   the window?

1    A.    That's correct.

2    Q.    The person who didn't go to the window, behind the scenes,

3    so to speak, there wouldn't be an accounting for that person,

4    would there?

5    A.    That's correct.

6          MR. BRENNAN:  Thank you very much.

7          THE COURT:  Any redirect?

8          MR. HAFER:  Very brief, your Honor, thank you.

9                    REDIRECT EXAMINATION

10:00 10   BY MR. HAFER:

11   Q.    Special Agent Lemanski, Mr. Brennan asked you some

12   questions about dice and casinos and Switzerland.  Do you

13   recall those questions?

14   A.    Yes.

15   Q.    Did he ask you any questions about South Boston Liquor

16   Mart?

17         MR. BRENNAN:  Objection.

18         THE COURT:  Sustained.

19   BY MR. HAFER:

10:00 20   Q.    Mr. Brennan asked you some questions about Attachment C to

21   Exhibit 1172, Stephen Flemmi's plea agreement, and some assets

22   that were attached to that.  Do you recall that?

23   A.    I do.

24   Q.    That was the plea agreement Mr. Flemmi entered in 2001?

25   A.    That's correct.

1   Q.   It's got nothing to do with this 2003 plea agreement?

2        MR. BRENNAN:  Objection.

3        THE COURT:  Well, sustained.

4   BY MR. HAFER:

5   Q.   Are you aware whether the plea agreement, 1172 and

6   Attachment C, reflects the final cooperation plea agreement

7   that Stephen Flemmi entered into with the government -- 2001 --

8   withdrawn.

9        Are you aware, Special Agent Lemanski, whether the

10:01 10 Attachment C to Exhibit 1172 reflects Stephen Flemmi's final

11  plea agreement with the government?

12  A.   What's the date?  I'm sorry.  Do you know the date?

13  Q.   2001 is the agreement that Mr. Brennan asked you questions

14  about with respect to certain assets and Attachment C.

15  A.   Yes.

16  Q.   Is that Stephen Flemmi's cooperation plea agreement?

17  A.   No, that is when he pled guilty to the money laundering

18  charges related to the indictment of March of 1997.

19  Q.   And finally, Special Agent Lemanski, Mr. Brennan asked you

10:01 20 some questions about a home owned by John Martorano in Florida

21  and cash and accounts in Switzerland.  Do you recall those

22  questions?

23  A.   I do.

24  Q.   Are you aware, Special Agent Lemanski, that those

25  transactions predated the federal money laundering statute in

1    1986?

2    A.    I believe -- I'm actually not sure when those properties

3    were purchased.  I apologize.

4    Q.    Do you know when the federal money laundering statute was

5    enacted?

6    A.    Yes, in 1986.

7              MR. HAFER:  Nothing further, your Honor.

8              THE COURT:  Any recross?

9              MR. BRENNAN:  Please.

10                        RECROSS-EXAMINATION

11   BY MR. BRENNAN:

12   Q.    Hello, again.

13   A.    Hello.

14   Q.    You saw yesterday there was a 2001 plea agreement with

15   Stephen Flemmi?

16   A.    Yes.

17   Q.    And then you saw there was subsequently the 2003 plea

18   agreement with Stephen Flemmi at his time of cooperation?

19   A.    Yes.

10:02 20  Q.    And do you recall in that 2003 plea agreement with Stephen

21   Flemmi there was a provision in that plea agreement that we

22   showed to the jury that included consideration of Attachment C,

23   which was those properties?

24              MR. HAFER:  Objection, your Honor.

25              THE COURT:  Overruled.

1    A.   My understanding is based out of our money laundering

2    investigation in --

3    Q.   Let me stop you there, Special Agent Lemanski.

4         MR. HAFER:  She's trying to answer the question, your

5    Honor, I object.

6         THE COURT:  Counsel, let me hear the question again.

7    BY MR. BRENNAN:

8    Q.   Did you notice when we showed the 2003 cooperation

9    agreement with Stephen Flemmi that Attachment C was part of

10:03 10   that agreement in a provision that we showed for the jury?  Do

11   you remember seeing that?

12   A.   There's an attachment to that, yes.

13        MR. BRENNAN:  Thank you.

14        THE COURT:  Thank you, Agent, you're excused.

15        Counsel?

16        MR. HAFER:  Yes, your Honor.  The United States calls

17   Scott Garriola.

18        THE COURT:  He may be called.

19        SCOTT GARRIOLA, having been duly sworn by the Clerk,

10:04 20   was examined and testified as follows:

21        THE CLERK:  Thank you.  Please be seated.

22        THE COURT:  Good morning, sir.

23        THE WITNESS:  Good morning.

24        MR. HAFER:  May I proceed, your Honor?

25        THE COURT:  You may.

<pre>
 1                    DIRECT EXAMINATION

 2   BY MR. HAFER:

 3   Q.   Good morning.

 4   A.   Good morning.

 5   Q.   Could you state your name, please, spell your last name

 6   for the record?

 7   A.   Scott Garriola, G-a-r-r-i-o-l-a.

 8   Q.   How are you currently employed?

 9   A.   I'm a special agent with the FBI in Los Angeles.

10:04 10   Q.   How long have you been a special agent with the FBI in Los

11   Angeles?

12   A.   Twenty-five years.

13   Q.   Are you currently assigned, Special Agent Garriola, to a

14   particular unit or squad or division of the FBI in Los Angeles?

15   A.    It's called a Fugitive Task Force with the FBI and Los

16   Angeles Police Department.

17   Q.   How long have you been with the FBI/Los Angeles Police

18   Department Fugitive Task Force?

19   A.   Over 16 years.

10:04 20   Q.   Prior to those 16 years, how were you employed within the

21   FBI?

22   A.   Oh, I worked in Los Angeles -- I arrived in Los Angeles in

23   1991, I started working on organized crime matters, before that

24   I was assigned to the New Orleans division of the FBI.

25   Q.   Could you describe in general terms what the Fugitive Task
</pre>

1    Force does?

2    A.    Since we have a task force with the Los Angeles Police

3    Department, a lot of our cases are generated from Los Angeles

4    Police homicide matters, and we go after someone who has a

5    warrant and is fleeing from the law, particularly a homicide

6    suspect.

7              In addition, we handle incoming leads from other FBI

8    field offices in the United States and abroad.

9    Q.    In connection with your employment on the Fugitive Task

10:05 10    Force, have you undergone various types of training?

11    A.    The most -- the typical training we go through is street

12    survival training, where we practice arresting people,

13    handcuffing techniques, entry into buildings, entry into rooms,

14    vehicle stops, things of that nature.  That's the bulk of the

15    training I received.

16    Q.    Again, in general terms, when the Fugitive Task Force is

17    looking for somebody, Special Agent Garriola, what types of

18    techniques do you use to try to find them?

19    A.    There's a wide variety of them, some I don't want to

10:06 20    disclose, but we track vehicles, we do stuff with telephones,

21    surveillance, surveillance is a big part of what we do, talk to

22    neighbors, interview, develop informants, things like that.

23    Q.    The 16 years you've been with the Fugitive Task Force of

24    FBI in Los Angeles, approximately how many fugitive

25    apprehensions have you participated in?

A.    I would approximate probably a thousand that I've been

responsible for putting handcuffs on or had arrests in other

jurisdictions.

Q.    Are those all in Los Angeles?

A.    Vast majority in Los Angeles, but I've had people arrested

all over the would.

Q.    I want to direct your attention to June 22nd of 2011.

Were you working that day?

A.    Actually, no, I was on vacation that week.

Q.    Did something happen to change your work status?

A.    Yeah, I received an e-mail from an agent that I know in

Boston division, told me he needed someone in Los Angeles to

cover a lead on a Top Ten fugitive.  I replied to the e-mail,

just have the agent give me a call.

Q.    So what did you do next?

A.    Well, I spoke to Agent Richard Teahan of the Boston

office, and he explained to me that a tip had come had in on

the Boston tip line with the name and an address of someone

that they believed to be was "Whitey" Bulger and Catherine

Greig.

Q.    So what did you do after receiving that information?

A.    Well, first thing I did was I had to get a baby-sitter,

had to call my task force members.  So I sent out an e-mail to

my task force members to meet me down -- we had an address in

Santa Monica on Third Street, and we had a name of Charles

1    Gasko and Carol Gasko.

2         I had my officers meet me down in Santa Monica, and

3    while I was en route in Santa Monica, I contacted several of my

4    sources in the utility companies and social welfare sources and

5    things of that nature trying to develop information on these

6    two names and the address that I had.

7    Q.   What did you say the two names were?

8    A.   Charles and Carol Gasko.

9    Q.   What was the address?

10:08 10   A.   1012 Third Street, Apartment Number 303 in Santa Monica,

11   California.

12   Q.   You mentioned you were trying to track down information on

13   a Charles and Carol Gasko.  What types of information?

14   A.   Utility information, the utility holder, electric, gas on

15   the people that were living in that apartment; welfare

16   recipient; Social Security; things of that nature.

17   Q.   Did you find anything?

18   A.   Very, very limited information.  Nothing that could

19   corroborate the information that I had in the tip.

10:09 20   Q.   So what did you do next?

21   A.   Well, we arrived in Santa Monica, it was early afternoon.

22   We briefed over the air and we set up a surveillance on the

23   place.  I spoke, again, to Rich Teahan of the Boston office and

24   I asked if I could be put in touch with the person that called

25   in the tip.  I wanted to speak firsthand with the person.

1    Q.    Did you speak to the tipster?

2    A.    I did.

3    Q.    Did you, in fact, go to 1012 -- did you go to the

4    location?

5    A.    Yeah, we went to the address.  We set up a surveillance on

6    all the exterior doors.  I sent one of my task force officers

7    in to try and get -- figure out where inside the building

8    apartment number 303 was so we could watch the windows and see

9    if we could notice any activity inside.

10:10 10   Q.    What time of day was it when you went there on June 22,

11   2011?

12   A.    This must have been around 1:00 to 2:00.

13         MR. HAFER:  May I approach, your Honor?

14         THE COURT:  You may.

15   BY MR. HAFER:

16   Q.    Special Agent Garriola, I placed in front you a binder

17   with a number of exhibits that are marked for identification,

18   which I'll read now for the benefit of the Court.

19         While I'm doing that, if you could flip through the

10:10 20   binder, and when we're done, I'll ask if you recognize what's

21   in there.

22         For the benefit of the record the binder contains

23   Exhibits 1133, 1051, 1055, 1129, 1058, 1138, 1131, 1052, 1113,

24   1112, 1111, 1110, 1132, 1137, 1053, 1056, 1054; and then every

25   exhibit in the range between 1072 and 1101; finally, 1102 and

1    1104.

2              Have you had a chance to review those photographs?

3    A.    I have.

4    Q.    Do you recognize them?

5    A.    I do.

6    Q.    And in very general terms, what are they?

7    A.    They're pictures of the items, the weapons and the cash,

8    that we seized from Mr. Bulger's apartment that day.  There's

9    photographs of the interior of the apartment, exterior, and

10:12 10   also a hand-drawn schematic of the inside of the apartment.

11   Q.    To the best of your knowledge, do those exhibits fairly

12   and accurately depict the scene and items recovered from the

13   scene on June 22, 2011 by you?

14   A.    Yes, they do.

15             MR. HAFER:  At this time, your Honor, the government

16   offers the exhibits that have been read to the Court.

17             THE COURT:  Any objection?

18             MR. CARNEY:  No, your Honor, thank you.

19             THE COURT:  They may be admitted and published.

10:12 20             (Exhibits 1133, 1051, 1055, 1129, 1058, 1138, 1131,

21   1052, 1113, 1112, 1111, 1110, 1132, 1137, 1053, 1056, 1054;

22   1072 to 1101; 1102, 1104 received into evidence.)

23             THE COURT:  Counsel, can I just ask you to take the

24   chalk down from the last witness?

25             MR. CARNEY:  Your Honor, I don't mind doing it.

1    THE COURT:  Okay, thank you.

2    BY MR. HAFER:

3    Q.   Showing you in evidence now as Exhibit 1133, Special Agent

4    Garriola, what is this?

5    A.   This is a photograph of the exterior of the apartment

6    located at 1012 Third Street in Santa Monica.

7    Q.   And on this particular photograph, can you see the windows

8    associated with Apartment 303?

9    A.   Yes.

10:13 10    Q.   Could you actually using your screen which is like a

11    telestrator, could you circle that on your screen?

12    A.   (Indicating.)

13    Q.   So after you arrived there on the afternoon of June 22,

14    2011, what did you do next?  Did you make any attempts to speak

15    to anyone?

16    A.   I did.  After I spoke with the tipster, and we had the

17    surveillance initiated, I decided that I was going to try and

18    speak to the property manager of the building.

19    Q.   Did you speak to the property manager?

10:13 20    A.   I did.  I came to find out that the management of the

21    building was located across the street on the east side of

22    Third Street in a sort of a hotel, it's a weekly/daily hotel.

23    So I went in and tried to speak with the manager that covered

24    both buildings.

25    The manager was not present at that time.

1    Q.   Were you eventually able to speak with the manager?

2    A.   I did.

3         The manager was off.  I asked the assistant manager to

4    call the manager.  I spoke with the manager on the phone.  He

5    didn't want to come over right away, and I told him it was

6    important, that he needed to come over, so he met me in the

7    management office of the building across the street.

8    Q.   And when you first met with the manager that day, Special

9    Agent Garriola, did you show him anything?

10:14 10   A.   I did.  I showed him a couple of photographs, one of the

11   defendant and one of Catherine Greig.

12   Q.   Did you observe his reaction when you showed him the

13   photographs?

14   A.   I did.

15   Q.   What was it?

16   A.   It was like this.  (Indicating.)

17        He buried his head in his hands and he started shaking

18   his head.  He immediately said, Those are my neighbors.

19   Q.   So what did you do next?

10:15 20   A.   Well, I asked him, you know, where he lived in the

21   building, and it turned out he lives in the apartment right

22   next door, and I asked him if there was any -- any

23   documentation in the file about them living there, agreement,

24   rent agreement or something like that.

25        He was a little reluctant, a little hesitant about

1    cooperating, nervous.  So he wanted to go downstairs in the

2    basement and talk.  I called for another member of the task

3    force to come in, we went down to the basement, and he

4    proceeded to tell me that he knew a hundred percent that these

5    were his neighbors.  There was some discussion of how he knew,

6    why he was so certain, and he said he had lived there next door

7    for five years.  He recognized the Boston accent, even though

8    he was told by Mr. Bulger that they were from Chicago and New

9    York.

10:16 10    Q.   And you're in the basement at this point?

11    A.   We're in the basement of the building across the street.

12         So I asked him to draw me a little diagram of the

13    layout of the apartment, and we went back upstairs and I asked

14    for information from the file.  There was not much in the file.

15    This was a rent-controlled apartment, and there was -- there

16    was not even an application in there for rental, and they had

17    been there -- no one knew how long they had been there.

18         So we asked for an observation post in the building

19    across the street so we could get a better look into the

10:16 20    apartment.  So there was a vacant room in the hotel on the

21    third floor, and I put one of my task force officers up in that

22    apartment -- up in that hotel room to observe the balcony and

23    the windows of Apartment 303.

24    Q.   And that's to observe the balcony and windows that are

25    circled still on the exhibit in evidence on the screen in front

1   of you?

2   A.    Correct.

3   Q.    Okay.

4         So what did you do next?

5   A.    I asked the manager to walk me over to the building so I

6   could get a look myself at the layout and see if I could

7   hear -- hear any noise or anything.  He had told me that he

8   hadn't seen Mr. Bulger in a couple of weeks, and he thought he

9   may be ill.  So at this time we had observed what we thought

10:17 10  was a female coming out to the balcony.  So we figured at least

11  one person was in there.

12        So the manager was very hesitant about going over

13  there.  I had to go around the back because he advised me that

14  Mr. Bulger would frequently stand on the balcony with

15  binoculars and observe the people passing and the traffic, and

16  he said they probably saw me come into the building.  Well, I

17  wasn't dressed like this.  I said there was no need to worry,

18  that we could go back across.

19        I went around the back anyway to make him feel better,

10:18 20  he met me upstairs in his apartment.

21        Prior to that, I was asking him for his opinion on

22  ways that we could determine whether or not Mr. Bulger was

23  there that day.  So I went through all my tricks that I would

24  normally use.  Well, we'd shut off the power, knock on the

25  door, say there was a leak downstairs in the apartment, things

1    like that, to try and figure out if there was more than one

2    person inside.  Every time I came up with a suggestion, the

3    manager didn't think that would work.  He didn't think they

4    would fall for anything.

5        So, I met the manager in the back of the apartment

6    building, and we entered through the -- there's a garage, a

7    subterranean garage, and as we're walking through the garage, I

8    noticed there was some storage lockers above the carports that

9    are associated with the apartments.

10:19 10       So I asked if the Gaskos had a locker.  He said, Yes,

11   this one over here.  And I said, What if we told them that

12   someone had broken into his locker and you were going to call

13   the police department and that they needed to come down to see

14   if anything was missing before you called the police.  I

15   figured if he was a fugitive, he wouldn't want the police

16   coming to his door.  So the manager thought that was a good

17   idea, that would work.

18       So, we went up to his apartment, and I couldn't hear

19   anything, I tried to look through the peephole, I tried to put

10:19 20   my ear to the door of Apartment 303, I couldn't hear anything

21   inside, listened by the window.

22   Q.   You said Apartment 303?

23   A.   303.  Couldn't hear anything.

24       At that point, I told the manager what we were going

25   to do is I'm going to cut the lock off the storage locker and

that for him to go back to the office and that when the storage

locker was cut and we were set up with an arrest scenario to

try and lure him out, I would call him and have him make the

call.

MR. HAFER:  Mr. Barnico, could I have on the screen

Exhibit 1051?

Q.    Special Agent Garriola, do you recognize Exhibit 1051 on

the screen in front of you?

A.    Yes, that's the door to Apartment 303.

Q.    The one you just testified that you listened --

A.    Yes.

Q.    So, after listening and going back downstairs, what did

you do next?

A.    I went to -- I brought my vehicle around the back, I went

out to my car, I grabbed my bolt cutters, I went downstairs, I

cut the lock to storage unit number 303.

Q.    Go ahead.

A.    I called to my office, and I asked for a couple more units

or agents to come out, because the plan was to put myself and

my -- at that point, three L.A.P.D. officers in the garage, and

I needed surveillance around the outside of the building in the

event someone came out before we could put our plan into

action.

Q.    What did you do next?  Did you attempt at that time to

contact Mr. Bulger?

A.   We did.  Once the surveillance was set up, put our
vehicles in the garage, I called over to the manager, who was
then back at the hotel, and asked him to make a call into the
apartment -- he had a telephone for them -- make a call into
the apartment and tell them the plan.

Q.   What happened after that call was made?

A.   The manager called me back and said he left him a message,
that they didn't answer the phone.  He wanted to know what he
should do next, he was kind of nervous.  I told him to relax,
let's give it some time, and then we'll come up with another
plan if we had to.

Q.   While you were waiting, what happened?

A.   While we were waiting, trying to figure out what to do
next, probably five or six minutes, he calls -- the manager
calls me back and tells me that -- I believe it was Catherine
had just called him back and that she was sending "Whitey" down
to the garage.

        Hung up the phone and we could hear the elevator
coming down the shaft in the garage, and I noticed Mr. Bulger
exit the elevator room and walk over towards the storage
locker.

Q.   What was his physical appearance when you observed him?

A.   Well, he had a white summer-style -- like a fedora but not
a fedora, white hat on, dressed pretty much in light, soft
colors, he had a beard, like that.

Q.   What happened once you observed him exit the elevator,
Special Agent Garriola?
A.   The four of us exited the car, we went over to him, told
him to get his hands up, and --
Q.   What did he say?
A.   We asked him to get down on his knees on the ground,
and -- I mean, he swore at us a few times, told us he wasn't
going to get down on his knees, there was grease on the floor,
things like that.  There was an exchange back and forth, harsh
words back and forth.
Q.   Then what happened?
A.   He finally got on the ground, we handcuffed him, and I
asked him for his name.
Q.   What did he say when you asked him for his name?
A.   He said his name was Charles Gasko.
Q.   What did you do next?
A.   I asked if he had any ID.  He asked me to identify myself,
and I identified myself to him, and I asked him if he was
"Whitey" Bulger, and --
Q.   What did he say?
A.   At first he wouldn't admit it.  I told him then we'd have
to go upstairs and see if there was any ID in your apartment,
maybe Catherine can identify you.  He says, You know who I am.
He says, I'm "Whitey" Bulger.
Q.   What did you do next?

A.   Well, we called in -- at that point, I asked him, you
know, if Catherine was upstairs, and he said, Yes.  And I asked
him if there was any weapons upstairs.  And he said, yeah,
there was plenty of weapons, and they were all loaded.

        Then I told him, Well, does that mean I have to get a
SWAT team to get Catherine out of the apartment?  That's kind
of when his whole tone and demeanor changed.  He said, No, I
can get her out, just give me the phone, and I'll call her,
she'll come down.

Q.   Did you give him a phone?

A.   No.  I told him we were not going to do that.  I said I'd
grab the keys, I'd go up and get her.  He told me there was no
need to worry, she had never held a gun in her hand, all the
guns were in his bedroom and she had never been allowed in his
bedroom.

        So I grabbed a female agent and a couple of officers
and we went upstairs and knocked on the door.

Q.   And that's the door on the screen in front of you?

A.   Knocked on Apartment 303, and covered the peephole and
identified myself as the police.  I told her we had a storage
locker downstairs that was broken into.  She opened the door,
and we took her into custody.  She identified herself as
Catherine Greig.

Q.   Did you ask her anything after she identified herself
regarding the apartment?

1    A.   Well, the first thing we did is we had to do a safety

2    sweep of the apartment, make sure there was no one else in

3    there.

4         I had previously asked Mr. Bulger if there were any

5    booby traps or anything in there, so I felt confident that we

6    had nothing to worry about.

7         We went and we did a safety sweep of the apartment to

8    make sure -- and there was no one else in there.

9    Q.   Did you observe anything in your safety sweep?

10:25 10   A.   I saw a semiautomatic pistol on the bookshelf on a paper

11   towel in his bedroom, what I come later to find out was his

12   bedroom, in plain view.

13   Q.   And so after observing that and after doing the safety

14   sweep, what did you do next?

15   A.   I asked Catherine if we could have -- we could get consent

16   from her to search the apartment.  She asked what he had said,

17   and I said, Well, let's go down and find out.

18   Q.   So did you go downstairs?

19   A.   Yeah, we allowed her -- she wanted to change clothes, so

10:26 20   we let her change clothes.  We went back downstairs.  I asked

21   Mr. Bulger, outside of her presence, for consent to search the

22   apartment.  He said we were going to get in there anyway, he

23   didn't want to delay this.  Then I asked her, outside of his

24   presence, for consent, and again, she asked me what he said.  I

25   brought them both together, and we talked about consent.  He

1    looked at her and says, They're going to get it, I don't want

2    to delay this.  And he made it clear to me that he was doing

3    this for consideration, future consideration for Catherine.

4    Q.    Did you then present Mr. Bulger and Catherine Greig with a

5    form, a standard form?

6    A.    I did.

7    Q.    What's that form called?

8    A.    It's an FBI FD 26, consent to search form.

9    Q.    And did Mr. Bulger sign the form?

10:27 10    A.    Mr. Bulger signed the form.

11    Q.    Did he say anything to you when he signed the form?

12    A.    He said, It's the first time I've signed this name in a

13    long time.

14    Q.    And the name he signed the form with was?

15    A.    James J. Bulger.

16    Q.    After the form was signed -- and Catherine Greig signed

17    the form as well?

18    A.    Catherine signed it as well.

19    Q.    What did you do next?

10:27 20    A.    I asked Mr. Bulger if -- since we were going to go in and

21    search the apartment, what items we would find in there.  He

22    started to -- he started to discuss and tell me what we'd find,

23    where the weapons were, where money was.  It became obvious to

24    me that it was too much for me to write down and then try to

25    find at a later date.  I asked him if he wouldn't mind coming

1    upstairs with us and pointing out where the items were so we

2    wouldn't miss anything.

3    Q.    And did he do that?

4    A.    He did.

5    Q.    And did you, Special Agent Garriola, and other members of

6    the L.A.P.D. task force then proceed to search Apartment 303?

7    A.    Yes.

8          MR. HAFER:  Can I have Exhibit 1055, please?

9    Q.    On the screen in front of you, Exhibit 1055, Special Agent

10:28 10   Garriola, could you briefly describe what that is?

11   A.    This is -- it looks like a schematic or a hand-drawn

12   diagram of the interior of Apartment 303.

13   Q.    Could you just indicate the doorway -- and you previously

14   mentioned Mr. Bulger's bedroom, where that is on the schematic?

15   A.    Okay.  The doorway -- and his bedroom would be in H.

16   That's his bed.

17         MR. HAFER:  Could I have Exhibit 1129, please?

18   Q.    Do you recognize this photograph?

19   A.    Yes.

10:29 20   Q.    What is it?

21   A.    That's the living room area.  There's a little futon right

22   there, sofa, but that's the -- when you come in the doorway,

23   that's immediately to your right.  Those windows, those dark

24   curtains over the windows, those face Third Street.  So that's

25   the inside of the picture we saw before that I drew the circle

1    around, the balcony.

2    Q.   So those are dark curtains?

3    A.   Dark curtains.

4         MR. HAFER:  Could I have Exhibit 1058, please?

5    Q.   Do you recognize this photograph?

6    A.   I do.  That's -- those are his bedroom bookshelves.

7    That's the foot of his bead.  Here's the weapon I referred to

8    seeing, the semiautomatic.

9    Q.   And did you and other agents, in fact, actually seize a

10:29 10   number of books from the apartment, Special Agent Garriola?

11   A.   Yes, we did.

12        MR. HAFER:  Could I have Exhibit 1138, the photograph,

13   1138, please?

14   Q.   Do you recognize Exhibit 1138?

15   A.   I do.

16   Q.   What are these books depicted in this photograph?

17   A.   Those are some of the books that were on his bookshelf in

18   his room.

19   Q.   The top book being by Kevin Weeks?

10:30 20   A.   Yes.

21   Q.   And then a book by "Red" Shea?

22   A.   Yes.

23   Q.   Another book by Pat Nee?

24   A.   Yes.

25   Q.   Those were in Mr. Bulger's bedroom?

```
 1   A.   Yes.

 2        MR. HAFER:  Could I have Exhibit 1131, please?

 3   Q.   Do you recognize the books in this photograph?

 4   A.   Yes.

 5   Q.   Where were they?

 6   A.   Those were, again, on the bookshelf in Mr. Bulger's

 7   bedroom.

 8   Q.   And generally, what are these books about, the general

 9   topic or theme of --

10   A.   Mob, organized crime, Mafia.

11        MR. HAFER:  Your Honor, may I approach the witness,

12   please?

13        THE COURT:  You may.

14   BY MR. HAFER:

15   Q.   Placing in front of you, Special Agent Garriola, two

16   exhibits marked for identification, 1114 A and 1057 A.

17        Do you recognize those books?

18   A.   I do.

19   Q.   Where did they come from?

20   A.   These were from -- this book, I believe, was from his

21   bedroom, and this one is entitled How to Find Missing Persons,

22   A Handbook For Investigators, Revised and Expanded.  This was

23   from the bedroom.

24        This one, I believe, was out by the desk in the living

25   room.  It's called Secrets of a Back Alley ID Man, Fake ID
```

1   Construction Techniques of the Underground.

2   Q.   And those were both recovered from the defendant's

3   apartment on June 22, 2011?

4   A.   Yes, they were.

5        MR. HAFER:  Your Honor, government offers 1114 A and

6   1057 A.

7        THE COURT:  Any objection?

8        MR. CARNEY:  No, thank you.

9        THE COURT:  Okay.  They may be admitted been.

10       (Exhibits 1114 A, 1057 A received into evidence.)

11  BY MR. HAFER:

12  Q.   Special Agent Garriola, while you were in the bedroom, did

13  you observe anything on a windowsill?

14  A.   I did.

15  Q.   What?

16  A.   There was a towel underneath the windowsill, and

17  underneath the towel there were two, I believe they were 357

18  magnum revolvers, semiautomatic handgun, and there was some

19  cash, I believe it was in, like, I'd call it a ditty bag or

10:32 20  shaving kit-type bag.

21       MR. HAFER:  Could I have Exhibit 1052, please?

22  Q.   Do you recognize this photograph, Exhibit 1052 in

23  evidence?

24  A.   Yes.

25  Q.   What is that?

1    A.    This is the -- that's duct tape over some foil that was

2    covering the windows in the bedroom.

3          This is a stack of cash in a shaving-type kit bag that

4    was below the windowsill in his bedroom.

5    Q.    You mentioned there was foil covering the bedroom windows?

6    A.    His bedroom window was lined with some type of foil.

7    Q.    And you said also near that windowsill there were a couple

8    of weapons, a 45 and two 357s?

9    A.    Yes.

10:33 10    Q.    Did you later determine whether those were loaded?

11    A.    The revolvers were loaded.

12    Q.    While you were searching the apartment, Special Agent

13    Garriola, did the defendant indicate to you that there were any

14    hidden areas in the apartment?

15    A.    Yes, he did.

16    Q.    Where did he indicate those were?

17    A.    The -- out in the living room there was a wet bar area

18    that was a little passageway between the kitchen and the living

19    room, and behind the mirror in the wet bar area he indicated to

10:34 20    me there was going to be weapons in there.

21    Q.    During the search did he point anything out to you under

22    the bed in his bedroom?

23    A.    He told me there was a bag under the bed that had -- first

24    he thought it was $500,000 cash, then he said, no, probably

25    more, and weapons under the bed.  Then he pointed out a mirror

1    in his bathroom in his bedroom that we were going to find money

2    and some other things in there, some IDs.

3            MR. HAFER:  Could I have Exhibit 1113, please?

4    Q.   In evidence, Exhibit 1113, Special Agent Garriola, do you

5    recognize this photograph?

6    A.   I do.

7    Q.   What is this?

8    A.   That's a hidden area behind a bathroom mirror in his

9    bedroom.

10:34 10   Q.   Did you and other agents recover anything from that hidden

11   area on June 22, 2011?

12   A.   Yes, we did.

13   Q.   What?

14   A.   You can see the shaving kit down here, there was money in

15   there, a bunch of fake IDs, as well as a bunch of car keys.

16   Q.   During the course of the search of the apartment, did you,

17   in fact, recover a number of fake identifications?

18   A.   I did.

19           MR. HAFER:  Your Honor, may I approach again, please?

10:35 20          THE COURT:  You may.

21   BY MR. HAFER:

22   Q.   Placed in front of you for identification, Special Agent

23   Garriola, are the following exhibits:  the series between

24   1059 A through 1067 A, 1068 and 1069 A, 1134 through 1136 A,

25   and 1115 through 1128 A, and also 1070 A.

1          Do you recognize those exhibits?

2   A.    I do.

3   Q.    Generally what are they?

4   A.    Generally they're photographs of Mr. Bulger on different

5   types of identification under fake names or alias names.

6   Q.    And those are identifications recovered from the apartment

7   on June 22, 2011?

8   A.    Yes, they were.

9          MR. HAFER:   I would offer those exhibits, your Honor.

10:36 10          THE COURT:   Any objection to the identified exhibits?

11          MR. CARNEY:   No, your Honor.   Thank you.

12          THE COURT:   They may be admitted, what Mr. Hafer

13   recited as exhibit numbers, and published if you wish.

14          (Exhibits 1059 A through 1067 A, 1068, 1069 A, 1134

15   through 1136 A, 1115 through 1128 A, 1070 A received into

16   evidence.)

17          MR. HAFER:   Ms. Hourihan, can I have the ELMO, please?

18          May I retrieve them, your Honor?

19          THE COURT:   You may.

10:37 20   BY MR. HAFER:

21   Q.    First, placing on the screen in front of you are 1059

22   through 1067 A.

23          You mentioned the names Charles Gasko or Gaska earlier

24   in your testimony, Special Agent Garriola?

25   A.    Gasko was the name on the apartment.

```
 1    Q.   And starting in the top middle of your screen, do you

 2    recognize that identification as one you retrieved from the

 3    apartment that day?

 4    A.   I do.

 5    Q.   And the name on that is --

 6    A.   Charles W. Gaska.

 7    Q.   That's a medical alert card?

 8    A.   Yes.

 9    Q.   And below that, in the center of your screen now, does

10    that -- what does that appear to be?

11    A.   A New York State ID card.

12    Q.   Below that is a Social Security card in the name Charles

13    Gaska?

14    A.   Yes.

15    Q.   And on the right-hand side, an AARP card in the name of

16    Charles Gasko?

17    A.   Yes.

18    Q.   Carlos Cleaning Services business card with a New York

19    address in the name of Charles Gaska?

20    A.   Yes.

21    Q.   The bottom left of your screen, do you see where I've

22    touched the screen there?

23    A.   Yes.

24    Q.   What does that appear to be?

25    A.   A New York State ID card in the name of Donald Gene Gould.
```

1    Q.    Directly above that?

2    A.    That's some type of work ID from New York in the name of

3    Donald Gene Gould.

4    Q.    I believe that one indicates he's employed at Movie Plex

5    42 in New York, New York?

6    A.    Yes.

7    Q.    In addition to the Charles Gasko and Donald Gould

8    identification, were there identifications found in other names

9    in the apartment?

10:39 10    A.    Yes, there were.

11    Q.    Do you recall those names?  Any of them?

12    A.    I recall James Lawler, I recall Sidney Terry, and another

13    name, Sampson.

14    Q.    Starting first with Sidney Terry.  Showing you Exhibits

15    1134 through 1136 A.  Starting at the top, what does that

16    appear to be?

17    A.    That appears to be a Nevada driver's license in the name

18    Sydney Joe Terry.

19    Q.    And Sam's Club card for Sidney Terry below that?

10:40 20    A.    Sam's Club card and Social Security card, Sidney J. Terry.

21    Q.    You mentioned the name James Lawler?

22    A.    James Lawler, yes.

23    Q.    Showing you now Exhibits 1115, 16, 17, 18, 22, and 27 A.

24         Do you recognize the item in the top left-hand corner

25    of the screen?

1    A.    That's a California driver's license in the name of James

2    William Lawler.

3    Q.    And next to that is a prescription savings card in that

4    same name?

5    A.    Yes.

6    Q.    Some kind of card?

7    A.    Yes.

8    Q.    Directing your attention now to the center of your screen,

9    what does that appear to be?

10:40 10    A.    That's another driver's license in the name of James

11    William Lawler.

12    Q.    That was in the apartment as well?

13    A.    Yes.

14    Q.    Showing you Exhibits 1121, 23, and 28 A, do you recognize

15    these items?

16    A.    I do.

17    Q.    What are they?

18    A.    They appear to be casino player cards or loyalty cards

19    from Las Vegas casinos.

10:41 20    Q.    In the name James Lawler?

21    A.    In the name of James Lawler, correct.

22    Q.    In the defendant's apartment on June 22, 2011?

23    A.    Yes.

24    Q.    Placing on the screen Exhibit 1119 A.  Do you recognize

25    this?

```
 1    A.    I do.

 2    Q.    What is it?

 3    A.    It's a certification of military service for James Lawler.

 4    Q.    Exhibit 1120 A on the screen in front of you.

 5    A.    It appears to be a New York City birth certificate in the

 6    name of James Lawler.

 7    Q.    Exhibit 1124 A?

 8    A.    It's some type of certificate for completion of training

 9    for employment for James Lawler.

10    Q.    Saying James Lawler has successfully completed the minimum

11    standards of training for teargas and pepper spray?

12    A.    Yes.

13    Q.    Finally, showing you 1070 A.  Do you recognize this?

14    A.    I do.

15    Q.    What is this?

16    A.    This is a birth certificate in the name of Ernest

17    Beaudreau from -- it looks like it's the State of

18    Massachusetts.

19    Q.    That was in the apartment, also?

20    A.    Yes.

21    Q.    You mentioned that when he was showing you the apartment,

22    the defendant indicated a hidden area near a bar?

23    A.    Yes.

24          MR. HAFER:  Can I have Exhibit 1112, please?

25          Can we go back to the Sanction, please, Ms. Hourihan?
```

1    Q.    Showing you what's in evidence as Exhibit 1112, do you

2    recognize that?

3    A.    I do.

4    Q.    What is that, Special Agent Garriola?

5    A.    That's a view from the living room into the bar area, and

6    that is a cutout of the drywall that was behind the mirror that

7    we took down.

8          MR. HAFER:  And could I have Exhibit 1111?

9    Q.    Do you recognize that photograph?

10:43 10    A.    I do.  That's just a closeup of the cash and the knives

11    and the weapons that were inside the wall when we took the

12    mirror down.

13          MR. HAFER:  Could I have Exhibit 1110, please?

14    Q.    Same question with respect to Exhibit 1110.

15    A.    Yes, that's more of a closeup.  Those are knives on top of

16    stacks of money.

17    Q.    You mentioned money a few times in your testimony, Special

18    Agent Garriola.  Did you and other agents and officers

19    ultimately recover a sum of money from Apartment 303 on June

10:44 20    22, 2011?

21    A.    Yes, we did.

22          MR. HAFER:  Your Honor, may I approach?

23          THE COURT:  You may.

24          (Pause.)

25    BY MR. HAFER:

1    Q.   I placed in front of you Exhibit 1139 for identification.

2    Would you take a moment and review the contents and tell me if

3    you recognize it?

4    A.   I do.

5    Q.   What is it?

6    A.   This is the cash that was found inside the apartment in

7    various locations.

8    Q.   How much cash was found inside the apartment?

9    A.   A grand total of almost $822,000.

10:45 10         MR. HAFER:  Your Honor, the government at this time

11   offers Exhibit 1139 and requests permission for Special Agent

12   Garriola to step down and publish on the table in front of

13   Ms. Hourihan?

14         THE COURT:  Any objection?

15         MR. CARNEY:  No, your Honor.

16         THE COURT:  You may do so.

17         It may be admitted and also published in that way.

18         (Exhibit 1139 received into evidence.)

19         (Money was placed on table.)

10:47 20   BY MR. HAFER:

21   Q.   Did you find any knives in the apartment?

22   A.   I found a bunch of knives.

23         MR. HAFER:  Could I have Exhibit 1137, please?

24   Q.   Do you recognize that document?

25   A.   Those were -- we just saw them in the previous photo on

1    top of the money behind the bar mirror, a stack of knives.

2            MR. HAFER:  Your Honor, at this time -- well,

3    withdrawn.

4    Q.   Special Agent Garriola, you have indicated in your

5    testimony that you and other agents recovered a number of guns

6    from the apartment that day?

7    A.   Yes.

8    Q.   How many?  Do you recall?

9    A.   Thirty.

10:48 10           MR. HAFER:  Your Honor, at this time I request

11   permission to approach the witness, it's going to be a bunch of

12   back and forth, if I could have standing permission to go back

13   and forth?

14           THE COURT:  You may.

15   MR. HAFER:

16   Q.   Starting with Exhibit 1093 and 1098 B, Special Agent

17   Garriola, do you recognize those?

18   A.   I do.

19   Q.   What are they?

10:49 20   A.   They're a couple of .22 calibers, one is a revolver and

21   one is a semi-auto.

22   Q.   Where were those found?

23   A.   Inside Apartment 303.

24           MR. HAFER:  Government offers 1093 and 1098 B.

25           THE COURT:  They may be admitted, 1093 and 1098 B.

 1                (Exhibits 1093 B and 1098 B received into evidence.)

 2    BY MR. HAFER:

 3    Q.    I've placed in front of you what's marked for

 4    identification 1090 B and 1097 B.  Do you recognize those,

 5    Special Agent Garriola?

 6    A.    I do.  This is a .45 caliber semi-auto, and this is a .38

 7    Special revolver.

 8    Q.    Where were those taken from?

 9    A.    In Apartment 303.

10:50 10             MR. HAFER:  The government offers the exhibits, your

11    Honor.

12             THE COURT:  Any objection?

13             MR. CARNEY:  I have no objection to these firearms,

14    nor will I have an objection to any further firearms that

15    Mr. Hafer wishes to offer.

16             THE COURT:  With that noted, counsel, you can just

17    still read the exhibit numbers as you bring them forward.

18             MR. HAFER:  Yes, your Honor, did you get those two?

19             THE COURT:  1093 and --

10:50 20             MR. HAFER:  1090 and 1097.

21             THE COURT:  Thank you.

22             (Exhibits 1090 B, 1097 B received into evidence.)

23             MR. HAFER:  Your Honor, just so it's clear, these are

24    all Bs, every number has a B.

25             THE COURT:  Meaning the As are the photos?

1           MR. HAFER:  The photos are just going to be the

2    number, and there will be no A, and these will be Bs.

3           THE COURT:  Okay.

4           MR. HAFER:  Approaching with 1075 B, 1086 B.

5    BY MR. HAFER:

6    Q.   Do you recognize those, Special Agent Garriola?

7    A.   Yes, two more revolvers.

8    Q.   Where were those recovered?

9    A.   In Apartment 303.

10:51 10          MR. HAFER:  The government offers those, your Honor.

11          THE COURT:  They may be admitted.

12          (Exhibits 1075 B, 1086 B received into evidence.)

13          (Pause.)

14    BY MR. HAFER:

15    Q.   Showing you 1077 B, 1092 B, Special Agent Garriola, do you

16    recognize those?

17    A.   Yes, two more appear to be .38 revolvers.

18    Q.   .38 revolvers obtained from where?

19    A.   Apartment 303.

10:52 20          MR. HAFER:  The government offers them, your Honor.

21          (Exhibits 1077 B, 1092 B received into evidence.)

22    Q.   Showing you, Special Agent Garriola, 1072 B, 1079 B.  Do

23    you recognize 1072 and 1079 B?

24    A.   Yes, they're both .45 caliber semi-autos.

25    Q.   Taken from where?

```
 1   A.    Apartment 303.
 2             MR. HAFER:  The government offers them, your Honor.
 3             THE COURT:  They may be admitted.
 4             (Exhibits 1072 B and 1079 B received into evidence.)
 5             (Pause.)
 6   BY MR. HAFER:
 7   Q.    1082 B and 1084 B, Special Agent Garriola, do you
 8   recognize those?
 9   A.    Yes.  One's a .40 caliber, and one's a .45 caliber
10   semiautomatic pistol.
11   Q.    And where did they come from?
12   A.    Apartment 303.
13             MR. HAFER:  I offer them, your Honor.
14             THE COURT:  They may be admitted.
15             (Exhibits 1082 B, 1084 B received into evidence.)
16             (Pause.)
17   BY MR. HAFER:
18   Q.    Showing you now 1073 B and 1100 B.
19             THE COURT:  What was the second one?
20             MR. HAFER:  1100 B, your Honor.
21   BY MR. HAFER:
22   Q.    Do you recognize those?
23   A.    I do.
24   Q.    What are they?
25   A.    One's a Baretta .9 millimeter, and the other one is a Colt
```

1    .45, a semiautomatic pistol.

2    Q.    Where did they come from?

3    A.    Apartment 303.

4          MR. HAFER:  The government offers them, your Honor.

5    A.    They may be admitted.

6          (Exhibits 1073 B, 1100 B received into evidence.)

7          (Pause.)

8    BY MR. HAFER:

9    Q.    Showing you, Special Agent Garriola, 1078 B and 1099 B, do

10:55  10  you recognize those?

11   A.    I do.

12   Q.    What are they?

13   A.    They're a couple of .357 Magnum revolvers.

14   Q.    Where did they come from?

15   A.    Apartment 303.

16         MR. HAFER:  The government offers them, your Honor.

17         THE COURT:  They may be admitted.

18         (Exhibits 1078 B, 1099 B received into evidence.)

19         (Pause.)

10:56  20  BY MR. HAFER:

21   Q.    Showing you 1089 B and 1101 B, do you recognize 1089 B and

22   1101 B?

23   A.    I do.

24   Q.    What are they?

25   A.    Two .357 Magnum revolvers.

```
 1    Q.   Where did they come from?

 2    A.   Apartment 303.

 3              MR. HAFER:  I offer them, your Honor.

 4              THE COURT:  They may be admitted.

 5              (Exhibits 1089 B, 1101 B received into evidence.)

 6              (Pause.)

 7    BY MR. HAFER:

 8    Q.   Showing you now 1083 B and 1091 B, do you recognize those,

 9    Special Agent Garriola?

10    A.   I do.

11    Q.   What are they?

12    A.   They're .45 caliber semiautomatic pistols.

13    Q.   Where did those come from?

14    A.   Apartment 303.

15              MR. HAFER:  I offer them, your Honor.

16              THE COURT:  They may be admitted.

17              (Exhibits 1083 B, 1091 B received into evidence.)

18              (Pause.)

19    BY MR. HAFER:

20    Q.   Showing you 1074 B and 1081 B, do you recognize those?

21    A.   They're .45 caliber semiautomatic pistols.

22    Q.   Where did they come from?

23    A.   From Apartment 303.

24              MR. HAFER:  I offer them, your Honor.

25              THE COURT:  They may be admitted.
```

1           (Exhibits 1074 B, 1081 B received into evidence.)

2           (Pause.)

3    BY MR. HAFER:

4    Q.    Showing you 1076 B, 1080 B, do you recognize 1076 B and

5    1080 B?

6    A.    1076 is a .22 caliber Derringer, little pistol; and the

7    other one is a .45 caliber Colt semiautomatic.

8    Q.    Where did they come from?

9    A.    Apartment 303.

10:59 10         MR. HAFER:  I offer them, your Honor.

11          THE COURT:  They may be admitted.

12          (Exhibits 1076 B, 1080 B received into evidence.)

13          (Pause.)

14    BY MR. HAFER:

15    Q.    Special Agent Garriola, the guns that we just admitted

16    into evidence, did you and other agents determine whether they

17    were loaded, some of them?

18    A.    Some of them -- most of the revolvers were loaded; some of

19    them were.

10:59 20    Q.    You mentioned earlier a bag under the bed that the

21    defendant pointed out to you?

22    A.    Yes.

23          MR. HAFER:  Could I have Exhibit 1056, please?

24    Q.    Do you recognize that photograph?

25    A.    Yes.

1    Q.   What is it?

2    A.   There's -- appears to be holsters, there's a rifle scope

3    in that bag.

4         MR. HAFER:  Could I have Exhibit 1102, please?

5    Q.   Do you recognize that photograph?

6    A.   I do.

7    Q.   What is it?

8    A.   It's the contents of the bag that was under the bed.

9    Q.   Did you find any ammunition in the apartment?

11:00 10   A.   Found hundreds of rounds of ammunition in the apartment.

11        MR. HAFER:  Could I have Exhibit 1053, please?

12   Q.   What is that?

13   A.   It's a portion of the ammunition that we found.

14        MR. HAFER:  Could I have Exhibit 1054?

15   Q.   What is that, Special Agent Garriola?

16   A.   These are items that were behind the mirror in the bar

17   area.  There's shotgun shells, appears to be, knives,

18   ammunition, handcuffs.

19   Q.   Those were in the hide behind the bar area?

11:01 20   A.   Yes.

21        MR. HAFER:  May I approach again, your Honor?

22        THE COURT:  You may.

23   BY MR. HAFER:

24   Q.   Placing in front of you 1085 B and 1088 B, do you

25   recognize 1085 and 1088 B?

1    A.    I do.

2    Q.    What are they?

3    A.    1085 is a Ruger .22 caliber pistol with some type of

4    improvised either silencer or suppressor on it, and the other

5    exhibit is -- it looks like a pistol grip 12-gauge Mossberg

6    shotgun.

7    Q.    Where did those come from?

8    A.    These were all from inside the Apartment 303.

9              MR. HAFER:  I offer them, your Honor?

11:02 10             THE COURT:  Any objection to those?

11             MR. CARNEY:  No, your Honor.

12             THE COURT:  They may be admitted.

13             (Exhibits 1085 B, 1088 B received into evidence.)

14             (Pause.)

15   BY MR. HAFER:

16   Q.    Placing in front of you 1095 B, 1096 B, starting with

17   1095, do you recognize that?

18   A.    This is another pistol grip 12-gauge shotgun.

19             The other one, it's a machine pistol, carbine 15,

11:03 20   probably fires .223 rounds, caliber rounds.

21   Q.    Where did those come from?

22   A.    Apartment 303.

23             MR. HAFER:  I offer them, your Honor.

24             THE COURT:  Mr. Carney, I understood your position

25   holds for all of these?

1           MR. CARNEY:  Yes, your Honor.

2           THE COURT:  They may be admitted.

3           (Exhibits 1095 B, 1096 B received into evidence.)

4           (Pause.)

5    BY MR. HAFER:

6    Q.   Finally, approaching with 1087 B and 1094 B, Special Agent

7    Garriola.

8    A.   This one here is -- appears to be a mini Ruger, also fires

9    .223 rounds, with a collapsable stock, and the other one is a

11:04 10   version of the AR-15, which is a version of the M16 the

11   military uses, and this also fires .223 caliber rounds,

12   semiautomatic rifles.

13   Q.   Where did they come from?

14   A.   Apartment 303.

15           MR. HAFER:  I offer them, your Honor.

16           THE COURT:  They may be admitted.

17           (Exhibits 1087 B, 1094 B received into evidence.)

18   BY MR. HAFER:

19   Q.   To your knowledge, Special Agent Garriola, were these guns

11:04 20   ever test-fired?

21   A.   Yes, they were.

22   Q.   What was the result?

23   A.   They were all found to be functional, fireable, operable.

24   Q.   The gentleman that you referred to numerous times

25   throughout your testimony as the defendant who you arrested on

1    June 22, 2011 in Santa Monica, California, do you see him in

2    the courtroom today?

3    A.    I do.

4    Q.    Would you point him out and identify an article of

5    clothing he's wearing?

6    A.    The gentleman sitting here in the green, long-sleeve

7    shirt.

8            MR. HAFER:  If the record could reflect the witness

9    has identified the defendant, your Honor.

11:05 10           THE COURT:  It may.

11           MR. HAFER:  I have no further questions.

12           THE COURT:  Counsel, given that the time is, 11:05,

13    should we take our break now?

14           MR. CARNEY:  Certainly, your Honor.

15           THE COURT:  Jurors, we'll take our mid-morning break

16    now, 20 minutes.

17           THE CLERK:  All rise.

18           THE COURT:  Sir, you can step down for the moment.

19           (Jury left the courtroom.)

11:06 20           THE COURT:  Is there anything before we break?

21           MR. KELLY:  No, your Honor.

22           (Recess taken.)

23           THE COURT:  Mr. Carney?

24           MR. CARNEY:  Thank you.

25                           CROSS-EXAMINATION

BY MR. CARNEY:

Q.    Good morning, Mr. Garriola.

A.    Good morning.

Q.    Agent Garriola, excuse me.

A.    Good morning, sir.

Q.    I just have a few questions for you.

      You stated that you are assigned to the Los Angeles office?

A.    Yes.

Q.    How far is Los Angeles from Santa Monica?

A.    From the apartment, it's about three miles.

Q.    Is there an FBI field office in Santa Monica?

A.    No.

Q.    The Los Angeles one covers it.

A.    Right.

Q.    When you arrived at the --

      MR. CARNEY:  Can I have a moment, your Honor, please?

      THE COURT:  You may.

BY MR. CARNEY:

Q.    How many agents, special agents, are there in the FBI Los Angeles field office, approximately?

A.    Approximately 800 agents in the seven counties we cover.

Q.    Were you at the office in Los Angeles when John Morris was there as head of public corruption or the Assistant Special Agent in Charge?

```
 1   A.   Yes.

 2   Q.   That was his posting after he left Boston, if you know?

 3   A.   I don't know.

 4   Q.   Do you work closely with the Los Angeles Fugitive Task

 5   Force?

 6   A.   I run the Los Angeles Fugitive Task Force.

 7   Q.   And that's made up of a number of agencies?

 8   A.   It's FBI and Los Angeles Police Department.

 9   Q.   How many officers are assigned to the Fugitive Task Force?

11:32 10   A.   At that time?

11   Q.   Yes, sir.

12   A.   There was just myself, I was the only special agent on it,

13   and then we have -- we had five officers and a supervisor.

14   Q.   How many additional officers from the police department or

15   from the Bureau could you draw upon, if necessary?

16   A.   Oh, depending on the circumstance, I'm sure hundreds.

17   Q.   You became aware at some point that Mr. Bulger was placed

18   on the FBI's Ten Most Wanted list?

19   A.   Yes.

11:33 20   Q.   When was that, if you remember?

21   A.   I believe it was 1999, but I don't want to be quoted on

22   that.

23   Q.   I won't.

24   A.   Okay.

25   Q.   What does being on the top Ten Most Wanted list for the
```

 1    FBI mean to you as an agent?

 2    A.    Well, to me as an agent when the call comes in on a Ten

 3    Most Wanted fugitive, it's your responsibility to expeditiously

 4    handle the lead.  And what comes with it usually is a reward

 5    and a lot of publicity.

 6    Q.    What about --

 7    A.    I'm sorry, not for the agent covering the lead, but for

 8    the capture of the fugitive.

 9    Q.    What is the responsibility of an FBI agent prior to any

11:33 10   tip coming in in regard to the -- to a top ten fugitive?

11            In other words, do you have any obligation to

12    affirmatively look for him or her?

13    A.    No.

14    Q.    You just sit back and wait for a tip?

15    A.    Yes.

16    Q.    The firearms that were seized in the Apartment 303, as

17    well as the false identifications, were all illegal to possess,

18    correct?

19    A.    Correct.

11:34 20   Q.    That would be considered contraband?

21    A.    Yes.

22    Q.    Mr. Bulger faces criminal charges for the possession of

23    those items in federal court in California; isn't that true?

24    A.    I'm not aware of that.

25    Q.    Were you aware that he was indicted for this in

1    California?

2          MR. HAFER:  Objection, your Honor.

3          THE COURT:  Sustained.

4    BY MR. CARNEY:

5    Q.    Were you aware that he could have been charged with these

6    offenses in California?

7    A.    Sure, yes.

8    Q.    And it would be under the federal court jurisdiction if

9    they charged him, right?

11:35 10  A.    As a felon in possession of a weapon, correct.

11   Q.    He admitted to you that those false IDs and those firearms

12   were his, didn't he?

13   A.    Yes.

14   Q.    And the combination of those illegal firearms and the

15   confession by the defendant would make it a pretty easy case to

16   prosecute, wouldn't you agree as an experienced agent?

17   A.    I'm not a prosecutor, but as an agent that would be an

18   easy case to bring to the prosecutors.

19   Q.    Does "slam dunk" come to mind?

11:35 20        MR. HAFER:  Objection, your Honor.

21         MR. CARNEY:  Withdrawn.

22         THE COURT:  Sustained.

23   BY MR. CARNEY:

24   Q.    And based on your knowledge of a defendant who has a prior

25   criminal record as a felon and who possesses this amount of

1    guns, as well as false identification, he very much would be

2    facing a life sentence in prison on those charges, wouldn't he?

3            MR. HAFER:  Objection, your Honor.

4            THE COURT:  Sustained.

5    BY MR. CARNEY:

6    Q.   Do you know if he would face a probable life sentence in

7    prison on those charges?

8            MR. HAFER:  Objection, your Honor.

9            THE COURT:  Sustained.

11:36 10  BY MR. CARNEY:

11    Q.   What do you think the range of a sentence would be on

12    those charges in California?

13            MR. HAFER:  Objection, your Honor.

14            THE COURT:  Sustained.

15    BY MR. CARNEY:

16    Q.   Will I be able to ask any question on this subject any

17    further --

18            THE COURT:  Mr. Carney, if you want to be heard at

19    sidebar, I'll hear you at sidebar.

11:36 20          MR. CARNEY:  I'll move on, your Honor.

21    BY MR. CARNEY:

22    Q.   At the time you were dealing with Mr. Bulger at the scene

23    of his arrest, and once you had established his name and put

24    him in custody by handcuffing him, it's fair to say that he was

25    cooperative with you?

1     A.    Yes.

2     Q.    He told you that he would help you get custody of

3     Catherine by either calling her, asking her to come down, or

4     going up and telling her to surrender; is that right?

5     A.    That's right.

6     Q.    He said that he would be willing to be cooperative with

7     you, not for any benefit to be shown to him, but for

8     consideration to be shown to Catherine; isn't that right?

9     A.    That's correct.

11:37 10    Q.    When he went into the apartment with you, he led you

11    around the apartment, albeit, in custody and handcuffed, and

12    pointed out to you where you could find things, correct?

13    A.    Correct.

14    Q.    These areas included what can be called "hides," or places

15    where a person has reconfigured a wall, or something like that,

16    in order to conceal illegal contraband, right?

17    A.    Right.

18    Q.    He showed you the hide that was behind a mirror, correct?

19    A.    Correct.

11:38 20    Q.    Showed you other places where you could locate weapons,

21    right?

22    A.    Right.

23    Q.    And you were able to recover all of the weapons, money,

24    false IDs much easier because of his assistance; isn't that

25    right?

A.    That's correct.

Q.    He showed you where there was a book in which a gun was concealed, didn't he?

A.    Yes, he did.

Q.    He directed you to a location in the bedroom where you could find what ultimately turned out to be approximately $800,000 in cash, right?

A.    Correct.

Q.    He alerted you that the weapons, in particular the handguns, were loaded in order to alert you to that fact, right?

A.    Several times.

Q.    And that was helpful to you in your search, wasn't it?

A.    Yes.

Q.    Were you present when an agent had asked him if he had intended to use these guns to shoot it out with anyone if they were trying to capture him?

A.    I asked him that question.

Q.    What did he say?

A.    He paused, and then he told me that, no, because a stray bullet may hit someone.

Q.    And at the end of all this assistance that he was providing you or cooperation that he was providing you, he reiterated, did he not, that all he was looking for was for you to indicate to the prosecutors that in return for his

1    cooperation and assistance all he was asking was that this

2    cooperation be brought to the prosecutor's attention so that

3    consideration could be shown toward Catherine.

4    A.    That's correct.

5    Q.    You agreed to do that; is that right?

6    A.    I told him I would let them know, and I did.

7    Q.    And how did you do that, sir?

8              MR. HAFER:  Objection, your Honor.

9              THE COURT:  Counsel, I'll see you at sidebar on this.

11:40 10          (At sidebar on the record.)

11             THE COURT:  Counsel, is it a hearsay objection?

12             MR. HAFER:  Yes, your Honor.  Just a hearsay

13    objection.

14             MR. CARNEY:  I don't think it is hearsay, your Honor.

15    I'm not asking him what he said, I'm just asking him, And did

16    you -- How did you do so?  And so he can say either I put it in

17    writing or I sent them an e-mail or I spoke to them in person.

18    I don't agree with this being hearsay.

19             MR. HAFER:  That's fine.

11:41 20          THE COURT:  Is it withdrawn?

21             MR. HAFER:  Yes.

22             (End of discussion at sidebar.)

23             THE COURT:  Counsel, I think your objection has been

24    withdrawn.

25             Mr. Carney.

```
 1              MR. CARNEY:  May I put the question again, your Honor?
 2              THE COURT:  You may.
 3    BY MR. CARNEY:
 4    Q.   Special Agent Garriola, you indicated that you informed
 5    the prosecutors that Jim Bulger had been cooperative and of
 6    assistance to you during your search and that he only asked in
 7    return that you bring this to the attention of the prosecutors
 8    so that they would take that into consideration only in regard
 9    to Catherine Greig.  Do you recall that answer you gave?
11:42 10   A.   I do.
11    Q.   And my previous question was:  In what manner did you do
12    that, sir?
13    A.   It's memorialized in my report of the arrest.
14    Q.   You would know that that information would come to the
15    attention of the prosecutor in that way.
16    A.   Eventually.
17    Q.   When they read the report.
18    A.   Right.
19    Q.   Right.
11:42 20        Are you aware that Catherine Greig was sentenced to
21    eight years in prison?
22              MR. HAFER:  Objection, your Honor.
23              THE COURT:  Sustained.
24    BY MR. CARNEY:
25    Q.   Do you know the sentence that Catherine Greig received in
```

```
 1   this court?

 2            MR. WYSHAK:  Same objection.

 3            THE COURT:  Sustained.

 4   BY MR. CARNEY:

 5   Q.   Do you know now that Catherine Greig is serving an

 6   eight-year prison sentence?

 7            MR. HAFER:  Objection.

 8            THE COURT:  Sustained.

 9   BY MR. CARNEY:

11:42 10   Q.   Were you aware that the government asked the judge to

11   impose an even longer sentence than that?

12            MR. HAFER:  Objection, your Honor.

13            THE COURT:  Sustained.

14            MR. CARNEY:  Your Honor, I'm submitting it on

15   relevance grounds.

16            MR. HAFER:  And that's exactly the way --

17            THE COURT:  I understood the objection to be on that

18   ground, too.

19            MR. CARNEY:  Thank you, Special Agent.

11:43 20            THE COURT:  You're welcome.

21            MR. CARNEY:  That's all I have, your Honor.

22            THE COURT:  Any redirect?

23            MR. HAFER:  Very briefly, your Honor.

24                         DIRECT EXAMINATION

25   BY MR. HAFER:
```

1    Q.    Special Agent Garriola, Mr. Carney asked you some

2    questions about the location of the FBI field office in Los

3    Angeles as compared to Apartment 303.  Do you remember those

4    questions?

5    A.    I do.

6    Q.    Prior to June 22, 2011, did Mr. Bulger ever walk to the

7    FBI field office and offer to turn himself in?

8    A.    No, he didn't.

9    Q.    Mr. Carney asked you some questions regarding Mr. Bulger's

11:44 10   assistance and his cooperation with you after he was arrested.

11   Do you recall those questions?

12   A.    I do.

13   Q.    Is it fair to say in just a few brief minutes Mr. Bulger

14   offered to cooperate with the FBI?

15   A.    Yes.

16            MR. HAFER:  Nothing further, your Honor.

17            THE COURT:  Any recross?

18            MR. CARNEY:  No, your Honor.  Thank you.

19            Thank you, Agent, you're excused.

11:44 20          THE COURT:  Mr. Kelly.

21            MR. KELLY:  Yes, your Honor.  At this time the United

22   States would rest its case against James Bulger.

23            THE COURT:  Counsel, unless you need to be heard

24   before I discharge the jury for the day, I'm going to discharge

25   them for the day.

1          Mr. Kelly?

2          MR. KELLY:  That's fine for the government.

3          THE COURT:  Mr. Carney?

4          MR. CARNEY:  Yes, your Honor.

5          THE COURT:  Okay.

6          Jurors, you've just heard that the United States has

7    rested its case in this matter.  This is what I anticipated

8    would happen this week.

9          The defendant, as I've instructed you on numerous

11:45 10   occasions, does not have to put on any evidence.  The burden of

11   proof always remains with the government.

12         If the defendant, however, chooses to put on any

13   evidence, any defense case would start on Monday.

14         This is a very long-winded way of saying the evidence

15   in this case hasn't necessarily closed.  So for this weekend

16   and until further notice, and you know what I'm about to say,

17   you must still abide by all of my cautionary instructions.

18   Don't talk to anyone about the case, don't let anyone else talk

19   to you about the case, don't read any media accounts, listen to

11:46 20   any media accounts, don't watch any media accounts, don't do

21   any research at all related to this case, and those

22   instructions are as important now on what I believe is day 30

23   of testimony on this case as they were on the first day.

24         So we'll see you on Monday.  Have a very good weekend.

25         Thank you.

1               THE CLERK:  All rise.

2               (Jury left the courtroom.)

3               THE COURT:  Everyone can be seated.

4               Mr. Carney, do you want to be heard?

5               MR. CARNEY:  No, your Honor.

6               THE COURT:  Counsel, any other matters that we should

7       take up now?

8               I did want to address scheduling for next week.

9               MR. KELLY:  Just two matters, your Honor, briefly.  I

11:47 10    think I mentioned this at sidebar earlier.

11              As the Court requested, we did prepare a redacted

12      version of the indictment.

13              THE COURT:  Yes.

14              Can you bring those forward and share one with your

15      brother?

16              (Pause.)

17              THE COURT:  And, Mr. Kelly, just for the record, can

18      you explain the ways in which it's been redacted?

19              MR. KELLY:  Yes.  On the face page, the first page

11:48 20    that is, I deleted the counts, the citations to the statutes

21      on the face page --

22              THE COURT:  In the caption, to the right of the

23      caption.

24              MR. KELLY:  -- that he's not charged with, and we

25      deleted the counts that he's not charged with.

1          And then throughout we deleted the word "Bulger" in

2     front of the term, the collective term "group," and we've

3     checked it manually a couple of times, we've checked it by

4     computer search, and I think we've got all of them.  I think

5     that's it.

6          THE COURT:  Okay.

7          MR. KELLY:  So there are some gaps in pages because,

8     obviously, there are certain charges that don't pertain to him.

9          THE COURT:  Well, obviously, you've shared it with

11:48 10    Mr. Carney and Mr. Brennan, and when I see you at the charge

11     conference, if there's anything you want to be heard on in

12     terms of the form, I'll hear you then.

13          MR. CARNEY:  I had one request for your Honor to

14     consider.

15          I don't believe the charge conference is going to be

16     very long, and I would ask the Court to consider recessing with

17     the jury at 12:30 on Monday so that we could do the charge

18     conference at that time.

19          The honest reason for why to do that is because we

11:49 20    don't just simply take an elevator down to the court.  It

21     generally takes us up to a half an hour to get back to our

22     office, and then it would be a half an hour to come back here

23     in the afternoon, a half an hour to go back, and we're a little

24     pressed for time in the trial.

25          THE COURT:  Counsel, I fully understand that, and I've

1    tried to do scheduling in this case with that in mind and other

2    concerns in mind.

3            I actually have a full schedule on at 2:00 in other

4    cases that I've consolidated in different ways to make room --

5            MR. CARNEY:  What I'm suggesting is we could probably

6    cover the charge conference from 12:30 until 1:00.

7            THE COURT:  Okay.

8            You're more optimistic than I am, about the length of

9    the charge conference.  I'll be happy to be corrected on that.

11:50 10        Mr. Kelly, do you have any position one way or the

11    other?

12            MR. KELLY:  I prefer it starts right at 1:00 once the

13    evidence is done for the day so we can get all the evidence

14    that we can get in that day.

15            THE COURT:  Counsel, some part of this is affected by

16    the preparation I need to do to give you enough time to review

17    things, and part of the reason I thought 3:30, counsel, is I

18    don't think I will be giving you drafts until Monday morning or

19    at the break.

11:50 20        So, counsel, let me think about it.  I want to keep it

21    on at 3:30 for the moment, but if I make more progress and I'm

22    able to get you the materials before then, I would contemplate

23    doing it earlier.

24            MR. CARNEY:  Another way I could propose it would be

25    to do it Tuesday morning.

1          THE COURT:  Well, counsel, that may be affected by

2    what we talk about next, but I think my sense is, counsel,

3    sooner rather than later may be better here.  And I'm not sure

4    you disagree with that.

5          MR. CARNEY:  Well, we've got a lot of balls in the

6    air.

7          THE COURT:  I know.

8          MR. CARNEY:  And the -- a lot of decisions to be made,

9    and spending time here takes away from that other time.

11:51 10          THE COURT:  Well, counsel, I anticipated that

11    decisions would be being made this weekend, as opposed to on

12    Monday.

13          MR. CARNEY:  No, that's not necessarily true.

14          THE COURT:  Well, for the time being, counsel, I'll

15    keep it on for 3:30, but let me think about scheduling, what's

16    on the Court's plate, and let me hear you further on the

17    schedule.

18          Although, Mr. Kelly, did you have something else?

19          MR. KELLY:  I just want to add briefly to what we've

11:52 20    already discussed on several of the witnesses.

21          I do think we need some finality with respect to --

22    there were several undecided witnesses left.

23          I understand Siracusa is subject to a cumulative

24    objection, but there were several that remain.

25          I think Trooper -- excuse me, Lieutenant Johnson,

1    Agent Doherty remain undecided, as does -- I think there's some

2    sort of property title examiner that they just noticed us with

3    last night.  And I thought by this point we could focus on what

4    evidentiary basis there is to offer them.

5        THE COURT:  Well, I understood Lieutenant Johnson and

6    Agent Doherty to be being called on prior inconsistent

7    statements in regards to Mr. Flemmi, as I recall from

8    yesterday's discussion.

9        MR. CARNEY:  That's correct, your Honor.  And pursuant

11:53 10   to laying the foundation for that, your Honor may recall that

11    Mr. Brennan confronted Mr. Flemmi on several occasions about

12    whether he told Trooper -- I'm sorry, Lieutenant Johnson and

13    Agent Doherty something different.  Mr. Flemmi was then shown a

14    document and said, No, I didn't tell them that.

15        THE COURT:  I remember that from the discussion

16    yesterday.

17        MR. CARNEY:  So that would be the clearest guide that

18    the Court would have, because we had to go through that

19    protocol in order to introduce the prior inconsistent.

11:54 20       MR. KELLY:  But I think even if there is an example of

21    that, the statement that they're trying to contradict still has

22    to be material and logically relevant to the charges in

23    question.

24        THE COURT:  But -- and, counsel, I haven't gone back

25    over Mr. Flemmi's testimony, but I think there were questions

1    that were related to charged conduct here, at least some of

2    them were.

3            MR. CARNEY:  I also suggest they're the type of

4    evidentiary issue your Honor has faced throughout this trial

5    and been able to handle immediately, so --

6            THE COURT:  I guess what I'm saying, Mr. Kelly, is I

7    understood yesterday that the defense was still planning to

8    call Lieutenant Johnson and Agent Doherty, and based on the

9    proffer under 613(b), I didn't think that was improper.

11:54 10          MR. KELLY:  I don't understand, though, why a Heather

11   Hoffman has been added.

12           THE COURT:  Is that the title examiner?  I think

13   that's part of a sidebar you may not have been present for,

14   counsel, in regards to my -- when Mr. Brennan moved to admit

15   certain title records through Mr. Flemmi, and I didn't think

16   there was foundation through Mr. Flemmi himself for the title

17   search records, if I'm recalling correctly.

18           MR. KELLY:  Okay.

19           And then, finally, again, briefly, I just want to

11:55 20   address the Marion Hussey issue one last time.

21           THE COURT:  Marion Hussey?

22           MR. KELLY:  Yes.  As I reflect upon that and look at

23   the rules, it's not a 613(b) scenario at all, because 613(b)

24   would apply if Mr. Flemmi said A in court but he said B outside

25   of court.  613(b) addresses the witness' prior inconsistent

1    statement.

2          THE COURT:  But isn't it 608(b) on an issue that's

3    non-collateral, counsel?

4          MR. KELLY:  It is 608(b), I do agree with that.  But I

5    think under Winchenbach and the rule, it is pure misconduct

6    evidence, whether it's conduct or a statement that's being

7    offered as further misconduct, which should be excluded under

8    608(b).

9          It's not as though Mr. Flemmi did not admit this vile

11:56 10   conduct, he did, so we're really talking about a question of

11    numbers.  And I don't think that rises to the level of being

12    admissible under the rules.

13          THE COURT:  Well, counsel, I'm going to go back and

14    look at this.  I haven't made a decision about that yet, but I

15    do remember Beauchamp, which I think may have addressed 608(b)

16    and 613(b), but I'll go back and look at it, carving out an

17    exception that 608(b) wouldn't apply to evidence that's being

18    offered in regards to a motive to give false testimony or bias,

19    assuming it's not of marginal relevance.  And it's hard to say

11:57 20   that it would be here, given their theory.

21          MR. KELLY:  Okay.

22          The final point would be I just don't think the mother

23    of the murdered, molested victim should be the one --

24          THE COURT:  And I understood your separate hearsay

25    objection.

```
 1              MR. KELLY:  Okay.

 2              I think that is everything with respect to the

 3     witnesses.  And I would just, again -- and defense counsel

 4     already has, but I would again request that they give us

 5     additional notice of their order of witnesses for Monday in

 6     light of the Court's rulings on the various people that they

 7     had on their list.

 8              MR. CARNEY:  I'll be able to do that immediately after

 9     this hearing.

11:57 10         If I can update your Honor on one other matter?

11              THE COURT:  Yes.

12              MR. CARNEY:  Further research has confirmed that your

13     Honor is correct in your view of a witness' ability to assert

14     the Fifth Amendment for --

15              THE COURT:  As to Mr. Nee.

16              MR. CARNEY:  Yes, your Honor.

17              THE COURT:  Okay.

18              MR. CARNEY:  It also indicates in the research that we

19     did that the Court should handle this on a question-by-question

11:58 20  basis.  By that I mean there can be questions posed to a

21     witness on which he has a valid Fifth Amendment right not to

22     answer.  There may be other questions that do not implicate his

23     Fifth Amendment that he would be compelled to answer if he

24     doesn't have a Fifth Amendment privilege.

25              And so I believe that on matters where he does have a
```

privilege, I will not pursue it; if it's a matter that he does

not have the privilege, then I may.

THE COURT:  Counsel, what's the best case that you can

cite to me for the idea that you -- a defendant doesn't waive

their Fifth amendment privilege by taking the stand and

answering any questions under oath on a certain topic?

MR. CARNEY:  Well, I think the fundamental law on --

actually, I may even be able to give you a direct case

citation.

11:59    THE COURT:  Counsel, if there's -- I don't need

full-blown briefing, just notice of a case; otherwise I'll look

at it myself, counsel.

Is Mr. Nee currently represented?

MR. CARNEY:  Yes, he is.

THE COURT:  And is he -- are you planning to have him

called in for Monday?

MR. CARNEY:  Tuesday, your Honor.

THE COURT:  Tuesday.

And is his attorney on notice of that?

11:59    MR. CARNEY:  He will be this afternoon.

THE COURT:  And as we stand here today, we don't know

what position his attorney takes on the question-by-question

position.

MR. CARNEY:  Well, it's the position that the U.S.

Supreme Court takes, so --

1          THE COURT:  No, I know.  But I guess what I'm saying

2    is there hasn't been -- what was represented to me yesterday

3    was through his attorney he was planning to invoke.  So other

4    than that, there hasn't been any more nuanced discussion about

5    question by question is what I'm saying.

6          MR. CARNEY:  Oh, I don't want to have a spoiler alert

7    for the witness.

8          THE COURT:  Well, that might be out of the bag now,

9    but -- okay.

12:00 10          Tuesday, counsel?

11          MR. CARNEY:  I can also confirm for your Honor the

12    limited nature of my examination of Mr. Martorano, also

13    scheduled for Tuesday.

14          THE COURT:  Tuesday.

15          Are you doing that now, counsel?

16          MR. CARNEY:  In terms of what the substance would be?

17          THE COURT:  Right.  I understood it to be a statement

18    about Ms. Davis' --

19          MR. CARNEY:  That's correct.

12:01 20          THE COURT:  -- murder by Mr. Flemmi.

21          MR. CARNEY:  Mr. Martorano has twice testified under

22    oath that Mr. Flemmi told him how Debra Davis died, and he

23    said, in essence, I strangled her, and she accidentally died.

24          THE COURT:  That was what I understood to be the

25    proffer.

1          MR. CARNEY:  That will be what I intend to bring out

2     on Tuesday.

3          THE COURT:  And on Monday, counsel?

4          Just the lineup?

5          MR. CARNEY:  The lineup, yes, your Honor.

6          The lineup as it is right now, and if this changes

7     because of any scheduling difficulties, I'll notify

8     Ms. Hourihan --

9          THE COURT:  Yes.

12:02 10          MR. CARNEY:  -- your very able clerk, and copy the

11     prosecutors.

12          Right now the witnesses would be Crawford; Cronin;

13     Davis; Joseph Kelly; Todd Richards; Siracusa; Marion Hussey;

14     Heather, the title examiner, I don't remember her last name.

15          And then on Tuesday, we would expect, most likely, the

16     order would be Doherty, Johnson, Eugene Kelly, Desi

17     Sideropoulos, Fitzpatrick --

18          THE COURT:  Is that the person from the FBI?

19          MR. CARNEY:  Yes, your Honor.

12:03 20          And we've received additional discovery concerning

21     that witness last night, and it includes documents that we

22     expect we'll introduce during her testimony.

23          After Sideropoulos, your Honor, is Fitzpatrick, Nee,

24     Martorano.

25          THE COURT:  And then do you expect to go into

1    Wednesday, counsel?  Meaning, having now written down those

2    names, I imagine some of those are going to be relatively

3    short.

4              MR. CARNEY:  Correct, your Honor, and some will be

5    longer.

6              Our goal is to try to present these witnesses in the

7    first two days of next week.

8              THE COURT:  Okay.

9              So, counsel, I had asked you yesterday, have you made

12:04 10   a decision about whether your client is taking the stand?

11             MR. CARNEY:  I'll let you know at the end of those

12   witnesses, your Honor.

13             THE COURT:  Well, counsel, my question -- and I

14   understand wanting the weekend to consider that issue, and the

15   beginning of the defense case, but do you think we're going to

16   go until 1:00 on Tuesday with these witnesses?

17             MR. CARNEY:  Yes, I do.

18             THE COURT:  And do you think there's a chance that

19   this case is going to go to the jury on Wednesday?

12:05 20             MR. CARNEY:  I don't know.

21             THE COURT:  Well, I will ask you the same question,

22   counsel, on Monday at some juncture.

23             MR. CARNEY:  And with the greatest of respect, I'll

24   give you the same answer.

25             THE COURT:  Well, I'm still going to ask it, counsel.

1          MR. CARNEY:  I understand.

2          THE COURT:  Counsel, let's just move forward.

3          So under any scenario, with you not answering the big

4    question, which I understand at this juncture why you're not

5    answering it, counsel, there's -- either way there's a great

6    likelihood that the jury gets this case at some point next

7    week.

8          MR. KELLY:  Yes, absolutely.

9          THE COURT:  Thank you, Mr. Kelly.  I was actually

12:05 10    asking Mr. Carney.

11          MR. KELLY:  Oh.

12          MR. CARNEY:  Could you repeat the questions, please?

13          THE COURT:  I said, knowing that you're not answering

14    the question about your client now, which at this moment I

15    understand, that regardless of what the answer might be to that

16    question, the jury is likely to get this case next week, at

17    some point next week.

18          MR. CARNEY:  I don't know the answer, your Honor.

19          MR. KELLY:  I do, your Honor.

12:06 20          THE COURT:  Well, I guess the fair thing to say is --

21    the fair thing to say, Mr. Carney, is I think I need to plan as

22    if the jury may get this case next week, and there are a few

23    things, obviously one is the charge conference, which I'm

24    actually not inclined to move off of Monday, but the other

25    thing is alerting, at least giving the jury notice the day

1    before that they need to stay the full day.

2           So let me turn to another topic, which is closing

3    arguments, because I don't think I talked to counsel yet about

4    how much time they anticipate.

5           MR. KELLY:  Yes, your Honor.  Obviously, since the

6    government has opening closing, rebuttal closing, we would want

7    to take both those into account, I think this is perhaps too

8    large an amount of a time, just to be sure I think between the

9    two of them I don't see it going over three hours.  There's a

12:07 10    lot of evidence to summarize in the opening closing, but of

11    course the rebuttal closing is usually shorter.

12           THE COURT:  And did you have any sense of how that

13    would be broken up between the primary closing and rebuttal?

14    Did you have any sense --

15           MR. KELLY:  Mr. Wyshak is going to handle this one if

16    he doesn't cough himself into a tizzy, but he's doing the

17    closing, your Honor.

18           THE COURT:  Okay.

19           MR. WYSHAK:  I think I need at least three hours.  And

12:07 20    again, depending upon what the defense case is and whether or

21    not the defendant testifies, that may alter that, but I would

22    anticipate I would want to save at least half an hour for the

23    rebuttal summation.

24           THE COURT:  So three hours total, counsel?

25           MR. WYSHAK:  I don't want to be handcuffed to that,

1    but that's my estimate.

2              THE COURT:  Okay.

3              Mr. Carney, same question?

4              MR. CARNEY:  We request whatever amount of time you

5    give the prosecutor you give the defense, the same amount of

6    time.

7              THE COURT:  The total amount of time.

8              MR. CARNEY:  Yes, your Honor.

9              THE COURT:  Well, I think, counsel, if we -- well --

12:08 10   okay.  I'll get back to you about that.

11             Counsel, anything else that we should address now?

12             I haven't yet heard you if you need to be heard on the

13   Nee discovery matter, Docket 1187.

14             MR. KELLY:  No, your Honor.

15             MR. CARNEY:  The one matter I'd like to request of the

16   court is that the Court permit Mr. Brennan and I to split our

17   portion of the closings, and I've made this request in other

18   cases in this court, and it's always been granted.  We would

19   remain within the time allotted to the defense, but just split

12:09 20   up the closing, with your permission.

21             THE COURT:  Okay.

22             I will consider that, counsel, but I understand what

23   you're asking.

24             MR. CARNEY:  The sooner we could find out your Honor's

25   ruling, the more important it is.  And we'd be grateful if we

```
 1    could learn this tomorrow.

 2              THE COURT:  Okay.

 3              MR. CARNEY:  Not tomorrow, maybe this afternoon.

 4              THE COURT:  Okay.  Counsel, it's a lot to ask of me

 5    when -- okay.

 6              Counsel, are you splitting the closing and rebuttal?

 7              MR. WYSHAK:  No, your Honor.

 8              THE COURT:  Do you have any position on the splitting

 9    of the closing?

10    MR. KELLY:  I have to think about that.  I have not

11    seen that before, but we'll think about that, and we'll give

12    you an answer sooner than Mr. Carney gives an answer on the

13    witnesses, I'm sure.

14              THE COURT:  Okay.

15              MR. CARNEY:  If I can direct your Honor to a case, the

16    most recent case I tried in this court was United States v.

17    Tarek Mehanna, before Judge O'Toole, and my partner Janice

18    Bassil and I were co-counsel.  He permitted us to split the

19    closing, and we stayed within the time that the government had

20    been allotted for its closing.

21              THE COURT:  I can't think of anything -- I think it's

22    probably a matter that is very much dedicated to my discretion.

23    I can't think of any absolute bar to it.  It doesn't seem

24    particularly objectionable, but I want to think about it.

25              MR. CARNEY:  Yes, your Honor.
```

1          THE COURT:  Counsel, anything else?

2          MR. KELLY:  No, your Honor.

3          THE COURT:  There's one thing I do want to talk to you

4     about at sidebar before we recess for the day.

5          (At sidebar on the record.)

6          THE COURT:  Okay.  Just two things.  This is not why I

7     called you over, but since we're here anyway, Mr. Carney, I'm

8     certainly not trying to be disrespectful to your need to

9     consult with your client and make a very important decision

12:19 10   about whether or not he testifies.

11          Part of the reason I was asking you about the weekend

12     is, I completely understand why you wouldn't give me an answer

13     today and now that the government has just rested, this is,

14     obviously, an important juncture for that decision making.  So

15     when I was asking you about inquiring next week, it was not to

16     put any undue pressure, it's more because I anticipate a

17     scenario at which I'm looking to both sides to both close and

18     charge, and it sounds like, perhaps, as early as Wednesday.

19          Now, I could be completely wrong about that, but given

12:19 20   the proffer that you've made to me about certain of the defense

21     witnesses, I think at least a few of them are going to be very

22     short, and I want both sides to have enough time to

23     appropriately be ready for closing, the Court to be ready for

24     the charge, and frankly, for the jury to know that when they're

25     coming in they will be staying the full day.  Okay?

1          MR. WYSHAK:  And I do think that we are entitled to

2     notice, your Honor.

3          What is Mr. Carney going to do, stand up at the end of

4     Tuesday and either say his client is taking the stand or we're

5     going to sum the next day?

6          I don't think the government should be put in that

7     position.  If we have to prepare for the cross-examination of

8     the defendant, I think we deserve at least some notice of that.

9     If we are to prepare for summation, I think that we're entitled

12:19 10    to know that, too.

11         Now we're on the defense case, we're entitled to the

12     same courtesy that we've been providing to the defendant for

13     the last two months.

14         THE COURT:  I understand the point.  I think -- I

15     didn't necessarily expect an answer today, and I'll inquire

16     again next week, but I understand that there's some

17     decision-making process about whether the defendant takes the

18     stand in his own defense that is different than putting on

19     other witnesses, and I think this is a question that's often

12:19 20    left open and unanswered for prosecutors until fairly late in

21     the case.  So I'll inquire again in the morning.

22         The reason I was, actually, bringing you over was just

23     some logistics about the jury.  We still, knock on wood, have

24     18 jurors in the box.  As you all know, the last six are

25     alternates.  It's my usual practice that after the first day of

deliberation, I usually allow the alternates to go home with
cautionary instructions by me that they're still under the
cautionary instructions and they don't have to return day after
day while the deliberating jury sits.

I think this is a case, given the length of the trial
and the nature of the trial, where it makes sense for me to
keep having the six alternates come back day after day and have
us greet all 18 in the morning, send the deliberating jurors up
to the jury room.  I've made arrangements to have the six
alternate jurors be in a separate room on the other side of the
building.

I may actually allow the six alternates to have their
electronic devices so they're not staring at each other for
however much time the deliberating jury takes.

So I just wanted to mention that in regards to what I
think the plan should be.

And in terms of the jury, once the case is to the
jury, my usual practice is to have them greeted by all of us in
the morning and then around 4:15, 4:30, if we haven't heard
anything otherwise.  I usually have Ms. Hourihan inquire about
what they want to do, whether or not they want to stay some
short period of time or if they want to leave for the day.
Usually they want to leave for the day, and then they'll return
the next day.

MR. CARNEY:  Your Honor, I want to alert you that this

```
 1   week, this weekend, we're going to make a decision on whether
 2   to ask that the jury be sequestered during deliberations.
 3             As the Court knows, in the recent high-profile
 4   Zimmerman case in Florida, the jury was sequestered from the
 5   beginning of the trial until the end of the trial.  We had
 6   considered requesting it for the whole trial, but decided
 7   against it for a number of reasons.  But now with the
 8   unprecedented amount of attention on the case and public
 9   comment on the case and interest of the community in the case,
10   I'm seriously concerned that these jurors, even as well-meaning
11   as they might be, are going to be bombarded by people wanting
12   to offer them their opinion of what the verdict can be.  And I
13   think the only way to shield them from that extraneous pressure
14   is to sequester them.
15             If we intend to do so, we'll be filing a motion on
16   Sunday so that the Court will have our reasons by Monday.
17             MR. KELLY:  And if he files a motion, we will respond,
18   your Honor.
19             THE COURT:  I will wait to see if any motion is filed,
20   and if so, whether -- what the response is on the other side.
21             MR. CARNEY:  I understand.  I just wanted to alert --
22   we may end up not doing it, but I wanted to alert my
23   colleagues.
24             MR. KELLY:  Sure.
25             MR. CARNEY:  And your Honor, of course, that at least
```

1    that's in the mix for decision this weekend.

2            THE COURT:  Okay.

3            MR. KELLY:  And as to the Court's procedure, that's

4    fine by us.

5            The only question I would have is what is the timing

6    of the Court's typical greetings?  Is it 8:45, is it 9:00 with

7    these jurors?

8            THE COURT:  That's a fair question, Mr. Kelly.  It's

9    9:00.

12:19 10         MR. KELLY:  Thank you.

11            Anything else, counsel?

12            MR. KELLY:  No, your Honor.

13            THE COURT:  Have a good weekend.

14            (End of discussion at sidebar.)

15            THE CLERK:  All rise.

16            (Court adjourned at 12:18 p.m.)

17                    - - - - - - - - - - - -

18                        CERTIFICATION

19            I certify that the foregoing is a correct transcript

20    of the record of proceedings in the above-entitled matter to

21    the best of my skill and ability.

22

23

24    /s/Debra M. Joyce              August 3, 2013
       Debra M. Joyce, RMR, CRR       Date
25    Official Court Reporter

```
 1                              INDEX

 2

 3   WITNESS                                              PAGE

 4
     SANDRA LEMANSKI
 5
        Direct Examination                                15
 6      By Mr. Hafer
        Cross-Examination                                 42
 7      By Mr. Brennan
        Redirect Examination                              52
 8      By Mr. Hafer
        Recross-Examination                               54
 9      By Mr. Brennan

10   SCOTT GARRIOLA

11      Direct Examination                                56
        By Mr. Hafer
12      Cross-Examination                                 96
        By Mr. Carney
13      Direct Examination                               106
        By Mr. Hafer
14                        E X H I B I T S

15

16   Exhibit No.          Description              Received

17      91, 97 A, 97   Summary charts                     23
        B
18      730, 735       Checks                             36

19                     Photographs of items received in   61
                       Santa Monica & schematic drawing of
20                     apartment

21      1114 A, 1057   Books                              76
        A
22      1059 A         Fake IDs                           79
        through 1067
23      A, 1068, 1069
        A, 1134
24      through 1136
        A, 1115
25      through 1128
        A, 1070 A
```

1                    INDEX (CONT'D)

2     1139             Cash recovered in Santa Monica          85

3     1093 B and    Guns                                        87
      1098 B
4     1090 B, 1097  Guns                                        87
      B
5     1075 B, 1086  Guns                                        88
      B
6     1077 B, 1092  Guns                                        88
      B
7     1072 B and    Guns                                        89
      1079 B
8     1082 B, 1084  Guns                                        89
      B
9     1073 B, 1100  Guns                                        90
      B
10    1078 B, 1099  Guns                                        90
      B
11    1089 B, 1101  Guns                                        91
      B
12    1083 B, 1091  Gus                                         91
      B
13    1074 B, 1081  Guns                                        92
      B
14    1076 B, 1080  Guns                                        92
      B
15    1085 B, 1088  Guns                                        94
      B
16    1095 B, 1096  Guns                                        95
      B
17    1087 B, 1094  Guns                                        95
      B

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25